IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          )
                                   )
          Plaintiff,               )
                                   )    CR No. 21-83
                                   )    Washington, D.C.
     vs.                           )    July 14, 2021
                                   )    10:17 a.m.
BRANDON FELLOWS,                   )
                                   )
          Defendant.               )
_____    )


TRANSCRIPT OF DETENTION HEARING
BEFORE THE HONORABLE TREVOR N. McFADDEN
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Government:          Mona Furst
                             DOJ-USAO
                             Office of the
                             United States Attorney
                             301 North Main
                             Suite 1200
                             Wichita, KS 67052
                             (316) 269-6481
                             Email: mona.furst@usdoj.gov


For the Defendant:           Cara Kurtz Halverson
                             FEDERAL PUBLIC DEFENDER
                             625 Indiana Ave NW
                             Suite 550
                             Washington, D.C. 20004
                             (202) 208-7500
                             Email: cara_halverson@fd.org

APPEARANCES CONTINUED:

Court Reporter:                 William P. Zaremba
                                Registered Merit Reporter
                                Certified Realtime Reporter
                                Official Court Reporter
                                E. Barrett Prettyman CH
                                333 Constitution Avenue, NW
                                Washington, D.C. 20001
                                (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

1          P R O C E E D I N G S

2          COURTROOM DEPUTY:  The Honorable Trevor N.

3   McFadden presiding.  Please be seated and come to order.

4          Your Honor, this is Criminal Case 21-83,

5   United States of America versus Brandon Fellows.

6          Counsel, please come forward to identify

7   yourselves for the record, starting with the government.

8          MS. FURST:  Good morning, Your Honor.

9          Mona Furst, Assistant United States Attorney

10   representing the United States.

11          THE COURT:  Good morning, Ms. Furst.

12          MS. HALVERSON:  And Cara Halverson representing

13   Mr. Fellows.

14          THE COURT:  Good morning, Ms. Halverson;

15   good morning, Mr. Fellows.

16          We're here for a detention hearing.

17   Ms. Halverson, I guess I'm wondering a little bit if this is

18   necessary.  I feel like you'd agree with me, I've been

19   pretty patient and accommodating along the way.  I've

20   honestly never even seen a third motion for revocation,

21   because judges have typically granted the first or second

22   one.

23          It occurs to me that possibly is in Mr. Fellows'

24   best interests to stop digging at some point and not to have

25   me hear a bunch of witnesses talking about what he's done,

1   but you tell me what you think we need to do.

2           MS. HALVERSON:  Thank you, Your Honor.

3           And I do agree that you've been patient in this

4   case.

5           I have spoken with Mr. Fellows and he does want to

6   elect to put on his case today, as far as the detention

7   hearing.  So he would like to proceed with the proceedings

8   today.

9           THE COURT:  Okay.

10          Ms. Furst.

11          MS. FURST:  Your Honor, as a preliminary matter,

12   we discussed how you would like to proceed since all but one

13   person are officers of the Court.

14          So what we have is Ms. Robinson from PSA,

15   Ms. Rennie and Ms. Kiebart, who are from Albany, the

16   probation officers and supervisor probation officer.  And

17   then we have Ms. Rennie's mother, who, obviously, is a

18   civilian.

19          But since the others are officers of the Court,

20   would you prefer that they just tell you their -- tell you

21   what happened or do you want me to put them under oath and

22   question them?

23          THE COURT:  Ms. Halverson, what's your position?

24          MS. HALVERSON:  My position is I think at this

25   point, we're sort of in legal argument land.  I think that

 1   there's been allegations that have been put out.  I don't

 2   know that we're necessarily challenging what they're saying

 3   happened, it's just a matter of whether or not that's enough

 4   to revoke him.

 5            So I guess I don't know that it's necessary to

 6   call them as witnesses if we're not necessarily challenging

 7   the factual basis, we're only challenging sort of -- from my

 8   perspective, this is a legal argument.

 9            THE COURT:  Okay.  That makes sense to me.

10            So, Ms. Furst, I don't think there's any need to

11   swear in the court officers.

12            MS. FURST:  All right, Your Honor.  Thank you.

13            I'll just go ahead and start with Ms. Robinson and

14   have her tell you her part of it.

15            THE COURT:  Okay.

16            MS. FURST:  Then we'll go to Ms. Rennie,

17   Ms. Kiebart, and then Ms. Rennie can talk about what

18   happened to Mom --

19            THE COURT:  Okay.

20            MS. FURST:  -- if you'd be okay with that, and

21   then Mom doesn't have to worry about it.

22            THE COURT:  Okay.

23            MS. FURST:  All right.

24            THE COURT:  That sounds like that makes sense.

25   Well, let me hear what the Pretrial Services or the

1    Probation Officer has to say and we can decide whether it

2    makes sense to hear from her mother as well.

3                MS. FURST:  Okay.  Thanks.

4                MS. HALVERSON:  Your Honor, if I could, just very

5    quickly.

6                If we're going to have them speak openly in a

7    narrative fashion, I think that's fine.  I just want to make

8    sure that I'm reserving my right to then object for

9    relevancy when that happens.

10               THE COURT:  Of course.

11               And you'd have an opportunity to cross-examine

12   them if you wish.

13               MS. HALVERSON:  Thank you.

14               COURTROOM DEPUTY:  Is it okay if I admit all

15   three?

16               MS. FURST:  Yes.

17               MS. HALVERSON:  Uh-huh.

18               MS. FURST:  And, Your Honor, while we're getting

19   them into the room, I have submitted four exhibits; one is a

20   Word document that contains a text message, and the other

21   three are voicemails.  And I would move to just admit them

22   en masse at this point.

23               MS. HALVERSON:  I would object to their

24   admittance, Your Honor.

25               THE COURT:  You do object?

```
 1                MS. HALVERSON:  I do object.

 2                THE COURT:  Okay.

 3                Well, why don't you kind of -- I saw those, they

 4      honestly didn't make a lot of sense to me.  So maybe you

 5      can --

 6                MS. FURST:  I can explain to you my purpose in

 7      providing them.

 8                THE COURT:  All right.

 9                Well, why don't you do that as they come up and we

10      can deal with the objection.

11                MS. FURST:  Okay.  Thank you.

12                All right.  So, Your Honor, this is -- we will be

13      calling Ms. Robinson first -- or not calling, but asking her

14      to talk.

15                THE COURT:  Okay.

16                Good morning, Ms. Robinson.

17                MS. ROBINSON:  Good morning, Your Honor.

18                THE COURT:  And can you state your name and

19      position for the record, ma'am.

20                MS. ROBINSON:  Sure.

21                Takeysha Robinson, supervisor, Pretrial Services

22      Office in U.S. District Court.

23                THE COURT:  Okay.

24                MS. FURST:  So, Ms. Robinson, could you spell your

25      full name for the reporter, please.
```

1          MS. ROBINSON:  Sure.

2          T-a-k-e-y-s-h-a, R-o-b-i-n-s-o-n.

3          MS. FURST:  And, Ms. Robinson and Ms. Kiebart and

4    Ms. Rennie, what the Court and counsel have decided is,

5    I'm not going to question you.  The Court sees you as

6    officers of the Court.  So you can just tell the judge what

7    happened.

8          Ms. Robinson, we'll start with you and then we'll

9    go to Ms. Rennie and then we'll go to Ms. Kiebart.

10         Ms. Rennie and Ms. Kiebart, there are exhibits

11   that I want to admit through you, so there will be some

12   questioning in order to lay that foundation, and then I'll

13   move to admit them, Ms. Halverson will file her objection,

14   and the Court will rule.

15         But as far as Ms. Robinson is concerned, the

16   petition and your part of it, the petition's part of the

17   court file, so we don't have to admit that.

18         So, Ms. Robinson, if you would just go ahead and

19   tell the judge what happened on June 14th and what you know

20   about the defendant, how he came to be supervised by PSA and

21   forward.

22         MS. ROBINSON:  Okay.

23         Takeysha Robinson, Pretrial Services.

24         The defendant became a client back in January,

25   I believe.  And throughout his supervision period, there

1    have been several issues with the defendant.

2            We attempted to work with the defendant outside of

3    the court to regain compliance, and there was a lot of

4    pushback.  And so then what I instructed my employee, who

5    was actually the D.C. supervising case manager of the

6    defendant, was to file a petition -- I'm sorry, file a

7    report with the Court at that time asking that the defendant

8    be removed because of the continued behavior that the

9    defendant exhibited.  That has happened a couple of times.

10   The defendant was warned a couple of times by the Court, as

11   well as by Pretrial in New York.

12           We got to June the 14th, and I received a phone

13   call from the supervisor in New York, Ms. Kiebart,

14   indicating that the defendant was informed -- well, he told

15   them that morning that he was not going to come --

16   I'm sorry, that he was unable to make his appointment.

17           So when she contacted -- when Ms. Rennie contacted

18   the defendant to find out --

19           MS. HALVERSON:  I was going to make an objection.

20           It sounds like she's going to be talking about

21   hearsay, and I would prefer that Ms. Rennie be the one to

22   talk about what she actually had on that phone call.

23           THE COURT:  Okay.

24           Is Ms. Rennie going to speak in a minute?

25           MS. FURST:  She is, Your Honor.

1          But, you know, I would submit under Federal Rule

2    of Evidence 1101 that hearsay is admissible, but Ms. Rennie

3    will be testifying.

4          THE COURT:  I agree.

5          MS. FURST:  This is just Ms. Robinson telling you

6    what she understood was going on that led to the petition

7    for warrant being filed.

8          THE COURT:  Okay.  Objection overruled.

9          You may continue, ma'am.

10          MS. ROBINSON:  Okay.

11          And so when I received the phone call, I was asked

12    what could be done.  And so what they had to do was give me

13    the history of what occurred that day, starting from that

14    morning.

15          And that morning was when Ms. Rennie contacted the

16    defendant and questioned the defendant about why he canceled

17    his appointment for the mental health appointment.

18          And the defendant, at that point, told her his

19    reasons why he canceled the appointment, asked if he could

20    go out on a job, she denied that, and then a little while

21    later, he was contacted and told to come into the office by,

22    I believe it was Ms. Kiebart.

23          And soon after he was contacted by Ms. Kiebart to

24    make his way into the office, the phone call was made to

25    Ms. Rennie's family member, and at that point, based on the

1    history that the defendant had previously exhibited,

2    comments that the defendant had made, I felt like the

3    defendant was a danger to the community, and submitted the

4    petition for warrant.

5            MS. FURST:  Can I?  May I, Your Honor?

6            THE COURT:  Yes, ma'am.

7            MS. FURST:  Ms. Robinson, could you tell the

8    Court, when you say based on information that you had, you

9    decided he was a danger, could you elaborate on that,

10   please, and tell the judge what specific things led you to

11   believe he was a danger?

12           MS. ROBINSON:  Okay.

13           The defendant has previous arrests for

14   harassment -- harassment cases.  And then there was

15   information that was provided that the defendant had

16   previously contacted -- I'm sorry, had previously used the

17   phone number of a judge that was presiding over a case that

18   the defendant was a party to.  And so at that point, this

19   was an obvious pattern.

20           MS. FURST:  All right.

21           So to make that a little bit clearer, as

22   I understand what you're telling the Court, defendant had an

23   appointment -- when we say "defendant," we're talking about

24   who?

25           MS. ROBINSON:  Mr. Fellows.

1          MS. FURST:  Brandon Fellows.  Okay.

2          MS. ROBINSON:  That is correct.

3          MS. FURST:  He had an appointment on June 14th for

4   a mental health evaluation; is that correct?

5          MS. ROBINSON:  That is correct.

6          MS. FURST:  And was that a court-ordered condition

7   of his release?

8          MS. ROBINSON:  That was.

9          MS. FURST:  Was that a condition that was added at

10  the second motion for revocation held June 4th?

11         MS. ROBINSON:  Yes, it was.

12         MS. FURST:  And so did he -- to your

13  understanding, did he make that appointment -- did he go to

14  that appointment?

15         MS. ROBINSON:  He did not go to the appointment.

16         MS. FURST:  Did he cancel the appointment?

17         MS. ROBINSON:  It is my understanding that he

18  canceled the appointment.

19         MS. FURST:  Okay.

20         And so after that, there were phone calls and some

21  contact.  And we'll have Ms. Rennie go into that.

22         But the harassment arrest, as well as calling --

23  or leaving a number for -- that was to the judge's wife in

24  the harassment case led you to believe that he was a danger?

25         MS. ROBINSON:  Yes.

1          MS. FURST:  And do you know any more specifics

2    about the judge's wife phone call?

3          MS. ROBINSON:  The specifics that I know from one

4    of the documents that I read was that the defendant was,

5    I believe, in a -- like in the Clerk's Office somewhere and

6    was told to fill out a form to include the information of

7    his contact information, and the phone number that he put

8    down on that form was the phone number to the wife of the

9    judge.

10         MS. FURST:  So when the clerk tried to call the

11   defendant, it rang to the judge's wife's office; is that

12   your understanding?

13         MS. ROBINSON:  That is my understanding.

14         MS. FURST:  All right.

15         And so on June 14th, were you also aware of other

16   behaviors by the defendant that had happened previously that

17   led you to believe he may be a danger?

18         MS. ROBINSON:  Yes.

19         The defendant has made several comments; the

20   defendant has left voice messages.  It was a constant

21   throughout.

22         And like I said, we attempted to resolve it with

23   the defendant and defense counsel, and to no avail, we are

24   at this point.

25         MS. FURST:  All right.

1          And, Your Honor, I'll go into more detail maybe

2     with Ms. Rennie.

3          THE COURT:  Okay.

4          Did you have any questions for Ms. Robinson,

5     Ms. Halverson?

6          MS. HALVERSON:  Just briefly.

7          Good morning, Ms. Robinson.

8          Is it your understanding that Mr. Fellows -- you

9     said that he canceled his appointment for mental health

10    evaluation?

11         MS. ROBINSON:  Good morning.

12         Yes, that is my understanding.

13         MS. HALVERSON:  And did he reschedule it?

14         MS. ROBINSON:  At the time, I wasn't sure if the

15    appointment was rescheduled or not.

16         MS. HALVERSON:  Are you aware now?

17         MS. ROBINSON:  If you're telling me that it's

18    rescheduled.

19         MS. HALVERSON:  So you have not been made aware

20    one way or the other whether or not he's rescheduled that

21    appointment?

22         MS. ROBINSON:  I do believe that there was some

23    reschedule.  But when the phone call was made, that was not

24    the -- that part of the conversation.

25         It was just the appointment was canceled, he asked

1  to go to work, he was denied to go to work because he did

2  not make the appointment, which is kind of what he has been

3  doing the entirety of his supervision.  When he doesn't want

4  to go to take a drug test or doesn't want to go and do

5  something, he doesn't do it.  And so going to work that day

6  was denied, and then we later on got into the part where he

7  reached out to the defendant's family member.

8           MS. HALVERSON:  All right.

9           So just to back up a little bit, Ms. Rennie never

10  told you that he rescheduled his appointment prior to you

11  filing the petition for revocation?

12           MS. ROBINSON:  I did not ask that question, but

13  that was not -- to my remembrance, that was not a part of

14  the conversation.

15           MS. HALVERSON:  Okay.

16           Additionally, you noted in the -- you wrote the

17  pretrial petition for revocation, correct?

18           MS. ROBINSON:  That is correct.

19           MS. HALVERSON:  And you cite what I think you put

20  as an outline of an email from a case, and that's the case

21  in upper state New York?

22           MS. ROBINSON:  That's correct.

23           MS. HALVERSON:  And did you provide that -- the

24  full email to anybody or did you just include the summary?

25           MS. ROBINSON:  Just the summary.

1            MS. HALVERSON:  And you crafted the summary

2    yourself?

3            MS. ROBINSON:  No.

4            I received the information -- well, part of the

5    summary came from Ms. Kiebart.

6            MS. HALVERSON:  Okay.

7            So Ms. Kiebart crafted the summary?

8            MS. ROBINSON:  The email that was sent to me that

9    is -- yes.

10           MS. HALVERSON:  I just want to understand how many

11   hands were on this.

12           So, Ms. Kiebart, and I'll ask her that as well,

13   but your understanding is that the summary of the email that

14   was provided is a summary that Ms. Kiebart drafted based on

15   email that she received from somebody else?

16           MS. ROBINSON:  And that is typical when a case is

17   being courtesy supervised.

18           MS. HALVERSON:  Right.

19           But is that correct?

20           MS. FURST:  Well, Your Honor, I'm going to object.

21           I think, first of all, it's a compound question,

22   and, secondly, it's asking for speculation as to where

23   Ms. Kiebart got the information.

24           THE COURT:  Overruled.

25           MS. HALVERSON:  So you can answer the question.

1          MS. ROBINSON:  Yes.

2          So the email was provided to me when I asked for a

3     summary of what happened.

4          MS. HALVERSON:  Okay.

5          THE COURT:  And, I'm sorry, we're talking about

6     the February 22nd, 2021, email, is that this --

7          MS. HALVERSON:  The Court's indulgence.

8          THE COURT:  -- that talks -- I just want to make

9     sure I understand what we're all talking about.

10          MS. HALVERSON:  Yeah.

11          So what I'm talking about is there is a note, it's

12     the fourth paragraph down, it says:  "The following is an

13     outline of an email that one of the NYNP presentence

14     investigators sent to the U.S. magistrate judge."  And then

15     it is in quotes and talks about conduct.  And that's the

16     email that I'm talking about.

17          Is that an email that was sent to you directly

18     from this person or was it sent to you through Ms. Rennie?

19          MS. ROBINSON:  That was sent to me through --

20     I believe it was Ms. Kiebart.  I would have to look back at

21     the name of the person that sent it to me, but it was sent

22     from that office.

23          MS. HALVERSON:  And it says it's an outline of an

24     email.  What did you mean by "an outline of an email"?

25     Is it the full email that was sent to them or is it a

1    summary that -- do you understand it to be drafted?  I'm

2    just wondering about that word "outline" that you used.

3              MS. ROBINSON:  The word "outline" is -- meaning

4    it's not the email in its entirety.

5              MS. HALVERSON:  Okay.

6              So there is part of the email that is not included

7    in this?

8              MS. ROBINSON:  That's a possibility.

9              Like I said, I asked for a summary so that I could

10   get the -- provide the Court with the information, and that

11   was the summary that was provided to me.

12             MS. HALVERSON:  From Ms. Rennie or Ms. Kiebart?

13             MS. ROBINSON:  Yes.

14             MS. HALVERSON:  Okay.

15             And are you aware if charges were brought against

16   Mr. Fellows regarding his conduct?

17             MS. ROBINSON:  For the -- with the phone number?

18             MS. HALVERSON:  Uh-huh.  Yes.

19             MS. ROBINSON:  I'm not aware if charges were

20   brought, but I know it was in connection with the case, and

21   I do understand that the judge was removed from the case and

22   the case was reassigned.  So I don't know if charges were

23   brought or not.

24             But I do know that there are pending charges, the

25   last information that I have, but I'm not sure who it's in

1  connection to.

2          MS. HALVERSON:  Are you talking about the petty

3  theft charges?

4          MS. ROBINSON:  No.

5          There is a pending -- let's see.

6          There is a pending -- there looks like there is a

7  pending harassment, and I believe that that is the case that

8  -- the 2019 case that is in connection with the judge.  But

9  like I said, I don't know who the parties are to that case.

10          MS. HALVERSON:  So my understanding is it's a

11  contempt charge that's pending.  He has two pending charges;

12  one's a contempt charge and one's a petty larceny charge.

13  The petty larceny charge is for conduct that occurred after

14  he was placed on pretrial -- or, I'm sorry, before he was

15  placed on pretrial supervision, so I'll sort of skirt around

16  that.

17          But as far as the contempt-of-court charge, you're

18  not aware of whether or not the judge or his wife is a party

19  to that --

20          MS. ROBINSON:  That is correct.

21          MS. HALVERSON:  -- or whether or not that contempt

22  charge at all relates to the conduct that was part of the

23  summary outline of an email that somebody sent to Ms. Rennie

24  or Ms. Kiebart?

25          MS. ROBINSON:  No.

1            So my understanding is that email is a part of

2    what happened in the judge that was assigned to that 2019

3    case, where there's one count for criminal contempt and

4    another count for harassment, seriously annoying.

5            MS. HALVERSON:  Okay.

6            I guess I'm just trying to get clarity.  And I

7    don't want to waste anybody's time, but just to make sure

8    the record's clear, you're not aware if that contempt or

9    harassment charge has anything to do with the conduct that

10   was outlined in this email?

11           MS. ROBINSON:  Correct.

12           MS. HALVERSON:  Okay.

13           No further questions.

14           THE COURT:  Thank you, ma'am.

15           MS. FURST:  Thank you, Judge.

16           So, Ms. Robinson, in the petition, the summary

17   that you placed from the email you got from the Northern

18   District of New York, that summary says that police were

19   called because Mr. Fellows was --

20           MS. ROBINSON:  Following someone.

21           MS. FURST:  -- following a woman who apparently

22   was an ex-girlfriend.  Is that your understanding?

23           MS. ROBINSON:  That is correct.

24           MS. FURST:  She called the police, police went out

25   to investigate, they saw that cars were following each other

1    in a parking lot; is that right?

2              MS. ROBINSON:  Correct.  That's correct.

3              MS. FURST:  And they ran Mr. Fellows and found

4    that there was a protection order against him;

5    is that correct?

6              MS. ROBINSON:  That is correct.

7              MS. FURST:  And that's in Guilders Town [sic],

8    New York.

9              MS. ROBINSON:  New York.

10             MS. HALVERSON:  And, Your Honor, we would object

11   to this line of questioning at this point.  He's got a

12   conviction for that.  I don't know that we need to go into

13   the specifics of the conduct of that.

14             THE COURT:  Okay.

15             I mean, I can read the email or whatever this is,

16   as well as either of you.

17             MS. FURST:  Yes, Your Honor.

18             I just feel it was a little convoluted, especially

19   when it comes to the contempt, if I could just follow

20   through on the actual facts, because I believe the contempt

21   came -- if I may proffer.

22             THE COURT:  Sure.

23             MS. FURST:  So in August of 2019, the police are

24   called to this situation where the female victim said this

25   man's following me.

22

1          THE COURT:  Right.

2          MS. FURST:  Police go there, they learn that

3    Mr. Fellows, there's a protection order from this victim

4    against him, so that was already in place.

5          And then I believe the contempt came because he

6    allegedly violated the order by following her on that date.

7    And I'm not sure; Ms. Halverson probably knows more than I

8    do.  But at any rate, that is a totally separate matter than

9    calling the -- putting down the judge's phone number.

10          If I may continue with the proffer, I can --

11          THE COURT:  Okay.

12          Yeah.  But I think Ms. Halverson's point was, he

13   was not charged or anything in relating to -- in relation to

14   this call of the judge's wife.

15          MS. FURST:  Right, Your Honor.

16          And what I wanted to proffer was that he was not

17   charged; however, the judge did make a police report.  And

18   so that is of record, and then the Judge asked to be removed

19   from the case.

20          THE COURT:  Okay.

21          MS. FURST:  But that is correct, there was not any

22   charges?

23          I believe the contempt was for violating the

24   protection order.

25          THE COURT:  Okay.

```
1              MS. FURST:  Thank you.

2              THE COURT:  Thanks.

3              All right.  Are we moving on, Ms. Furst?

4              MS. FURST:  If I may have a moment.

5              THE COURT:  Sure.

6              MS. HALVERSON:  The Court's indulgence.

7              I'm not exactly sure what the rules are, but I

8     just wanted to whisper to my client, which normally I would

9     do when he's next to me, but if I can just go around the

10    table --

11             THE COURT:  That's fine.

12             MS. HALVERSON:  Okay.

13             THE COURT:  I think all of that stuff is there to

14    protect you.

15             MS. HALVERSON:  Yeah.  Well, I appreciate that.

16             MS. FURST:  I don't think I have any -- I don't

17    think I have anything else for Ms. Robinson, Your Honor.

18    Ms. Halverson may have something more.

19             THE COURT:  Okay.

20             Well, I think we're ready to move on to your next

21    witness.

22             MS. FURST:  Okay.

23             THE COURT:  Thank you, Ms. Robinson.

24             MS. FURST:  Your Honor, then we will ask

25    Ms. Kendra Rennie to step up.
```

1            And is that Kendra?

2            Is Kendra there?

3            All right.  Well, it looks like -- I've never meet

4     these folks, Your Honor.  I'm guessing this is Ms. Kiebart.

5     Is Ms. Kiebart there?  Yes, she raised her hand.

6            All right.  We'll go forward with her.

7            We can't hear you.

8            THE COURT:  It looks like she can't hear us.

9            MS. FURST:  And Ms. Rennie is just totally not

10    there, I guess.

11           MS. RENNIE:  Can you hear me now?

12           THE COURT:  Yes.

13           MS. RENNIE:  Sorry, it said that you guys had to

14    give me permission.

