```
 1                    BEFORE THE UNITED STATES DISTRICT COURT
                          FOR THE DISTRICT OF COLUMBIA
 2

 3     UNITED STATES OF AMERICA,         .
                                         .  Case Number 21-cr-83
 4              Plaintiff,               .
                                         .
 5          vs.                          .
                                         .
 6     BRANDON FELLOWS,                  .  November 29, 2021
                                         .  10:06 a.m.
 7              Defendant.               .
       - - - - - - - - - - - - - - - - -

 8

 9                       TRANSCRIPT OF STATUS CONFERENCE
                     BEFORE THE HONORABLE TREVOR N. MCFADDEN
10                        UNITED STATES DISTRICT JUDGE

11

12     APPEARANCES:

13     For the United States:        MONA FURST, AUSA
                                     United States Attorney's Office
14                                   301 North Main Street
                                     Suite 1200
15                                   Wichita, Kansas 67052

16                                   EMILY MILLER, AUSA
                                     United States Attorney's Office
17                                   555 Fourth Street Northwest
                                     Washington, D.C. 22205
18

19     For the Defendant:           BRANDON FELLOWS, PRO SE

20     Standby Counsel:             CARA HALVERSON, AFPD
                                     Federal Public Defender's Office
21                                   625 Indiana Avenue Northwest
                                     Suite 550
22                                   Washington, D.C. 20004

23     Official Court Reporter:     SARA A. WICK, RPR, CRR
                                     United States District Court
24                                   333 Constitution Avenue Northwest
                                     Washington, D.C. 20001
25                                   202-354-3284
```

P R O C E E D I N G S

(Call to order of the court.)

COURTROOM DEPUTY:  This is Criminal Action 21-83,
United States of America versus Brandon Fellows.

Can the parties please come forward to identify yourselves
for the record, starting with the government.

MS. FURST:  Good morning, Your Honor.  Assistant U.S.
Attorney Mona Furst, and with me is Assistant U.S. Attorney
Emily Miller, Deputy Chief, to answer any questions about
discovery.

THE COURT:  Good morning, ladies.

MS. HALVERSON:  Cara Halverson as standby counsel for
Mr. Fellows.

THE COURT:  Good morning, Ms. Halverson.  Good
morning, Mr. Fellows.

All right.  We've got a few motions that I wanted to
address today.  First up is the defense motion for a second
evidentiary hearing.  I believe that's ECF-51.  No, I'm sorry.
It's ECF number 50.  I'm going to deny that motion.

For the record, as the parties know, we had an initial
detention hearing.  At that hearing, the -- well, I shouldn't
say it was an initial detention hearing.  It was a detention
hearing where the government was seeking to revoke the
defendant's bond.  At that hearing, the government presented
various witnesses.  The defense elected not to present any

1    evidence.  And I found that the government had met its burden to

2    have the defendant revoked.

3         Subsequently, the defendant had a change of heart, decided

4    to represent himself, and sought to reopen the hearing.  I

5    allowed him to do that.  I don't think he was entitled to do

6    that, but I allowed him that opportunity.  And he testified at

7    length in that hearing.  He also sought to put on his former

8    attorney.

9         I denied that motion, and I found that all of the evidence

10   that the defendant presented, if anything, confirmed my concerns

11   about allowing the defendant to be on bond.

12        So we've now had two lengthy hearings where I've heard

13   evidence from both sides.  I don't think it's appropriate or

14   necessary to have a third evidentiary hearing on this detention

15   issue.  The defendant is welcome to appeal me, but I've given

16   him lengthy opportunity to present evidence.  He had an

17   opportunity, really two opportunities now, to present evidence,

18   and we're not going to do a third.  So I'm going to deny that

19   motion.

20        The second motion is for access to a laptop and contact

21   lenses, given that the defendant is detained.

22        Ms. Halverson, you might know best of any of us, how do we

23   get Mr. Fellows contact lenses?

24             MS. HALVERSON:  So sort of the normal way that I would

25   go about this is have my investigator sort of look into it at

the Federal Defender's Office.  We did look into it.  We tracked
down his last known optometrist, left messages for them, and
didn't receive a call back.

Now, his mother, I believe, has contact lenses, although
they're expired, but she has them, and she wants to mail them to
the jail.  But my understanding is that the jail will not accept
them because they're contact lenses and not glasses.

So really, the only way for Mr. Fellows to be able to
correct his vision, as it stands right now, is to wait for the
jail to give him optometry services and prescribe him glasses.

THE COURT:  Okay.  Do you have a sense of how long
that takes?

MS. HALVERSON:  I think Mr. Fellows may know better
than me.

THE COURT:  Okay.  Mr. Fellows, have you talked with
the jail?  You can come on up, sir.

THE DEFENDANT:  Good morning.

THE COURT:  Good morning.

THE DEFENDANT:  I have talked to the jail.  I've also
talked to lots of inmates.  I've been informed from people like
Peter Schwartz that it took about ten months to get them.
Obviously, that's a little problematic.  I would like to be able
to see.  Contacts, they can clearly check to see if it's
dangerous.  I just was hoping that they could just accept it in
the mail.  They're not expired.  The prescription is expired.

1    It expires every year.  But the contacts are good to go.

2              THE COURT:  So your mom has lenses for you?

3              THE DEFENDANT:  Yes.  I had her pick them up from my

4    property, yes.

5              THE COURT:  Okay.  Thank you.

6         Anybody know?  I don't quite understand why we just can't

7    supply Mr. Fellows with his lenses.  Ms. Furst, do you have any

8    knowledge about this?

9              MS. FURST:  Your Honor, last week, I e-mailed the

10   deputy counsel for DOC for the jail and inquired about what we

11   could do, and he forwarded the e-mail over to the jail.  As of

12   today, I still haven't heard anything back.

13        My thought was maybe mom could mail them to the Public

14   Defender's Office and they could maybe just walk them over, but

15   I don't know if the jail would even allow that to happen.

16             THE COURT:  Okay.

17             MS. FURST:  And then -- I'm sorry.

18             THE COURT:  Go ahead.

19             MS. FURST:  In Mr. Fellows's motion, he did say that

20   he was told the glasses would come either in February or March.

21             THE COURT:  I think that's too long.

22             MS. FURST:  I don't disagree.  I just don't know how

23   to fix it.

24             THE COURT:  Ms. Halverson, do you have any thoughts?

25             MS. HALVERSON:  Very briefly.  This is sort of a

1    unique issue that I have not dealt with before.  So I've asked

2    the other investigators in my office, and sort of what I was

3    told was that one of the investigators is willing to bring them

4    to the jail.  The thing is that it's considered to be

5    contraband, though.  So if she were to give Mr. Fellows the

6    contact lenses, she could be in violation of the jail's policies

7    of providing contraband to Mr. Fellows.  I don't necessarily

8    want to put the federal defender's staff in that position.

9            THE COURT:  Yeah, I understand that.

10       Ms. Miller, you've dealt with the D.C. Jail more than any

11   of us.  Do you have any thoughts about how to handle this?

