UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,         .
                                  .
            Plaintiff,            .   CR No. 21-0083 (TNM)
                                  .
      v.                          .
                                  .
BRANDON FELLOWS,                  .   Washington, D.C.
                                  .   Thursday, April 14, 2022
            Defendant.            .   3:00 p.m.
. . . . . . . . . . . . . . . .


TRANSCRIPT OF STATUS HEARING
BEFORE THE HONORABLE TREVOR N. MCFADDEN
UNITED STATES DISTRICT JUDGE


<u>APPEARANCES</u>:

For the Government:         MONA FURST, AUSA
                            U.S. Attorney's Office
                            301 North Main
                            Suite 1200
                            Wichita, KS 67052
                            (316) 269-6481


For the Defendant:          WILLIAM L. SHIPLEY, JR., ESQ.
                            Law Offices of William L. Shipley
                            841 Bishop Street
                            Suite 2201
                            Honolulu, HI 96813
                            (808) 521-3336

                            RYAN MARSHALL, ESQ.
                            355 S. Grand Avenue
                            44th Floor
                            Los Angeles, CA 91311
                            724-812-1455


Court Reporter:             BRYAN A. WAYNE, RPR, CRR
                            U.S. Courthouse, Room 4704-A
                            333 Constitution Avenue NW
                            Washington, DC 20001
                            (202) 354-3186

1              P R O C E E D I N G S

2                 (Via Videoconference)

3          THE DEPUTY CLERK:  Your Honor, this is criminal case

4    21-83, United States of America versus Brandon Fellows.

5    Will the parties please introduce yourselves for the record,

6    starting with the government.

7          MS. FURST:  Good afternoon, Your Honor.  Mona Furst,

8    assistant United States attorney, for the government.

9          THE COURT:  Good afternoon, Ms. Furst.

10          MR. SHIPLEY:  Good afternoon, Your Honor.  William

11    Shipley on behalf of Brandon Fellows, who is present via

12    videoconference from the DOC facility.

13          THE COURT:  Good afternoon, Mr. Shipley, and good

14    afternoon, Mr. Fellows.

15          MR. MARSHALL:  Good afternoon, Your Honor.

16    Ryan Marshall, also for Brandon Fellows.

17          THE COURT:  Good afternoon, Mr. Marshall.

18      All right.  Why don't we start there.  Mr. Fellows, I know

19    you had sought leave to represent yourself, and I allowed you

20    to do so.  Am I correct in understanding that you would like

21    Mr. Shipley and Mr. Marshall to now represent you, sir?

22          THE DEFENDANT:  So, there's -- there seems to be a bit

23    of a miscommunication, and I was under the impression I was

24    hiring them as standby counsel pending seeing, you know, how

25    things went and then eventually moving to full representation.

1    I was just informed that they put a motion for appearance on
2    my behalf, and then they said that they weren't interested
3    in representing me as standby counsel.  So I was essentially
4    told, hey, let's talk for the next 30 days and figure out
5    what's going on.  But obviously I'm trying to stop the abuse
6    here at the jail, trying to get our constitutional rights
7    back.  I think -- they've been very helpful currently.
8    They've essentially been acting as standby counsel, and I've
9    been very happy with that.  But I'm essentially -- like I'm in
10   an unknown territory as of just a couple of minutes ago
11   because I still wanted to kind of run the shots for a little
12   bit longer and kind of run through a test run because of, you
13   know, my mistrust that was created through Ms. Halverson.

14       And so I don't really know -- you know, I'm kind of afraid
15   to say, you know, that I'm not going to accept the full
16   representation because I was informed now they're not going to
17   be standby counsel, that they'd withdraw, but I also don't
18   want to potentially throw out the ability to be able to say --
19   to be able to speak and actually address the issues that I
20   think are important even if it's, you know, a potential train
21   wreck, you know, since I'm not a lawyer.  So I'm honestly
22   unaware how to -- I don't know what to do.

23       THE COURT:  Okay.  So, obviously, I can't advise you,
24   sir.  It sounds like it's your call.  I don't know --
25       Mr. Shipley, are you all willing to stay on at least for

1    today as standby counsel?

2         MR. SHIPLEY:  Yes, Your Honor.  I told Mr. Fellows

3    that, you know, I don't know where this misunderstanding

4    originated, because he came to me.  And I would have never

5    accepted to be standby counsel.  I would -- Mr. Fellows needs

6    help, and I was willing to step in and help.

7         We filed a general notice of appearance as soon as I became

8    a member of the court.  That took a little bit of doing.  I

9    actually just missed the March deadline, had to wait for the

10   April deadline.  As soon as I was a member, I filed a general

11   notice of appearance.

12        Mr. Marshall, who'd been working with Mr. Fellows for a

13   little bit of time, and it's just this morning that Mr. --

14   my direction to Mr. Fellows was, Brandon, you know, be quiet

15   during this hearing, let me introduce myself to Judge

16   McFadden, let's figure out where we stand, let's see if we

17   can't get your case moving forward.

18        And it's like the idea that he wouldn't be able to talk

19   and he wouldn't be his own lawyer anymore suddenly was a new

20   revelation to him.  So I'm willing to go through the hearing

21   today.  I'm counsel of record.  I filed a notice of

22   appearance.  If he wants me to withdraw, I can do so after

23   today's hearing, but I won't be standby counsel.