15           MS. FURST:  All right.

16           Is there maybe a permission for Ms. Rennie, too?

17           COURTROOM DEPUTY:  I don't see that on my end.

18           MS. FURST:  Okay.

19           Judge, if I may ask Ms. Kiebart if she knows where

20    Ms. Rennie is.  Maybe if they're both in the office,

21    Ms. Rennie then can come up to the Zoom.

22           THE COURT:  Okay.  Sure.

23           MS. FURST:  Ms. Kiebart, are you at your office?

24           MS. KIEBART:  Yes, I am.

25           MS. FURST:  Is Ms. Rennie there by any chance?

1           MS. KIEBART:  No, she is not, but I can get ahold

2    of her.

3           MS. FURST:  Okay.

4           I'm not sure why the Zoom -- maybe if you can ask

5    her to just call in to the Zoom, that might help, on the

6    phone.

7           THE COURT:  So it looks like -- I mean, I think

8    this black screen is her down there.  We need to get her

9    video moving.

10          And there should be a button -- Ms. Rennie,

11   I don't know if you can hear me, but on the lower left-hand

12   corner, there is a video icon that you need to click on and

13   a microphone that you need to click on.

14          MS. KIEBART:  If I may speak, she said she's

15   rejoining.

16          THE COURT:  Okay.

17          MS. FURST:  Okay.

18          Well, Judge, we can go forward with Ms. Kiebart.

19          THE COURT:  Okay.

20          MS. FURST:  We can do that.

21          And, Ms. Kiebart, we're sort of doing this proffer

22   question and narrative.

23          Why don't you start with who you are, how you are

24   connected to Mr. Fellows, and just go down and tell the

25   judge what you know about this incident and what's alleged

1   in the petition.

2          MS. KIEBART:  Good morning.  My name is Jeannine

3   J-e-a-n-n-i-n-e.  Last name Kiebart, K-i-e-b-a-r-t.  I'm a

4   supervising U.S. Probation officer in the Northern District

5   of New York.  And I am currently Kendra Rennie's supervisor.

6   And I have 22 years --

7          MS. FURST:  I'm sorry, I'm having so much

8   feedback, I can't hear it.

9          THE COURT:  It looks like we have Ms. Rennie.

10         Ms. Rennie, can you mute for the moment there.

11         There.  Thank you.  We'll let you know when you're

12   up.

13         MS. KIEBART:  Thus far, what I was saying?

14         THE COURT:  Yeah, please continue, Ms. Kiebart.

15         MS. KIEBART:  Okay.

16         I come to know Mr. Fellows, as I am the supervisor

17   for PO Rennie.

18         I don't know what direct line of questioning, but

19   my first contact with him was back in April of -- April 5th

20   of 2021.

21         At that time, I received a voicemail from him in

22   reference to PO Rennie directing him to report weekly with

23   his job-search logs.  It was about a five-minute

24   conversation.  I don't know if we're able to play that

25   conversation or if you want me just to tell you what was in

1   that five-minute voicemail.

2           MS. FURST:  All right.

3           And, Your Honor, at this point, I would move to

4   admit Government's Exhibit 4, which is the voicemail that

5   Ms. Kiebart is referring to.  She received it Monday,

6   April 5th, approximately 4:19 p.m. from the defendant's

7   phone number.  Let me just lay one more piece of foundation.

8           Are you aware -- I can't pull the screen up so you

9   cannot look at the person sitting in the courtroom, I don't

10  know how to identify him for you.

11          MS. KIEBART:  I can identify him.

12          MS. FURST:  Your Honor --

13          THE COURT:  You might be able to see the

14  courtroom.  Can you?

15          MS. KIEBART:  Yes.

16          THE COURT:  Yeah.

17          MS. KIEBART:  Yes, Your Honor.

18          Mr. Fellows is the gentleman in the orange

19  jumpsuit wearing his mask below his lips.

20          MS. FURST:  All right.

21          And nodding his head?

22          MS. KIEBART:  Correct.

23          MS. FURST:  Thank you for that identification.

24          And at the time, did your office have a cell phone

25  number by which he would contact your office?

1          MS. KIEBART:  Yes, we did.

2          MS. FURST:  And the voicemail, Exhibit 4, that we

3  are going to move to admit, did that come from the

4  defendant's cell phone number that was on record in the

5  office in Albany?

6          MS. KIEBART:  Yes, it did.

7          MS. FURST:  All right.

8          Albany was doing courtesy supervision, correct?

9          MS. KIEBART:  That is correct.

10          MS. FURST:  And that is because defendant lived in

11  the Northern District?

12          MS. KIEBART:  That is correct.

13          MS. FURST:  Okay.

14          And this voicemail came to you, and this was your

15  first experience, direct experience with the defendant;

16  is that correct?

17          MS. KIEBART:  That is correct.

18          MS. FURST:  Your Honor, we would move to admit

19  Government's Exhibit 4.

20          MS. HALVERSON:  We would object, Your Honor.

21          We've had two revocation hearings before -- or

22  after that voicemail was left.  That was never raised.

23  I don't see now why it's relevant information.

24          I don't think the government is proffering that he

25  made any threats towards anybody in that voicemail message.

1   I think this is really just to sort of inflame the passions

2   to show that Mr. Fellows is rude, and, again, I don't think

3   that has any bearing on whether or not he's a danger to the

4   community.  So I would submit that this isn't relevant

5   information.

6           THE COURT:  All right.

7           I don't think my passions will be inflamed.

8   Overruled.

9           MS. FURST:  Okay.

10          And, Ms. Kiebart, you've listened to this

11  voicemail, correct?

12          MS. KIEBART:  That is correct.

13          MS. FURST:  And it's a true and accurate

14  representation of the one you received that day?

15          MS. KIEBART:  That is correct.

16          (Audio played)

17          MS. FURST:  Ms. Kiebart, after you --

18          (Audio played)

19          THE COURT:  It sounds like it's just starting up

20  again.

21          MS. FURST:  Sorry, Your Honor.

22          Ms. Kiebart, so he ran the message out, the

23  voicemail; is that correct?

24          MS. KIEBART:  That is correct.

25          MS. FURST:  And are you aware of whether or not he

1    did that on a regular basis?

2            MS. KIEBART:  I know he has done it to Ms. Rennie

3    in the past.

4            MS. FURST:  And after you heard this voicemail,

5    was there anything about this voicemail that caused you

6    alarm?

7            MS. KIEBART:  Yes.

8            And not just alarmed, but concerned and disturbed,

9    I think, are appropriate words as well.

10           As you heard, it's a lengthy voicemail.  In that

11   time, he made reference to my sex drive, which to me I

12   construed it as sexual harassment.

13           I had concerns about his anger and any kind of

14   perceived threats.  He made mention of wanting to fight

15   people on the bus, random people, just over wearing masks.

16           He made statements that he's getting more and more

17   angry with us, and I'm taking "us" as my department, and

18   specifically Ms. Rennie.

19           He made reference to the way that Officer Rennie

20   conducts her job as that of the Nazis, in that he would tell

21   them to kindly fuck off.

22           All those statements has caused me to have

23   concerns.  And to be honest, as the case progressed and as I

24   saw a pattern, those concerns increased even more so than

25   when I initially received the email or the voicemail.

1              MS. FURST:  All right.

2              And after this April 5th voicemail, did you

3      contact Mr. Fellows?

4              MS. KIEBART:  Yes, I did.

5              MS. FURST:  Could you tell the Judge when you did

6      that and what you talked about?

7              MS. KIEBART:  I called him back on his reported

8      phone number the following day, on April 6th, at around

9      11:20 a.m.

10             At that point, I had more of a brief conversation

11     with him.  I told him that he needs to follow Officer

12     Rennie's instructions, which means if she's telling him to

13     report, he needs to report.

14             And I listened to his concerns regarding the

15     reporting, but, again, told him what his directives were and

16     that he needed to follow Officer Rennie's directives.

17             At that point, he told me to enjoy my shitty job

18     and ended the conversation.

19             MS. FURST:  All right.

20             And he was unhappy with Ms. Rennie because of her

21     requiring him to come in to report his job search;

22     is that correct?

23             MS. KIEBART:  That's correct.

24             MS. FURST:  And you had contact again with him on

25     April 30th, where he was in the lobby but didn't have a

1    mask?

2            MS. KIEBART:  That is correct.

3            MS. FURST:  Could you tell the Judge about that

4    contact?

5            MS. KIEBART:  The officers -- sure.

6            The Court Security Officers requested me to come

7    downstairs to provide Mr. Fellows with a mask so that he can

8    enter the building.

9            By the time I arrived, he was having a

10   conversation with the security officers regarding a small

11   knife that he kept on his keychain.

12           He was providing them with resistance on why he

13   needed to remove that knife.  He did, in fact, remove it

14   when I gave him the directive to do so.

15           I provided him with a mask.  We walked upstairs.

16   And during our conversation upstairs, I instructed him that

17   he is -- his behavior is not appropriate and he did at that

18   time tell me that he was sorry that he took his frustrations

19   out on me during the phone conversations.

20           MS. FURST:  All right.

21           And then you had contact with him again on

22   June 14th -- or that's not true.

23           Was there an issue that arose on June 14th of 2021

24   concerning Mr. Fellows?

25           MS. KIEBART:  Yes, there was.

1      MS. FURST:  And go ahead and tell us.

2      MS. KIEBART:  Officer Rennie came to me --

3      MS. FURST:  Go ahead.

4      MS. KIEBART:  I'm sorry.

5      Officer Rennie came to me visibly upset, advising

6  me that Mr. Fellows made reference to her hormones.

7      At that time, I told Officer Rennie that I was

8  going to call Mr. Fellows myself and direct him to report

9  that day and that I would be providing him with a new

10  officer.

11      On that same day around June 14th, around

12  2:24 p.m., I did call Mr. Fellows on his reported phone

13  number and directed him to report on the office to come see

14  me.

15      MS. FURST:  And we have some documents that have

16  his reported phone number redacted.

17      And, Your Honor, for the record, those are

18  documents 32 in our file, which were the -- it was my motion

19  for judicial knowledge -- and then to include in the record

20  the documents from the New York initial appearance and

21  detention hearing.

22      And in those documents, Ms. Kiebart, the reported

23  phone number is redacted; however, are you familiar with the

24  full phone number?

25      MS. KIEBART:  Yes, I am.

1          MS. FURST:  And the number that you called was the

2    full, correct phone number for the defendant?

3          MS. KIEBART:  Yes, it was.

4          MS. FURST:  Okay.

5          And in that conversation, what did you tell the

6    defendant?

7          And you said it was 2:24 on June 14th?

8          MS. KIEBART:  That is correct.

9          It was a very short conversation.  I gave him

10   explicit instructions to report to my office to see me at

11   3:45 p.m. that same day.

12         MS. FURST:  And your intent at that time was to

13   give him a different probation officer to report to?

14         MS. KIEBART:  That is correct.

15         MS. FURST:  Okay.

16         Did anything happen after that where Ms. Rennie

17   came to you again?

18         MS. KIEBART:  Yes.

19         I was in a meeting with our Deputy Chief and

20   another supervising officer.  Ms. Rennie came in extremely

21   upset; she was actually shaking and emotional.  I could tell

22   that something tragic had happened, but I did not know what.

23   We stopped our meeting and all of us addressed Ms. Rennie to

24   see what was going on.

25         At that point, we learned that her mother had

1    called her and indicated that Mr. Fellows, which we later

2    identified as him through her caller ID, contacted her,

3    wanting to know if this was Kendra Rennie's number.

4              MS. FURST:  And you said Ms. Rennie was upset.

5              Did you do anything after you learned what had

6    happened?

7              MS. KIEBART:  Yes.

8              Myself and the Deputy Chief and Ms. Rennie and

9    another supervisor all reached out to Pretrial Services

10   office in Washington to advise of the situation and to

11   request a warrant.

12             MS. FURST:  And why did you want a petition and a

13   warrant?

14             MS. KIEBART:  We were concerned for safety at that

15   point.

16             MS. FURST:  So other than the April 30th call that

17   we -- I'm sorry, April 5th call, Exhibit 4 that we talked

18   about, and then the call about hormones, was there anything

19   else that went into your concern that led you to believe the

20   defendant might be a danger?

21             MS. KIEBART:  Yes.

22             I became Kendra's supervisor in March, so I

23   learned about the case back then.  And it seemed to be a

24   pattern with how Mr. Fellows has been treating Ms. Rennie,

25   making sexual innuendo comments, talking to our

1  UA technician in a manner that's inappropriate.

2          He recently had revocation proceedings in front of

3  the Court where some of those issues were addressed.  So at

4  this point, I was seeing a pattern.

5          MS. FURST:  And you're talking about the June 4th

6  hearing and the voicemail where he described his genitalia?

7          MS. KIEBART:  That is correct.

8          MS. FURST:  All right.

9          And were you aware of an incident that happened in

10 Guilders Town with another female?

11         MS. KIEBART:  Yes.

12         A bail report writer indicated and got information

13 that was provided to Ms. Rennie and also our court in the

14 Northern District of New York that there was a situation in

15 Guilderland where he wrote down the Presiding Judge's wife's

16 phone number as his personal contact information.

17         MS. FURST:  And do you know whether or not that

18 was the case that arose from his violation of a protective

19 order against an ex-girlfriend?

20         MS. KIEBART:  Yes, it was.

21         MS. FURST:  All right.

22         And after this incident with Ms. Rennie and her

23 mother, you contacted D.C.  Did you contact D.C. to ask them

24 about the warrant?

25         MS. KIEBART:  It was a joint phone call, so I

1    could see where there was some confusion.

2          The Deputy Chief was on the phone call.  So we

3    called from her office, and myself, Kendra, and another

4    supervisor, Michael Patnaude.

5          So, yes, we all were calling up.

6          MS. FURST:  And did anybody email Ms. Robinson any

7    information in reference to Ms. Halverson's questions

8    earlier?

9          MS. KIEBART:  Yes, that was our Deputy Chief,

10   Christine Connolly.  She was operating off of her computer

11   and her email, with us providing her with the information.

12         MS. FURST:  All right.

13         And after this happened, did the defendant report

14   at 3:45?

15         MS. KIEBART:  He reported later than 3:45, but he

16   did report.

17         MS. FURST:  And what happened at that time?

18         MS. KIEBART:  We did not receive a warrant, so he

19   did wait in our waiting area for a while, at which point

20   around 5:30, I did tell him that he was going to be given a

21   new officer, that new officer was not available, and that he

22   needed to report the following day, and that he was to see

23   Christine Connolly -- Christine Connolly is a Deputy Chief

24   in our office -- at which point he told me that he thought

25   he was going to be getting a male officer and that he has

1    more respect for male officers.

2           MS. FURST:  And when the warrant did not occur,

3    was there a point when Mr. Fellows left your office?

4           MS. KIEBART:  Right after that comment, he did

5    leave.

6           Our Deputy Chief, Christine Connolly, followed him

7    out to escort him out the building, at which time he made

8    reference to me as blondie.

9           MS. FURST:  And after that occurred, did you have

10   more conversations with Ms. Rennie about what had happened

11   with her mother -- and what had happened?

12          MS. KIEBART:  Yes.

13          MS. FURST:  Okay.

14          Can you tell the Court what your understanding

15   was?

16          MS. KIEBART:  Yes.

17          Her mother was extremely upset as well.  She was

18   concerned for her safety, and Ms. Rennie was going to go

19   pick her mother up that evening.

20          MS. FURST:  Did her mother live in another state?

21          THE COURT:  I'm sorry, are we going to hear from

22   Ms. Rennie?

23          MS. FURST:  We are, Your Honor.

24          THE COURT:  Okay.

25          Let's move this along.

1          MS. FURST:  We'll move on.

2          Did you yourself have any further contact with the

3   defendant on June 14th?

4          MS. KIEBART:  Yes, I did.

5          MS. FURST:  What was that?

6          MS. KIEBART:  I received a phone call from

7   Ms. Rennie indicating that Mr. Fellows had reached out to

8   her and sent her a screenshot of his Google search of her.

9   And I told her that I will call him directly and tell him to

10  cease contact with her unless it's location-monitoring

11  related.

12          So at around 7:06 p.m. on June 14th, I called

13  Mr. Fellows on his reported phone number and told him that

14  he is not to have any more contact with Ms. Rennie unless

15  it's strictly related to location-monitoring concerns.

16  I provided him with my direct line and number so that he can

17  call me with any issues.

18          I asked him to repeat back those directive, so I

19  wanted to make sure he had a very clear understanding, and

20  he told me that he records all his conversations, including

21  this one.  He did, though, repeat back my directives.

22          He did inquire at that time if the reason I'm

23  calling him was in reference to him reaching out to her

24  family member.

25          MS. FURST:  May I have one moment, Your Honor?

1           THE COURT:  Yes.

2           MS. FURST:  Your Honor, I'll turn this witness

3    over.

4           THE COURT:  Okay.

5           Ms. Halverson.

6           Good morning -- are we still in the morning?  Yes.

7           So thank you for being here today.  I just have a

8    couple questions for you and then, hopefully, you'll be able

9    to relax a little bit.

10          So just to sort of go back, you said that the

11   email that was written to Ms. Robinson was a summary that

12   was provided by Officer Connolly from your office?

13          MS. KIEBART:  So that's a two-part question.

14          The summary -- if you're talking about the

15   outline, that was an outline done by Ms. Inman in my office,

16   which I referenced to, is a bail report presentence writer.

17          The email that outlined a lot of the violation

18   behavior above that came from my Deputy Chief, if that makes

19   sense.

20          MS. HALVERSON:  Sort of.

21          So I just -- so I guess my point is that there was

22   multiple people that sort of looked at this email that came

23   through and made edits and excises from the actual email.

24          MS. KIEBART:  Can you please clarify which email

25   you're speaking of?

1           MS. HALVERSON:  I'm sorry, I'm talking about the

2     email that was cited in the petition -- the Court's

3     indulgence.

4           This was -- the email doesn't have a date on it,

5     so that's why it's a little bit difficult for me to figure

6     out, but it's the -- it's on the fourth paragraph of the

7     narrative of the pretrial revocation report.  So it starts:

8     "The following is an outline of an email," and then there

9     was a quote.

10          MS. KIEBART:  Yes, that quote, that email came

11    from Melissa Inman.

12          MS. HALVERSON:  Okay.

13          And Melissa Inman is the one that reviewed and

14    drafted this but from a different document?

15          MS. KIEBART:  Correct.

16          MS. HALVERSON:  Okay.

17          MS. KIEBART:  She's the one that -- just so we're

18    clear, she's the one that obtained the incident report and

19    she notified our court and provided Ms. Rennie with that

20    summary.

21          Does that answer the question?

22          MS. HALVERSON:  Yes.

23          And so just to follow up on that, she provided it

24    to Ms. Rennie, Ms. Rennie provided it to you, you then

25    passed it to Ms. Robinson?

1          MS. KIEBART:  I did not pass that to Ms. Robinson.

2          It went from Ms. Rennie, and she would have to

3    testify to how it got to Ms. Robinson.

4          MS. HALVERSON:  Okay.

5          And going back to the April 5th message that was

6    left for you, did you at that time contact D.C. Pretrial

7    Services and ask that his bond be revoked on the basis of

8    that voicemail message at that time?

9          MS. KIEBART:  No, I did not.

10         MS. HALVERSON:  Did you tell him, when you asked

11   him on June 14th at 2:24 p.m. to come into the office, did

12   he ask you why?

13         MS. KIEBART:  Yes, he did.

14         MS. HALVERSON:  And did you tell him why?

15         MS. KIEBART:  No, I did not.

16         MS. HALVERSON:  No further questions.

17         THE COURT:  Thank you, Ms. Kiebart.

18         MS. FURST:  Ms. Kiebart, I don't know if you have

19   this in front of you, it is the police report from

20   Guilderland concerning the harassment argument in the

21   parking lot from August of 2019.

22         MS. HALVERSON:  I would object.

23         MS. KIEBART:  I do not have that in front of me.

24         MS. FURST:  I'm sorry?

25         MS. KIEBART:  I'm sorry, I do not have that in

1   front of me.

2           MS. FURST:  Okay.

3           Are you aware of whether or not that's where the

4   quote came from?

5           MS. KIEBART:  Yes, that's my understanding.

6           MS. HALVERSON:  Again, I would object to this line

7   of questioning, Your Honor.  I don't think this has anything

8   to do with what we're talking about here today.  It sounds

9   like we're trying to litigate a case that should be

10  litigated up in Guilderland, New York, and not litigated

11  down here in the U.S. District Court for the District of

12  Columbia.

13          So I think that we're trying to push in

14  information to make Mr. Fellows seem more guilty than he is,

15  and I just object to the relevancy of whatever a police

16  report says from 2019.

17          My point in my line of questioning was that there

18  were multiple people that edited this statement that was

19  sent in the Pretrial Services Report violation report.

20          THE COURT:  Okay.

21          I thought Ms. Furst was trying to explain that,

22  where that language came from.

23          MS. FURST:  That's correct, Your Honor.

24          THE COURT:  Okay.

25          Overruled.

1          MS. FURST:  And, Your Honor, if I may, I'll just

2     show the report to counsel so she'll have a copy.

3          THE COURT:  That's fine.

4          Okay.  Did you have any more questions for

5     Ms. Kiebart?

6          MS. FURST:  Sorry, Your Honor?

7          Ms. Kiebart, is there anything else relevant that

8     the judge should know?

9          MS. KIEBART:  The only thing is, with that report,

10    that was instrumental for us with our concerns, because it

11    shows a pattern of behavior.  So if defense counsel wants to

12    know why that was important to us, it's because it was

13    similar conduct, where it was an attempt at intimidation.

14         THE COURT:  Okay.

15         MS. FURST:  And --

16         ALSO PRESENT:  That's why that report is so

17    important, which is why we sought a warrant.

18         MS. FURST:  So was this report part of the

19    decision that went into your thought process about why you

20    believe the defendant was dangerous and escalating

21    behaviors?

22         MS. KIEBART:  Absolutely.

23         It's a culmination of everything I testified to

24    that made the decision why we wanted to move forward with

25    the warrant.

1          MS. FURST:  Okay.

2          Your Honor, I would move to admit the Guilderland

3     report that we're talking about into evidence, because it

4     did go into the decision to request the warrant.

5          And there are two reports, for the Court's

6     edification.  One involves the August 19 violation of the

7     protection order.  And then on the last page is the report

8     by the judge in the harassment case, where the report was

9     the phone number given by the defendant to contact him was a

10    Google number that then rang to the judge's wife's office.

11    So I would move to admit those as Exhibit 5, and counsel has

12    a copy.

13         MS. HALVERSON:  I would object to admission of

14    that for a couple of reasons.  One, again, I do not see the

15    relevancy of this.  I think we're trying to litigate a case

16    from the upper state of New York down here in the District

17    Court.

18         THE COURT:  So, I'm sorry, even to the relevance

19    of your client allegedly calling a judge's wife?

20         MS. HALVERSON:  So the reason I don't see that to

21    be relevant is because, at the end of the day with that

22    case, charges were never filed, which makes me think that

23    these were unsubstantiated charges.  So I don't think that

24    unsubstantiated accusations are relevant to whether or not

25    he's a danger.

1          I also believe that the first page, the request

2    that was given to the Guilderland Town Police Department in

3    order to obtain these records, was improper on the part of

4    Pretrial Services.

5          In order to obtain the record, Pretrial Services

6    said that they needed the report to ascertain details to

7    calculate defendant's criminal history, not to find pieces

8    or facts to then use later to revoke his pretrial release.

9          So I think it was disingenuous on the part of

10   Pretrial Services in New York to even obtain the contents of

11   a case that's not being litigated before Your Honor.

12          THE COURT:  Okay.  Thank you, Ms. Halverson.

13          MS. FURST:  And, Your Honor, just to respond, it's

14   routine for Probation or, I guess, PSA here, to request

15   records in order to give the Court a full picture for bond

16   purposes in the beginning of a case.

17          This request was made January 19th after defendant

18   was first arrested.  It was done in the normal course of

19   business.  It became important for this motion to revoke,

20   because it is part of the thought process that went into

21   Probation in New York asking for a petition for a warrant

22   because of his past conduct.

23          THE COURT:  I understand.

24          MS. FURST:  Okay.

25          THE COURT:  I'm admitting the document.

```
 1   I think -- I understand Ms. Halverson's point on there's no
 2   charges or conviction, and I think that goes to the weight,
 3   but on detention issues, courts regularly consider any
 4   number of things, including arrests.
 5               MS. FURST:  Thank you.
 6               THE COURT:  So I think it is appropriate.
 7               I don't see anything -- well, regardless, even if
 8   Pretrial Services did somehow pull a fast one on this police
 9   department, I don't see how that would be a reason to keep
10   it out.  So I'll admit it.
11               All right.  Next witness.
12               MS. FURST:  Yes, Your Honor.  We'll call
13   Ms. Kendra Rennie.
14               And, Ms. Rennie, I don't know if you were able to
15   hear at the beginning.  We are going to just talk about what
16   happened with your mom and not require your mom to testify.
17               MS. RENNIE:  Thank you.
18               MS. FURST:  Sure.
19               MS. RENNIE:  Good afternoon, Judge.  I was on the
20   full video.  I'm not understanding why I was not able to be
21   seen, but I connected on my phone now.
22               THE COURT:  Okay.
23               We can hear you well.  Thank you, ma'am.
24               MS. RENNIE:  Thank you.
25               MS. FURST:  And actually, we can see you.
```

1          All right.  Would you tell the Court your name,

2     your occupation, your experience, and then discuss how you

3     first met Mr. Fellows and did you go over the requirements

4     of pretrial release with him, and just tell the judge,

5     leading up to June 14th, your experience.