12           MS. MILLER:  I was just trying to talk to Ms. Furst

13   about who exactly she contacted at the jail.  The best I can

14   offer is I can send an e-mail to Michelle Wilson, the deputy

15   general counsel, and try and follow up.  I will just get the

16   string that Mona sent and follow up later today and see what I

17   can find out.

18           MS. FURST:  So Judge, I e-mailed with Eric Glover, who

19   is the general counsel.

20           MS. MILLER:  I understand.  It might be helpful to go

21   down a notch.

22           THE COURT:  That makes sense.  All right.  So we need

23   to figure this out.  Mr. Fellows does need to be able to read.

24   I'm not quite sure how to do this.  I'm not quite at the stage

25   yet where we need to order this.  I will ask the government to

1    try to work with Ms. Halverson to find a way.

2         I will say that if we can't get them within two weeks, I'm

3    going to be inclined to order the jail to allow Mr. Fellows to

4    have -- to receive his contact lenses.  So Ms. Halverson, maybe

5    you can let me know if he hasn't gotten them by then.  If

6    there's something I need to do to facilitate it, so be it.  I

7    appreciate the attorneys working.  I think that's the better way

8    to do it, to make sure that I'm not missing something, but

9    Mr. Fellows does need to be able to see.

10        On access to a laptop, I know, Ms. Miller, you've been

11   involved at length with the jail in getting defendants laptops,

12   some sort of tablet access, and I appreciate that.  I guess it

13   does strike me that a defendant who is pro se and is facing the

14   type of voluminous discovery that Mr. Fellows is may be in a

15   slightly different circumstance from the mine run of defendants

16   at D.C. Jail.

17        So what are we doing to make sure he has access to his

18   evidence in this case?

19             MS. MILLER:  Well, as a preliminary matter, let me

20   make sure I understand.  I'm inferring something right now from

21   what the Court just said.  Is the Court saying that it believes

22   that pro se defendants should have continuous access to a laptop

23   as opposed to equal access to other people and their discovery,

24   if that makes sense?

25             THE COURT:  Not necessarily continuous.  But I think

there is a greater need for him to be able to get access to --
somehow we need to make sure he's reviewing the evidence.  It
doesn't strike me -- like I think the mine run defendant, A, is
not facing this type of discovery, B, has an attorney who is
reviewing it and can kind of filter to him what he needs to
have.

MS. MILLER:  So I think that there's a multifaceted
answer to this and probably some new things that also -- I could
talk to FPD about.

Right now, the way that it works is under the jail's
program, Mr. Fellows is -- when he receives discovery -- so if
Ms. Furst sends discovery to the Department of Corrections
Litigation Support Unit, when they receive it, Mr. Fellows goes
on a wait list, and when it's his turn, he gets a laptop for two
weeks that he's allowed to use to review that discovery that he
received in his single cell.

The last time that I checked, which was, I think,
November 5, that wait list was pretty short, and I think that's
because -- and Mr. Fellows had his discovery that he had been
waiting for already.  Like, he's off the wait list.  I could see
he either had the computer or had returned the computer, but he
was no longer waiting for a computer for discovery.  So if more
discovery is sent, he would go back onto that wait list.  So
that's one way that he gets access to a laptop now.

And part of the reason that I think the wait list is moving

1    better is that the jail just got 15 new laptops for discovery.

2    So they have a total of 23.

3         With respect to what we are doing specifically at the U.S.

4    Attorney's Office to help defendants get access to discovery,

5    there's a few things.  One is we have been working with Axon,

6    which is the company that owns evidence.com, and American Prison

7    Data Systems, which is the company that provides the educational

8    tablets.  I think there's over a thousand of them at the jail

9    that are available to inmates.  And based on our most recent

10   discussions, like last week, APDS now believes that they will be

11   able to put evidence.com onto those educational tablets.  They

12   are currently testing some of the other issues that would go

13   along with that.  Like, can they make sure the website is

14   securely locked down so it can't be used as a way to then reach

15   out to other web sites, can they figure out with Axon how to

16   manage the permission so that when Mr. Fellows wants to look at

17   videos in evidence.com, other inmates don't see what he's doing

18   and vice versa, protecting the attorney-client privilege.  So

19   there's technical aspects to this that they're working through.

20        APDS reportedly says -- and I haven't dealt with them

21   directly.  I'm just talking to our agents who are talking to

22   them.  But according to them, they think they will be able to

23   roll out evidence.com on these tablets by the end of the year.

24   I say that with a little bit of reluctance because vendors are

25   often optimistic.  So I hope that that's right, but that's the

1    most recent news that I have.

2         So that's one way that we're taking care of making

3    discovery available.  Over 23,000 video files are currently in

4    the defense instance of evidence.com, and we would essentially

5    just make those available to the inmates in jail.  So

6    Mr. Fellows would have access to all of those videos, which I

7    think is the most sort of primarily important discovery based on

8    the nature of the cases here.

9         The second thing that we are working on, which is slower,

10   is trying to give defendants access to Internet for viewing

11   documents.  So evidence.com isn't really a document review

12   platform.  We want -- we have not -- we are exploring with

13   Deloitte and with FPD all working together sort of the best way

14   to make that happen.  So I'm not going to get into the

15   technological weeds because it could be one of five different

16   things that they're working on right now.

17        But the idea would eventually be that there is a computer

18   discovery room in the jail, and that room has ten to 15

19   computers in it, and it's just at CTF.  And the January 6

20   inmates could go to that room and essentially either log into

21   Relativity itself, some portion of it, or log in to sort of pull

22   discovery down from the cloud, much like when we share materials

23   through USAfx.  Instead of having to mail the discovery to the

24   jail and then wait for it, to get a laptop and get your turn, it

25   would just be in the cloud.  So when you log into that computer,

1    you can pull your discovery down, which obviously creates

2    greater efficiencies.

3         So these are the things that we're exploring.  When I spoke

4    to A.J. Kramer on the Wednesday before Thanksgiving, he told me

5    that FPD was placing an order for those computers and that it

6    would be done either on Friday or today.  So the computers are

7    being ordered, and we're hoping to work out the technological

8    issues in the next six to eight weeks, which I think it will

9    take for computers to arrive, given Christmas and supply chain

10   problems and chip shortages and everything else.

11        And then we're also working with the jail, and they've

12   offered to give us a room.  They've offered to give us

13   hard-wired Internet connectivity into the room to make this

14   happen.  We have to staff the room, obviously.  And so that is

15   the next portion of this, which is figuring out -- working with

16   one of our vendors hopefully how they can work in the room,

17   provide IT support, whether it's log-in and troubleshooting,

18   just basic computer problems, or sort of that next-level tranche

19   of assistance using things like -- using the databases, like

20   evidence.com and Relativity, which requires a higher level of,

21   you know, education about these computers.  So that's another

22   ongoing discussion.

23        I think we have some good ideas for it, but they have to be

24   more solidified before I can apply for funding, because I can't

25   apply for funding based on an idea.  It needs to be kind of in

the weeds, and those are the weeds that we're working out with
FPD and Deloitte and the jail.  So we're doing our best to move
it along as fast as we can.