24        THE COURT:  All right.  So, Mr. Fellows, you've had a

25   series of choices you have made that have landed you here, and

1        you continue to get to make your choices.  I'm not going to

2        tell you how to do them.  I think for today I'll assume that

3        you're still representing yourself and Mr. Shipley and

4        Mr. Marshall are here as your advisors.

5            Obviously, it's up to them whether they continue to do

6        that, and up to you whether you actually want to have them

7        represent you.  But I'm not going to be addressed by a team

8        of people from the defense.  You're going to have to decide

9        at some point who's in charge.

10              THE DEFENDANT:  Yes.  This was last-minute notice,

11       and I just -- you know, it was originally agreed upon a

12       retainer was for standby counsel.  It was originally going

13       to be more for full representation.  I tried to negotiate

14       perhaps we could do this since I didn't have a ton of money

15       left over for that, and that was my understanding.

16           Communication has been mainly through Ryan.  Bill and I

17       have spoken I think two, three times, potentially, but almost

18       all the conversations have been had with Ryan and myself.

19       So I just would at least like to represent myself for today,

20       not throw them out and have them withdraw, but I just want

21       to have a better understanding of like what they're seeking,

22       because that was news to me within a couple minutes of court.

23       That wasn't what I originally was agreeing to.  That's it.

24           And I also just would object, because as I mentioned in

25       the first evidentiary as it happened, I do want to showcase

1    that I really shouldn't have ever had a detention hearing and

2    I really shouldn't have been revoked in the first place.  So I

3    don't think that really, a hundred percent at least, it was my

4    actions that led to me being here.

5           THE COURT:  All right.  Mr. Fellows, we need to arraign

6    you in a superseding indictment.  Are you willing to do that

7    virtually, or do you want to wait until we can do that in

8    person?

9           THE DEFENDANT:  No, we can do it virtually.

10          THE COURT:  I do find it appropriate for us to do it

11   virtually for the arraignment in light of the pandemic and the

12   authorization in the CARES Act.  Ms. Chaclan?

13          THE DEPUTY CLERK:  Brandon Fellows, in criminal case

14   21-83, in which you are charged by a superseding indictment

15   on Count 1, Obstruction of an Official Proceeding, Aiding and

16   Abetting; Count 2, Entering and Remaining in Restricted

17   Building or Grounds; Count 3, Disorderly and Disruptive

18   Conduct in a Restricted Building or Grounds; Count 4, Entering

19   and Remaining in Certain Rooms in a Capitol Building; Count 5,

20   Violent Entry and Disorderly Conduct in a Capitol building,

21   do you waive formal reading of the superseding indictment,

22   and how do you wish to plead?

23          THE DEFENDANT:  Yeah, I waive it and not guilty.

24          THE COURT:  Okay.  So we have a couple of senior

25   officials here from the Department of Corrections.  I'll

ask you all to introduce yourselves for the record.

MS. WILSON:  Good afternoon, Your Honor.  I'm Michelle Wilson.  I'm deputy director of administration, the interim deputy director of administration.

THE COURT:  Good afternoon, Ms. Wilson.

MR. GLOVER:  Good afternoon, Your Honor.  Eric Glover, general counsel, D.C. Department of Corrections, and with me is DOC's attorney advisor, Richard Rudasill.

THE COURT:  All right.  Good afternoon, Mr. Glover and Mr. Rudasill.

All right.  Since we've got these folks on the line, I wanted to address the defendant's concerns about his conditions of confinement first, so we can let them go.

I've reviewed, Mr. Fellows, your motion, which is somewhat dated at this point, no fault of yours, and I've reviewed Ms. Furst's response, which I thought was very careful and kind of laid out where things are.

I think -- I'll tell you my impression, sir, is, (a), jail is not a great place to be at the best of times, and I understand there are a number of frustrations along the way; (b), by no means have these been the best of times.

You've been there during a pandemic, and I think the D.C. jail has had to take a lot of steps that they wouldn't normally take that had nothing to do with you or the January 6 defendants, but did end up meaning that privileges that you

1        would typically get were denied or took longer than they would

2        normally take.

3            I'm not interested in addressing how things were a couple

4        months ago.  I believe the restrictions have lessened some in

5        light of the lessening of the pandemic recently.  Is there any

6        specific issue you want to raise at this point regarding your

7        current conditions of confinement?

8            THE DEFENDANT:  Yes.  The retaliation the past 10 days

9        has been absolutely terrible, and on top of that, I do have a

10       response to Mrs. Furst's lie-filled and gaslighting, pivoting

11       motion that's coming in a post-response along with exhibits to

12       showcase their lies with proof, 156 examples of their lies,

13       including other people's PREA violations, including a black-

14       mold coverup back from when they lied when Congress members

15       came and said, oh, there's no black mold and then they removed

16       us and put signs all over it saying there's black mold, among

17       explaining and showcasing exactly how the grievance process,

18       they take advantage of loopholes, how they take advantage of

19       others, and it's just a fraction of it, that should be coming

20       in.

21           Unfortunately, because of the delays the past 10 days,

22       I've been removed from the pod and inhibited again -- this

23       pen issue came up because they took all my belongings, put

24       me in a cell where they said I wasn't being punished because

25       of a potential safety threat to me, but they took all my

1    belongings, took my sneakers, put me inside a cell which,
2    by the way, it has black mold inside the water.  In fact, I
3    got actual proof that I snuck in here.  It shot out from my
4    sink.  And this is what we've been eating.  And I just think
5    before you make any decisions on the jail's grievance process,
6    you need to be able to see that proof for it all.  But I want
7    to show you this real quick.