6          MS. RENNIE:  Yes, I -- Kendra Rennie, R-e-n-n-i-e.

7     I've been a Probation Officer for almost 24 years.

8          I came into contact with Mr. Fellows on

9     January 19th, following his release in the Northern District

10     of New York.

11          On that date, he reported to our office, at which

12     time I reviewed his conditions of release, which included

13     contact information for our office.  I also placed him on

14     the bracelet, and he signed documentation agreeing to the

15     conditions, and on the location monitoring conditions, it

16     included my office number and the emergency number for the

17     Court.

18          Immediately following his enrollment in the

19     program, Brandon has showed signs of non-compliance.

20          There was a conversation on August -- or, excuse

21     me, January 26th, where I told him that he was not allowed

22     out for exercise purposes.

23          At that time, he indicated that he didn't feel

24     that was appropriate and that his body would not do well

25     with that and he said to me, "I won't forget that."  So I

1  interpreted that to mean that he was stating that he would,

2  you know, not forget that we were not allowing him out to

3  exercise.

4         Again, right from the start -- as the Court's

5  aware, we filed violations, he's been problematic, leaving

6  disturbing voicemails, texts, inappropriate conversations

7  with other members of our staff, including text messages

8  with other officers.

9         He was resistant to seeking employment.  When

10 doing so, he indicated that he submitted an application to

11 the FBI office in Albany, which I found to be sarcastic in

12 nature.  That was not an actual attempt to seek employment,

13 in my view.  Again, he indicated he didn't want to work in

14 terms of being on the books.

15        And as we've mentioned and the Court's aware, we

16 filed two violations for Mr. Fellows.  The first was on

17 May 5th, where we, after revocation for his failure to

18 report, failure to provide information about his employment,

19 failing to follow his curfew.  On two occasions, failing to

20 report police contact.

21        And as the Court's aware, he left a voicemail for

22 me on May 19th, failed to follow through with the drug

23 testing program, which led to a second violation on May

24 26th.

25        And following the May 26th hearing -- or not the

1  hearing.  Following the June 4th hearing, Your Honor issued

2  an order for him to attend a mental health evaluation.

3          MS. FURST:  And during the course of your

4  supervision of Mr. Fellows, did he ever leave you long

5  voicemails that were just sort of rambling?

6          MS. RENNIE:  Yes, he did.

7          MS. FURST:  And did he ever send inappropriate

8  text messages to you or people in your office?

9          MS. RENNIE:  Yes.

10          He sent an inappropriate text message to another

11  officer, Ronald Lacoy, and sent me several emails and

12  voicemails.

13          MS. FURST:  All right.

14          And we have marked as Exhibit 1 the text message

15  content to Probation Officer Lacoy from February 15th of

16  2021, correct?

17          MS. RENNIE:  Yes.

18          MS. FURST:  And, Your Honor, I would move to

19  submit this text messages into evidence.

20          MS. HALVERSON:  I would object, Your Honor.

21  It's a Word document that's based on I don't know what.

22          I've not seen a printout of the actual text

23  message.  I don't have any way to verify this was sent.

24  It's simply just a Word-document transcription of something

25  that I wasn't actually provided the underlying information

1   for.

2          So I have no way to authenticate this or -- and

3   Officer Lacoy is not present, so I can't cross-examine him.

4          And additionally, this is, apparently, from

5   February of this year, which I don't think is relevant to

6   the inquiry that we're talking about today.

7          So for all of those reasons, I would object to its

8   submission into evidence.

9          THE COURT:  Thank you, Ms. Halverson.

10         Have I seen this?

11         MS. FURST:  The actual text?

12         THE COURT:  Well, the document.  Is this in your

13  third motion to revoke the defendant's pretrial release?

14         MS. FURST:  It is not in the motion, Your Honor.

15         THE COURT:  Okay.

16         MS. FURST:  This was given to me by Probation

17  afterwards as we were getting ready for the hearing.

18         THE COURT:  Okay.

19         MS. FURST:  I can lay a little bit more

20  foundation.

21         THE COURT:  Okay.

22         MS. FURST:  Ms. Rennie, without going into what

23  the text says, did you receive this text from Mr. Lacoy?

24         MS. RENNIE:  Yes, I did.

25         MS. FURST:  And what was the background?  Why was

1  he even talking with Mr. Fellows?

2          MS. RENNIE:  I believe I was out that day or

3  conducting field work.  And I knew that Brandon's number was

4  on the call-in list and he did not call in the night before

5  for drug testing.  So I asked Ron to get in touch with him

6  and let him know that he needed to report for a drug test

7  and I asked that he remind him to bring verification of his

8  employment, meaning his DVA.

9          MS. FURST:  And did you have the reported number

10  for Mr. Fellows at that time?

11          MS. RENNIE:  Yes.

12          His reported phone number?

13          MS. FURST:  Yes.

14          MS. RENNIE:  Yes.

15          MS. FURST:  And did you provide that to Mr. Lacoy

16  to contact Mr. Fellows?

17          MS. RENNIE:  Yes, or he would have found it in the

18  chronological records, yes.

19          MS. FURST:  And you received the body of the text

20  that reportedly came from Mr. Fellows to Mr. Lacoy;

21  is that correct?

22          MS. RENNIE:  Yes.

23          MS. FURST:  And in what form did you receive it?

24          MS. RENNIE:  I believe that when I came into the

25  office the next day, Ron had -- Ron Lacoy had placed the

1    text message into my chronological record and told me to

2    look at it.  That's my best recollection.

3              MS. FURST:  All right.

4              And have you seen Government's Exhibit 1, the Word

5    document?

6              MS. RENNIE:  Yes.

7              MS. FURST:  Is that an accurate representation of

8    the text message?

9              MS. RENNIE:  Yes.

10             MS. FURST:  And what is the relevance for this

11   hearing concerning this text message?

12             MS. RENNIE:  It shows Mr. Fellows' unwillingness

13   to comply with his conditions, inappropriate conduct -- or

14   inappropriate communication when he references, I'm not

15   going to have anyone weirdly staring at my dick.  I'm not a

16   fan of that weird stuff.  He's dictating -- I'm sorry?

17             MS. FURST:  He was referencing that because when

18   you take -- when you give a UA, or a urinalysis, there is

19   going to be an officer in the room to make sure that nothing

20   is diluted or manufactured, correct?

21             MS. RENNIE:  That's correct.

22             And he also makes reference to corrupt government

23   and the politicians, and he said they will burn in hell

24   unless they change, just like I will.  So I found that to be

25   inappropriate and disturbing.

1          MS. FURST:  And did this text message, did you

2   have knowledge of this text message in February when it was

3   sent to Mr. Lacoy?

4          MS. RENNIE:  Yes.

5          MS. FURST:  Did this text message fall into your

6   thought process during the events of June 14th?

7          MS. RENNIE:  Yes.

8          MS. FURST:  Your Honor, I would move to admit

9   Exhibit 1.

10          MS. HALVERSON:  My objection stands, Your Honor.

11   I think she's given a narrative that shows that without

12   actually having to submit it as an exhibit.

13          But, again, I don't have any -- if it was

14   submitted from that officer to Ms. Rennie, I don't know why,

15   just like all the other voicemail and text messages that

16   you've been able to take judicial notice of, why this was,

17   apparently, not included in something.  Instead, it's some

18   kind of transcription that was done in a Word document, and

19   I just don't think that that's proper.

20          So for all those reasons, I would object to its

21   coming into evidence.

22          THE COURT:  Okay.

23          Over objection, I'll admit it.  I think those

24   arguments go to the weight, not the admissibility.

25

1                                    (Government's Exhibit 1
                                     received into evidence.)
2           MS. FURST:  Thank you, Your Honor.

3           Do you want time to read it or shall I move on?

4           THE COURT:  Let's keep moving.  I can read

5    quickly.

6           MS. FURST:  All right.

7           And then we -- let's continue with -- that was

8    just an example of the kind of things that Mr. Fellows would

9    send to Probation; is that correct?

10          MS. RENNIE:  Yes.

11          MS. FURST:  All right.

12          And then leading up to -- no, let's go to

13   Exhibit 2.

14          You mentioned the June 4th revocation hearing.

15   Was there an additional requirement and condition of release

16   added at that time?

17          MS. RENNIE:  Yes.

18          The Court ordered the defendant participate in

19   mental health treatment.

20          MS. FURST:  And in order to facilitate that, was

21   anything done to set up an appointment?

22          MS. RENNIE:  Yes.

23          Through our contract agency, I contacted the

24   agency and coordinated the setup of that evaluation for

25   June 14th.

1          MS. FURST:  So was the evaluation to be held on

2    June 14th?

3          MS. RENNIE:  Yes.

4          MS. FURST:  What time?

5          MS. RENNIE:  11:00 a.m.

6          MS. FURST:  And did you receive any indication

7    from Mr. Fellows that he was aware of that appointment on or

8    before June 14th?

9          MS. RENNIE:  Yes.

10          I had emailed him, I believe it was June 9th, to

11    advise him of the appointment and provided him time out for

12    that appointment.

13          And then Mr. Fellows emailed me on June 14th at

14    1:30 a.m. indicating that he almost forgot about his

15    appointment, but that he knew it was that day, meaning

16    11:00 a.m., on June 14th.

17          MS. FURST:  And before June 14th, on June 10th,

18    did you receive a voicemail from him?

19          MS. RENNIE:  Yes, I did.

20          MS. FURST:  And we've got that marked as

21    Exhibit 2; is that correct?

22          MS. RENNIE:  Yes.

23          MS. FURST:  And what is the relevance in the

24    context of this hearing for that voicemail?

25          MS. RENNIE:  Mr. Fellows was late in getting home,

1    so he was contacting me through the emergency number to let

2    me know that he was going to be late.  So this was a

3    voicemail he left at 5:02 p.m. to explain why he was late.

4            MS. FURST:  So was it your understanding that he

5    knew he could get messages to you through the emergency

6    contact number you had given him when he first came under

7    supervision?

8            MS. RENNIE:  Yes.

9            MS. FURST:  All right.

10           Is this also another example of a little bit of a

11   winding voicemail?

12           MS. RENNIE:  Yes.

13           He used up the full voicemail, if I remember

14   correctly.

15           MS. FURST:  Your Honor, I move to admit Exhibit 2.

16           MS. HALVERSON:  I believe it's already been

17   admitted into evidence, if I'm not mistaken.  Exhibit 2

18   would be the --

19           MS. FURST:  No.  We did 4.

20           MS. HALVERSON:  I thought that's the June 10th.

21   This is the June 10th?

22           (Counsel conferred off the record.)

23           MS. HALVERSON:  Oh, I'm sorry.  Yeah.

24           So my objections are the same for all of these

25   documents.  I don't think that they show anything; I don't

1    think that they're relevant information to whether or not

2    he's a danger to the community, and based on that, you know,

3    I would object to its admission.

4              THE COURT:  I am wondering a little bit where

5    we're going with all of this.

6              Are you just showing that he knows he can reach

7    her?

8              MS. FURST:  That's one thing, Your Honor.

9              The other thing, Your Honor, is, as a proffer, he

10   says in there that he leaves these long voicemails for no

11   purpose other than it's fun, it passes time, and it's a

12   hobby.

13             THE COURT:  Okay.

14             I'm not going to revoke on that basis.

15             MS. FURST:  Okay.

16             All right.  We'll move on.  Thank you, Your Honor.

17             Also, if I may, this -- I'm not going to play

18   this, but this June 10th voicemail was after the June 4th

19   revocation, correct?

20             MS. RENNIE:  Yes.

21             MS. FURST:  All right.

22             So let's go ahead then and talk about Exhibit 3.

23             And, Your Honor, I know there's going to be

24   another objection to that one, which is also another

25   voicemail.

1           And what is the relevance of Exhibit 3, the

2     voicemail that was left on February 3rd in regards to your

3     thought process on June 14th?

4           MS. RENNIE:  That was a voicemail that was left

5     following his court appearance.  And he was updating me on

6     what occurred in court, but he was also indicating something

7     along the lines of the prosecution lady is miserable, she's

8     lying, corrupt, and I found it to be another disturbing

9     voicemail.

10          MS. FURST:  Did it feed into your -- how you felt

11    after you learned the defendant had called your mom?

12          MS. RENNIE:  Yes, because it's a pattern of

13    behavior.

14          MS. FURST:  Your Honor, I would move to admit

15    Exhibit 3.

16          MS. HALVERSON:  I would object again, same basis

17    for objection.

18          At this point, it's incredibly cumulative

19    information.  I think we already have a basis to make the

20    points.  I don't think we need to actually admit these

21    voicemails into evidence.

22          THE COURT:  All right.

23          So, Ms. Furst, I've got another hearing that was

24    supposed to start half an hour ago.

25          MS. FURST:  I'm sorry.

1              THE COURT:  We've been doing this for well over an

2    hour.  You need to come to a point here.

3              MS. FURST:  I will, Your Honor.

4              Ms. Rennie, let's get to the point of what

5    happened on June 14th.

6              On June 14th, did you have several contacts with

7    the defendant?

8              MS. RENNIE:  Yes, I did.

9              Several emails with the defendant and a text.

10             MS. FURST:  And did that contact on June 14th

11   start at 1:37 in the morning?

12             MS. RENNIE:  Yes.

13             MS. FURST:  And in that email, did defendant

14   indicate, I almost forgot, I have a therapy session at 11:00

15   tomorrow?

16             MS. RENNIE:  Yes.

17             MS. FURST:  And earlier in the morning at 8:40,

18   8:43, you had emails with the defendant about his schedule,

19   his work schedule; is that right?

20             MS. RENNIE:  Yes.  I emailed him at 8:40 and 8:43.

21             MS. FURST:  And at 8:44, you sent him a text to

22   read his email about the scheduling; is that correct?

23             MS. RENNIE:  Yes, it is.

24             MS. FURST:  And then at 12:26, he replies with an

25   email.  And then at 12:36, you actually call him on his

61

1    reported number; is that correct?

2            MS. RENNIE:  That's correct.

3            MS. FURST:  And during that phone call, did you

4    have a discussion about whether or not he went to his mental

5    health evaluation?

6            MS. RENNIE:  Yes, I did.

7            We discussed that he did not go to his mental

8    health appointment, and he indicated that he canceled it

9    because he wasn't feeling great because his sleep schedule

10   was off because the thunderstorms kept him up.

11           MS. FURST:  And did he then ask if he could go to

12   work or at least go solicit work?

13           MS. RENNIE:  Yes, he did.

14           And I denied it.  And then that's when he asked,

15   have you checked your hormones today.

16           MS. FURST:  And did that upset you?

17           MS. RENNIE:  Yes, it did.

18           MS. FURST:  And did you see this as part of that

19   escalating course of behavior?

20           MS. RENNIE:  Yes, I did, because he also left me a

21   voicemail on May 19th referencing his genitalia and the size

22   of his genitalia and the performance of his genitalia.

23           MS. FURST:  Now, did defendant tell you he

24   rescheduled the mental health evaluation?

25           MS. RENNIE:  Yes.

1          MS. FURST:  Based on his behaviors up until that

2     date, did you have an expectation that he would actually go

3     to the mental health evaluation?

4          MS. RENNIE:  No, I did not.

5          I asked him why he canceled, and he said, I was

6     not feeling great.  And I said, well, it sounds like you're

7     good enough -- you know, you feel well enough to go to work.

8     He said, well, you can't prove that I'm not sick.

9          MS. FURST:  So in the petition -- did you consider

10    them this failure to go to the mental health evaluation a

11    violation of a condition?

12         MS. RENNIE:  Yes.

13         MS. FURST:  In the petition, however, that was

14    drafted by D.C., the violation is -- the allegation is

15    dangerousness to the community, but the violation is, the

16    defendant should avoid contact with any person who's a

17    victim or witness.  Are you aware of that?

18         MS. RENNIE:  Yes.

19         And I would explain that, based on his ongoing

20    behavior, a failure for him to attend a mental health

21    treatment could leave him as a danger to the community based

22    on his continued behavior.

23         MS. FURST:  And so in your mind, is the mental

24    health violation -- violation of going to get the eval, is

25    that the violation, even though it is listed differently in

63

1   the petition?

2           MS. RENNIE:  Yes.

3           In addition, as you've laid out, I feel he

4   continues to be a danger to the community based on the other

5   information.

6           MS. FURST:  All right.

7           And after you told him he couldn't go to work or

8   couldn't petition work, what happened then?

9           MS. RENNIE:  At that time, as I said, he asked

10  about my hormones, and he then -- I told him that I would

11  need him to speak with my supervisor, I was not able to

12  locate her, so I told him I would call him back.  And then a

13  few minutes later he mailed me, and that was at 12:58 and

14  then he mailed me again at 1:09.

15          MS. FURST:  And that just had to do with him

16  telling you about contact with law enforcement over the

17  weekend?

18          MS. RENNIE:  Correct, and about paying his EI

19  bill, his location monitoring bill.

20          MS. FURST:  All right.

21          And as Ms. Kiebart testified, she called him at

22  2:24 after she learned about the hormone comment, told him

23  it was inappropriate, told him to report, correct?

24          MS. RENNIE:  That's correct.

25          MS. FURST:  And then at 2:30, did your mother

1   receive a phone call?

2           MS. RENNIE:  She did.

3           MS. FURST:  And your mother does not live in

4   New York; is that correct?

5           MS. RENNIE:  That's correct.

6           MS. FURST:  And you learned about this from your

7   mother who called you after this happened, correct?

8           MS. RENNIE:  Yes.

9           Yes, she texted me and then -- sorry.

10          MS. FURST:  Please tell the Court about that.

11          MS. RENNIE:  When I spoke with my mother, she

12  indicated that someone had just called her and asked if this

13  was Kendra Rennie's phone number.  And then she indicated

14  that it was.

15          And then he asked again, is this Kendra's Rennie's

16  phone number.  And she indicated it was.  And she asked, you

17  know, who's calling, and he did not answer her.  And then

18  she asked if she could relay a message and he indicated that

19  that wasn't necessary and that he would call her on the

20  other numbers.

21          MS. FURST:  And what did your mother relay to you

22  as to how she felt after she got that phone call?

23          MS. RENNIE:  She said she knew it wasn't right,

24  that it made her nervous, and she felt very uncomfortable.

25          MS. FURST:  And did you ultimately go pick up your

1   mother?

2           MS. RENNIE:  I did.

3           MS. FURST:  And while you were at her home,

4   did you take a picture of her landline that had the number

5   who had called her on it?

6           MS. RENNIE:  Yes, I did.

7           MS. FURST:  And you have seen document 32, there

8   are two pictures in the back of that document, correct?

9           MS. RENNIE:  Yes.

10          MS. FURST:  And on the last page, is that a

11  picture of your mother's landline, the time of 2:30 and June

12  14th?

13          THE COURT:  I'm sorry, are you contesting that he

14  called?

15          MS. HALVERSON:  I am not, Your Honor.

16          MS. FURST:  Oh, okay.

17          THE COURT:  Then move on.

18          MS. RENNIE:  Okay.

19          MS. FURST:  So ultimately, all of these taken

20  together, Ms. Rennie, please tell the Court why you believe,

21  based on your experience with this defendant and your

22  experience as a United States parole officer, why you

23  believe he's a danger.

24          MS. RENNIE:  I feel he's a danger to the

25  community.

1          And it begins with during his pretrial interview,

2    he was asked if he had any weapons in the home and he

3    indicated his only weapons are his hands.

4          And as I mentioned throughout supervision, he's

5    been problematic and making sexual innuendos.

6          What he did by calling my mother, I feel was

7    purposeful, it was intimidation, it was frightening, it made

8    me nervous.  It's very easy for him to cut off the bracelet,

9    go to my mother's house.  I couldn't protect her.

10         He's been arrested in the past for violation of

11   protection orders.  He allegedly has jumped on his

12   girlfriend's car and bashed her cell phone on the dashboard,

13   allowing her not to call the police.  So I find all of that

14   to be -- to show that he's a danger to the community.

15         And lastly, this conduct is just very similar to

16   what he did to the Guilderland Town judge as a form of

17   intimidation to show that he is in control and he can show

18   you that he can control you be reaching out to your family

19   members.  So I feel it's intimidation and I feel that he is

20   nothing but a danger to the community.

21         MS. FURST:  I'll turn the witness over,

22   Your Honor.

23         MS. HALVERSON:  I'll be brief.  I only have a

24   couple questions for you, Ms. Rennie.

25         On June 12th, did he email you and tell you that

1   his SIM card was not working?

2           MS. RENNIE:  Yes.

3           MS. HALVERSON:  Did he reschedule his appointments

4   for -- his mental health evaluation appointment for the

5   following week, June 21st?

6           MS. RENNIE:  Yes.

7           MS. HALVERSON:  Did he reschedule before you

8   admonished him for canceling it?

9           MS. RENNIE:  Yes, I believe so.

10          MS. HALVERSON:  Was his reporting improving since

11  the revocation -- the last revocation hearing?

12          MS. RENNIE:  Can you define "reporting"?

13          MS. HALVERSON:  Well, I guess my understanding is

14  that he's to call in to you and that there was an allegation

15  in the last revocation hearing that he wasn't calling in

16  like he was supposed to?

17          MS. RENNIE:  Yes.

18          His continued calling in increased, but his

19  conduct and communication with our office did not.

20          MS. HALVERSON:  All right.

21          No further questions.

22          THE COURT:  I have a question.

23          Ms. Rennie, I think I saw somewhere that your

24  mother's phone number is listed under your name in Google;

25  is that correct?

1          MS. RENNIE:  Yes.

2          Well, Your Honor, he searched it, and my name

3   comes up connected to her address, perhaps, because I've

4   lived there before, that's what I believe it is.

5          THE COURT:  Okay.

6          MS. RENNIE:  But, Your Honor, if I may, it also

7   showed that my address is in Glenmont, New York, which

8   there's no reason for him to call an area code of 413 when

9   he knows that my phone number is a 518.

10         THE COURT:  Yeah.

11         I guess I'm just thinking, you know, a lot of

12  folks have different area codes than -- with cell phones,

13  the way they are these days, I'm wondering if someone could

14  mistakenly think that's your home line or other line by

15  Googling you.

16         MS. RENNIE:  I'm sure that's possible.

17         But if his SIM card was broken, then I'm not sure

18  how he was able to make phone calls, because your SIM card,

19  I believe, is what's responsible for cell service in your

20  phone.

21         THE COURT:  All right.

22         Thank you, ma'am.

23         MS. RENNIE:  Thank you.

24         MS. FURST:  I have nothing further, Your Honor.

25         THE COURT:  Thank you, Ms. Furst.

1          MS. HALVERSON:  I have nothing but argument.

2          THE COURT:  Okay.

3          Thanks to the witnesses.  I appreciate your time.

4          All right.  Ms. Furst, I'm not going to hold the

5     defendant on the basis of dangerousness to the community.

6     I think you've shown that he's rude and immature and

7     misogynist.

8          Do you want to argue that he is unlikely to abide

9     by any condition or combination of conditions of release?

10          MS. FURST:  Your Honor, I think the evidence or

11     the proffers of the witnesses have shown that to be the

12     case.  He is -- although it is not against the conditions to

13     be rude and crude, Your Honor, you have seen an escalating

14     pattern of harassment and anger against the probation

15     officers, especially against Ms. Rennie.

16          Your Honor, I believe the evidence shows that it

17     escalated from harassment to intimidation upon his making

18     the effort to find a phone number that he didn't need to

19     find.

20          And Googling Ms. Rennie, when you Google her, the

21     first number that comes up is the Probation Office's number.

22     As Ms. Rennie told you, he can contact her through the

23     emergency number.  If his SIM card wasn't working, he

24     couldn't have called anybody, including the mom.  And he had

25     just talked with Ms. Kiebart.  He could have just hit

1     "redial" and asked to speak with Kendra Rennie.

2              I think this is an escalation into territory which

3     shows that he has a continuing pattern of doing whatever he

4     wants when he wants.  He is not -- and as the Court noted in

5     the beginning, this is the third motion to revoke.  I mean,

6     I've been practicing 41 years and I can tell the Court I've

7     never had a third motion to revoke.  Number two is usually

8     it.

9              And so at this point, he's not doing what the

10    Court said.  If you recall in May, that May -- the May

11    revocation hearing that we had, the five days after the May

12    revocation hearing, he didn't call in five days in a row,

13    he didn't call in for his UA.  He deliberately snubbed the

14    Court's orders.

15             In June, after the phone call about the genitalia,

16    then six days later he's leaving this rambling phone

17    message.  He talks about how it's fun to leave these

18    messages.  In the text message, Exhibit 1, he argues about

19    why should he have to bring in his business license.  And,

20    no, I'm not going to do it today.  And, no, I'm not going to

21    provide a UA because someone's watching me.  But I can do it

22    tomorrow.  In other words, he's exhibiting this behavior

23    where he thinks he doesn't have to listen to the Court's

24    orders and the Court's employees.  And, in fact, in that

25    Exhibit 4 voicemail, he tells Ms. Kiebart, you know,

1    Ms. Rennie doesn't need to know where I am, that's none of

2    her business, I can do what I want to do.