So putting all of that aside, which would mean it will be a
couple of months easily before there's access to something like
that, I'm wondering if at least when those computers come, one
thing we could explore is sort of dedicating a couple of
computers for pro se defendants.  So I could speak to FPD about
that.  I don't want to get ahead of myself, but when the Court
mentioned, look, these defendants don't have attorneys, they
need greater access to discovery, maybe instead of putting 15 in
the room with Internet access, a couple of them could just go
into the single cells for the pro se defendants.

But I'm just making that up right now.  So I would need to
talk to FPD and see if they're willing to commit a couple of
those computers to that purpose and if the jail would be also
agreeable to that.

And then there was one other thing the Court said.  Oh, in
no event, just so that the Court understands the government's
perspective, in no event will Mr. Fellows or any defendant be
given broad access to all of Relativity.  In other words, we may
make huge productions to FPD over time.  When their Relativity
database is ready, which it's not yet, they're constructing it,
but when it's ready, we're going to start producing a lot of
material to that database.

1       I do not anticipate giving defendants direct access to the

2   world of the database, because it will be filled with tons of

3   sensitive information.  And although it's their discovery, I

4   think in balancing the risk in terms of invasion of people's

5   privacy and the sensitivity designations that are going to be on

6   a lot of that material, the way we expect this to work in

7   non-pro se situations is that attorneys will take a look through

8   the database.  They'll provide what they think is the most

9   relevant to their clients, in addition to the case-specific

10  discovery that the government's already providing, and then they

11  can give them an index of what is in the database and say is

12  there anything else here that you think you might want to see

13  and then let them -- and then make those things available

14  hopefully through the cloud.

15      I think for someone like Mr. Fellows, there has to be a

16  similar sort of agency relationship through like a standby

17  counsel.  I understand that it may not be Ms. Halverson.  I

18  understand she has some resource availability objections to

19  that.  But there has to be somebody who can sort of be the go-

20  between between these pro se defendants and an enormous database

21  that's filled with hundreds of people's bank records and travel

22  records and grand jury records and everything else that I expect

23  the defense is going to put into their Relativity database.

24      So I think that's an issue we need to work through.  And

25  frankly, particularly with respect to this defendant, and I say

1   that for the reasons that Ms. Furst put in her motion, which is

2   that especially with respect to the sensitive and highly

3   sensitive information, I do have concerns about Mr. Fellows's

4   willingness and ability to follow orders in terms of how to

5   treat that information, and that's based on what I understand to

6   be prior violations of a CPO with a girlfriend, as well as

7   harassment of his Pretrial Services officer in this case.  I'm

8   not really confident in Mr. Fellows's ability to follow orders

9   of this Court.  I think that's part of the reason that he's

10   incarcerated right now.  And the idea of him having access to

11   sensitive or highly sensitive information unsupervised does give

12   me concern.

13         THE COURT:  All right.  So going back to where you

14   started, am I correct in understanding you believe Mr. Fellows

15   has had access to everything that he's entitled to right now?

16         MS. MILLER:  That is my understanding.

17         THE COURT:  Okay.

18         MS. MILLER:  I did not see him again on the wait list.

19   I saw that he had a computer, and I did not see his name on the

20   bottom of the wait list.  Now, that could have changed, but that

21   was my last information.

22         THE COURT:  Okay.  Thank you, Ms. Miller.

23      I guess on this motion, I'll tell you, Mr. Fellows, I don't

24   know if you want to talk or if you would like Ms. Halverson to

25   speak on your behalf, but it sounds to me like right now we're

1  in a situation where you've gotten -- been able to see just

2  about everything that you're entitled to.  I think there's more

3  coming, and I think this could be an issue down the road.  I am

4  kind of concerned about where this is headed, but I think for

5  right now, it sounds like you're getting computer access.

6          THE DEFENDANT:  Well, Your Honor, I have some comments

7  on that.

8          Number 1, the discovery, Ms. Miller, I believe her name is,

9  I believe she's not really sharing the facts correctly.  I have

10  an exhibit that you will be receiving once it's entered in the

11  ECF for one of my responses in the memorandums regarding the

12  discovery and also the motion that the government filed.  And of

13  that, 17 of the 26 people that I asked about if they've even

14  received their laptops have not gotten that, and this is about a

15  week and a half old.  I think it's similar looking at the

16  Worrell case.  I think you have to take what the jail says with

17  a grain of salt.  It's my understanding that case, Christopher

18  Worrell, January 6'er, they forged documents is what my

19  understanding was.

20          But speaking on behalf of me personally, I have not

21  received anything.  I understand why they see on their -- I

22  understand why they've been informed that I've gotten a laptop.

23  A laptop was brought to me.  However, they required that I sign

24  the contract, which I've been trying to negotiate against and

25  just ask a certain couple of questions.

1        Unfortunately, this Court has yet again been misled from

2    the gaslighting and maliciousness of the prosecutor.  She's not

3    relaying the facts.  I doubt that it's because of memory

4    problems.  I think she's just, you know, trying to continue to

5    do what she's gotten away with and been rewarded with.

6        I know exactly what I want to negotiate.  I mentioned

7    exactly the situation that happened in my response.  So I'm not

8    going to talk forever on this.  I will just briefly say I asked

9    her if we could talk about it, and she -- her idea of

10   negotiations was it's nonnegotiable.  When I pointed to Section

11   8, my favorite section of the discovery, the new protective

12   order, it said that modification was permitted, and we were

13   supposed to try to negotiate outside of court.  I respected that

14   side of the Court's request.  I've tried to not waste the

15   Court's time, unlike the prosecutors.

16       And unfortunately, we are where we are, and I still have

17   yet to receive an ounce of discovery, and now I'm being told

18   December potentially that I'm going to be able to receive my

19   discovery maybe off of a pilot program, which I will add is very

20   similar to kind of what I've requested, a laptop with Internet,

21   and they're saying that's a potential pilot program.  I would be

22   excited for that pilot program, but I would not be excited to

23   potentially wait until potentially next year, especially with an

24   upcoming court date.

25       A few things -- a few additional things I would like to

just add is Ms. Miller is not as familiar with this case.  So
her kind of speaking and saying she feels as if I've proven that
I can't be trusted with this, if I wanted to break the order, if
I had an idea of breaking the order, I would just sign it, and
then I wouldn't respect it.

The reason that I have waited on that is because I had
genuine concerns that I was hoping to bring up.  I didn't get to
do that.  Ms. Halverson could attest to that as well.  I've
brought this up for a while.

I will add, though, my least favorite section was taken
care of, Section 6(a).  Section 6(a) said that you had to sit
down with a lawyer and review the highly sensitive.  I not only
for my time and concerns said no, but I also thought about the
taxpayer and the additional parties, how that would be affecting
them for someone like Ms. Halverson having to sit down and
essentially baby-sit me over something that I could just wait
and negotiate potentially outside of this courtroom.

So it's not that I've been trying to, like, wait and break
the rules.  I signed the previous protective order because I
agreed with it, and I abided by it.  I didn't do anything.