8        So this on my birthday was -- I'll stand.  This is black
9    mold.  This is black mold and stuff that shot out, and I was
10   hoping perhaps at the end of this we can have an order to make
11   sure that the jail doesn't do as they always do and cover up
12   -- and Ms. Wilson, you look surprised, but we remember that
13   the marshals found black mold here last time that they were
14   here.  The problem is still here.

15       And since then -- in the past 216 hours I've gotten 210 --
16   210 of those have been stuck inside a cell, not being allowed
17   to call my attorneys, not being allowed to call who I thought
18   was my standby counsels, not being allowed to contact my
19   family.  And when I do get rec, I get put in chains like this
20   and moved to another cell with a TV with like nine channels
21   and no sunlight there, except for maybe the one time they
22   brought me outside.

23       On top of that, my health has severely deteriorated because
24   of what I mentioned in my access to court violations and
25   nutrition.  I've been constipated -- I wish I didn't have to

1     share this, but I've been constipated for a third time so bad

2     I had to go get an x-ray because of severe pain that woke me

3     up in the middle of the night.  They said you're FOS, full

4     of poop.  So I went on six days of laxatives and clocked the

5     toilet so bad, but they didn't move me.  This is the second

6     time.  Last time they kept me in a cell for six days with no

7     working toilet.

8         And then I stayed in there, and their solution was, sorry,

9     no maintenance can come because it's the weekend.  So they

10    gave me a bag to tide over and I had to pee in my sink.

11    There's roaches everywhere.  They didn't give me my lunch that

12    one day.  I've been asking and asking to be able to contact

13    people.

14        There's been retaliation, all supposed for my safety, yet

15    they didn't move me when I was seeing stabbings and being

16    threatened to be stabbed in 2 South, which we know from just

17    a couple months ago that, what I've already seen, that the jail

18    guards supplied the knives and the drugs and the cell phones

19    to a lot of these inmates in here, causing a lot of people to

20    get stabbed.  So this is severely limiting my defense.

21        So there's two things.  I don't think the Court -- we

22    should be ruling on the grievance process or the paper and

23    pen.  I wasn't able to do that.  I requested time and again to

24    get papers and pens, and Lancaster kept refusing.  Nobody gave

25    it to me, except my neighbor whose name I don't know, O.G.,

1    whatever his name is, gave me a pen because he felt sympathetic

2    on day five.  And so I'd like to wait on this issue because my

3    defense was inhibited for the 50th time or so, not exaggerating,

4    from this jail on those issues.

5        But relating to the two other things that we're ruling on

6    today, Your Honor, religious services and haircuts, yes, they

7    changed their policy, but that's very -- it was the expected

8    move.  Because when the marshals came here, again, on March

9    18, it was -- they informed me -- they informed the pod that

10   they came because of an order looking into the jail's

11   grievance process, among other issues.

12       And when they found out that that was my case, because

13   you made that order on Valentine's Day to look into it, they

14   informed me that the day before March 17, the DOC, Department

15   of Corrections, did an internal audit showing that the

16   grievance process at the jail was completely broken, which

17   was way more severe than what I said.  I said it was broken in

18   many ways.  And the marshals said they also agree with the DOC

19   that it's completely broken, which gives, as I mentioned many

20   months ago, that the Court has discretion to rule on these

21   issues.

22       And I'm not looking to run like a lot of other defendants

23   are.  I've dealt with a lot of abuse in my life.  I can take

24   it.  The jail -- you know, it sucks, but I can take it.  I

25   want to change the jail and also better it, not just for

myself but for other people, and the Court should as well
because if this grievance process worked, they wouldn't have
been in contempt regarding the last situation of Chris
Worrell.  They wouldn't have lost millions of dollars for
the past decades, and rates are beginning to close up.

I checked in the Fastcase case, which is not PACER, it's
very limited, but I saw that as of the year 2000, the same
situation with the grievances was going on, at least one of
the loopholes.  They kept ignoring -- and I don't have the
case here because I wasn't able to write it down, but it was
2000.  The jail got found in contempt because of the grievance
process.  They just ignore it and ignore it.

And so the marshals shared with me that they expected the
DDA, who they said was having a hardened heart because they
were relying on the D.C. Department of Health for the
reasoning for why they weren't giving us haircuts and all
these other things.  But they said we're trying to let her
know like if she doesn't cave at least on something, it's not
going to look good for her.

And less than two weeks later, that cave came.  And they
pretended as if it was just because of their good graces, the
marshals shared, listen, we're letting them know, if you show
up in court on the 14th without changing these things, it's
not right.

And I also will say, Your Honor, as I mentioned, you said

1    even one week of missed church, and that's just church alone,

2    was too much of damages, essentially, for redress for grievances

3    to take care of.  And we have gone as of today, some of us,

4    65 weeks.  But that's not including the other unvaccinated.

5    And even if you did for a second think this haircut thing

6    should be seen as moot, just as you saw on *Capitol Hill v.*

7    *Bowser* or *Catholic Archbishop v. Bowser*, this is very much

8    open to reclassification, especially when you consider the

9    fact that Dr. Fauci and the media are talking about upcoming

10   variants in which there will be potentially more shutdowns.