3         So, Your Honor, I think taking everything into

4    consideration since the hearing in May, the hearing in June,

5    and today, there is absolutely no belief that he's going to

6    follow the conditions of the Court.  He violated a condition

7    under the statute by not going to mental health and

8    canceling it, and he's not going to follow the conditions.

9    I still believe he's a danger.  I understand what you say,

10   Your Honor, but there is still a basis to revoke, and I ask

11   that you do that.

12        THE COURT:  Thank you, Ms. Furst.

13        Ms. Halverson.

14        MS. HALVERSON:  I'll be super quick.  I won't

15   address any of the dangerousness arguments since you already

16   short-cutted that.

17        I would offer proffer to the Court that, given the

18   fact that Mr. Fellows rescheduled his appointment almost

19   immediately after he canceled it shows that he was trying to

20   comply.  I think that there are many times he was doing

21   exactly what a lot of people during the pandemic do.  You

22   don't feel well, you'll cancel your appointment and you

23   reschedule it.  The fact that the rescheduling was never

24   proffered to the Court except in this hearing is a little

25   bit concerning.  So I would say we haven't actually given

1   him a full chance to comply.  Additionally, you heard

2   Ms. Rennie say that his call-in was improving.

3          So I don't think that this is a basis that -- or

4   I don't think there's a basis to find that he is not going

5   to comply with your conditions, especially when he did make

6   a follow-up appointment, which was before Ms. Rennie

7   admonished him for canceling, showing that it's not some

8   kind of nefarious or -- there's some kind of troubling

9   inference that the only reason he rescheduled is because

10  Ms. Rennie got mad at him for rescheduling.  He rescheduled

11  on his own accord.

12         And additionally, it does seem that he's

13  improving, which, I'll just remind the Court, the reason the

14  Court, I believe, ordered mental health evaluation for

15  Mr. Fellows before is that we felt that that was the -- the

16  problem with him reporting, the problems that he has being

17  rude and crass and offensive is related to a mental health

18  issue that's going on.  And so I think we should, again,

19  allow him the opportunity to get that help.  He's not going

20  to get it at the D.C. jail.  So I would submit to Your Honor

21  that there is proof that he is actually complying with his

22  conditions and that there's no basis to find that he's not

23  going to in the future.

24         Additionally, Your Honor, I do believe that

25  Mr. Fellows wants to address the Court.  I have asked and

1    I have advised Mr. Fellows that I do not believe that it is

2    in his interest and I advised him to not address the Court

3    at this time.  I believe Mr. Fellows would like to do so

4    anyway.

5              THE COURT:  Okay.

6              Ms. Furst, do you believe he needs to be put under

7    oath?

8              MS. FURST:  Yes, Your Honor.

9              And I would ask the Court that I be able to

10   cross-examine.

11             THE COURT:  Okay.

12             Have you talked with your client about what that

13   entails, Ms. Halverson?

14             MS. HALVERSON:  I have not talked to him about the

15   potential for cross-examination.  I guess my only comment on

16   that would be that it remains relevant to the inquiry today

17   and that it does not lead into questions getting to the

18   heart of what his charges are, the underlying charges are.

19             THE COURT:  All right.

20             We'll deal with that, but why don't you talk a

21   moment and talk with him about what this will mean.

22             And, of course, also, potential for charges and

23   enhancements for obstruction of justice and perjury.

24             (Defense counsel conferred with the defendant off

25   the record.)

1          MS. HALVERSON:  Your Honor, this is not the first

2     time I've sort of had this conversation with Mr. Fellows.

3          At this point, I'm a little bit -- I'm not exactly

4     sure how to proceed.

5          Mr. Fellows, time and again, has told me that he

6     does not believe that I am making the best judgments in his

7     case.  He believes that there potentially could be another

8     attorney that could advise him differently.  And so I don't

9     know if the Court wants to make a finding at this point, but

10    I do not think that Mr. Fellows wishes to continue with my

11    representation.

12          THE COURT:  Okay.

13          What do you think I should do?

14          I'm wondering if we should continue this and give

15    an opportunity for you all to talk or to look for different

16    options for him.

17          MS. HALVERSON:  So my -- as far as the

18    representation is concerned, I think that it -- if he's not

19    taking my advice about not making a statement today and that

20    is based on the fact that he does not want me to be his

21    representative and he doesn't believe I have his best

22    interests at heart, I would want him to get advice from a

23    different attorney before making that determination, because

24    once he starts making statements in open court, you can't

25    walk that back.

1            And so I do feel that advice through another

2    attorney may be helpful since it doesn't seem like I'm able

3    to really get through to him and he's not able to listen to

4    me.

5            THE COURT:  How long do you think we need to find

6    someone else?

7            MS. HALVERSON:  I will check with my office.

8    If we could potentially continue for one week's time if your

9    schedule would allow it.

10           THE DEFENDANT:  May I please speak?

11           THE COURT:  Okay, sir.  Go ahead.

12           THE DEFENDANT:  I'm sorry.

13           I don't know how all this works, it's still kind

14   of new to me.

15           I just -- I'd rather not wait.  She's -- my

16   attorney has been very helpful in many ways, but we've had

17   different views.  It's been mostly, hey, I object to this,

18   the prosecution is lying, I would like this to be addressed.

19   Many times lies have not been touched on, this being the

20   sixth time.  I would really like to be able to address them.

21           It's not the mere fact -- I think Cara does a

22   great job at trying to wait out for a plea deal, but I have

23   been sitting here getting abused and lied, and they've had

24   many times to speak and there's been many things that have

25   not been given context that I've been able to speak to.

1         Rather than wait, because I need immediate relief,

2    I would like to be able to at least make these statements.

3    I've been made well aware of the risks that could be -- that

4    could come from this; I'm willing to accept those risks.

5    I just really would like to be able to present my case just

6    as each and every one of these people have been able to

7    present today and previously at six times while I've only,

8    to my knowledge, spoken three sentences in all five or six

9    hearings.

10        THE COURT:  All right.

11        So, Mr. Fellows, are you comfortable with

12   Ms. Halverson as your attorney or are you seeking to have a

13   different attorney?

14        THE DEFENDANT:  I personally am comfortable, but I

15   will say that it seems as if she does, you know, like --

16   previously, I did want to pursue to wait out for a plea

17   deal.  That was prior to me reading on certain laws.

18   Obviously, I'm not a lawyer, but I feel as if a plea deal

19   may not be in my best concern, and I feel like upon reading

20   these laws, I have been abused.

21        And I know for the longest time I've been lied

22   about and I've just been sitting here quietly.  I would like

23   to address those lies here today.  And I'm fine with being

24   cross-examined.  And I'm fine with these being initiated as

25   facts, because everything I speak on this today is going to

```
1   be 100 percent facts, unlike what the prosecutor has said.

2             THE COURT:  Okay.

3             So you can certainly have your chance to present

4   your side.

5             I think what Ms. Halverson is saying, and I'm sure

6   what just about any defense attorney would tell you, is that

7   there are big risks to you in doing that.

8             What I'd like to do is come back in a few days

9   when we can find another attorney who could represent you

10  and you could have an opportunity to chat with that

11  attorney.  If you still want to testify, you could do that.

12            If you're telling me, though, that you're

13  comfortable with her as your attorney, you understand all

14  the risks, and you want to proceed anyway but you want her

15  to continue to represent you, I'm willing to consider that.

16            Is that what you're saying or would you like to

17  have an opportunity to talk with another attorney?

18            THE DEFENDANT:  I would very much like to be able

19  to speak today.  I believe Cara has represented me well.

20            Obviously we have just now more recently

21  differentiating views on how to -- what we should be

22  seeking, plea deal or not.  But I do think that she has --

23  she has good character, she's done her best, and I'd like to

24  proceed.

25            I definitely want to read this, because I need
```

1    immediate relief in a timely manner for my personal life and

2    business life and multiple reasons.

3                 THE COURT:  Okay.  Thank you, sir.

4                 Ms. Halverson, I mean, it sounds like -- you know,

5    I can imagine how someone could have a differing view from

6    his attorney but still think his attorney is representing

7    him well.  That's what I think I'm hearing.

8                 MS. HALVERSON:  I think that's right, Your Honor.

9                 And I'm happy to stay in the case.  I have no

10   problems with Mr. Fellows.  I just wonder if there's -- if

11   there's another voice in the case, if Mr. Fellows might be

12   able to hear the cautions that I'm giving him in a different

13   way potentially, and I would rather say this off the record

14   if possible if we could approach.

15                THE COURT:  Okay.

16                I don't even know if that's possible in this

17   courtroom.

18                COURTROOM DEPUTY:  We don't have the intercoms.

19                THE COURT:  Well, so are you suggesting the

20   attorneys approach?

21                MS. HALVERSON:  Yes.

22                THE COURT:  Okay.

23                Well, come on over here.

24                MS. HALVERSON:  Thank you.

25                (Off the record bench conference.)

1          THE COURT:  All right.

2          So, Mr. Fellows, this is what I want to do.

3    I want to try to come back tomorrow morning and give --

4    hopefully in that time, we can find another attorney, he'll

5    have an opportunity to talk with you.  And we can talk then

6    about whether you want to proceed with Ms. Halverson,

7    proceed with a different attorney, and hopefully we can

8    continue this detention hearing tomorrow.

9          I'm not going to make a decision about kind of

10   detention between now and then.  But, as you can tell, you

11   taking the stand and testifying under oath is a big deal and

12   there's -- I understand why you want to do it, and you're

13   certainly entitled to have your day in court if you want to,

14   but I also want to make sure you completely understand what

15   you're doing by doing that, okay?

16         So can we come back at, let's say, 11:00 tomorrow,

17   Ms. Furst?  Does that work for you?

18         MS. FURST:  Yes, Your Honor, I'll be here.

19         THE COURT:  Okay.

20         And, Ms. Halverson, does that work for you?

21         MS. HALVERSON:  It does, Your Honor.  Thank you.

22         THE COURT:  All right.

23         And I think we can be back in my courtroom,

24   courtroom 2.

25         Anything further we need to do now, Ms. Furst?

 1            MS. FURST:  Your Honor, do you want Ms. Robinson,

 2    Ms. -- any of the --

 3            THE COURT:  I don't think we need -- I mean -- let

 4    me put it this way:  If Mr. Fellows decides to testify,

 5    I suppose you would have an opportunity for rebuttal.  So if

 6    you think you need somebody available, that's your call, but

 7    I'm not asking you to bring anybody.

 8            MS. FURST:  I personally don't.

 9            THE COURT:  Well, pick a mic.

10            MS. FURST:  Any mic.

11            I don't think I need them available, Your Honor,

12    but if for some reason I do, perhaps let's be in your

13    courtroom, but maybe I could just get them on the phone, put

14    the phone up to the mic.

15            THE COURT:  We'll figure something out.

16            MS. FURST:  Okay.  Thank you, Your Honor.

17            THE COURT:  Ms. Halverson, anything further?

18            MS. HALVERSON:  No, Your Honor.

19            THE COURT:  Thanks, folks.  We'll continue this

20    until 11:00 a.m. tomorrow.

21            (Proceedings concluded at 12:04 p.m.)

22

23

24

25

C E R T I F I C A T E

        I, William P. Zaremba, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.

Date:__September 28, 2021__   /S/__William P. Zaremba_____

                          William P. Zaremba, RMR, CRR

**ALSO PRESENT: [1]**
44/16
**COURTROOM
DEPUTY: [4]** 3/2 6/14
24/17 78/18
**MS. FURST: [196]**
**MS. HALVERSON:
[77]** 3/12 4/2 4/24 6/4
6/13 6/17 6/23 7/1 9/19
14/6 14/13 14/16 14/19
15/8 15/15 15/19 15/23
16/1 16/6 16/10 16/18
16/25 17/4 17/7 17/10
17/23 18/5 18/12 18/14
18/18 19/2 19/10 19/21
20/5 20/12 21/10 23/6
23/12 23/15 28/20
40/20 41/1 41/12 41/16
41/22 42/4 42/10 42/14
42/16 42/22 43/6 45/13
45/20 50/20 54/10
57/16 57/20 57/23
59/16 65/15 66/23 67/3
67/7 67/10 67/13 67/20
69/1 71/14 73/14 74/1
74/17 75/7 78/8 78/21
78/24 79/21 80/18
**MS. KIEBART: [62]**
24/24 25/1 25/14 26/2
26/13 26/15 27/11
27/15 27/17 27/22 28/1
28/6 28/9 28/12 28/17
29/12 29/15 29/24 30/2
30/7 31/4 31/7 31/23
32/2 32/5 32/25 33/2
33/4 33/25 34/3 34/8
34/14 34/18 35/7 35/14
35/21 36/7 36/11 36/20
36/25 37/9 37/15 37/18
38/4 38/12 38/16 39/4
39/6 40/13 40/24 41/10
41/15 41/17 42/1 42/9
42/13 42/15 42/23
42/25 43/5 44/9 44/22
**MS. RENNIE: [73]**
24/11 24/13 47/17
47/19 47/24 48/6 50/6
50/9 50/17 51/24 52/2
52/11 52/14 52/17
52/22 52/24 53/6 53/9
53/12 53/21 54/4 54/7
55/10 55/17 55/22 56/3
56/5 56/9 56/19 56/22
56/25 57/8 57/12 58/20
59/4 59/12 60/8 60/12
60/16 60/20 60/23 61/2
61/6 61/13 61/17 61/20
61/25 62/4 62/12 62/18
63/2 63/9 63/18 63/24
64/2 64/5 64/8 64/11
64/23 65/2 65/6 65/9
65/18 65/24 67/2 67/6
67/9 67/12 67/17 68/1
68/6 68/16 68/23
**MS. ROBINSON: [44]**
7/17 7/20 8/1 8/22
10/10 11/12 11/25 12/2

12/17 12/25 13/3 13/13
13/18 14/11 14/14
14/17 14/22 15/12
15/18 15/22 15/25 16/3
16/8 16/16 17/1 17/19
18/3 18/8 18/13 18/17
18/19 19/4 19/20 19/25
20/11 20/20 20/23 21/2
21/6 21/9
**THE COURT: [104]**
**THE DEFENDANT: [4]**
75/10 75/12 76/14
77/18
**/**
**/S [1]** 81/7
**1**
**100 [1]** 77/1
**10:17 [1]** 1/6
**10th [4]** 56/17 57/20
57/21 58/18
**1101 [1]** 10/2
**11:00 [4]** 56/5 60/14
79/16 80/20
**11:00 a.m [1]** 56/16
**11:20 [1]** 31/9
**1200 [1]** 1/15
**12:04 [1]** 80/21
**12:26 [1]** 60/24
**12:36 [1]** 60/25
**12:58 [1]** 63/13
**12th [1]** 66/25
**14 [1]** 1/5
**14th [24]** 8/19 9/12
12/3 13/15 32/22 32/23
33/11 34/7 39/3 39/12
42/11 48/5 54/6 55/25
56/2 56/8 56/13 56/16
56/17 59/3 60/5 60/6
60/10 65/12
**15th [1]** 50/15
**19 [1]** 45/6
**19th [4]** 46/17 48/9
49/22 61/21
**1:09 [1]** 63/14
**1:30 [1]** 56/14
**1:37 [1]** 60/11
**2**
**20001 [1]** 2/5
**20004 [1]** 1/20
**2019 [5]** 19/8 20/2
21/23 42/21 43/16
**202 [2]** 1/20 2/5
**2021 [6]** 1/5 17/6 26/20
32/23 50/16 81/7
**208-7500 [1]** 1/20
**21-83 [2]** 1/4 3/4
**21st [1]** 67/5
**22 [1]** 26/6
**22nd [1]** 17/6
**24 [1]** 48/7
**269-6481 [1]** 1/16
**26th [3]** 48/21 49/24
49/25
**28 [1]** 81/7

63/22
**2:24 p.m [1]** 33/12
**2:30 [2]** 63/25 65/11
**3**
**301 [1]** 1/15
**30th [2]** 31/25 35/16
**316 [1]** 1/16
**32 [2]** 33/18 65/7
**3249 [1]** 2/5
**333 [1]** 2/4
**354-3249 [1]** 2/5
**3:45 [3]** 34/11 37/14
37/15
**3rd [1]** 59/2
**4**
**41 [1]** 70/6
**413 [1]** 68/8
**4:19 [1]** 27/6
**4th [5]** 12/10 36/5 50/1
55/14 58/18
**5**
**518 [1]** 68/9
**550 [1]** 1/19
**5:02 [1]** 57/3
**5:30 [1]** 37/20
**5th [6]** 26/19 27/6 31/2
35/17 42/5 49/17
**6**
**625 [1]** 1/19
**6481 [1]** 1/16
**67052 [1]** 1/16
**6th [1]** 31/8
**7**
**7500 [1]** 1/20
**7:06 [1]** 39/12
**8**
**83 [2]** 1/4 3/4
**8:40 [2]** 60/17 60/20
**8:43 [2]** 60/18 60/20
**8:44 [1]** 60/21
**9**
**9th [1]** 56/10
**A**
**a.m [6]** 1/6 31/9 56/5
56/14 56/16 80/20
**abide [1]** 81/7
**able [18]** 26/24 27/13
40/8 47/14 47/20 54/16
63/11 68/18 73/9 75/2
75/3 75/20 75/25 76/2
76/5 76/6 77/18 78/12
**about [58]** 3/25 5/17
5/21 8/20 9/20 9/22
10/16 11/23 13/2 17/5
17/9 17/11 17/15 17/16
18/2 19/2 25/25 26/23
30/5 30/13 31/6 32/3
35/18 35/18 35/23 36/5
36/24 38/10 40/14 41/1
43/8 44/19 45/3 47/15

60/18 60/22 61/4 63/10
63/16 63/18 63/22 64/6
64/10 70/15 70/17
70/18 73/12 73/14
73/21 74/19 76/22 77/6
79/6 79/9
**above [2]** 40/18 81/4
**above-titled [1]** 81/4
**absolutely [2]** 44/22
71/5
**abused [2]** 75/23 76/20
**accept [1]** 76/4
**accommodating [1]**
3/19
**accord [1]** 72/11
**accurate [2]** 29/13 53/7
**accusations [1]** 45/24
**actual [5]** 21/20 40/23
49/12 50/22 51/11
**actually [11]** 9/5 9/22
34/21 47/25 50/25
54/12 59/20 60/25 62/2
71/25 72/21
**added [2]** 12/9 55/16
**addition [1]** 63/3
**additional [1]** 55/15
**additionally [5]** 15/16
51/4 72/1 72/12 72/24
**address [7]** 68/3 68/7
71/15 72/25 73/2 75/20
76/23
**addressed [3]** 34/23
36/3 75/18
**admissibility [1]** 54/24
**admissible [1]** 10/2
**admission [2]** 45/13
58/3
**admit [16]** 6/14 6/21
8/11 8/13 8/17 27/4
28/3 28/18 45/2 45/11
47/10 54/8 54/23 57/15
59/14 59/20
**admittance [1]** 6/24
**admitted [1]** 57/17
**admitting [1]** 46/25
**admonished [2]** 67/8
72/7
**advice [3]** 74/19 74/22
75/1
**advise [3]** 35/10 56/11
74/8
**advised [2]** 73/1 73/2
**advising [1]** 33/5
**after [24]** 10/23 12/20
19/13 28/22 29/17 30/4
31/2 34/16 35/5 36/22
37/13 38/4 38/9 46/17
49/17 58/18 59/11 63/7
63/22 64/7 64/22 70/11
70/15 71/19
**afternoon [1]** 47/19
**afterwards [1]** 51/17
**again [16]** 29/2 29/20
31/15 31/24 32/21
34/17 43/6 45/14 49/4
49/13 54/13 59/16
63/14 64/15 72/18 74/5

**against [7]** 18/15 21/4
22/4 36/19 69/12 69/14
69/15
**agency [2]** 55/23 55/24
**ago [1]** 59/24
**agree [3]** 3/18 4/3 10/4
**agreeing [1]** 48/14
**ahead [5]** 5/13 8/18
33/1 33/3 58/22 75/11
**ahold [1]** 25/1
**aided [1]** 2/7
**alarm [1]** 30/6
**alarmed [1]** 30/8
**Albany [4]** 4/15 28/5
28/8 49/11
**all [62]** 4/12 5/12 5/23
6/14 7/8 7/12 11/20
13/14 13/25 15/8 16/21
17/9 19/22 23/3 23/13
24/3 24/6 24/15 27/2
27/20 28/7 29/6 30/22
31/1 31/19 32/20 34/23
35/9 36/8 36/21 37/5
37/12 39/20 47/11 48/1
50/13 51/7 53/3 54/15
54/20 55/6 55/11 57/9
57/24 58/5 58/16 58/21
59/22 63/6 63/20 65/19
66/13 67/20 68/21 69/4
73/19 74/15 75/13 76/8
76/10 77/13 79/1 79/22
**All right [9]** 5/12 5/23
13/25 15/8 28/7 31/19
36/8 50/13 63/20
**allegation [2]** 62/14
67/14
**allegations [1]** 5/1
**alleged [1]** 25/25
**allegedly [3]** 22/6
45/19 66/11
**allow [2]** 72/19 75/9
**allowed [1]** 48/21
**allowing [2]** 49/2 66/13
**almost [4]** 48/7 56/14
60/14 71/18
**along [3]** 3/19 38/25
59/7
**already [4]** 22/4 57/16
59/19 71/15
**also [13]** 13/15 36/13
46/1 48/13 53/22 57/10
58/17 58/24 59/6 61/20
68/6 73/22 79/14
**although [1]** 69/12
**am [9]** 24/24 26/5
26/16 33/25 58/4 65/15
71/1 74/6 76/14
**AMERICA [2]** 1/3 3/5
**anger [2]** 30/13 69/14
**angry [1]** 30/17
**annoying [1]** 20/4
**another [18]** 20/4
34/20 35/9 36/10 37/3
38/20 50/10 57/10
58/24 58/24 59/8 59/23
74/7 75/1 77/9 77/17
78/11 79/4
**answer [3]** 16/25 41/21

**A**

answer... [1] 64/17
any [26] 5/10 13/1 14/4
22/8 22/21 23/16 24/25
28/25 29/3 30/13 37/6
39/2 39/14 39/17 44/4
47/3 50/23 54/13 56/6
62/16 66/2 69/9 71/15
77/6 80/2 80/10
anybody [5] 15/24
28/25 37/6 69/24 80/7
anybody's [1] 20/7
anyone [1] 53/15
anything [14] 20/9
22/13 23/17 30/5 34/16
35/5 35/18 43/7 44/7
47/7 55/21 57/25 79/25
80/17
anyway [2] 73/4 77/14
apparently [3] 20/21
51/4 54/17
appearance [2] 33/20
59/5
APPEARANCES [2]
1/12 2/1
application [1] 49/10
appointment [27] 9/16
10/17 10/17 10/19
11/23 12/3 12/13 12/14
12/15 12/16 12/18 14/9
14/15 14/21 14/25 15/2
15/10 55/21 56/7 56/11
56/12 56/15 61/8 67/4
71/18 71/22 72/6
appointments [1] 67/3
appreciate [2] 23/15
69/3
approach [2] 78/14
78/20
appropriate [4] 30/9
32/17 47/6 48/24
approximately [1] 27/6
April [9] 26/19 26/19
27/6 31/2 31/8 31/25
35/16 35/17 42/5
April 5th [1] 27/6
are [44] 4/13 4/15 4/19
6/21 8/10 13/23 14/16
18/15 18/24 19/2 19/9
21/23 23/3 23/7 24/23
25/23 25/23 27/8 28/3
29/25 30/9 33/17 33/23
38/21 38/23 40/6 43/3
45/5 45/24 47/15 57/24
58/6 62/17 65/8 65/13
66/3 68/13 71/20 73/18
73/18 76/11 76/12 77/7
78/19
area [3] 37/19 68/8
68/12
argue [1] 69/8
argues [1] 70/18
argument [4] 4/25 5/8
42/20 69/1
arguments [2] 54/24
71/15
arose [2] 32/23 36/18
around [7] 19/15 23/9