Now, obviously, you know that I have tried to offer
testimony besides myself to show that the prosecutor has lied on
other issues and also twisted the previous case in where a
protective order was broken.  I will again remind her that
that's not a conviction.  She should know this being a lawyer

1  for 41 years, you don't say that somebody broke the law,

2  actually broke the law --

3          THE COURT:  I will interject.  I'm quite sure

4  Ms. Miller has not been an attorney for 41 years.

5          THE DEFENDANT:  I didn't mean Ms. Miller.  I meant

6  Ms. Furst.  Sorry about that.

7      So just to kind of wrap up, I did want to still discuss it,

8  but because of Ms. Furst twisting the situation, which again I

9  talk in full detail about in my motion, I'm more than happy to

10  negotiate.  I've been asking for that.  I would just simply ask,

11  which I've asked in the motion, is I don't know if it's possible

12  to maybe record our next interaction so that way we can have

13  some proof for actually how the conversation goes.  And yeah,

14  it's pretty much what I would like to do.

15      And one last thing I will also mention, when we met, I will

16  just say it was very odd that she argued that I shouldn't be

17  released on bond and then came down 20 minutes later and offered

18  me a zero to six months time-served plea deal where I wouldn't

19  even be on supervision.

20      So the question is, does she actually believe that I'm a

21  danger or not?  Because she lied to this Court clearly by

22  offering that plea deal.

23      I will send my motions to this Court after today.  Thank

24  you.

25          THE COURT:  Mr. Fellows, I just want to make sure I

1   understand.  You were given a laptop, but the jail or the U.S.

2   Attorney's Office or someone was requiring you to sign a

3   contract to use it, and you wouldn't sign the contract, so you

4   didn't get to use the laptop?

5            THE DEFENDANT:  Yes.  Ms. Halverson has also informed

6   me -- that is correct.  Ms. Halverson also informed me that I

7   should not have had to sign this because the evidence that was

8   being sent to me was on a contract that I have already agreed

9   to.

10       I'm not looking to break any laws.  I'm not looking to do

11   anything.

12       I will also say as a last comment that I forgot, I have not

13   heard that anyone else is required to do this.  What she's

14   referring to is essentially keeping Section 6(a) of this

15   contract, of this protective order from March 29 and asking for

16   me to be the only person to do that based off of -- I have no

17   actual -- there's no violent charges.  I've got no criminal

18   history.

19       And I think it's a continued showing of her vindictiveness,

20   for instance saying I shouldn't be released and then can we

21   accept her plea deal and go home.

22            THE COURT:  Can you tell me, what is your concern with

23   the contract you're being asked to sign?

24            THE DEFENDANT:  Yes.  I was going to see if we could

25   talk about it outside of court, but if you're asking directly,

1    in the motion, she cites that she -- her most -- her best method

2    of figuring out what the problem was for whatever reason was to

3    play a game of telephone rather than ask me directly, which she

4    had the opportunity to.  So she asked Ms. Halverson what my

5    issues were, and supposedly, it was only shared that I had a

6    question about --

7              THE COURT:  Just tell me what your concern is.

8              THE DEFENDANT:  My issue was -- obviously, the notes

9    thing was my biggest thing.  I'm glad to see on the most recent

10   one Section 6(a) was off.

11       I also wanted to -- sorry.  I was kind of expecting not to

12   be on the spot.  I was wondering if I could get in trouble for

13   verbally telling others what I could share.  I was a little

14   confused on that.  I just wanted information on if I can discuss

15   it verbally to others.  I was a little confused on that.

16   Specifically speaking on Section 4(b), limitations on

17   dissemination, I had trouble understanding that one.

18             THE COURT:  Okay.

19             THE DEFENDANT:  And -- oh, sorry.  You want me to

20   continue.  I guess besides 6(a), that was my biggest problem

21   really.  That was really it.  So she could have told me that in

22   the meantime, and that would have really been to my

23   understanding.

24       Oh, one other question was, how do I contest a sensitivity

25   designation?  Do I come to you?  Do I write it in a motion?  How

1    would I do that?

2              THE COURT:  Okay.  Thank you, Mr. Fellows.

3              THE DEFENDANT:  Thank you.

4              THE COURT:  All right.  Ms. Halverson, did you want to

5    say something?

6              MS. HALVERSON:  Very briefly just so that we're all on

7    the same page.  The contract that Mr. Fellows is referring to is

8    the protective order that was filed in this case and agreed to

9    by the parties previously.  When I sent over a large amount of

10   discovery to Mr. Fellows at the jail, anything that wasn't

11   sensitive or highly sensitive, all that other information was

12   all sent to him at the jail.  My understanding was that a laptop

13   was given to him, but he was told he had to sign Attachment A of

14   the protective order in order to get access to that, which

15   didn't really make any sense because Attachment A is

16   specifically for materials that are sensitive and highly

17   sensitive, and none of the material that I sent over was

18   sensitive or highly sensitive.

19       I contacted Michelle Wilson.  I think I also contacted

20   Ms. Furst to let her know -- yeah, I contacted Michelle Wilson

21   back on November 16th and said this is an issue, he shouldn't

22   have to sign the protective order in order to have this

23   discovery because it's not sensitive or highly sensitive, and I

24   never received a response.

25       So I'm kind of unsure of what to do here, but my reading of

1   the protective order was that Attachment A did not need to be

2   signed by Mr. Fellows unless and until he was receiving

3   sensitive or highly sensitive information, which is not what I

4   was providing, thinking that the sensitive and highly sensitive

5   information would be information that Mr. Fellows and the U.S.

6   Attorney's Office would have to work out about how to get that

7   information.

8              THE COURT:  Okay.  Thank you, Ms. Halverson.

9              MS. MILLER:  Your Honor, may I be heard for a moment?

10             THE COURT:  Yes, ma'am.

11             MS. MILLER:  I'm still making my way through all of

12  the things that have just been said.  But my understanding is

13  that, as Ms. Halverson just indicated, the protective order was

14  entered, but the defendant never signed Attachment A.

15  Attachment A says that he carefully reviewed it with his

16  attorney, he's satisfied with the legal services, but most

17  importantly, putting that aside, that he fully understands and

18  voluntarily agrees to it, that no threats have been made to him,

19  and that he's not under the influence of anything in agreeing to

20  it.

21      That's the part that he has not signed.  Until he signs

22  that, pursuant to this protective order, he can't have access,

23  as Ms. Halverson said, to any sensitive or highly sensitive

24  material.  All of the U.S. Capitol CCTV in this case has been

25  designated sensitive or highly sensitive pursuant to our,

1  essentially, negotiation with the U.S. Capitol Police who have

2  sensitivity concerns about that material being disseminated

3  beyond anything -- any discovery needs in this case.

4      And so even just basic access to evidence.com requires the

5  defendant to in some way, whether he signs Attachment A or

6  engages in a colloquy with this Court, but to acknowledge that

7  he's read this order and that he understands the limitations on

8  dissemination and disclosure.

9      To answer the defendant's specific question, the limitation

10 on dissemination provision, which is 4(b), says that no

11 sensitive or highly sensitive materials or the information

12 contained therein may be disclosed to any persons other than the

13 defendant, the legal defense team, the person to whom the

14 information solely and directly pertains, or that person's

15 counsel without agreement of the United States or prior

16 authorization of this Court.