11        And so you smartly decided in those cases that, hey, yeah,

12   they're saying that right now they've increased it or they've

13   given more rights to these people and not taking away their

14   constitutional rights as much, which they should never have

15   been able to do, just as the 6th Circuit, Supreme Court, and

16   you have said, COVID is not an excuse to throw away the

17   Constitution.

18        That goes for our personal hygiene, our religious liberties.

19   And, on top of that, when we're being abused in here -- and I

20   don't even get to speak on these things.  I'm going to be able

21   to write a book about all the abuse that we've suffered in

22   here, which the media mocks, right?  But they try to use the

23   little stories, but there's big, big stories, some of which

24   I'm sure the Court is aware of.

25        And it's just not proper that all this has been going on,

1   and what would help immensely is why I said we need church and

2   something to help us deal with this abuse.  Nobody can

3   truthfully, objectively think that treating people this way

4   and then releasing them at some point is going to be good.

5   Criminal statistics don't back that up, it's not good for

6   reforming, and I'm not talking about giving us lollipops and

7   paint everything in rainbows here; I'm just talking about give

8   us haircuts.  Give us church services.  Don't abuse us.

9       And so I'd like for today -- to close this up, I'd like

10  to say there's motions pending regarding addressing the

11  government's lies and coverups, which will be very eye-opening

12  to the Court.  I just showed you black mold.  I'd like an

13  order for the jail not to do any "cover it up" like they

14  typically try to do here.  I want it tested or send it to

15  somebody.  Potentially, if maybe my lawyers would like to

16  stick around as we try to come to an agreement, I was told

17  that he was visiting me today.  I'd like to give that to him.

18      And I'd also like to be able to -- since I wasn't able to

19  write, I'd like to be able to bring my -- the laptop that they

20  gave me recently, thankfully, from my other standby counsel,

21  I'd like to be able to bring that when I meet with him so I

22  can send him the things I wrote.

23      And finally, we need like some sort of thing that's going

24  to protect us from reclassification from anything and

25  immediate changes on church, because 65 at least, that's just

1   for us, weeks of no church, is ridiculous.  You can't expect

2   us to be able to handle it a hundred percent rate, and

3   sometimes you can't expect us to even handle it great at

4   times.  And you'll see that in my motions.  Mrs. Furst pivots

5   and says, look at how he responds in some of these.  He says

6   mean words.

7           THE COURT:  All right.

8           THE DEFENDANT:  Yeah.

9           THE COURT:  So, Mr. Fellows, a couple of things.

10   First, to the extent that you want to bring a suit or

11   something about your conditions of confinement and what you've

12   experienced in the past, that's something you need to do

13   separately.

14       My focus -- and I really encourage you, sir, to have this

15   be your focus -- is to kind of reach a resolution in this case

16   that either we're going to have a trial date or you're going

17   to plead guilty.  And that, of course, is entirely up to you.

18       I do want to try to address the current issues, so I want

19   you to -- please answer yes or no to my questions:  Sir, are

20   you saying you're in solitary confinement right now?  Is that

21   what you're telling me?

22           THE DEFENDANT:  Yes.  I'm in the hole, which is a place

23   for punishment.

24           THE COURT:  Okay.  Are you -- you said currently your

25   toilet does not work?  Is that what you're telling me?

1       THE DEFENDANT:  No.  That was fixed days later, and

2   they left poop water on the floor.

3       THE COURT:  Okay.  And are you saying that -- I thought

4   you said that you're now able to have religious services and

5   get haircuts.  Did I misunderstand that?

6       THE DEFENDANT:  I have not gotten a haircut since I

7   burned and ripped it off in October, and religious services,

8   we got notified that vaccinated people could go.  That was the

9   last I heard.  But even with the current rates of, to my

10  knowledge, allowing 10 people, I think this jail holds 1400

11  people.  So at best that's allowing .75 percent of the

12  population to practice their religious liberties, which is

13  obviously protected by the Supreme Court, the Constitution --

14  you know, it's not proper.  We need church services in here,

15  just like you agreed two other times.  That needs to have

16  happened months ago.

17      THE COURT:  Okay.  Regarding the black mold, you're

18  saying that's coming out of your faucet?

19      THE DEFENDANT:  Yes.  It's coming out of the faucet.

20  The conditions of moisture in the air is still creating it.

21  It made a bunch of -- it was like a bunch of weird pressure of

22  air in the water, and then eventually it became unclogged and

23  this was the results.  I collected samples of it, got on my

24  toothbrush -- they didn't give me a toothbrush for two days

25  too, but yes, there appears to be either mold or something

1     nasty came from that sink, and we're drinking that.  So that's

2     messed up.  It's not healthy.

3          THE COURT:  Okay.  So, Mr. Glover, I know there was a

4     lot there that Mr. Fellows mentioned, but could you or one of

5     your colleagues address the specific current concerns?

6          MR. GLOVER:  I'll defer to Ms. Wilson.

7          MS. WILSON:  Good afternoon, Your Honor.

8          THE COURT:  Good afternoon, Ms. Wilson.

9          MS. WILSON:  Mr. Fellows was placed in one of our

10    restrictive housing units.  We don't have solitary confinement

11    here at the facility.  He was placed in restrictive housing

12    due to the fact it was reported that there are individuals who

13    are on work detail in his previous unit who were going to hurt

14    him.  When the staff, the correctional officers, attempted to

15    find out and have him identify who he was fearful of and had

16    concerns about, he refused to -- he has not indicated who

17    those individuals are --

18        (Defendant interrupting.)