39/12
arrest [1] 12/22
arrested [2] 46/18
66/10
arrests [2] 11/13 47/4
arrived [1] 32/9
as [62] 4/6 4/6 4/11 5/6
6/2 7/9 8/5 8/15 8/15
9/10 9/11 11/21 12/22
12/22 15/20 16/12
16/22 19/17 19/17
21/16 21/16 26/16 30/9
30/10 30/12 30/17
30/20 30/23 30/23 35/2
36/16 38/8 38/17 45/11
49/4 49/15 49/21 50/14
51/17 54/12 56/20 58/9
61/18 62/21 63/3 63/9
63/21 64/22 65/22 66/4
66/16 69/22 70/4 74/17
74/17 76/6 76/12 76/15
76/18 76/24 77/13
79/10
ascertain [1] 46/6
ask [11] 15/12 16/12
23/24 24/19 25/4 36/23
42/7 42/12 61/11 71/10
73/9
asked [20] 10/11 10/19
14/25 17/2 18/9 22/18
39/18 42/10 52/5 52/7
61/14 62/5 63/9 64/12
64/15 64/16 64/18 66/2
70/1 72/25
asking [5] 7/13 9/7
16/22 46/21 80/7
assigned [1] 20/2
Assistant [1] 3/9
attempt [2] 44/13
49/12
attempted [2] 9/2
13/22
attend [2] 50/2 62/20
attorney [17] 1/14 3/9
74/8 74/23 75/2 75/16
76/12 76/13 77/6 77/9
77/11 77/13 77/17 78/6
78/6 79/4 79/7
attorneys [1] 78/20
Audio [2] 29/16 29/18
August [4] 21/23 42/21
45/6 48/20
authenticate [1] 51/2
avail [1] 13/23
available [3] 37/21
80/6 80/11
Ave [1] 1/19
Avenue [1] 2/4
avoid [1] 62/16
aware [17] 13/15 14/16
14/19 18/15 18/19
19/18 20/8 27/8 29/25
36/9 43/3 49/5 49/15
49/21 56/7 62/17 76/3

**B**

back [17] 8/24 15/9

39/18 39/21 40/10 42/5
63/12 65/8 74/25 77/8
79/3 79/16 79/23
background [1] 51/25
bail [2] 36/12 40/16
Barrett [1] 2/4
based [11] 10/25 11/8
16/14 50/21 58/2 62/1
62/19 62/21 63/4 65/21
74/20
bashed [1] 66/12
basis [5] 5/7 30/1
42/7 58/14 59/16 59/19
69/5 71/10 72/3 72/4
72/22
be [62] 3/3 5/20 7/12
8/11 8/20 9/8 9/20 9/21
10/3 10/12 13/17 18/1
22/18 25/10 27/13 29/7
30/23 33/9 35/20 35/23
37/20 37/25 40/8 42/7
43/9 45/21 47/9 47/20
49/11 53/19 53/24 56/1
57/2 57/18 58/23 59/8
63/4 66/14 66/18 66/23
69/11 69/13 71/14 73/6
73/9 73/16 74/7 74/20
75/2 75/18 75/20 76/2
76/3 76/5 76/19 77/1
77/18 77/21 78/11
79/18 79/23 80/12
bearing [1] 29/3
became [3] 8/24 35/22
46/19
because [28] 3/21 9/8
15/1 20/19 21/20 22/5
28/10 31/20 44/10
44/12 45/3 45/21 46/20
46/22 53/17 59/12 61/9
61/9 61/10 61/20 68/3
68/18 70/21 72/9 74/23
76/1 76/25 77/25
been [28] 3/18 4/3 5/1
5/1 9/1 14/19 15/2
35/24 48/7 49/5 54/16
57/16 60/1 66/5 66/10
70/6 75/16 75/17 75/19
75/23 75/24 75/25
75/25 76/3 76/6 76/20
76/21 76/22
before [12] 1/10 19/14
28/21 46/11 52/4 56/8
56/17 67/7 68/4 72/6
72/15 74/23
beginning [3] 46/16
47/15 70/5
begins [1] 66/1
behavior [9] 9/8 32/17
40/18 44/11 59/13
61/19 62/20 62/22
70/22
behaviors [3] 13/16
44/21 62/1
being [9] 10/7 16/17
40/7 46/11 49/14 72/16
75/19 76/23 76/24
belief [1] 71/5

39/18 39/21 40/10 42/5
63/12 65/8 74/25 77/8
79/3 79/16 79/23
believe [34] 4/3 9/25
11/11 12/24 13/5 13/17
14/22 17/20 19/7 21/20
22/5 22/23 35/19 44/20
46/1 52/2 52/24 56/10
57/16 65/20 65/23 67/9
68/4 68/19 69/16 71/9
72/14 72/24 73/1 73/3
73/6 74/6 74/21 77/19
believes [1] 74/7
below [1] 27/19
bench [1] 78/25
best [6] 3/24 53/2 74/6
74/21 76/19 77/23
between [1] 79/10
big [2] 77/7 79/11
bill [2] 63/19 63/19
bit [10] 3/17 11/21 15/9
40/9 41/5 51/19 57/10
58/4 71/25 74/3
black [1] 25/8
blondie [1] 38/8
body [2] 48/24 52/19
bond [2] 42/7 46/15
books [1] 49/14
both [1] 24/20
bracelet [2] 48/14 66/8
BRANDON [4] 1/6 3/5
12/1 48/19
Brandon's [1] 52/3
brief [2] 31/10 66/23
briefly [1] 14/6
bring [3] 52/7 70/19
80/7
broken [1] 68/17
brought [3] 18/15
18/20 18/23
building [2] 32/8 38/7
bunch [1] 3/25
burn [1] 53/23
bus [1] 30/15
business [4] 46/19
70/19 71/2 78/2
button [1] 25/10

**C**

calculate [1] 46/7
call [37] 5/6 9/13 9/22
10/11 10/24 13/2 13/10
14/23 22/14 25/5 33/8
33/12 35/16 35/17
35/18 36/25 37/2 39/6
39/9 39/17 47/12 52/4
52/4 60/25 61/3 63/12
64/1 64/19 64/22 66/13
67/14 68/8 70/12 70/13
70/15 72/2 80/6
call-in [2] 52/4 72/2
called [15] 20/19 20/24
21/24 31/7 34/1 35/1
37/3 39/12 59/11 63/21
64/7 64/12 65/5 65/14
69/24
caller [1] 35/2
calling [11] 7/13 7/13
12/22 22/9 37/5 39/23
45/19 64/7 66/6 67/15
67/18

calls [2] 12/20 68/18
came [18] 8/20 16/5
21/21 22/5 28/14 33/2
33/5 34/17 34/20 40/18
40/22 41/10 43/4 43/22
48/8 52/20 52/24 77/6
can [47] 5/17 6/1 7/5
7/6 7/10 7/18 8/6 11/5
16/25 21/15 22/10 23/9
24/11 24/21 25/1 25/4
25/11 25/18 25/20
26/10 27/11 27/14 32/7
38/14 39/16 40/24
47/23 47/25 51/19 55/4
58/6 66/17 66/18 67/12
69/22 70/6 70/21 71/2
77/3 77/9 78/5 79/4
79/5 79/7 79/10 79/16
79/23
can't [7] 24/7 24/8 26/8
27/8 51/3 62/8 74/24
cancel [2] 12/16 71/22
canceled [8] 10/16
10/19 12/18 14/9 14/25
61/8 62/5 71/19
canceling [3] 67/8 71/8
72/7
cannot [1] 27/9
car [1] 66/12
cara [5] 1/18 1/21 3/12
72/21 77/19
card [4] 67/1 68/17
68/18 69/23
cars [1] 20/25
case [31] 3/4 4/4 4/6
9/5 11/17 12/24 15/20
15/20 16/16 18/20
18/21 18/22 19/7 19/8
19/9 20/3 22/19 30/23
35/23 36/18 43/9 45/8
45/15 45/22 46/11
46/16 69/12 74/7 76/5
78/9 78/11
cases [1] 11/14
caused [2] 30/5 30/22
cautions [1] 78/12
cease [1] 39/10
cell [5] 27/24 28/4
66/12 68/12 68/19
certain [1] 76/17
certainly [2] 77/3 79/13
Certified [1] 2/3
certify [1] 81/2
CH [1] 2/4
challenging [3] 5/2 5/6
5/7
chance [3] 24/25 72/1
77/3
change [1] 53/24
character [1] 77/23
charge [7] 19/11 19/12
19/12 19/13 19/17
19/22 20/9
charged [2] 22/13
22/17
charges [13] 18/15
18/19 18/22 18/24 19/3
19/11 22/22 45/22

**C**

charges... [5] 45/23
47/2 73/18 73/18 73/22
chat [1] 77/10
check [1] 75/7
checked [1] 61/15
Chief [7] 34/19 35/8
37/2 37/9 37/23 38/6
40/18
Christine [4] 37/10
37/23 37/23 38/6
chronological [2]
52/18 53/1
cite [1] 15/19
cited [1] 41/2
civilian [1] 4/18
clarify [1] 40/24
clarity [1] 20/6
clear [3] 20/8 39/19
41/18
clearer [1] 11/21
clerk [1] 13/10
Clerk's [1] 13/5
click [2] 25/12 25/13
client [4] 8/24 23/8
45/19 73/12
code [1] 68/8
codes [1] 68/12
COLUMBIA [2] 1/1
43/12
combination [1] 69/9
come [18] 3/3 3/6 7/9
9/15 10/21 24/21 26/16
28/3 31/21 32/6 33/13
42/11 60/2 76/4 77/8
78/23 79/3 79/16
comes [3] 21/19 68/3
69/21
comfortable [3] 76/11
76/14 77/13
coming [1] 54/21
comment [3] 38/4
63/22 73/15
comments [3] 11/2
13/19 35/25
communication [2]
53/14 67/19
community [10] 11/3
29/4 58/2 62/15 62/21
63/4 65/25 66/14 66/20
69/5
completely [1] 79/14
compliance [2] 9/3
48/19
comply [4] 53/13 71/20
72/1 72/5
complying [1] 72/21
compound [1] 16/21
computer [2] 2/7 37/10
computer-aided [1]
2/7
concern [2] 35/19
76/19
concerned [5] 8/15
30/8 35/14 38/18 74/18
concerning [4] 32/24
42/20 53/11 71/25
concerns [6] 30/13

39/15 44/10
conviction [2] 21/12
47/2
convoluted [1] 21/18
coordinated [1] 55/24
copy [2] 44/2 45/12
corner [1] 25/12
correct [54] 12/2 12/4
12/5 15/17 15/18 15/22
16/19 19/20 20/11
20/23 21/2 21/2 21/5
21/6 22/21 27/22 28/8
28/9 28/12 28/16 28/17
29/11 29/12 29/15
29/23 29/24 31/22
31/23 32/2 34/2 34/8
34/14 36/7 41/15 43/23
50/16 52/21 53/20
53/21 55/9 56/21 58/19
60/22 61/1 61/2 63/18
63/23 63/24 64/4 64/5
64/7 65/8 67/25 81/3
correctly [1] 57/14
corrupt [2] 53/22 59/8
could [29] 6/4 7/24
10/12 10/19 11/7 11/9
18/9 21/19 31/5 32/3
34/21 37/1 57/5 61/11
62/21 64/18 68/13
69/25 74/7 74/8 75/8
76/3 76/4 77/9 77/10
77/11 78/5 78/14 80/13
couldn't [4] 63/7 63/8
66/9 69/24
counsel [8] 3/6 8/4
13/23 44/2 44/11 45/11
57/22 73/24
count [2] 20/3 20/4
couple [5] 9/9 9/10
40/8 45/14 66/24
course [5] 6/10 46/18
50/3 61/19 73/22
court [49] 1/1 2/2 2/3
4/13 4/19 5/11 7/22 8/4
8/5 8/6 8/14 8/17 9/3
9/7 9/10 11/8 11/22
12/6 18/10 19/17 32/6
36/3 36/13 38/14 41/19
43/11 45/17 46/15 48/1
48/17 55/18 59/5 59/6
64/10 65/20 70/4 70/6
70/10 71/6 71/7 71/24
72/13 72/14 72/25 73/2
73/9 74/9 74/24 79/13
Court's [10] 17/7 23/6
41/2 45/5 49/4 49/15
49/21 70/14 70/23
70/24
court-ordered [1] 12/6
courtesy [2] 16/17
28/8
courtroom [6] 27/9
27/14 78/17 79/23
79/24 80/13
courts [1] 47/3
CR [1] 1/4
crafted [2] 16/1 16/7
crass [1] 72/17

conviction [2] 21/12
46/7
cross [5] 6/11 51/3
73/10 73/15 76/24
cross-examination [1]
73/15
cross-examine [3]
6/11 51/3 73/10
cross-examined [1]
76/24
CRR [2] 81/2 81/8
crude [1] 69/13
culmination [1] 44/23
cumulative [1] 59/18
curfew [1] 49/19
currently [1] 26/5
cut [1] 66/8
cutted [1] 71/16

**D**

D.C [9] 1/5 1/20 2/5 9/5
36/23 36/23 42/6 62/14
72/20
danger [16] 11/3 11/9
11/11 12/24 13/17 29/3
35/20 45/25 58/2 62/21
63/4 65/23 65/24 66/14
66/20 71/9
dangerous [1] 44/20
dangerousness [3]
62/15 69/5 71/15
dashboard [1] 66/12
date [5] 22/6 41/4
48/11 62/2 81/7
day [13] 10/13 15/5
29/14 31/8 33/9 33/11
34/11 37/22 45/21 52/2
52/25 56/15 79/13
days [5] 68/13 70/11
70/12 70/16 77/8
deal [7] 7/10 73/20
75/22 76/17 76/18
77/22 79/11
decide [1] 6/1
decided [2] 8/4 11/9
decides [1] 80/4
decision [4] 44/19
44/24 45/4 79/9
defendant [50] 1/7
1/18 8/20 8/24 9/1 9/2
9/6 9/7 9/9 9/10 9/14
9/18 10/16 10/16 10/18
11/1 11/2 11/3 11/13
11/15 11/18 11/22
11/23 13/4 13/11 13/16
13/19 13/20 13/23
28/10 28/15 34/2 34/6
35/20 37/13 39/3 44/20
45/9 46/17 55/18 59/11
60/7 60/9 60/13 60/18
61/23 62/16 65/21 69/5
73/24
defendant's [5] 15/7
27/6 28/4 46/7 51/13
DEFENDER [1] 1/18
defense [4] 13/23
44/11 73/24 77/6
define [1] 67/12

definitely [1] 77/25
deliberately [1] 70/13
denied [4] 10/20 15/11
15/6 61/14
department [3] 30/17
46/2 47/9
Deputy [4] 34/19 35/8
37/2 37/9 37/23 38/6
40/18
described [1] 36/6
detail [1] 14/1
details [1] 46/6
detention [7] 1/9 3/16
4/6 33/21 47/3 79/8
79/10
determination [1]
74/23
dick [1] 53/15
dictating [1] 53/16
did [106]
did you [16] 15/23
15/24 31/2 34/5 36/23
39/2 42/6 42/10 51/23
52/15 52/23 56/6 56/18
62/9 64/25 65/4
didn't [7] 7/4 31/25
48/23 49/13 69/18
70/12 70/13
different [9] 34/13
41/14 68/12 74/15
74/23 75/17 76/13
78/12 79/7
differentiating [1]
77/21
differently [2] 62/25
74/8
differing [1] 78/5
difficult [1] 41/5
digging [1] 3/24
diluted [1] 53/20
direct [4] 26/18 28/15
33/8 39/16
directed [1] 33/13
directing [1] 26/22
directive [2] 32/14
39/18
directives [3] 31/15
31/16 39/21
directly [7] 17/17 39/9
discuss [1] 48/2
discussed [2] 4/12
61/7
discussion [1] 61/4
disingenuous [1] 46/9
DISTRICT [12] 1/1 1/1
1/10 7/22 20/18 26/4
28/11 36/14 43/11
43/11 45/16 48/9
disturbed [1] 30/8
disturbing [4] 49/6
53/25 59/8
do [52] 4/1 4/3 4/21
6/25 7/1 7/9 10/12 13/1
14/22 15/4 15/5 18/1
18/21 18/24 20/9 22/8
23/9 25/20 32/14 35/5
36/17 42/23 42/25 43/8
45/14 48/24 55/3 63/15

**D**

do... [24] 69/8 70/20 70/21 71/2 71/2 71/11 71/21 72/24 73/1 73/3 73/6 74/10 74/13 74/13 75/1 75/5 77/8 77/11 77/22 79/2 79/12 79/25 80/1 80/12

do understand [1] 18/21

do you believe [1] 73/6

do you know [2] 13/1 36/17

document [10] 6/20 41/14 46/25 50/21 50/24 51/12 53/5 54/18 65/7 65/8

documentation [1] 48/14

documents [6] 13/4 33/15 33/18 33/20 33/22 57/25

does [12] 4/5 41/21 64/3 72/12 73/17 74/6 74/20 75/21 76/15 79/17 79/20 79/21

doesn't [9] 5/21 15/3 15/4 15/5 41/4 70/23 71/1 74/21 75/2

doing [11] 15/3 25/21 28/8 49/10 60/1 70/3 70/9 71/20 77/7 79/15 79/15

DOJ [1] 1/13

DOJ-USAO [1] 1/13

don't [49] 5/1 5/5 5/10 7/3 7/9 8/17 18/22 19/9 20/7 21/12 23/16 23/16 24/17 25/11 25/23 26/18 26/24 27/9 28/23 28/24 29/2 29/7 42/18 43/7 45/20 45/23 47/7 47/9 47/14 50/21 50/23 51/5 54/13 54/14 54/19 57/25 57/25 59/20 71/22 72/3 72/14 73/20 74/8 75/13 78/16 78/18 80/3 80/8 80/11

done [8] 3/25 10/12 30/2 40/15 46/18 54/18 55/21 77/23

down [8] 13/8 17/12 22/9 25/8 25/24 36/15 43/11 45/16

downstairs [1] 32/7

drafted [4] 16/14 18/1 41/14 62/14

drive [1] 30/11

drug [4] 15/4 49/22 52/5 52/6

during [7] 32/16 32/19 50/3 54/6 61/3 66/1 71/21

DVA [1] 52/8

**E**

each [2] 20/25 76/6

easy [1] 66/8

edification [1] 45/6

edited [1] 43/18

edits [1] 40/23

effort [1] 69/18

EI [1] 63/18

either [1] 21/16

elaborate [1] 11/9

elect [1] 4/6

else [5] 16/15 23/17 35/19 44/7 75/6

email [38] 1/17 1/21 15/20 15/24 16/8 16/13 16/15 17/2 17/6 17/13 17/16 17/17 17/24 17/24 17/25 18/4 18/6 19/23 20/1 20/10 20/17 21/15 30/25 37/6 37/11 40/11 40/17 40/22 40/23 40/24 41/2 41/4 41/8 41/10 60/13 60/22 60/25 66/25

emailed [1] 56/10 56/13 60/20

emails [1] 50/11 60/9 60/18

emergency [4] 48/16 57/1 57/5 69/23

emotional [1] 34/21

employee [1] 9/4

employees [1] 70/24

employment [4] 49/9 49/12 49/18 52/8

en [1] 6/22

end [2] 24/17 45/21

ended [1] 31/18

enforcement [1] 63/16

enhancements [1] 73/23

enjoy [1] 31/17

enough [5] 5/3 62/7 62/7

enrollment [1] 48/18

entails [1] 73/13

enter [1] 32/8

entirety [1] 15/3 18/4

entitled [1] 79/13

escalated [1] 69/17

escalating [3] 44/20 61/19 69/13

escalation [1] 70/2

escort [1] 38/7

especially [3] 21/18 69/15 72/5

eval [1] 62/24

evaluation [11] 12/4 14/10 50/2 55/24 56/1 61/5 61/24 62/3 62/10 67/4 72/14

even [8] 3/20 30/24 45/18 46/10 47/7 52/1 62/25 78/16

evening [1] 38/19

events [1] 54/6

ever [2] 50/4 50/7

every [1] 76/6

everything [1] 44/23

evidence [10] 10/2 45/3 50/19 51/8 54/21 55/1 57/17 59/21 69/10 69/16

ex [2] 20/22 36/19

ex-girlfriend [2] 20/22 36/19

exactly [3] 23/7 71/21 74/3

examination [1] 73/15

examine [3] 6/11 51/3 73/10

examined [1] 76/24

example [2] 55/8 57/10

except [1] 71/24

excises [1] 40/23

excuse [1] 48/20

exercise [4] 48/22 49/3 56/13 56/25 71/18

exhibit [19] 27/4 28/2 28/19 35/17 45/11 50/14 53/4 54/9 54/12 55/1 55/13 56/21 57/15 57/17 58/22 59/1 59/15 70/18 70/25

Exhibit 1 [3] 50/14 54/9 70/18

Exhibit 2 [2] 55/13 56/21

Exhibit 5 [1] 45/11

exhibited [2] 9/9 11/1

exhibiting [1] 70/22

exhibits [2] 6/19 8/10

expectation [1] 62/2

experience [6] 28/15 28/15 48/2 48/5 65/21 65/22

explain [4] 7/6 43/21 57/3 62/19

explicit [1] 34/10

extremely [2] 34/20 38/17

**F**

facilitate [1] 55/20

fact [6] 32/13 70/24 71/18 71/23 74/20 75/21

facts [4] 21/20 46/8 76/25 77/1

factual [1] 5/7

failed [1] 49/22

failing [2] 49/19 49/19

failure [4] 49/17 49/18 62/10 62/20

fall [1] 54/5

familiar [1] 33/23

family [4] 10/25 15/7 39/24 66/18

fan [1] 53/16

far [5] 4/6 8/15 19/17 26/13 74/17

fashion [1] 6/7

fast [1] 47/8

FBI [1] 49/11

fd.org [1] 1/21

February [5] 17/6 50/15 51/5 54/2 59/2

feed [1] 10/1

feedback [1] 26/8

feel [13] 3/18 21/18 48/23 62/7 63/3 65/24 66/6 66/19 66/19 71/22 75/1 76/18 76/19

feeling [2] 61/9 62/6

FELLOWS [53] 1/6 3/5 3/13 3/15 4/5 11/25 12/1 14/8 18/16 20/19 21/3 22/3 25/24 26/16 27/18 29/2 31/3 32/7 32/24 33/6 33/8 33/12 35/1 35/24 38/3 39/7 39/13 43/14 48/3 48/8 49/16 50/4 52/1 52/10 52/16 52/20 55/8 56/7 62/15 62/25 73/1 73/3 74/2 74/5 74/10 76/11 78/10 78/11 79/2 80/4

Fellows' [2] 3/23 53/12

felt [5] 11/2 59/10 64/22 64/24 72/15

female [2] 21/24 36/10

few [2] 63/13 77/8

field [1] 52/3

fight [1] 30/14

figure [2] 41/5 80/15

file [5] 8/13 8/17 9/6 9/6 33/18

filed [4] 10/7 45/22 49/5 49/16

filing [1] 15/11

fill [1] 13/6

find [10] 9/18 46/7 66/13 69/18 69/19 72/4 72/22 75/5 77/9 79/4

finding [1] 74/9

fine [5] 6/7 23/11 44/3 76/23 76/24

first [12] 3/21 7/13 16/21 26/19 28/15 46/1 46/18 48/3 49/16 57/6 69/21 74/1

five [5] 26/23 27/1 70/11 70/12 76/23 27/1

five-minute [2] 26/23 27/1

folks [3] 24/4 68/12 80/19

follow [9] 21/19 31/11 31/16 41/23 49/19 49/22 71/6 71/8 72/6

follow-up [1] 72/6

followed [1] 38/6

following [15] 17/12 20/20 20/21 20/25 21/25 22/6 31/8 37/22 41/8 48/9 48/18 49/25 50/1 59/5 67/5

foregoing [1] 81/3

forget [2] 48/25 49/2

forgot [2] 56/14 60/14

form [4] 13/6 13/8

forward [5] 3/6 8/21 24/6 25/18 44/24

found [5] 21/3 49/11 52/17 53/24 59/8

foundation [3] 8/12 27/7 51/20

four [1] 6/19

fourth [2] 17/12 41/6

frightening [1] 66/7

front [4] 36/2 42/19 42/23 43/1

frustrations [1] 32/18

fuck [1] 30/21

full [9] 7/25 15/24 17/25 33/24 34/2 46/15 47/20 57/13 72/1

fun [2] 58/11 70/17

Furst [14] 1/13 3/9 3/11 4/10 5/10 23/3 43/21 59/23 68/25 69/4 71/12 73/6 79/17 79/25

further [7] 20/13 39/2 42/16 67/21 68/24 79/25 80/17

future [1] 72/23

**G**

gave [2] 32/14 34/9

genitalia [5] 36/6 61/21 61/22 61/22 70/15

gentleman [1] 27/18

get [13] 18/10 20/6 25/1 25/8 52/5 57/5 60/4 62/24 72/19 72/20 74/22 75/3 80/13

getting [7] 6/18 30/16 37/25 51/17 56/25 73/17 75/23

girlfriend [2] 20/22 36/19

girlfriend's [1] 66/12

give [7] 10/12 24/14 34/13 46/15 53/18 74/14 79/3

given [9] 37/20 45/9 46/2 51/16 54/11 57/6 71/17 71/25 75/25

giving [1] 78/12

Glenmont [1] 68/7

go [39] 5/13 5/16 8/9 8/9 8/18 10/20 12/13 12/15 12/21 14/1 15/1 15/1 15/4 15/4 21/12 22/2 23/9 24/6 25/18 25/24 33/1 33/3 38/18 40/10 45/4 48/3 54/24 55/12 58/22 61/7 61/11 61/12 62/2 62/7 62/10 63/7 64/25 66/9 75/11 65/8

go ahead [6] 5/13 8/18 33/1 33/3 58/22 75/11

goes [1] 47/2

going [39] 6/6 8/5 9/15 9/19 9/20 9/24 10/6 15/5 16/20 28/3 33/8 34/24 37/20 37/25 38/18 38/21 42/5 47/15 51/2 53/15 53/19 57/2