17     So those are the rules, which means that to the extent that

18 Mr. Fellows is reviewing documents or video that is sensitive or

19 highly sensitive, he is not supposed to discuss it is how I

20 interpret disclosure with anybody other than the people that I

21 just identified or that the Court authorized.

22            THE COURT:  So are you saying that there's nothing

23 that you can provide him that is not sensitive or highly

24 sensitive?

25            MS. MILLER:  No, that part, it sounds like

Ms. Halverson did try to provide him discovery that was not either sensitive or highly sensitive and that for some reason the jail said they would not allow him to view it nevertheless unless he signed this Attachment A.

I don't know where the jail is getting that from.  We never instructed the jail in that regard.  So I don't know if it's their own rules and regulations that they sort of instilled after reviewing this protective order.  Maybe they've misunderstood it.  I'm not sure.

It sounds like Ms. Halverson has already reached out to Michelle Wilson, which is exactly what I would do to try to get to the bottom of this.  Again, I'm happy, when I reach out to her about the contacts issue, to raise this as well, but it sounds like Ms. Halverson has done everything that could be done to figure out why that's happening.

THE COURT:  Okay.  So I thought -- we've entered this protective order.  I think Ms. Halverson's point that she's made before, it feels like a fair one, that I've ordered the defendant to do this.  It feels a little bit like we're standing on ceremony here refusing to provide information to the defendant.

MS. MILLER:  I don't think that --

THE COURT:  He's clearly read it.  He's read it very carefully.  We need to make this happen, Ms. Miller.

MS. MILLER:  Your Honor, I agree.  That's why I said

1    if he doesn't want to sign the Attachment A, we would just ask

2    that this Court simply ask the defendant to indicate, which he

3    somewhat has, but just to make it absolutely clear that he has

4    read it, that he understands it, that he voluntarily agrees to

5    it, and that he's not doing that pursuant to any -- obviously,

6    under the influence of anything or any threats or anything like

7    that.  And that's it.  And if he would do that on the record

8    here in this court, he doesn't need to sign Attachment A, and we

9    can make the sensitive and highly sensitive materials available.

10         But there are still, as I said, limitations to then how

11   those materials pursuant to the protective order can be viewed,

12   disseminated, disclosed, et cetera.  That's why they have those

13   classifications.  So we still need to deal with those

14   limitations in the context of him being incarcerated.

15         THE COURT:  Mr. Fellows is a difficult defendant, but

16   he's clearly an intelligent defendant, and he is entitled to

17   discovery.  And we can't just refuse to turn over discovery to

18   him because he's not doing -- saying what you want him to say.

19         MS. MILLER:  Well, to be clear, we are not refusing to

20   turn over discovery.  All the discovery has been provided to his

21   counsel up until the point that he went pro se.  So whether --

22   in other words, we don't stop the flow of discovery because

23   somebody refuses to sign Attachment A.  All the discovery is

24   provided.

25         It's just that the defendant is not allowed to then have

access to it until -- the sensitive and highly sensitive portions until he agrees to the protective order.

Now, the protective order is something that this Court authorized and that the parties agreed to previously. I mean, it's about balancing his interests to review the discovery, which we want him to have access to, absolutely, against concerns about abuse of that discovery, which based on the record in this case there are some reasons even to believe specifically it could be abused.

And so all we're asking, it's not much, is that pursuant to the order that was previously agreed to, that he says I understand it, and we can move on, and we will start providing it. But there are still going to be issues about his unsupervised access to certain materials that we're going to have to work through, like him not having access to the Relativity database and who is going to be the go-between, is it going to be Ms. Halverson, for providing him an index and seeing what materials he wants to look at.

And with respect to this particular defendant, I really do have concerns, the same ones that are highlighted in Ms. Furst's motion, about him having unsupervised access to those materials because of his particular record. So I'm not saying that's true for every defendant or even every pro se defendant, but in this particular case, I do worry about this defendant's access to unredacted documents that identify police officers who are

accused, even if it's later found unfounded, of misconduct and
things like that and what he might do with e-mail addresses,
with phone numbers, with any other information based on what
happened with his Pretrial Services officer and her mother and
the prior CPO.

So I do think that because of his prior conduct he needs to
have a higher level of supervision, and that's what we're
requesting in this case, not for every case, not for every
defendant, but because of who he is and what he has done in the
past.

THE COURT:  Okay.  So Mr. Fellows --

MS. FURST:  Your Honor, may I add a couple things?

THE COURT:  Yes, ma'am.

MS. FURST:  Ms. Miller is doing fabulous.  So I'm
going to bring her every other time I come.

I just want the Court to know that we did inquire of the
jail.  On November 5th, for instance, we sent a thumb drive to
the Litigation Unit.  The thumb drive had his own TikTok data
obtained through legal process.  So we sent that to the jail on
November 5th, and we received an e-mail -- because we wanted to
know did he get it and look at it, and on November 12th, he was
provided the discovery that we sent, a flash drive, and he
reviewed the material is what we were told.

So I know he's getting some things.  It sounds like he's
getting the documents.  And at least he's gotten the one thumb

1    drive.

2        I think --

3        THE COURT:  But if he's not allowed to use a laptop,

4    the thumb drive is not much good to him.

5        MS. FURST:  He was provided the ability to review the

6    flash drive, and I think that was in the normal course where he

7    puts his name on the list and he gets the laptop to look at it.

8    He can tell you if that actually happened or what happened.

9        THE COURT:  Well, he was shaking his head over there.

10       MS. FURST:  Okay.  That's what we were told by the

11   jail.

12       And if you will look at page 15 of his second pro se

13   motion, the one that was for access to the laptop, at the top of

14   the page, he says that "the Internet is available via

15   connection.  I personally know this for a fact because prior to

16   and during video calls with my attorney, I connected to the

17   jail's WiFi and was able to access Google, e-mail, and other web

18   sites freely without restriction.  This was when I was yelled at

19   and the keyboard was taken away from me.  Still, it's been

20   tested, and it's ready to go."

21       So even in his own motion, he tells you that he wasn't

22   obeying the jail's rules, and he found a way to access the

23   Internet.

24       So the whole reason for the government's motion, I don't

25   want to deny him the sensitive and the highly sensitive

1    information.  If the Court would just, as Ms. Miller said, go

2    through him with would he agree to abide by it.  If he says no,

3    what we would do is ask that someone on the prior defense team,

4    Ms. Halverson's prior defense team, sit with him when he is

5    reviewing the sensitive and highly sensitive information and

6    that he not be allowed to keep it.  That's what we're asking

7    for.

8              THE COURT:  Okay.

9              MS. FURST:  Thank you.

10             THE COURT:  Mr. Fellows, I hopefully have gotten the

11   answers to your questions.  Are you willing to sign the

12   Attachment A now?

13             THE DEFENDANT:  If I could just respond briefly first.

14       So I know they're talking about dangerousness, that they

15   worry that I'm going to be viewing things because of a supposed

16   break in an order in the past.  I have read in the law books

17   that dangerousness is not supposed to be theoretical but

18   actually proven.