19        If I may, sir.

20        As he's indicated during his -- as he indicated that he is

21    fearful for his safety, he was placed in a restrictive housing

22    unit in order to ensure that he would be safe and would not or

23    could not potentially be harmed by individuals he had

24    indicated were attempting to hurt him.  And so that is why he

25    was placed in restrictive housing, sir.

1          THE DEFENDANT:  Nice.

2          THE COURT:  Thank you.

3      All right.  So, Mr. Fellows, you had over 10 minutes to

4   speak.  I want to talk with Ms. Wilson right now.

5      Ma'am, can you address the concerns regarding grooming,

6   religious services, and black mold?

7          MS. WILSON:  Absolutely, Your Honor.  As to the

8   grooming services, Mr. Fellows, since March 28, he along with

9   all residents at DOC may request for a haircut.  How haircuts

10  and barbering services, including trimming of his beard if he

11  so chooses, what you do is he submits a request for barbering,

12  and when they're on his unit, it is usually done every three

13  weeks to -- at least once a month, I believe it is, Your

14  Honor.

15     And when they're on the unit, the barbers are on his unit,

16  if he's requested barbering services, have his hair and facial

17  hair, if he chooses, to be trimmed.  So he can submit that

18  request at any time.  And then again, once they're on the

19  unit, they will trim his hair for him.

20         THE COURT:  Ms. Wilson, I understand you may not know.

21  Do you know has he submitted a request?

22         MS. WILSON:  I don't know, Your Honor.  I don't know,

23  and I also cannot tell you -- there's a schedule as to when

24  the barbers go to the units, the various units.  So I don't

25  know when they're scheduled to go or if they've gone to his

1    unit.  I cannot speak to that.

2            THE COURT:  Okay.  And then the religious services.

3            MS. WILSON:  Yes.  Currently, religious services are

4    offered to those who are vaccinated, Your Honor.  Those who

5    are not vaccinated, however, do have access to our educational

6    tablets in which various religious services are available on

7    the tablets for them to view and to participate in that way.

8    But, yes, in-person religious services are available to those

9    who are vaccinated.

10           THE DEFENDANT:  Unconstitutional.

11           THE COURT:  And I mean, obviously, I'm not a chemist or

12   anything, but what Mr. Fellows is showing me certainly doesn't

13   look very healthy.  I know you're just finding this now.  What

14   can we do about that?

15           MS. WILSON:  Well, I currently, while Mr. Fellows was

16   speaking, I've asked officers to report to his unit and to his

17   cell to photograph his cell and his unit, to run the water to

18   test to see if there are any issues as he's outlined.

19       I will also request, Your Honor, that our sanitarian report

20   to his unit to also conduct tests and to also check and see if

21   any of these items which he's alleging are shooting out from

22   his water actually in fact occur.  So I've requested that.  As

23   soon as I receive the information, I'll be happy to forward

24   that to the Court and all of the photographs from his unit and

25   his cell that I receive regarding this matter.

1          THE COURT:  Okay.  Thank you, Ms. Wilson.

2          THE DEFENDANT:  Your Honor, may I speak to the officer

3     of corrections just briefly?

4          THE COURT:  Yeah, so I want -- Mr. Fellows, I want to

5     bring this portion to a close and kind of move on with talking

6     about your case.  Maybe you can say whether or not you've

7     requested a barbering.  I mean, whether or not you have a

8     right to something more than religious services on a tablet

9     right now, I'm not going to rule on that over Zoom.  If you

10    want to file something, I'll certainly consider it.  I'm just

11    not sure what to say about that.  But if you want to talk

12    about something else, I'm happy to hear from you.

13         THE DEFENDANT:  Okay.  So, first, just two corrections

14    to the allegations that I was scared for my safety; I never

15    shared that.  I read I needed to document things in case

16    anything happens.  Captain of multiple wrestling teams.  Not

17    scared of people.  I wasn't scared even when I was being

18    threatened.  I've been jumped three times in my life, one of

19    which was because of my race.  Once the adrenaline kicks in,

20    it's fine.  So I wasn't scared.  I just kept record of it in

21    case something happened, there's record of it.  And I've done

22    this multiple times -- [indiscernible] -- when people were

23    stabbing me, they didn't remove me.  And I didn't request to

24    be removed.  I felt safe.

25       There's just one Nazi in the pod, and that's fine.  I can

deal with a Nazi.  All right?  That's fine.  I don't like
radical leftists; I don't like Nazis.  There's a Nazi in the
pod.  He really does not like free speech as he screams "f'
antifa," not realizing the hypocrite that he is.  But that's
fine.  And actually -- I'm not going to say anything else on
that.

But anyhow, with church services, Your Honor, I don't think
that you would have agreed -- and you said put it in writing
and I did.  And I've been waiting for months, as have many
people.  And I just don't understand like if Bowser came and
said, hey, look, we've got it on a tablet, clearly they have
internet.  Everybody has internet.  Technically, they could go
drive to Delaware, Maryland, or Virginia and go get that.
It's just not proper.