**G**

**going...** **[17]** 58/5
58/14 58/17 58/23
62/24 69/4 70/20 70/20
71/5 71/7 71/8 72/4
72/18 72/19 72/23
76/25 79/9
**good** **[13]** 3/8 3/11
3/14 3/15 7/16 7/17
14/7 14/11 26/2 40/6
47/19 62/7 77/23
**good morning** **[9]** 3/8
3/11 3/14 3/15 7/16
7/17 14/7 26/2 40/6
**Google** **[4]** 39/8 45/10
67/24 69/20
**Googling** **[2]** 68/15
69/20
**got** **[11]** 9/12 15/6
16/23 20/17 21/11
36/12 42/3 56/20 59/23
64/22 72/10
**government** **[4]** 1/13
3/7 28/24 53/22
**Government's** **[4]** 27/4
28/19 53/4 55/1
**granted** **[1]** 3/21
**great** **[3]** 61/9 62/6
75/22
**guess** **[9]** 3/17 5/5 20/6
24/10 40/21 46/14
67/13 68/11 73/15
**guessing** **[1]** 24/4
**Guilderland** **[6]** 36/15
42/20 43/10 45/2 46/2
66/16
**Guilders** **[2]** 21/7 36/10
**guilty** **[1]** 43/14
**guys** **[1]** 24/13

**H**

**had** **[41]** 9/22 10/12
11/1 11/2 11/8 11/15
11/16 11/22 12/3 13/16
24/13 28/21 30/13
31/10 31/24 32/21
34/22 34/25 35/5 36/2
38/10 38/11 39/7 39/19
52/25 52/25 56/10 57/6
59/11 60/18 63/15
64/12 65/4 65/5 66/2
69/24 70/7 70/11 74/2
75/16 75/23
**half** **[1]** 59/24
**halverson** **[21]** 1/18
1/21 3/12 3/14 3/17
4/23 8/13 14/5 22/7
23/18 40/5 46/12 51/9
71/13 73/13 76/12 77/5
78/4 79/6 79/20 80/17
**Halverson's** **[3]** 22/12
37/7 47/1
**hand** **[2]** 24/5 25/11
**hands** **[2]** 16/11 66/3
**happen** **[1]** 34/16
**happened** **[20]** 4/21
5/3 5/18 8/7 8/19 9/9
13/16 17/3 20/2 34/22

38/10 38/11 47/16 60/5
63/8 64/7
**happens** **[1]** 6/9
**happy** **[1]** 78/9
**harassment** **[12]** 11/14
11/14 12/22 12/24 19/7
20/4 20/9 30/12 42/20
45/8 69/14 69/17
**has** **[25]** 6/1 9/9 11/13
13/19 13/20 15/2 19/11
20/9 29/3 30/2 30/22
35/24 37/25 43/7 45/11
48/19 66/11 70/3 72/16
74/5 75/16 77/1 77/19
77/22 77/23
**have** **[91]**
**haven't** **[1]** 71/25
**having** **[3]** 26/7 32/9
54/12
**he** **[215]**
**he didn't** **[2]** 70/12
70/13
**he said** **[3]** 53/23 62/5
62/8
**he'll** **[1]** 79/4
**he's** **[28]** 3/25 14/20
21/11 23/9 29/3 30/16
45/25 49/5 53/16 58/2
65/23 65/24 66/4 66/10
66/14 67/14 69/6 70/9
70/16 70/22 71/5 71/8
71/9 72/12 72/19 72/22
74/18 75/3
**head** **[1]** 27/21
**health** **[16]** 10/17 12/4
14/9 50/2 55/19 61/5
61/8 61/24 62/3 62/10
62/20 62/24 67/4 71/7
72/14 72/17
**hear** **[12]** 3/25 5/25 6/2
24/7 24/8 24/11 25/11
26/8 38/21 47/15 47/23
78/12
**heard** **[1]** 30/4 30/10
72/1
**hearing** **[22]** 1/9 3/16
4/7 33/21 36/6 49/25
50/1 50/1 51/17 53/11
55/14 56/24 59/23
67/11 67/15 70/11
70/12 71/4 71/4 71/24
78/7 79/8
**hearings** **[2]** 28/21
76/9
**hearsay** **[2]** 9/21 10/2
**heart** **[2]** 73/18 74/22
**held** **[2]** 12/10 56/1
**hell** **[1]** 53/23
**help** **[2]** 25/5 72/19
**helpful** **[2]** 75/2 75/16
**her** **[56]** 5/14 5/14 6/2
7/13 8/13 10/18 16/12
22/6 24/5 24/6 25/2
25/5 25/8 25/8 30/20
31/20 33/6 34/25 35/1
35/2 35/2 36/22 37/3
37/10 37/11 37/11

38/19 38/20 39/8 39/8
39/8 39/9 39/10 39/23
58/7 63/12 64/12 64/17
64/19 64/24 65/3 65/4
65/5 66/9 66/12 66/13
68/3 69/20 69/22 71/2
77/13 77/14 77/23
**here** **[12]** 3/16 40/7
43/8 43/11 45/16 46/14
60/2 75/23 76/22 76/23
78/23 79/18
**hey** **[1]** 75/17
**him** **[86]**
**his** **[90]**
**history** **[3]** 10/13 11/1
46/7
**hit** **[1]** 69/25
**hobby** **[1]** 58/12
**hold** **[1]** 69/4
**home** **[4]** 56/25 65/3
66/2 68/14
**honest** **[1]** 30/23
**honestly** **[3]** 3/20 7/4
**Honor** **[73]** 3/4 3/8 4/2
4/11 5/12 6/4 6/18 6/24
7/12 7/17 9/25 11/5
14/1 16/20 21/10 21/17
22/15 23/17 23/24 24/4
27/3 27/12 27/17 28/18
28/20 29/21 33/17
38/23 39/25 40/2 43/7
43/23 44/1 44/6 45/2
46/11 46/13 47/12 50/1
50/18 50/20 51/14 54/8
54/10 55/2 57/15 58/8
58/9 58/16 58/23 59/14
60/3 65/15 66/22 68/2
68/6 68/24 69/10 69/13
69/16 71/3 71/10 72/20
72/24 73/8 74/1 78/8
79/18 79/21 80/1 80/11
80/16 80/18
**HONORABLE** **[2]** 1/10
3/2
**hopefully** **[3]** 40/8 79/4
79/7
**hormone** **[1]** 63/22
**hormones** **[4]** 33/6
35/18 61/15 63/10
**hour** **[2]** 59/24 60/2
**house** **[1]** 66/9
**how** **[18]** 4/12 8/20
16/10 25/23 27/10
35/24 42/3 47/9 48/2
59/10 64/22 68/18
70/17 74/4 75/5 75/13
77/21 78/5
**however** **[3]** 22/17
33/23 62/13
**huh** **[2]** 6/17 18/18

**I**

**I also** **[3]** 46/1 48/13
79/14
**I am** **[4]** 26/5 58/4
65/15 74/6
**I believe** **[15]** 8/25

22/5 22/23 52/2 52/24
56/10 57/16 68/4 69/16
73/3 77/19
**I can** **[11]** 7/6 21/15
22/10 25/1 27/11 51/19
55/4 70/6 70/21 71/2
78/5
**I can't** **[3]** 26/8 27/8
51/3
**I could** **[1]** 34/21
**I couldn't** **[1]** 66/9
**I did** **[7]** 15/12 33/12
34/22 37/20 42/1 65/2
76/16
**I don't** **[19]** 5/10 23/16
23/16 25/11 28/23
28/24 29/2 29/7 43/7
45/23 51/5 57/25 57/25
59/20 72/3 72/4 78/16
80/3 80/11
**I don't have** **[2]** 50/23
54/13
**I gave** **[1]** 34/9
**I guess** **[8]** 3/17 20/6
24/10 40/21 46/14
67/13 68/11 73/15
**I have** **[18]** 4/5 6/19
18/25 23/16 23/17
39/25 51/2 60/14 67/22
68/24 69/1 72/25 73/1
73/14 74/21 75/22
76/20 78/9
**I just** **[9]** 6/7 16/10
21/18 40/21 43/15
54/19 75/15 76/5 78/10
**I know** **[4]** 13/3 18/20
30/2 58/23
**I mean** **[4]** 21/15 25/7
78/4 80/3
**I provided** **[1]** 39/16
**I should** **[1]** 74/13
**I suppose** **[1]** 80/5
**I think** **[28]** 4/24 4/25
6/7 15/19 16/21 22/12
23/13 23/20 25/7 29/1
30/9 45/15 47/1 47/2
54/11 54/23 59/19
67/23 69/6 69/10 70/2
71/3 71/20 74/18 75/21
77/5 78/7 78/8
**I thought** **[2]** 43/21
57/20
**I told** **[6]** 31/11 33/7
39/9 48/21 63/10 63/12
**I understand** **[6]** 11/22
17/9 46/23 47/1 71/9
79/12
**I want** **[4]** 8/11 71/2
79/2 79/3
**I wanted** **[1]** 22/16
**I was** **[10]** 9/19 10/11
26/13 33/7 34/19 36/4
47/19 47/20 52/2 63/11
**I will** **[4]** 39/9 53/24
60/3 75/7
**I would** **[3]** 17/20 59/14
78/13

86

**[3]** 75/15 77/8 77/23
**I'll** **[14]** 5/13 8/12 14/1
16/12 19/15 40/2 44/1
47/10 54/23 66/21
66/23 71/14 72/13
79/18
**I'm** **[67]** 3/17 6/8 8/5
9/6 9/16 11/16 16/20
17/5 17/11 17/16 18/1
18/19 18/25 19/14 20/6
22/7 23/7 24/4 25/4
26/3 26/7 26/7 30/17
33/4 35/17 38/21 39/22
41/1 41/1 42/24 42/25
45/18 46/25 47/20
53/14 53/15 53/16
57/17 57/23 58/14
58/17 59/25 62/8 65/13
68/11 68/13 68/16
68/17 69/4 70/20 70/20
74/3 74/3 74/14 75/2
75/12 76/4 76/18 76/23
76/24 77/5 77/15 78/7
78/9 78/12 79/9 80/7
**I'm just** **[2]** 20/6 68/11
**I'm not** **[13]** 8/5 18/25
23/7 47/20 53/15 58/14
58/17 62/8 69/4 70/20
74/3 76/18 80/7
**I'm not sure** **[1]** 22/7
25/4 68/17
**I'm sorry** **[18]** 9/6 9/16
11/16 17/5 19/14 26/7
33/4 35/17 38/21 41/1
42/24 42/25 45/18
53/16 57/23 59/25
65/13 75/12
**I'm sure** **[1]** 77/5
**I've** **[15]** 3/18 3/19 24/3
48/7 50/22 59/23 68/3
70/6 70/6 74/2 75/25
76/3 76/7 76/21 76/22
**icon** **[1]** 25/12
**ID** **[1]** 35/2
**identification** **[1]** 27/23
**identified** **[1]** 35/2
**identify** **[3]** 3/6 27/10
27/11
**imagine** **[1]** 78/5
**immature** **[1]** 69/6
**immediate** **[2]** 76/1
78/1
**immediately** **[2]** 48/18
71/19
**important** **[3]** 44/12
44/17 46/19
**improper** **[1]** 46/3
**improving** **[3]** 67/10
72/2 72/13
**inappropriate** **[8]** 36/1
49/6 50/7 50/10 53/13
53/14 53/25 63/23
**incident** **[4]** 25/25 36/9
36/22 41/18
**include** **[3]** 13/6 15/24
33/19
**included** **[4]** 18/6
48/12 48/16 54/17

**I**

including [4] 39/20 47/4 49/7 69/24
increased [2] 30/24 67/18
incredibly [1] 59/18
Indiana [1] 1/19
indicate [1] 60/14
indicated [11] 35/1 36/12 48/23 49/10 49/13 61/8 64/12 64/13 64/16 64/18 66/3
indicating [4] 9/14 39/7 56/14 59/6
indication [1] 56/6
indulgence [3] 17/7 23/6 41/3
inference [1] 72/9
inflame [1] 29/1
inflamed [1] 29/7
information [21] 11/8 11/15 13/6 13/7 16/4 16/23 18/10 18/27 26/5 28/23 29/5 36/12 36/16 37/7 37/11 43/14 48/13 49/18 50/25 58/1 59/19 63/5
informed [1] 9/14
initial [1] 33/20
initially [1] 30/25
initiated [1] 76/24
Inman [3] 40/15 41/11 41/13
innuendo [1] 35/25
innuendos [1] 66/5
inquire [1] 39/22
inquiry [2] 51/6 73/16
Instead [1] 54/17
instructed [2] 9/4 32/16
instructions [2] 31/12 34/10
instrumental [1] 44/10
intent [1] 34/12
intercoms [1] 78/18
interest [1] 73/2
interests [2] 3/24 74/22
interpreted [1] 49/1
interview [1] 66/1
intimidation [5] 44/13 66/7 66/17 66/19 69/17
investigate [1] 20/25
investigators [1] 17/14
involves [1] 45/6
is [189]
Is it [1] 17/25
is that correct [12] 12/4 21/5 28/16 29/23 31/22 52/21 55/9 56/1 60/22 61/1 64/4 67/25
is there [2] 24/16 44/7
isn't [1] 29/4
issue [2] 32/23 72/18
issued [1] 50/1
issues [4] 9/1 36/3 39/17 47/3
it [128]

16/21 16/22 17/11 17/23 18/4 18/25 19/10 28/23 29/13 29/19 30/10 39/10 39/15 41/5 41/6 41/6 44/12 44/23 46/13 50/21 50/24 54/17 57/16 58/11 58/11 59/12 59/18 66/8 66/19 70/17 72/7 75/13 75/17 75/21
It's a [1] 50/21
its [4] 18/4 51/7 54/20 58/3

**J**

J-e-a-n-n-i-n-e [1] 26/3
jail [1] 72/20
January [4] 8/24 46/17 48/9 48/21
January 19th [1] 48/9
January 26th [1] 48/21
Jeannine [1] 26/2
job [6] 10/20 26/23 30/20 31/17 31/21 75/22
job-search [1] 26/23
joint [1] 36/25
judge [24] 1/10 8/6 8/19 11/10 11/17 13/9 17/14 18/21 19/8 19/18 20/2 20/15 22/17 22/18 24/19 25/18 25/25 31/5 32/3 44/8 45/8 47/19 48/4 66/16
judge's [8] 12/23 13/2 13/11 22/9 22/14 36/15 45/10 45/19
judges [1] 3/21
judgments [1] 74/6
judicial [2] 33/19 54/16
July [1] 1/5
jumped [1] 66/11
jumpsuit [1] 27/19
June [38] 8/19 9/12 12/3 12/10 13/15 32/22 32/23 33/11 34/7 36/5 39/3 39/12 42/11 48/5 50/1 54/6 55/14 55/25 56/2 56/8 56/10 56/13 56/16 56/17 56/17 57/20 57/21 58/18 58/18 59/3 60/5 60/6 60/10 65/11 66/25 67/5 70/15 71/4
June 14th [2] 32/22 55/25
just [64] 4/20 5/3 5/13 6/4 6/7 6/21 8/6 8/18 10/5 14/6 14/25 15/9 15/24 15/25 16/10 17/8 18/12 20/6 20/7 21/18 21/19 23/8 23/9 24/9 25/5 25/24 26/25 27/7 29/1 29/19 30/8 37/5 40/7 40/10 40/21 41/17 41/23 43/15 44/1 46/13 47/15 48/4 50/5 50/24

58/6 63/15 64/12 66/15 68/11 69/25 69/25 72/13 75/15 76/5 76/5 76/22 77/6 77/20 78/10 80/13
justice [1] 73/23

**K**

K-i-e-b-a-r-t [1] 26/3
keep [2] 47/9 55/4
Kendra [10] 23/25 24/1 24/2 26/5 35/3 37/3 47/13 48/6 64/13 70/1
Kendra's [2] 35/22 64/15
kept [2] 32/11 61/10
keychain [1] 32/11
Kiebart [36] 4/15 5/17 8/3 8/9 8/10 9/13 10/22 10/23 16/5 16/7 16/12 16/14 16/23 17/20 18/12 19/24 24/4 24/5 24/19 24/23 25/18 25/21 26/3 26/14 27/5 29/10 29/17 29/22 33/22 42/17 42/18 44/5 44/7 63/21 69/25 70/25
kind [9] 7/3 15/2 30/13 54/18 55/8 72/8 72/8 75/13 79/9
kindly [1] 30/21
knew [4] 52/3 56/15 57/5 64/23
knife [2] 32/11 32/13
know [44] 5/2 5/5 8/19 10/1 13/1 13/8 13/20 18/22 18/24 19/9 21/12 25/11 25/25 26/11 26/16 26/18 26/24 27/10 30/2 34/22 35/3 36/17 42/18 44/8 44/12 47/14 49/2 50/21 52/6 54/14 57/2 58/2 58/23 62/7 64/17 68/11 70/25 71/1 74/9 75/13 76/15 76/21 78/4 78/16
knowledge [3] 33/19 54/2 76/8
knows [4] 22/7 24/19 56/8 68/9
KS [1] 1/16
Kurtz [1] 1/18

**L**

Lacoy [8] 50/11 50/15 51/3 51/23 52/15 52/20 52/25 54/3
lady [1] 59/7
laid [1] 63/3
land [1] 4/25
landline [2] 65/4 65/11
language [1] 43/22
larceny [2] 19/12 19/13
last [6] 18/25 26/3 45/7 65/10 67/11 67/15
lastly [1] 66/15
late [3] 56/25 57/2 57/3

35/1 37/15 46/8 63/19 70/16
law [1] 63/16
laws [2] 76/17 76/20
lawyer [1] 76/18
lay [3] 8/12 27/7 51/19
lead [1] 73/17
leading [2] 48/5 55/12
learn [1] 22/2
learned [4] 34/25 35/5 35/23 59/11 63/22 64/6
least [2] 61/12 76/2
leave [4] 38/5 50/4 62/21 70/17
leaves [1] 58/10
leaving [3] 12/23 49/5 70/16
led [6] 10/6 11/10 12/24 13/17 35/19 49/23
left [10] 13/20 25/11 28/22 38/3 42/6 49/21 57/3 59/2 59/4 61/20
left-hand [1] 25/11
legal [4] 4/25 5/8
lengthy [1] 30/10
let [6] 5/25 26/11 27/7 52/6 57/1 80/3
let's [9] 19/5 38/25 55/4 55/7 55/12 58/22 60/4 79/16 80/12
let's see [1] 19/5
license [1] 70/19
lied [2] 75/23 76/21
lies [2] 75/19 76/23
life [2] 78/1 78/2
like [35] 3/18 4/7 4/12 5/24 9/20 11/2 13/5 13/22 18/9 19/6 19/9 24/3 24/8 25/7 26/9 29/19 43/9 53/24 54/15 62/6 67/16 73/3 75/2 75/18 75/20 76/2 76/5 76/15 76/16 76/22 77/8 77/16 77/18 77/23 78/4
line [2] 21/11 26/18 39/16 43/6 43/17 68/14 68/14
lines [1] 59/7
lips [1] 27/19
list [1] 52/4
listed [2] 62/25 67/24
listen [2] 70/23 75/3
listened [2] 29/10 31/14
litigate [2] 43/9 45/15
litigated [3] 43/10 43/10 46/11
little [12] 3/17 10/20 11/21 15/9 21/18 40/9 41/5 51/19 57/10 58/4 71/24 74/3
live [2] 38/20 64/3
lived [2] 28/10 68/4
lobby [1] 31/25
locate [1] 63/12
location [4] 39/10

location-monitoring [2] 39/10 39/15
logs [1] 26/23
long [3] 50/4 58/10 75/5
longest [1] 76/21
look [4] 17/20 27/9 53/2 74/15
looked [1] 40/22
looks [5] 19/6 24/3 24/8 25/7 26/9
lot [7] 7/4 9/3 21/1 40/17 42/21 68/11 71/21
lower [1] 25/11
lying [2] 59/8 75/18

**M**

ma'am [6] 7/19 10/9 11/6 20/14 47/23 68/22
mad [1] 72/10
made [18] 10/24 11/2 13/19 14/19 14/23 28/25 30/11 30/14 30/16 30/19 33/6 38/7 40/23 44/24 46/17 64/24 66/7 76/2
magistrate [1] 17/14
magistrate judge [1] 17/14
mailed [2] 63/13 63/14
Main [1] 1/15
make [21] 6/7 7/4 9/16 9/19 10/24 11/21 12/13 15/2 17/8 20/7 22/17 39/19 43/14 53/19 59/19 68/18 72/5 74/9 76/2 79/9 79/14
makes [6] 5/9 5/24 6/2 40/18 45/22 53/22
making [7] 35/25 66/5 69/17 74/6 74/19 74/23 74/24
male [2] 37/25 38/1
man's [1] 21/25
manager [1] 9/5
manner [2] 36/1 78/1
manufactured [1] 53/20
many [6] 16/10 71/20 75/16 75/19 75/24 75/24
March [1] 35/22
marked [2] 50/14 56/20
mask [4] 27/19 32/1 32/7 32/15
masks [1] 30/15
masse [1] 6/22
matter [4] 4/11 5/3 22/8 81/4
may [26] 10/9 11/5 13/17 21/21 22/10 23/4 23/18 24/19 25/14 39/25 44/1 49/17 49/22 49/23 49/25 58/17 61/21 68/6 70/10 70/10 70/10 70/11 71/4 75/2

**M**

**may... [2]** 75/10 76/19
**May 5th [1]** 49/17
**maybe [6]** 7/4 14/1
24/16 24/20 25/4 80/13
**McFADDEN [2]** 1/10
3/3
**me [65]** 3/18 3/23 3/25
4/1 4/21 5/9 5/25 7/4
10/12 14/17 16/8 17/2
17/19 17/21 18/11
21/25 23/9 24/11 24/14
25/11 26/25 27/7 30/11
30/22 31/17 32/6 32/18
32/19 33/2 33/5 33/6
33/14 34/10 37/24 38/8
39/17 39/20 41/5 42/23
43/1 45/22 48/21 48/25
49/22 50/11 51/16 53/1
56/13 57/1 57/2 59/5
61/20 63/13 63/14 64/9
66/8 70/21 74/5 74/20
75/4 75/14 76/17 77/12
77/19 80/4
**mean [8]** 17/24 21/15
25/7 49/1 70/5 73/21
78/4 80/3
**meaning [3]** 18/3 52/8
56/15
**means [1]** 31/12
**mechanical [1]** 2/7
**meet [1]** 24/3
**meeting [2]** 34/19
34/23
**Melissa [2]** 41/11
41/13
**member [3]** 10/25 15/7
39/24
**members [2]** 49/7
66/19
**mental [16]** 10/17 12/4
14/9 50/2 55/19 61/4
61/7 61/24 62/3 62/10
62/20 62/23 67/4 71/7
72/14 72/17
**mention [1]** 30/14
**mentioned [1]** 49/15
55/14 66/4
**mere [1]** 75/21
**Merit [1]** 2/2
**message [17]** 6/20
28/25 29/22 42/5 42/8
50/10 50/14 50/23 53/1
53/8 53/11 54/1 54/2
54/5 64/18 70/17 76/18
**messages [7]** 13/20
49/7 50/8 50/19 54/15
57/5 70/18
**met [1]** 48/3
**mic [3]** 80/9 80/10
80/14
**Michael [1]** 37/4
**microphone [1]** 25/13
**might [4]** 25/5 27/13
35/20 78/11
**mind [1]** 62/23
**minute [3]** 9/24 26/23
27/1

**minutes [1]** 58/13
**miserable [1]** 59/7
**misogynist [1]** 69/7
**mistaken [1]** 57/17
**mistakenly [1]** 68/14
**mom [6]** 5/18 5/21
47/16 47/16 59/11
69/24
**moment [4]** 23/4 26/10
39/25 73/21
**Mona [2]** 1/13 3/9
**mona.furst [1]** 1/17
**Monday [1]** 27/5
**monitoring [4]** 39/10
39/15 48/15 63/19
**more [16]** 13/1 14/1
22/7 23/18 27/7 30/16
30/16 30/24 31/10 38/1
38/10 39/14 44/4 44/4
51/19 77/20
**morning [17]** 3/8 3/11
3/14 3/15 7/16 7/17
9/15 10/14 10/15 14/7
14/11 26/2 40/6 40/6
60/11 60/17 79/3
**mostly [1]** 75/17
**mother [15]** 4/17 6/2
34/25 36/23 38/11
38/17 38/19 38/20
63/25 64/3 64/7 64/11
64/21 65/1 66/6
**mother's [3]** 65/11
66/9 67/24
**motion [8]** 3/20 12/10
33/18 46/19 51/13
51/14 70/5 70/7
**move [6]** 6/21 8/13
23/20 27/3 28/3 28/18
38/25 39/1 44/24 45/2
45/11 50/18 54/8 55/3
57/15 58/16 59/14
65/17
**moving [3]** 23/3 25/9
55/4
**Mr. [56]** 3/13 3/15 3/23
4/5 11/25 14/8 18/16
20/19 21/3 22/3 25/24
26/16 27/18 29/2 31/3
32/7 32/24 33/6 33/8
33/12 35/1 35/24 38/3
39/7 39/13 43/14 48/3
48/8 49/16 50/4 51/23
52/1 52/10 52/15 52/16
52/20 52/20 53/12 54/3
55/8 56/7 56/13 56/25
71/18 72/15 72/25 73/1
73/3 74/2 74/5 74/10
76/11 78/10 78/11 79/2
80/4
**Mr. Fellows [50]** 3/13
3/15 4/5 11/25 14/8
18/16 20/19 21/3 22/3
25/24 26/16 27/18 29/2
31/3 32/7 32/24 33/6
33/8 33/12 35/1 35/24
38/3 39/7 39/13 43/14
48/3 48/8 49/16 50/4
52/1 52/10 52/16 52/20