19       And yes, they have sent stuff to the jail, but it's not

20   helpful to me.  Sergeant Franklin can attest.  He is the officer

21   that tried to give me the laptop.  I told him, and he was

22   shocked.  I said I'm sorry, there's the contract, I still have

23   to discuss this, if I can't get the laptop without signing this,

24   then I can't accept this at this point.

25       With regards to the Internet, that's not --

```
 1            THE COURT:  The contract is Attachment A?  Is that

 2   what you're talking about?

 3            THE DEFENDANT:  The document 18 filed 3/29/21, seven

 4   pages.  I don't see anything on here saying it's Attachment A.

 5   So I'm not sure.  If they can possibly point it out to me.

 6            THE COURT:  So that --

 7            THE DEFENDANT:  I can't see it.

 8            THE COURT:  That's right, because we haven't gotten

 9   you lenses.  So it says "defendant's acceptance."

10            MS. MILLER:  The very last page of the document is

11   Attachment A.

12            THE DEFENDANT:  Just essentially like accepting

13   everything else.

14       I did also want to clarify some things.  I'm not trying to

15   waste the Court's time.  I thought we were going to handle this

16   outside of court.  I think it would take honestly five minutes

17   if they came downstairs at the end, maybe even less.  I could

18   almost promise this Court that I can sign it today, because I

19   promise you, I want my discovery.  I've been waiting for it.

20   I've been asking for it.  I've been asking to meet with this

21   Court.

22       And also, I just wanted to state with regards to the

23   accessing the Internet, I don't like telling people, because

24   I've tried to avoid it since high school because I don't like to

25   have that stigma attached, but high-functioning Asperger's, we
```

1   are able to conduct -- we are able to be very there with a lot

2   of situations.  Certain situations were slow, especially for me,

3   certain social situations.  So if it's not clearly written out

4   for me, if it's not spelled out, I go by just what I read, what

5   I see.  If I don't hear or see a clear rule, I don't

6   immediately, like most people might think, think to myself, oh,

7   I'm breaking this.

8        For instance, on the Internet, I saw it, hey, I'm curious,

9   I wanted to see the Internet.  I looked up the fake news

10  articles about me, and I was just interested in what they were

11  saying about me.  That's it.

12       I didn't break any laws.  I was free for five months.  I

13  didn't contact any --

14            THE COURT:  Let's talk about the contract.

15            THE DEFENDANT:  So I could easily sign this in five

16  minutes.  I don't have a lot of discrepancies with it now.  I

17  just wanted to clarify some things, if that's acceptable.

18            THE COURT:  Okay.  Can you sign that now?

19            THE DEFENDANT:  I just wanted to know with regards to

20  how long would I not be able to discuss it?  For instance, I

21  will just share briefly, super briefly my concern.

22       I, of course, feel as if I've been lied about about a lot

23  of things.  If, for instance, I saw a video that supported what

24  I've been saying this whole time, in my head I'm just thinking

25  why is it wrong for me to share that with people if it directly

1    relates to me?

2              THE COURT:  All right.  So you're looking at 4(a)?

3              THE DEFENDANT:  I'm looking at 4(b), yes.  I'm just

4    curious how long I can --

5              THE COURT:  It says prior authorization of the Court.

6    I am authorizing you to talk about any video you see with

7    anybody you want to.

8              THE DEFENDANT:  Very well.  I can sign it.

9              THE COURT:  All right.  Can you do that now, please.

10             THE DEFENDANT:  And obviously, I do object also, as my

11   standby counsel did, to having to be baby-sat while watching it.

12   I'm already in a more secure position than the other, what, 700,

13   800 people that are free.  I'm in a jail.  I can't do anything

14   with it.  I can't take it anywhere.  I think there's adequate

15   security.  And despite their pushing, I think I'm not an actual

16   huge threat as they make me out to be.

17             THE COURT:  All right.  Can you hand that to

18   Ms. Furst?

19        All right.  So I think the government's motion regarding

20   compliance with the protective order I'm going to deny as moot

21   now in light of Mr. Fellows's agreement to sign it.

22        The government has moved to introduce detention hearing

23   testimony.  Ms. Halverson, are you going to be responding to

24   that on Mr. Fellows's behalf, or is that something Mr. Fellows

25   is responding to?

1          MS. HALVERSON:  I did not plan to respond to it, Your

2     Honor.  If Mr. Fellows want to address it, he is welcome to.

3     But my understanding is that he didn't receive it yet from -- it

4     was mailed by both Ms. Furst and me to the jail, but my

5     understanding at the beginning before court started, he hadn't

6     yet received the government's motion.  I gave him a paper copy

7     today of it.

8          THE COURT:  Great.

9          MS. HALVERSON:  But I again caution with setting

10    deadlines for him to respond from the jail.  It's just really

11    difficult to do deadlines in a timely manner when a defendant's

12    pro se at the jail.

13         THE COURT:  Okay.

14         MS. MILLER:  Your Honor, I'm sorry.  May I clarify two

15    things?

16         THE COURT:  Yes, ma'am.

17         MS. MILLER:  First of all, with respect to the

18    protective order, I just wanted to make clear that automatically

19    excluded from the order and its protections are any materials

20    that were derived directly from the defendant, that pertain

21    solely to the defendant, things like his own financial records,

22    telephone records, digital device downloads, social media,

23    electronic communications, his own statements to law

24    enforcement.  So video that pertains directly to him was already

25    excluded.  I just wanted to make clear that we were trying to be

compromising and fair with this order.

But the other thing I wanted to let the Court know is I received an inmate discovery waiting list from the jail. I said November 5 before. It was actually November 15. And according to that waiting list, on November 1, the jail received discovery at the Department of Corrections Litigation Support Unit, and as of November 9, Mr. Fellows was listed as "currently reviewing," meaning he had a laptop in a single cell and was reviewing it.

So I don't know where the disconnect is happening here or where the truth lies, but that's what -- the sort of just running list of the people who just administer the wait list. It's not -- this isn't kept by the general counsel or something like that. This is a list that's just the people whose job it is to administer their program, to keep a list of when the discovery comes in, and that's what it showed.

THE COURT: Okay. Thank you, Ms. Miller.

So Ms. Furst, why don't you tell me where things stand otherwise in the case.

MS. FURST: Well, Your Honor, we've been providing discovery, as you've heard. The latest batch went out November 23 to the jail, and that was just documents.

So that was the motion that I filed to admit his testimony. There was an FBI agent present at that meeting on October 12 after we held court. That FBI agent took notes and did a 302 report, and I mailed that to standby counsel, as well as

1    Mr. Fellows.  And I also mailed the ECF notice to Mr. Fellows.

2    That response is due to my motion December 10th.  So that was

3    the last mailing that we sent out.

4         Once I get the signed Attachment A, I will then ask the

5    public defender -- because they have most of this information

6    already that I provided specific to him and that they went

7    through and separated out.  They've already sent, as you know,

8    the nonsensitive, nonhighly sensitive stuff over.  I would then

9    ask if they would just simply do the same with the sensitive and

10   highly sensitive stuff that we sent to them -- materials that we

11   sent to them when they still represented Mr. Fellows fully.  And

12   then from now on, anything that is discoverable we will provide

13   under the Court's order.