I mean the big premise -- and I'm not sure about Islam --
in Christianity is to be able to be in community with other
Christians, to be able to be together in a place of worship,
not sitting in a cell, which they say it's not solitary, but
210 out of the 216 of the past hours I was in solitary.  So I
think that meets the definition.  You can say that it isn't,
but it really is.

And you would not have said, oh, you know what, you can
just go on the internet.  And especially while we're being
abused, it should be ruled on.  It was written about.  It's
constitutional violations.  The Supreme Court has ruled on it.

1     And I just -- if you're going to deny it, I just want it to be

2     a full-out denial; that way I can just -- you know, not

3     disrespectfully, but just for my benefit and health and mental

4     health struggling in all these other areas so I can attempt to

5     try to appeal it because we need to say -- you know, today, we

6     should have the right to be able to go to church, not .75

7     percent of a small, vaccinated privileged class.  That's not

8     proper.

9         And so I shouldn't have been removed because of a Nazi.

10    This guy's written out multiple people.  The other Jewish guy

11    before, my friend and other fellow New Yorker, Jacob Lang, he

12    not only tried to write him out and bullied him all the time

13    and drawing cartoons, but this guy freaking sent -- you know,

14    was planning -- you know, he knew that an attack was going to

15    happen from another inmate, and that threat is now removed

16    from the pod.  The violent person in the pod has been removed.

17        And so there's the Nazi, there's a couple sympathizers

18    because, well, his family offers money to help support certain

19    people -- that's my opinion.  It's an opinion.  But I don't

20    know why people sympathize with this Nazi.  He's an actual

21    Nazi.

22            THE COURT:  Mr. Fellows, have you actually requested

23    to have barbering services?

24            THE DEFENDANT:  Yes, back in Septem -- oh, you mean,

25    yeah, recently.  Yes.  So I did put that in the second that

1    they said we were allowed, and I heard the pod was allowed,

2    C2B, was given haircuts.  But because I was removed, I was not

3    given a haircut.

4         THE COURT:  Okay.  Ms. Wilson, can I just ask you to

5    make sure we get Mr. Fellows on that list here in the very

6    near future?

7         MS. WILSON:  I will confirm that he is on the list,

8    Your Honor.  Yes.  I will do that.  Not a problem.

9         THE COURT:  Thank you.  Okay.

10      So, Mr. Fellows, I don't think -- I'm not suggesting this

11   is all resolved, but I think we need to move on.  Let me just

12   ask you this, sir:  Are you asking to be transferred to a

13   different jail?

14        THE DEFENDANT:  Absolutely not.  Like the founding

15   fathers, I don't run from my problems.  So I'd like to try to

16   get it fixed here, not just for my benefit, but a lot of

17   people.  And the Court should have an interest in that as

18   well.

19        THE COURT:  Okay.  Thank you, sir.

20      Thank you, Ms. Wilson, Mr. Glover and Mr. Rudasill, for

21   your presence.  You're excused.

22        MR. GLOVER:  Thank you, Your Honor.

23      (Corrections officials exit conference.)

24        THE COURT:  Ms. Furst, where do things stand on this

25   matter?

1          MS. FURST:  Your Honor, defendant received discovery

2     from the government.  Gave it to him by DOC on April 8.  And

3     as of April 8 he is on the list with the laptop and the

4     discovery reviewing it.  He still has access to evidence.com

5     even though he's in restrictive housing.  And I have talked

6     with Mr. Shipley.  I have given he and Mr. Marshall

7     invitations to the USAfx folder where I have put the same

8     discovery sent to the jail for Mr. Fellows.  I put that in

9     USAfx, and both attorneys have access to it and have

10     acknowledged they have access to it.

11          We still have outstanding his motion, 58-1, and our

12     response, which I think is 75 or 78.  Mr. Fellows did

13     supplement his original motion with ECF 78.  He has told the

14     Court, and Mr. Conte has told me also, that there are over a

15     hundred exhibits he wants to provide to the Court.  We have

16     the motion to admit testimony at trial still under advisement.

17     We haven't really dealt with that, which is fine.  There's no

18     rush on that.

19          Other than that, Your Honor, I thought I was dealing with

20     Mr. Shipley and Mr. Marshall now representing Mr. Fellows; so

21     I have had conversations with them, and we are all in

22     agreement that we would like to go forward with the case as

23     much as the Court.

24          I think we have gotten way off base, just as you said

25     earlier today.  We're not concentrating on the criminal case.

1    Mr. Fellows is very concerned with the jail conditions.  I

2    think a civil lawsuit is something he should consider.  But

3    Your Honor has bent over backwards to try to accommodate him,

4    and I think it's time that we deal with his criminal matters

5    that are very serious that -- he's been in jail for 10 months,

6    Judge, tomorrow.  And that's not unusual.  I have lots and

7    lots of drug cases where defendants are in jail for a year or

8    two years before we go to trial, but I think Mr. Fellows is

9    stuck on that jail condition wheel and we need to get him off

10   of it.

11       THE DEFENDANT:  That jail condition wheel is what is

12   inhibiting my defense the most, besides your lies and

13   gaslighting and pivoting.

14       THE COURT:  So, Mr. Fellows, I really would like to try

15   to set a trial date.  I want to kind of give you your day in

16   court here.  I think I'm inclined to try to do that, frankly,

17   because we've waited so long.  I'm looking late into the fall

18   at this point, but I think we should just go ahead and get

19   this on the calendar.