**71/18 72/15 72/25 73/1**
73/3 74/2 74/5 74/10
76/11 78/10 78/11 79/2
80/4
**Mr. Fellows' [2]** 3/23
53/12
**Mr. Lacoy [4]** 51/23
52/15 52/20 54/3
**Ms [3]** 17/20 68/25
80/2
**Ms. [152]**
**Ms. Furst [11]** 3/11
4/10 5/10 23/3 43/21
59/23 69/4 71/12 73/6
79/17 79/25
**Ms. Halverson [18]**
3/14 3/17 4/23 8/13
14/5 22/7 23/18 40/5
46/12 51/9 71/13 73/13
76/12 77/5 78/4 79/6
79/20 80/17
**Ms. Halverson's [3]**
22/12 37/7 47/1
**Ms. Inman [1]** 40/15
**Ms. Kendra [2]** 23/25
47/13
**Ms. Kiebart [34]** 4/15
5/17 8/3 8/9 8/10 9/13
10/22 10/23 16/5 16/7
16/12 16/14 16/23
18/12 19/24 24/4 24/5
24/19 24/23 25/18
25/21 26/14 27/5 29/10
29/17 29/22 33/22
42/17 42/18 44/5 44/7
63/21 69/25 70/25
**Ms. Rennie [59]** 4/15
5/16 5/17 8/4 8/9 8/10
9/17 9/21 9/24 10/2
10/15 12/21 14/2 15/9
17/18 18/12 19/23 24/9
24/16 24/20 24/21
24/25 25/10 26/9 26/10
30/2 30/18 31/20 34/16
34/20 34/23 35/4 35/8
35/24 36/13 36/22
38/10 38/18 38/22 39/7
39/14 41/19 41/24
41/24 42/2 47/14 51/22
54/14 60/4 65/20 66/24
67/23 69/15 69/20
69/22 71/1 72/2 72/6
72/10
**Ms. Rennie's [2]** 4/17
10/25
**Ms. Robinson [22]**
4/14 5/13 7/13 7/16
7/24 8/3 8/8 8/15 8/18
10/5 11/7 14/4 14/7
20/16 23/17 23/23 37/6
40/11 41/25 42/1 42/3
80/1
**much [2]** 26/7 77/18
**multiple [3]** 40/22
43/18 78/2
**mute [1]** 26/10
**my [57]** 4/24 5/7 6/8

71/18 72/15 72/25 73/1
73/3 74/2 74/5 74/10
76/11 78/10 78/11 79/2
80/4
**14/12 15/13 19/10 20/1**
23/8 24/17 26/2 26/19
29/7 30/11 30/17 31/17
33/18 34/10 39/16
39/21 40/15 40/18
40/21 43/5 43/17 43/17
47/21 48/16 49/13 53/1
53/2 53/15 54/10 57/24
63/10 63/11 64/11 66/6
66/9 67/13 68/2 68/7
68/9 73/15 74/10 74/17
74/19 75/7 75/15 76/5
76/8 76/19 78/1 79/23
**myself [3]** 33/8 35/8
37/3

**N**

**name [8]** 7/18 7/25
17/21 26/2 26/3 48/1
67/24 68/2
**narrative [4]** 6/7 25/22
41/7 54/11
**nature [1]** 49/12
**Nazis [1]** 30/20
**necessarily [2]** 5/2 5/6
**necessary [3]** 3/18 5/5
64/19
**need [18]** 4/1 5/10
21/12 25/8 25/12 25/13
59/20 60/2 63/11 69/18
71/1 75/5 76/1 77/25
79/25 80/3 80/6 80/11
**needed [5]** 31/16 32/13
37/22 46/6 52/6
**needs [3]** 31/11 31/13
73/6
**nefarious [1]** 72/8
**nervous [2]** 64/24 66/8
**never [7]** 3/20 15/9
24/3 28/22 45/22 70/7
71/23
**new [20]** 9/11 9/13
15/21 20/18 21/8 21/9
26/5 33/9 33/20 36/14
37/21 37/21 43/10
45/16 46/10 46/21
48/10 64/4 68/7 75/14
**New York [14]** 9/11
9/13 15/21 20/18 21/8
21/9 26/5 33/20 36/14
45/16 46/10 46/21
48/10 64/4
**next [4]** 23/9 23/20
47/11 52/25
**night [1]** 52/4
**no [24]** 1/4 13/23 16/3
19/4 19/25 20/13 25/1
42/9 42/15 42/16 47/1
51/2 55/12 57/19 58/10
62/4 67/21 68/8 70/20
70/20 71/5 72/22 78/9
80/18
**nodding [1]** 27/21
**non [1]** 48/19
**non-compliance [1]**
48/19
**none [1]** 71/1

**normal [1]** 46/18
**normally [1]** 23/8
**North [1]** 1/15
**Northern [5]** 20/17
26/4 28/11 36/14 48/9
**not [121]**
**note [1]** 17/11
**noted [2]** 15/16 70/4
**nothing [4]** 53/19
66/20 68/24 69/1
**notice [1]** 54/16
**notified [1]** 41/19
**now [8]** 14/16 24/11
28/23 47/21 61/23
77/20 79/10 79/25
**number [41]** 11/17
12/23 13/7 13/8 18/17
22/9 27/7 27/25 28/4
31/8 33/13 33/16 33/23
33/24 34/1 34/2 35/3
36/16 39/13 39/16 45/9
45/10 47/4 48/16 48/16
52/3 52/9 52/12 57/1
57/6 61/1 64/13 64/16
65/4 67/24 68/9 69/18
69/21 69/21 69/23 70/7
**numbers [1]** 64/20
**NW [2]** 1/19 2/4
**NYNP [1]** 17/13

**O**

**oath [3]** 4/21 73/7
79/11
**object [17]** 6/8 6/23
6/25 7/1 16/20 21/10
28/20 42/22 43/6 43/15
45/13 50/20 51/7 54/20
58/3 59/16 75/17
**objection [8]** 7/10 8/13
9/19 10/8 54/10 54/23
58/24 59/17
**objections [1]** 57/24
**obstruction [1]** 73/23
**obtain [3]** 46/3 46/5
46/10
**obtained [1]** 41/18
**obvious [1]** 11/19
**obviously [3]** 4/17
76/18 77/20
**occasions [1]** 49/19
**occupation [1]** 48/2
**occur [1]** 38/2
**occurred [4]** 10/13
19/13 38/9 59/6
**occurs [1]** 3/23
**off [8]** 30/21 37/10
57/22 61/10 66/8 73/24
78/13 78/25
**offensive [1]** 72/17
**offer [1]** 71/17
**office [30]** 1/14 7/22
10/21 10/24 13/5 13/11
17/22 24/20 24/23
27/24 27/25 28/5 33/13
34/10 35/10 37/3 37/24
38/3 40/12 40/15 42/11
45/10 48/11 48/13
48/16 49/11 50/8 52/25

89

**O**

office... [2] 67/19 75/7
Office's [1] 69/21
officer [23] 4/16 6/1
26/4 30/19 31/11 31/16
33/2 33/5 33/7 33/10
34/13 34/20 37/21
37/21 37/25 40/12 48/7
50/11 50/15 51/3 53/19
54/14 65/22
officers [11] 4/13 4/16
4/19 5/11 8/6 32/5 32/6
32/10 38/1 49/8 69/15
Official [1] 2/3
Oh [2] 57/23 65/16
okay [81] 4/9 5/9 5/15
5/19 5/20 5/22 6/3 6/14
7/2 7/11 7/15 7/23 8/22
9/23 10/8 10/10 11/12
12/1 12/19 14/3 15/15
16/6 17/4 18/5 18/14
20/5 20/12 21/14 22/11
22/20 22/25 23/12
23/19 23/22 24/18
24/22 25/3 25/16 25/17
25/19 26/15 28/13 29/9
34/4 34/15 38/3 38/24
40/4 41/12 41/16 42/4
43/2 43/20 43/24 44/4
44/14 45/1 46/12 46/24
47/22 51/15 51/18
51/21 54/22 58/13
58/15 65/16 65/18 68/5
69/2 73/5 73/11 74/12
75/11 77/2 78/3 78/15
78/22 79/15 79/19
80/16
once [1] 74/24
one [22] 3/22 4/12 6/19
9/21 13/3 14/20 17/13
20/3 27/7 29/14 39/21
39/25 41/13 41/17
41/18 45/6 45/14 47/8
58/8 58/24 75/8 76/6
one's [2] 19/12 19/12
ongoing [1] 62/19
only [7] 5/7 44/9 66/3
66/23 72/9 73/15 76/7
open [1] 74/24
openly [1] 6/6
operating [1] 37/10
opportunity [7] 6/11
72/19 74/15 77/10
77/17 79/5 80/5
options [1] 74/16
orange [1] 27/18
order [13] 3/3 8/12
21/4 22/3 22/6 22/24
36/19 45/7 46/3 46/5
46/15 50/2 55/20
ordered [3] 12/6 55/18
72/14
orders [3] 66/11 70/14
70/24
other [14] 6/20 13/15
14/20 20/25 35/16 49/7
49/8 54/15 58/9 58/11
63/4 64/20 68/14 70/22

**P**

p.m [7] 27/6 33/12
34/11 39/12 42/11 57/3
80/21
page [3] 45/7 46/1
65/10
pandemic [1] 71/21
paragraph [2] 17/12
41/6
parking [2] 21/1 42/21
parole [1] 65/22
part [16] 5/14 8/16 8/16
14/24 15/6 15/13 16/4
18/6 19/22 20/1 40/13
44/18 46/3 46/9 46/20
61/18
participate [1] 55/18
parties [1] 19/9
party [2] 11/18 19/18
pass [1] 42/1
passed [1] 41/25
passes [1] 58/11
passions [2] 29/1 29/7
past [3] 30/3 46/22
66/10
patient [2] 3/19 4/3
Patnaude [1] 3/19
pattern [8] 11/19 30/24
35/24 36/4 44/11 59/12
69/14 70/3
paying [1] 63/18
pending [6] 18/24 19/5
19/6 19/7 19/11 19/11
people [7] 30/15 30/15
40/22 43/18 50/8 71/21
76/6
perceived [1] 30/14
percent [1] 77/1
performance [1] 61/22
perhaps [2] 68/3 80/12
period [2] 8/25

**Others** [1] 11/9
our [17] 32/16 33/18
34/19 34/23 35/25
36/13 37/9 37/19 37/24
38/6 41/19 44/10 48/11
48/13 49/7 55/23 67/19
out [24] 5/1 9/18 10/20
13/6 15/7 20/24 29/22
32/19 35/9 38/7 38/7
39/7 39/23 41/6 47/10
48/22 49/2 52/2 56/11
63/3 66/18 75/22 76/16
80/15
outline [10] 15/20
17/13 17/23 17/24 18/2
18/3 19/23 40/15 40/15
41/8
outlined [2] 20/10
40/17
outside [1] 9/2
over [9] 11/17 30/15
40/3 48/3 54/23 60/1
63/16 66/21 78/23
overruled [7] 10/8
16/24 29/8 43/25
own [1] 72/11

perjury [1] 73/23
permission [2] 24/14
24/16
person [5] 4/13 17/18
17/21 27/9 62/16
personal [2] 36/16
78/1
personally [2] 76/14
80/8
perspective [1] 5/8
petition [15] 8/16 9/6
10/6 11/4 15/11 15/17
20/16 26/1 35/12 41/2
46/21 62/9 63/12 63/1
63/8
petition's [1] 8/16
petty [3] 19/2 19/12
19/13
phone [46] 9/12 9/22
10/11 10/24 11/17
12/20 13/2 13/7 13/8
14/23 18/17 22/9 25/6
27/7 27/24 28/4 31/8
32/19 33/12 33/16
33/23 33/24 34/2 36/16
36/25 37/2 39/6 39/13
45/9 47/21 52/12 61/3
64/1 64/13 64/16 64/22
66/12 67/24 68/9 68/18
68/20 69/18 70/15
70/16 80/13 80/14
phones [1] 68/12
pick [3] 38/19 64/25
80/9
picture [1] 46/15 65/4
65/11
pictures [1] 65/8
piece [1] 27/7
pieces [1] 46/7
place [1] 22/4
placed [5] 19/14 19/15
20/17 48/13 52/25
Plaintiff [1] 1/4
play [2] 26/24 58/17
played [2] 29/16 29/18
plea [4] 75/22 76/16
76/18 77/22
please [9] 3/3 3/6 7/25
11/10 26/14 40/24
64/10 65/20 75/10
PO [2] 26/17 26/22
point [27] 3/24 4/25
6/22 10/18 10/25 11/18
13/24 21/11 22/12 27/3
31/10 31/17 34/25
35/15 36/4 37/19 37/24
38/3 40/21 43/17 47/1
59/18 60/2 60/4 70/9
74/3 74/9
points [1] 59/20
police [12] 20/18 20/24
20/24 21/23 22/2 22/17
42/19 43/15 46/2 47/8
49/20 66/13
politicians [1] 53/23
position [2] 4/23 4/24
7/19
possibility [1] 18/8

possible [2] 45/19
78/14 78/16
possibly [1] 3/23
potential [2] 73/15
73/22
potentially [3] 74/7
75/8 78/13
practicing [1] 70/6
prefer [2] 4/20 9/21
preliminary [1] 4/11
present [4] 51/3 76/5
76/7 77/3
presentence [2] 17/13
40/16
presiding [3] 3/3 11/17
36/15
pretrial [19] 5/25 7/21
8/23 9/11 15/17 19/14
19/15 35/9 41/7 42/6
43/19 46/4 46/5 46/8
46/10 47/8 48/4 51/13
66/1
pretty [1] 3/19
Prettyman [1] 2/4
previous [1] 11/13
previously [6] 11/1
11/16 11/16 13/16 76/7
76/16
printout [1] 50/22
prior [5] 15/10 76/17
probably [1] 22/7
probation [13] 4/16
4/16 6/1 26/4 34/13
46/14 46/21 48/7 50/15
51/16 55/9 69/14 69/21
Probation Office's [1]
69/21
problem [1] 72/16
problematic [2] 49/5
66/5
problems [2] 72/16
78/10
proceed [7] 4/7 4/12
74/4 77/14 77/24 79/6
79/7
proceedings [5] 2/7
4/7 36/2 80/21 81/4
process [4] 44/19
46/20 54/6 59/3
produced [1] 2/7
proffer [2] 21/21 22/10
22/16 25/21 58/9 71/17
proffered [1] 71/24
proffering [1] 28/24
proffers [1] 69/11
program [2] 48/19
49/23
progressed [1] 30/23
proof [1] 72/21
proper [1] 54/19
prosecution [2] 59/7
75/18
prosecutor [1] 77/1
protect [2] 23/14 66/9
protection [5] 21/4
22/3 22/24 45/7 66/11
protective [1] 36/18
prove [1] 62/8

provide [6] 15/23
18/10 32/7 49/18 52/15
70/21
provided [13] 11/15
16/14 17/2 18/11 32/15
36/13 39/16 40/12
41/19 41/23 41/24
50/25 56/11
providing [4] 7/7 32/12
33/9 37/11
PSA [3] 4/14 8/20
46/14
PUBLIC [1] 1/18
pull [2] 27/8 47/8
purpose [2] 7/6 58/11
purposeful [1] 66/7
purposes [2] 46/16
48/22
pursue [1] 76/16
push [1] 43/13
pushback [1] 9/4
put [8] 4/6 4/21 5/1
13/7 15/19 73/6 80/4
80/13
putting [1] 22/9

**Q**

question [9] 4/22 8/5
15/12 16/21 16/25
25/22 40/13 41/21
67/22
questioned [1] 10/16
questioning [5] 8/12
21/11 26/18 43/7 43/17
questions [9] 14/4
20/13 37/7 40/8 42/16
44/4 66/24 67/21 73/17
quick [1] 71/14
quickly [2] 6/5 55/5
quietly [1] 76/22
quote [3] 41/9 41/10
43/4
quotes [1] 17/15

**R**

R-e-n-n-i-e [1] 48/6
R-o-b-i-n-s-o-n [1] 8/2
raised [2] 24/5 28/22
rambling [2] 50/5
70/16
ran [2] 21/3 29/22
random [1] 30/15
rang [2] 13/11 45/10
rate [1] 22/8
rather [3] 75/15 76/1
78/13
reach [1] 58/6
reached [3] 15/7 35/9
39/7
reaching [2] 39/23
66/18
read [6] 13/4 21/15
55/3 55/4 60/22 77/25
reading [2] 76/17
76/19
ready [2] 23/20 51/17
really [4] 29/1 75/3
75/20 76/5

90

**R**

**Realtime** [1] 2/3
**reason** [7] 39/22 45/20
47/9 68/8 72/9 72/13
80/12
**reasons** [5] 10/19
45/14 51/7 54/20 78/2
**reassigned** [1] 18/22
**rebuttal** [1] 80/5
**recall** [1] 70/10
**receive** [6] 37/18 51/23
52/23 56/6 56/18 64/1
**received** [11] 9/12
10/11 16/4 16/15 26/21
27/5 29/14 30/25 39/6
52/19 55/1
**recently** [2] 36/2 77/20
**recollection** [1] 53/2
**record** [13] 3/7 7/19
22/18 28/4 33/17 33/19
46/5 53/1 57/22 73/25
78/13 78/25 81/3
**record's** [1] 20/8
**recorded** [1] 2/7
**records** [4] 39/20 46/3
46/15 52/18
**redacted** [2] 33/16
33/23
**redial** [1] 70/1
**reference** [8] 26/22
30/11 30/19 33/6 37/7
38/8 39/23 53/22
**referenced** [1] 40/16
**references** [1] 53/14
**referencing** [2] 53/17
61/21
**referring** [1] 27/5
**regain** [1] 9/3
**regarding** [3] 18/16
31/14 32/10
**regardless** [1] 47/7
**regards** [1] 59/2
**Registered** [1] 2/2
**regular** [1] 30/1
**regularly** [1] 47/3
**rejoining** [1] 25/15
**related** [3] 39/11 39/15
72/17
**relates** [1] 19/22
**relating** [1] 22/13
**relation** [1] 22/13
**relax** [1] 40/9
**relay** [2] 64/18 64/21
**release** [8] 12/7 46/8
48/4 48/9 48/12 51/13
55/15 69/9
**relevance** [4] 45/18
53/10 56/23 59/1
**relevancy** [3] 6/9 43/15
45/15
**relevant** [8] 28/23 29/4
44/7 45/21 45/24 51/5
58/1 73/16
**relief** [2] 76/1 78/1
**remains** [1] 73/16
**remember** [1] 57/13
**remembrance** [1]
15/13

**remove** [2] 32/13 32/13
**removed** [3] 9/8 18/21
22/18
**Rennie** [69] 4/15 5/16
5/17 8/4 8/9 8/10 9/7
9/21 9/24 10/2 10/15
12/21 14/2 15/9 17/18
18/12 19/23 23/25 24/9
24/16 24/20 24/21
24/25 25/10 26/9 26/10
26/17 26/22 30/2 30/18
30/19 31/20 33/2 33/5
33/7 34/16 34/20 34/23
35/4 35/8 35/24 36/13
36/22 38/10 38/18
38/22 39/7 39/14 41/19
41/24 41/24 42/2 47/13
47/14 48/6 51/22 54/14
60/4 65/20 66/24 67/23
69/15 69/20 69/22 70/1
71/1 72/2 72/6 72/10
**Rennie's** [8] 4/17
10/25 26/5 31/12 31/16
35/3 64/13 64/15
**repeat** [2] 39/18 39/21
**replies** [1] 60/24
**report** [33] 9/7 22/17
26/22 31/13 31/13
31/21 33/8 33/13 34/10
34/13 36/12 37/13
37/16 37/22 40/16 41/7
41/18 42/19 43/16
43/19 43/19 44/2 44/9
44/16 44/18 45/3 45/7
45/8 46/6 49/18 49/20
52/6 63/23
**reported** [10] 31/7
33/12 33/16 33/22
37/15 39/13 48/11 52/9
52/12 61/1
**reportedly** [1] 52/20
**reporter** [5] 2/2 2/2 2/3
2/3 7/25
**reporting** [4] 31/15
67/10 67/12 72/16
**reports** [1] 45/5
**represent** [2] 77/9
77/15
**representation** [4]
29/14 53/7 74/11 74/18
**representative** [1]
74/21
**represented** [1] 77/19
**representing** [3] 3/10
3/12 78/6
**request** [5] 35/11 45/4
46/1 46/14 46/17
**requested** [1] 32/6
**require** [1] 47/16
**requirement** [1] 55/15
**requirements** [1] 48/3
**requiring** [1] 31/21
**reschedule** [5] 14/13
14/23 67/3 67/7 71/23
**rescheduled** [8] 14/15
14/18 14/20 15/10
61/24 71/18 72/9 72/10

**reserving** [1] 6/8
**resistance** [1] 32/12
**resistant** [1] 49/9
**resolve** [1] 13/22
**respect** [1] 38/1
**respond** [1] 46/13
**responsible** [1] 68/19
**reviewed** [2] 41/13
48/12
**revocation** [15] 3/20
12/10 15/11 15/17
28/21 36/2 47/9 47/17
55/14 58/19 67/11
67/11 67/15 70/11
70/12
**revoke** [8] 5/4 46/8
46/19 51/13 58/14 70/5
70/7 71/10
**revoked** [1] 42/7
**right** [51] 5/12 5/23 6/8
7/8 7/12 11/20 13/14
13/25 15/8 16/18 21/1
22/1 22/15 23/3 24/3
24/6 24/15 27/2 27/20
28/7 29/6 31/1 31/19
32/20 36/8 36/21 37/12
38/4 47/11 48/1 49/4
50/13 53/3 55/6 55/11
57/9 58/16 58/21 59/22
60/19 63/6 63/20 64/23
67/20 68/21 69/4 73/19
76/10 78/8 79/1 79/22
**risks** [4] 76/3 76/4 77/7
77/14
**RMR** [2] 81/2 81/8
**Robinson** [24] 4/14
5/13 7/13 7/16 7/21
7/24 8/3 8/8 8/15 8/18
8/23 10/5 11/7 14/4
14/7 20/16 23/17 23/23
37/6 40/11 41/25 42/1
42/3 80/1
**Ron** [2] 52/5 52/25
52/25
**Ronald** [1] 50/11
**room** [2] 6/19 53/19
**routine** [1] 46/14
**row** [1] 70/12
**rude** [4] 29/2 69/6
69/13 72/17
**rule** [2] 8/14 10/1
**rules** [1] 23/7

**S**

**safety** [2] 35/14 38/18
**said** [20] 13/22 14/9
18/9 19/9 21/24 24/13
25/14 34/7 35/4 40/10
46/6 48/25 53/23 62/5
62/6 62/8 63/9 64/23
70/10 77/1
**same** [4] 33/11 34/11
57/24 59/16
**sarcastic** [1] 49/11
**saw** [4] 7/3 20/25
30/24 67/23

**71/9 71/25 72/2 76/15**
78/13 79/16
**saying** [4] 5/2 26/13
77/5 77/16
**says** [6] 17/12 17/23
20/18 43/16 51/23
58/10
**schedule** [4] 60/18
60/19 61/9 75/9
**scheduling** [1] 60/22
**screen** [2] 25/8 27/8
**screenshot** [1] 39/8
**search** [3] 26/23 31/21
39/8
**searched** [1] 68/2
**seated** [1] 3/3
**second** [3] 3/21 12/10
49/23
**secondly** [1] 16/22
**security** [2] 32/6 32/10
**see** [15] 19/5 24/17
27/13 28/23 33/13
34/10 34/24 37/1 37/22
45/14 45/20 47/7 47/9
47/25 61/18
**seeing** [1] 36/4
**seek** [1] 49/12
**seeking** [3] 49/9 76/12
77/22
**seem** [3] 43/14 72/12
75/2
**seemed** [1] 35/23
**seems** [1] 76/15
**seen** [7] 3/20 47/21
50/22 51/10 53/4 65/7
69/13
**sees** [1] 8/5
**send** [2] 50/7 55/9
**sense** [5] 5/9 5/24 6/2
7/4 40/19
**sent** [16] 16/8 17/14
17/17 17/18 17/19
17/21 17/21 17/25
19/23 39/8 43/19 50/10
50/11 50/23 54/3 60/21
**sentences** [1] 76/8
**separate** [1] 22/8
**September** [1] 81/7
**seriously** [1] 20/4
**service** [1] 68/19
**Services** [1] 5/25 7/21
8/23 35/9 42/7 43/19
44/6 46/5 46/10 47/8
**session** [1] 60/14
**set** [1] 55/21
**setup** [1] 55/24
**several** [5] 9/1 13/19
50/11 60/6 60/9
**sex** [1] 30/11
**sexual** [3] 30/12 35/25
66/5
**shaking** [1] 34/21
**shall** [1] 55/3
**she** [37] 9/17 9/22 9/25
10/6 10/20 16/15 20/24
24/5 24/8 24/19 25/1
25/14 27/5 34/21 37/10