14            THE COURT:  Okay.

15            MS. FURST:  And the only other thing is, Your Honor,

16   because of all this, I know the Court was anxious to set a trial

17   date.  We all know that Mr. Fellows wants a trial.  However,

18   until we get this all sorted out, I am again requesting that we

19   have another continuance and that we toll speedy trial under 18

20   U.S.C. 3161(h).

21            THE COURT:  Okay.  How long are you requesting,

22   Ms. Furst?

23            MS. FURST:  Your Honor, normally I say 60 days.  I'm

24   going to ask for 90.  I have not spoken with Mr. Fellows about

25   this.  But in order for him to see all the video and review all

1     the video -- it's not just -- there's some body-worn camera, a

2     couple of them that I found him in, maybe it was one that I

3     found him in, but Ms. Halverson had requested video from outside

4     the Senate wing doors about the time he went in to see if there

5     was any other body-worn camera.

6         And while there were officers outside the door, they were

7     sort of backed up a ways, but I don't know.  He might want to

8     look at their body-worn camera and see if he's in there or if it

9     helps him in any way.

10        So the 90 days is the reason because of all that evidence

11    he has yet to look at.

12              THE COURT:  Thank you, ma'am.

13        Mr. Fellows, do you wish to be heard?

14              THE DEFENDANT:  Yes, Your Honor.  Obviously, I think

15    I'm in a unique position from some of the other Jan 6'ers that

16    I've spoken with who are kind of trying to get their trials in,

17    some of which want speedy trial before maybe hypothetically some

18    more troubling stuff comes out.

19        I'm not afraid of the video footage that's going to come

20    out.  I actually want it.  It's helpful to what I'm claiming,

21    and it will support what I've claimed.  So if it has to wait, I

22    would like to wait, so that way I can get that footage.

23        But I will say that based upon their most recent plea deal

24    and imagining I will be making a motion shortly to -- at least

25    an attempt to dismiss the obstruction charge, if that is taken

out, which even if it wasn't I don't think it's going to go on
with the merits, I think I'm quickly approaching, compared to
what everyone else has suffered with in my similar situations in
that room or even in more extreme situations, I think I'm
actually now approaching the period where if I was convicted I
would be facing about a similar time frame.

So perhaps even like another autistic person that I just
read on Emanuel Jackson, who struck officers with baseball bats,
was released to a halfway house in D.C.  I do love this city.
It's a beautiful city.  Perhaps I could go and do the similar
thing.  It's still supervised.  It's still secure.  Perhaps I
could show a bit of per se reformed nature and chance in the
future, if not now.

I would like to throw that on the table if we are going to
delay.  So obviously, in that environment, I would really like
to be able to contact witnesses that I have trouble reaching in
the jail, getting evidence that I need.  There's a whole list
that I've mentioned.

So I'm not going to talk your ear off.  I would like to ask
that, and I want to wait until all the discovery of the areas
that I've asked for are within my -- have been looked at with a
decent amount of time on my end.

Thank you.

MS. FURST:  Your Honor, if I might respond.

Ms. Miller reminded me, we still haven't addressed the

maintenance of the sensitive and highly sensitive stuff that
he's going to look at, if he's going to be supervised or not.
Even under the protective order, he needs to at least be
supervised, I think.  I'm going to defer to her.

          MS. MILLER:  So I think based on the Court's colloquy
with Mr. Fellows and his willingness to sign the document,
because of exceptions that we've made for video, I have no issue
with Mr. Fellows reviewing as much video as he wants to by
himself without supervision.  It's impossible to download it.
If he doesn't get access to the Internet again, it should be
impossible to share it in any way.

     I am more concerned, as I mentioned earlier, about the
documents, the documents that contain PII, the documents that
include unfounded allegations against officers who are already,
frankly, quite traumatized from this event, the documents that
contain personal and private information of other defendants, of
witnesses, of tipsters.

     And I -- even if we were willing to -- my concern is that
at the very least any notes he takes from those documents need
to be shared with stand-by counsel and inspected to make sure
that he's not copying down information he should not be copying
down from those materials, like PII and people's contact
information and so forth.  But in general, I just worry about
him having any unsupervised access to those materials.

          THE COURT:  I'm sorry.  So how do you envision this

1    working?

2         MS. MILLER:  Well, an attorney -- it would have to be

3    either a separate room at the jail that's completely supervised

4    at the jail where he has to go to that room to look at that

5    discovery so that he can't -- he literally can't leave with

6    inappropriate notes or an attorney needs to come and be with him

7    and go over those discovery materials with him.

8         THE COURT:  But how do you -- is this like on his

9    honor?  I don't understand when -- how you would know that he's

10   being supervised?

11        MS. MILLER:  It would have to be that he only gets

12   those materials when his attorney comes with him.  That's how

13   that would work.  For the documents that are highly sensitive,

14   they would have to be brought in by the standby counsel or

15   some --

16        THE COURT:  Like on a thumb drive?

17        MS. MILLER:  Sure, yes, they can do that.  The defense

18   counsel can come with a computer and a thumb drive to a jail

19   visit and show discovery to a client.

20        THE COURT:  Ms. Halverson, what do you say to this?

21        MS. HALVERSON:  So my concern is that, you know, the

22   government's already stated in multiple filings that this is a

23   incredibly unique case with voluminous discovery.  To be quite

24   candid with the Court, I don't have the resources and the

25   Federal Public Defender doesn't have the resources to sit at the

jail for eight hours a day for 14,000 hours to review this kind

of discovery with Mr. Fellows.

I also think --

THE COURT:  How are you handling it on cases where FPD

does represent the defendant?

MS. HALVERSON:  So we send it over to the jail.  But

this protective order is very unique that it's got the highly

sensitive and sensitive information.  In regular cases where

there's CI -- sort of like CI cases and that's protected

information, we can get redacted versions of it and send it

over, and the jail monitors it in their pilot program -- or

their program where they allow them to have educational tablets

and review their discovery that way.

This case is different because there seems to be an even

higher designation, and the protective order in this case again

talks about him being supervised.

THE COURT:  So this is different from other January 6

cases?

MS. HALVERSON:  No, this is different from other

regular, run-of-the-mill U.S. District Court cases.

THE COURT:  So how are you dealing with this in other

January 6 cases?

MS. HALVERSON:  Me personally, Mr. Fellows is the only

January 6 defendant that I have that is incarcerated.  So for

the unincarcerated January 6 clients that I have, we have been

able to upload the highly sensitive and sensitive materials to a cloud-based system after providing notice to the U.S. Attorney that we intend to do so and after getting the signature of the client saying they will abide by the protective order on Attachment A and filing that on ECF.

THE COURT:  Do you know how your colleagues are handling incarcerated defendants?

MS. HALVERSON:  I don't, but I can inquire.

THE COURT:  Okay.  So I think what I want to do is come back in about a month.  I think 90 days is too long, especially since we've got a few open issues here.  I want to make sure that Mr. Fellows has his glasses, and I want to make sure that he's actually getting the discovery.