20       THE DEFENDANT:  I think before you set that, though,

21   Your Honor, you should see the exhibits showcasing Ms. -- it's

22   Mrs. Furst's lies.  She tries to say, you know, and gaslight

23   the problems over me about me not taking discovery, and I have

24   solid proof in those exhibits that Mrs. Furst lied about that

25   and that the jail is so disorganized and messed up even on

1   multiple things in their own arguments.

2        You really should be -- you're essentially making a

3   decision without seeing what has caused these slowdowns.  And

4   on top of that, I think one could understand that being under,

5   you know, the treatment that we're undergoing, which you know

6   a fraction of are suffering here, it can be inhibiting to our

7   defense, including pens and paper and all those other

8   slowdowns, Ms. Halverson leaving, breaking a court order for

9   her to be standby counsel before you actually said she could

10  leave, which caused months of delays, and was the biggest

11  reason why I started hunting for somebody that I heard very

12  good, great things about from other clients and people that I

13  could trust, which is Mr. Shipley and Mr. Marshall.

14       And that's why I started looking, on top of the fact that

15  people donated funds to me in order to go and be able to help

16  relieve the taxpayers of having to pay for a public defender

17  and get somebody I think who is a little bit more professional

18  and experienced.  I really don't think we should do that, but

19  I will say this one update on my end about the case, I did get

20  the discovery, and I did actually find the officer who gave me

21  the express permission that day.

22       I have no way of identifying his name, but he's in the

23  video, and he's right there, Capitol Police officer, right

24  next to the bench and -- yeah.  So I've got the officer.  I

25  want to look at some faces in the crowd, because it looks also

1    exactly what I thought when I was entering the building that

2    through what I now know as implied permission at first,

3    definitely implied, and then a high percentage of chance that

4    I think I recall being express permission was being shared by

5    the police.

6        And it showed their verbal -- it appears through both body

7    language, and it appears through attempts of lipreading on the

8    camera.  But I'd really like -- it looks like some potential

9    criminal defendants are recording up close to those officers.

10   I'd like to try to -- now that I have that, try to identify

11   who those criminal defendants are and get even more supportive

12   evidence that cops let me in.

13       Mrs. Furst is correct, to close this up, that yes, I have

14   been in here 10 months.  But let's also not forget that I was

15   under the most severe restrictions, including not being

16   allowed to operate my business, which I'm pretty sure is

17   illegal, for five months most of the time by my probation

18   officer and harassment from her, which I have yet to showcase,

19   and that has led -- I mean, I just saw last week you made a

20   smart decision, and somebody I think who has the same

21   misdemeanors, just didn't have that arbitrarily attached

22   "obstruction," which is a garbage charge and it's not gonna

23   stick -- I don't even think with a biased jury in D.C. it

24   would stick.

25       And so I think the chances are high, exactly what just

1   happened last week is going to happen to me.  I have

2   supportive evidence of the cops saying we can come in, giving

3   me directions inside.  Mrs. Furst has seen those videos.  And

4   I just don't think -- and even people who assaulted officers,

5   Robert Reid, three months.  People who smoked 11 -- or brought

6   11 joints.  And I thought this whole time -- I know, don't

7   talk about it, but one thing, I thought I smoked one hit.  I

8   smoked two hits.  I thought I Barack Obama'd it, and I didn't.

9       But there's a guy that brought 11 blunts in and smoked

10  three inside, and he got 24 months of probation and just have

11  to call in and check in.  People assaulted police that day, so

12  much less.  And I'm just saying it's beyond what anybody that

13  I've seen any similar to me.  I'm the only person in Jeff

14  Murphy's office to have a felony, and yet Baked Alaska, who

15  was telling people don't leave, was swearing at cops --

16          THE COURT:  All right.  Mr. Fellows, we need to wrap

17  this up.  So here's what I want to do.  I'm going to set

18  another status conference in about a month.  By that point,

19  sir, I want you and Mr. Shipley and Mr. Marshall to figure out

20  who's running your case.  If it's you, that's just fine.  But

21  that's something that you should think seriously about.

22      You know, you've just told me what good things you've heard

23  about them, and I'll just point out to you I've had hundreds

24  of defendants including the case that you're referencing from

25  last week.  In almost every single case, somebody has decided

1    to rely on an attorney and not try to do it themselves.

2    That's your choice, that's not mine, but I want you to think

3    seriously about that.

4        I also -- as Ms. Furst said, a lot of these things that

5    you're complaining about in jail, that is kind of a civil

6    matter.  I'm not sure I'm going to be able to do much about

7    that in the midst of a criminal case.  My strong instinct is

8    that I should just order you transferred to a different

9    facility, and hopefully that would address some of your

10   concerns.  At the very least, it would give kind of a restart

11   for you.

12       So that's the other thing I want you to think about here

13   the next time we get together.  If you're still concerned

14   about your conditions, I want to tell you that's going to be

15   what I'm likely to do.  So I want you to think about that

16   between now and then.

17       And then the third thing I really -- I'm going to insist

18   that we pick a trial date next time.  I'm just looking at my

19   calendar.  It's looking through the end of the year right now,

20   and I want to give you your day in court.  I would have done

21   that before but for your request.

22       If you have exhibits, it sounds like you're going to be

23   seeing Mr. Marshall later today, get those to me; I'm happy to

24   look at them.  But I'll tell you, the things that you're

25   describing, sir, that's something that you should be

1   presenting at trial.  I think it's very unlikely that that's
2   going to be a fruitful motion to dismiss or some sort of
3   pretrial motion.  All of that sounds like great evidence that
4   you should present at trial, not to me beforehand.