**33/17 41/19 41/23 42/2**
63/21 63/22 64/2 64/9
64/11 64/13 64/16
64/16 64/18 64/18
64/22 64/22 64/23
64/23 64/24 76/15
77/22 77/23
**she'll** [1] 44/2
**she's** [9] 9/20 25/14
31/12 41/17 41/18
54/11 59/7 75/15 77/23
**shitty** [1] 31/17
**short** [2] 34/9 71/16
**short-cutted** [1] 71/16
**should** [9] 25/10 43/9
44/8 62/16 70/19 72/18
74/13 74/14 77/21
**show** [6] 29/2 44/2
57/25 66/14 66/17
66/17
**showed** [2] 48/19 68/7
**showing** [2] 58/6 72/7
**shown** [2] 69/6 69/11
**shows** [6] 44/11 53/12
54/11 69/16 70/3 71/19
**sic** [1] 21/7
**sick** [1] 62/8
**side** [1] 77/4
**signed** [1] 48/14
**signs** [1] 48/19
**SIM** [4] 67/1 68/17
68/18 69/23
**SIM card** [1] 68/17
68/18 69/23
**similar** [2] 44/13 66/15
**simply** [1] 50/24
**since** [6] 4/12 4/19
67/10 71/4 71/15 75/2
**sir** [2] 75/11 78/3
**sitting** [3] 27/9 75/23
76/22
**situation** [3] 21/24
35/10 36/14
**six** [3] 70/16 76/7 76/8
**sixth** [1] 75/20
**size** [1] 61/21
**skirt** [1] 19/15
**sleep** [1] 61/9
**small** [1] 32/10
**snubbed** [1] 70/13
**so** [116]
**so I think** [4] 43/13
46/9 47/6 72/18
**solicit** [1] 71/2
**some** [11] 3/24 8/11
12/20 14/22 33/15 36/3
37/1 54/17 72/7 72/8
80/12
**somebody** [2] 16/15
19/23 80/6
**somehow** [1] 47/8
**someone** [5] 20/20
64/12 68/13 75/6 78/5
**someone's** [1] 70/21
**something** [7] 15/5
23/18 34/22 50/24
54/17 59/6 80/15
**somewhere** [2] 13/5

**S**

somewhere... [1]
67/23
soon [1] 10/23
sorry [23] 9/6 9/16
11/16 17/5 19/14 24/13
26/7 29/21 32/18 33/4
35/17 38/21 41/1 42/24
42/25 44/6 45/18 53/16
57/23 59/25 64/9 65/13
75/12
sort [10] 4/25 5/7 19/15
25/21 29/1 40/10 40/20
40/22 50/5 74/2
sought [1] 44/17
sounds [6] 5/24 9/20
29/19 43/8 62/6 78/4
speak [10] 6/6 9/24
25/14 63/11 70/1 75/10
75/24 75/25 76/25
77/19
speaking [1] 40/25
specific [1] 11/10
specifically [1] 30/18
specifics [3] 13/1 13/3
21/13
speculation [1] 16/22
spell [1] 7/24
spoke [1] 64/11
spoken [2] 4/5 76/8
staff [1] 49/7
stand [1] 79/11
stands [1] 54/10
staring [1] 53/15
start [6] 5/13 8/8 25/23
49/4 59/24 60/11
starting [3] 3/7 10/13
29/19
starts [2] 41/7 74/24
state [7] 7/18 15/21
38/20 45/16
statement [2] 43/18
74/19
statements [4] 30/16
30/22 74/24 76/2
STATES [8] 1/1 1/3
1/10 1/14 3/5 3/9 3/10
65/22
stating [1] 49/1
statute [1] 71/7
stay [1] 78/9
stenography [1] 2/7
step [1] 23/25
still [6] 40/6 71/9 71/10
75/13 77/11 78/6
stop [1] 3/24
stopped [1] 34/23
strictly [1] 39/15
stuff [2] 23/13 53/16
submission [1] 51/8
submit [5] 10/1 29/4
50/19 54/12 72/20
submitted [4] 6/19
11/3 49/10 54/14
suggesting [1] 51/8
Suite [2] 1/15 1/19
summary [17] 15/24
15/25 16/1 16/5 16/7

**S**

18/9 18/11 19/23 20/16
20/18 40/11 40/14
41/20
super [1] 71/14
supervised [2] 8/20
16/17
supervising [3] 9/5
26/4 34/20
supervision [7] 8/25
15/3 19/15 28/8 50/4
57/7 66/4
supervisor [9] 4/16
7/21 9/13 26/5 26/16
35/9 35/22 37/4 63/11
suppose [1] 80/5
supposed [2] 59/24
67/16
sure [22] 6/8 7/20 8/1
14/14 17/9 18/25 20/7
21/22 22/7 23/5 23/7
24/22 25/4 32/5 39/19
47/18 53/19 68/16
68/17 74/4 77/5 79/14
swear [1] 5/11

**T**

T-a-k-e-y-s-h-a [1] 8/2
table [1] 23/10
take [4] 15/4 53/18
54/16 65/4
taken [1] 65/19
Takeysha [2] 7/21 8/23
taking [4] 30/17 71/3
74/19 79/11
talk [11] 5/17 7/14 9/22
47/15 58/22 73/20
73/21 74/15 77/17 79/5
79/5
talked [5] 31/6 35/17
69/25 73/12 73/14
talking [16] 3/25 9/20
11/23 17/5 17/9 17/11
17/16 19/2 35/25 36/5
40/14 41/1 43/8 45/3
51/6 52/1
talks [3] 17/8 17/15
70/17
technician [1] 36/1
tell [31] 4/1 4/20 4/20
5/14 8/6 8/19 11/7
11/10 25/24 26/25
30/20 31/5 32/3 32/18
33/1 34/5 34/21 37/20
38/14 39/9 42/10 42/14
48/1 48/4 61/23 64/10
65/20 66/25 70/6 77/6
79/10
telling [6] 10/5 11/22
14/17 31/12 63/16
77/12
tells [1] 70/25
terms [1] 49/14
territory [1] 70/2
test [2] 15/4 52/6
testified [2] 44/23
63/21
testify [1] 42/3 47/16

**T**

testifying [2] 10/3
79/11
testing [2] 49/23 52/5
text [21] 6/20 49/7 50/8
50/10 50/14 50/19
50/22 51/1 51/23
51/23 52/19 53/1 53/8
53/11 54/1 54/2 54/5
54/15 60/9 60/21 70/18
texted [1] 64/9
texts [1] 49/6
than [4] 22/7 22/8
30/24 35/16 37/15
43/14 58/11 68/12 76/1
thank [28] 4/2 5/12
6/13 7/11 20/14 20/15
23/1 23/23 26/11 27/23
40/7 42/17 46/12 47/5
47/17 47/23 47/24 51/9
55/2 58/16 68/22 68/23
68/25 71/12 78/3 78/24
79/21 80/16
thank you [23] 4/2
5/12 6/13 7/11 20/14
23/1 26/11 40/7 42/17
46/12 47/17 47/23
47/24 51/9 55/2 58/16
68/23 68/25 71/12 78/3
78/24 79/21 80/16
that [495]
that's [40] 5/3 6/7
15/20 15/22 17/15 18/8
19/11 21/2 21/7 23/11
31/23 32/22 36/1 40/13
41/5 43/3 43/5 43/23
44/3 44/16 46/11 50/21
53/2 53/21 54/19 57/20
58/8 61/2 61/14 63/24
64/5 68/4 68/14 68/16
71/1 72/18 78/7 78/8
78/16 80/6
theft [1] 19/3
their [2] 4/20 6/23
them [18] 4/21 4/22 5/6
6/6 6/12 6/19 6/21 7/7
8/13 9/15 17/25 30/21
32/12 36/23 62/10
75/20 80/11 80/13
then [50] 4/17 5/16
5/17 5/21 6/8 8/8 8/9
8/12 9/4 10/20 11/14
15/6 17/14 22/5 22/18
23/24 24/21 32/21
33/19 35/18 35/23 40/8
41/8 41/24 45/7 45/10
46/8 48/2 55/7 55/12
56/13 58/22 60/24
60/25 61/11 61/14 63/8
63/10 63/12 63/14
63/25 64/9 64/13 64/15
64/17 65/17 68/17
70/16 79/5 79/10
therapy [1] 60/14
there [53] 8/10 8/11
8/25 9/3 11/14 12/20

**T**

19/5 19/6 19/6 19/6
21/4 22/22 22/21 23/13
24/2 24/5 24/10 24/16
24/25 25/8 25/10 25/12
26/10 26/11 30/5 32/23
32/25 35/18 36/14 37/1
38/3 40/21 41/8 43/17
44/7 45/5 48/20 53/18
55/15 58/10 65/7 67/14
68/4 71/5 71/10 71/20
72/21 74/7 77/7
there's [14] 5/1 5/10
20/3 22/3 47/1 58/23
68/8 72/4 72/8 72/22
75/24 78/10 78/11
79/12
these [13] 24/4 45/23
46/3 57/24 58/10 59/20
65/19 68/13 70/17 76/2
76/6 76/20 76/24
they [12] 4/20 7/3 7/9
10/12 20/25 21/3 22/2
46/6 53/23 53/24 57/25
68/13
they're [3] 5/2 24/20
58/1
they've [1] 75/23
thing [3] 44/9 58/8
58/9
things [4] 11/10 47/4
55/8 75/24
think [59] 4/1 4/24 4/25
5/10 6/7 15/19 16/21
22/12 23/13 23/16
23/17 23/20 25/7 28/24
29/1 29/2 29/7 30/9
43/7 43/13 45/15 45/22
45/23 46/9 47/1 47/2
47/6 51/5 54/11 54/19
54/23 57/25 58/1 59/19
59/20 67/23 68/14 69/6
69/10 70/2 71/3 71/20
72/3 72/4 72/18 74/10
74/13 74/18 75/5 75/21
77/5 77/22 78/6 78/7
78/8 79/23 80/3 80/6
80/11
thinking [1] 68/11
thinks [1] 70/23
third [4] 3/20 51/13
70/5 70/7
this [114]
those [13] 7/3 30/22
30/24 33/17 33/22 36/3
39/18 45/11 51/7 54/20
54/23 76/4 76/23
though [3] 39/21 62/25
77/12
thought [7] 37/24
43/21 44/19 46/20 54/6
57/20 59/3
threats [2] 28/25 30/14
three [3] 61/5 61/6 76/8
through [13] 8/11
17/18 17/19 21/20 35/2
40/23 49/22 55/23 57/1
57/5 69/22 75/1 75/3

**T**

thoughout [3] 8/25
13/21 66/4
thunderstorms [1]
61/10
Thus [1] 26/13
time [33] 9/7 14/14
20/7 26/21 27/24 30/11
32/9 32/18 33/7 34/12
37/17 38/7 39/22 42/6
42/8 48/12 48/23 52/10
55/3 55/16 56/4 56/11
58/11 63/9 65/11 69/3
73/3 74/2 74/5 75/8
75/20 76/21 79/4
timely [1] 78/1
times [6] 9/9 9/10
71/20 75/19 75/24 76/7
titled [1] 81/4
today [14] 4/6 4/8 40/7
43/8 51/6 61/15 70/20
71/5 73/16 74/19 76/7
76/23 76/25 77/19
together [1] 65/20
told [22] 9/14 10/18
10/21 13/6 15/10 31/11
31/15 31/17 33/7 37/24
39/9 39/13 39/20 48/21
53/1 63/7 63/10 63/12
63/22 63/23 69/22 74/5
tomorrow [6] 60/15
70/22 79/3 79/8 79/16
80/20
too [1] 24/16
took [1] 32/18
totally [2] 22/8 24/9
touch [1] 52/5
touched [1] 75/19
towards [1] 28/25
Town [2] 21/7 36/10
46/2 66/16
tragic [1] 34/22
transcript [3] 1/9 2/7
81/3
transcription [3] 2/7
50/24 54/18
treating [1] 35/24
treatment [2] 55/19
62/21
TREVOR [2] 1/10 3/2
tried [1] 13/10
troubling [1] 72/8
true [2] 29/13 32/22
try [1] 79/3
trying [7] 20/6 43/9
43/13 43/21 45/15
71/19 75/22
turn [2] 40/2 66/21
two [8] 19/11 28/21
40/13 45/5 49/16 49/19
65/8 70/7
two-part [1] 40/13
typical [1] 16/16
typically [1] 3/21

**U**

U.S [4] 7/22 17/14 26/4
43/11
UA [2] 36/1 53/18

**U**

UA... [2]  70/13 70/21
UA technician [1]  36/1
Uh [2]  6/17 18/18
Uh-huh [2]  6/17 18/18
ultimately [2]  64/25 65/19
unable [1]  9/16
uncomfortable [1] 64/24
under [7]  4/21 10/1 57/6 67/24 71/7 73/6 79/11
underlying [2]  50/25 73/18
understand [11]  11/22 16/10 17/9 18/1 18/21 46/23 47/1 71/9 77/13 79/12 79/14
understanding [16] 12/13 12/17 13/12 13/13 14/8 14/12 16/13 19/10 20/1 20/22 38/14 39/19 43/5 47/20 57/4 67/13
understood [1]  10/6
unhappy [1]  31/20
UNITED [8]  1/1 1/3 1/10 1/14 3/5 3/9 3/10 65/22
United States [3]  3/9 3/10 65/22
United States of [1] 3/5
unless [3]  39/10 39/14 53/24
unlike [1]  77/1
unlikely [1]  69/8
unsubstantiated [2] 45/23 45/24
until [2]  62/1 80/20
unwillingness [1] 53/12
up [22]  7/9 15/9 23/25 24/21 26/12 27/8 29/19 37/5 38/19 41/23 43/10 48/5 55/12 55/21 57/13 61/10 62/1 64/25 68/3 69/21 72/6 80/14
updating [1]  59/5
upon [2]  69/17 76/19
upper [2]  15/21 45/16
upset [5]  33/5 34/21 35/4 38/17 61/16
upstairs [2]  32/15 32/16
urinalysis [1]  53/18
us [8]  24/8 30/17 30/17 33/1 34/23 37/11 44/10 44/12
USAO [1]  1/13
usdoj.gov [1]  1/17
use [1]  46/8
used [3]  11/16 18/2 57/13
usually [1]  70/7

**V**

verification [1]  52/7
verify [1]  50/23
versus [1]  3/5
very [8]  6/4 34/9 39/19 64/24 66/8 66/15 75/16 77/18
victim [3]  21/24 22/3 62/17
video [3]  25/9 25/12 47/20
view [2]  49/13 78/5
views [2]  75/17 77/21
violated [2]  62/6 71/6
violating [1]  22/23
violation [12]  36/18 40/17 43/19 45/6 49/23 62/11 62/14 62/15 62/24 62/24 62/25 66/10
violations [2]  49/5 49/16
visibly [1]  33/5
voice [2]  13/20 78/11
voicemail [30]  26/21 27/1 27/4 28/2 28/14 28/22 28/25 29/11 29/23 30/4 30/5 30/10 30/25 31/2 36/6 42/8 49/21 54/15 56/18 56/24 57/3 57/11 57/13 58/18 58/25 59/2 59/4 59/9 61/21 70/25
voicemails [6]  6/21 49/6 50/5 50/12 58/10 59/21
vs [1]  1/5

**W**

wait [5]  37/19 75/15 75/22 76/1 76/16
waiting [1]  37/19
walk [1]  74/25
walked [1]  32/15
want [29]  4/5 4/21 6/7 8/11 15/3 15/4 16/10 17/8 20/7 26/25 35/12 49/13 55/3 69/8 71/2 74/20 74/22 76/16 77/11 77/14 77/14 77/25 79/2 79/3 79/6 79/12 79/13 79/14 80/1
wanted [4]  22/16 23/8 39/19 44/24
wanting [2]  30/14 35/3
wants [5]  44/11 70/4 70/4 72/25 74/9
warned [1]  9/10
warrant [11]  10/7 11/4 35/11 35/13 36/24 37/18 38/2 44/17 44/25 45/4 46/21
was [219]
Washington [4]  1/5 1/20 2/5 35/10
wasn't [7]  14/14 50/25 61/9 64/19 64/23 67/15 69/23

watching [1]  70/21
way [9]  3/19 10/24 14/20 30/19 50/23 51/2 68/13 78/13 80/4
ways [1]  75/16
we [76]  4/1 4/12 4/14 4/17 6/1 7/9 7/12 8/17 9/2 9/12 11/23 13/22 13/23 15/6 21/10 21/12 22/3 23/24 24/7 25/8 25/18 25/20 26/9 28/1 28/2 28/18 28/20 28/22 33/15 34/23 34/25 35/1 35/14 35/17 35/17 37/2 37/5 37/18 38/21 38/23 40/6 44/17 44/24 47/15 47/23 47/25 49/2 49/5 49/15 49/17 50/14 51/17 55/7 57/19 59/19 59/20 61/7 70/11 71/25 72/15 72/18 74/14 75/5 75/8 77/9 77/20 77/21 78/14 78/18 79/4 79/5 79/7 79/16 79/23 79/25 80/3
we will [2]  7/12 23/24
we would [1]  21/10
we'll [13]  5/16 8/8 8/8 8/9 12/21 24/6 26/11 39/1 47/12 58/16 73/20 80/15 80/19
we're [21]  3/16 4/25 5/2 5/6 5/7 6/6 6/18 11/23 17/5 17/9 23/20 25/21 26/24 41/17 43/8 43/9 43/13 45/3 45/15 51/6 58/5
we've [5]  28/21 49/15 56/20 60/1 75/16
weapons [2]  66/2 66/3
wearing [2]  27/19 30/15
week [1]  67/5
week's [1]  75/8
weekend [1]  63/17
weekly [1]  66/22
weight [2]  47/2 54/24
weird [1]  53/16
weirdly [1]  53/15
well [34]  5/25 6/2 7/3 7/9 9/11 9/14 12/22 16/4 16/12 16/20 21/16 23/15 23/20 24/3 25/18 30/9 38/17 47/7 47/23 48/24 51/12 60/1 62/6 62/7 62/8 67/13 68/2 71/22 76/3 77/19 78/7 78/19 78/23 80/9
went [6]  20/24 35/19 42/2 44/19 46/20 61/4
were [22]  12/20 13/15 16/11 18/15 18/19 18/22 20/18 20/25 31/15 33/18 35/14 36/3 36/9 37/5 43/18 45/22 45/23 47/14 49/2 50/5 51/17 65/3

will [5]  7/17 10/24 4/21 5/2 5/17 5/25 8/4 8/6 8/19 8/19 9/4 9/22 10/6 10/12 10/12 10/13 11/10 11/22 15/2 15/19 17/3 17/9 17/11 17/24 20/2 22/16 23/7 25/25 26/13 26/18 26/25 31/6 31/15 34/5 34/22 34/24 35/5 37/17 38/10 38/11 38/14 39/5 43/8 47/15 50/21 51/22 51/25 52/23 53/10 56/4 56/23 59/1 59/6 60/4 63/8 64/21 66/6 66/16 68/4 70/9 71/2 71/9 71/21 73/12 73/18 73/21 74/13 77/1 77/5 77/6 77/8 77/16 77/21 78/7 79/2 79/14
what's [3]  4/23 25/25 68/19
whatever [3]  21/15 43/15 70/3
when [35]  6/9 9/17 9/17 10/11 10/15 11/8 11/23 13/10 14/23 15/3 16/16 17/2 21/19 23/9 26/11 30/25 31/5 32/14 38/2 38/3 42/10 49/9 52/24 53/14 53/17 53/18 54/2 57/6 61/14 64/11 68/8 69/20 70/4 72/5 77/9
where [20]  15/6 16/22 20/3 21/24 24/19 31/25 34/16 36/3 36/6 36/15 37/1 43/3 43/22 44/13 45/8 48/21 49/17 58/4 70/23 71/1
whether [13]  5/3 6/1 14/20 19/18 19/21 29/3 29/25 36/17 43/3 45/24 58/1 61/4 79/6
which [25]  15/2 23/8 27/4 27/25 30/11 31/12 33/18 35/1 37/19 37/24 38/7 40/16 40/24 44/17 45/22 48/11 48/12 49/11 49/23 51/5 58/24 68/7 70/2 72/6 72/13
while [5]  6/18 10/20 37/19 65/3 76/7
whisper [1]  23/8
who [11]  4/15 4/17 9/4 11/24 18/25 19/9 20/21 25/23 64/7 65/5 77/9
who's [2]  62/16 64/17
why [28]  7/3 7/9 10/16 10/19 25/4 25/23 28/23 32/12 35/12 41/5 42/12 42/14 44/12 44/16 44/17 44/19 44/24 47/20 51/25 54/14 54/16 57/3 62/5 65/20 65/22 70/19 73/20 79/12
Wichita [1]  1/16

wife [6]  12/23 13/2 13/8 19/18 22/14 45/19 45/19
wife's [3]  13/11 36/15 45/10
will [14]  7/12 8/11 8/13 8/14 10/3 23/24 29/7 39/9 53/23 53/24 60/3 73/21 75/7 76/15
William [4]  2/2 81/2 81/7 81/8
willing [2]  76/4 77/15
winding [1]  57/11
wish [1]  6/12
wishes [1]  74/10
without [2]  51/22 54/11
witness [5]  23/21 40/2 47/11 62/17 66/21
witnesses [4]  3/25 5/6 69/3 69/11
woman [1]  20/21
won't [2]  48/25 71/14
wonder [1]  78/10
wondering [5]  3/17 18/2 58/4 68/13 74/14
word [7]  6/20 18/2 18/3 50/21 50/24 54/3 54/18
Word-document [1] 50/24
words [2]  30/9 70/22
work [14]  9/2 15/1 15/1 15/5 49/13 52/3 60/19 61/12 61/12 62/7 63/7 63/8 79/17 79/20
working [2]  67/1 69/23
works [1]  75/13
worry [1]  5/21
would [62]  4/7 4/12 4/20 6/21 6/23 8/18 9/21 10/1 17/20 21/10 23/8 27/3 27/25 28/18 28/20 29/4 30/20 33/9 42/2 42/22 43/6 45/2 45/11 45/13 47/9 48/1 48/24 49/1 50/18 50/20 51/7 52/17 54/8 54/20 55/8 57/18 58/3 59/14 59/16 62/2 62/19 63/10 63/12 64/19 71/17 71/25 72/20 73/3 73/9 73/16 74/22 75/9 75/18 75/20 76/2 76/5 76/22 77/6 77/16 77/18 78/13 80/5
writer [2]  36/12 40/16
written [1]  40/11
wrote [2]  15/16 36/15

**Y**

Yeah [7]  17/10 22/12 23/15 26/14 27/16 57/23 68/10
year [1]  51/5
years [3]  26/6 48/7 70/6
yes [91]
York [16]  9/11 9/13 15/21 20/18 21/8 21/9

**Y**

**York... [10]** 26/5 33/20
36/14 43/10 45/16
46/10 46/21 48/10 64/4
68/7
**you [274]**
**you'd [3]** 3/18 5/20
6/11
**you'll [2]** 40/8 71/22
**you're [14]** 11/22 14/17
19/17 20/8 26/11 36/5
40/14 40/25 62/6 77/12
77/12 77/16 79/12
79/15
**you've [5]** 4/3 29/10
54/16 63/3 69/6
**your [136]**
**Your Honor [73]** 3/4
3/8 4/2 4/11 5/12 6/4
6/18 6/24 7/12 7/17
9/25 11/5 14/1 16/20
21/10 21/17 22/15
23/17 23/24 24/4 27/3
27/12 27/17 28/18
28/20 29/21 33/17
38/23 39/25 40/2 43/7
43/23 44/1 44/6 45/2
46/11 46/13 47/12 50/1
50/18 50/20 51/14 54/8
54/10 55/2 57/15 58/8
58/9 58/16 58/23 59/14
60/3 65/15 66/22 68/2
68/6 68/24 69/10 69/13
69/16 71/3 71/10 72/20
72/24 73/8 74/1 78/8
79/18 79/21 80/1 80/11
80/16 80/18
**yourself [2]** 16/2 39/2
**yourselves [1]** 3/7

**Z**

**Zaremba [4]** 2/2 81/2
81/7 81/8
**Zoom [3]** 24/21 25/4
25/5