This sounds like an issue that is not unique to Mr. Fellows, that I don't know if that's FPD finding someone or if it's the U.S. Attorney's Office figuring out a way to allow -- kind of get resources for defendants to view this.  But he represents himself.  He needs to be able to view his discovery.  That's the bottom line.

Yes, Mr. Fellows?  Yes, last time.

THE DEFENDANT:  I just wanted to make sure I get these things out before we end, because last time I didn't get to speak on some things.  But first of all, I just wanted to add to what they've just talked about.

The other reason I kind of disagree with that notion of

trying to have me be baby-sat for unknown amounts of hours aside from the financial aspect is every time we go -- I have yet to do this, but every timer Jan 6'ers or even other people in the jail go to go see someone in person, they have to get strip searched.  Obviously, you will recall how I felt about having to be drug tested with somebody staring at me.  Perhaps you'll even remember my quote.  So I, obviously, would not be a big fan of that as well.

Additionally -- oh, I need better ways to be able to respond to the motions.  So I hear that I'm supposed to respond by December 10.  I've notified the jail of my understanding of *Bounds v. Smith*, in which not only are they supposed to provide me paper, pen, stamps, which I'm continuously -- first of all, I've never gotten stamps, but I'm always running low.  The pens are very troublesome.  Along with my handwriting and my eyesight, I feel bad handing these things in to you and for anyone else who has to read them.

But additionally, the bigger problem is, I've asked them to send in the motions, continuously, like the motions that I have, and they refuse.  I'm not the only one who has had this problem. The other pro se person, Brian Mock, has had issues with this as well.  I need some way to have better access to the Court so I can respond timely and not have it all just pile on every time I show up.

And the one other thing I just wanted to mention was just

1    for clarity purposes, because I didn't -- and then I am pretty

2    much set for the time, is I just wanted to make it clear, last

3    time, I think, especially the fake news on the back, but it

4    seemed maybe this Court could have been confused on, like, why I

5    shared that information.  I didn't accidentally -- more

6    specifically, the information regarding the past case in which I

7    thought I found a loophole, I didn't share it accidentally.  I

8    shared it knowing, having been warned months ago, that hey,

9    actually, that would make you look very bad and it's illegal.  I

10   shared it as a proffer that I'm not afraid of looking bad and

11   sharing the truth.  And so I wanted to clarify that.

12        That's pretty much all I wanted to say.  Thank you.

13            THE COURT:  Thank you, Mr. Fellows.

14        How about January 7 at 10:30?  Does that work for the

15   government?

16            MS. FURST:  Your Honor, may I have a moment?

17        Yes, Your Honor.

18            THE COURT:  Ms. Halverson, does that work for you?

19            MS. HALVERSON:  January 7 at 10:30 works just fine for

20   me.

21        I wanted to clarify, so I'm crystal clear on exactly what

22   the Court wants, by January 7 the Court wants his contact lens

23   situation at least figured out or inquired about or dealt with?

24            THE COURT:  Well, two weeks.

25            MS. HALVERSON:  You want that within two weeks, okay.

1    And then what are my next marching orders as far as the

2    discovery situation is concerned?

3        THE COURT:  So I think we've got to figure out the

4    situation for him to be able to view sensitive or highly

5    sensitive information.  That strikes me as an FPD/U.S.

6    Attorney's Office issue that, you know, is not unique to this

7    case, although perhaps particularly important in this case since

8    he represents himself.

9        And then the other thing I was going to say, I'm going to

10   ask the defense to respond to the government's motion to

11   introduce the detention hearing by that point.

12       Mr. Fellows, great idea to ask Ms. Halverson to respond on

13   your behalf.  I'm sure she'd be willing to do that.  Obviously,

14   you have the right to respond yourself if you want to.  If you

15   haven't been able to send it to me by then, just bring it with

16   you on January 7 at 10:30.

17       THE DEFENDANT:  Sorry.  I forgot.  I have one piece of

18   paper ex parte.  I don't know how ex parte works.

19       THE COURT:  Okay.  You can give it to Ms. Halverson.

20       MS. HALVERSON:  Would the Court like me to -- may I

21   approach, Your Honor?

22       THE COURT:  You may.

23       All right.  Mr. Fellows, I want to give this back to

24   Ms. Halverson.  I think she will know how to deal with this.  Is

25   that okay with you?

1          THE DEFENDANT:  Yes.

2          THE COURT:  All right.  So January 7, 10:30, we will

3    have a continued status conference.  I'm going to toll the time

4    between now and then.  I think, A, there's open motions that

5    would justify that as a matter of law, but in any event, I think

6    we have ongoing discovery and some issues with ensuring that

7    Mr. Fellows is able to review it that would justify tolling time

8    between now until January 7, and I find that the interests of

9    justice outweigh the interests of the defendant and the public

10   in a speedy trial to the extent that I'm tolling until then.

11         Yes, Ms. Miller.

12         MS. MILLER:  A couple of things, Your Honor.  I'm

13   sorry.

14         First, I just wanted to say -- I heard Ms. Halverson

15   describe the way that FPD seems to be treating highly sensitive

16   materials.  For the record, that's not consistent with our

17   protective order.  The protective order says that if the defense

18   is able to -- the defense is able to share highly sensitive

19   material with defendants over a cloud-based system from which

20   they can't download if they first provide notice to the United

21   States and give us an opportunity to object.

22         We have preemptively stated for all highly sensitive video

23   we don't object.  If they've signed Attachment A, give them the

24   video, and nobody needs to supervise.  We have come to no

25   agreement regarding documents.  So if the FPD is providing

documents that are marked highly sensitive to defendants

unsupervised using a cloud-based discovery system, that's been

unknown until now.

    The second thing I wanted to say, Your Honor, is we have

discussed with FPD this issue about resources with standby

counsel.  I raised it with them before this hearing.

Ms. Peterson, Shelli Peterson, echoes the concerns of

Ms. Halverson about resources.

    One idea that I had was that a CJA attorney could

potentially be appointed to assist essentially with pro se

defendant review.  I don't agree with Ms. Halverson's

characterization that the way this is always handled in every

case is that materials are just redacted and the defense can

leave it with their clients.

    But we did cite in our motion, which is document number 53,

a number of cases for the proposition that standby counsel does

properly take up this role with respect to sensitive and highly

sensitive materials.  And I would just merely encourage and

request the Court to review some of the cases that we cited in

that motion, because there are plenty of cases that stand for

the proposition that certain discovery materials that are

sensitive should not be left with the pro se defendant in jail,

they need to be safeguarded, and the way to do that is to have a

lawyer there when they're reviewed and have them taken away when

the defendant is done reviewing them.

1          THE COURT:  Okay.  Thank you, Ms. Miller.  I'm going

2   to hope that between now and January 7 the two offices are able

3   to figure out a way to deal with this, but if not, I can try to

4   resolve it, then.

5          Thanks, folks.  I will see you on January 7.

6          (Proceedings adjourned at 11:14 a.m.)

CERTIFICATE OF OFFICIAL COURT REPORTER


     I, Sara A. Wick, certify that the foregoing is a
correct transcript from the record of proceedings in the
above-entitled matter.



/s/ Sara A. Wick_____          December 17, 2021___
SIGNATURE OF COURT REPORTER          DATE