5        Ms. Furst, how does May 17th at 2 p.m. look for you?
6   Actually, I guess, Ms. Chaclan, I think we need to check the
7   jail calendar, unless, Ms. Furst, would you prefer to do this
8   in person?

9        THE DEFENDANT:  Yes.

10       THE COURT:  You understand that -- I understand
11  Mr. Shipley may not be able to join us.  If he's not present,
12  he can listen in, but he's not going to be talking.  Is it
13  still your preference that we meet in person?

14       THE DEFENDANT:  Yeah.  Previously, we discussed that we
15  would be able to -- they would be able to chime in just like
16  Ms. Miller does via video.

17       THE COURT:  No.  So we can do that via Zoom if you'd
18  like to do that, but I'm not going to have people talking from
19  the phone on the hearing.

20       THE DEFENDANT:  I guess I'm uncertain how to answer,
21  because I'm still up in the air.  I want to get a better
22  understanding of the miscommunications with --

23       THE COURT:  Okay.  So let's look for a Zoom hearing,
24  Ms. Chaclan.

25       THE DEPUTY CLERK:  Yes, Your Honor.

1             MR. SHIPLEY:  Thank you for that, Your Honor.

2             THE DEPUTY CLERK:  May 17th is available, Your Honor.

3     Morning or afternoon.  I'm not sure what time.

4             THE COURT:  Ms. Furst, how about 2 p.m.?  Does that

5     work for you?

6             MS. FURST:  I'm sorry.  Was it May 14th?

7             THE COURT:  May 17th.  Tuesday.

8             MS. FURST:  Tuesday at 2 p.m.?  Yes.

9             THE COURT:  Mr. Shipley?

10            MR. SHIPLEY:  Ryan, can you access your calendar real

11    quick?

12            MR. MARSHALL:  Yes, Your Honor, we're both available at

13    that time.

14            THE COURT:  Okay.  We'll set this for a continued

15    status conference on May 17 at 2 p.m.  Ms. Furst, you have a

16    motion?

17            THE DEFENDANT:  Before we close, Your Honor, I just

18    want to --

19            THE COURT:  Hold on, Mr. Fellows.  I'll give you a

20    chance to speak in a moment.

21         Ms. Furst?

22            MS. FURST:  Yes, Your Honor.  I've talked with

23    Mr. Shipley.  We would ask that the statute be tolled from

24    today through May 17, the next hearing date in the interest of

25    justice under 18 U.S.C. 3161(h).

1    THE COURT:  All right.  Mr. Fellows, do you object to

2    tolling the speedy trial clock?  And anything else you want to

3    say briefly, now is your chance.

4    THE DEFENDANT:  I do not object.  I just wanted to just

5    say I know you said you didn't really know how -- you know,

6    that there wasn't much of anything you could do or something

7    along those lines.  As the marshals and the DOC, I and I think

8    16 other people have shown in document 58-1, you do because

9    they wrote the jail -- they broke the Prison Litigation Reform

10    Act, and I just think it's -- I want a straight-up denial

11    today so I can just appeal it if you're not going to offer for

12    our First Amendment rights as you did with the other people.

13    I mean, it's been 65 weeks.  I don't understand what the

14    difference is.  In fact, I think that requires more of a

15    reason to rule in favor of this, and if I waited -- I filed it

16    I think in October, November, because the Supreme Court says

17    it's counseling and filing when you hand it off to jail

18    officials and it didn't get entered on the ECF until December

19    1.

20    So I've been waiting more than half a year on this thing,

21    and I just want to get it moving to the benefit of not just me

22    but the others, but it's definitely -- it's un-American.  This

23    jail does not operate under American law, and I'm bringing the

24    attention of this to the Court in hopes that we can say, hey,

25    this is unjustified, and I'm confused why nothing's happened.

1     So if you're going to say -- I'd like an either yes or no,

2     and then I'll just try to appeal.  Not disrespecting.  I want

3     my First Amendment right.  Our founding fathers were not as

4     peaceful in requesting their liberties and -- yeah.  So I

5     really want those things.  I know you agreed to that in the

6     past.  It's either yes or no for me, please, so that way I

7     can just try to move forward in seeking it elsewhere.

8          THE COURT:  All right.  Based upon representations

9     that have been made before me, and also the evidence from

10     Ms. Wilson, I'm denying your motion to the extent that I

11     have not already addressed it.

12     I am tolling the speedy trial clock between now and

13     May 17 in light of the ongoing discovery, the motions that

14     the parties seek to be filing, and Mr. Fellows' interest

15     in potentially bringing Mr. Shipley and Mr. Marshall on to

16     represent you.

17          All right.  Thanks, folks.  I'll see you next month.

18          (Proceedings adjourned at 3:51 p.m.)

19

20

21

22

23

24

25

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify

that the foregoing pages are a correct transcript from the

record of proceedings in the above-entitled matter. *

*/s/ Bryan A. Wayne*
Bryan A. Wayne

* PLEASE NOTE:

This hearing was taken via videoconference in compliance
with U.S. District Court standing order(s) during the COVID-
19 pandemic.  Transcript accuracy may be affected by the use
of electronic technology, including but not limited to sound
distortion or audiovisual interference.