**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **Case No. 21-cr-00083-TNM** |
| | ) | |
| **BRANDON FELLOWS,** | ) | |
| | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

**DEFENDANT FELLOW'S PRETRIAL MOTIONS**

Motion 2 of 7, Part 1 of 5Entrapment by Estoppel Response/ Motions (Notes Written But Stolen For Over A Year, git them back shortly before our discussing the motiin in limine on the matters. Additiomally, mot fully finished as I had to do my best to re scramble/ scramble to prepare for trial after my preperatioms were illegally stolen frommme by tue governmemt 9 times)/ Notice/ Case Law And ArgumentsIndex:Intro:Part 1: NoticesPart 2: Response to Pages 1-5 Of The Government's Motion In Limine To Preclude My Entrapment By Estoppel DefencePart 3: Response to Pages 6-10 Of The Government's Motion In Limine To Preclude My Entrapment By Estoppel DefencePart 4: Case Law and ArgumentsSection 1: Overall/ RandomSection 2: Dellums courtSection 3: Barham V. RamseySection 4: Carr V. District of ColumbiaSection 5: United States V. Eicher, 2023 U.S. Dist. Lexis 90103, DDC opinion by Beryl HowellSection 6: Cox v. Louisiana 379 U.S. 536 85 S.Ct. 453 13 L.Ed.2d 471Section 7: United States V. Gutierrez-Gonzales, 184 F.3d 1160 (10th Cir. 1999)Section 8: Garcia v. Doe, 779 F.3d 84 2nd Cir.Part 5: Entrapment By Estoppel Related Motions:Intro:The government has continually tried to increase the chances of them winning against me by illegally locking me up over lies, refusing to give discovery, giving incomplete discovery, having my preparations taken about 9 times, and now, by trying to stop me from sharing what happened that day to the jury. The main reason I haven't taken their time served plea deals (despite one of them being a misdemeanor and despite being in jail) is because I wanted to promote the truth of why I did what I did that day. I thought I was allowed to enter and protest as I did because of preconceived notions (1st amendment/ "The people's house"), others around me/ 3rd party entrapment( "They are letting us in!", "It's our house, we have a right to be here"), possibly due to government agents / entrapment(prosecutor has admitted they were present in the areas I was when I was there, see William Pope motion), and by police words, actions, and in-actions (entrapment by estoppel).To not allow me to advocate what truely happened that day and to conduct a complete defence would be another way this court denies me of a constitutional right. I desire to show a jury my complete defence, I already won't be able to do so as a result of all the things the government has done to hinder my preparations, it's not proper to let them do this also.I desire not only to show this via a jury instruction, but during my opening and closing statements as well as during my arguments. To only allow the jury instruction and not allow me to present this anywhere else would be to stop me from presenting my full defence. To only give a jury instruction at the end would be to only allow the court to say "Oh, by the way, he claims he's not guilty because police made him feel he was allowed to do this". I imagine a juror may ask "Why didn't he mention this earlier?", and by that time, have already been "sold" on my guilt so as to decrease the chance of them finding me not guilty due to entrapment by estoppel. Instead, I wish to let the jurors know in my opening that I'm not disputing that my actions MAY be viewed to have been disorderly, and I'm not disputing that I unknowingly trespassed, I'm arguing that I shouldn't be found guilty of these misdemeanors because I truely believed due to police actions, words and inactions (and other factors) that I was allowed inside to protest as others in the same area were. I intend to put on evidence to support this in many various forms. It should be up to the jurors to decide if they think I was fooled into thinking I was allowed inside to protest as I did due to these factors.Before beginning, I wish to remind the court that I had my preparations taken many times, destroyed multiple times, I was moved 10 times in 24 months. A lot of this information was previously stolen from me, some of this was regathered after notes and preparations on such things were destroyed. You are receiving this now because of these situations. Had the court

granted my many forms of requested relief, these arguments and motions would have been submitted much earlier. This is one of the many reasons why I shared I'm not ready to go to trial, but you continue to "fall" for the governments lies and then ignorantly assert false statements as fact, really causing confusion for a later appellate court to understand the actual facts of the situation... Very corrupt, but well thought out. Please stop these sort of actions...Part 1: Notices: 1) I intend to advance an entrapment by estoppel defence to my 4 misdemeanor charges.2) I intend to advance an entrapment defence to all of my charges.3) I intend to advance these aids to both my entrapment defence and entrapment by estoppel defences:3.1) 3rd party entrapment: That Trump (and lack of signs, barricades, and police) made me beleive I was welcome on Captiol grounds, as did people walking everywhere on it. That protesters helped bring me to the window to observe if police were allowing us in, and helped me to realize and feel safer that police (who I was watching and trying to listen to) were truely letting us in.Comments: This has been allowed and recognized by the 2nd Circuit in United States V. Morrison (February 26, 2009) as establishing the entrapment by estoppel defence under a conduit theory. In that case, the purported misrepresentations of law by the governor or other public officials could be relayed through Facer. Here is an explanation from the judge: "I declined to grant the governments request to preclude the defence from endeavoring to present evidence in support of the subject defence. Instead, I took the position that it was 'appropriate that the defence have an opportunity to try to develope [the] point' noting that '[they] may or may not be successful.'..."3.2) Evidence for my disorders (Autism spectrum, ODD, and ADHD). Comments: I was hoping to habe a mental evaluatiin to look into such matters, or be free and be able to hunt down which doctors gave me the diagnoses. However, my useless contract breaking lawyers (now stand-by counsels) set me up for a competancy hearimg instead wjere they do not look into such matters, only to see if I am compatent to stand trial... This court also is fault here for allowong me to be locked up over lies without actually looking into the evidence. It was working with tje government/ protectimg it by refusing to look into these matters.4) I intend to support the fact that police were allowing people who were protesting to protest as I was by presenting videos of police where I was and where I wasn't.The government has issue with the latter part...Comments: I'll quickly point out that I don't disagree with the government that videos of officers actions, words, or inactions that I didn't see couldn't have possibly had an effect on my state of mind. Rather, I'd correctly point out that it further disproves what the government has continually asserted, that police were not welcoming protesters in or allowing them to protest in the Capitol. Analogy: In a Creationist v. Evolutionist debate (which I've witnessed), imagine how restrictive it would be for the creationist to only give proof of creation with things that he personally has witnessed. Most of the proof for God is relayed through the bible, archeology, history, and science. Nearly the entire practice of apologetics would be lost by that restriction. Imagine how restrictive it would be for an evolutionist to rely on only giving proof for examples of evolution that he personally has witnessed. Given that evolution is often taught to take periods of time much greater than a lifetime to witness, that also would be restrictive. Nearly the entire subject of biology would be thrown away. In both circumstances, how could a jury listening to the debate know what the truth is without having heard what the whole defence for each theory is? They wouldn't because it would be an incomplete defence! The government wants me to have an incomplete defence, doing so won't allow the jury to hear my actual defence. The government showed their hand, they strongly and continually have asserted no police were welcoming protesters in to protest. Let them stand with that assertion rather than suppressing the truth. Only the weak rely on suppression and censorship, let the truth out. My point in sharing these kinds of videos is to

substantiate the other claim of mine that the government has said didn't happen, that I was allowed in by police. If police were allowing others in, then clearly there is greater chance that the same was done for me, which is what I've claimed since the very second I left the building. Remember, entrapment by estoppel defences don't just look at the actions of the defendant, they look into the actions of the officers involved, and can also look into the actions of the agency in dealing with the protesters similarly situated (see case law arguments for proof).This is further argued and proved more in detail later in this motion, so please, don't draw your decision based only on that short argument.Part 2: Response To Pages 1-5 Of The Government's Motion In Limine To Preclude My Entrapment By Estoppel Defence:1) The government first argues to stop me from arguing an entrapment by estoppel defence in regard to alleged statements of law enforcement.Response: That matter should be up to the jury to decide whether they believe me or not (though if the government didn't steal and refuse to give me my phone back, I could provide them with the video evidence). Read Part 5 for further arguments and relevant case law.2: They next argue that I shouldn't be allowed to present the defence at all because "in order to prove an entrapment by estoppel defence, a defendant must show (proffer):2.1) "A government agent actively mislead [me] about the state of the law defining the offence."Response: I've testified that I witnessed police officers actions in the area I would enter to be in line with what other protesters were shouting from both inside and outside ("They are letting us in"). I've testified that I spoke to and recorded an officer inside who gave me the rules to follow and assured me so long as I followed those rules that I would not be arrested. Since testifying to that, I've seen video of that officer and I speaking to each other just as I mentioned. I've testified that I later got directions from another officer on where these statues were (which the previous officer told me I could go to), and that I also recorded this officer. I've testified that officers seemed welcoming (I recorded them too) and even shared such things the very second I left the building to National Fake News Media (CNN) where my first January 6th related video went viral, all before I even knew that I would be charged, that I broke any laws, or before I knew about an entrapment by estoppel defence. I've also testified that no dispersal orders were given to me nor was I told I was breaking any laws or could face arrest, indeed, I was told the opposite by Capitol Police. I've testified I did not see any "no trespassing" signs, nor police barricades, nor had I encountered police lines until I had left the building. Read Part 5 for further arguments and relevant case law.2.2) "The government agent was responsible for interpreting, administering, or enforcing the law defining the offence."Response: The Capitol police have a manual with how to deal with civil disorders, protesters, and 1st amendment issues on Capitol grounds, they can not only allow people to protest at certain times in certain areas, but they can also arrest those for breaking their laws/ rules. As seen in the Dellums decision, which has since been supported in other case law (Barham V. Ramsey, Carr V. District of Columbia, etc.) the Capitol police have a duty to warn protesters that their conduct is illegal and warn them that if they do not stop that they will be arrested. Not only that, but when protesters have failed to hear these warnings the DC circuit has held that the police were at fault, as they should have individually warned protesters that they were breaking the law, that they needed to disperse, and that they be given sufficient time to comply. When this wasn't met, the DC circuit threw out the convictions and held the Capitol police liable in civil court. It is clearly established that the Capitol Police are responsible for interpreting, administering, and enforcing such laws... Even metropolitan Police departments there that day recognized that they had to follow the Capitol police orders as it was their duty to administer the law, not MPD's duty, which is why they sought guidance on what to do from them throughout the day. Read Part 5 for further arguments and relevant case law.Though I had no

idea there were 2 separate police forces (and others) present on capitol grounds, nor would I have guessed only one agency had the ultimate authority there, the government would have a stronger argument if I were alleging an MPD officer made me feel welcome inside the Capitol, but that's not the case. Though MPD made me feel welcome outside the Capitol building.2.3) "That the defendant actually relied on the agents' misleading pronouncement (can also be implied)."Response: I did rely on the agents statements, actions, and in-actions. I did not enter the building when protesters broke the window, indeed, even when offered a hand to climb up and enter (as seen on video), I waited to further examine the officers actions and in-actions, while also trying to watch and listen for additional supportive evidence that we were truely being allowed inside. Had it been shared that I was breaking the law and could face arrest if I did not leave or stop protesting as others around me were, I would've left the area immediately, and warned others that they too should leave. The Capitol police recognize this is typical of people whose conduct is not in line with the law (that they fix it to be in line with the law, see Dellums) in the capitol. Because of this, they required their officers to first warn others that their conduct is improper and give them time to fix it. Multiple warnings are issued prior to an arrest. When this hasn't been done, the arrests were thrown out. Read Part 5 for further case arguments and relevant case law.2.4) "That the defendant's reliance was reasonable in light of the identity of the agent, the point of law misrepresented, and the substance of the misrepresentation."Response: This is mainly to be decided by a jury. Still, I would never have sought to destroy the place (in fact I attempted to stop others from doing so as seen in one video in Merkely's office), nor assumed an officer could give me permission to do so. However, I did seek to enter as others seemingly were being allowed to and to protest as they seemed to be allowed to protest. I took note the major difference in how police treated the super minority of protesters in my area who seemed to be inclined to violence (one protester I met inside who was pepper sprayed) and those simply chanting and smoking weed. I even took note of the officers near a man on a desk not even saying a word to him about him being up there. Given the name of "The people's house", 1st amendment confusion, and how our country was founded, I was under the impression that such actions were allowed. This is supported in case law and the Capitol Police manual for dealing with such protesters. The capitol police have recognized that civilian and protesters confusion over what they are allowed to do and not do in the Capitol building is so widespread and common that they found it to be unfair to simply arrest such people prior to warning them of the law, warning them that if they don't stop they will be arrested, and to give them reasonable time to comply with that information. Clearly, this was reasonable to believe, as even the Capitol police recognize that many people are confused over what they are allowed to do and not do in a place referred to as "The People's House". 3) The government argues I should've known that to enter was illegal given that I entered through a broken window. However, I was lead to believe by preconceived notions, protesters, and police, that I had a right, just like a partial owner of a house to enter. Hard to understand? I'll provide you three quick true stories to help you understand my thought process.True story 1: In college, one of my roommates was a drunken idiot most nights, it was very annoying. He'd often break things, scream, and start fights. I imagine if I came home towards the side of the house that we rented and saw a broken window, or even that he broke it to get inside, that I may very well go in that window whether I witnessed it or not, especially considering that it's closer than the door. I wouldn't think I was trespassing because it is MY HOUSE, though I'm only a partial owner... I don't imagine I'd ever break the window to get inside, but if it's already broken, I'm a man of efficiency and curiosity, I would enter the quickest way I could. True story 2: In high school, to get home, I attempted to follow

the most direct route, I didn't want to walk around the gates, that would add a minute or two to my run, so I'd climb the gate and continue on the most direct path so I could reach my destination as soon as possible. Being a student at the school, I felt since my presence was welcome on the grounds and inside the building that entering the area (even through unorthodox methods) was welcome. Though I wouldn't feel a sense of being welcomed enough to enter through a broken window at school (unless teachers told me I could),I felt it enough to climb over barriers, something I didn't do at the Capitol, a place I felt I had more rights to (like a partial owner) than the school.True story 3: Finally, the same thing happened just hours earlier at the Ellipse. The people broke past security, even knocked a man who was holding the crowd back down. Was the Ellipse now off limits to all just because the line was breached and because some protesters sparred and charged at security and the secret service? No! I waited for them to settle the crowd down until it was clear that I and others were allowed to continue on, which I also did at the Capitol. As a result, thanks to friends in the secret service, I got one of the best seats in the Ellipse, eventually seated in row 5, less than 100 feet away from Trump. Secret service ensured I was the first civilian allowed inside the Ellipse (I have this on video too). Just as I would witness later, I took note how the secret service and security dealt with violent and destructive protesters, they were treated differently than protesters who behaved as I did.Finally, I offer this analogy: Imagine you and others are locked out of your car. Lets say you all pitched in to buy the car or were mutual owners.. One of the people breaks the glass window to enter the car. You may be thinking, "that was stupid/ crazy", and find it annoying that you will probably be paying for a new one (as I would being a tax payer by paying for that broken window I climbed through), but you wouldn't assume that the idiot who broke it is trespassing, you'd assume he is stupid or crazy for breaking it (just as I assumed of those who broke the windows open, or the first door I saw open (I'm on video saying "This is fucking crazy after I witnessed and recorded it)". You'd assume this because he is too is a partial owner. Now of course, there are laws in place to stop him from destroying your mutually owned property, and you could even press charges on him or bring him to court to deal with that. However, you wouldn't expect to get a charge by entering through what is already broken if you were a partial owner! That is the best way I can convey how I viewed the situation at the Capitol. I figured the people who broke windows or stole things could be held legally responsible, and obviously for attacking the overly friendly police, but not for entering into the capitol, especially after all that I witnessed. Read Part 5 for further arguments and relevant case law.4: The government argues to stop me from offering evidence or argument concerning any claim that, by allegedly failing to act, law enforcement made [my] entry into the United States Capitol building or Grounds, or his conduct therein, lawful.Response: The government seems to be confused over the simple definition of an entrapment by estoppel defence. Entrapment by estoppel defences don't make illegal conduct lawful due to police actions, words, or inactions. Rather, they negate criminal liability despite the unlawful actions being committed. With that being corrected, police in-action is recognized as a form of implied entrapment by estoppel. The courts have allowed defendants to show police in-action in support of entrapment by estoppel defences. Additionally, considering the confusion regarding lawful conduct at the capitol, the capitol police and the DC Circuit courts found it proper to require Capitol police to order warnings and dispersals to protesters and law breakers prior to arresting them. When such actions have not been followed (making them in-actions), the arrests were thrown out. Clearly, police in-action is recognized as a form of entrapment by estoppel. Please read Part 5 for further arguments and relevant case law (there is a lot on this in Part 5).5) The government asks to stop me from "arguing or presenting evidence of alleged

inaction by law enforcement, unless [I] specifically observed or was otherwise personally aware of such conduct." On page 8 they argue that "though conduct of law enforcement may be relevant to the defendant's state of mind,... any action or inaction of which defendant was not aware cannot possibly have had any effect on his state-of-mind and is inadmissible as irrelevant under Rule of Evidence 401." Response: I don't disagree with the government that any action or inaction that I didn't see cannot possibly have had any effect on my state of mind. However, that argument is a bit too "zoomed in" to one subject. "Zoom out" of just focusing on the state of the defendants mind and you'll find the reasons I and the DC circuit courts believe this evidence is admissible in my case. First, the nature of this defence can often be aided by proof of a collective action, inaction, orders to allow certain conduct, or the failure to give orders to stop certain conduct. Even accusations of police inaction have caused courts in this very Circuit to look at the collective inactions of officers and the agency they represent as a whole. (See Part 5 (Barham, Dellums, and Carr)).Second, entrapment by estoppel and related defences (a police officers failure to do their duty), isn't only predicated on the state of the defendants mind, it's based off of an agents' actions, words, in-actions, and even their thoughts if they can be found out. In fact, sometimes (including in the DC circuit courts) the agents/ police officers actions, words, inactions, and even past words/ thought processes have been used against them to figure out if they truely did fail to do their duty or make others believe they were allowed to do what they were doing REGARDLESS of whether the protesters/ rioters witnessed them, or had no way of witnessing them.For example, take a look into the DC Circuit case of Barham V. Ramsey, or specifically look to part 5, section 3, # 2. Do you know how the court found out that the MPD commander told members of his staff weeks prior to the protest that officers should overlook minor violations of the law in order to accomodate protesters? They looked into the police officers actions, words, and orders to not act on minor violations of the law (in-actions). Do you think any protester was present in the MPD offices weeks prior to hear this? Clearly not! So why did the court not only look into this, and admit the evidence, but use it against the government/ commander?The reason the court looked into this is in my view best shown by a similar case. Take a look into the DC Circuit case of Dellums V. Powell, or Part 5, Section 2, #1, "the burden of proof was on defendant police chief (of the Capitol Police)." "The court held that an order to quit and an opportunity to disperse had to precede arrests." In other words, upon an allegation of the police failing to warn protesters that they can't do something and must stop, the court looked into the officers words, actions, orders of in-actions, and actual inactions even though protesters/ rioters clearly couldn't have seen or heard some of those.Another example to prove this is in Part 5, section 2, #12. How did the court find out what Chief Powell said to Chief Wilson? I'll tell you how they didn't get it, they didn't get it by requiring all of the plaintiffs to have personally heard what he said to Wilson in this self described loud enviroment. So, what am I saying? I'm saying a lot of things... One, that just because I didn't witness an officers words, actions, in-actions, or orders to take no actions, doesn't mean that such evidence shouldn't be admitted. Have the court look back to our 10/12/21 hearing, take notice, the prosecutor acted as if it was crazy to suggest that officers were welcoming us in any way whatsoever. They even got a statement from an officer (who I don't know/ remember, and who doesn't know me/ remember me) since then to assert that no one was allowing us or telling us that we were allowed inside. How damaging it would be to show that many police officers were welcoming us in, that many were giving directions, that many were not doing their duty, and that many were telling other officers not to do anything to us (or even the more recent videos that they also use to deny, that undercover officers were actually influencing the crowd to break the law and go into the building). Oh how

damaging that would be to their previous and even current assertions! And I've viewed them... See, the government knows this, which is why they are desperate to hide this evidence from you, and from the jury... They can't rely on the truth to win, so they seek suppression (or destroying and taking my preparations/ partaking in discovery violations, depending on the month). What I'm saying is, the entrapment by estoppel defence looks into and welcomes evidence to suggest that officers were welcoming or doing things that could've made others feel as if they were welcomed. It can and often does look into the collective action or preparations of an entire agency, the commanders, or Chiefs, even if such things weren't witnessed by a defendant. As we have seen, the government has tried to suggest that was not the case at all for anyone. Sure, my videos are helpful to making my defence, but you know what is more helpful? Showing that police everywhere were doing the same, or exactly what I said they were since the second I left the building. You must see through them judge, they use to claim there no was such possibility, now, they claim there isn't, but that I must be stopped from presenting such evidence. They are singing a different tune!Another reason this should be allowed is because these officers were all over and moved all over the building. They encountered one another, they encountered the protesters that I was near, or me personally at a later or earlier time than was recorded. They were right above where I was, or to the side, or entered an area before or after I did. Some, walked right past me, but that 2 seconds of me waving to some of them, or smiling at them only shows so much. What really solidifies beyond a reasonable doubt (yes, that high) that the Capitol police as a whole/ agency were allowing protesters like myself in and to protest as I was, at the time that I was inside, is a look into the collective.This court should apply the standard that the Dellums and Barham courts used, to welcome any evidence of police actions, words, in-actions, or orders of in-action. Except, not only should it be used to point out that they failed to order a warning of arrest, law breaking, or to order a dispersal, it should be used to establish and support that overall, police were welcoming/ not stopping us, and in effect allowing me in to protest as I was.The government counters my argument before I even made it by claiming that to include this defence (which is the truth/ what truely happened with me on that day) would be prejudicial to them and confuse the jury.I don't disagree, the truth is prejudicial to their claims against me. It very well may confuse a jury who has been told by the media that many there that day went to the capitol because Trump told us to and that we were were intending to overthrow the government. Here is what I suggest, to eliminate potential confusion. First, I show my videos and evidence that I personally witnessed that made me feel as if police were welcoming me in, that I was allowed to protest as I did, and where I did. Then, after my direct evidence and videos showing officers who I encountered has been shown, I then present further evidence to show the jury that Capitol Police were welcoming us to protest inside through their actions, words, and in-actions. This of course isn't relevant to my state of mind, but it is relevant to establish a strong and true foundation that Capitol Police as a collective were allowing conduct like mine to happen when I was in the building/ grounds.A simple jury instruction that the jury only use videos that I took, or videos that I'm in/ next to as evidence to my state of mind would negate any supposed prejudice to an impartial ruling.Now I know I already in a way argued this, but I want to address this aspect of their argument still just in case. The government argued such evidence would not be admissible under rule of evidence 401, however that, was to my state of mind. The court now knows why such evidence should be admitted. Further, I love what the Rhine Court said on this:United States V. Rhine (D.D.C. 2023):"Relevance under Rule 401 is a low bar, merely requiring that evidence have "any tendency" to make a fact of consequence more or less probable... Surely, if the jury found that defendant brought knives and pepper spray with him,

into the capitol, it would tend to show he intended to engage in disorderly or disruptive conduct while he was there. The officer's testimony on this subject is therefore relevant and significantly probative as to Defendant's mental state."Comments: (See similarities of Rhine case law and this paragraph I wrote): Yes, a low bar, and the evidence that I wish to present has a strong tenancy to make the fact of entrapment by estoppel more probable. Surely, if the jury found out that Capitol police were welcoming others in through their words, actions, or in-actions, it would tend to show that they were fooling people like myself into thinking we were allowed in while I was there. The officers conduct and videos relevant to this subject is therefore relevant and significantly probative as to the likelihood of there being entrapment by estoppel to defendants like me who have claimed it (especially if like me, they have claimed it since the very second they left the building to National Fake News Media).

Motion 2 of 7, Part 1 of 5Entrapment by Estoppel Response/ Motions (Notes Written But Stolen For Over A Year, git them back shortly before our discussing the motiin in limine on the matters. Additiomally, mot fully finished as I had to do my best to re scramble/ scramble to prepare for trial after my preperatiions were illegally stolen frommme by tue governmemt 9 times)/ Notice/ Case Law And ArgumentsIndex:Intro:Part 1: NoticesPart 2: Response to Pages 1-5 Of The Government's Motion In Limine To Preclude My Entrapment By Estoppel DefencePart 3: Response to Pages 6-10 Of The Government's Motion In Limine To Preclude My Entrapment By Estoppel DefencePart 4: Case Law and ArgumentsSection 1: Overall/ RandomSection 2: Dellums courtSection 3: Barham V. RamseySection 4: Carr V. District of ColumbiaSection 5: United States V. Eicher, 2023 U.S. Dist. Lexis 90103, DDC opinion by Beryl HowellSection 6: Cox v. Louisiana 379 U.S. 536 85 S.Ct. 453 13 L.Ed.2d 471Section 7: United States V. Gutierrez-Gonzales, 184 F.3d 1160 (10th Cir. 1999)Section 8: Garcia v. Doe, 779 F.3d 84 2nd Cir.Part 5: Entrapment By Estoppel Related Motions:Intro:The government has continually tried to increase the chances of them winning against me by illegally locking me up over lies, refusing to give discovery, giving incomplete discovery, having my preparations taken about 9 times, and now, by trying to stop me from sharing what happened that day to the jury. The main reason I haven't taken their time served plea deals (despite one of them being a misdemeanor and despite being in jail) is because I wanted to promote the truth of why I did what I did that day. I thought I was allowed to enter and protest as I did because of preconceived notions (1st amendment/ "The people's house"), others around me/ 3rd party entrapment( "They are letting us in!", "It's our house, we have a right to be here"), possibly due to government agents / entrapment(prosecutor has admitted they were present in the areas I was when I was there, see William Pope motion), and by police words, actions, and in-actions (entrapment by estoppel).To not allow me to advocate what truely happened that day and to conduct a complete defence would be another way this court denies me of a constitutional right. I desire to show a jury my complete defence, I already won't be able to do so as a result of all the things the government has done to hinder my preparations, it's not proper to let them do this also.I desire not only to show this via a jury instruction, but during my opening and closing statements as well as during my arguments. To only allow the jury instruction and not allow me to present this anywhere else would be to stop me from presenting my full defence. To only give a jury instruction at the end would be to only allow the court to say "Oh, by the way, he claims he's not guilty because police made him feel he was allowed to do this". I imagine a juror may ask "Why didn't he mention this earlier?", and by that time, have already been "sold" on my guilt so as to decrease the chance of them finding me not guilty due to entrapment by estoppel. Instead, I wish to let the jurors know

in my opening that I'm not disputing that my actions MAY be viewed to have been disorderly, and I'm not disputing that I unknowingly trespassed, I'm arguing that I shouldn't be found guilty of these misdemeanors because I truely believed due to police actions, words and inactions (and other factors) that I was allowed inside to protest as others in the same area were. I intend to put on evidence to support this in many various forms. It should be up to the jurors to decide if they think I was fooled into thinking I was allowed inside to protest as I did due to these factors.Before beginning, I wish to remind the court that I had my preparations taken many times, destroyed multiple times, I was moved 10 times in 24 months. A lot of this information was previously stolen from me, some of this was regathered after notes and preparations on such things were destroyed. You are receiving this now because of these situations. Had the court granted my many forms of requested relief, these arguments and motions would have been submitted much earlier. This is one of the many reasons why I shared I'm not ready to go to trial, but you continue to "fall" for the governments lies and then ignorantly assert false statements as fact, really causing confusion for a later appellate court to understand the actual facts of the situation... Very corrupt, but well thought out. Please stop these sort of actions...Part 1: Notices: 1) I intend to advance an entrapment by estoppel defence to my 4 misdemeanor charges.2) I intend to advance an entrapment defence to all of my charges.3) I intend to advance these aids to both my entrapment defence and entrapment by estoppel defences:3.1) 3rd party entrapment: That Trump (and lack of signs, barricades, and police) made me beleive I was welcome on Captiol grounds, as did people walking everywhere on it. That protesters helped bring me to the window to observe if police were allowing us in, and helped me to realize and feel safer that police (who I was watching and trying to listen to) were truely letting us in.Comments: This has been allowed and recognized by the 2nd Circuit in United States V. Morrison (February 26, 2009) as establishing the entrapment by estoppel defence under a conduit theory. In that case, the purported misrepresentations of law by the governor or other public officials could be relayed through Facer. Here is an explanation from the judge: "I declined to grant the governments request to preclude the defence from endeavoring to present evidence in support of the subject defence. Instead, I took the position that it was 'appropriate that the defence have an opportunity to try to develope [the] point' noting that '[they] may or may not be successful.'..."3.2) Evidence for my disorders (Autism spectrum, ODD, and ADHD). Comments: I was hoping to habe a mental evaluatiin to look into such matters, or be free and be able to hunt down which doctors gave me the diagnoses. However, my useless contract breaking lawyers (now stand-by counsels) set me up for a competancy hearimg instead wjere they do not look into such matters, only to see if I am compatent to stand trial... This court also is fault here for allowong me to be locked up over lies without actually looking into the evidence. It was working with tje government/ protectimg it by refusing to look into these matters.4) I intend to support the fact that police were allowing people who were protesting to protest as I was by presenting videos of police where I was and where I wasn't.The government has issue with the latter part...Comments: I'll quickly point out that I don't disagree with the government that videos of officers actions, words, or inactions that I didn't see couldn't have possibly had an effect on my state of mind. Rather, I'd correctly point out that it further disproves what the government has continually asserted, that police were not welcoming protesters in or allowing them to protest in the Capitol. Analogy: In a Creationist v. Evolutionist debate (which I've witnessed), imagine how restrictive it would be for the creationist to only give proof of creation with things that he personally has witnessed. Most of the proof for God is relayed through the bible, archeology, history, and science. Nearly the entire practice of apologetics would be lost by that restriction. Imagine how restrictive it would

be for an evolutionist to rely on only giving proof for examples of evolution that he personally has witnessed. Given that evolution is often taught to take periods of time much greater than a lifetime to witness, that also would be restrictive. Nearly the entire subject of biology would be thrown away. In both circumstances, how could a jury listening to the debate know what the truth is without having heard what the whole defence for each theory is? They wouldn't because it would be an incomplete defence! The government wants me to have an incomplete defence, doing so won't allow the jury to hear my actual defence. The government showed their hand, they strongly and continually have asserted no police were welcoming protesters in to protest. Let them stand with that assertion rather than suppressing the truth. Only the weak rely on suppression and censorship, let the truth out. My point in sharing these kinds of videos is to substantiate the other claim of mine that the government has said didn't happen, that I was allowed in by police. If police were allowing others in, then clearly there is greater chance that the same was done for me, which is what I've claimed since the very second I left the building. Remember, entrapment by estoppel defences don't just look at the actions of the defendant, they look into the actions of the officers involved, and can also look into the actions of the agency in dealing with the protesters similarly situated (see case law arguments for proof).This is further argued and proved more in detail later in this motion, so please, don't draw your decision based only on that short argument.Part 2: Response To Pages 1-5 Of The Government's Motion In Limine To Preclude My Entrapment By Estoppel Defence:1) The government first argues to stop me from arguing an entrapment by estoppel defence in regard to alleged statements of law enforcement.Response: That matter should be up to the jury to decide whether they believe me or not (though if the government didn't steal and refuse to give me my phone back, I could provide them with the video evidence). Read Part 5 for further arguments and relevant case law.2) They next argue that I shouldn't be allowed to present the defence at all because "in order to prove an entrapment by estoppel defence, a defendant must show (proffer):2.1) "A government agent actively mislead [me] about the state of the law defining the offence."Response: I've testified that I witnessed police officers actions in the area I would enter to be in line with what other protesters were shouting from both inside and outside ("They are letting us in"). I've testified that I spoke to and recorded an officer inside who gave me the rules to follow and assured me so long as I followed those rules that I would not be arrested. Since testifying to that, I've seen video of that officer and I speaking to each other just as I mentioned. I've testified that I later got directions from another officer on where these statues were (which the previous officer told me I could go to), and that I also recorded this officer. I've testified that officers seemed welcoming (I recorded them too) and even shared such things the very second I left the building to National Fake News Media (CNN) where my first January 6th related video went viral, all before I even knew that I would be charged, that I broke any laws, or before I knew about an entrapment by estoppel defence. I've also testified that no dispersal orders were given to me nor was I told I was breaking any laws or could face arrest, indeed, I was told the opposite by Capitol Police. I've testified I did not see any "no trespassing" signs, nor police barricades, nor had I encountered police lines until I had left the building. Read Part 5 for further arguments and relevant case law.2.2) "The government agent was responsible for interpreting, administering, or enforcing the law defining the offence."Response: The Capitol police have a manual with how to deal with civil disorders, protesters, and 1st amendment issues on Capitol grounds, they can not only allow people to protest at certain times in certain areas, but they can also arrest those for breaking their laws/ rules. As seen in the Dellums decision, which has since been supported in other case law (Barham V. Ramsey, Carr V. District of Columbia, etc.) the Capitol police have a duty to warn

protesters that their conduct is illegal and warn them that if they do not stop that they will be arrested. Not only that, but when protesters have failed to hear these warnings the DC circuit has held that the police were at fault, as they should have individually warned protesters that they were breaking the law, that they needed to disperse, and that they be given sufficient time to comply. When this wasn't met, the DC circuit threw out the convictions and held the Capitol police liable in civil court. It is clearly established that the Capitol Police are responsible for interpreting, administering, and enforcing such laws... Even metropolitan Police departments there that day recognized that they had to follow the Capitol police orders as it was their duty to administer the law, not MPD's duty, which is why they sought guidance on what to do from them throughout the day. Read Part 5 for further arguments and relevant case law.Though I had no idea there were 2 separate police forces (and others) present on capitol grounds, nor would I have guessed only one agency had the ultimate authority there, the government would have a stronger argument if I were alleging an MPD officer made me feel welcome inside the Capitol, but that's not the case. Though MPD made me feel welcome outside the Capitol building.2.3) "That the defendant actually relied on the agents' misleading pronouncement (can also be implied)."Response: I did rely on the agents statements, actions, and in-actions. I did not enter the building when protesters broke the window, indeed, even when offered a hand to climb up and enter (as seen on video), I waited to further examine the officers actions and in-actions, while also trying to watch and listen for additional supportive evidence that we were truely being allowed inside. Had it been shared that I was breaking the law and could face arrest if I did not leave or stop protesting as others around me were, I would've left the area immediately, and warned others that they too should leave. The Capitol police recognize this is typical of people whose conduct is not in line with the law (that they fix it to be in line with the law, see Dellums) in the capitol. Because of this, they required their officers to first warn others that their conduct is improper and give them time to fix it. Multiple warnings are issued prior to an arrest. When this hasn't been done, the arrests were thrown out. Read Part 5 for further case arguments and relevant case law.2.4) "That the defendant's reliance was reasonable in light of the identity of the agent, the point of law misrepresented, and the substance of the misrepresentation."Response: This is mainly to be decided by a jury. Still, I would never have sought to destroy the place (in fact I attempted to stop others from doing so as seen in one video in Merkely's office), nor assumed an officer could give me permission to do so. However, I did seek to enter as others seemingly were being allowed to and to protest as they seemed to be allowed to protest. I took note the major difference in how police treated the super minority of protesters in my area who seemed to be inclined to violence (one protester I met inside who was pepper sprayed) and those simply chanting and smoking weed. I even took note of the officers near a man on a desk not even saying a word to him about him being up there. Given the name of "The people's house", 1st amendment confusion, and how our country was founded, I was under the impression that such actions were allowed. This is supported in case law and the Capitol Police manual for dealing with such protesters. The capitol police have recognized that civilian and protesters confusion over what they are allowed to do and not do in the Capitol building is so widespread and common that they found it to be unfair to simply arrest such people prior to warning them of the law, warning them that if they don't stop they will be arrested, and to give them reasonable time to comply with that information. Clearly, this was reasonable to believe, as even the Capitol police recognize that many people are confused over what they are allowed to do and not do in a place referred to as "The People's House". 3) The government argues I should've known that to enter was illegal given that I entered through a broken window. However, I was lead to believe

by preconceived notions, protesters, and police, that I had a right, just like a partial owner of a house to enter. Hard to understand? I'll provide you three quick true stories to help you understand my thought process.True story 1: In college, one of my roommates was a drunken idiot most nights, it was very annoying. He'd often break things, scream, and start fights. I imagine if I came home towards the side of the house that we rented and saw a broken window, or even that he broke it to get inside, that I may very well go in that window whether I witnessed it or not, especially considering that it's closer than the door. I wouldn't think I was trespassing because it is MY HOUSE, though I'm only a partial owner... I don't imagine I'd ever break the window to get inside, but if it's already broken, I'm a man of efficiency and curiosity, I would enter the quickest way I could. True story 2: In high school, to get home, I attempted to follow the most direct route, I didn't want to walk around the gates, that would add a minute or two to my run, so I'd climb the gate and continue on the most direct path so I could reach my destination as soon as possible. Being a student at the school, I felt since my presence was welcome on the grounds and inside the building that entering the area (even through unorthodox methods) was welcome. Though I wouldn't feel a sense of being welcomed enough to enter through a broken window at school (unless teachers told me I could),I felt it enough to climb over barriers, something I didn't do at the Capitol, a place I felt I had more rights to (like a partial owner) than the school.True story 3: Finally, the same thing happened just hours earlier at the Ellipse. The people broke past security, even knocked a man who was holding the crowd back down. Was the Ellipse now off limits to all just because the line was breached and because some protesters sparred and charged at security and the secret service? No! I waited for them to settle the crowd down until it was clear that I and others were allowed to continue on, which I also did at the Capitol. As a result, thanks to friends in the secret service, I got one of the best seats in the Ellipse, eventually seated in row 5, less than 100 feet away from Trump. Secret service ensured I was the first civilian allowed inside the Ellipse (I have this on video too). Just as I would witness later, I took note how the secret service and security dealt with violent and destructive protesters, they were treated differently than protesters who behaved as I did.Finally, I offer this analogy: Imagine you and others are locked out of your car. Lets say you all pitched in to buy the car or were mutual owners.. One of the people breaks the glass window to enter the car. You may be thinking, "that was stupid/ crazy", and find it annoying that you will probably be paying for a new one (as I would being a tax payer by paying for that broken window I climbed through), but you wouldn't assume that the idiot who broke it is trespassing, you'd assume he is stupid or crazy for breaking it (just as I assumed of those who broke the windows open, or the first door I saw open (I'm on video saying "This is fucking crazy after I witnessed and recorded it)". You'd assume this because he is too is a partial owner. Now of course, there are laws in place to stop him from destroying your mutually owned property, and you could even press charges on him or bring him to court to deal with that. However, you wouldn't expect to get a charge by entering through what is already broken if you were a partial owner! That is the best way I can convey how I viewed the situation at the Capitol. I figured the people who broke windows or stole things could be held legally responsible, and obviously for attacking the overly friendly police, but not for entering into the capitol, especially after all that I witnessed. Read Part 5 for further arguments and relevant case law.4: The government argues to stop me from offering evidence or argument concerning any claim that, by allegedly failing to act, law enforcement made [my] entry into the United States Capitol building or Grounds, or his conduct therein, lawful.Response: The government seems to be confused over the simple definition of an entrapment by estoppel defence. Entrapment by estoppel defences don't make illegal conduct

lawful due to police actions, words, or inactions. Rather, they negate criminal liability despite the unlawful actions being committed. With that being corrected, police in-action is recognized as a form of implied entrapment by estoppel. The courts have allowed defendants to show police in-action in support of entrapment by estoppel defences. Additionally, considering the confusion regarding lawful conduct at the capitol, the capitol police and the DC Circuit courts found it proper to require Capitol police to order warnings and dispersals to protesters and law breakers prior to arresting them. When such actions have not been followed (making them in-actions), the arrests were thrown out. Clearly, police in-action is recognized as a form of entrapment by estoppel. Please read Part 5 for further arguments and relevant case law (there is a lot on this in Part 5).5) The government asks to stop me from "arguing or presenting evidence of alleged inaction by law enforcement, unless [I] specifically observed or was otherwise personally aware of such conduct." On page 8 they argue that "though conduct of law enforcement may be relevant to the defendant's state of mind,... any action or inaction of which defendant was not aware cannot possibly have had any effect on his state-of-mind and is inadmissible as irrelevant under Rule of Evidence 401." Response: I don't disagree with the government that any action or inaction that I didn't see cannot possibly have had any effect on my state of mind. However, that argument is a bit too "zoomed in" to one subject. "Zoom out" of just focusing on the state of the defendants mind and you'll find the reasons I and the DC circuit courts believe this evidence is admissible in my case. First, the nature of this defence can often be aided by proof of a collective action, inaction, orders to allow certain conduct, or the failure to give orders to stop certain conduct. Even accusations of police inaction have caused courts in this very Circuit to look at the collective inactions of officers and the agency they represent as a whole. (See Part 5 (Barham, Dellums, and Carr)).Second, entrapment by estoppel and related defences (a police officers failure to do their duty), isn't only predicated on the state of the defendants mind, it's based off of an agents' actions, words, in-actions, and even their thoughts if they can be found out. In fact, sometimes (including in the DC circuit courts) the agents/ police officers actions, words, inactions, and even past words/ thought processes have been used against them to figure out if they truely did fail to do their duty or make others believe they were allowed to do what they were doing REGARDLESS of whether the protesters/ rioters witnessed them, or had no way of witnessing them.For example, take a look into the DC Circuit case of Barham V. Ramsey, or specifically look to part 5, section 3, # 2. Do you know how the court found out that the MPD commander told members of his staff weeks prior to the protest that officers should overlook minor violations of the law in order to accomodate protesters? They looked into the police officers actions, words, and orders to not act on minor violations of the law (in-actions). Do you think any protester was present in the MPD offices weeks prior to hear this? Clearly not! So why did the court not only look into this, and admit the evidence, but use it against the government/ commander?The reason the court looked into this is in my view best shown by a similar case. Take a look into the DC Circuit case of Dellums V. Powell, or Part 5, Section 2, #1, "the burden of proof was on defendant police chief (of the Capitol Police)." "The court held that an order to quit and an opportunity to disperse had to precede arrests." In other words, upon an allegation of the police failing to warn protesters that they can't do something and must stop, the court looked into the officers words, actions, orders of in-actions, and actual inactions even though protesters/ rioters clearly couldn't have seen or heard some of those.Another example to prove this is in Part 5, section 2, #12. How did the court find out what Chief Powell said to Chief Wilson? I'll tell you how they didn't get it, they didn't get it by requiring all of the plaintiffs to have personally heard what he said to Wilson in this self described loud enviroment. So, what am I saying? I'm saying a

lot of things... One, that just because I didn't witness an officers words, actions, in-actions, or orders to take no actions, doesn't mean that such evidence shouldn't be admitted. Have the court look back to our 10/12/21 hearing, take notice, the prosecutor acted as if it was crazy to suggest that officers were welcoming us in any way whatsoever. They even got a statement from an officer (who I don't know/ remember, and who doesn't know me/ remember me) since then to assert that no one was allowing us or telling us that we were allowed inside. How damaging it would be to show that many police officers were welcoming us in, that many were giving directions, that many were not doing their duty, and that many were telling other officers not to do anything to us (or even the more recent videos that they also use to deny, that undercover officers were actually influencing the crowd to break the law and go into the building). Oh how damaging that would be to their previous and even current assertions! And I've viewed them... See, the government knows this, which is why they are desperate to hide this evidence from you, and from the jury... They can't rely on the truth to win, so they seek suppression (or destroying and taking my preparations/ partaking in discovery violations, depending on the month). What I'm saying is, the entrapment by estoppel defence looks into and welcomes evidence to suggest that officers were welcoming or doing things that could've made others feel as if they were welcomed. It can and often does look into the collective action or preparations of an entire agency, the commanders, or Chiefs, even if such things weren't witnessed by a defendant. As we have seen, the government has tried to suggest that was not the case at all for anyone. Sure, my videos are helpful to making my defence, but you know what is more helpful? Showing that police everywhere were doing the same, or exactly what I said they were since the second I left the building. You must see through them judge, they use to claim there no was such possibility, now, they claim there isn't, but that I must be stopped from presenting such evidence. They are singing a different tune!Another reason this should be allowed is because these officers were all over and moved all over the building. They encountered one another, they encountered the protesters that I was near, or me personally at a later or earlier time than was recorded. They were right above where I was, or to the side, or entered an area before or after I did. Some, walked right past me, but that 2 seconds of me waving to some of them, or smiling at them only shows so much. What really solidifies beyond a reasonable doubt (yes, that high) that the Capitol police as a whole/ agency were allowing protesters like myself in and to protest as I was, at the time that I was inside, is a look into the collective.This court should apply the standard that the Dellums and Barham courts used, to welcome any evidence of police actions, words, in-actions, or orders of in-action. Except, not only should it be used to point out that they failed to order a warning of arrest, law breaking, or to order a dispersal, it should be used to establish and support that overall, police were welcoming/ not stopping us, and in effect allowing me in to protest as I was.The government counters my argument before I even made it by claiming that to include this defence (which is the truth/ what truely happened with me on that day) would be prejudicial to them and confuse the jury.I don't disagree, the truth is prejudicial to their claims against me. It very well may confuse a jury who has been told by the media that many there that day went to the capitol because Trump told us to and that we were were intending to overthrow the government. Here is what I suggest, to eliminate potential confusion. First, I show my videos and evidence that I personally witnessed that made me feel as if police were welcoming me in, that I was allowed to protest as I did, and where I did. Then, after my direct evidence and videos showing officers who I encountered has been shown, I then present further evidence to show the jury that Capitol Police were welcoming us to protest inside through their actions, words, and in-actions. This of course isn't relevant to my state of mind, but it is relevant to establish a strong

and true foundation that Capitol Police as a collective were allowing conduct like mine to happen when I was in the building/ grounds.A simple jury instruction that the jury only use videos that I took, or videos that I'm in/ next to as evidence to my state of mind would negate any supposed prejudice to an impartial ruling.Now I know I already in a way argued this, but I want to address this aspect of their argument still just in case. The government argued such evidence would not be admissible under rule of evidence 401, however that, was to my state of mind. The court now knows why such evidence should be admitted. Further, I love what the Rhine Court said on this:United States V. Rhine (D.D.C. 2023):"Relevance under Rule 401 is a low bar, merely requiring that evidence have "any tendency" to make a fact of consequence more or less probable... Surely, if the jury found that defendant brought knives and pepper spray with him, into the capitol, it would tend to show he intended to engage in disorderly or disruptive conduct while he was there. The officer's testimony on this subject is therefore relevant and significantly probative as to Defendant's mental state."Comments: (See similarities of Rhine case law and this paragraph I wrote): Yes, a low bar, and the evidence that I wish to present has a strong tenancy to make the fact of entrapment by estoppel more probable. Surely, if the jury found out that Capitol police were welcoming others in through their words, actions, or in-actions, it would tend to show that they were fooling people like myself into thinking we were allowed in while I was there. The officers conduct and videos relevant to this subject is therefore relevant and significantly probative as to the likelihood of there being entrapment by estoppel to defendants like me who have claimed it (especially if like me, they have claimed it since the very second they left the building to National Fake News Media).


Motion 2 of 7, Part 2 of 5In conclusion to this long and multi pronged argument, if the court wants to fully assess the situation and the jurors are to be made fully aware of whether police were allowing protesters like myself to protest as we were, they must also be able to view videos relevant to that subject (whether police were allowing protesters like myself to protest as I did). Such evidence would certainly be relevant to that subject, as we can clearly see from the Dellums and Barham DC Circuit courts. That is the full "zoomed out" picture.6) The government again "conveniently" cites another irrelevant decision as to why this court should grant their motion in my case when they cite the decision reached in United States v. Chwiesiuk (D. D.C. 2023). Response: They "conveniently" failed to share that the defendants in that case didn't intend on pushing such defences, the defence didn't object! Of course it was granted!Further, other issues with this case include the false assumption that all protesters "faced temporary and permanent barricades and Capitol Police positioned to prevent unauthorized entry to the Capitol" and that "police "engaged in combat with the rioters to prevent them from... breaking police lines". These assumptions clearly also had an effect on the conclusion reached in this motion. As mentioned and testified to, I saw no such things where I would enter.This court also relied on chief judge Howell's previous position on such matters in Chrestman. Since then, her position has clearly evolved to welcome an entrapment defence from such defendants so long as a proffer of evidence is shown.7) The government cites chief Judge Howell's previous view of entrapment by estoppel in Chrestman.Response: They "conveniently" failed to bring up how her view of entrapment by estoppel in January 6 cases has evolved. She no longer suggests that the Capitol Police don't have authority. She no longer asserts that no January 6th defendant could claim such a defence given police barricades, police lines, and police orders restricting entry at the Capitol. In fact, reading her writings in Eicher (2023), it's clear she is open to defendants offering

evidence for such claims (entrapment by estoppel), so long as it's not based on President Trump, that she has remained solid on. She even helps prove that the DC courts recognize and are willing to look at and consider implied entrapment by estoppel (including in-actions.) See Part 5 section 5 for all the proof and other relevant arguments and case law.Part 3: Response To Pages 6-10 Of The Government's Motion In Limine To Preclude My Entrapment By Estoppel Defence:1) The government "submits that [I] will be unable to put forth any evidence that law enforcement officers gave [me] express permission to enter the Capitol Grounds, much less the Capitol building...given that there were "obvious police barricades, police lines, and police orders restricting entry at the Capitol."Response: First, the government fails to recognize what even DC district court judges have shared, that the grant of permission need not be explicit... Still, I'll argue their flawed position for fun. I don't dispute that they gave didn't me express permission to be on the grounds, until I spoke to the officer inside (who gave me all the rules to follow, and permission). However, prior to speaking to that officer there were no "obvious police barricades" that I noticed, the government knows these were removed, or moved long before I arrived. The government knows I didn't see any police until a crazy old man broke into the Capitol with his cane and entered into an area (not where I entered) that police made clear they didn't want people in. I told national fake news about this, and even pointed to him on live television "this guy broke in over there". Finally, the government knows that I was given no police orders restricting my entry, in fact, quite the opposite occured, which they know also, hence them trying to stop me from introducing evidence on such things. Prior to entering I heard others sharing that police were allowing us in. I then observed police and listened to and watched what the protesters around them were saying and doing while also watching and listening to those officers responses. Everything lead me to believe that I was allowed to enter the Capitol.Though the government has taken and refused to give my video evidence which shows the officer I spoke to giving me express permission and rules, I still have additional evidence.First, testimony is evidence, and I have provided such evidence already, though here they pretend I didn't share such evidence.Second, I have a non-audio version of the officer and I speaking over CCTV footage. This is important because the government knows I did not view this evidence prior to April 2022. Given that I testified on 10/12/21 to speaking to this officer, sharing he went where he actually went after our talk, and given that the talk happened in the area I said it did, all before I had seen this video, further supports that I was telling the truth, that I got permission and rules from that officer.Third, my other videos further support that I was given permission to enter.Fourth, videos from the body cameras of officers further support that they were allowing people who were protesting as I was to enter and protest.2) That my actions of entering through a broken window belie the argument of entrapment by estoppelResponse: I already addressed this (see Part 2, #3). 3) Citing ChrestmanResponse: Dealt with a few times earlier, but, see her updated view of thinking in Eicher (Part 5, Section 5).4) Again on page 8 the government relies on an outdated view from Chief Judge Howell on Chrestman to claim that officer inaction or failure to notify a person that their actions are unlawful cannot shield an individual from liability for an illegal act.Response: Tell that to the Dellums, Carr, or Barham courts, all DC Circuit cases in which for many protesters, police failed to warn those present that they were breaking the law and had to leave/ stop what they were doing. The court took note of police failures and inactions to properly warn protesters and ensured the defendants charges were dropped as a result of these factors. Remember, the Commander of the MPD in Barham told his agency to ignore minor violations of the law to accomodate protesters (do not act to arrest them or warn them their activity is illegal). The Barham court saw this as a reason to throw out the

convictions. That conversation was clearly not in the presence of the protesters, the DC circuit recognized that when looking into officer inactions, or orders of inaction to an agency, a look into the collective is admissible. 5) They cite Cox V. Louisiana to help support this assertion.Response: Though the government tried to cite this against me, there is actually so much that proves it supports an entrapment by estoppel defence in my case that I made an entire breakdown/ section of comparisons and arguments relating to this case. Please see Part 5, Section 6.6) They cite United States V. Gutierrez-Gonzales, 184 F.3d 1160 (10th Cir. 1999)Response: Though the government tried to cite this against me, there is actually so much that proves it supports an entrapment by estoppel defence in my case that I made an entire breakdown/ section of comparisons and arguments relating to this case. Please see Part 5, Section 7.7) They cite Garcia v. Does, 779 F.3d 84, 95 (2nd Cir 2015)Response: Though the government tried to cite this against me, there is actually so much that proves it supports an entrapment by estoppel defence in my case that I made an entire breakdown/ section of comparisons and arguments relating to this case. Please see Part 5, Section 8.8) They argue that "it is illogical to conclude that officers overwhelmed by a hostile, forceful mob were permitting or authorizing rioters to enter and explore the building simply because those officers did not physically oppose that which they could not stop.Response: (See Part 5 section 8 for full comparisons/ arguments) In Garcia V. Does, the crowd was as officers described "hostile", the police shared they too were overwhelmed by the number of protesters. However, once they got enough police to take care of the protesters, they arrested them. Not only that, they gave them three dispersal orders and time to comply(they didn't do that for me).On January 6th, what happened with the protesters once the police had enough people to arrest them? They didn't arrest them so long as they obeyed curfew and didn't break the rules that were set out. Video after video after video, it is shown that whether protesters outnumbered police, or vice versa, arrests were not conducted during the time I was inside, and even for large parts of time before and after, so long as they behaved as officers shared we had to behave.Such accommodating actions for protesters on the part of police agencies aren't unusual, see Meyers V. City of New York (2nd cir.) or Barham V. Ramsey (DC Cir.). Even so, as shown in Carr V. District of Columbia (DC Cir.), "a crowd substantially filled with violence does not negate the requirement of police to give a dispersal order that protesters can hear". Furthermore, as shown in a NAACP Supreme Court case against a hardware company, you aren't suppose to punish individuals based off of the actions of others in a protest, I was not hostile, most around me were not hostile... Their argument is beyond flawed.9) They argue that the court should preclude evidence of officer inaction not perceived by me. Response: This has already been argued: See Part 2 number 5.10) They cite Williams case law.Response: Given that the arguments and citations taken from Williams are already addressed in Eicher, Cox, and Chrestman references that I argued, it also has been, or will be address in those sections of Case law arguments.Part 4Case Law Arguments:Section 1: General/ Overall:1: As the 2nd circuit shares: "An entrapment by estoppel defence doesn't depend solely on absence of criminal intent (since the government tries to falsely assert that I must have had criminal intent because I entered through a broken window in a place called "The People's House"). Nor is it limited to the circumstances of actual authorization (as they assert that I didn't receive 'actual' authorization to enter, and falsely assert that I didn't receive 'actual' authorization to remain and go/ protest as others around me and ahead of me were). Rather, it focuses on the conduct of the government leading the defendant to believe reasonably that he was authorized to do the act forbidden by the law (something that the government tries to ignore when it is the central focus of this defence). The doctrine depends on the unfairness of prosecuting one who has been led by the conduct of

government agents to believe his acts were authorized. This focus on unfairness arises from circumstances that gave birth to entrapment by estoppel."2: "The question of entrapment is generally one for the jury, rather than for the court." -Matthews V. United States, 485 U.S. 58, 63, 108 S. Ct. 883, 99 L.Ed. 2d 54 (1988)Comments: That means I should be allowed to present it in opening and closing statements as well as during arguments.3: The main focus is on the government not me: "...after public officials acted as they did, to sustain appellate later conviction for demonstrating where they told him he could 'would be to sanction an indefensible sort of entrapment by the state-concicting a citizen for exercising a privilege which the state had clearly told him was available to him'" -Cox, 379 U.S. at 571 (quoting Raley V. Ohio, 360 U.S. 423, 426, 79 S. Ct. 1257, 3 L. Ed. 2d 1344 (1959)."4: I acted just as others around me were: The 6th Circuit in Levin, 973 F.2d at 468 also had an entrapment defence. The court shared that the defendants conduct was identical to that which HCFA had approved. His conduct was not vastly different from what they authorized... Comments: I personally witnessed everything I did, I mirrored people's actions so long as I knew officers were allowing such actions due to their personal actions, words, or inactions. I witnessed the man on a desk waving a flag next to the officer I got rules from, I witnessed others smoking, I witnessed the officer who gave rules to me walk right by Jeff Merkelys' room. Have the court take notice of the photo that the government provided in their motion in limine, notice how many people are in that photo prior to me entering. They are further than the eye can see and that the camera can capture, yet I wasn't that far away from the door/ window, that's because I waited to observe the actions of police and what they were and were not allowing prior to entering. I didn't jump on top of the desk until I took notice that the man already on the desk was ignored by the officer I got the rules of the day for, and I didn't move down towards the Crypt or Jeff Merkely's office until many others had done so, and when I was temporarily sketched out again I inquired to ensure that I still was allowed to go down to the statues (Crypt) and I was given evidence to suggest that I was by a separate Capitol police officer. 5: United States V. Wilson, 721 F.2d 967, 975 (4th Cir. 1983) (violation of statute must be initiated by government agent): Comments: Though it was through their actions, there still is a major difference in this case compared to mine. The difference in my case is that Capitol police and MPD have long established methods and requirements for arresting a group of protesters or those in a riot. They are required to warn the protesters that they are breaking the law, to stop, and to be given adequate time to leave/ stop. Still, even if this wasn't the case, for me, the Capitol police did initiate this violation through their words, actions, and inactions. I did not blindly rush in, I waited and observed (with my eyes and ears) the police, what protesters around them were saying, and what was seemingly (and clearly) allowed and not allowed. 6: United States V. Nakouzi, November 30, 2005, 2nd Cir.: "To prevail on a defence of entrapment by estoppel, the defendants conduct must also remain within the general scope of the assurance of authorization; this defence will not support a claim of an open-ended licence to commit crimes in the expectation of receiving subsequent authorization." Comments: Again, everything I did was not done prior to me taking notice that police were allowing others to do it. Everything I did was already done within the view and scope of the present officers, and to ensure I was allowed to do what others were allowed to do, I personally sought and received express permission to do them, most of which had already been conveyed as being welcomed through implied actions and inactions.7: United States V. Hurtado, 47 F.3d 577, 584 (2d Cir. 1995) ("A defence theory must be charged as long as it has some foundation in the proof, no matter how tenuous that defence may appear to the trial court.") "Accordingly, the government's motion to preclude these defences and related evidence is denied."Comments: Clearly, Judge

Howell now recognizes this, compare her previous position in Chrestman with that of Eicher.8: When my "meter" of trusting that I was allowed enter, remain, or to protest as others were was wavering, I inquired to see if I truely was allowed to do so three separate times. Thankfully, all three times are on video. This shows I was sincerely desirous of obeying the law. This is important because as the law-books share: "To invoke the entrapment by estoppel defence the defendant must show that he relied on the officials statement and that his reliance was reasonable, in that a person sincerely desirous of obeying the law would've accepted the information as true and would not have been put on notice to make further inquires." Comments: When in doubt I made the inquires, all three resulted in a "yes", that I was allowed to do as others were before me in the areas I was in.9: As the law-books share: "this defence is really a narow exception to the general rule that ignorance of the law is no excuse."10: In Cox V. Louisiana, a state statute made it a criminal offence to demonstrate "near" a courthouse. Defendant, the leader of a planned demonstration was advised by police officials that a certain location across the street from the courthouse was permissible. When the demonstration began, defendant was arrested for being too close to the courthouse. The court again reversed, stating that this was "an indefensible sort of entrapment" because defendant was wrongly advised by the police officials who were "charged with responsibility for administering and enforcing the statute. Comparisons: In my case, I was advised by police officials (both through words, actions, and inactions) that certain forms of protesting were permissible in certain locations. After the demonstration, I was arrested for following the advise. This is an indefensible sort of entrapment because I was wrongly advised by the police officials who were charged with responsibility for administering and enforcing the statute. However, an even more extreme issue is presently working against the government in my case and that is that the Capitol police are required to order dispersals and warnings prior to making arrests. The police in Cox were not required to do this. The Capitol police did not do this, further strengthening the point that this is/ was an indefensible sort of entrapment.11: It's easy for people to have thought we were allowed to protest as we(the peaceful ones) were: The statute 40 U.S.C §5104 (f) (I'm facing two 40 U.S.C §5104 charges), the statute restricting expressive activity on the grounds of the capitol, became the subject of a constitutional challenge in Jeannette Rankin Brigade V. Chief of Capitol Police, 342 F. Supp. 575 (D.D.C. 1972). There, a three-judge court declared the statute unconstitutional under the 1st and 5th amendments, enjoining the Capitol Police from enforcing it. The court ruled the government's interest in maintaining decorum failed to justify a ban on political demonstrations outside the building housing the nations elected representatives. The Supreme Court affirmed in 1972.12: Meyers V. City of New York (2nd Cir. 2020): The mayor of New York City temporarily forwent enforcing trespass laws against protesters occupying Zuccotti Park in Manhattan telling the police to focus on more serious crimes in the area (This is similar to what Capitol police clearly did, they temporarily forwent enforcing trespass, disorderly conduct, and parading and picketing laws, when someone began to assault officers they would then take action, when some protesters hopped up on statues, they spoke loudly and forced the protester off of the statue.). After the NYC police department evicted the protesters and charged them criminally, the protesters insisted that they, like the Cox protesters, had relied on the Mayor's statement that 'we'll allow [the protesters] to express themselves" "as long as [they] obey the laws." (2019 U.S. Dist. Lexis 53150 [WL] at *1 (cleaned up)). That statement however did not advise the protesters that the behavior for which they were prosecuted was lawful(avoiding a dispersal order being the main thing the court focused on).Comment: Here, the police clearly were witnessing the protesters before me conduct the very action that I soon would get

permission to do myself/ mirror. Unlike in Meyers, I didn't enter and then act beyond that which the officers had previously authorized. Everything I did was authorized by Capitol Police through both words, actions, and inactions. As the court shared, unlike me, the police had probable cause to arrest the protesters for disorderly conduct and trespassing after the protesters ignored a dispersal order.13: Christman: "Central to Raley, Cox, and PICCO is the fact that the government actors in question provided relatively narrow misstatements of the law that bore directly on a defendants specific conduct. Moreover, in all 3 cases, the government actors statements were made in the specific exercise of the powers lawfully entrusted to them, of examining witnesses at commission hearings, monitoring the location of demonstrations, and issuing technical regulations under a particular statute, respectively." Comments: I was given relatively narrow misstatements of the law that bore directly on my specific conduct. Moreover, the government actors statements were made in the specific exercise of the powers lawfully entrusted to them, Capitol police issue technical regulations for the capitol building and grounds, monitor and allow demonstrations, and warn of arrest/ arrest people for breaking rules on Capitol grounds or the building.14: Blood, 435 F.3d at 626: District court's instruction incorporated both elements of entrapment and entrapment by estoppel.Comments: Both were present at the Capitol that day, the prosecutor from William Popes case admitted that. I seek to have both elements presented and argued.Section 2: Case Law And Arguments From Dellums V. Powell, August 4, 1977, DC Cir.:1) Plaintiffs were arrested by U.S. Capitol Police without an order to quit as they protested the Vietnam war on the steps of the U. S. Capitol. The court held that since class members were arrested without a warrant, unlawful imprisonment was presumed as a matter of law, and the burden of proof was on defendant police chief. The court held that an order to quit and an opportunity to disperse had to precede arrests.Comments: Not only did police not order me to leave, they did the opposite. Further, the government should bear the burden of proving that I was ordered to disperse and given adequate time to comply just as the Dellums court required.2) In any situation in which an order to disperse can constitutionally be given, there will be substantial noise or disorder. For this reason police will either have to warn each demonstrator individually or work through the leaders of a demonstration to the extent they have access to powerful public address systems.Comments: On 1/6/21, Capitol police did not warn me or order me to disperse, even when I was speaking to them directly or walking by them where there was not a ton of noise, whether inside the capitol or outside the Capitol. Since then, I've come to realize (mainly because I'm looking for such evidence) that even in areas where police vastly outnumber protesters, peaceful ones at that, they often don't order a dispersal order.3) At the capitol the leaders were stopped by a capitol police officer, but were allowed to enter the grounds when congressman Dellums appeared and explained the arrangement for meeting on the Capitol steps. Comments: This goes against the governments false claim that Capitol police don't have the authority to authorize protesters to enter and protest at the Capitol. Additionally, just as in my case, the protesters were at first stopped from being allowed on the grounds/ inside the building, but later were. It could be surmised that they had a similar situation happen in that they were informed that Trump had told us we were going to protest at the Capitol just as Congressman Dellums told police this and later got permission to do as they normally would not be able to do, protest on capitol grounds. It also could be surmised just like in Dellums, just because protesters were at first stopped by capitol police from protesting at the capitol, the police had the authority and power to change their minds and allow protesters to gather at the capitol and protest.4) While Congressman Abzug was addressing the crowd, the police cordoned off the bottom of the steps, preventing anyone from leaving, and began arresting members of the assemblage.

Comments: Just as in my case, police welcomed my presence and activity, and then later, despite that permission, I was arrested.5) "... the record shows that chief Powell unquestionably took some steps to order the crowd to disperse on May 5 and, moreover, he testified that standard practice at the Capitol would be for such orders to be given because it was the experience of the Capitol Police that many people were not aware of the statutes governing conduct at the Capitol and would, upon being notified of a potential violation bring their conduct into line with the law. (Tr. 2096, 2099-2100, JA 1286, 1289-1290). Comments: In my case, all of the Capitol police and Metropolitan police I personally was around and interacted with did not take any steps to order me to disperse or to stop protesting as I was, indeed, they did the opposite and welcomed it. Additionally, take note, the Capitol police chief shared that many people are not aware of the statutes governing conduct at the Capitol, and upon being notified of a potential violation, they typically bring their conduct into line with the law. Even on the limited law library, there are so many examples of people incorrectly thinking they are allowed to be present and protest because the building is called "The People's House. So, why were the orders to stop and to disperse not given if that is their experience, especially with a present crowd that was overwhelmingly filled with protesters shouting and sharing their support and affinity for police ("back of the blue"). Would these people not want to please the police more so than those who may detest them, whom these officers also encountered in the past and gave dispersal orders to? Why was the standard procedure ignored, and even more extreme, why was the opposite conveyed to me/ others around me?6) In addition, regulations issued by Chief Powell required that persons be given individual warnings to leave before they were placed under arrest for participating in a mass demonstration. According to Chief Powell's testimony, however, such individualized orders to leave were not given on May 5. Notwithstanding this administrative interpretation, Chief Powell urges that orders to disperse are not required by section 124 and, further, that a violation of his own regulations in this regard has no bearing on the falsity of an arrest under that section. For the reasons set forth below, we find that orders to disperse were required, and we therefore reject Chief Powell's contention.7) There is a past history of being allowed to protest in the Capitol, even if police tell you to leave due to the 1st amendment. This history definitely could have solidified a thought process for many of being allowed to protest on Capitol grounds. This was shown in United States V. Nicholson, 97 Daily Wash. L. Rptr. 1213, No5, 20210-69A et. al. (D.C. Ct. Of Gen. Sess. June 19, 1969), aff'd, 263 A.2d 56 (D.C. App. 1970), appendix at [1]-[2]. In this case (which was cited by the Dellums court) 13 quakers were arrested while standing on the steps of the Capitol reading names of Vietnam War dead from the Congressional record. They were charged... in that they failed to leave the Capitol when requested by a Capitol policeman to do so. The Quakers moved to dismiss that their activities were protected by the first amendment. Judge Greene agreed, holding that the Capitol was a public forum.8) "the protesters were unquestionably granted an unwritten "permit (implied permission)", as described in Nicholson, to assemble on the Capitol Grounds and steps. Because police officials in effect (implied entrapment by estoppel) told the demonstrators that they could meet where they did, to sustain [plaintiffs] later conviction where they told [them they] could 'would be to sanction an indefensible sort of entrapment by the state-convicting a citizen for exercising a privilege which the state had clearly told him was available to him.' (Cox V. Louisiana)... In these circumstances, no constitutionally valid arrest could have been made until an order to disperse had been given which was itself based on permissible considerations (Dellums again citing Cox V. Louisiana)." Comments: And the government tries to fool this court by saying that the Capitol police can't tell people that they can protest at the Capitol? That they can't give permission to people? That

implied entrapment by estoppel isn't recognized? That the DC courts haven't weighed in on entrapment by estoppel defences? Well, now you know! 9) "The evidence is similarly in conflict on the question whether Chief Powell made a bona-fide effort to make sure the crowd heard his dispersal order. Although there was certainly evidence that the jury could credit to the effect that Powell made attempts to inform the crowd and was each time hooted down and drowned out, there was also evidence that Chief Powell realized that the crowd had not heard his warnings and yet took no steps to correct the situation. For example, a reporter present at the scene testified that he had overheard Chief Powell say to Chief Wilson "that he [Powell] wasn't sure whether they [the demonstrators] heard him or not, or [that] he didn't think a lot of them heard him. Regardless of this, no further warnings were made, although such warnings were required by Chief Powell's regulations. Comments: Can the government even claim that police did at least as much as the Chief in Dellums?9.1) Nor was use made of a powerful police sound truck that was at the scene, nor was any attempt made to use the public address system of the demonstrations leaders; indeed, an offer from Congressman Dellums to make announcements over that system was specifically refused by Chief Powell. Chief Powell urges us in a brief that the fact that no one heard his warnings was due to the loudness of the crowd and, therefore, was not his fault. We are not impressed with this argument. In any situation in which an order to disperse can constitutionally be given there will be substantial noise or disorder, see Washington Mobilization Committee V. Cullianan, Supra note 31, 566 F.2d at 120. For this reason police will either have to warn each demonstrator individually or warn through the leaders of a demonstration to the extent they have access to powerful public address systems. Alternatively, it appears that a device called a "sound curdler" is available which can make the police heard over most tumult: Q. What is the curdler that you referred to? A. That is an audio curdler that we had installed on top of the barricade car, which is a converted Brinks wagon kept in the yard up at the Tactical unit. This particular curdler was bought in 1970 from applied electronics over in Alexandria because of the fact that we had given a lot of instructions on bull horns, which is the small audio handler that people claimed they could not hear distinguished over the roar of the crowd. Parenthetically, it should be noted that Zanders testimony in Cullinane would tend to indicate that Chief Powell should have been aware that the hand-held bull horn he testified he used to give his orders was not powerful enough to reach the crowd." Comments: How is it that in the early 1970s the Capitol police seemed to have on hand powerful public address systems to disperse of large crowds, but on January 6th 2021, the Capitol police couldn't even find their weak bull horns anywhere? Take one look into my crappy legal law library and you'll find that Capitol police still in the 2000s and even 2010s were using their bull horns and other PA systems to disperse crowds... Why did they disappear on the 6th? Why did Capitol police give me directions and rules, or stand and smile instead of giving me individual dispersal orders? They had innumerable chances to do so!

Motion 2 of 7, Part 3 of 510) "...Thus, although the line of Marchers was initially stopped at the boarder of the Capitol Grounds by Inspector Xander of the Capitol Police, he stepped aside upon being told by Representatives Dellums, Abzug, and Mitchell that they had invited the Marchers to meet with them. Comments: Perhaps the capitol police heard that Trump had invited us to meet us there. Perhaps friendly Congress members or senate members would be present and shared that they planned to meet or speak with us just as others had done outside of the White house. Perhaps there was an auditorium like setting inside the building where a select number of

protesters could sit/ stand to listen to speakers (after all, only a select few made it into seated positions in VIP and directly outside it, all others had to stand or bring their own chairs). These are all thoughts that briefly crossed my mind either in trying to guess what was going on at the capitol before I got there or while encountering police inside... I was open to tons of possibilities and trying to assess what the actual situation was, including even (the prosecutor will love using this) that some protesters were starting a revolution when they initially broke in after hearing that Mike Pence certified the election (perhaps they recognized the tyranny and that the election was stolen (after all, we (the American people) have a right and a duty to overthrow a tyrannical government)). Regardless, I personally had no intension of breaking any laws, I'm not selfless enough to do that, I loved where my career and life were going and was not looking to screw it up, hence why I was only interested in coming into the capitol when people started sharing "they are letting us in!" and even then, I only entered after observing police truely were letting us in. The same situation happened at the Ellipse hours earlier, excited and violent protesters broke through security lines and jumped over bike racks (but this time I clearly saw bike racks, though they were mainly used to help guide lines). A security officer was even knocked to the ground via a punch from a supporter. The secret service agent, the women (campaign staffers) and I were almost knocked down at the violent pushing of the crowd... Still, security allowed many of those people who broke through the security line to continue on. Very similar to what happened hours later at the capitol.11) "In addition, no efforts (inaction) were made to keep the protesters from assembling on the steps." Comments: This is exactly what many people (including myself) experienced when we arrived to the steps, right outside the building, and shortly after, inside the Capitol building. Later, many protesters including myself didn't see any efforts to keep protesters from assembling in certain areas in the capitol.11.5(11 continued)): "There can be no doubt that these actions (or as they put it, inactions) constituted police permission to assemble on the steps." Comments: This shows the DC Circuit recognizes that police in-action ("no efforts (in-action) were made to keep the protesters from assembling on the steps") can constitute implied permission/ entrapment by estoppel ("There can be no doubt that these actions (in-actions) constituted police permission to assemble on the steps") (Further, the court also shows that actions/ implied entrapment is recognized in the same section because in-action is the action of doing nothing, so the court is saying actions can also be implied entrapment by estoppel.).12) "Chief Powell was not acting in good faith. Chief Powell's INACTION after his remark to chief Wilson indicates that Powell was aware that notice to the crowd had been inadequate. Buttressing the interference of bad faith is the further fact that chief Powell, by relying exclusively on dispersal orders shouted over a hand-held bull horn in attempting to give notice, violated his own "procedure for handling protest groups."Comments: Again, the DC circuit does consider police inaction in entrapment by estoppel cases.12.5(12 continued)): Federal exhibit 11: This regulation states that preliminary to arrests the ranking official in charge at the scene shall approach the demonstration leadership and explain the law violations which are being committed. He shall request that any and all violations be corrected immediately. If such a request is complied with, no further police action shall be taken. If the leaders do not comply with the request, the official shall publicly announce to the crowd through a voice amplification the following "I am [insert name and title]. I hereby inform all persons assembled that you are in violation of [state the regulation in general terms and give statute number in code if known]. In the name of the United States Capitol Police Board, I command all of you here assembled to disperse." The official in charge shall wait a reasonable length of time for compliance. If after this first announcement nothing develops, the official shall repeat the aforesaid order. Arresting

officers shall accompany the transporting officers to the proximity of the individuals about to be arrested. The arresting officer shall state to the violator that you are in violation of (give law violated). When applicable state "You are requested to please depart this area immediately and peaceably or you shall subject yourself to immediate arrest." 13) At trial, Chief Powell maintained that he could not ascertain who the leaders of the demonstration were, although he further admitted that he made no attempt to locate any of the Congressman who had invited the group onto the steps. Nor apparently was any attempt made to use the sound amplification equipment of the demonstrators to give dispersal orders. Chief Powell admitted that he never identified the statute alleged to have been violated. Chief Powell admitted that he knew for a fact that "none of the arresting officers made the statement [to leave or to be arrested] and gave that last opportunity to leave to the people who were being arrested."14) "The application of trespass statutes to government land presents greater complexities (to an already complex charge that typically requires a "knowingly" factor, making government land "DOUBLE COMPLEX" in regards to trespass statutes)... But there are other types of government land-public parks, streets, sidewalks, and historic lamdmarks-which may not ordinarily be closed to the public for reasonable use ("TRIPLE COMPLEX"). See Hague V. C.I.O., 307 U.S. 496, 515-16, 59 S. Ct. 954, 83 L. Ed. 1423 (1939); Marsh V. Alabama, 326 U.S. 501, 90 L. Ed. 265, 66 S. Ct. 276 (1946): Cox V. Louisiana, 379 U.S. 536, 13 L. Ed. 2d 471, 85 S. Ct. 453 (1965); Shuttlesworth V. Birmingham, 394 U.S. 147, 22 L. Ed 2d 162, 89 S. Ct. 935 (1969) Gregory V. Chicago, 394 U.S. 111, 22 L. Ed. 2d 134, 89 S. Ct. 946 (1989). The Capitol of the United States, a national historical shrine and the political centerpiece of the Republic, is in the latter category. It may not be declared off limits to the people. Indeed, the Congress invites and welcomes the public. In view of the broad and general invitation extended to the citizenry to this preeminently public building and the surrounding grounds , individual citizens could not be held to be "without lawful authority to remain... thereon", within the meaning of the unlawful entry statute, in the absence of some other, specific bar to their presence("QUADTRUPLE COMPLEX")."Comments: Out of all the buildings in the country, and arguably, the world, the Capitol building seems to be the most complex regarding trespassing laws. Clearly, the Capitol police and the DC circuit recognize this which is why they approved of Federal exhibit 11 (see 12.5 above) to be implemented as as a required regulation for the Capitol police to follow prior to arresting people on Capitol Grounds/ the building.15) the court emphasized that the fair notice required by the Culliname court is notice reasonably likely to have reached all of the crowd despite any noise the demonstrators may have been making." id. at 181-82 n.3116) The Dellums jury instructions: "...the defendants (Powell, police, and Government) were also required to prove that demonstrators "were in fact ordered off" the property, and that they were given a "chance of getting off or staying on and being arrested" and that they "ignored the order knowingly". Guided by these and other instructions, the jury deliberated for more than a day. The substantial verdict they returned in favor of the plaintiffs clearly shows that the jury credited the plaintiffs" characterization of the events in question... Plaintiffs were able to introduce voluminous evidence in support of their points that... the warnings were not heard." Comments: Clearly, the DC circuit courts recognize police inaction from the Capitol police, they recognize it so much they gave this jury instruction, with the burden on the government! I'm seeking the same thing. Further, just as the DC circuit court allowed those charged to present voluminous evidence to make their points that the police failed to do their duty, I should be allowed to as well.17) ...a vague statute puts too much discretion in the hands of officials with the result that the statute may be enforced selectively against those who hold unpopular points of view.

Comments: Take notice of my 1512 charge, obstructing an official proceeding. Take notice of Tigthe Barry, a man my magistrate judge let go for violently obstructing and single handily interrupting his 7th official proceeding. She only made him pay a 10 dollar fine and serve 12 hours in jail for his 7th time interrupting an official proceeding, and even grouped in his 2 contempt of court actions while on pre-trial release, one of which was for assaulting a secret service sargent with a tent pole during a political demonstration... The 2 more recent times he personally interrupted official proceedings were for Brett Kavanaugh and Jeff Sessions, republicans... But I'm charged with the 1512? That same Magistrate that Tigthe had gave me 30 something conditions of release as she only gave him 2 or 3? This is exactly what the Dellums court warned about!Section 3: Case Law And Arguments On Barham V. Ramsey January 13, 2006 DC Cir (This Court Relied On Dellums V. Powell In Coming To Its Decision).:1) Even the Metropolitan Police Department has a similar rule regarding warning protesters (even a protest filled with substantial amounts of obstruction or violence) prior to arrest: "Newsham and Ramsey concede that the mass arrest was executed with no prior warning to the occupants of the park to disperse and no warning to them that arrest was imminent. In the end, 386 people were arrested. The District court denied the governments motion, holding that MPD's arrest of hundreds of individuals assembled in the exercise of 1st amendment rights, without first issuing an order to disperse followed by a reasonable opportunity to comply, violated plaintiffs clearly established constitutional rights." 1.5 (1 continued)): "Murphy explained that if he issued an order to arrest without first issuing three successive warnings, he would violate his agency's mass arrest policy."... The government sought an appeal of that decision and lost again.2) "In the weeks leading up to the protests, MPD's civil disturbance unit braced for an influx of protesters. Ramsey commanded the department throughout the pre-protest planning and allegedly told members of his staff that officers should overlook minor violations of the law in order to accomodate protesters." Comments: Clearly, the Capitol police were doing the same. They knew weeks ahead that a protest was coming, they had been warned through intelligence reports of the threat of violence and law breaking. Yet for whatever reason, they clearly, even according to their own and MPD officers, didn't prepare for it... Still, they clearly told members that they should overlook minor violations of the law in order to accomodate protesters. I witnessed it myself, the world witnessed it.3) Again, the Barham court found that even MPD was required to issues a dispersal order to protesters in order for the arrests to stand: "When compelling circumstances are present, the police may be justified in detaining an undifferentiated crowd of protesters, but only after providing a lawful order to disperse followed by a reasonable opportunity to comply with that order. Two cases spell this out: First in Washington Mobilization Committee V. Cullinane, 184 U.S. App. D.C. 215, 566 F.2d 107 (D.C. Cir. 1977) ("It is the tenor of the demonstration as a whole that determines whether the police may intervene; and if it is substantially infected with violence or obstruction the police may act to control it as a unit."..."the police may validly order violent or obstructive demonstrators to disperse or clear the streets. If any demonstrator or bystander refuses to obey such an order after fair notice and opportunity to comply, his arrest does not violate the constitution even though he has not previously been violent or obstructive.") (Second case cited was Dellums)."Comments: This tosses out the governments excuse of "It was a hostile crowd", which I witnessed many areas where it was not only nit violent, but people wearing Blue lives matter clothing and waving similar flags... They have encountered worse, like less than a year earlier at the White house where more officers were injured under the group that screams "kill all cops", ANTIFA...4) The court held that "a reasonable police chief" encountering the events unfolding in Pershing Park

"would recognize the need--and indeed the duty--to ask a subordinate officer whether a dispersal order had been given prior to ratifying a mass arrest."-388 F. Supp. 2d at 61.Comments: Did the FBI do this prior to coming to arrest me? Just wondering.5) "Institutionally, moreover, MPD clearly grasped the constitutional rights elaborated in the applicable case law. MPD's Manual for Mass Demonstrations and Responding to Civil Disturbances instructs officers on the protocol for dealing with situations like the one Newsham faced. Under the guidelines established by the department (which are only partially reproduced on the record), officers seeking to disperse a crowd must "attempt to verbally persuade the crowd to disperse of its own accord "by issuing an initial warning" followed by a "final warning." Then, "if, after a reasonable amount of time following the final warning, the crowd continues in its refusal to disperse, the unit commander shall direct that the violators be arrested." -MPD Manual fo Mass Demonstrators and Responding to Civil Disturbances at 21, J.A. 564.Comments: Did the MPD do this for me on 1/6/21? No. Why didn't they? Did Capitol Police command also instruct their officers that they were nit going to be arresting us/ that certain conduct was allowed in order to accomodate us?6) Significantly, the MPD Manual acknowledges that its procedures embody judicially enunciated constitutional principles. It prefaces the discussion of mass arrest procedures by noting: "Following the civil disturbances of April 1968, procedures were developed by the Metropolitan Police Department, in cooperation with the courts, to provide for the speedy, but fair administration of Justice during mass arrest situations." -id at 22, J.A. 565. The procedures now in place apparently resulted from "court ordered prescriptions against certain mass arrest techniques followed during the April 1971 disorders.Comments: Go and read up on the attached newspaper titles from that era that the court provided in their notes, they make the fed set up January 6th riot look like kindergarten in comparison. Yet the police and courts didn't allow the excuse of "but the crowd was hostile (which they clearly were)" to stop them from requiring such procedures on warning protesters (even substantially sized, lr substantially violent ones) to disperse or face arrest. Though the government tries the same argument they tried numerous times years ago, it should fail for the same reasons. The national guard was called and still couldn't stop those disturbances and riots for weeks, even months. Our set up by the feds riot was only 4 hours, and I think I'm the only one that came back the next day, and all I did was buy an airforce one backpack from across the street of the Capitol, clearly, this isn't a new situation that the courts have been introduced with.7) The Circuit court affirmed arrests were improper due to no warnings of breaking the law or orders to disperse/ reasonable amount of time to respond. "In a government of laws, the regulation of conduct- particularly conduct in the sensitive area covered by the First Amendment- must be predicated on a set of definite rules, not on the opinions of police officers." - The Barham court citing the Dellums Court who was citing Cox V. Louisiana, supra, 379 U.S. at 552.Comments: Again, the DC courts clearly have tossed their hat into the ring and made their positions clear regarding entrapment by estoppel defences.Section 4: Carr V. District of Columbia (June 17, 2008):Protesters against president Bush organized a concert in DC on 1/20/2005. Fliers handed out said "after the last song we invite you to join in a festive March from this show through the streets of DC to the doorstep of those in power. They also shared they wanted "to create an explosive protest against the war in Iraq and the war here at home as well as against all that represents.Comments: Sound similar to the events of 1/6/21 (Trump: "After I'm done speaking....We are going to peacefully and patriotically March down to the Capitol... to give them (the people in power) the boldness they need... to fight for America...")(Rudy: "Let's have trial by combat!")Along the way, property damage (including windows being broken) commenced from the crowd. Rocks and bottles were thrown at police

vehicles, a rock broke the windshield of a police cruiser and fireworks were being used by the crowd. Comments: I do recall windows bring broken at the Capitol, and shortly after leaving the building, some people stupidly charging at a police line outside. I read on the news a man got 5 years for throwing a firecracker at police.The commander of the MPD then sent Civil Disturbance Units to arrest protesters for rioting. The CDU officers arrested them without ordering the protesters to stop or disperse.Comments: CDU units were present, but they didn't arrest me, I was arrested by the FBI 10 days later.Here is what we can learn:1) "Contrary to the District's representation, Cullinane specifically prohibits Mass arrests without notice or opportunity to comply where a crowd has become violent or obstructive." Comments: I was next to MPD for a long time, even taking sexy photos with them, why did they not order a dispersal, or threaten me with arrest, or tell me I was breaking any laws and would be arrested if I didn't leave?2) The government argued that the protesters charged were celebrating the acts of vandalism by cheering and throwing up their hands which encouraged more such acts. The court didn't find merit in that argument.Comments: I've seen the government argue such points in other January 6th cases...3) The district then argued that defendants were guilty of rioting because they continued to move with the "mob" despite the vandalism that was occuring. By continuing to march, the District claims, plaintiffs "tended to enlarge and perpetuate the atmosphere of violence and tumult..." and therefore may be charged with rioting. To this, the court said: "This argument lacks merit. The law is clear that "the right to associate does not lose all constitutional protection merely because some members of the group may have participated in conduct or advocated doctrine that itself is not protected." -N.A.A.C.P. V. Clarborn Hardware Co., 458 U.S. 886, 908, 102 S. Ct. 3409, 73 L. Ed. 2d 1215 (1992).Comments: Similarly, the government argues this generally and in regards to those with the 1512 charge in that I/ we are guilty of obstructing because we/ I "was raindrop in the field causing a flood". Since I was present as others were obstructing, I too am guilty of obstructing and it shows my intension of obstructing, that is wjat they have argued.4) They then continue: "Rather, when violence "occurs in the context of constitutionally protected activity, precision of regulation is demanded. Specifically the presence of activity protected by the first amendment imposes restraints... on the persons who may be held accountable. If a person is to be punished for his association with those who engaged in vandalism, there must be "clear proof that...he specifically intended to accomplish the aims of the protest by resort to violence." -quoting the Supreme Court case of scales V. United States, 367 U.S. 203, 229, 81 S. Ct. 1469, 6 L. Ed. 2d 782 (1961). 5) The court elaborated further when they said: "Under Supreme Court precedent, a peaceful political protester may not be punished for failing to cease his protected activity simply because others associated with the assembly may have committed illegal acts. Therefore, since the District has not provided any particularized showing that any individual plaintiff intended to engage in or further riotous behavior, it cannot sustain its arrest on this ground." The District then argued that plaintiff left the bar to join the march at a time when acts of vandalism were being committed, thereby demonstrating by his actions "his active support and participation in the mob's conduct sufficient to evince his willful engagement in a riot." The court responded "Even assuming that the District was correct that Singer intended to join the demonstration, absent evidence that Singer intended to engage in and further the vandalism, he cannot be punished for the peaceful exercise of his first amendment rights."Section 5: United States V. Eicher, 2023 U.S. Dist. Lexis 90103, DDC opinion by Beryl Howell (on entrapment by estoppel): (Compare with her previous view on E-B-E in Chrestman 2021)1) "First, defendant must show "that a government official affirmatively communicated to the defendant the officials approval of the conduct at issue," Alvarado, 808

F.3d at 485; see also Sheppard, 2022 U.S. Dist. Lexis 232610, 2022 WL 17978837 at *9... This official statement of law NEED NOT BE EXPLICIT. As Sheppard explains, "the public authority and entrapment by estoppel defences are available only when the officials's statements OR CONDUCT state OR CLEARLY IMPLY that the defendant's actions are lawful." 2022 U? Dist. Lexis 232610, 2022 WL 17978837 at *9."Comments: Clearly, the previous biggest opponent of the entrapment by estoppel defence in 1/6 cases not only is welcoming it, but even pointing out that implied entrapment by estoppel is recognized.2) "In Cox for example, the Supreme Court reversed the conviction of the leader of a civil rights protest under a Louisiana anti-picketing statute, which prohibited demonstrations "near" a courthouse without defining "near", holding that the conviction violated the Due process clause because the towns police chief "IN EFFECT told demonstrators that they could meet where they did, 101 feet from the courthouse steps." 379 U.S. at 571.Comments: Again, she points out implied entrapment by estoppel is recognized.3) I should not be stopped from mentioning how law enforcement made me feel that I was welcome to enter, remain and protest as I did, it eliminates the truth and my entire defence: "the parties agree that the government will have to prove at trial that defendant "entered or remained in a restricted building or grounds without lawful authority to do so," and that he did so "knowingly".Comments: If the government is to argue at trial to the jury that a defendant didn't have lawful authority to enter or protest, it would only be fair for the defence to argue that they did have lawful authority... It would not be fair to only suggest it as a defence during jury instructions as the government would be arguing the opposite during trial, I should not be stopped from doing the opposite.3.5(3 continued)) "Evidence related to the former presidents'statements urging supporters to, for example, "go to the Capitol",... may be probative as to defendant's required intent for this charge. In fact, other judges in this district have explicitly instructed juries that, as to this count, "a person who enters or remains in a restricted area with a good faith belief that she is entering or remaining with LAWFUL AUTHORITY is not guilty of "violating 18 U.S.C. § 1752 (a)(1). As a result, evidence showing defendant believed her actions were authorized "also could constitute a failure of proof defence" as to count one. Jumah, 493 F.3d at 874 n.4." Comments: Though it was not the main reason for why I entered into the Capitol, nor even the second reason, it still lead me to the grounds which lead me to the window that I would eventually enter into. Trump sharing we were going to the Capitol had an influence on me, but definitely wasn't the strongest influence... I especially knew he would not approve of how some protesters entered into the Capitol (violently and destructively).4) She was permitted to present evidence that she was allowed to enter and remain: "...and the jury will be able to assess the credibility and believability of that testimony in the fuller evidentiary context of what was occuring when defendant allegedly engaged in the charged offence conduct."Comments: If Howell is welcoming defendant's to offer evidence and testimony that they were allowed to enter and remain, then this court should allow it as well. 5) "...similarly, defendants who seek to present evidence of law enforcement INACTION during the January 6th riot have been permitted to do so, provided they actually perceived such inaction, because this evidence may be probative of their state of mind. See, e,g, Mem. & order, U.S. V. Bender, case No. 21-cr-508 (BAH), ECF No. 76; U.S. V. Oliveras, case No. 21-cr-738 (BAH), 2023 U.S. Dist. Lexis 7805, 2023 WL 196525, at *2 (D.D.C. Jan. 17, 2023)."Comments: Again, if Howell is recognizing and allowing arguments of implied entrapment through law enforcement in-action, this court should allow it as well. I'll also note I addressed the issue with this "Zoomed in" argument in Part 2, #5.6) "Fortunately, he can do so any number of ways (establish his awareness of alleged permissiveness), such as a good faith proffer outside the presence of the

jury, or using other evidence to show that defendant was adequately nearby the alleged INACTION at the correct time to have perceived and understood such permissiveness as giving him permission to enter the Capitol."Comments: Again, even Howell now recognizes implied entrapment by estoppel can be shown through law enforcement in-action.Section 6: Cox v. Louisiana 379 U.S. 536 85 S.Ct. 453 13 L.Ed.2d 4711) When Cox arrived, 1,500 of the 2,000 students were assembling at the site of the old State Capitol building, two and one-half blocks from the courthouse. Captain Font of the City Police Department and Chief Kling of the Sheriff's office, two high-ranking subordinate officials, approached the group and spoke to Cox at the northeast corner of the capitol grounds. Kling asked Cox to disband the group and "take them back from whence they came." Cox did not acquiesce in this request but told the officers that they would march by the courthouse... The officer repeated his request to disband, and Cox again refused. Kling and Font then returned to their car in order to report by radio to the Sheriff and Chief of Police who were in the immediate vicinity; while this was going on, the students, led by Cox, began their walk toward the courthouse. Comments: I too was protesting at a Capitol building less than a block away from this court house. Unlike me, Cox was at first told by police, twice, to turn around and leave, he refused. I never was told to leave, I was shown and told the opposite multiple times. Yet this mans charges were thrown out due to entrapment by estoppel.2) As Cox, still at the head of the group, approached the vicinity of the courthouse, he was stopped by Captain Font and Inspector Trigg and brought to Police Chief Wingate White, who was standing in the middle of St. Louis Street. White testified that he told Cox that "he must confine" the demonstration "to the west side of the street." White added, "This, of course, was not—I didn't mean it in the import that I was giving him any permission to do it, but I was presented with a situation that was accomplished, and I had to make a decision." Comments: Cox was told where his protesting was allowed to and where it wasn't allowed to be. I too was told the same. The police Chief in Cox suggests he allowed what is typically not allowed because "he was presented with a situation that was accomplished"... I assume now knowing all the facts (that I didn't know when entering the Capitol) that it could be a strong possibility that Capitol Police officers felt similarly to Cox's officers, that they (70 officers) were presented with a situation (2,000 protesters) and so allowed what is normally not allowed. Like in Cox, famous police officers who were doing similar to the Cox officers (allowing protesters in and giving them directions/ rules) also claim "I/ we was/were not giving [anyone] permission to do it". The government in my case makes a similar argument in there motion in limine, they suggest the police were presented with a situation that they could not control ("a situation that was accomplished"), and just like the government in Cox did, asserts that they still have a right to convict me, a person they gave permission to protest as I was and where I was/ would go... Those who don't learn from history are doomed to repeat it (Supreme Court here I come?).3) Cox testified that the officials agreed to permit the meeting. James Erwin testified that "My understanding was that they would be allowed to demonstrate if they stayed on the west side of the street and stayed within the recognized time," Comments: I testified that the officers agreed to permit my protesting and presence. I testified that they laid out where I could and could not go, and set time restraints (curfew).4) The Sheriff, then took a power microphone and said, "Now, you have been allowed to demonstrate. Up until now your demonstration has been more or less peaceful, but what you are doing now is a direct violation of the law, a disturbance of the peace, and it has got to be broken up immediately." Comments: Cox received a warning and despite it being the 1960s, an officer hopped onto a "power microphone" that was able to reach the protesters... Cox and his protesters received a dispersal order. I did not. Where was this sort

of "advanced technology" in my case in 2021, especially considering what the Dellums and Barham Court shared in the DC circuit about Bull horns in the 1970s and in 2008? What happened to the Capitol police officers Bull horns they always use, or their powerful PA system they have? It was set up by the feds...5) The testimony as to what then happened is disputed. Some of the State's witnesses testified that Cox said, "don't move"; others stated that he made a "gesture of defiance." It is clear from the record, however, that Cox and the demonstrators did not then and there break up the demonstration.

Motion 2 of 7, Part 4 of 5---6) Two of the Sheriff's deputies immediately started across the street and told the group, "You have heard what the Sheriff said, now, do what he said." A state witness testified that they put their hands on the shoulders of some of the students "as though to shove them away." Comments: Cox received a second dispersal order, he still did not listen given the time frame between this order and tear gas being sent out (see next).7) Almost immediately thereafter—within a time estimated variously at two to five minutes—one of the policemen exploded a tear gas shell at the crowd. This was followed by several other shells. The demonstrators quickly dispersed, running back towards the State Capitol and the downtown area; Cox tried to calm them as they ran and was himself one of the last to leave.Comments: Cox tried to calm/ keep protesters present despite the tear gas and dispersal orders. I didn't, someone shoots tear gas at me I'm leaving. If a police officer tells me to leave, I'm leaving.8) No [civilians] participating in the demonstration were arrested on that day. The next day appellant was arrested and charged with the four offenses above described.Comments: Like me, Cox went home and was later arrested and charged for his actions at the protest. Unlike me, he was charged by the same agency he disobeyed dispersal orders from. 9) Appellant was convicted of violating a Louisiana "disturbing the peace" statute.. "And who fails or refuses to disperse and move on * * * when ordered so to do by any law enforcement officer of any municipality, or parish...shall be guilty of disturbing the peace." LSA-Rev.Stat. § 14:103.1 (Cum.Supp.1962). Comments: This is similar to my disorderly conduct charge. Like MPD and Capitol police Manuals/ court decisions require them to issue a dispersal order in order to be found guilty/ be arrested, so too does Cox's charge here.10) Cox was charged with an obstruction charge: OBSTRUCTING PUBLIC PASSAGE Louisiana statute, LSA-Rev.Stat. § 14:100.1 (Cum.Supp.1962), which provides:"No person shall wilfully obstruct the free, convenient and normal use of any public sidewalk, street, highway, bridge, alley, road, or other passageway, or the entrance, corridor or passage of any public building, structure, watercraft or ferry, by impeding, hindering, stifling, retarding or restraining traffic or passage thereon or therein.Comments: I too was charged with an obstruction charge. My only felony, 18 U.S.C. §1512(C)(2).11) In upholding appellant's conviction under this statute...There is no doubt from the record in this case that this far sidewalk was obstructed, and thus...appellant violated the statute.Comments: Though I disagree for various reasons, the government argues my mere presence in the Capitol obstructed an official proceeding.12) The control of travel on the streets is a clear example of governmental responsibility to insure this necessary order. A restriction in that relation, designed to promote the public convenience in the interest of all, and not susceptible to abuses of discriminatory application, cannot be disregarded by the attempted exercise of some civil right...Comments: Similarly, the government recognizes the importance of ensuring that

Congress can due its duty (in this case to certify a stolen election) and is able to do so with the necessary order. Please, for the purposes of the next number, take notice of "and not susceptible to abuses of discriminatory application".13) But here it is clear that the practice in Baton Rouge allowing unfettered discretion in local officials in the regulation of the use of the streets for peaceful parades and meetings is an unwarranted abridgment of appellant's freedom of speech and assembly secured to him by the First Amendment, as applied to the States by the Fourteenth Amendment. It follows, therefore, that appellant's conviction for violating the statute as so applied and enforced must be reversed.Comments: Here too the federal government has shown it is selective in who it charges/ doesn't charge with a 1512. Take a look at Tigthe Barry who has done so 7 times and has never been charged with a 1512 because he is a democrat. My favorite comparisons are on his personal obstructing Brett Kavanuagh's proceeding, and his 2 violent contempt of courts while on pre-trial release, all of which he served 12 hours in jail for and paid a 10 dollar fine, which the government even moved to drop that. Less than 1.25 years later, and my selective magistrate judge went crazy on the restrictions for me despite having no criminal history, and being more accomplished than Barry... Those who don't learn from history are doomed to repeat it!14) For the reasons discussed above the judgment of the Supreme Court of Louisiana is reversed.Comments: For that reason (selective prosecution) I should not be charged with the 1512...15) Not argument, just love this point from Cox: Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech * * * is * * * protected against censorship or punishment * *. There is no room under our Constitution for a more restrictive view. For the alternative would lead to standardization of ideas either by legislatures, courts, or dominant political or community groups." Terminiello v. City of Chicago, 337 U.S. 1, 4-5, 69 S.Ct. 894, 93 L.Ed. 1131. In Terminiello convictions were not allowed to stand because the trial judge charged that speech of the defendants could be punished as a breach of the peace " 'if it stirs the public to anger, invites dispute, brings about a condition of unrest, or creates a disturbance, or if it molests the inhabitants in the enjoyment of peace and quiet by arousing alarm.' " Id., 337 U.S., at 3, 69 S.Ct., at 895. Maintenance of the opportunity for free political discussion is a basic tenet of our constitutional democracy.Comments: I share this because the government said it was not my actions on 1/6/21 that were the most concerning, it was my speech after 1/6/21... They've targeted me mainly because of my speech... They threw me in jail because of lies(they broke the BRA), and to punish me for my speech...Section 7: United States V. Gutierrez-Gonzales, 184 F.3d 1160 (10th Cir. 1999) Background: The Defendant, Mr. Gutierrez-Gonzalez, was convicted of reentry subsequent to deportation following an aggravated felony (second degree murder), in violation of 8 U.S.C. 1326(a)(1)&(2) and 8 U.S.C. 1326(b)(2). On appeal, Mr. Gutierrez-Gonzalez alleged that the district court erred in not considering his defense of entrapment by estoppel....Why the court denied his entrapment by estoppel defence: 1) Mr. Gutierrez-Gonzalez received and signed an Advisal of Penalty for Reentry Form informing him in his native tongue of the penalties which can be imposed should he return to this country after deportation without obtaining permission from the Attorney General. 2) Gonzalez then for a third time illegally entered the country, without obtaining permission from the Attorney General. Upon applying for a work permit, he was told that they could not give him a green card. He then shared that he knew he was in the country illegally.3) Mr. Gutierrez-Gonzalez then applied for a

change of status (not with the Attorney General) and lied by saying that he never was deported. He then signed the form, certifying "under penalty of perjury . . . that this application, and the evidence submitted with it, is all true and correct."4) Mr. Gutierrez-Gonzalez (still in the United States illegally) then took his application for adjustment of status to an INS office in Texas, for processing. When submitting the application, he told the INS clerk that he was in the United States illegally. Regardless, the INS clerk issued him a work authorization permit (Form I-688B). However, the clerk specifically informed Mr. Gonzalez that the work permit was not an entry document.5) Gonzalez was found by agents after being placed in jail for committing more crimes. He was then charged by boarder patrol agents. The statute under which Mr. Gutierrez-Gonzalez was convicted states in relevant part: ...The statute expressly excludes any specific intent regarding entry into the United States and makes it a crime for a deported alien to be found "at any time" in this country "unless" he has the "express" consent of the Attorney General. "nothing more than a showing of general intent is required" and "the government need not show that defendant willfully and knowingly engaged in criminal behavior, but only that the defendant's acts were willful and knowing that the defendant willfully and knowingly reentered the United States and that he did so without the Attorney General's permission."...by excluding a specific intent requirement, Congress placed the burden of correctly obtaining permission from the Attorney General and reentering the United States legally on the alien.6) Gonzalez does not challenge the fact that the government proved every element of the crime required by the statute: that Mr. Gutierrez-Gonzalez was (1) knowingly in the United States, (2) without the permission of the Attorney General, (3) after prior deportation for an aggravated felony. Rather, Mr. Gutierrez-Gonzalez argues that the government should be estopped from prosecuting him because an "agent of the government" led Mr. Gutierrez-Gonzalez to believe that he was in the country legally. Mr. Gutierrez-Gonzalez contends that he reasonably believed he was in the United States legally as a result of his interaction with Diocesan Services and the issuing of a work permit by the INS. 7) Diocesan Services is not licensed by the government. It is not a government agency.8) Finally, Gonzalez argues that the INS "affirmatively misled him as to the state of the law" and that he "relied on that misrepresentation," when the INS clerk issued him a temporary work permit.... Gonzalez did not inform the INS clerk that he had previously been deported from the United States. Rather, Gonzalez submitted a fraudulent application that affirmatively stated that he had never been deported. The INS clerk specifically informed Mr. Gutierrez-Gonzalez that the work permit "was not an entry document." Under these facts, even if an INS clerk could be considered an "agent of the government" charged with interpreting, administering or enforcing immigration law and the actions in this case considered "active misleading" as to the state of the law, Mr. Gonzalez's alleged "belief" that he was in the United States legally was not reasonable.Overall Comparisons: For me to be in a semi-similar situation as Gonzalez I would've had to: have been convicted of trespassing into the Capitol twice, have been also convicted of murder while inside the Capitol, and I then would've had to sign a document stating "I agree and understand that I'm never to enter the Capitol again unless I get written permission from the Attorney General himself, and that no one else may give me that permission, no matter their actual or apparent authority". I'd have to then go into the Capitol a third time, clearly knowing I'm not allowed to legally be there. I'd have to have even stated this to others while inside. Then I'd have to commit perjury when asked if I've ever been arrested in the Capitol before. I'd then have to be arrested for committing a separate crime in the Capitol.

Then I'd have to claim that some lady who doesn't work for the government told me I could be in the Capitol, even though there was clear evidence that she didn't say such things, and that I even shared that I knew I was breaking the law... Finally, like Gonzalez, I'd have to be charged with a statute that doesn't require any intention of wrong doing to be convicted... Clearly, my case is nothing like this and no judge, even on heavy drugs, would ever come close to thinking that man deserved an entrapment by estoppel defence. It is sad the government chooses cases like this to suggest that you too should deny my entrapment by estoppel defence. Clearly, they have no valid arguments! Pathetic!Section 8: Garcia v. Doe, 779 F.3d 84 2nd Cir.The government cites this case as to why I should be stopped from arguing that law enforcement inaction made my conduct on January 6th lawful.I'm not suggesting that police inaction made my conduct lawful. Entrapment by estoppel doesn't make illegal actions lawful, it eliminates criminal liability even if all the elements of the charges are met.With that out of the way, the government points out that in Garcia, the entrapment by estoppel defence was not allowed despite that those charged argued their conduct had been implicity approved by police, but could not show it was affirmatively approved by police.Before I point out the differences and problems with this case comparison, please take note, the 2nd circuit appellate court multiple times were leaning towards allowing such a defence despite these circumstances (see there 2014 ruling on this case), so this wasn't so simple for the 2nd circuit, and the District court thought the inactions were enough to warrant this defence (even though it had less compelling circumstances than my case). But, as my comparisons will show, my case is much stronger and very different from the Garcia case. 1) The 2014 court affirmed the judgment of the District court because the court could not resolve at this early stage the ultimately factual issue of whether certain defendants implicitly invited the demonstrators to walk onto the roadway of the Brooklyn Bridge, which would otherwise have been prohibited by New York law.Note: The court was willing to accept the potential that police had given the implied permission to protest on a highway/bridge, despite that normally, they clearly wouldn't be allowed to.Comparison: A high-way is rarely thought of as a place we have a right to protest on foot. Compare that to the Capitol building, a place so confusing the Capitol Police and Circuit courts made it a point to not arrest people prior to warning them of arrest, and a dispersal order. It arguably is the most confusing area in the world. Many people are confused over what they are allowed to do, even locals. You can't say the same for a highway. Almost all citizens have experienced a high-way, there is not confusion over whether people are allowed to protest on it, let alone block it. The protesters entering the highway would've had no purpose of entering it other than to cause chaos. Most citizens have never been to the Capitol, indeed, even many locals have never been to the Capitol building. Unlike me, I was entering what I thought I had a personal right to, and in order to protest, what many people go to the Capitol to do! 2) On October 1, 2011, thousands of demonstrators marched through Lower Manhattan to show support for the Occupy Wall Street movement. Although no permit for the march had been sought, the New York City Police Department was aware of the planned event in advance.Comparisons: Our group had a permit to march to the Capitol, and if I recall (it's been over a year since I had this particular discovery (DC jail stole it)) to protest on certain areas of the Grounds.3) When the march arrived at the Manhattan entrance to the Bridge, police, including command officials, and other city officials watched as the protesters poured across Centre Street towards the Bridge. A bottleneck soon developed, creating a large crowd at the entrance to the Bridge's pedestrian walkway. While video footage

suggests that the crowd waiting to enter the pedestrian walkway blocked traffic on Centre Street, defendants do not contend that they had probable cause to arrest plaintiffs for their obstruction of traffic at that point, as opposed to their later obstruction of traffic on the Bridge roadway (Because no order of dispersal was given). Indeed, plaintiffs alleged in their Complaint that the police themselves stopped vehicular traffic on Centre Street near the entrance to the Bridge before the majority of the marchers arrived at the entrance.Comments: This was an understandable action taken by police because unlike what would happen later, it would appear this bottle neck was not a purposeful action caused to create chaos or interrupt traffic. I also added in the fact of why police did not have probable cause to arrest the protesters over this because no dispersal order was given, which like in DC and the Capitol is required prior to arresting protesters/ groups of people.4) While a steady stream of protesters continued onto the walkway, a group of protesters stopped and stood facing the police on the ramp constituting the vehicular entrance to the Bridge at a distance of approximately twenty feet. By this time, a large crowd of demonstrators had pooled behind that lead group. Given the size and density of the crowd, it would clearly have been impossible for vehicles to enter the bridge using the ramp at that location. At this point, all the video evidence confirms that the march had divided; one group was proceeding across the Bridge via the pedestrian walkway, while a second group had moved onto the vehicular roadway, where they were blocked by a line of police.An officer on the vehicular ramp stepped forward with a bullhorn and made an announcement. The officer can clearly be heard repeating several times into the bullhorn: "I am asking you to step back on the sidewalk, you are obstructing traffic." Plaintiffs allege that these statement were "generally inaudible," and the video excerpts they have provided are consistent with that allegation. Two minutes later the same officer announced into the bullhorn: "You are obstructing vehicular traffic. If you refuse to move, you are subject to arrest," and "If you refuse to leave, you will be placed under arrest and charged with disorderly conduct." While it is clear that at least some marchers at the front of the crowd heard this announcement, plaintiffs allege that the officers knew that their warnings or orders to disperse would not have been audible to the vast majority of those assembled. There was considerable noise and confusion at the scene.Comparisons: In Garcia, the police first gave a dispersal order and a threat of arrest, something that officers did not do for me. Further, it would appear that the plaintiffs, though not able to hear the police, would've recognized a few things. First, that the main part of the protest/ approved part of the protest was going the opposite way. Second, this was not the protest plan (unlike our plan, to march to the Capitol). Third, that police were instead of guiding them towards their known destination (as they were earlier), were now facing them and probably pointing to go the other direction. Again, a common person would know that they have no 1st amendment right to block traffic to a major bridge in NYC. The same can't be said for being allowed to protest in the Peoples house as a United States citizen.5) A minute and a half after the second announcement, the officers and city officials in the lead group turned around and began walking unhurriedly onto the Bridge roadway with their backs to the protesters. The protesters began cheering and followed the officers onto the roadway in an orderly fashion about twenty feet behind the last officer. The protesters on the roadway then encouraged those on the pedestrian walkway to "come over," and the videos show several protesters jumping down from the pedestrian walkway onto the roadway, though for the most part the marchers on the pedestrian walkway continued their progress on the walkway and did not enter the vehicular lanes. Protesters

initially walked up the Bridge via the first (northernmost) entry ramp, but they eventually blocked the second and third ramps as well and occupied all of the Bridge's eastbound traffic lanes, preventing any cars from moving onto the Bridge in that direction.Comparisons: Unlike in my case, the present protesters in Garcia were given a second order to disperse. I was given none, and told the opposite. Again, it is clear, there would be no 1st amendment rights confusion over pedestrians being allowed to block the Brooklyn Bridge.6) Midway across the Bridge, the officers in front of the line of marchers turned and stopped all forward movement of the demonstration. An officer announced through a bullhorn that those on the roadway would be arrested for disorderly conduct. Plaintiffs allege that this announcement was also inaudible. Officers blocked movement in both directions along the Bridge roadway and "prevented dispersal through the use of orange netting and police vehicles." The officers then methodically arrested over seven hundred people who were on the Bridge roadway. Comparisons: Unlike in my case, officers then gave a third warning through a bull horn to protesters on the road blocking traffic. Again, I was given none, and in fact, was told the opposite.7) Nevertheless, plaintiffs do not allege that any officer explicitly stated that the marchers would be permitted to advance along the vehicular lanes of the Bridge. Nor does any plaintiff allege that he or she observed any officer beckon to the demonstrators or state by word or gesture that they were welcome to proceed. Comparisons: This is also a major difference. Unlike the plaintiffs in Garcia, I have shared that an officer gave me explicit/ express permission to be in the capitol, protesting as I was/ others around me were. I've also shared that he told me how far I could go, when I had to leave, and gave additional rules. I've also, unlike the plaintiffs in Garcia, shared that I observed body language and facial expressions, and even other factors that supported that the police were letting us in. Unlike in the Garcia case, the in-actions I witnessed go to support my other claims, where as Garcia only had inactions to rely on. The inactions alone caused the District court to say they were estopped (see #8), and caused confusion for a while in the 2nd circuit. My case would have not been so confusing, and given its strength in the areas that caused the Garcia case to throw away the entrapment by estoppel defence, the same would not have happened for me. The two cases are very different.8) The district court held that the allegations in the Complaint, if true, established that a reasonable officer would have known that he did not have probable cause to arrest plaintiffs. The district court further held that while plaintiffs had clearly violated the law by entering the Bridge roadway and blocking vehicular traffic, based on the facts alleged, no reasonable police officer could believe that plaintiffs had received fair warning that their behavior was illegal, as required by law. The district court concluded that while New York's disorderly conduct statute would normally have given protesters fair warning not to march on the roadway, it did not do so here, where defendants, who had been directing the march along its entire course, seemed implicitly to sanction the protesters' movement onto the roadway.9) It cannot be said that the officers here disregarded known facts clearly establishing a defense. In the confused and boisterous situation confronting the officers, the police were aware that the demonstrators were blocking the roadway in violation of § 240.20(5). They were also certainly aware that no official had expressly authorized the protesters to cross the Bridge via the roadway. To the contrary, the officers would have known that a police official had attempted to advise the protesters through a bullhorn that they were required to disperse. While reasonable officers might perhaps have recognized that much or most of the crowd would be unable to hear the warning due to the noise created by the

chanting protesters, it was also apparent that the front rank of demonstrators who presumably were able to hear exhibited no signs of dispersing.Comparisons: Unlike in Garcia, the Capitol police clearly were allowing such conduct. It had been expressed through various channels and ways. There was no bull horns used to order a dispersal where I was despite that in the 1970s they (Police and DC circuit) knew that even a bullhorn was too weak to reach huge crowds and had a giant sound system to reach large crowds over the roar of the crowd.10) The Complaint and videotapes are devoid of any evidence that any police officer made any gesture or spoke any word that unambiguously authorized the protesters to continue to block traffic, and indeed the Complaint does not allege that any of the plaintiffs observed any such gesture.Comparisons: Just in my direct videos, there is tons of evidence that police officers made gestures and spoke words that authorized or supported the idea of authorization that we were allowed to enter, remain, protest as we were, and even go further into the building. The plaintiffs in Garcia don't even allege such things, let alone have any evidence for such claims.11) Plaintiffs rely on the Supreme Court's decision in Cox v. Louisiana to argue that, in light of their apparent earlier passivity in the face of the march, police officers had to provide the protesters with "fair warning" before changing course and effecting any arrests. See 379 U.S. 559, 574, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965). But the facts of that case differ significantly from those at issue here. In Cox, a large group of demonstrators protesting on the street opposite a courthouse were arrested and charged with violating a statute that prohibited "picket[ing] or parad[ing] in or near a building housing a court of the State of Louisiana." Cox, the leader of the demonstrators, testified to an explicit conversation with police officials in which he had been given "permission" to conduct the demonstration on the far side of the street, some 101 feet from the courthouse steps. Comparison: The reason the court denied the Garcia plaintiffs to claim similarity with Cox was because Cox was given explicit permission from an officer he had a conversation with to protest where he was, as he was. Unlike the Plaintiffs in Garcia, I too testified to having a conversation with an officer who gave me permission to protest where I was, where I would go, and as I was/ others were. Not to mention all the other factors shared above and below in the other comparisons.12) The circumstances in this case are quite different. Unlike the "unspecific" statutory command in Cox , § 240.20(5)'s prohibition against obstructing traffic is hardly vague, and it would have been clear to any person (and certainly to a reasonable police officer) that the protesters were occupying a location where they were not ordinarily permitted to be. Comparisons: Again, who thinks they are welcome to occupy a highway on foot for a protest? No one. Who thinks they are welcome to protest across the street from a court house? Most people who live near that court house. Who thinks they are welcome to protest inside The Peoples House? Most people in the United States.13) Also unlike Cox , there was no explicit consultation between the leaders of the demonstration and the police about what conduct would be permitted. Comparison: As I've testified to, I had an explicit consultation with an officer about what conduct would be permitted and not permitted.14) Nor was there any express statement from any police official authorizing the protesters to cross the Bridge on the vehicular roadway, opining that doing so would be lawful, or waiving the enforcement of any traffic regulation. Comparison: Clearly, the police were authorizing people who were protesting where I was, as I was, and when I was.15) Most importantly, no plaintiff alleges in the Complaint that he or she heard any statement from any police officer authorizing the protesters to cross the Bridge via the vehicular roadway, or observed any unambiguous indication from any police

officer inviting the protesters to cross the Bridge in that manner. Nor is any such statement or gesture recorded in the videotapes submitted by the parties and incorporated into the Complaint by reference. Indeed, most of the plaintiffs allege that they did not see anything the police officers did, and simply "followed the march" as it proceeded across the Bridge.Comparisons: Again, unlike plaintiffs in Garcia, I do allege such things, and have evidence for such things on video. Even supportive gestures are shown in my videos. Unlike plaintiffs in Garcia, I first observed police prior to entering rather than just following the crowd into the building and taking the crowd at their word that the police were letting us in.16) An officer still has probable cause to arrest, and certainly is entitled to qualified immunity, so long as any such defense rests on facts that are so unclear, or a legal theory that is not so clearly established, that it cannot be said that any reasonable officer would understand that an arrest under the circumstances would be unlawful. Reichle v. Howards, ⸺ U.S. ⸺, 132 S.Ct. 2088 2093, 182 L.Ed.2d 985 (2012) ; see also Messerschmidt v. Millender, ⸺ U.S. ⸺, 132 S.Ct. 1235 1244, 182 L.Ed.2d 47 (2012).Comments/ Comparison: I share this because I want the court to be reminded what the DC circuit court said in Barham V. Ramsey (and also in Carr V. District of Columbia/ Dellums V. Powell) when the police chief knew that a dispersal order had not been given to the people prior to arrest. The DC circuit said (unlike in Garcia) that the police chief knew there was no dispersal order given, and yet arrested them, which not only caused the criminal charges to be dismissed, but caused him to lose his qualified immunity in that case. My case is similar to the Barham case in that no dispersal order was given to me/ around me. In fact, it's even more extreme because I received express permission to do what I was doing and had many officers further support that through implied actions and inactions. The Barham recognized that DC (the park in this case) is a confusing place regarding 1st amendment rights, and that no dispersal order was given. Barham officers made more clear failures than Garcia, and the officers in my case made more clear failures than in Barham. My case and the Garcia case are very different.17) As a matter of law, Cox establishes that, under some circumstances, demonstrators or others who have been advised by the police that their behavior is lawful may not be punished for that behavior. The extent of that principle is less than clear, and we need not decide here how far it might extend.Comments: Unlike in Garcia, it is clear the agency was allowing certain conduct, and it is also clear that I was given permission to do what I was doing. Very different cases.

Motion 2 of 7, Part 5 of 518) Plaintiffs also rely on our holding in Papineau v. Parmley, 465 F.3d 46 (2d Cir.2006), which denied qualified immunity to officers who arrested peaceful protesters without first giving them "fair warning" through an order to disperse. Papineau is inapposite, however. In Papineau, plaintiffs were protesting on private property bordering a public highway when a handful of protesters briefly entered the highway to distribute pamphlets. Once all participants were back on the property, police officers entered and began arresting protesters indiscriminately and without advance warning. Because the protest in Papineau occurred on private property and posed no danger of "imminent harm" at the time of the arrests, plaintiffs neither needed permission from the police to engage in that protest nor, absent clear orders to disperse, had any notice that they might be engaging in unlawful conduct.Comparisons: Though the situation involves private property, I want to point out some quick things. The protesters in Papineau were protesting mostly in an area where they had a personal interest and ownership

in. The protesters in Garcia cannot claim the same for a highway. However, Capitol Police recognize that many people believe that they too have an interest/ ownership in the Capitol building similar to that of their own personal (but shared) private property, hence the name "The Peoples house", and the chants of "Our house". Additionally, as mentioned, those in Garcia had 3 separate dispersal orders prior to arrest, I and those in Papineau did not. Finally, unlike both cases, I was given express and implied permission to do what I was doing by police.Final Comment: Our (protesters who were protesting as I was) grant of permission could be shown by officers not arresting any of the protesters there around me whether the protesters out numbered them, or vice versa. It is also shown in other areas of the building where police vastly outnumbered the protesters, they did not arrest many of them. Almost all arrests made that day were from violent protesters, or those who broke curfew. The arrests for those who behaved as I did were made between the next day, all the way to the following years after the incident, and by an entire different agency (FBI). In the Garcia case, though vastly outnumbered by a court described hostile crowd, the arrests were made at that point. The agency quickly made it clear that such actions were not being allowed. I did get express permission, and later I got directions to go further into the building. These protesters did not get permission, nor did they get directions to go further down the bridge ramps/ highway... That is why (along with the many other factors expressed in previous numbers) the Court did not allow an entrapment by estoppel defence.Part 5:Entrapment By Estoppel Related Motions:1) For the government to explain why both MPD and capitol police didn't order a dispersal near me/ for me, nor share the laws I was breaking, nor give me time to disperse after hearing that I was breaking those laws. (See Part 4, section 2, #1)1.1) Both MPD and Capitol police know not doing so has caused cases to be dismissed and/ or for the officers to be sued/ lose their qualified immunity (See Baram, Dellums, Carr, etc.). It's their duty to explain and do such things prior to arresting anyone involved in a demonstration or riot. In cases where they have failed to do this the charges have been thrown out and/ or the convictions have been thrown out. (See Part 4, section 2, #1)2) To have a hearing (adequate notice please, unlike your surprise and unrequested bond hearing 10/12/21 you gave me) to determine if my arrest was proper since MPD and Capitol Police failed to do their duty in giving me a dispersal order, telling me what law I was breaking, or giving me adequate time to respond to such information. (See Part 4, section 2, #1)3)To dismiss my charges since both MPD and Capitol Police failed to do this/ their duty.3.1) The government has the burden to show that this was done for me. Worse for them, they know I have multiple videos to show officers doing the opposite of telling me to leave or that I was breaking the law. (See Part 4, section 2, #1)4) Motion to include the Dellums court Jury instruction on the matter of a dispersal order:Comments: The jury instruction can be shown in Part 4, Section 2, number 16. 5) Colloquy into why the officers who moved the gates/ barriers and let people pass couldn't be identified when there was a maximum of 4,000 officers present yet they were able to identify people in the crowd with masks on from every state out of hundreds of millions of people.6) Motion to admit officers body camera footage purposely being turned off when trying to cover up speech about their misconduct and being set up by their superiors.Comments: This footage helps support the entrapment defence, and is an aid to the potential of entrapment by estoppel defence.7) Implied should be added to jury instructions: see Dellums number 8, dc cir court in Dellums8) Motion to know if any capitol police or MPD officers were also employed or compensated in any way by the FBI8.1) My

arresting officer was both a state trooper and FBI agent. I'm wondering if others were also employed by the FBI. If so, I'd also motion for their body camera footage to see if like other undercover agents there that day if they too were inciting people or making them feel welcome in the capitol.9) To admit testimony/ proof of 20 undercover agents being present with proud boys on 1/6/21(increased chances for entrapment/ entrapment by estoppel).10) To present statements of William Popes prosecutor admitting undercover officers were acting as provocateurs (increases the chances that some uniformed officers may have had goal of allowing protesters in.11) To be able to show times givermnet lied so jury can decide if they are trustworthy: 10/12/21, 2/14/22, 4/14/22, 3rd revocation hearimg, 2md revocation hearimg, 1st revocation hearing, Protective order debate hearing in 2021.


Notes I need sent to me or to someome that can gove to me...Questions for capitol police notes (yet ro be organized/ finished): 1) (open up CL:3, E-B-E-19, #2) I'd like to read you somethig. and ask you questiins as we breifky read alomg, are you ready? (Once I'm ready with that opemed i then state): "okay, these are quotes from a coirt focusing on arrests stemmimg from the case of Baram V. Ramsey in which I see great simikarities in police actions and failures, I wamt to see how you and yoir agency to the best of your kniwledge acted differently or simikarly... S: "In the weeks leading up to the pritest, MPD's civil disturnance unit braced for an influx of protesters." Q: Now, do you recall when Trump posted his now famois tweet that essiemtially said 'Be in DC, will be wild'? (About 2 weeks prior to the 6th)... Q: Do you personally remember or are you aware of Capitol police being aware that this protest was going to happen on the 6th? Q: Did you personally prepare or are you aware of your leadership preparing for an influx of protesters? Q: how did you all prepare for this?Q: are you aware if you yourself or if leadershio knew that there was a high potential for violence at this protest? (I've read reports that capitol police and other ageniciies were bombared with such news and warnings), Q: What sort of preperatiins are tyoically made in hearing of a large amount of protesters at rhe capitol, espeshailly if there is intelligence to suggest that thise protesters are going to inclined to violence? (Dom't read rhis, read past parenthesis: Hard gear):.... Q:Do they get issued helmets? Q:Why did so many officers not have helmets (In the famois first line breaching where Ryan samsul amd others cross over I didn't see any of tuose officers with helmets? Q: Do they get gas masks Q: Why did so many offiicers not have gas masks (in that same video I didm't see any gas masks)? Q: Do they have armour/ hard gear on? Q:Coukd you explain what hardgear consists of to myself and the jury? Q: Why did so many not have hard gear on (in that same video I didnt see any hard gear on)? Q: do they have radios with effective comincatioms/ channels in place?Q: why were so many capitol police complaining about not neing abke to get in contact or find anything out? Why did so many nit have radios?Q: Do they have all units called up? Q: Were all officers present/ called up?Q: Do they have bull horns? Q: are bull horns so,etimes used to issue disperal or cease amd desist orders?Q:Why were no bull horns around/ used? Q:Where were they? Q:Where are they nirmally held? Q:Why couodnt anyome find them during this particular protest/ riot? Q: Why werent they prepared to be used? (Statement): Nkw in 1970, over 50 years ago, the Capitol police shared in Dellums V. Powell that they bought a massive and insanley loud sound device to deal with massive pritests called the sound curdler which was comverted from a Brinks wagon, it was made to reach protesters far and wide, even

over thousands of peopels screams and roars, specificially to ensure they coukd hear orders to disperse simce they had heard complaimts that often times people coukd not hear dispersal orders from bull horns in loud demomstrations... Q: Now, that was over 50 years ago, and technogy in all areas espeshailly in audio equipment certainly has advanced, does the Capitol police have anything more powerful than a bull horn to aid with orderimg a very large and loud crowd to disperse? (No): Responce: the capitol police of 1970 recognized this was a majir issue, why if we are to learn from history wouod you nit have such rechnklogy?(Yes): Where was it?.... Why wasm't it used/ prepared if Capitol Police kmew well in advance of a latge amoitn of people comimg and that they may be violemt or prone to breaking laws?Q: are there other barriers ypu had aside from small and short bike racks?Q: did ypu habe enoigh pf these to wrap around the buikding? The grounds? (If yes, why wasn't this dome?")Q: what aboit barricades, I now know that some bike racks were used, but they didm't wrap around the capitol, imstead there were only random poimts in which as yoir own officers have stated were able to be easiky walked around... Was there more that coupd have been done with barriers given all the warnigns and time that capitol police had to orepare for this portest? Q: why wasn't more done on this front?So, to conclude this comparison, in the Baram V. Ramaey case, the DC MPD properky prepared for am infkux of protesters, wouod you say givem what happemed amd what we've discussed that Capitol polcie properly prepared for an influx of protesters with warmkmgs that it may be violemt? Okay, so, now I'm going to read another qiote from tuat case and ask you some more questions.S: "Ramsey commanded the department throughout the pre-protest planning and allegedly told members of his staff that officers shouod overlook minir violatioms of the law in order to accomadate protesters." Q: Were you aware of anyone in the Capitol police being told prior to the protest that officers should overlook minor violatioms of the law in order to accomadate protesters?Q: were you aware of anyone in the Capitol police being told during the arrest that officers should overlook minor violatioms of the law in order to accomadate protesters?Q: do you think given all of the evidemce and viral videos of Capitol police not doing anything to many protesters that it's possible that such similar orders to overlook minor violatioms of the law in order to accomadate the protesters was given?... To anyone?... How can you be certain? How certain are you of that? Q: even though mPD officers themsekves recognized that you guys were allowing us in? ... play video...Q: even though MPD recognized you were not stopping us from protesting / "doimg whatever we want (as ome officer put it)?... play videos...Q: then coukd you explain these videos( play me inside, me talking to officer near desk, jeff merkeleys room, officer i got directions from, officers in cryot, offficers not saying anything on way oit, officers with no helmets, Q: coikd you explain these videos that i didn't personalky witness (play videos of capitol police inside allowing protesters to enter, walk around, protest, go to the bathroom, high fives, thumbs up, etc.Q: can you tell me of your command structure slowly( so I can write it down to review it), starting from entry level all the way to the top...Review top ones,... Q: now, starting from the top, I'm going to ask you if you heard any orders to suggest that you gusy should let us do wjat we were doing, I want you to tell the jury hiw certain you are that no orders came from those people, Q: was the radio workimg well that day? Q: How many officers were you around?Play videoFollow up/ review of answers ask officers at trial if when they lock it down there is an option to lock the doors via the magnets that clearly are more powerful than any lock. If so, why didn't anyone do that?

Motion global discovery notes 1 of 3: Brandon Fellows Global Discovery Detailed List(90k chartecters)Each title is a space, each section is a space, amd each number is a space.***Need print out for trial*** video listSection 1:Title: Mah02954.MP4, ID: Laura Brickman video-UWT, around 237pm, 1 minute 8 seconds long1) .05, officers saying nothing, black officer says "treat this place with respect guys2).13, ... "what is about to happen?", Officer:"what?", "I'm press", Officer:No you can't come in, nobody can come in."... play in slow motion, more funny3) .36, protester asks "are you letting us through?" Black cop: "no... I'm asking you guys to leave, I'm asking you guys directly to leave"... stays silent after saying that Breach point about 150-300 ft away from where I entered: Journalist is walking into the capitol to observe what is going on, unknowingly to officers at first. As she walks in the African American officer smiles and says "treat this place with respect guys"... Comments: speak on how welcoming the officer is and happy then show this woman bring up that she is press to another capitol officer in group, asking what is going here "what! No, you can't come in, nobody can come in!".... camera then pans to protesters coming in and going up the stairs, then back to the officer..Comments: bring up how worried he now seem, "crap, they see me letting these guys in"... notice his twitchy face and hands, notice his facial expressions... Now, the regulations state they are suppose to tell us of a law we are breaking prior to arresting us, but they did the opposite... finally, bring up how government for over 2 years claimed it was out of the question to suggest officers were letting us in/ making us feel welcome., resort found no wrong doing, how convienant. That way they can claim they investigated and found no police welcomed us in so they could continue their narratives.Section 2: Title: 01/06/2021-STOP/FRISK-1400 Independance ace..., ID: 210025531, 2100255, Axon Body 3: x6039B396, 29:44, Shawn Rooney1) 3:54: lead woman officer in Rotunda "I told him (Capitol police) there's 200 people coming in through that door, 1 came in and punched me in the face, they (Capitol) said 'Fuck you we have no resources!' This is their Capitol, what the fuck!" 2: 4:15 "Where is the Capitol boss!?"Section 3:Terrance, Watford: Coc, misconduct:1) inside crypt at 4:39 pm. Complaining about crowd numbers... said 1 minute earlier "like fighting a tsunami" 2)start off at 6:37, "They outnumber us... Fuck it, let em in this bitch at this point, rebuild it" 3) 7:37, "I was trying to break their fingers" (on fence area with baton)4) 8:58, "I'm ready to pop a mutha fucka for real", other officer: "no bullshit (x2)", "it's taking everything in me not to...BOP..."Section 4:John Stadnik: 17:54/ 03:31:41/ 2:42:42pm1) 17:46/ 2:42:34 pm (one gun shot is heard), seconds later officer says to guy on left "This is how democracy dies, the sound of bullets" end time 2:42:41/ 17:532) officer next ti him says "fuck"3)Section 5:Thomas Miller (4149), video axon body 3x6039BA52, 2nd video/ 2:57 pm, 34:11 long1) 16:09, Officer is asking if they have any munitions in reserve, but shares that "they want3d em back, we gave em back", "Great..." 2) 18:23, cop asks other cop "where's charles allen at?", "I don't know who that is.", "The one who voted to get rid of all our shit."Section 6:Thomas Miller (4149), video axon body 3x6039BA52, 3rd video, 1:24:24 long,1) 25:20, Miller is explaining to officer how Capitol officer shot a woman through a window in the neck and killed her", "Fuckin idiot (think talking about officer)", 2) 26:00, he continues to tell 5 other officers, they are all disgusted, one says "That's not cool", another says "was she armed hopefully?"3) video ends with officer sharing Ashley Babbit was shot through a window in the neck, officer near RCO face lights up (:D) as he says "ouuuuuuu!", the RCO then points to his own camera after tapping that officer on the shoulder, then the "ouuuu" officer looks right down at his camera and begins to put his hand on it but realizes that would be too obvious, so

he jerks his hand away and pretends to yawn, then this video ends...Section 7:Timothy Dumont: 3:17 long1) 2:41:01, walks from behind and passes chansley, dough jenson, and long haired yellowish hoodie guy, and capitol officer I asked about no helmet is 10' away from Chansely2) 2:41:28 (1:58-2:12) Protester to metro cop "They (Capitol police where I would soon enter from) just said 'let em go, let em go, let em go", at 2:10-2:12 another protester said "They were letting us go through."Section 8:Riezinger, earliest vid, 29:33 long1) entrapment aid: other capitol cop: "you want to talk about getting caught with your pants down!", Riezinger: (sarcastically) "Wow! If only we had some warning that this was gonna happen", he couldn't even finish his sentence because he started laughing.2) 23:39, shows different view of Luke Foskett smiling as protester walks by "Heh, feel free walk by"3) 23:59, Riezing laughs and says "Ha Ha, just people walking around the Capitol building like it's nothing Ha-Ha"4) 24:44, cop says "we are not pursuing no-body"5) 25:23, Chansley and his 2 Capitol police officer escort are calmly walking down steps real close to Riezinger6) 26:33, RIezinger is asking Luke Foskett "So what's the goal right now, is it to get every one out of the capitol?" Luke: "You can't do that until you lockdown the perimeter", Dumont: "You push em out they are still gonna breach, they are still gonna breach if there are still breach points." Then other officer goes to window showing crowd exiting where I entered and exited saying that they may be able to do it soon. All of this happened between 2:50 and 3:01 pm, times I was inside, right near them.7) 3:02/ 28:45 in vid, better view of m cycle capitol officer on phone and off it and then updating the Lt that the watch commander said let's monitor and just not let them trash the place."Section 9:Rarnesha Daniels: 28:04 longWith group under command of Faust and Riezinger1) 5:42, Lt. Tells them at 2:46pm " Hey Hey Hey, fall in, remember, if they over-run, this ain't our house, well, it is our house, but, let them do what they are gonna do, okay? We are not gonna get hurt." They are right above the first entry I witnessed and less than a minute of a walk away from where I entered.2) 7:15, dude calmly walks by police, they say nothing3) 8:00 (2:48 pm), Chansley front and center "Oh women in group! God bless you... You guys got some ovaries of steel, I tell ya!..." looks up to stairs "Hey what up dude!(:D)", continue until 2:49:15, then take note officer asks for cop next to him to step aside so Chansely can pass, he passes while saying "Whose house?" on bull horn (a man dressed as mid evil viking was more technologically advanced than the capitol police were in 2021... even 1970s capitol police had not only bull horns, but super powerful sound curdlers, and even 1960s Louisiana had mobile public address systems and other powerful address systems present for the crowd that randomly sprang up..I what happened to CP's bull horns? Why coukdn't capitol officers find any of them?... ) they let him walk right by, BUT, stop all the others, the entrance to the Senate is where Chnsely just went. He walks up stairs 4) 2:50pm, dough jenson walks up and says something5) 11:59 (2:52:49) officers are giving protesters directions: "This way", "Right down this way", other officer to woman and boyfriend "Hey guys they are all leaving.", "Alright thank you, because we were wondering how to get out haha." , both couple and capitol officer wave at each other and say thank you/ stay safe.6) 2:53:21, officer Dupont: tells them to take their masks off, tells them they aren't using any munitions while inside."7) Skip to 2:54:53, "Somebody deployed somthin over there"8) 2:55:16, other officer tells girls to put their masks on (funny), 9) 2:55:34, woman with black hair makes annoyed facial expressions.10) 2:59:47, Chansley walks by with his famous Capitol police escort right in front of Rarnesha as he says "God bless the men and women in blue", then Humphrey sneezed, chansley says "bless you", she says "thank you". 11) 20:45/ 3:01:36, Metro cops

(women) all talking about how Capitol police are letting them go up there"12) 23:53, 2 women protesters calmly walk by 3 women officers sharing they are going to the bathroom, black haired woman cop points ajd says "bathroom is that way", "thank you", woman cop shrugs her shoulders afterwards, funny. Few seconds later some black capitol officer is saying something about "If they let em stay, we will let them stay."Section 10:Reizinger, 2nd to last video, 27:31long, 3:47pm start time1) He is about 20-30 feet from m-cycle I sat on, it's 4:07 pm, so I'm right near them at this time... 2) at 21:47 a protester can be heard asking "What are the standing orders? What were you guys told to do? Just not let people through or... Keep the peace?... Cause I see people over there, you guys aren't allowed to let anybody past this point I take it."... no ome answers him, he even invited a personal dispersal and didn't get one... this also solidified that people didn't know this area was off limits, no one was telling them it seemed...Section 11:M. Humphrey (super hot blonde cop), 51:49 long1) 8:17/ 2:49:13pm, capitol officer of some higher rank gestures for the women cops to let chansley through (watch his hands)2) 8:27, as Chansley walks by chanting in his bull horn while smiling "whose house?" he in between says "Excuse me ladies"3) 8:35 Dumont stops guy behind Chansley (MPD) and then annoying says "guys, you gotta stop these people", but MPD Lt said to let them through minutes prior, as did the Capitol officer of some rank. This shows did tell protesters they couldn't go in certain areas and that there was confusion among some officers as to what the orders were. Just because an officer claims that they were not allowing others in doesn't make it universal for the others present.4) Doug Jensons full sentence from other vid: "What would happen if we pushed, would you... back up? Were not gonna push hard... (before 17:30)... funny, the orders were if they were pushed by protesters to let them through, Doug may not be the smartest, or, even smart tbh, but this spot on lol.lSecton 12:James Love, 3:21long, 5:17 start time1) 5:17, officer is saying "just need a breather man in safety", literally as he finishes saying that a flash bang goes off like 100' behind police lines next to the building (how could they have missed so badly that police shot the flash bang 100 feet behind at the building where no protesters were at the time?), "well, relative safety", kinda ironic and funny, kinda weird...Section 13:Lt. Issac Huff, 1:15:01 long1) 3:43:29 pm/ 1:14:34, officer next to him tells him "but the thing is they set us up, they didn't have us bring nothin, they was just like '64 come over here, we over there (jokingly and angerly jogs in place as both laugh), came over there like this, woth helmets (no masks), they (Capitol/ others) throwing tear gas and we over there like this (jokingly and angrily swings blindly in random directions), no masks, no nothin!", then reaches towards Huff's camera to turn it off, probably to do the real complaining.2) Nick Brockoff was in his later video towards the end, almost arrested there for having police helmet in possession, "I found it on the ground I swear", "can I please go?", he was sat down as police were doing final clear of area outside tunnel/ end, "now yoir're going to jail, don't move", was let go 2 minutes later.Section 14:Kevin Leitzel, 54:05 long1) 3:20:16, James Grant walks by upper terrace police line,2) 48:12/ 3:21:53 pm, Guy on phone walks by clearly saying "I had a brick and I broke the window", carrying large flag pole, blue jeans, blackish blue MAGA hat, very tall (15-20' tall) blue trump 2020 flag.Section 15:Kevin Veizaj, 2:53:51 long, 1) 2:36/ 2:33:57 pm, short clip of women protesters getting directions from woman capitol police officer despite being on grounds/ grass of the Capitol.Section 16:David Terestre:, 17:06 long1) 12:50-13:00, passenger: "They (command) wanted us back?", Driver: That's what they said", Passenger: Well, they're (protesters) are 3 feet from the capitol, I don't understand that." Then asks immediately after

"your'te still hot right (recording)". This shows that even police arriving to the scene who are semi aware of Capitol grounds policies don't understand why protesters were allowed so close to the building, but the government expects people who have never been there/ lived near it to have known we shouldn't have been there? The police didn't see signs or police lines, or barricades, they simply didn't understand...2) 13:08, Driver puts up thumb in support, then both officers laugh. Then passenger says "I'm not gonna get upset about this, I mean, ya know" ( I think I know, but do others know? Sounds like he thinks it's justified...), then driver says " I think it's fucking hilarious"... passenger laughs then asks "did you see them back there? They had their helmets o. And everything.", Then driver said passenger has to send him video of protesters, "it's hilarious"3) 15:05, Driver: talks about how the current police Chief may he the shortest Chief there ever was (due to being fired for massive failure to properly prepare and handle situation) haha, Passenger: "Poor Patsi"... 4) 16:35, two officers in car: "(Both laughing at the chaos on the police radio?) And the band played on... it's like the fucking Titanic", "Gentlemen, it has been a pleasure playing with you", then guy on radio "we need to get a game plan together", Driver: "(chokes while laughing so hard)", passenger: "(while laughing) "Yeah I guess ya do!", Driver: "(still dying of laughter)" Passenger: "That should have been last week!", Driver: "(laughing, barely able to say:) Yeah, little late for that right about now (still laughing)", passenger realizes camera is still on (touches it/ looks at it than quickly adds in a more serious and less jolly "unfortunately"...."but uh, you know, the curfew just came out, so..." video ends seconds later, doesn't say anything sketch after this...Section 17:Perry Hoak, 12:34 long1) 2:06/ 2:41:23pm, gets on car speaker and says to protesters :"We are on your side, so let us get through (laughs),2) take note, Hoak ends his video when asked to and as shown in other video, Terestre accidently left his on and then they really start roasting how command screwed this up and shared support for protesters/ how it was funny.Section 18:Jemal Averette, 11:00 long1) 3:18, protester to left is the old man who broke the door open with a cane2) 3:43, it's him on close up3) 4:46, he's standing with officers with hands free... everyone else is being pushed out.4) 7:48/ 3:03:14 pm, setting/ background: MPD just helped Capitol clear protesters from door I witnessed broken open... Now that it's secure a Capitol police officer begins asking the officers "You wanna get some more (protesters/action)?", Jemal is like "Hell yeah!"(funny), Capitol officer: "Let's get it!", they start off to a new area... on the way up steps an officer in view (Capitol) asks a Capitol moterycycle officer (same on from Reizinger video) if they cleared the second floor yet... Body language and speech suggests they aren't seeking to clear people... M-cycle says "No, I talked to Bishop, okay? Cause I can't get him on the radio (convieanant, they don't leave a trace on writings/ radio transcribing giving officers instructions to allow protesters to protest/ enter and remain/ obstruct (technically according to the government)), were still gonna have to stand-off in the hall-way, Metropolitan is asking like how hard do you want this to hold, Bishop says just, just, if they push, just let them go, just don't let them fuck up anything"Section 19:Singh Amanpreet, 6:09 long, 2:47pm start time 1) 2:49, best view of Capitol officer telling them to let chansley through, then tries to explain to irritated Dupont why they let him through, Dupont then goes to ask Capitol officer who gestured to let him through about it right after.Section 20:James Albright, 17:13 long,1) 4:55/ 3:07:38 pm, location: Crypt, behind Fanone, I'm in Crypt at this time. Capitol officer in front seen laughing and talking with officers..2) at 5:05 Capitol officer around happy peaceful protesters says "I'm on your side" to one protester3) 5:28, protester asks Albright where the restroom was, Albright:"It's my first

time being in here", protester: "oh really? Haha" this helps show that protesters didn't know the difference between officers, lay out of the building, or that he couldn't be inside.4) 6:13, M. Fanone is to his left complaining about how hot it is: this is an important thing to nite because he just entered the building... I was wearing ski clothes and thick winter rated clothes beneath those and a knited beard hat and was there much longer than he was... I believe this suggests he ended up passing out due to heat exhaustion given that he shared he wasn't hit, he had no marks or signs of injuries when checked out, and given that officers kept shouting "he passes out all the time!"...5) 6:45, guy I helped with water in eyes is yelling at Albright and Fanone: "This is America, and you are on the wrong fucking side!", it's clear he is still the only one that appears to be hostile in the area... he then goes to yell at black cop who asked motercycle officer if second floor was cleared.Section 21:Eric Watson, 20:06 long1) 3:18:50 pm, walking into Crypt (I'm in Crypt at this time), and on right side is a protester smoking weed next to a Capitol police officer while calmly talking to him and nodding his head while listening to Capitol officer, 2) 5:08, Watson walks right by me3) 9:46, Watson asks Fanone: "Did you get hit with somthin?", Fanone: "No, they just pulled me out into the..." doesn't finish sentence...Section 22: Eric Watson, 2nd vid of his, 1:08:05 long1) 8:21/ 3:54:18, Watson: "Yo, Fanone got knocked the fuck out", Other officer: "Dude, he always gets knocked out, he gets knocked out every fucking time..." "every fucking time",2) 11:17, Watson takes a pic of crowd at 3:57:14 from view overlooking crowd on scaffolding and says "never seeing anything like this again"3) 36:45, protester being moved by police as they move to cut outside access to window I entered asking police "What time is it? It's not curfew time is it?" This helps show that people in the area had no idea we weren't suppose to ne there and further supports that we were not told to leave until curfew time. He even asks this officer, inviting a dispersal order, and they don't give him one... He was confused why they were moving him, he felt that prior to that movement they were also allowed to be in the area that police just cut off access to.Section 23:Micheal Fanone 6845, 15:54 long, 3:04 pm start1) goes to Crypt when I'm there...2) 6:58, the guy I put water in eyes yells at Fanone "This is the United States of America, ypur're on the wrong side!"... Fanone literally just walked in 2 minutes ago past toms of protesters being chill, amd its chill in the Crypt... Guy then gets in Capitol officers face, gets pushed by cop amd told to go. 3) 5:02-5:10, cop in crypt talking with 5 protesters in front of fanone, cop makes joke, all protesters laugh4) 5:25, guy with "be there, will ne wild protest" approaches Fanomes partner James Albright, asks him which way is the bathroom, Albright shares its his first time i. Capitol, "really?" Is all can be heard, amd some laughter, see james albright video for better version.5) 8:14, he leaves the Crypt to shouts of USA, towards the end of vid he is in crowd pushing in the tunnel where the most violent people are.Section 24Micheal Fanone, 21:15 long, 3:18pm start time1) go tk him being outside right before he finds the armored green vehicl, he talks about his radio being stolen, cops make joke "tell ? that you gave it to them, you'll get a suspension hahahaha" "they said they were tax payers and that they wanted it back hahahaha" "I told them the thing never works anyways, they didn't believe me, so I gave em the radio haha", Fanone is just lightly laughing2) 18:30ish, cop "knock on wood they seem to be dispersing", "For what it's worth after we got you back they were like "were sorry were sorry, what if we just sit down, would you stop hitting us?" Other cop "haha", RCO: "Dude that scared the shit outta me, like they were tryin to take my gun, I mean I was holding onto my gun with all my fuckin,... for dear life". Section 25:Cole Collin, 11:59 long1) 8:08/ 3:19:00pm, exiting door right around time I exited, protester

can be heard telling cop :Appreciate it, at least letting us come in here."2) James grant is at 6:56Section 26:G Parks, 3:10pm start, 12:40 long1) 0:00 starts off 1' behind chansely, walking him down steps.2) 7:34, Protester: "thanks for the tour guys"3) 7:37, Baked Alaska next to emo James Grant, Alaska is recording everyone but is one of last people in area where I left... "Don't shove me, your're a fucking oath breaker you piece of shit! Fuck you! Fuck you! (I've seen this from Alaska's camera, this is the officer who he was yelling at), James is calm, gestures it's alright/ to remain calm to officers, then walks out door after Alaska does, but, Alaska tries coming back in to yell, James stops Alaska with arm, then calmly says something to near-by police. 4) 10:29-10:31, protester giving fist bumps to cops.Section 27:Christopher Cartwright, 2:03:41 long,6:32: protester told to get back, "But it's our place!"1) 6:50/ 3:15:00 pm, Protester speaks clearly, he shares we arent here to be violent or hurt anybody. This is our house, we want our voices, this is our building... other protester shares "this is our building"... 2) 7:45, 3rd protester says "This is our house", 3) 9:20-9:27, walks by Jeff Merkelys office,4) 9:29, officer opens door to look inside office, keep watching until 9:48ish, Capitol officer calmly escorts protesters out of Merkely's office5) 10:00, more protesters leaving his office6) 10:08, protester screams "we will be back here tommorow, WITH RIFLES!"7) 10:38, protester eating and nodding head chilling with Capitol officer at 10:40, 8) 10:45, Trash can/ Josiah Kenyon high on crack walks by in jack the skeleton onsie, shared he was funded by ANTIFA to come and had a goal of inciting police and Trump supporters so he would get Trump supporters and police killed...9) 11:12, funny scream from my video is heard on this camera11) 12:20/ 3:20:35pm, I'm seen speaking to a Capitol police woman, asking her something, can't make out full sentence... ("normally up/ going up? Alright..", officer walks right down hall way past Capitol woman I was talking to, leads to tunnel...12) 13:30-14 ish minutes in officer is being pulled in, Cartwright goes with passed out officer, it's Fanone, RCO removes Fanones helmet. 13) Is with fire arms instructor S. Chih, they then leave and head out door where famous "no you can't come in video was recorded and meet up with other ERT members (Fauster, Reizinger, and Dumount), they are all talking about how this is similar to the movie "we were soldiers". 14) 49:25, officer: "They are in there! Like comin out of offices!", "There's a ton of them in the basement fuckin up offices right now (Watson)", "They in there right now, and one of them in the Rotunda like 'Yeah yea! Ra-Ra-Ra", Rco": "Yeah-our house"(watson), RCO "and Capitol (police) just standing around like this", "Watching?", Rco "Yeah"..."Cause they don't want none of it", Watson: "That's what we should do, 'You're on your own'"15) 50:13, Reizinger telling RCO that "they shot and killed someone in the Capitol"... RCO: "So we got a murder, ok"... (Reizinger shares an agency shot them and he relaxes)16) 1:05:27, Foster points to Reizinger and says "This guy is probably like 'Yeah, this is great, haha'"17) 1:09:30, RCO is quietly saying prayer for protesters... idiolizing country... they try to overthrow and rebel.... in Jesus name move in lord God, I trust in You Lord God, no matter what You do, no matter what happens, I trust in You" (at 57:00ish he was talking about how similar spirit as BLM, similar talking points)... I sorta agree, these people do argue and act like a right version of BLM, not all, but many...1:10:45, officers talking about how police killed a female, RCO says "ohhh boy.", other says "That's not good", RCO: "Once they(protesters near them (I'm near them)) find out about that...", other officer: "Oh they (protesters near Ashley/ East side) knew over there..." RCO asks what circumstances were, "She breached through a window..." RCO: "Ohhh, okay... That's not good"18) one of first videos I watched of officer asking "how many kids you got after final push before curfew, this RCO is the officer he

was talking to.19) 2:00:23, officer: "I kind of like the revolutionary music, it's kind of funny" (protester is playing loud revolutionary music).Section 28:Kyle kimball 8821, axon body 3 video 2021-01-06 1621, ID: 21002555, 21002377, 7:51 long, 4:21 pm, tags: internal investigation, CoC misconduct1) 2:00, 4 people still in Crypt chilling near cops on bench, no handcuffs2) 5:09, RCO "Hey did you (not understandable)..." cop points to camera immediate,y, RCO stops talking, looks away, 3) 5:18, RCO: "Fuck", keeps walking4) sounds like "Hey did you go under your desk.... something..., both cops turn walkies up a ton after, in elevator turn it up even more before RCO begins to whisper to other cop.... sketch... 5) 7:47, RCO: "Fuck this I'm done" turns camera off..... Section 29:20210106-Riotous Acts-US CAPITOL COMPLEX, 1:58:31 long, 1:03 pm start time, axon body 3 X6039BFYE, Jacobi Crawley 11496, 1) 10:15, RCO: "Oh shit they got da paint balls out!" "Looook! (X2), They bustin them haha (x2)", cop: "look like some gladiator shit!" Section 30:20210106-Riotous Acts-US CAPITOL COMPLEX, 1:06:45 long, 1:03 pm, Louis Laurore 11590, Axon Body 3 X6030252f, 1) 8:15, "Can you imagine if they did have guns?", RCO: "I mean they do"2) 9:40-9:50, RCO is seeing shots and is excited "oh lets go! Leggo!(x5) laughing and running towards stairs", 3) 23:27 Daniel Harrington video where cops talking about punching protesters and cop says "blink blink", RCO talks about hitting 4 people, other cop says "yeah I seen you, I was like God-dam!",4) 30:22, cop: " I don't know why they weren't prepared for this"5) 31:28, One of the leader cops says to Capitol police "Stop throwing fuckin CS, it's blowin back on everybody else!"6) 36:30, RCO is mad they(police) keep spraying "It's blowback (x5) GOD! Just hold the line! Stop sprayin, just hold the line bruh!"7) 1:00:08, officer: Where's the fuckin mega-phone dude?"8) 1:06:26, you hear axon camera being turned off, seconds later rco does it to his.Section 31: 20210106-RIOTOUS ACTS-US CAPITAL, 1:03pm start, 1:54:29 long, Axon Body 3 X6030853k, Daniel Harrington (4582).... RCO is Captain1) 11:23, RCO starts spraying everyone, no warning, right away...2) 11:50, capitol officer tells RCO "hit him again haha", sprays a dude doing nothing 10'away with no one else near him, does it again at 11:583) 1:22pm/ 21:15, "They shot me in my face guy from senate chamber is being escorted towards crowd by police4) 25:34, RCO sprays woman talking to cops5) 26:06, RCO is rinsing his eyes, one of protesters who yelled at him for spraying is screaming/ can be seen "yeah, rinse your fuckin eyes bitch (x3)" hilarious!6) 1:21 pm Captain calla in and says fireworks being thrown by crowd, great for pointing to protesters not knowing concussion grenades, because it wasn't a firework he was referencing...7) 50:30/ 1:51 pm, shot my face guy is in back with police, :55 RCO approaches him "who's this?", "huh?", "What are you doing up here?", "They brought me up here", "Who?", "I don't know", RCO then says "He's a lock up (x2)", "No I'm not! I'm medical!", "Your're a lock up, I don't know what the fuck he is but he's a lock up! Don't let him wander around back here!" This is great to show that even Captains didn't know that the man was trespassing on capitol ground, otherwise he wouldn't have been unaware of what to charge him with, at the least he would've known he was a trespasser, if he himself knew that this was Capitol grounds, but, he didn't despite that he was a Captain...8) 108ish, RCO walks right past "announcement speaker", then walks away, great for showing it can't be heard9) 1:54:20, RCO walks to other officials, they look worried and stop talking when they Notice RCOs camera is on, 2 out of the 3 cops are already clearly turning their cameras off. Then guy says "just hold on, hold on, shut off, then 1 cop who just shut off begins to say "okay, lets talk for a minute"... video cuts off.Section 32:20210106-Riotous Acts-US CAPITOL COMPLEX, 3:37:26 long, 1:03pm start, axon body 3 X6039BOYJ, Johniqua Chance 112671) 12:10/ 1:15 pm, earliest cop is heard saying

"Why wouldn't they let us get our stuff?(x2)"2)11:06ish (or 106ish), RCO: "They should have let us get our gas mask"3) 1:09-1:10ish, RCO and other cop: "It's a wrap, ain't nothin we can do, there's too many, we don't have enough people"4) 1:13:36, RCO: "The one thing I could say is not all of them is against us cuz one dude actually handed me back somebodies..."5) 1:14:58, "They shot my face" senate chamber guy with yellow gloves is walking by RCO on east side as she's grabbing munitions from van, he looks at cop next to RCO and says "Thank you for your service"6) 1:23ish, tear gas hits North side of scaffolding (opposite of west side where I went), most left position of police line7) 2:26 pm, RCO throws up8) 1:32:30, RCO: "We def should not have come up here, this is the definition of unprepared"9) 1:35ish, "tells us to hold the line and then you deploy CS",10) says it again at 1:36:1811) 1:37:37, "How back up comin 3 hours later?" 12) 1:41:20, RCO: "Oh they made it inside! Bro at this point, I'm over this" other cop says "same"13) 1:47:00-30, RCO and 4 cops rant about how they were basically set up and how it took forever to get back up, "I don't care what they say about my video, they weren't the ones being gassed14) 1:52:07, Female cop who drove gear to 64 "were looking at a fucking revolution, if they don't get removed we aren't ever going to have a fucking government, they set us up", she wasn't even there and she knows it was a set up.15) 2:03:47, "Ha, I love how they set up 64 for failure", RCO: "Straight set up", cop: "They set us the fuck up", 16) 2:04:42, walkie talkie saying "we are about to lose this line", RCO: "Man fuck that line"17) 2:10:37, cry baby cop smiles and says to RCO "I wanna fuck somebody up"18) 2:13:20, woman is heard screaming to cops at vehicl "thank you guys for standing down...:"19) 2:49:33, "We got transgender, black, hispanic, everybody out here"20) early on, "oh, I'm ready to fight, drop kick ready to fight"

Global discovery 2 of 3:Section 32.5(2nd/not related):Enoch Rogers, 35:08 long, MPD m cycle officer1) 3:14/ 3:20:30pm, Protester to cop: "which way is Pelosis office?", cop points outside and says "that way (and begins laughing)", before he sneezed and same cop said "bless you"2)15:29-15:55, you can see how magnetic door work, will not open unless green. Officers can't open doors until light is green, they press and wait, then turns green... ask officers at trial if when they lock it down there is an option to lock the doors via the magnets that clearly are more powerful than any lock. If so, why didn't anyone do that?3) 19:22, protester to police: "let us in peacefully, please, it's our right, let us in peacefully"4) 21:09-21:16, protester to police "that's our building, thay's our building5) 28:03- , protester to police: "its our hoise, why cam't we go in? It's our house, I didm't even know that until today, its our right, you guys are pissin on our rightsSection 33: *left off at 33:00**James Luckett, 1:32:45 long1) 4:05/ 3:20 pm, black officer on left can be seen fist bumping protester2) 29:30, protester says to cop "when antifa goes out, amd they habe their riots and their break in shit, you guys stand down and let them do it, amd here we show up, and we just want to get into the house here, amd make a statement.... keep watching until....?3)Section 34:Thomas Miller (4149), video axon body 3 x6039Ba52, 33:08 long1)19:28, officer shares "if you push on a line, they will take your shit, it's not like antifa where if you push they back off", another officer says "no, these guys came to fight.", 2) video ends with officers asking and telling them to turn their cameras off real quick so he can tell him something...3) 15:55, inspector says "problem is all the CS we threw out, it flew back on us"4) 18:18, RCO "they(command) wouldn't let us come up here (capitol grounds)"Section 35:Tags: "internal affairs", vid 1, 12:36 seconds: 1/6/21, 11:34 pm, Hilton

Hotel, Sayvon Weinfield0) He was imside capitol givimg orders to his people, camera was physically on him, but was mot turmed on at all until later...1) officer Sayvon Weinfield locks outer door with baton, "Fire hazard" yelled by people inside, building security tries to ask officer to remove it, cop says "on a case by case basis, we let people check in", then says " you tell them to go to their rooms..." wow.... "You need to tell the, it's time to go to their rooms, tell them to clear the lobby", "The thing is that we cannot force them to go inside their rooms", "You can revoke their hotel rooms"2) rco gets mad at woman "You don' even fuckin know nothin", hotel guest "Your're fucked up", Rco: "you are" goes back and forth 2 more times, like children, the lady arguing with him in Hilton is mullato lady who was at front lines earlier at protest shouting "we come in peace, we love you" near media tower, crazy I found her here.Section 36:Tags: "internal affairs", vid 2, 20:12 long, 1/6/21 11:25pm, Tiffany Payne 11652, 1) records interior of capitol illegally on facetime, thinking she turned off camera, but she accidently turned on the sound... 2) 7:41, she says " I was here for this shit... some kracker... excuse my French... some kracker shit..." really? Perhaps like BLM we should've attacked citizens and businesses instead of protesting at the source and then getting pissed as they attack us without warning...3) 7:46, "right, cuz that wouldn't happen with any otha culture", "right, uh-huh, I was pissed"4) 8:38, I ain't tryna be all obvious and shit takin piks and shit"5) 15:00ish, 2nd face time, when i tell you this place looks like shit, it looks like the movie Olympus is fallen minus the hollywood special effects.Section 37:20210106-Riotous Acts-US Capitol Complex, ID: 21002555, categories: none, 1:39:28 long, axon body 3 x6039BJT9, Lawrence Lazewski1) 5:16, "Did Capitol not take the threat of them storming it seriously? Haha, it doesm't seem like they have enough people haha" 2) 10:30, tons of capitol police shooting guns/ pepper balls into the crowd from up top, 3) 11:53, black woman "what the fuck do you think you are doing? Police pepper spray her, other vids show police surprise her and push her without warning4) around 18 or 19 minutes capitol police pointing to chill area, they are looking at officers on inaugeration stage, kind of near pepper ballers, at 20:05 they fire a flash bang in response to that area , RCO then grabs his glasses to protect his eyes after, then crowd is angry and behins attacking police.5) 20:33, spray man waving flag6) 35:01, citizen "they are shooting us (x2)", confused, doesn't know is trespassing7) 42:21, and before is kid saying "if you guys want me to move back just let me know, I don't want to be mased or hit", officer: "no, your're fine" (13:43:22)8)Section 38: Robinson, Mark, 1:46:32 long1) 2:33, grandpa, 2 kids husband and wife walking off capitol grounds right near east entrance of capitol while smiling and say thank you to officers. Bike racks/ barriers are only used to keep people off the road there, not stopping people from entering, helps show that they were more so used to guide foot traffic...2) 6:45, 2 cops: " why is he wearing that?","I don't know", "look at our lt. Right now wearing a Make America Great Again hat", 2 cap officers point to show MPD RCO and he says "that's your what?", both reply "That's our Lt.", one officer is smiling, other looks pissed, MPD: "in the red?", smiling officer "with the red hat on", unhappy cop: "i don't know why"... continues: " my guess, my guess is that he did that to get to the officers, but that's gonna be all over the news now", other officer: "yup" 3) 52:53, group of Capitol police without helmets or gas masks complaining about how they weren't allowed to get their gas masks... 4)1:23:00, RCo: just left area with tons of capitol police, says to himself as walking away: "you let em breach the capitol? Really?" Section 39:Brian Sulivan (10375), 3:18:51 long, axon x6039BCSE,1) 9:55, RCO: "Should have given us our gas masks, 2) 1 minute later:"Breeze is this way", tons of flags blowing in direction of officers,

great show of why officers got screwed.3) 51:00-52:58, flag down, crowd yelling "pick up the flag", at end whole crowd cheers and claps, up close "yayyy!" "Wooooo", "That's a fuckin patriot right there", 4) 1:15:53, Epic man runs off stairs and tackles multiple officers! EPIC and hilarious!,5) left off atb1:34Section 40:01/06/2021-stop/frisk-1400 Independance Av..., ID:21002531, 21002555, axon body 3: x6039B396, 11:35 long, 2:48pm, Shawn Rooney1) 6:05-6:22, 2 members of 24 (yes 24)walk past RCO "You okay?"... "I'mout(?)", "We got no gas masks and no helmets, I'm trying to calm my guys") 7:08-7:40, Jessica Hawkims sharing they need their masks3) 8:35-843, member of 34 (yes 34) complaining that they didn't tell him to bring his gas mask, partner next to RCo (unknown unit number) complaining that all 4 of them were not told to bring their gas masks (and it's 2:55pm... been fighting crowds since around noon)...4) 10:31, officer T mosher is talking about going to get gas masks for all his guys, other 3 officers discussing doing the same. T mosher looks like Peter Forbare5) last 10 seconds, as talking about going to get masks, RCO tells 5 others to shut their cameras off real quickSection 41:Unknown_202101061642_WFC1029558_38237350..., ID:Virginia State Police, 49:50 long, uploaded by Ellen-CB, Josh (Ellen, Josh-CB), 1) 48:34-47, cop to RCO telling about how traffic cop was lost in tunnel push, then 5 second mid sentence silence... like RCO told him camera is on then hands dropped, turns, other officer nods as if saying "don't look at me, finish it/fix it" and then talks about how cop did the right thing and he's injured, within minute he turns his camera off, "I'm gonna turn this off",2) 11:32, officer says "?", then RCO says "I'm recording", "What?", "recording", silence...Section 42:*** government deleted this video from data base, I want it back...20210106-CDU-14th St nw, ID: 21002555, Axon body 3: x6039BFA5, 1/6/21, 22:08 pm, 3:48 long,1) last minute of vid, woman surrounded by police asks to be escorted to hotel across street, explains knows liberals attack Trump supporters in this city, cop plays dumb but escorts her.Section 43:20210106-stop-1500 constitution ave NW, 11:08 long, ID: 21002529, 21002555, axon body 3 x6030853k, 11:52 am, Daniel Harrington1) around 6:30-11, man who police thought had a gun was stopped and got his number...Section 44: *** Government deleted this video, increases chances that they don't want us noticing him...20210106-disorderly-15th st & constitution ave, ID: 21002555, axon body 3 x6039BKCx, 12:08 pm, 1) appears and sounds like plain clothes FBI being checked, active, said trying to keep it concealed, has clearance card near ID, badge # is 6504 (appeared to be)2) continued in next sectionSection 45: ***government deleted this video, increases chances that they don't want us noticing him...20210106-stop-1500 constitution ave NW, ID: 21002555, axon body 3 x6039BFR2, 1) he is an active officer of some sort, he has a concealed weapon, was trying to keep it hidden while hands/ arms raised at rally.Section 46:20210106-stop-1200 F st NW, ID: 21002555, axon body 3 x6039BJHB, 12:20pm, 2.53 minute long video, Tyquan Brown1) 4 men stopped for worry of gun, all plain clothed cops of some sort, 1 guy wasn't hiding it well.Section 47:20210106-CPWL-825 10th St NW, ID: 2100255, pending, axon body 3 x6039BBE1, Maximilian Park, 23:50 lomg1) Police break into 2 cars under suspicion of weapons, no weapons found...2) "Hey let me try this thing out"... cop excited to try break in equipment...Section 48:20210106-Riotous acts-US Capitol Complex, Axon Body 3x6039BD07, 35:05 long, Marina Bronstein1) 18:26, Cop: "I can't arrest him, I didn't see him do anything",... while on Capitol Grounds, if cop from city thinks its fine, why would citizens from other states think he wasn't able to?2) Later, someone says "it's a restricted area, all of it is a restricted area."3) 29:00-30:00, white and black man: "all races coming together", black man also saying "historically the patriots won"Section 49:Camera 924: 1:59:33 pm, 1/6/21: 1) black

guy who broke door in is next to guy Reffit on stair push (stairs I would go up in half an hour), 2) 2:02:06, cop pushes climber off wall, long fall.... can't see if he recovers.... crazy to watch!Section 50:Recess called at 2:13pm in senate, 2:18 the chair declares the house in recess, resumes at 2:26 pm, 2:29 chair declares house in recess again, senate called back to order at 806 pm, house came to order at 9:02 pm,. 3:44 am house and senate jointly pass stolen election.Section 51:20210106-Riotous Acts-US Capitol Complex, ID: 2100255, 36:44 long, 1:03 pm, axon body 3 x6039BFA8, Brian Madison1) 18:16, citizen saying he just got shot in the leg with a paintball gun, then looks at cop recording "They're shooting at y'all too (x2)", 2) 18:33, he records showing it's in the police eyes too3) 19:40-20:00, older man who explained in previous video his grandfather was a political prisoner in another country is asking up close police why they are shooting them, then realizes it's capitol police shooting up on the balcony, he waves towards them asking them to stop. This shows that he and others didn't know the grounds was off limits...4) 21:14, Black camo guy up close "This is democracy, this is revolution, this is fucking freedom, stand down!"5) 31:54, "They set us up for failure, they should have had us bring our fucking gas masks (1st time he said it) with RCO (Mr. Get my contacts out), they head up steps together early, ...6) 36:44, Mr. They set us up turns off this recorder/ attempts to then goes to turn off another officers camera, then this guy turns off his own seconds later after they set us up guy tried to turn his off... prob to say exactly what he thought they were doing, which shows he was truely scared to speak out, not as he suggested in another video, he claimed he wasn't scared what "they" say about his video when he was saying "they" set them up for failure...Section 52:20210106-Riotous Acts-US Capitol Complex, ID: 21002555, 1:08:29 long, axon body 3 x6039BHJC, 1:03:04pm, Greg Kimak1) funny old man protester: "Your're a little too late", his wife:"stop it Bill", "What? Stop the steal, They're cops!", 2) 20:32, same cop who said "they set us up is walking by around 1 hour before other videos where I saw him (Brewster) saying "Come on man they should have had us bring our gas masks man" then another black officer says "Why they not let us bring our gas masks man!' "Then they (Capitol) just start spraying next to us", Then capitol police woman says to RCO who is not complaining, just suffering silently being deconditioned "Are we not friends anymore?" Metro: "Oh, we are always friends haha",3) 21:59, dude asks white shirt metro semi leader "Can we have someone go back and get our masks?", "No(walks away)"...."I gotta go back"4) 24:00, "Why didn't we bring our gas masks?", Notes:Man with trench coat and on radio most is Commander, Danny Thau is crazy guy who tazed 7 people before being told to stop tazing protesters, officer walker is man whose face was split open. Officer who was with walker said he's heading to hospital.. Noteworthy: Captain Augustine5) 53:27, plain clothes guy behind police line who gave mixer bottle with baking soda in it to cop, asks while recording "How did that stuff work?" "Great", "I use that stuff when I'm with Antifa", other cops begins to laugh, officer then asks plain clothes "Well, where's the Antifa?"... Then asks "Huh?"... Dude can't be seen on camera, no verbal response heard.6) 55:45, commander says to RCO "You'll never forget this day for the rest of your life", "Haha I know I won't haha"7) 1:08:22, at eye wash station Metro cop says "it's over, we are retreating to inside the building and locking it all down", "That sucks, I can't believe we have to retreat", "Well, but you know what, what this shows is that they could never say that they were ever peaceful", "That's true"... idiots.Section 53: *** may not be done***Title: Thau 1st video-2021-01-06 USCP Riots, axon body 3: x6039B830, 1:54:32 long, 1:02pm start,1) 10:30, cop warns "look out for freakin guns man",2) 13:21, "We need blast munitions!", "I don't have

any", "God dam man we gotta get something, get something!", asks another guy, "We need blast munitions!", Tazes man, screams "felony APO right there" to officer, assaulting police officer keeps begging for munitions. 4) 17:00, "we need munitions", "I know, I just got hit with one", "this is a shit show", 5) 22:00, "give me your fucking tazer, runs up, tazes man, screams "get him get him!" Officers and protesters just look at him loke this dude is losing his shit... no one gets him...6) 23:ish, tries to steal womans OC, "Can I get that?"7) 24:ish, he gets hit with a tazer hahaha, 8) 31:51, Jimmy throws can of some sort into crowd way behind front line, Thau says "hold fire", grabs smoke canister preparing to throw,9) 33:41, "Captain, I've got a triple chaser, do you want me to use it?!" "Yeah, no, don't use it"10) 35:18, throws 2nd flash bang and see it explode, 37 seconds guy throws another and it explodes11) "gonna switch to rubber", "okay, make there are no kids", "There aren't"12) 46:32, he throws another flash bang13) 13:50, "They are already in the capitol, get ready to move, pay the fuck attention!"14) 50:20, officer getting water poured in eyes "fuckin stop usin the God dam pepper spray!"15) 13:54:50, "they are moving their (CP) resources inside,16) 1:23:21, officer walks by with loud speaker, "got a loud one, not good enough", "hahaha", "I know"17) 1:24:52, cop shoots into his officers, hilarious18) 1:34:06, the bike I sat on! 19) 1:37:51, "They are in the house floor", "That's what it sounds like", "What's the option 2?", Capitol: "nothing", "Okay.", "There's too many people dude", "You guys gotta have a procedure or somthin", "well, we usually lock the building down, but, well, thay's impossible."20) "Capitol doesn't know shit" "They are scarce and have no resources"Notes: 4 original vids from gov: Dallas Bennet (129 min), Angelique Core (137m 21sec.), Jefferey Sipes (172m 28sec.), Christopher Dove (172m 36 sec) Section 54:Axon body 3 x6039BLDK, Christopher Dove, 2:52:00 long1) shots fired at 2:22 ish, 2) 14:29:20, "All MPD fall back", helps shoe why I didn't see police when I arrived, they fell back out of view of where I would soon be arriving.3) 14:31:25, "fall back to the upper deck of the Capitol", "I think that is where we are"4) lead guy says "the guard is coming now"5) 2:49:48, police get to area that was broken in (I entered about 2-3 minutes prior to them getting there, just missed them.6) 14:53:25, "You think this will be on the news haha?"7) 14:55:23 "We have multiple shots fired inside the building...", "This is not good"8) 14:58:18, "This escalated quickly"9) 14:59, "I ain't never seen nothin like this", "So the question is, are these really pro Trumpers or re they Antifa dressed like pro Trumpers, that's the question."10) 15:04, phone rings, he covers the camera, "Whoa, Bowser just issued a curfew for 6-6", "They are requesting for PG to respond", "PG?", "Yes!..." 15:08:3011)15:09, "they are calling Virgina air arlington"12) 15:11:02, "They called for all police departments around DC to respond "Holy shit"13) 15:12:30, "Hey look in the windows first floor", "yup", "Oh shit!", "Hahaha", "You see that?" (think it's me looking out at him from window), 14) 15:15:20, "Virginia State said they will be here in 15 minutes"15) 15:21:01, "Do you think if we just asked them nicely to leave they would?" "Hahaha", tells another joke seconds later16) 15:24:00"There's no transport they already let that guy go (Mark Ponder)... So they are back just FYI"17) 15:25:45-65, starts laughing because heard on radio Virginia state police (25 people) arrived by metro bus... "Never in my life...", other officers: "They just jacked a bus"... "They commondered a bus"18) 15:26:31-60ish, this is gonna get real sill with all the evening platoon comes here because that's when they are gonna push everyone up", "oh we are just holding everyone right now", "that's what I mean"19) 15:30:35, "look at the guy inside smoking a ciggerette inside the window with a cop behind him, smoking like a boss haha", 20) 15:35:00, "maybe the national guard will help, maybe the marines"21) 15:38:15, Megaphone

guy says "The door behind me is open, go inside"... officer "He's yelling go inside the door is open, the guy with the microphone, he's telling everyone to go in"22) 15:45:15, guy they thought had a gun is arrested until found out he didn't have a gun23) 15:47:00-25, they start to escort him back to protest since he had no gun, notice that theybdidn't tell him he was trespassing or tell him to leave...24) 15:50:00, "I heard you took the bus haha", 25) 16:06:47, "Tim Hales voice "I am offended that you guys will not accept my... extremely offended"26) 16:11:30, "It's gotta be 100,000 people what are you gonna do?", "This is gonna make Portland look like kindergarten27) 16:14, "inspector put mask on, you know it's about to get real"28) 16:22:45, protester: "It's not curfew time is it?", "No...", protester: nods head... was this protester also told by other police that he was allowed to remain/ protest until curfew? Regardless, why did police not instruct this calm individual to leave or warn him that he was breaking the law? Because they were allowing protesters to remain up there... 29) 16:52:10, "It was actually smoother than I thought"30) 16:56:00-28, "there's not a lot of people and they aren't hostile..." , "The crowds not bad", other cop: "Oh I know." "Yeah" "oh I know"31) 17:00:00, "we got everybody to hate us", "it's only going to continue man", "oh yeah, the left, the right, everybody hates us"32) 17:04-5, "CPR on someone who wasn't an officer", "we have had curfew before, this ain't 9/11 I'm takin the weekend off", other cop: "it might be...6-6 curfew... city wide 1033..."Section 55: *** may not be done***Axon body 3 x6039B849, Angelique Core (8495), 2:17:00 long1) 15:05:52, black man and NYC Russian woman talking about soviet union,2) 15:12:35-55, old guy setting up chair "I'm old and got a new hip in me, standing up is killing me-1 minute or so lady helps him sit down3) 15:29:03, couple says thank you to cops4) 15:40:49, It's the guy from CNN vid who said "pick a side, weve had your backs for a long time now"5) 15:42:40, guy says "they just stormed the Nevada capitol, it's not just happening hear, we are taking our freedoms back6) 15:43:59, antifa guy i saved runs by,7) 15:49:58, latina talking about civil war8) 16:55:25, motercycle is safe9) Section 56:Axon body 3 x6039BJ4E, Dallas Bennet, 2:09:00 long1) 14:22:15- calm people walking right up capitol steps, no police2) 14:24:15-35, shots heard, "That didn't sound like ours, just sayin", other cop: "that did not sound like ours"3) 14:39:13/ 18:36, L or I Fer(???) Telling him RCO not to side with them "Don't do it", RCO: "if you read our founding documents, this is not ar from something that we allow..." at :45 "why aren't we trying to take the capitol (with them?)"4) 14:40:59, looks like black break in guy walking towards crowd from police5) 14:42:20, guy on mega phone "were not burning it down, we just are going inside"6) 14:43:30, "my question is, why are we on federal property?", other cop: "I don't know, I was wondering the same thing"7) 14:45:59, the windowless doors with magnets are magically open8) 14:48:47, Mark ponder is threatning officers with a bat of some kind, at 49:37 RCO takes it9) 14:50:25, 2 black guys pushing against police, 1 white guy yelling at police for it, then at 50:38 black breaking guy shows up yelling at cops, other black guy then keeps the crowd calm10) 14:52:12-20, black guy came out hands up "no harm (x15) were just tryin to get heard11) 56:40 he comes back "we are trying to be heard guys, not to fight"12) Asian woman "go to china, dey take care of uuu, they try to ruin the united states"13) 15:08:37-43, Chinese woman "Chinese communists they gonna come and get uuu..."14) 15:18:26, terrorist palmeranian15) 15:21:12, latin guy who's felon says "we fuck with you guys (police), :49 makes sure dude is good16) 15:22:59, old lady smiles and says "i think I made a wrong turn..." funny... next 30 seconds crazy dude is calmed down by near by people17) 15:23:40, "How much you bench bro?", officer: "315"18) 15:25:08, "man, ya'll are fucking

outnumbered, but we arent gonna fight ya"19) 15:34:17, "I'm married to a latina and I'm a white supremacist, got 2 south american boys lovely as hell too20) 15:41:39, Puerto rican flag guy next to 2 other latinoes and says "it doesn't matter what color we are"21) 15:43:40, black guy walks by shit talking BLM and Antifa22) 15:43:58, The dude I told to run after being punched and called antifa is running away "they just had me surrounded! They started hitting me for no fucking reason"23) 15:51:36, crazy shirtless man who attacked officers earlier breaks through crowd "this is my house..." officer says "here he comes" showing he remembered the one trouble maker in the area of thousands....24) 1t:54:08, protester: "time to do some patriot ass kickin up in DC, we can't beat up antifa cause our mayor won't let us, we just get on our knees and suck her dick" (mocking cops)25) 2:08:11/16:29:22: RCO telling Gonzalez ""I had to straight shank this guy cause he was pushin in"... other officer points to mouth and his own camera to warn him his camera is going, then je out of no where claims the pain traveled up, (sounds very scripted and fake), he then turns jis camera off. Before he fell he straight shanked a protester in face, looked very painful, I saw it...Section 57:*** may not be done***Axon body 3, x6039BK2Z, Jeffrey Sipes (6792), 2:52:00 long1) 15:13:00, "look in window!" (Think it's me), 2) 15:15:18, "never seen this before in my whole career"3) 15:26:00, metro bus4) 15:30:00, girl officer texting5) 15:38:10, "he said go inside the door is open"6) 15:47:23, people cheering we took another state capitol7) 15:48:51, Fernando walks into camera, the guy who may have asked why arnet we joining them8) 15:54:00, cop recording crowd with phone9) 16:09:00, cop texting10) 16:21:35, peaceful move down of cops11) 16:25:10, old lady being escorted by cops to leave12) 16:56:00, officer takes photo of cops folding flag13) 16:58:40, "dude! Are you going to wear the hat(officer kept trump cowboy hat)", calls cap, o brien she14) "this is worse when they ordered us all in for the BLM shit...15) 17:13:0: metro bus16) Section 58: *** re-watch/ write***Stephen Chih, 20210106-Riot-US Capitol Building, ID: 21002555, 11:28 long, axon body 3 x6039B7Q4,1)9:23, lightly pushes/ guides James Grant towarss door.2) 9:26-10:00, Merkelys office, officer asks them to come out (3:17pm) protesters coming out of them calmly, 3) skip to 10:14-10:18 on the dot, caoitol officer is giving pritester directions on where to go, granted it's towarss the exit, it's the hall way I walked down towards Crypt4) skip or watch to 10:33, man who continued directioms to statues is still seen standing there5) 10:43, on right protester is eating and nodding his head while calmly talking to capitol police officer6) 11:04, protester to RCO "thank you guys for being here, we love you" Section 58.5:Stephen Chih, 3:58 long, 3:19pm start time1) 0:47, I'm talking to Capitol police woman2) less than 1.5 minutes later he begins to help compulsive liar Micheal Fanone inside who seemingly was suffering from heat stroke... Section 59: *** finish, left off at 40:00***20210106-First amendment assembly-US capi..., 1:03 pm start, 2:22:22 long, axon body 3 x6039BF80, Kevin Valentine,1) 3:31-3:36, cop: "ya'll remember, gut punches, they (superiors) cam't see gut punches",2) 28:37, guy takes selfie with RCO, RCO thumbs up in photo and fist bumps guy behind fence3) 30:46, flash bang "good god dude, they are getting carried away with that"4) 38:31-40, latino funny guy "that's what is great about this country, we got white, black, Asian, rich, poor, latino WOOO!5) Section 60:Couod not find... now, nit important vid anyways... 20210106-Riot-US Capitol Building, ID: 21002555, 1:13:57 long, axon body 3 x6039BF8E, 1) 14:09/ 1:41:49pm, old man and RCO debating about election being stolen, RCO says "it worked, you voted, trust the system", "I'm from PA! It did not work, 200k votes....", old man continues to state stats, cop stupidly just keeps saying "it worked", old man says "you know I grew up in the 1960s", RCO "your people grew up in the

1960s as my people in the 1960s were dying every day, okay? Thank you"...Section 61:20210106-Riotous Acts-US Capitol Complex, ID: 21002555, 1:03pm start time, 2:18:05, axon body 3 x6039BKVP, Matthew Cek(7357)1) 14:28, black camo guy yelling/ leading screaming at cops "he got a right to be here" to hard helmet guy with pole2) 15:35, black camo guy "I'm going to speak to Kamala" facing crowd, :55 "Let me go in" is what he said to crowd, then gets hugged, then says it again towards police...Section 62:*** early on, asks capt to get masks, "no",... also recheck #1320210106-Riotous acts-US capitol complex, ID: 21002555, 1:03pm start, 1:16:51 long, axon body 3 x6039Bjju, Nathan Tate (11280)1) 2:00, RCO: "do we need our helmet and mask?" "No"2) 14:13, "why wouldn't they let us get our stuff yall, why wpuldn't they let us get our stuff?" He asked on walk if they would need gas masks or helmets, told "no"3) 15:08, Bart threatning with body to push a cop lol, 15:12 he unexpectanly pushes officer LOL4) 15:57, RCO: "why woukdn't they let us get our stuff!" 5) 16:34, 4 cops and RCO swearing and blind :"they gotta let us get our masks6) Rco: "they (capitol) sprayed them with no regard for us bruh"7) other cop "they shoulda had us bring oir gas masks, RCO: "Thay's what I just said bro! Why they didm't let us get the gas masks man", other cop: "IDK, whoever the fuck it is is gonna get punched", RCO: "dam bruh, then they just start sprayin em straight in the face, i got hit liem 5 times, it burns... "8) 18:53, RCO: "They (capitol) sprayed them (protesters) with no regard for us"9) 26:37, "why would they (capitol) spray us like that though? They was spraying us! They had OC too"10) 38-40:15, RCO says "He got a gun" Finally finds him, guy says "I don't have a weapon, I came here to protest peacefully, I don't need a weapon", cop says "okay your're good"11) 14:25-14:27, guy in crowd "you flash bang a terrorist, you don't flash bang old people!"12) 49:57, guy from senate chamber with hole in the face with tellow glove is let through gates by police and brought to EMT, famous dude13) 116:07/ 2:17:09pm, Rco: on phone looking at first door where famous media woman questions seemingly welcoming capitol police ("No, youncam't come in"), "They upstairs bro", "How are they comin in?", "They breakin through bruh!... and they (capitol) not shooting at... they (capitol) shootin at us!", "They shootin!?"..."not with the ah, they shootin with the oc spray", "oh lord", "what happened on... (time?), they got a video of you", "for real?", "yeah", "what I do?", "you punched a dude", "ohh"...take notice he starts walking backwards now as he says nervously "nah nah, dude grabbed you, and you like pushin him back", rco: "yeah", "huh" (he is whispering to the guy on the phone)", rco "nah (whispers in phone more as guy continues story then turns his camera off (cover up)) Section 63: ***find time for 4***Eric Hairston, 1:06 long1) 14:38, RCO: "what are we doing here?", officer "no idea" (grounds of capitol)2) 14:43, RCO asks another officer "whats the fuckin plan?", "i don't know"3)14:52, other officer "they fucked us all up", RCO "whats the fuckin plan?", 2 cops then complain about "the mother fuckers" popped it over it there, cs... kept blowing back all this way, throwing hand thrown shit", "they should have called us up here earlier!"... 4) "why didn't they call us earlier?"Section 64:Daniel Harrington, 8:47 long1) 2:34, secret service on camera right up and close, use to show jury, these barriers were burst through when they began letting some people through, they dkdm't arrest or stop everyone, only those who attacked police or initially caused breach.Section 65:Shawn Rooney, 29:44 long, 3:02pm enters capitol1)3:51, MPD female ranking officer inside capitol rotunda complaining to RCO:"I told them, theres 200 people coming in through that door, one of them came in and punched me in the face, they said fuck you we have no resources,... this is their Capitol what the

fuck!?"2)4:10-4:26, command lady to RCO "where is the capitol boss(x5)", "somebody, like the supervisor a manager, anybody!"

:First of 7 documents: Part 1 of 1:(Do not semd this to court: please send to public defenders office or myself as legal mail. Spaceing out the video topics would be helpful):Brandon Fellows Global Discovery Topic Index (7k charecters)Each video topic is spaced:***Need print out for Trial***Important times:Recess called at 2:13pm in senate, 2:18 the chair declares the house in recess, resumes at 2:26 pm, 2:29 chair declares house in recess again, senate called back to order at 806 pm, house came to order at 9:02 pm,. 3:44 am house and senate jointly pass stolen election. I entered at 2:47pm, MPD arrived within view of outside window area at 2:49:48 (about 2 minutes later). I left around 3:20-23pm, was on upper west terrace until about 4:24-28. 2:29:20pm was official order to fall back, they had been falling back without orders a few minutes before due to tear gas and no masks. Curfew issued to some around 2:49(section 70(7)), others at 3:04(section 54(10)).Entrapment BY estoppel: Section A: strongest video evidence: section 8(7), section 18(all), section 56(3), section 68(7), section 76(8-9)Section B: Where I was when I was there: section 10(all), section 20(all), section 21(all), section 22(3), section 23(all), section 25(all), section 26(all), section 27(3-5* (caution, read 6)), section 27(7-14, 16,), section 54(13,18,19,21-23, 26,28,30), section 55(2,3,8), section 57(1,5,8,9), section 58(4-6), section 58.5(all), section 76(8-9), section 79(1)(maybe),4), section 81(1-5,11-18)Section C: near where I was when I was there: Section 7( 2), section 8(2-6), section 9(1-5, 10-12), section 11(1-3), section 19(1), section 33(1), section 54(2,3,5), section 58(2,3), section 68(all), section 70(4,6), section 71(2), section 72(2-5), section 83(1-8($9)),10-12), section 84(8(maybe),12-16), Section D: overall/ supportive evidence: Section 1 (all), section 3(2), section 13(2), section 15(1), Section 16(2, 4), section 17(1), section 27(19), section 28(1), section 32(3, 18, 12,16), section 33(2), section 36(>3), section 37(7), section 38(1,2,4), section 48(1), section 53(19-20), section 54(10), section 56(1,6,7,16,17), section 57(4,11,13), section 59(2), section 62(10,13), section 63(1,2), section 65(2), section 66(all), section 67(1-7), section 69(1), section 70(3), section 75(6,7), section 77(1-4), section 84(1,7), section 85(1), Section E: Other/ funny police/ protester interactions (not already included): section 32.5(1), section 52(1), section 54(17), section 74(6Entrapment:Section A: Willaim pope/ christopher Wray, Capitol Police Chief Sund:, and: sections 44-47, section 62(9)Section B: Supportive evidence: Section 1(all), section 2(all), Section 8(1), Section 13(1), section 16(1, 3), section 18(all), section 29(1), section 30(4-7), section 31(9), section 32(1-3, 6,8-11,13,14,15), section 32.5(2), section 34(4), section 37(1-3), section 38(4), section 40(3), section 51(1-3,5), section 52(2-4), section 53(14, 17), section 55(5), section 56(1,4,5,7), section 57(6), section 59(3), section 62(1-9), section 62(11,13), section 63(3,4), section 65(1,2), section 68(1,9-11), section 72(1,5,6), section 74(1,2,3), section 75(1-3,6,7), section 76(1,2,4,7), section 77(2-4,5(maybe),6), section 78(1,3,4), section 82(all), section 83(11,12), section 84(1,2,4,15,16), section 86(1), section 87(1), section 88(1)Capitol Police/ MPD Didn't prepare/Mishaps: (is also potential aid to Entrapment):Section 2(all), Section 3(1, 2), Section 5(all), section 8(1, 6), section 9(3, 6-9), Section 12(1), section 13(1), Section 16(3, 4), section 19(1), section 30(4-7), section 32(1-3, 6-12,16), section 34(3), section 37(1-3), section 38(1,3), section 39(1-2), section 40(1-4), section 51(1-3,5), section 52(2-4), section 53(2,4,14,17,19,20), section 54(11,16), section 56(6,18), section 62(1-9), section 63(1-3), section 65(1), section 68(1,9-11), section 70(1-3,9(great example)), section 71(3), section 72(1,2,5,6), section 74(1,2), section 75(6), section 76(1,2,4(great quote),6,7), section 77(1-4), section 78(3,4), section 81(22), section 83(3,6,11), section 84(1,3,8(maybe),15), section 86(1), section 87(1), section 88(1)Misconduct/cover ups(increase chance for entrapment):Section 3(3, 4), Section

6(3), section 13(1), section 16(4), section 17(2), section 20(4), section 21(3), section 22(1), section 24(all), section 28(2-5), section 29(1), section 30(2-3(8?)), section 31(1,2,4,5,9), section 32(17, 13), section 34(2), section 35(0-2), section 36(1&3), section 37(4,5,6), section 40(5), section 41(1-2), section 47, section 49(2), section 51(3(maybe1-2,6), section 52(5), section 53(5,8,10-12), section 56(25), section 59(1,3), section 62(11,13(second part), section 72(7), section 73(1), section 74(1,2,3), section 75(1-3,8), section 76(3,5,6(even Capitol didn't get masks)), section 77(6), section 78(1), section 81(13), section 83(1,4Ashley Babbit or Rossane related:Section 6 (all), section 27(15, 17(2nd part)), section 54(7,32), section 56(2), section 81(6), section 84(10,Trespass defence (non entrapment by estoppel related):Section 10(all), Section 16 (1), section 22 (3), section 27(0-2), section 31(3,7), section 32.5(3-5), section 33(2), section 37(6-7), section 38(1), section 48(1), section 54(21-23,28), section 55(2,3), section 56(1,16,23), section 57(8,9), section 58(2), section 59(2), section 61(1,2), section 62(10,11), section 66(all), section 67(1-7), section 69(1), section 70(6), section 71(1,2), section 72(3,4), section 74(1,2,3), section 75(3), section 79(1), section 83(1-8($9)),10-12), section 84(1,3,5(maybe),7,14), section 87(1)Cops agree It was a site to see in person:Section 22(2), section 29(1), section 30(1), section 52(6), section 54(9,17,20), section 57(2,12,14), section 75(1,5), section 77(3,5), section 84(15,16), section 85(1), My belief that we had guns in crowd:Section 30(1), sections 43-47, section 53(1), section 54(22), section 62(10), section 67(8(maybe), section 83(11Mega phone/bull horn related(aid to potential entrapment and trespass):Section 30(7), section 31(8), section 53(16), section 54(15,21,26), section 56(5), section 67(1-7), section 71(1), section 83(2,12)(maybe all of 83 if not already shown), section 84(3,15,16), "Didn't you hear concussion grenades" defence:Section 31(6), section 54(1cop thought were bullets), section 56(2(see <Random positive/funny comments on us from police (not already included)Section 32(4),section 54(6,29-30,), section 57(13), section 81(20,21), section 83(4All races(and a puppy) present (began topic at sec. 32):Section32(19), section 48(3), section 51(4), section 55(1,7,), section 56(8-16,19-21), section 59(4), section 61(1,2), section 74(1,4,5), section 75(4), section 78(2), section 79(2), section 80(1), section 81(1-5,7-10,13), section 84(2I came to fight Antifa/not 1512, ended up saving an antifa member:Section 42(1), section 54(9), section 55(6), section 56(22), section 80(2), section 81(1-5), $$$$$section 83(12), section 84(15Stairs I climbed related:Section 49(1-2), Declaration of independence related/ defence/ state of mind:Section 56(1), section 85(1), Secret service in gear related (Ellipse)Section 64(1), Other videos with me in them/ corrobating evidence(started at section 81):Section 81(1-16), , 2:45pm, red heads name is cara or kara, actually, may ne Tara Tu somethingC morris is kinda with themW. Bogner at 2:02 is with dispersal message outside, look him up


Motion 2 of 7, Part 1 of 5Entrapment by Estoppel Response/ Motions (Notes Written But Stolen For Over A Year, git them back shortly before our discussing the motiin in limine on the matters. Additiomally, mot fully finished as I had to do my best to re scramble/ scramble to prepare for trial after my preperations were illegally stolen frommme by tue governmemt 9 times)/ Notice/ Case Law And ArgumentsIndex:Intro:Part 1: NoticesPart 2: Response to Pages 1-5 Of The Government's Motion In Limine To Preclude My Entrapment By Estoppel DefencePart 3: Response to Pages 6-10 Of The Government's Motion In Limine To Preclude My Entrapment By Estoppel DefencePart 4: Case Law and ArgumentsSection 1: Overall/ RandomSection 2: Dellums courtSection 3: Barham V. RamseySection 4: Carr V. District of ColumbiaSection 5: United States V. Eicher, 2023 U.S. Dist. Lexis 90103, DDC opinion by Beryl HowellSection 6:

Cox v. Louisiana 379 U.S. 536 85 S.Ct. 453 13 L.Ed.2d 471Section 7: United States V. Gutierrez-Gonzales, 184 F.3d 1160 (10th Cir. 1999)Section 8: Garcia v. Doe, 779 F.3d 84 2nd Cir.Part 5: Entrapment By Estoppel Related Motions:Intro:The government has continually tried to increase the chances of them winning against me by illegally locking me up over lies, refusing to give discovery, giving incomplete discovery, having my preparations taken about 9 times, and now, by trying to stop me from sharing what happened that day to the jury. The main reason I haven't taken their time served plea deals (despite one of them being a misdemeanor and despite being in jail) is because I wanted to promote the truth of why I did what I did that day. I thought I was allowed to enter and protest as I did because of preconceived notions (1st amendment/ "The people's house"), others around me/ 3rd party entrapment( "They are letting us in!", "It's our house, we have a right to be here"), possibly due to government agents / entrapment(prosecutor has admitted they were present in the areas I was when I was there, see William Pope motion), and by police words, actions, and in-actions (entrapment by estoppel).To not allow me to advocate what truely happened that day and to conduct a complete defence would be another way this court denies me of a constitutional right. I desire to show a jury my complete defence, I already won't be able to do so as a result of all the things the government has done to hinder my preparations, it's not proper to let them do this also.I desire not only to show this via a jury instruction, but during my opening and closing statements as well as during my arguments. To only allow the jury instruction and not allow me to present this anywhere else would be to stop me from presenting my full defence. To only give a jury instruction at the end would be to only allow the court to say "Oh, by the way, he claims he's not guilty because police made him feel he was allowed to do this". I imagine a juror may ask "Why didn't he mention this earlier?", and by that time, have already been "sold" on my guilt so as to decrease the chance of them finding me not guilty due to entrapment by estoppel. Instead, I wish to let the jurors know in my opening that I'm not disputing that my actions MAY be viewed to have been disorderly, and I'm not disputing that I unknowingly trespassed, I'm arguing that I shouldn't be found guilty of these misdemeanors because I truely believed due to police actions, words and inactions (and other factors) that I was allowed inside to protest as others in the same area were. I intend to put on evidence to support this in many various forms. It should be up to the jurors to decide if they think I was fooled into thinking I was allowed inside to protest as I did due to these factors.Before beginning, I wish to remind the court that I had my preparations taken many times, destroyed multiple times, I was moved 10 times in 24 months. A lot of this information was previously stolen from me, some of this was regathered after notes and preparations on such things were destroyed. You are receiving this now because of these situations. Had the court granted my many forms of requested relief, these arguments and motions would have been submitted much earlier. This is one of the many reasons why I shared I'm not ready to go to trial, but you continue to "fall" for the governments lies and then ignorantly assert false statements as fact, really causing confusion for a later appellate court to understand the actual facts of the situation... Very corrupt, but well thought out. Please stop these sort of actions...Part 1: Notices: 1) I intend to advance an entrapment by estoppel defence to my 4 misdemeanor charges.2) I intend to advance an entrapment defence to all of my charges.3) I intend to advance these aids to both my entrapment defence and entrapment by estoppel defences:3.1) 3rd party entrapment: That Trump (and lack of signs, barricades, and police) made me beleive I was welcome on Captiol grounds, as did people walking everywhere on it. That protesters helped bring me to the window to observe if police were allowing us in, and helped me to realize and feel safer that police (who I was watching and trying to listen to) were truely letting us in.Comments: This has

been allowed and recognized by the 2nd Circuit in United States V. Morrison (February 26, 2009) as establishing the entrapment by estoppel defence under a conduit theory. In that case, the purported misrepresentations of law by the governor or other public officials could be relayed through Facer. Here is an explanation from the judge: "I declined to grant the governments request to preclude the defence from endeavoring to present evidence in support of the subject defence. Instead, I took the position that it was 'appropriate that the defence have an opportunity to try to develope [the] point' noting that '[they] may or may not be successful.'..."3.2) Evidence for my disorders (Autism spectrum, ODD, and ADHD). Comments: I was hoping to habe a mental evaluatiin to look into such matters, or be free and be able to hunt down which doctors gave me the diagnoses. However, my useless contract breaking lawyers (now stand-by counsels) set me up for a competancy hearimg instead wjere they do not look into such matters, only to see if I am compatent to stand trial... This court also is fault here for allowong me to be locked up over lies without actually looking into the evidence. It was working with tje government/ protectimg it by refusing to look into these matters.4) I intend to support the fact that police were allowing people who were protesting to protest as I was by presenting videos of police where I was and where I wasn't.The government has issue with the latter part...Comments: I'll quickly point out that I don't disagree with the government that videos of officers actions, words, or inactions that I didn't see couldn't have possibly had an effect on my state of mind. Rather, I'd correctly point out that it further disproves what the government has continually asserted, that police were not welcoming protesters in or allowing them to protest in the Capitol. Analogy: In a Creationist v. Evolutionist debate (which I've witnessed), imagine how restrictive it would be for the creationist to only give proof of creation with things that he personally has witnessed. Most of the proof for God is relayed through the bible, archeology, history, and science. Nearly the entire practice of apologetics would be lost by that restriction. Imagine how restrictive it would be for an evolutionist to rely on only giving proof for examples of evolution that he personally has witnessed. Given that evolution is often taught to take periods of time much greater than a lifetime to witness, that also would be restrictive. Nearly the entire subject of biology would be thrown away. In both circumstances, how could a jury listening to the debate know what the truth is without having heard what the whole defence for each theory is? They wouldn't because it would be an incomplete defence! The government wants me to have an incomplete defence, doing so won't allow the jury to hear my actual defence. The government showed their hand, they strongly and continually have asserted no police were welcoming protesters in to protest. Let them stand with that assertion rather than suppressing the truth. Only the weak rely on suppression and censorship, let the truth out. My point in sharing these kinds of videos is to substantiate the other claim of mine that the government has said didn't happen, that I was allowed in by police. If police were allowing others in, then clearly there is greater chance that the same was done for me, which is what I've claimed since the very second I left the building. Remember, entrapment by estoppel defences don't just look at the actions of the defendant, they look into the actions of the officers involved, and can also look into the actions of the agency in dealing with the protesters similarly situated (see case law arguments for proof).This is further argued and proved more in detail later in this motion, so please, don't draw your decision based only on that short argument.Part 2: Response To Pages 1-5 Of The Government's Motion In Limine To Preclude My Entrapment By Estoppel Defence:1) The government first argues to stop me from arguing an entrapment by estoppel defence in regard to alleged statements of law enforcement.Response: That matter should be up to the jury to decide whether they believe me or not (though if the government didn't steal and refuse to give me my phone back, I could provide

them with the video evidence). Read Part 5 for further arguments and relevant case law.2: They next argue that I shouldn't be allowed to present the defence at all because "in order to prove an entrapment by estoppel defence, a defendant must show (proffer):2.1) "A government agent actively mislead [me] about the state of the law defining the offence."Response: I've testified that I witnessed police officers actions in the area I would enter to be in line with what other protesters were shouting from both inside and outside ("They are letting us in"). I've testified that I spoke to and recorded an officer inside who gave me the rules to follow and assured me so long as I followed those rules that I would not be arrested. Since testifying to that, I've seen video of that officer and I speaking to each other just as I mentioned. I've testified that I later got directions from another officer on where these statues were (which the previous officer told me I could go to), and that I also recorded this officer. I've testified that officers seemed welcoming (I recorded them too) and even shared such things the very second I left the building to National Fake News Media (CNN) where my first January 6th related video went viral, all before I even knew that I would be charged, that I broke any laws, or before I knew about an entrapment by estoppel defence. I've also testified that no dispersal orders were given to me nor was I told I was breaking any laws or could face arrest, indeed, I was told the opposite by Capitol Police. I've testified I did not see any "no trespassing" signs, nor police barricades, nor had I encountered police lines until I had left the building. Read Part 5 for further arguments and relevant case law.2.2) "The government agent was responsible for interpreting, administering, or enforcing the law defining the offence."Response: The Capitol police have a manual with how to deal with civil disorders, protesters, and 1st amendment issues on Capitol grounds, they can not only allow people to protest at certain times in certain areas, but they can also arrest those for breaking their laws/ rules. As seen in the Dellums decision, which has since been supported in other case law (Barham V. Ramsey, Carr V. District of Columbia, etc.) the Capitol police have a duty to warn protesters that their conduct is illegal and warn them that if they do not stop that they will be arrested. Not only that, but when protesters have failed to hear these warnings the DC circuit has held that the police were at fault, as they should have individually warned protesters that they were breaking the law, that they needed to disperse, and that they be given sufficient time to comply. When this wasn't met, the DC circuit threw out the convictions and held the Capitol police liable in civil court. It is clearly established that the Capitol Police are responsible for interpreting, administering, and enforcing such laws... Even metropolitan Police departments there that day recognized that they had to follow the Capitol police orders as it was their duty to administer the law, not MPD's duty, which is why they sought guidance on what to do from them throughout the day. Read Part 5 for further arguments and relevant case law.Though I had no idea there were 2 separate police forces (and others) present on capitol grounds, nor would I have guessed only one agency had the ultimate authority there, the government would have a stronger argument if I were alleging an MPD officer made me feel welcome inside the Capitol, but that's not the case. Though MPD made me feel welcome outside the Capitol building.2.3) "That the defendant actually relied on the agents' misleading pronouncement (can also be implied)."Response: I did rely on the agents statements, actions, and in-actions. I did not enter the building when protesters broke the window, indeed, even when offered a hand to climb up and enter (as seen on video), I waited to further examine the officers actions and in-actions, while also trying to watch and listen for additional supportive evidence that we were truely being allowed inside. Had it been shared that I was breaking the law and could face arrest if I did not leave or stop protesting as others around me were, I would've left the area immediately, and warned others that they too should leave. The Capitol police recognize this is typical of people

whose conduct is not in line with the law (that they fix it to be in line with the law, see Dellums) in the capitol. Because of this, they required their officers to first warn others that their conduct is improper and give them time to fix it. Multiple warnings are issued prior to an arrest. When this hasn't been done, the arrests were thrown out. Read Part 5 for further case arguments and relevant case law.2.4) "That the defendant's reliance was reasonable in light of the identity of the agent, the point of law misrepresented, and the substance of the misrepresentation."Response: This is mainly to be decided by a jury. Still, I would never have sought to destroy the place (in fact I attempted to stop others from doing so as seen in one video in Merkely's office), nor assumed an officer could give me permission to do so. However, I did seek to enter as others seemingly were being allowed to and to protest as they seemed to be allowed to protest. I took note the major difference in how police treated the super minority of protesters in my area who seemed to be inclined to violence (one protester I met inside who was pepper sprayed) and those simply chanting and smoking weed. I even took note of the officers near a man on a desk not even saying a word to him about him being up there. Given the name of "The people's house", 1st amendment confusion, and how our country was founded, I was under the impression that such actions were allowed. This is supported in case law and the Capitol Police manual for dealing with such protesters. The capitol police have recognized that civilian and protesters confusion over what they are allowed to do and not do in the Capitol building is so widespread and common that they found it to be unfair to simply arrest such people prior to warning them of the law, warning them that if they don't stop they will be arrested, and to give them reasonable time to comply with that information. Clearly, this was reasonable to believe, as even the Capitol police recognize that many people are confused over what they are allowed to do and not do in a place referred to as "The People's House". 3) The government argues I should've known that to enter was illegal given that I entered through a broken window. However, I was lead to believe by preconceived notions, protesters, and police, that I had a right, just like a partial owner of a house to enter. Hard to understand? I'll provide you three quick true stories to help you understand my thought process.True story 1: In college, one of my roommates was a drunken idiot most nights, it was very annoying. He'd often break things, scream, and start fights. I imagine if I came home towards the side of the house that we rented and saw a broken window, or even that he broke it to get inside, that I may very well go in that window whether I witnessed it or not, especially considering that it's closer than the door. I wouldn't think I was trespassing because it is MY HOUSE, though I'm only a partial owner... I don't imagine I'd ever break the window to get inside, but if it's already broken, I'm a man of efficiency and curiosity, I would enter the quickest way I could. True story 2: In high school, to get home, I attempted to follow the most direct route, I didn't want to walk around the gates, that would add a minute or two to my run, so I'd climb the gate and continue on the most direct path so I could reach my destination as soon as possible. Being a student at the school, I felt since my presence was welcome on the grounds and inside the building that entering the area (even through unorthodox methods) was welcome. Though I wouldn't feel a sense of being welcomed enough to enter through a broken window at school (unless teachers told me I could),I felt it enough to climb over barriers, something I didn't do at the Capitol, a place I felt I had more rights to (like a partial owner) than the school.True story 3: Finally, the same thing happened just hours earlier at the Ellipse. The people broke past security, even knocked a man who was holding the crowd back down. Was the Ellipse now off limits to all just because the line was breached and because some protesters sparred and charged at security and the secret service? No! I waited for them to settle the crowd down until it was clear that I and others were allowed to continue on, which I also did

at the Capitol. As a result, thanks to friends in the secret service, I got one of the best seats in the Ellipse, eventually seated in row 5, less than 100 feet away from Trump. Secret service ensured I was the first civilian allowed inside the Ellipse (I have this on video too). Just as I would witness later, I took note how the secret service and security dealt with violent and destructive protesters, they were treated differently than protesters who behaved as I did.Finally, I offer this analogy: Imagine you and others are locked out of your car. Lets say you all pitched in to buy the car or were mutual owners.. One of the people breaks the glass window to enter the car. You may be thinking, "that was stupid/ crazy", and find it annoying that you will probably be paying for a new one (as I would being a tax payer by paying for that broken window I climbed through), but you wouldn't assume that the idiot who broke it is trespassing, you'd assume he is stupid or crazy for breaking it (just as I assumed of those who broke the windows open, or the first door I saw open (I'm on video saying "This is fucking crazy after I witnessed and recorded it)". You'd assume this because he is too is a partial owner. Now of course, there are laws in place to stop him from destroying your mutually owned property, and you could even press charges on him or bring him to court to deal with that. However, you wouldn't expect to get a charge by entering through what is already broken if you were a partial owner! That is the best way I can convey how I viewed the situation at the Capitol. I figured the people who broke windows or stole things could be held legally responsible, and obviously for attacking the overly friendly police, but not for entering into the capitol, especially after all that I witnessed. Read Part 5 for further arguments and relevant case law.4: The government argues to stop me from offering evidence or argument concerning any claim that, by allegedly failing to act, law enforcement made [my] entry into the United States Capitol building or Grounds, or his conduct therein, lawful.Response: The government seems to be confused over the simple definition of an entrapment by estoppel defence. Entrapment by estoppel defences don't make illegal conduct lawful due to police actions, words, or inactions. Rather, they negate criminal liability despite the unlawful actions being committed. With that being corrected, police in-action is recognized as a form of implied entrapment by estoppel. The courts have allowed defendants to show police in-action in support of entrapment by estoppel defences. Additionally, considering the confusion regarding lawful conduct at the capitol, the capitol police and the DC Circuit courts found it proper to require Capitol police to order warnings and dispersals to protesters and law breakers prior to arresting them. When such actions have not been followed (making them in-actions), the arrests were thrown out. Clearly, police in-action is recognized as a form of entrapment by estoppel. Please read Part 5 for further arguments and relevant case law (there is a lot on this in Part 5).5) The government asks to stop me from "arguing or presenting evidence of alleged inaction by law enforcement, unless [I] specifically observed or was otherwise personally aware of such conduct." On page 8 they argue that "though conduct of law enforcement may be relevant to the defendant's state of mind,... any action or inaction of which defendant was not aware cannot possibly have had any effect on his state-of-mind and is inadmissible as irrelevant under Rule of Evidence 401." Response: I don't disagree with the government that any action or inaction that I didn't see cannot possibly have had any effect on my state of mind. However, that argument is a bit too "zoomed in" to one subject. "Zoom out" of just focusing on the state of the defendants mind and you'll find the reasons I and the DC circuit courts believe this evidence is admissible in my case. First, the nature of this defence can often be aided by proof of a collective action, inaction, orders to allow certain conduct, or the failure to give orders to stop certain conduct. Even accusations of police inaction have caused courts in this very Circuit to look at the collective inactions of officers and the agency they represent as a whole. (See Part 5 (Barham,

Dellums, and Carr)).Second, entrapment by estoppel and related defences (a police officers failure to do their duty), isn't only predicated on the state of the defendants mind, it's based off of an agents' actions, words, in-actions, and even their thoughts if they can be found out. In fact, sometimes (including in the DC circuit courts) the agents/ police officers actions, words, inactions, and even past words/ thought processes have been used against them to figure out if they truely did fail to do their duty or make others believe they were allowed to do what they were doing REGARDLESS of whether the protesters/ rioters witnessed them, or had no way of witnessing them.For example, take a look into the DC Circuit case of Barham V. Ramsey, or specifically look to part 5, section 3, # 2. Do you know how the court found out that the MPD commander told members of his staff weeks prior to the protest that officers should overlook minor violations of the law in order to accomodate protesters? They looked into the police officers actions, words, and orders to not act on minor violations of the law (in-actions). Do you think any protester was present in the MPD offices weeks prior to hear this? Clearly not! So why did the court not only look into this, and admit the evidence, but use it against the government/ commander?The reason the court looked into this is in my view best shown by a similar case. Take a look into the DC Circuit case of Dellums V. Powell, or Part 5, Section 2, #1, "the burden of proof was on defendant police chief (of the Capitol Police)." "The court held that an order to quit and an opportunity to disperse had to precede arrests." In other words, upon an allegation of the police failing to warn protesters that they can't do something and must stop, the court looked into the officers words, actions, orders of in-actions, and actual inactions even though protesters/ rioters clearly couldn't have seen or heard some of those.Another example to prove this is in Part 5, section 2, #12. How did the court find out what Chief Powell said to Chief Wilson? I'll tell you how they didn't get it, they didn't get it by requiring all of the plaintiffs to have personally heard what he said to Wilson in this self described loud enviroment. So, what am I saying? I'm saying a lot of things... One, that just because I didn't witness an officers words, actions, in-actions, or orders to take no actions, doesn't mean that such evidence shouldn't be admitted. Have the court look back to our 10/12/21 hearing, take notice, the prosecutor acted as if it was crazy to suggest that officers were welcoming us in any way whatsoever. They even got a statement from an officer (who I don't know/ remember, and who doesn't know me/ remember me) since then to assert that no one was allowing us or telling us that we were allowed inside. How damaging it would be to show that many police officers were welcoming us in, that many were giving directions, that many were not doing their duty, and that many were telling other officers not to do anything to us (or even the more recent videos that they also use to deny, that undercover officers were actually influencing the crowd to break the law and go into the building). Oh how damaging that would be to their previous and even current assertions! And I've viewed them... See, the government knows this, which is why they are desperate to hide this evidence from you, and from the jury... They can't rely on the truth to win, so they seek suppression (or destroying and taking my preparations/ partaking in discovery violations, depending on the month). What I'm saying is, the entrapment by estoppel defence looks into and welcomes evidence to suggest that officers were welcoming or doing things that could've made others feel as if they were welcomed. It can and often does look into the collective action or preparations of an entire agency, the commanders, or Chiefs, even if such things weren't witnessed by a defendant. As we have seen, the government has tried to suggest that was not the case at all for anyone. Sure, my videos are helpful to making my defence, but you know what is more helpful? Showing that police everywhere were doing the same, or exactly what I said they were since the second I left the building. You must see through them judge, they use to claim there no was such possibility,

now, they claim there isn't, but that I must be stopped from presenting such evidence. They are singing a different tune!Another reason this should be allowed is because these officers were all over and moved all over the building. They encountered one another, they encountered the protesters that I was near, or me personally at a later or earlier time than was recorded. They were right above where I was, or to the side, or entered an area before or after I did. Some, walked right past me, but that 2 seconds of me waving to some of them, or smiling at them only shows so much. What really solidifies beyond a reasonable doubt (yes, that high) that the Capitol police as a whole/ agency were allowing protesters like myself in and to protest as I was, at the time that I was inside, is a look into the collective.This court should apply the standard that the Dellums and Barham courts used, to welcome any evidence of police actions, words, in-actions, or orders of in-action. Except, not only should it be used to point out that they failed to order a warning of arrest, law breaking, or to order a dispersal, it should be used to establish and support that overall, police were welcoming/ not stopping us, and in effect allowing me in to protest as I was.The government counters my argument before I even made it by claiming that to include this defence (which is the truth/ what truely happened with me on that day) would be prejudicial to them and confuse the jury.I don't disagree, the truth is prejudicial to their claims against me. It very well may confuse a jury who has been told by the media that many there that day went to the capitol because Trump told us to and that we were were intending to overthrow the government. Here is what I suggest, to eliminate potential confusion. First, I show my videos and evidence that I personally witnessed that made me feel as if police were welcoming me in, that I was allowed to protest as I did, and where I did. Then, after my direct evidence and videos showing officers who I encountered has been shown, I then present further evidence to show the jury that Capitol Police were welcoming us to protest inside through their actions, words, and in-actions. This of course isn't relevant to my state of mind, but it is relevant to establish a strong and true foundation that Capitol Police as a collective were allowing conduct like mine to happen when I was in the building/ grounds.A simple jury instruction that the jury only use videos that I took, or videos that I'm in/ next to as evidence to my state of mind would negate any supposed prejudice to an impartial ruling.Now I know I already in a way argued this, but I want to address this aspect of their argument still just in case. The government argued such evidence would not be admissible under rule of evidence 401, however that, was to my state of mind. The court now knows why such evidence should be admitted. Further, I love what the Rhine Court said on this:United States V. Rhine (D.D.C. 2023):"Relevance under Rule 401 is a low bar, merely requiring that evidence have "any tendency" to make a fact of consequence more or less probable... Surely, if the jury found that defendant brought knives and pepper spray with him, into the capitol, it would tend to show he intended to engage in disorderly or disruptive conduct while he was there. The officer's testimony on this subject is therefore relevant and significantly probative as to Defendant's mental state."Comments: (See similarities of Rhine case law and this paragraph I wrote): Yes, a low bar, and the evidence that I wish to present has a strong tenancy to make the fact of entrapment by estoppel more probable. Surely, if the jury found out that Capitol police were welcoming others in through their words, actions, or in-actions, it would tend to show that they were fooling people like myself into thinking we were allowed in while I was there. The officers conduct and videos relevant to this subject is therefore relevant and significantly probative as to the likelihood of there being entrapment by estoppel to defendants like me who have claimed it (especially if like me, they have claimed it since the very second they left the building to National Fake News Media).

Read at 9:33 PM

Ryan: Motion 2 of 7, Part 2 of 5In conclusion to this long and multi pronged argument, if the court wants to fully assess the situation and the jurors are to be made fully aware of whether police were allowing protesters like myself to protest as we were, they must also be able to view videos relevant to that subject (whether police were allowing protesters like myself to protest as I did). Such evidence would certainly be relevant to that subject, as we can clearly see from the Dellums and Barham DC Circuit courts. That is the full "zoomed out" picture.6) The government again "conveniently" cites another irrelevant decision as to why this court should grant their motion in my case when they cite the decision reached in United States v. Chwiesiuk (D. D.C. 2023). Response: They "conveniently" failed to share that the defendants in that case didn't intend on pushing such defences, the defence didn't object! Of course it was granted!Further, other issues with this case include the false assumption that all protesters "faced temporary and permanent barricades and Capitol Police positioned to prevent unauthorized entry to the Capitol" and that "police "engaged in combat with the rioters to prevent them from... breaking police lines". These assumptions clearly also had an effect on the conclusion reached in this motion. As mentioned and testified to, I saw no such things where I would enter.This court also relied on chief judge Howell's previous position on such matters in Chrestman. Since then, her position has clearly evolved to welcome an entrapment defence from such defendants so long as a proffer of evidence is shown.7) The government cites chief Judge Howell's previous view of entrapment by estoppel in Chrestman.Response: They "conveniently" failed to bring up how her view of entrapment by estoppel in January 6 cases has evolved. She no longer suggests that the Capitol Police don't have authority. She no longer asserts that no January 6th defendant could claim such a defence given police barricades, police lines, and police orders restricting entry at the Capitol. In fact, reading her writings in Eicher (2023), it's clear she is open to defendants offering evidence for such claims (entrapment by estoppel), so long as it's not based on President Trump, that she has remained solid on. She even helps prove that the DC courts recognize and are willing to look at and consider implied entrapment by estoppel (including in-actions.) See Part 5 section 5 for all the proof and other relevant arguments and case law.Part 3: Response To Pages 6-10 Of The Government's Motion In Limine To Preclude My Entrapment By Estoppel Defence:1) The government "submits that [I] will be unable to put forth any evidence that law enforcement officers gave [me] express permission to enter the Capitol Grounds, much less the Capitol building...given that there were "obvious police barricades, police lines, and police orders restricting entry at the Capitol."Response: First, the government fails to recognize what even DC district court judges have shared, that the grant of permission need not be explicit... Still, I'll argue their flawed position for fun. I don't dispute that they gave didn't me express permission to be on the grounds, until I spoke to the officer inside (who gave me all the rules to follow, and permission). However, prior to speaking to that officer there were no "obvious police barricades" that I noticed, the government knows these were removed, or moved long before I arrived. The government knows I didn't see any police until a crazy old man broke into the Capitol with his cane and entered into an area (not where I entered) that police made clear they didn't want people in. I told national fake news about this, and even pointed to him on live television "this guy broke in over there". Finally, the government knows that I was given no police orders restricting my entry, in fact, quite the opposite occured, which they know also, hence them trying to stop me from introducing evidence on such things. Prior to entering I heard others sharing that police were allowing us in. I then observed police and listened to and watched

what the protesters around them were saying and doing while also watching and listening to those officers responses. Everything lead me to believe that I was allowed to enter the Capitol.Though the government has taken and refused to give my video evidence which shows the officer I spoke to giving me express permission and rules, I still have additional evidence.First, testimony is evidence, and I have provided such evidence already, though here they pretend I didn't share such evidence.Second, I have a non-audio version of the officer and I speaking over CCTV footage. This is important because the government knows I did not view this evidence prior to April 2022. Given that I testified on 10/12/21 to speaking to this officer, sharing he went where he actually went after our talk, and given that the talk happened in the area I said it did, all before I had seen this video, further supports that I was telling the truth, that I got permission and rules from that officer.Third, my other videos further support that I was given permission to enter.Fourth, videos from the body cameras of officers further support that they were allowing people who were protesting as I was to enter and protest.2) That my actions of entering through a broken window belie the argument of entrapment by estoppelResponse: I already addressed this (see Part 2, #3). 3) Citing ChrestmanResponse: Dealt with a few times earlier, but, see her updated view of thinking in Eicher (Part 5, Section 5).4) Again on page 8 the government relies on an outdated view from Chief Judge Howell on Chrestman to claim that officer inaction or failure to notify a person that their actions are unlawful cannot shield an individual from liability for an illegal act.Response: Tell that to the Dellums, Carr, or Barham courts, all DC Circuit cases in which for many protesters, police failed to warn those present that they were breaking the law and had to leave/ stop what they were doing. The court took note of police failures and inactions to properly warn protesters and ensured the defendants charges were dropped as a result of these factors. Remember, the Commander of the MPD in Barham told his agency to ignore minor violations of the law to accomodate protesters (do not act to arrest them or warn them their activity is illegal). The Barham court saw this as a reason to throw out the convictions. That conversation was clearly not in the presence of the protesters, the DC circuit recognized that when looking into officer inactions, or orders of inaction to an agency, a look into the collective is admissible. 5) They cite Cox V. Louisiana to help support this assertion.Response: Though the government tried to cite this against me, there is actually so much that proves it supports an entrapment by estoppel defence in my case that I made an entire breakdown/ section of comparisons and arguments relating to this case. Please see Part 5, Section 6.6) They cite United States V. Gutierrez-Gonzales, 184 F.3d 1160 (10th Cir. 1999)Response: Though the government tried to cite this against me, there is actually so much that proves it supports an entrapment by estoppel defence in my case that I made an entire breakdown/ section of comparisons and arguments relating to this case. Please see Part 5, Section 7.7) They cite Garcia v. Does, 779 F.3d 84, 95 (2nd Cir 2015)Response: Though the government tried to cite this against me, there is actually so much that proves it supports an entrapment by estoppel defence in my case that I made an entire breakdown/ section of comparisons and arguments relating to this case. Please see Part 5, Section 8.8) They argue that "it is illogical to conclude that officers overwhelmed by a hostile, forceful mob were permitting or authorizing rioters to enter and explore the building simply because those officers did not physically oppose that which they could not stop.Response: (See Part 5 section 8 for full comparisons/ arguments) In Garcia V. Does, the crowd was as officers described "hostile", the police shared they too were overwhelmed by the number of protesters. However, once they got enough police to take care of the protesters, they arrested them. Not only that, they gave them three dispersal orders and time to comply(they didn't do that for me).On January 6th, what happened with the protesters once the

police had enough people to arrest them? They didn't arrest them so long as they obeyed curfew and didn't break the rules that were set out. Video after video after video, it is shown that whether protesters outnumbered police, or vice versa, arrests were not conducted during the time I was inside, and even for large parts of time before and after, so long as they behaved as officers shared we had to behave.Such accommodating actions for protesters on the part of police agencies aren't unusual, see Meyers V. City of New York (2nd cir.) or Barham V. Ramsey (DC Cir.). Even so, as shown in Carr V. District of Columbia (DC Cir.), "a crowd substantially filled with violence does not negate the requirement of police to give a dispersal order that protesters can hear". Furthermore, as shown in a NAACP Supreme Court case against a hardware company, you aren't suppose to punish individuals based off of the actions of others in a protest, I was not hostile, most around me were not hostile... Their argument is beyond flawed.9) They argue that the court should preclude evidence of officer inaction not perceived by me. Response: This has already been argued: See Part 2 number 5.10) They cite Williams case law.Response: Given that the arguments and citations taken from Williams are already addressed in Eicher, Cox, and Chrestman references that I argued, it also has been, or will be address in those sections of Case law arguments.Part 4Case Law Arguments:Section 1: General/ Overall:1: As the 2nd circuit shares: "An entrapment by estoppel defence doesn't depend solely on absence of criminal intent (since the government tries to falsely assert that I must have had criminal intent because I entered through a broken window in a place called "The People's House"). Nor is it limited to the circumstances of actual authorization (as they assert that I didn't receive 'actual' authorization to enter, and falsely assert that I didn't receive 'actual' authorization to remain and go/ protest as others around me and ahead of me were). Rather, it focuses on the conduct of the government leading the defendant to believe reasonably that he was authorized to do the act forbidden by the law (something that the government tries to ignore when it is the central focus of this defence). The doctrine depends on the unfairness of prosecuting one who has been led by the conduct of government agents to believe his acts were authorized. This focus on unfairness arises from circumstances that gave birth to entrapment by estoppel."2: "The question of entrapment is generally one for the jury, rather than for the court." -Matthews V. United States, 485 U.S. 58, 63, 108 S. Ct. 883, 99 L.Ed. 2d 54 (1988)Comments: That means I should be allowed to present it in opening and closing statements as well as during arguments.3: The main focus is on the government not me: "...after public officials acted as they did, to sustain appellate later conviction for demonstrating where they told him he could 'would be to sanction an indefensible sort of entrapment by the state-concicting a citizen for exercising a privilege which the state had clearly told him was available to him'" -Cox, 379 U.S. at 571 (quoting Raley V. Ohio, 360 U.S. 423, 426, 79 S. Ct. 1257, 3 L. Ed. 2d 1344 (1959)."4: I acted just as others around me were: The 6th Circuit in Levin, 973 F.2d at 468 also had an entrapment defence. The court shared that the defendants conduct was identical to that which HCFA had approved. His conduct was not vastly different from what they authorized... Comments: I personally witnessed everything I did, I mirrored people's actions so long as I knew officers were allowing such actions due to their personal actions, words, or inactions. I witnessed the man on a desk waving a flag next to the officer I got rules from, I witnessed others smoking, I witnessed the officer who gave rules to me walk right by Jeff Merkelys' room. Have the court take notice of the photo that the government provided in their motion in limine, notice how many people are in that photo prior to me entering. They are further than the eye can see and that the camera can capture, yet I wasn't that far away from the door/ window, that's because I waited to observe the actions of police and what they were and were not allowing prior to entering. I didn't jump on top of the desk until I

took notice that the man already on the desk was ignored by the officer I got the rules of the day for, and I didn't move down towards the Crypt or Jeff Merkely's office until many others had done so, and when I was temporarily sketched out again I inquired to ensure that I still was allowed to go down to the statues (Crypt) and I was given evidence to suggest that I was by a separate Capitol police officer. 5: United States V. Wilson, 721 F.2d 967, 975 (4th Cir. 1983) (violation of statute must be initiated by government agent): Comments: Though it was through their actions, there still is a major difference in this case compared to mine. The difference in my case is that Capitol police and MPD have long established methods and requirements for arresting a group of protesters or those in a riot. They are required to warn the protesters that they are breaking the law, to stop, and to be given adequate time to leave/ stop. Still, even if this wasn't the case, for me, the Capitol police did initiate this violation through their words, actions, and inactions. I did not blindly rush in, I waited and observed (with my eyes and ears) the police, what protesters around them were saying, and what was seemingly (and clearly) allowed and not allowed. 6: United States V. Nakouzi, November 30, 2005, 2nd Cir.: "To prevail on a defence of entrapment by estoppel, the defendants conduct must also remain within the general scope of the assurance of authorization; this defence will not support a claim of an open-ended licence to commit crimes in the expectation of receiving subsequent authorization." Comments: Again, everything I did was not done prior to me taking notice that police were allowing others to do it. Everything I did was already done within the view and scope of the present officers, and to ensure I was allowed to do what others were allowed to do, I personally sought and received express permission to do them, most of which had already been conveyed as being welcomed through implied actions and inactions.7: United States V. Hurtado, 47 F.3d 577, 584 (2d Cir. 1995) ("A defence theory must be charged as long as it has some foundation in the proof, no matter how tenuous that defence may appear to the trial court.") "Accordingly, the government's motion to preclude these defences and related evidence is denied."Comments: Clearly, Judge Howell now recognizes this, compare her previous position in Chrestman with that of Eicher.8: When my "meter" of trusting that I was allowed enter, remain, or to protest as others were wavering, I inquired to see if I truely was allowed to do so three separate times. Thankfully, all three times are on video. This shows I was sincerely desirous of obeying the law. This is important because as the law-books share: "To invoke the entrapment by estoppel defence the defendant must show that he relied on the officials statement and that his reliance was reasonable, in that a person sincerely desirous of obeying the law would've accepted the information as true and would not have been put on notice to make further inquires." Comments: When in doubt I made the inquires, all three resulted in a "yes", that I was allowed to do as others were before me in the areas I was in.9: As the law-books share: "this defence is really a narrow exception to the general rule that ignorance of the law is no excuse."10: In Cox V. Louisiana, a state statute made it a criminal offence to demonstrate "near" a courthouse. Defendant, the leader of a planned demonstration was advised by police officials that a certain location across the street from the courthouse was permissible. When the demonstration began, defendant was arrested for being too close to the courthouse. The court again reversed, stating that this was "an indefensible sort of entrapment" because defendant was wrongly advised by the police officials who were "charged with responsibility for administering and enforcing the statute. Comparisons: In my case, I was advised by police officials (both through words, actions, and inactions) that certain forms of protesting were permissible in certain locations. After the demonstration, I was arrested for following the advise. This is an indefensible sort of entrapment because I was wrongly advised by the police officials who were charged with responsibility for

administering and enforcing the statute. However, an even more extreme issue is presently working against the government in my case and that is that the Capitol police are required to order dispersals and warnings prior to making arrests. The police in Cox were not required to do this. The Capitol police did not do this, further strengthening the point that this is/ was an indefensible sort of entrapment.11: It's easy for people to have thought we were allowed to protest as we(the peaceful ones) were: The statute 40 U.S.C §5104 (f) (I'm facing two 40 U.S.C §5104 charges), the statute restricting expressive activity on the grounds of the capitol, became the subject of a constitutional challenge in Jeannette Rankin Brigade V. Chief of Capitol Police, 342 F. Supp. 575 (D.D.C. 1972). There, a three-judge court declared the statute unconstitutional under the 1st and 5th amendments, enjoining the Capitol Police from enforcing it. The court ruled the government's interest in maintaining decorum failed to justify a ban on political demonstrations outside the building housing the nations elected representatives. The Supreme Court affirmed in 1972.12: Meyers V. City of New York (2nd Cir. 2020): The mayor of New York City temporarily forwent enforcing trespass laws against protesters occupying Zuccotti Park in Manhattan telling the police to focus on more serious crimes in the area (This is similar to what Capitol police clearly did, they temporarily forwent enforcing trespass, disorderly conduct, and parading and picketing laws, when someone began to assault officers they would then take action, when some protesters hopped up on statues, they spoke loudly and forced the protester off of the statue.). After the NYC police department evicted the protesters and charged them criminally, the protesters insisted that they, like the Cox protesters, had relied on the Mayor's statement that 'we'll allow [the protesters] to express themselves" "as long as [they] obey the laws." (2019 U.S. Dist. Lexis 53150 [WL] at *1 (cleaned up)). That statement however did not advise the protesters that the behavior for which they were prosecuted was lawful(avoiding a dispersal order being the main thing the court focused on).Comment: Here, the police clearly were witnessing the protesters before me conduct the very action that I soon would get permission to do myself/ mirror. Unlike in Meyers, I didn't enter and then act beyond that which the officers had previously authorized. Everything I did was authorized by Capitol Police through both words, actions, and inactions. As the court shared, unlike me, the police had probable cause to arrest the protesters for disorderly conduct and trespassing after the protesters ignored a dispersal order.13: Chrestman: "Central to Raley, Cox, and PICCO is the fact that the government actors in question provided relatively narrow misstatements of the law that bore directly on a defendants specific conduct. Moreover, in all 3 cases, the government actors statements were made in the specific exercise of the powers lawfully entrusted to them, of examining witnesses at commission hearings, monitoring the location of demonstrations, and issuing technical regulations under a particular statute, respectively." Comments: I was given relatively narrow misstatements of the law that bore directly on my specific conduct. Moreover, the government actors statements were made in the specific exercise of the powers lawfully entrusted to them, Capitol police issue technical regulations for the capitol building and grounds, monitor and allow demonstrations, and warn of arrest/ arrest people for breaking rules on Capitol grounds or the building.14: Blood, 435 F.3d at 626: District court's instruction incorporated both elements of entrapment and entrapment by estoppel.Comments: Both were present at the Capitol that day, the prosecutor from William Popes case admitted that. I seek to have both elements presented and argued.Section 2: Case Law And Arguments From Dellums V. Powell, August 4, 1977, DC Cir.:1) Plaintiffs were arrested by U.S. Capitol Police without an order to quit as they protested the Vietnam war on the steps of the U. S. Capitol. The court held that since class members were arrested without a warrant, unlawful imprisonment was presumed as a matter of

law, and the burden of proof was on defendant police chief. The court held that an order to quit and an opportunity to disperse had to precede arrests.Comments: Not only did police not order me to leave, they did the opposite. Further, the government should bear the burden of proving that I was ordered to disperse and given adequate time to comply just as the Dellums court required.2) In any situation in which an order to disperse can constitutionally be given, there will be substantial noise or disorder. For this reason police will either have to warn each demonstrator individually or work through the leaders of a demonstration to the extent they have access to powerful public address systems.Comments: On 1/6/21, Capitol police did not warn me or order me to disperse, even when I was speaking to them directly or walking by them where there was not a ton of noise, whether inside the capitol or outside the Capitol. Since then, I've come to realize (mainly because I'm looking for such evidence) that even in areas where police vastly outnumber protesters, peaceful ones at that, they often don't order a dispersal order.3) At the capitol the leaders were stopped by a capitol police officer, but were allowed to enter the grounds when congressman Dellums appeared and explained the arrangement for meeting on the Capitol steps. Comments: This goes against the governments false claim that Capitol police don't have the authority to authorize protesters to enter and protest at the Capitol. Additionally, just as in my case, the protesters were at first stopped from being allowed on the grounds/ inside the building, but later were. It could be surmised that they had a similar situation happen in that they were informed that Trump had told us we were going to protest at the Capitol just as Congressman Dellums told police this and later got permission to do as they normally would not be able to do, protest on capitol grounds. It also could be surmised just like in Dellums, just because protesters were at first stopped by capitol police from protesting at the capitol, the police had the authority and power to change their minds and allow protesters to gather at the capitol and protest.4) While Congressman Abzug was addressing the crowd, the police cordoned off the bottom of the steps, preventing anyone from leaving, and began arresting members of the assemblage. Comments: Just as in my case, police welcomed my presence and activity, and then later, despite that permission, I was arrested.5) "... the record shows that chief Powell unquestionably took some steps to order the crowd to disperse on May 5 and, moreover, he testified that standard practice at the Capitol would be for such orders to be given because it was the experience of the Capitol Police that many people were not aware of the statutes governing conduct at the Capitol and would, upon being notified of a potential violation bring their conduct into line with the law. (Tr. 2096, 2099-2100, JA 1286, 1289-1290). Comments: In my case, all of the Capitol police and Metropolitan police I personally was around and interacted with did not take any steps to order me to disperse or to stop protesting as I was, indeed, they did the opposite and welcomed it. Additionally, take note, the Capitol police chief shared that many people are not aware of the statutes governing conduct at the Capitol, and upon being notified of a potential violation, they typically bring their conduct into line with the law. Even on the limited law library, there are so many examples of people incorrectly thinking they are allowed to be present and protest because the building is called "The People's House. So, why were the orders to stop and to disperse not given if that is their experience, especially with a present crowd that was overwhelmingly filled with protesters shouting and sharing their support and affinity for police ("back of the blue"). Would these people not want to please the police more so than those who may detest them, whom these officers also encountered in the past and gave dispersal orders to? Why was the standard procedure ignored, and even more extreme, why was the opposite conveyed to me/ others around me?6) In addition, regulations issued by Chief Powell required that persons be given individual warnings to leave before they were placed under arrest for participating in a

mass demonstration. According to Chief Powell's testimony, however, such individualized orders to leave were not given on May 5. Notwithstanding this administrative interpretation, Chief Powell urges that orders to disperse are not required by section 124 and, further, that a violation of his own regulations in this regard has no bearing on the falsity of an arrest under that section. For the reasons set forth below, we find that orders to disperse were required, and we therefore reject Chief Powell's contention.7) There is a past history of being allowed to protest in the Capitol, even if police tell you to leave due to the 1st amendment. This history definitely could have solidified a thought process for many of being allowed to protest on Capitol grounds. This was shown in United States V. Nicholson, 97 Daily Wash. L. Rptr. 1213, No5, 20210-69A et. al. (D.C. Ct. Of Gen. Sess. June 19, 1969), aff'd, 263 A.2d 56 (D.C. App. 1970), appendix at [1]-[2]. In this case (which was cited by the Dellums court) 13 quakers are arrested while standing on the steps of the Capitol reading names of Vietnam War dead from the Congressional record. They were charged... in that they failed to leave the Capitol when requested by a Capitol policeman to do so. The Quakers moved to dismiss that their activities were protected by the first amendment. Judge Greene agreed, holding that the Capitol was a public forum.8) "the protesters were unquestionably granted an unwritten "permit (implied permission)", as described in Nicholson, to assemble on the Capitol Grounds and steps. Because police officials in effect (implied entrapment by estoppel) told the demonstrators that they could meet where they did, to sustain [plaintiffs] later conviction where they told [them they] could 'would be to sanction an indefensible sort of entrapment by the state-convicting a citizen for exercising a privilege which the state had clearly told him was available to him.' (Cox V. Louisiana)... In these circumstances, no constitutionally valid arrest could have been made until an order to disperse had been given which was itself based on permissible considerations (Dellums again citing Cox V. Louisiana)." Comments: And the government tries to fool this court by saying that the Capitol police can't tell people that they can protest at the Capitol? That they can't give permission to people? That implied entrapment by estoppel isn't recognized? That the DC courts haven't weighed in on entrapment by estoppel defences? Well, now you know! 9) "The evidence is similarly in conflict on the question whether Chief Powell made a bona-fide effort to make sure the crowd heard his dispersal order. Although there was certainly evidence that the jury could credit to the effect that Powell made attempts to inform the crowd and was each time hooted down and drowned out, there was also evidence that Chief Powell realized that the crowd had not heard his warnings and yet took no steps to correct the situation. For example, a reporter present at the scene testified that he had overheard Chief Powell say to Chief Wilson "that he [Powell] wasn't sure whether they [the demonstrators] heard him or not, or [that] he didn't think a lot of them heard him. Regardless of this, no further warnings were made, although such warnings were required by Chief Powell's regulations. Comments: Can the government even claim that police did at least as much as the Chief in Dellums?9.1) Nor was use made of a powerful police sound truck that was at the scene, nor was any attempt to use the public address system of the demonstrations leaders; indeed, an offer from Congressman Dellums to make announcements over that system was specifically refused by Chief Powell. Chief Powell urges us in a brief that the fact that no one heard his warnings was due to the loudness of the crowd and, therefore, was not his fault. We are not impressed with this argument. In any situation in which an order to disperse can constitutionally be given there will be substantial noise or disorder, see Washington Mobilization Committee V. Cullianan, Supra note 31, 566 F.2d at 120. For this reason police will either have to warn each demonstrator individually or warn through the leaders of a demonstration to the extent they have access to powerful public address systems. Alternatively, it appears that a

device called a "sound curdler" is available which can make the police heard over most tumult: Q. What is the curdler that you referred to? A. That is an audio curdler that we had installed on top of the barricade car, which is a converted Brinks wagon kept in the yard up at the Tactical unit. This particular curdler was bought in 1970 from applied electronics over in Alexandria because of the fact that we had given a lot of instructions on bull horns, which is the small audio handler that people claimed they could not hear distinguished over the roar of the crowd. Parenthetically, it should be noted that Zanders testimony in Cullinane would tend to indicate that Chief Powell should have been aware that the hand-held bull horn he testified he used to give his orders was not powerful enough to reach the crowd." Comments: How is it that in the early 1970s the Capitol police seemed to have on hand powerful public address systems to disperse of large crowds, but on January 6th 2021, the Capitol police couldn't even find their weak bull horns anywhere? Take one look into my crappy legal law library and you'll find that Capitol police still in the 2000s and even 2010s were using their bull horns and other PA systems to disperse crowds... Why did they disappear on the 6th? Why did Capitol police give me directions and rules, or stand and smile instead of giving me individual dispersal orders? They had innumerable chances to do so!

Motion 2 of 7, Part 3 of 510) "...Thus, although the line of Marchers was initially stopped at the boarder of the Capitol Grounds by Inspector Xander of the Capitol Police, he stepped aside upon being told by Representatives Dellums, Abzug, and Mitchell that they had invited the Marchers to meet with them. Comments: Perhaps the capitol police heard that Trump had invited us to meet us there. Perhaps friendly Congress members or senate members would be present and shared that they planned to meet or speak with us just as others had done outside of the White house. Perhaps there was an auditorium like setting inside the building where a select number of protesters could sit/ stand to listen to speakers (after all, only a select few made it into seated positions in VIP and directly outside it, all others had to stand or bring their own chairs). These are all thoughts that briefly crossed my mind either in trying to guess what was going on at the capitol before I got there or while encountering police inside... I was open to tons of possibilities and trying to assess what the actual situation was, including even (the prosecutor will love using this) that some protesters were starting a revolution when they initially broke in after hearing that Mike Pence certified the election (perhaps they recognized the tyranny and that the election was stolen (after all, we (the American people) have a right and a duty to overthrow a tyrannical government)). Regardless, I personally had no intension of breaking any laws, I'm not selfless enough to do that, I loved where my career and life were going and was not looking to screw it up, hence why I was only interested in coming into the capitol when people started sharing "they are letting us in!" and even then, I only entered after observing police truely were letting us in. The same situation happened at the Ellipse hours earlier, excited and violent protesters broke through security lines and jumped over bike racks (but this time I clearly saw bike racks, though they were mainly used to help guide lines). A security officer was even knocked to the ground via a punch from a supporter. The secret service agent, the women (campaign staffers) and I were almost knocked down at the violent pushing of the crowd... Still, security allowed many of those people who broke through the security line to continue on. Very similar to what happened hours later at the capitol.11) "In addition, no efforts (inaction) were made to keep the protesters from assembling on the steps." Comments: This is exactly what many people (including myself) experienced when we arrived to the steps, right outside the building, and shortly after, inside the Capitol building. Later, many protesters including myself didn't see any efforts to keep protesters

from assembling in certain areas in the capitol.11.5(11 continued)): "There can be no doubt that these actions (or as they put it, inactions) constituted police permission to assemble on the steps." Comments: This shows the DC Circuit recognizes that police in-action ("no efforts (in-action) were made to keep the protesters from assembling on the steps") can constitute implied permission/ entrapment by estoppel ("There can be no doubt that these actions (in-actions) constituted police permission to assemble on the steps") (Further, the court also shows that actions/ implied entrapment is recognized in the same section because in-action is the action of doing nothing, so the court is saying actions can also be implied entrapment by estoppel.).12) "Chief Powell was not acting in good faith. Chief Powell's INACTION after his remark to chief Wilson indicates that Powell was aware that notice to the crowd had been inadequate. Buttressing the interference of bad faith is the further fact that chief Powell, by relying exclusively on dispersal orders shouted over a hand-held bull horn in attempting to give notice, violated his own "procedure for handling protest groups."Comments: Again, the DC circuit does consider police inaction in entrapment by estoppel cases.12.5(12 continued)): Federal exhibit 11: This regulation states that preliminary to arrests the ranking official in charge at the scene shall approach the demonstration leadership and explain the law violations which are being committed. He shall request that any and all violations be corrected immediately. If such a request is complied with, no further police action shall be taken. If the leaders do not comply with the request, the official shall publicly announce to the crowd through a voice amplification the following "I am [insert name and title]. I hereby inform all persons assembled that you are in violation of [state the regulation in general terms and give statute number in code if known]. In the name of the United States Capitol Police Board, I command all of you here assembled to disperse." The official in charge shall wait a reasonable length of time for compliance. If after this first announcement nothing develops, the official shall repeat the aforesaid order. Arresting officers shall accompany the transporting officers to the proximity of the individuals about to be arrested. The arresting officer shall state to the violator that you are in violation of (give law violated). When applicable state "You are requested to please depart this area immediately and peaceably or you shall subject yourself to immediate arrest." 13) At trial, Chief Powell maintained that he could not ascertain who the leaders of the demonstration were, although he further admitted that he made no attempt to locate any of the Congressman who had invited the group onto the steps. Nor apparently was any attempt made to use the sound amplification equipment of the demonstrators to give dispersal orders. Chief Powell admitted that he never identified the statute alleged to have been violated. Chief Powell admitted that he knew for a fact that "none of the arresting officers made the statement [to leave or to be arrested] and gave that last opportunity to leave to the people who were being arrested."14) "The application of trespass statutes to government land presents greater complexities (to an already complex charge that typically requires a "knowingly" factor, making government land "DOUBLE COMPLEX" in regards to trespass statutes)... But there are other types of government land-public parks, streets, sidewalks, and historic lamdmarks-which may not ordinarily be closed to the public for reasonable use ("TRIPLE COMPLEX"). See Hague V. C.I.O., 307 U.S. 496, 515-16, 59 S. Ct. 954, 83 L. Ed. 1423 (1939); Marsh V. Alabama, 326 U.S. 501, 90 L. Ed. 265, 66 S. Ct. 276 (1946): Cox V. Louisiana, 379 U.S. 536, 13 L. Ed. 2d 471, 85 S. Ct. 453 (1965); Shuttlesworth V. Birmingham, 394 U.S. 147, 22 L. Ed 2d 162, 89 S. Ct. 935 (1969) Gregory V. Chicago, 394 U.S. 111, 22 L. Ed. 2d 134, 89 S. Ct. 946 (1989). The Capitol of the United States, a national historical shrine and the political centerpiece of the Republic, is in the latter category. It may not be declared off limits to the people. Indeed, the Congress invites and welcomes the public. In

view of the broad and general invitation extended to the citizenry to this preeminently public building and the surrounding grounds , individual citizens could not be held to be "without lawful authority to remain... thereon", within the meaning of the unlawful entry statute, in the absence of some other, specific bar to their presence("QUADTRUPLE COMPLEX")."Comments: Out of all the buildings in the country, and arguably, the world, the Capitol building seems to be the most complex regarding trespassing laws. Clearly, the Capitol police and the DC circuit recognize this which is why they approved of Federal exhibit 11 (see 12.5 above) to be implemented as as a required regulation for the Capitol police to follow prior to arresting people on Capitol Grounds/ the building.15) the court emphasized that the fair notice required by the Cullinane court is notice reasonably likely to have reached all of the crowd despite any noise the demonstrators may have been making." id. at 181-82 n.3116) The Dellums jury instructions: "...the defendants (Powell, police, and Government) were also required to prove that demonstrators "were in fact ordered off" the property, and that they were given a "chance of getting off or staying on and being arrested" and that they "ignored the order knowingly". Guided by these and other instructions, the jury deliberated for more than a day. The substantial verdict they returned in favor of the plaintiffs clearly shows that the jury credited the plaintiffs" characterization of the events in question... Plaintiffs were able to introduce voluminous evidence in support of their points that... the warnings were not heard." Comments: Clearly, the DC circuit courts recognize police inaction from the Capitol police, they recognize it so much they gave this jury instruction, with the burden on the government! I'm seeking the same thing. Further, just as the DC circuit court allowed those charged to present voluminous evidence to make their points that the police failed to do their duty, I should be allowed to as well.17) ...a vague statute puts too much discretion in the hands of officials with the result that the statute may be enforced selectively against those who hold unpopular points of view. Comments: Take notice of my 1512 charge, obstructing an official proceeding. Take notice of Tigthe Barry, a man my magistrate judge let go for violently obstructing and single handily interrupting his 7th official proceeding. She only made him pay a 10 dollar fine and serve 12 hours in jail for his 7th time interrupting an official proceeding, and even grouped in his 2 contempt of court actions while on pre-trial release, one of which was for assaulting a secret service sargent with a tent pole during a political demonstration... The 2 more recent times he personally interrupted official proceedings were for Brett Kavanaugh and Jeff Sessions, republicans... But I'm charged with the 1512? That same Magistrate that Tigthe had gave me 30 something conditions of release as she only gave him 2 or 3? This is exactly what the Dellums court warned about!Section 3: Case Law And Arguments On Barham V. Ramsey January 13, 2006 DC Cir (This Court Relied On Dellums V. Powell In Coming To Its Decision).:1) Even the Metropolitan Police Department has a similar rule regarding warning protesters (even a protest filled with substantial amounts of obstruction or violence) prior to arrest: "Newsham and Ramsey concede that the mass arrest was executed with no prior warning to the occupants of the park to disperse and no warning to them that arrest was imminent. In the end, 386 people were arrested. The District court denied the governments motion, holding that MPD's arrest of hundreds of individuals assembled in the exercise of 1st amendment rights, without first issuing an order to disperse followed by a reasonable opportunity to comply, violated plaintiffs clearly established constitutional rights." 1.5 (1 continued)): "Murphy explained that if he issued an order to arrest without first issuing three successive warnings, he would violate his agency's mass arrest policy."... The government sought an appeal of that decision and lost again.2) "In the weeks leading up to the protests, MPD's civil disturbance unit braced for an influx of protesters.

Ramsey commanded the department throughout the pre-protest planning and allegedly told members of his staff that officers should overlook minor violations of the law in order to accomodate protesters." Comments: Clearly, the Capitol police were doing the same. They knew weeks ahead that a protest was coming, they had been warned through intelligence reports of the threat of violence and law breaking. Yet for whatever reason, they clearly, even according to their own and MPD officers, didn't prepare for it... Still, they clearly told members that they should overlook minor violations of the law in order to accomodate protesters. I witnessed it myself, the world witnessed it.3) Again, the Barham court found that even MPD was required to issues a dispersal order to protesters in order for the arrests to stand: "When compelling circumstances are present, the police may be justified in detaining an undifferentiated crowd of protesters, but only after providing a lawful order to disperse followed by a reasonable opportunity to comply with that order. Two cases spell this out: First in Washington Mobilization Committee V. Cullinane, 184 U.S. App. D.C. 215, 566 F.2d 107 (D.C. Cir. 1977) ("It is the tenor of the demonstration as a whole that determines whether the police may intervene; and if it is substantially infected with violence or obstruction the police may act to control it as a unit."..."the police may validly order violent or obstructive demonstrators to disperse or clear the streets. If any demonstrator or bystander refuses to obey such an order after fair notice and opportunity to comply, his arrest does not violate the constitution even though he has not previously been violent or obstructive.") (Second case cited was Dellums)."Comments: This tosses out the governments excuse of "It was a hostile crowd", which I witnessed many areas where it was not only nit violent, but people wearing Blue lives matter clothing and waving similar flags... They have encountered worse, like less than a year earlier at the White house where more officers were injured under the group that screams "kill all cops", ANTIFA...4) The court held that "a reasonable police chief" encountering the events unfolding in Pershing Park "would recognize the need--and indeed the duty--to ask a subordinate officer whether a dispersal order had been given prior to ratifying a mass arrest."-388 F. Supp. 2d at 61.Comments: Did the FBI do this prior to coming to arrest me? Just wondering.5) "Institutionally, moreover, MPD clearly grasped the constitutional rights elaborated in the applicable case law. MPD's Manual for Mass Demonstrations and Responding to Civil Disturbances instructs officers on the protocol for dealing with situations like the one Newsham faced. Under the guidelines established by the department (which are only partially reproduced on the record), officers seeking to disperse a crowd must "attempt to verbally persuade the crowd to disperse of its own accord "by issuing an initial warning" followed by a "final warning." Then, "if, after a reasonable amount of time following the final warning, the crowd continues in its refusal to disperse, the unit commander shall direct that the violators be arrested." -MPD Manual fo Mass Demonstrators and Responding to Civil Disturbances at 21, J.A. 564.Comments: Did the MPD do this for me on 1/6/21? No. Why didn't they? Did Capitol Police command also instruct their officers that they were nit going to be arresting us/ that certain conduct was allowed in order to accomodate us?6) Significantly, the MPD Manual acknowledges that its procedures embody judicially enunciated constitutional principles. It prefaces the discussion of mass arrest procedures by noting: "Following the civil disturbances of April 1968, procedures were developed by the Metropolitan Police Department, in cooperation with the courts, to provide for the speedy, but fair administration of Justice during mass arrest situations." -id at 22, J.A. 565. The procedures now in place apparently resulted from "court ordered prescriptions against certain mass arrest techniques followed during the April 1971 disorders.Comments: Go and read up on the attached newspaper titles from that era that the court provided in their notes, they make the fed set up

January 6th riot look like kindergarten in comparison. Yet the police and courts didn't allow the excuse of "but the crowd was hostile (which they clearly were)" to stop them from requiring such procedures on warning protesters (even substantially sized, lr substantially violent ones) to disperse or face arrest. Though the government tries the same argument they tried numerous times years ago, it should fail for the same reasons. The national guard was called and still couldn't stop those disturbances and riots for weeks, even months. Our set up by the feds riot was only 4 hours, and I think I'm the only one that came back the next day, and all I did was buy an airforce one backpack from across the street of the Capitol, clearly, this isn't a new situation that the courts have been introduced with.7) The Circuit court affirmed arrests were improper due to no warnings of breaking the law or orders to disperse/ reasonable amount of time to respond. "In a government of laws, the regulation of conduct- particularly conduct in the sensitive area covered by the First Amendment- must be predicated on a set of definite rules, not on the opinions of police officers." - The Barham court citing the Dellums Court who was citing Cox V. Louisiana, supra, 379 U.S. at 552.Comments: Again, the DC courts clearly have tossed their hat into the ring and made their positions clear regarding entrapment by estoppel defences.Section 4: Carr V. District of Columbia (June 17, 2008):Protesters against president Bush organized a concert in DC on 1/20/2005. Fliers handed out said "after the last song we invite you to join in a festive March from this show through the streets of DC to the doorstep of those in power. They also shared they wanted "to create an explosive protest against the war in Iraq and the war here at home as well as against all that represents.Comments: Sound similar to the events of 1/6/21 (Trump: "After I'm done speaking....We are going to peacefully and patriotically March down to the Capitol... to give them (the people in power) the boldness they need... to fight for America...")(Rudy: "Let's have trial by combat!")Along the way, property damage (including windows being broken) commenced from the crowd. Rocks and bottles were thrown at police vehicles, a rock broke the windshield of a police cruiser and fireworks were being used by the crowd. Comments: I do recall windows bring broken at the Capitol, and shortly after leaving the building, some people stupidly charging at a police line outside. I read on the news a man got 5 years for throwing a firecracker at police.The commander of the MPD then sent Civil Disturbance Units to arrest protesters for rioting. The CDU officers arrested them without ordering the protesters to stop or disperse.Comments: CDU units were present, but they didn't arrest me, I was arrested by the FBI 10 days later.Here is what we can learn:1) "Contrary to the District's representation, Cullinane specifically prohibits Mass arrests without notice or opportunity to comply where a crowd has become violent or obstructive." Comments: I was next to MPD for a long time, even taking sexy photos with them, why did they not order a dispersal, or threaten me with arrest, or tell me I was breaking any laws and would be arrested if I didn't leave?2) The government argued that the protesters charged were celebrating the acts of vandalism by cheering and throwing up their hands which encouraged more such acts. The court didn't find merit in that argument.Comments: I've seen the government argue such points in other January 6th cases...3) The district then argued that defendants were guilty of rioting because they continued to move with the "mob" despite the vandalism that was occuring. By continuing to march, the District claims, plaintiffs "tended to enlarge and perpetuate the atmosphere of violence and tumult..." and therefore may be charged with rioting. To this, the court said: "This argument lacks merit. The law is clear that "the right to associate does not lose all constitutional protection merely because some members of the group may have participated in conduct or advocated doctrine that itself is not protected." -N.A.A.C.P. V. Clarborn Hardware Co., 458 U.S. 886, 908, 102 S. Ct. 3409, 73 L. Ed. 2d 1215 (1992).Comments: Similarly, the government

argues this generally and in regards to those with the 1512 charge in that I/ we are guilty of obstructing because we/ I "was raindrop in the field causing a flood". Since I was present as others were obstructing, I too am guilty of obstructing and it shows my intension of obstructing, that is wjat they have argued.4) They then continue: "Rather, when violence "occurs in the context of constitutionally protected activity, precision of regulation is demanded. Specifically the presence of activity protected by the first amendment imposes restraints... on the persons who may be held accountable. If a person is to be punished for his association with those who engaged in vandalism, there must be "clear proof that...he specifically intended to accomplish the aims of the protest by resort to violence." -quoting the Supreme Court case of scales V. United States, 367 U.S. 203, 229, 81 S. Ct. 1469, 6 L. Ed. 2d 782 (1961). 5) The court elaborated further when they said: "Under Supreme Court precedent, a peaceful political protester may not be punished for failing to cease his protected activity simply because others associated with the assembly may have committed illegal acts. Therefore, since the District has not provided any particularized showing that any individual plaintiff intended to engage in or further riotous behavior, it cannot sustain its arrest on this ground." The District then argued that plaintiff left the bar to join the march at a time when acts of vandalism were being committed, thereby demonstrating by his actions "his active support and participation in the mob's conduct sufficient to evince his willful engagement in a riot." The court responded "Even assuming that the District was correct that Singer intended to join the demonstration, absent evidence that Singer intended to engage in and further the vandalism, he cannot be punished for the peaceful exercise of his first amendment rights."Section 5: United States V. Eicher, 2023 U.S. Dist. Lexis 90103, DDC opinion by Beryl Howell (on entrapment by estoppel): (Compare with her previous view on E-B-E in Chrestman 2021)1) "First, defendant must show "that a government official affirmatively communicated to the defendant the officials approval of the conduct at issue," Alvarado, 808 F.3d at 485; see also Sheppard, 2022 U.S. Dist. Lexis 232610, 2022 WL 17978837 at *9... This official statement of law NEED NOT BE EXPLICIT. As Sheppard explains, "the public authority and entrapment by estoppel defences are available only when the officials's statements OR CONDUCT state OR CLEARLY IMPLY that the defendant's actions are lawful." 2022 U? Dist. Lexis 232610, 2022 WL 17978837 at *9."Comments: Clearly, the previous biggest opponent of the entrapment by estoppel defence in 1/6 cases not only is welcoming it, but even pointing out that implied entrapment by estoppel is recognized.2) "In Cox for example, the Supreme Court reversed the conviction of the leader of a civil rights protest under a Louisiana anti-picketing statute, which prohibited demonstrations "near" a courthouse without defining "near", holding that the conviction violated the Due process clause because the towns police chief "IN EFFECT told demonstrators that they could meet where they did, 101 feet from the courthouse steps." 379 U.S. at 571.Comments: Again, she points out implied entrapment by estoppel is recognized.3) I should not be stopped from mentioning how law enforcement made me feel that I was welcome to enter, remain and protest as I did, it eliminates the truth and my entire defence: "the parties agree that the government will have to prove at trial that defendant "entered or remained in a restricted building or grounds without lawful authority to do so," and that he did so "knowingly".Comments: If the government is to argue at trial to the jury that a defendant didn't have lawful authority to enter or protest, it would only be fair for the defence to argue that they did have lawful authority... It would not be fair to only suggest it as a defence during jury instructions as the government would be arguing the opposite during trial, I should not be stopped from doing the opposite.3.5(3 continued)) "Evidence related to the former presidents'statements urging supporters to, for example, "go to the Capitol",... may be probative

as to defendant's required intent for this charge. In fact, other judges in this district have explicitly instructed juries that, as to this count, "a person who enters or remains in a restricted area with a good faith belief that she is entering or remaining with LAWFUL AUTHORITY is not guilty of "violating 18 U.S.C. § 1752 (a)(1). As a result, evidence showing defendant believed her actions were authorized "also could constitute a failure of proof defence" as to count one. Jumah, 493 F.3d at 874 n.4." Comments: Though it was not the main reason for why I entered into the Capitol, nor even the second reason, it still lead me to the grounds which lead me to the window that I would eventually enter into. Trump sharing we were going to the Capitol had an influence on me, but definitely wasn't the strongest influence... I especially knew he would not approve of how some protesters entered into the Capitol (violently and destructively).4) She was permitted to present evidence that she was allowed to enter and remain: "...and the jury will be able to assess the credibility and believability of that testimony in the fuller evidentiary context of what was occuring when defendant allegedly engaged in the charged offence conduct."Comments: If Howell is welcoming defendant's to offer evidence and testimony that they were allowed to enter and remain, then this court should allow it as well. 5) "...similarly, defendants who seek to present evidence of law enforcement INACTION during the January 6th riot have been permitted to do so, provided they actually perceived such inaction, because this evidence may be probative of their state of mind. See, e,g, Mem. & order, U.S. V. Bender, case No. 21-cr-508 (BAH), ECF No. 76; U.S. V. Oliveras, case No. 21-cr-738 (BAH), 2023 U.S. Dist. Lexis 7805, 2023 WL 196525, at *2 (D.D.C. Jan. 17, 2023)."Comments: Again, if Howell is recognizing and allowing arguments of implied entrapment through law enforcement in-action, this court should allow it as well. I'll also note I addressed the issue with this "Zoomed in" argument in Part 2, #5.6) "Fortunately, he can do so any number of ways (establish his awareness of alleged permissiveness), such as a good faith proffer outside the presence of the jury, or using other evidence to show that defendant was adequately nearby the alleged INACTION at the correct time to have perceived and understood such permissiveness as giving him permission to enter the Capitol."Comments: Again, even Howell now recognizes implied entrapment by estoppel can be shown through law enforcement in-action.Section 6: Cox v. Louisiana 379 U.S. 536 85 S.Ct. 453 13 L.Ed.2d 4711) When Cox arrived, 1,500 of the 2,000 students were assembling at the site of the old State Capitol building, two and one-half blocks from the courthouse. Captain Font of the City Police Department and Chief Kling of the Sheriff's office, two high-ranking subordinate officials, approached the group and spoke to Cox at the northeast corner of the capitol grounds. Kling asked Cox to disband the group and "take them back from whence they came." Cox did not acquiesce in this request but told the officers that they would march by the courthouse... The officer repeated his request to disband, and Cox again refused. Kling and Font then returned to their car in order to report by radio to the Sheriff and Chief of Police who were in the immediate vicinity; while this was going on, the students, led by Cox, began their walk toward the courthouse. Comments: I too was protesting at a Capitol building less than a block away from this court house. Unlike me, Cox was at first told by police, twice, to turn around and leave, he refused. I never was told to leave, I was shown and told the opposite multiple times. Yet this mans charges were thrown out due to entrapment by estoppel.2) As Cox, still at the head of the group, approached the vicinity of the courthouse, he was stopped by Captain Font and Inspector Trigg and brought to Police Chief Wingate White, who was standing in the middle of St. Louis Street. White testified that he told Cox that "he must confine" the demonstration "to the west side of the street." White added, "This, of course, was not—I didn't mean it in the import that I was giving him any permission to do it, but I was presented

with a situation that was accomplished, and I had to make a decision." Comments: Cox was told where his protesting was allowed to and where it wasn't allowed to be. I too was told the same. The police Chief in Cox suggests he allowed what is typically not allowed because "he was presented with a situation that was accomplished"... I assume now knowing all the facts (that I didn't know when entering the Capitol) that it could be a strong possibility that Capitol Police officers felt similarly to Cox's officers, that they (70 officers) were presented with a situation (2,000 protesters) and so allowed what is normally not allowed. Like in Cox, famous police officers who were doing similar to the Cox officers (allowing protesters in and giving them directions/ rules) also claim "I/ we was/were not giving [anyone] permission to do it". The government in my case makes a similar argument in there motion in limine, they suggest the police were presented with a situation that they could not control ("a situation that was accomplished"), and just like the government in Cox did, asserts that they still have a right to convict me, a person they gave permission to protest as I was and where I was/ would go... Those who don't learn from history are doomed to repeat it (Supreme Court here I come?).3) Cox testified that the officials agreed to permit the meeting. James Erwin testified that "My understanding was that they would be allowed to demonstrate if they stayed on the west side of the street and stayed within the recognized time," Comments: I testified that the officers agreed to permit my protesting and presence. I testified that they laid out where I could and could not go, and set time restraints (curfew).4) The Sheriff, then took a power microphone and said, "Now, you have been allowed to demonstrate. Up until now your demonstration has been more or less peaceful, but what you are doing now is a direct violation of the law, a disturbance of the peace, and it has got to be broken up immediately." Comments: Cox received a warning and despite it being the 1960s, an officer hopped onto a "power microphone" that was able to reach the protesters... Cox and his protesters received a dispersal order. I did not. Where was this sort of "advanced technology" in my case in 2021, especially considering what the Dellums and Barham Court shared in the DC circuit about Bull horns in the 1970s and in 2008? What happened to the Capitol police officers Bull horns they always use, or their powerful PA system they have? It was set up by the feds...5) The testimony as to what then happened is disputed. Some of the State's witnesses testified that Cox said, "don't move"; others stated that he made a "gesture of defiance." It is clear from the record, however, that Cox and the demonstrators did not then and there break up the demonstration.

Motion 2 of 7, Part 4 of 5---6) Two of the Sheriff's deputies immediately started across the street and told the group, "You have heard what the Sheriff said, now, do what he said." A state witness testified that they put their hands on the shoulders of some of the students "as though to shove them away." Comments: Cox received a second dispersal order, he still did not listen given the time frame between this order and tear gas being sent out (see next).7) Almost immediately thereafter—within a time estimated variously at two to five minutes—one of the policemen exploded a tear gas shell at the crowd. This was followed by several other shells. The demonstrators quickly dispersed, running back towards the State Capitol and the downtown area; Cox tried to calm them as they ran and was himself one of the last to leave.Comments: Cox tried to calm/ keep protesters present despite the tear gas and dispersal orders. I didn't, someone shoots tear gas at me I'm leaving. If a police officer tells me to leave, I'm leaving.8) No [civilians] participating in the demonstration were arrested on that day. The next day appellant was arrested and charged with the four offenses above described.Comments: Like me, Cox went home and was later arrested and charged for his actions at the protest. Unlike me, he was charged by the

same agency he disobeyed dispersal orders from. 9) Appellant was convicted of violating a Louisiana "disturbing the peace" statute.. "And who fails or refuses to disperse and move on * * * when ordered so to do by any law enforcement officer of any municipality, or parish...shall be guilty of disturbing the peace." LSA-Rev.Stat. § 14:103.1 (Cum.Supp.1962). Comments: This is similar to my disorderly conduct charge. Like MPD and Capitol police Manuals/ court decisions require them to issue a dispersal order in order to be found guilty/ be arrested, so too does Cox's charge here.10) Cox was charged with an obstruction charge: OBSTRUCTING PUBLIC PASSAGE Louisiana statute, LSA-Rev.Stat. § 14:100.1 (Cum.Supp.1962), which provides:"No person shall wilfully obstruct the free, convenient and normal use of any public sidewalk, street, highway, bridge, alley, road, or other passageway, or the entrance, corridor or passage of any public building, structure, watercraft or ferry, by impeding, hindering, stifling, retarding or restraining traffic or passage thereon or therein.Comments: I too was charged with an obstruction charge. My only felony, 18 U.S.C. §1512(C)(2).11) In upholding appellant's conviction under this statute...There is no doubt from the record in this case that this far sidewalk was obstructed, and thus...appellant violated the statute.Comments: Though I disagree for various reasons, the government argues my mere presence in the Capitol obstructed an official proceeding.12) The control of travel on the streets is a clear example of governmental responsibility to insure this necessary order. A restriction in that relation, designed to promote the public convenience in the interest of all, and not susceptible to abuses of discriminatory application, cannot be disregarded by the attempted exercise of some civil right...Comments: Similarly, the government recognizes the importance of ensuring that Congress can due its duty (in this case to certify a stolen election) and is able to do so with the necessary order. Please, for the purposes of the next number, take notice of "and not susceptible to abuses of discriminatory application".13) But here it is clear that the practice in Baton Rouge allowing unfettered discretion in local officials in the regulation of the use of the streets for peaceful parades and meetings is an unwarranted abridgment of appellant's freedom of speech and assembly secured to him by the First Amendment, as applied to the States by the Fourteenth Amendment. It follows, therefore, that appellant's conviction for violating the statute as so applied and enforced must be reversed.Comments: Here too the federal government has shown it is selective in who it charges/ doesn't charge with a 1512. Take a look at Tigthe Barry who has done so 7 times and has never been charged with a 1512 because he is a democrat. My favorite comparisons are on his personal obstructing Brett Kavanuagh's proceeding, and his 2 violent contempt of courts while on pre-trial release, all of which he served 12 hours in jail for and paid a 10 dollar fine, which the government even moved to drop that. Less than 1.25 years later, and my selective magistrate judge went crazy on the restrictions for me despite having no criminal history, and being more accomplished than Barry... Those who don't learn from history are doomed to repeat it!14) For the reasons discussed above the judgment of the Supreme Court of Louisiana is reversed.Comments: For that reason (selective prosecution) I should not be charged with the 1512...15) Not argument, just love this point from Cox: Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech * * * is * * * protected against censorship or punishment * *. There is no room under our Constitution for a more restrictive view. For the alternative would lead to standardization of ideas either by legislatures, courts, or dominant political or community groups." Terminiello v. City of Chicago, 337 U.S. 1, 4-5, 69 S.Ct. 894, 93 L.Ed. 1131. In Terminiello convictions were not allowed to stand because the trial judge charged that speech of the defendants could be punished as a breach of the peace "

'if it stirs the public to anger, invites dispute, brings about a condition of unrest, or creates a disturbance, or if it molests the inhabitants in the enjoyment of peace and quiet by arousing alarm.' " Id., 337 U.S., at 3, 69 S.Ct., at 895. Maintenance of the opportunity for free political discussion is a basic tenet of our constitutional democracy.Comments: I share this because the government said it was not my actions on 1/6/21 that were the most concerning, it was my speech after 1/6/21... They've targeted me mainly because of my speech... They threw me in jail because of lies(they broke the BRA), and to punish me for my speech...Section 7: United States V. Gutierrez-Gonzales, 184 F.3d 1160 (10th Cir. 1999) Background: The Defendant, Mr. Gutierrez-Gonzalez, was convicted of reentry subsequent to deportation following an aggravated felony (second degree murder), in violation of 8 U.S.C. 1326(a)(1)&(2) and 8 U.S.C. 1326(b)(2). On appeal, Mr. Gutierrez-Gonzalez alleged that the district court erred in not considering his defense of entrapment by estoppel....Why the court denied his entrapment by estoppel defence: 1) Mr. Gutierrez-Gonzalez received and signed an Advisal of Penalty for Reentry Form informing him in his native tongue of the penalties which can be imposed should he return to this country after deportation without obtaining permission from the Attorney General. 2) Gonzalez then for a third time illegally entered the country, without obtaining permission from the Attorney General. Upon applying for a work permit, he was told that they could not give him a green card. He then shared that he knew he was in the country illegally.3) Mr. Gutierrez-Gonzalez then applied for a change of status (not with the Attorney General) and lied by saying that he never was deported. He then signed the form, certifying "under penalty of perjury . . . that this application, and the evidence submitted with it, is all true and correct."4) Mr. Gutierrez-Gonzalez (still in the United States illegally) then took his application for adjustment of status to an INS office in Texas, for processing. When submitting the application, he told the INS clerk that he was in the United States illegally. Regardless, the INS clerk issued him a work authorization permit (Form I-688B). However, the clerk specifically informed Mr. Gonzalez that the work permit was not an entry document.5) Gonzalez was found by agents after being placed in jail for committing more crimes. He was then charged by boarder patrol agents. The statute under which Mr. Gutierrez-Gonzalez was convicted states in relevant part: ...The statute expressly excludes any specific intent regarding entry into the United States and makes it a crime for a deported alien to be found "at any time" in this country "unless" he has the "express" consent of the Attorney General. "nothing more than a showing of general intent is required" and "the government need not show that defendant willfully and knowingly engaged in criminal behavior, but only that the defendant's acts were willful and knowing that the defendant willfully and knowingly reentered the United States and that he did so without the Attorney General's permission."...by excluding a specific intent requirement, Congress placed the burden of correctly obtaining permission from the Attorney General and reentering the United States legally on the alien.6) Gonzalez does not challenge the fact that the government proved every element of the crime required by the statute: that Mr. Gutierrez-Gonzalez was (1) knowingly in the United States, (2) without the permission of the Attorney General, (3) after prior deportation for an aggravated felony. Rather, Mr. Gutierrez-Gonzalez argues that the government should be estopped from prosecuting him because an "agent of the government" led Mr. Gutierrez-Gonzalez to believe that he was in the country legally. Mr. Gutierrez-Gonzalez contends that he reasonably believed he was in the United States legally as a result of his interaction with Diocesan Services and the issuing of a work permit by the INS. 7) Diocesan Services is not licensed by the government. It is not a government agency.8) Finally, Gonzalez argues that the INS "affirmatively misled him as to the state of the law" and that he "relied on that

misrepresentation," when the INS clerk issued him a temporary work permit.... Gonzalez did not inform the INS clerk that he had previously been deported from the United States. Rather, Gonzalez submitted a fraudulent application that affirmatively stated that he had never been deported. The INS clerk specifically informed Mr. Gutierrez-Gonzalez that the work permit "was not an entry document." Under these facts, even if an INS clerk could be considered an "agent of the government" charged with interpreting, administering or enforcing immigration law and the actions in this case considered "active misleading" as to the state of the law, Mr. Gonzalez's alleged "belief" that he was in the United States legally was not reasonable.Overall Comparisons: For me to be in a semi-similar situation as Gonzelez I would've had to: have been convicted of trespassing into the Capitol twice, have been also convicted of murder while inside the Capitol, and I then would've had to sign a document stating "I agree and understand that I'm never to enter the Capitol again unless I get written permission from the Attorney General himself, and that no one else may give me that permission, no matter their actual or apparent authority". I'd have to then go into the Capitol a third time, clearly knowing I'm not allowed to legally be there. I'd have to have even stated this to others while inside. Then I'd have to commit perjury when asked if I've ever been arrested in the Capitol before. I'd then have to be arrested for committing a separate crime in the Capitol. Then I'd have to claim that some lady who doesn't work for the government told me I could be in the Capitol, even though there was clear evidence that she didn't say such things, and that I even shared that I knew I was breaking the law... Finally, like Gonzalez, I'd have to be charged with a statute that doesn't require any intention of wrong doing to be convicted... Clearly, my case is nothing like this and no judge, even on heavy drugs, would ever come close to thinking that man deserved an entrapment by estoppel defence. It is sad the government chooses cases like this to suggest that you too should deny my entrapment by estoppel defence. Clearly, they have no valid arguments! Pathetic!Section 8: Garcia v. Doe, 779 F.3d 84 2nd Cir.The government cites this case as to why I should be stopped from arguing that law enforcement inaction made my conduct on January 6th lawful.I'm not suggesting that police inaction made my conduct lawful. Entrapment by estoppel doesn't make illegal actions lawful, it eliminates criminal liability even if all the elements of the charges are met.With that out of the way, the government points out that in Garcia, the entrapment by estoppel defence was not allowed despite that those charged argued their conduct had been implicity approved by police, but could not show it was affirmatively approved by police.Before I point out the differences and problems with this case comparison, please take note, the 2nd circuit appellate court multiple times were leaning towards allowing such a defence despite these circumstances (see there 2014 ruling on this case), so this wasn't so simple for the 2nd circuit, and the District court thought the inactions were enough to warrant this defence (even though it had less compelling circumstances than my case). But, as my comparisons will show, my case is much stronger and very different from the Garcia case. 1) The 2014 court affirmed the judgment of the District court because the court could not resolve at this early stage the ultimately factual issue of whether certain defendants implicitly invited the demonstrators to walk onto the roadway of the Brooklyn Bridge, which would otherwise have been prohibited by New York law.Note: The court was willing to accept the potential that police had given the implied permission to protest on a highway/bridge, despite that normally, they clearly wouldn't be allowed to.Comparison: A highway is rarely thought of as a place we have a right to protest on foot. Compare that to the Capitol building, a place so confusing the Capitol Police and Circuit courts made it a point to not arrest people prior to warning them of arrest, and a dispersal order. It arguably is the most confusing area in the world. Many people are confused over what they are allowed to do, even locals. You

can't say the same for a highway. Almost all citizens have experienced a high-way, there is not confusion over whether people are allowed to protest on it, let alone block it. The protesters entering the highway would've had no purpose of entering it other than to cause chaos. Most citizens have never been to the Capitol, indeed, even many locals have never been to the Capitol building. Unlike me, I was entering what I thought I had a personal right to, and in order to protest, what many people go to the Capitol to do! 2) On October 1, 2011, thousands of demonstrators marched through Lower Manhattan to show support for the Occupy Wall Street movement. Although no permit for the march had been sought, the New York City Police Department was aware of the planned event in advance.Comparisons: Our group had a permit to march to the Capitol, and if I recall (it's been over a year since I had this particular discovery (DC jail stole it)) to protest on certain areas of the Grounds.3) When the march arrived at the Manhattan entrance to the Bridge, police, including command officials, and other city officials watched as the protesters poured across Centre Street towards the Bridge. A bottleneck soon developed, creating a large crowd at the entrance to the Bridge's pedestrian walkway. While video footage suggests that the crowd waiting to enter the pedestrian walkway blocked traffic on Centre Street, defendants do not contend that they had probable cause to arrest plaintiffs for their obstruction of traffic at that point, as opposed to their later obstruction of traffic on the Bridge roadway (Because no order of dispersal was given). Indeed, plaintiffs alleged in their Complaint that the police themselves stopped vehicular traffic on Centre Street near the entrance to the Bridge before the majority of the marchers arrived at the entrance.Comments: This was an understandable action taken by police because unlike what would happen later, it would appear this bottle neck was not a purposeful action caused to create chaos or interrupt traffic. I also added in the fact of why police did not have probable cause to arrest the protesters over this because no dispersal order was given, which like in DC and the Capitol is required prior to arresting protesters/ groups of people.4) While a steady stream of protesters continued onto the walkway, a group of protesters stopped and stood facing the police on the ramp constituting the vehicular entrance to the Bridge at a distance of approximately twenty feet. By this time, a large crowd of demonstrators had pooled behind that lead group. Given the size and density of the crowd, it would clearly have been impossible for vehicles to enter the bridge using the ramp at that location. At this point, all the video evidence confirms that the march had divided; one group was proceeding across the Bridge via the pedestrian walkway, while a second group had moved onto the vehicular roadway, where they were blocked by a line of police.An officer on the vehicular ramp stepped forward with a bullhorn and made an announcement. The officer can clearly be heard repeating several times into the bullhorn: "I am asking you to step back on the sidewalk, you are obstructing traffic." Plaintiffs allege that these statement were "generally inaudible," and the video excerpts they have provided are consistent with that allegation. Two minutes later the same officer announced into the bullhorn: "You are obstructing vehicular traffic. If you refuse to move, you are subject to arrest," and "If you refuse to leave, you will be placed under arrest and charged with disorderly conduct." While it is clear that at least some marchers at the front of the crowd heard this announcement, plaintiffs allege that the officers knew that their warnings or orders to disperse would not have been audible to the vast majority of those assembled. There was considerable noise and confusion at the scene.Comparisons: In Garcia, the police first gave a dispersal order and a threat of arrest, something that officers did not do for me. Further, it would appear that the plaintiffs, though not able to hear the police, would've recognized a few things. First, that the main part of the protest/ approved part of the protest was going the opposite way. Second, this was not the protest plan (unlike our plan, to

march to the Capitol). Third, that police were instead of guiding them towards their known destination (as they were earlier), were now facing them and probably pointing to go the other direction. Again, a common person would know that they have no 1st amendment right to block traffic to a major bridge in NYC. The same can't be said for being allowed to protest in the Peoples house as a United States citizen.5) A minute and a half after the second announcement, the officers and city officials in the lead group turned around and began walking unhurriedly onto the Bridge roadway with their backs to the protesters. The protesters began cheering and followed the officers onto the roadway in an orderly fashion about twenty feet behind the last officer. The protesters on the roadway then encouraged those on the pedestrian walkway to "come over," and the videos show several protesters jumping down from the pedestrian walkway onto the roadway, though for the most part the marchers on the pedestrian walkway continued their progress on the walkway and did not enter the vehicular lanes. Protesters initially walked up the Bridge via the first (northernmost) entry ramp, but they eventually blocked the second and third ramps as well and occupied all of the Bridge's eastbound traffic lanes, preventing any cars from moving onto the Bridge in that direction.Comparisons: Unlike in my case, the present protesters in Garcia were given a second order to disperse. I was given none, and told the opposite. Again, it is clear, there would be no 1st amendment rights confusion over pedestrians being allowed to block the Brooklyn Bridge.6) Midway across the Bridge, the officers in front of the line of marchers turned and stopped all forward movement of the demonstration. An officer announced through a bullhorn that those on the roadway would be arrested for disorderly conduct. Plaintiffs allege that this announcement was also inaudible. Officers blocked movement in both directions along the Bridge roadway and "prevented dispersal through the use of orange netting and police vehicles." The officers then methodically arrested over seven hundred people who were on the Bridge roadway. Comparisons: Unlike in my case, officers then gave a third warning through a bull horn to protesters on the road blocking traffic. Again, I was given none, and in fact, was told the opposite.7) Nevertheless, plaintiffs do not allege that any officer explicitly stated that the marchers would be permitted to advance along the vehicular lanes of the Bridge. Nor does any plaintiff allege that he or she observed any officer beckon to the demonstrators or state by word or gesture that they were welcome to proceed. Comparisons: This is also a major difference. Unlike the plaintiffs in Garcia, I have shared that an officer gave me explicit/ express permission to be in the capitol, protesting as I was/ others around me were. I've also shared that he told me how far I could go, when I had to leave, and gave additional rules. I've also, unlike the plaintiffs in Garcia, shared that I observed body language and facial expressions, and even other factors that supported that the police were letting us in. Unlike in the Garcia case, the in-actions I witnessed go to support my other claims, where as Garcia only had inactions to rely on. The inactions alone caused the District court to say they were estopped (see #8), and caused confusion for a while in the 2nd circuit. My case would have not been so confusing, and given its strength in the areas that caused the Garcia case to throw away the entrapment by estoppel defence, the same would not have happened for me. The two cases are very different.8) The district court held that the allegations in the Complaint, if true, established that a reasonable officer would have known that he did not have probable cause to arrest plaintiffs. The district court further held that while plaintiffs had clearly violated the law by entering the Bridge roadway and blocking vehicular traffic, based on the facts alleged, no reasonable police officer could believe that plaintiffs had received fair warning that their behavior was illegal, as required by law. The district court concluded that while New York's disorderly conduct statute would normally have given protesters fair warning not to march on the

roadway, it did not do so here, where defendants, who had been directing the march along its entire course, seemed implicitly to sanction the protesters' movement onto the roadway.9) It cannot be said that the officers here disregarded known facts clearly establishing a defense. In the confused and boisterous situation confronting the officers, the police were aware that the demonstrators were blocking the roadway in violation of § 240.20(5). They were also certainly aware that no official had expressly authorized the protesters to cross the Bridge via the roadway. To the contrary, the officers would have known that a police official had attempted to advise the protesters through a bullhorn that they were required to disperse. While reasonable officers might perhaps have recognized that much or most of the crowd would be unable to hear the warning due to the noise created by the chanting protesters, it was also apparent that the front rank of demonstrators who presumably were able to hear exhibited no signs of dispersing.Comparisons: Unlike in Garcia, the Capitol police clearly were allowing such conduct. It had been expressed through various channels and ways. There was no bull horns used to order a dispersal where I was despite that in the 1970s they (Police and DC circuit) knew that even a bullhorn was too weak to reach huge crowds and had a giant sound system to reach large crowds over the roar of the crowd.10) The Complaint and videotapes are devoid of any evidence that any police officer made any gesture or spoke any word that unambiguously authorized the protesters to continue to block traffic, and indeed the Complaint does not allege that any of the plaintiffs observed any such gesture.Comparisons: Just in my direct videos, there is tons of evidence that police officers made gestures and spoke words that authorized or supported the idea of authorization that we were allowed to enter, remain, protest as we were, and even go further into the building. The plaintiffs in Garcia don't even allege such things, let alone have any evidence for such claims.11) Plaintiffs rely on the Supreme Court's decision in Cox v. Louisiana to argue that, in light of their apparent earlier passivity in the face of the march, police officers had to provide the protesters with "fair warning" before changing course and effecting any arrests. See 379 U.S. 559, 574, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965). But the facts of that case differ significantly from those at issue here. In Cox, a large group of demonstrators protesting on the street opposite a courthouse were arrested and charged with violating a statute that prohibited "picket[ing] or parad[ing] in or near a building housing a court of the State of Louisiana." Cox, the leader of the demonstrators, testified to an explicit conversation with police officials in which he had been given "permission" to conduct the demonstration on the far side of the street, some 101 feet from the courthouse steps. Comparison: The reason the court denied the Garcia plaintiffs to claim similarity with Cox was because Cox was given explicit permission from an officer he had a conversation with to protest where he was, as he was. Unlike the Plaintiffs in Garcia, I too testified to having a conversation with an officer who gave me permission to protest where I was, where I would go, and as I was/ others were. Not to mention all the other factors shared above and below in the other comparisons.12) The circumstances in this case are quite different. Unlike the "unspecific" statutory command in Cox , § 240.20(5)'s prohibition against obstructing traffic is hardly vague, and it would have been clear to any person (and certainly to a reasonable police officer) that the protesters were occupying a location where they were not ordinarily permitted to be. Comparisons: Again, who thinks they are welcome to occupy a highway on foot for a protest? No one. Who thinks they are welcome to protest across the street from a court house? Most people who live near that court house. Who thinks they are welcome to protest inside The Peoples House? Most people in the United States.13) Also unlike Cox , there was no explicit consultation between the leaders of the demonstration and the police about what conduct would be permitted. Comparison: As I've testified to, I had an explicit consultation with an officer about

what conduct would be permitted and not permitted.14) Nor was there any express statement from any police official authorizing the protesters to cross the Bridge on the vehicular roadway, opining that doing so would be lawful, or waiving the enforcement of any traffic regulation. Comparison: Clearly, the police were authorizing people who were protesting where I was, as I was, and when I was.15) Most importantly, no plaintiff alleges in the Complaint that he or she heard any statement from any police officer authorizing the protesters to cross the Bridge via the vehicular roadway, or observed any unambiguous indication from any police officer inviting the protesters to cross the Bridge in that manner. Nor is any such statement or gesture recorded in the videotapes submitted by the parties and incorporated into the Complaint by reference. Indeed, most of the plaintiffs allege that they did not see anything the police officers did, and simply "followed the march" as it proceeded across the Bridge.Comparisons: Again, unlike plaintiffs in Garcia, I do allege such things, and have evidence for such things on video. Even supportive gestures are shown in my videos. Unlike plaintiffs in Garcia, I first observed police prior to entering rather than just following the crowd into the building and taking the crowd at their word that the police were letting us in.16) An officer still has probable cause to arrest, and certainly is entitled to qualified immunity, so long as any such defense rests on facts that are so unclear, or a legal theory that is not so clearly established, that it cannot be said that any reasonable officer would understand that an arrest under the circumstances would be unlawful. Reichle v. Howards, —— U.S. ——, 132 S.Ct. 2088 2093, 182 L.Ed.2d 985 (2012) ; see also Messerschmidt v. Millender, —— U.S. ——, 132 S.Ct. 1235 1244, 182 L.Ed.2d 47 (2012).Comments/ Comparison: I share this because I want the court to be reminded what the DC circuit court said in Barham V. Ramsey (and also in Carr V. District of Columbia/ Dellums V. Powell) when the police chief knew that a dispersal order had not been given to the people prior to arrest. The DC circuit said (unlike in Garcia) that the police chief knew there was no dispersal order given, and yet arrested them, which not only caused the criminal charges to be dismissed, but caused him to lose his qualified immunity in that case. My case is similar to the Barham case in that no dispersal order was given to me/ around me. In fact, it's even more extreme because I received express permission to do what I was doing and had many officers further support that through implied actions and inactions. The Barham recognized that DC (the park in this case) is a confusing place regarding 1st amendment rights, and that no dispersal order was given. Barham officers made more clear failures than Garcia, and the officers in my case made more clear failures than in Barham. My case and the Garcia case are very different.17) As a matter of law, Cox establishes that, under some circumstances, demonstrators or others who have been advised by the police that their behavior is lawful may not be punished for that behavior. The extent of that principle is less than clear, and we need not decide here how far it might extend.Comments: Unlike in Garcia, it is clear the agency was allowing certain conduct, and it is also clear that I was given permission to do what I was doing. Very different cases.18) Plaintiffs also rely on our holding in Papineau v. Parmley, 465 F.3d 46 (2d Cir.2006), which denied qualified immunity to officers who arrested peaceful protesters without first giving them "fair warning" through an order to disperse. Papineau is inapposite, however. In Papineau, plaintiffs were protesting on private property bordering a public highway when a handful of protesters briefly entered the highway to distribute pamphlets. Once all participants were back on the property, police officers entered and began arresting protesters indiscriminately and without advance warning. Because the protest in Papineau occurred on private property and posed no danger of "imminent harm" at the time of the arrests, plaintiffs neither needed permission from the police to engage in that protest nor, absent clear orders to disperse, had any notice that they might be engaging in unlawful conduct.

the law, Cox and the protesters ignored them and did not leave. I left on my own, thanking officers and wishing them a good day as I walked away peacefully. Yet Cox still had his charges thrown away due to entrapment by estoppel.-----------------------------------------------:

Motion 2 of 7, Part 4 of 5---6) Two of the Sheriff's deputies immediately started across the street and told the group, "You have heard what the Sheriff said, now, do what he said." A state witness testified that they put their hands on the shoulders of some of the students "as though to shove them away." Comments: Cox received a second dispersal order, he still did not listen given the time frame between this order and tear gas being sent out (see next).7) Almost immediately thereafter—within a time estimated variously at two to five minutes—one of the policemen exploded a tear gas shell at the crowd. This was followed by several other shells. The demonstrators quickly dispersed, running back towards the State Capitol and the downtown area; Cox tried to calm them as they ran and was himself one of the last to leave.Comments: Cox tried to calm/ keep protesters present despite the tear gas and dispersal orders. I didn't, someone shoots tear gas at me I'm leaving. If a police officer tells me to leave, I'm leaving.8) No [civilians] participating in the demonstration were arrested on that day. The next day appellant was arrested and charged with the four offenses above described.Comments: Like me, Cox went home and was later arrested and charged for his actions at the protest. Unlike me, he was charged by the same agency he disobeyed dispersal orders from. 9) Appellant was convicted of violating a Louisiana "disturbing the peace" statute.. "And who fails or refuses to disperse and move on * * * when ordered so to do by any law enforcement officer of any municipality, or parish...shall be guilty of disturbing the peace." LSA-Rev.Stat. § 14:103.1 (Cum.Supp.1962). Comments: This is similar to my disorderly conduct charge. Like MPD and Capitol police Manuals/ court decisions require them to issue a dispersal order in order to be found guilty/ be arrested, so too does Cox's charge here.10) Cox was charged with an obstruction charge: OBSTRUCTING PUBLIC PASSAGE Louisiana statute, LSA-Rev.Stat. § 14:100.1 (Cum.Supp.1962), which provides:"No person shall wilfully obstruct the free, convenient and normal use of any public sidewalk, street, highway, bridge, alley, road, or other passageway, or the entrance, corridor or passage of any public building, structure, watercraft or ferry, by impeding, hindering, stifling, retarding or restraining traffic or passage thereon or therein.Comments: I too was charged with an obstruction charge. My only felony, 18 U.S.C. §1512(C)(2).11) In upholding appellant's conviction under this statute...There is no doubt from the record in this case that this far sidewalk was obstructed, and thus...appellant violated the statute.Comments: Though I disagree for various reasons, the government argues my mere presence in the Capitol obstructed an official proceeding.12) The control of travel on the streets is a clear example of governmental responsibility to insure this necessary order. A restriction in that relation, designed to promote the public convenience in the interest of all, and not susceptible to abuses of discriminatory application, cannot be disregarded by the attempted exercise of some civil right...Comments: Similarly, the government recognizes the importance of ensuring that Congress can due its duty (in this case to certify a stolen election) and is able to do so with the necessary order. Please, for the purposes of the next number, take notice of "and not susceptible to abuses of discriminatory application".13) But here it is clear that the practice in Baton Rouge allowing unfettered discretion in local officials in the regulation of the use of the streets for peaceful parades and meetings is an unwarranted abridgment of appellant's freedom of speech and assembly secured to him by the First Amendment, as applied to the States by the Fourteenth Amendment. It follows, therefore, that

appellant's conviction for violating the statute as so applied and enforced must be reversed.Comments: Here too the federal government has shown it is selective in who it charges/ doesn't charge with a 1512. Take a look at Tigthe Barry who has done so 7 times and has never been charged with a 1512 because he is a democrat. My favorite comparisons are on his personal obstructing Brett Kavanuagh's proceeding, and his 2 violent contempt of courts while on pre-trial release, all of which he served 12 hours in jail for and paid a 10 dollar fine, which the government even moved to drop that. Less than 1.25 years later, and my selective magistrate judge went crazy on the restrictions for me despite having no criminal history, and being more accomplished than Barry... Those who don't learn from history are doomed to repeat it!14) For the reasons discussed above the judgment of the Supreme Court of Louisiana is reversed.Comments: For that reason (selective prosecution) I should not be charged with the 1512...15) Not argument, just love this point from Cox: Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech * * * is * * * protected against censorship or punishment * *. There is no room under our Constitution for a more restrictive view. For the alternative would lead to standardization of ideas either by legislatures, courts, or dominant political or community groups." Terminiello v. City of Chicago, 337 U.S. 1, 4-5, 69 S.Ct. 894, 93 L.Ed. 1131. In Terminiello convictions were not allowed to stand because the trial judge charged that speech of the defendants could be punished as a breach of the peace " 'if it stirs the public to anger, invites dispute, brings about a condition of unrest, or creates a disturbance, or if it molests the inhabitants in the enjoyment of peace and quiet by arousing alarm.' " Id., 337 U.S., at 3, 69 S.Ct., at 895. Maintenance of the opportunity for free political discussion is a basic tenet of our constitutional democracy.Comments: I share this because the government said it was not my actions on 1/6/21 that were the most concerning, it was my speech after 1/6/21... They've targeted me mainly because of my speech... They threw me in jail because of lies(they broke the BRA), and to punish me for my speech...Section 7: United States V. Gutierrez-Gonzales, 184 F.3d 1160 (10th Cir. 1999) Background: The Defendant, Mr. Gutierrez-Gonzalez, was convicted of reentry subsequent to deportation following an aggravated felony (second degree murder), in violation of 8 U.S.C. 1326(a)(1)&(2) and 8 U.S.C. 1326(b)(2). On appeal, Mr. Gutierrez-Gonzalez alleged that the district court erred in not considering his defense of entrapment by estoppel....Why the court denied his entrapment by estoppel defence: 1) Mr. Gutierrez-Gonzalez received and signed an Advisal of Penalty for Reentry Form informing him in his native tongue of the penalties which can be imposed should he return to this country after deportation without obtaining permission from the Attorney General. 2) Gonzalez then for a third time illegally entered the country, without obtaining permission from the Attorney General. Upon applying for a work permit, he was told that they could not give him a green card. He then shared that he knew he was in the country illegally.3) Mr. Gutierrez-Gonzalez then applied for a change of status (not with the Attorney General) and lied by saying that he never was deported. He then signed the form, certifying "under penalty of perjury . . . that this application, and the evidence submitted with it, is all true and correct."4) Mr. Gutierrez-Gonzalez (still in the United States illegally) then took his application for adjustment of status to an INS office in Texas, for processing. When submitting the application, he told the INS clerk that he was in the United States illegally. Regardless, the INS clerk issued him a work authorization permit (Form I-688B). However, the clerk specifically informed Mr. Gonzalez that the work permit was not an entry document.5) Gonzalez was found by agents after being placed in jail for committing more crimes. He was then charged by boarder patrol agents. The statute

under which Mr. Gutierrez-Gonzalez was convicted states in relevant part: ...The statute expressly excludes any specific intent regarding entry into the United States and makes it a crime for a deported alien to be found "at any time" in this country "unless" he has the "express" consent of the Attorney General. "nothing more than a showing of general intent is required" and "the government need not show that defendant willfully and knowingly engaged in criminal behavior, but only that the defendant's acts were willful and knowing that the defendant willfully and knowingly reentered the United States and that he did so without the Attorney General's permission."...by excluding a specific intent requirement, Congress placed the burden of correctly obtaining permission from the Attorney General and reentering the United States legally on the alien.6) Gonzalez does not challenge the fact that the government proved every element of the crime required by the statute: that Mr. Gutierrez-Gonzalez was (1) knowingly in the United States, (2) without the permission of the Attorney General, (3) after prior deportation for an aggravated felony. Rather, Mr. Gutierrez-Gonzalez argues that the government should be estopped from prosecuting him because an "agent of the government" led Mr. Gutierrez-Gonzalez to believe that he was in the country legally. Mr. Gutierrez-Gonzalez contends that he reasonably believed he was in the United States legally as a result of his interaction with Diocesan Services and the issuing of a work permit by the INS. 7) Diocesan Services is not licensed by the government. It is not a government agency.8) Finally, Gonzalez argues that the INS "affirmatively misled him as to the state of the law" and that he "relied on that misrepresentation," when the INS clerk issued him a temporary work permit.... Gonzalez did not inform the INS clerk that he had previously been deported from the United States. Rather, Gonzalez submitted a fraudulent application that affirmatively stated that he had never been deported. The INS clerk specifically informed Mr. Gutierrez-Gonzalez that the work permit "was not an entry document." Under these facts, even if an INS clerk could be considered an "agent of the government" charged with interpreting, administering or enforcing immigration law and the actions in this case considered "active misleading" as to the state of the law, Mr. Gonzalez's alleged "belief" that he was in the United States legally was not reasonable.Overall Comparisons: For me to be in a semi-similar situation as Gonzelez I would've had to: have been convicted of trespassing into the Capitol twice, have been also convicted of murder while inside the Capitol, and I then would've had to sign a document stating "I agree and understand that I'm never to enter the Capitol again unless I get written permission from the Attorney General himself, and that no one else may give me that permission, no matter their actual or apparent authority". I'd have to then go into the Capitol a third time, clearly knowing I'm not allowed to legally be there. I'd have to have even stated this to others while inside. Then I'd have to commit perjury when asked if I've ever been arrested in the Capitol before. I'd then have to be arrested for committing a separate crime in the Capitol. Then I'd have to claim that some lady who doesn't work for the government told me I could be in the Capitol, even though there was clear evidence that she didn't say such things, and that I even shared that I knew I was breaking the law... Finally, like Gonzalez, I'd have to be charged with a statute that doesn't require any intention of wrong doing to be convicted... Clearly, my case is nothing like this and no judge, even on heavy drugs, would ever come close to thinking that man deserved an entrapment by estoppel defence. It is sad the government chooses cases like this to suggest that you too should deny my entrapment by estoppel defence. Clearly, they have no valid arguments! Pathetic!Section 8: Garcia v. Doe, 779 F.3d 84 2nd Cir.The government cites this case as to why I should be stopped from arguing that law enforcement inaction made my conduct on January 6th lawful.I'm not suggesting that police inaction made my conduct lawful. Entrapment by estoppel doesn't make illegal actions lawful, it

eliminates criminal liability even if all the elements of the charges are met.With that out of the way, the government points out that in Garcia, the entrapment by estoppel defence was not allowed despite that those charged argued their conduct had been implicity approved by police, but could not show it was affirmatively approved by police.Before I point out the differences and problems with this case comparison, please take note, the 2nd circuit appellate court multiple times were leaning towards allowing such a defence despite these circumstances (see there 2014 ruling on this case), so this wasn't so simple for the 2nd circuit, and the District court thought the inactions were enough to warrant this defence (even though it had less compelling circumstances than my case). But, as my comparisons will show, my case is much stronger and very different from the Garcia case. 1) The 2014 court affirmed the judgment of the District court because the court could not resolve at this early stage the ultimately factual issue of whether certain defendants implicitly invited the demonstrators to walk onto the roadway of the Brooklyn Bridge, which would otherwise have been prohibited by New York law.Note: The court was willing to accept the potential that police had given the implied permission to protest on a highway/bridge, despite that normally, they clearly wouldn't be allowed to.Comparison: A highway is rarely thought of as a place we have a right to protest on foot. Compare that to the Capitol building, a place so confusing the Capitol Police and Circuit courts made it a point to not arrest people prior to warning them of arrest, and a dispersal order. It arguably is the most confusing area in the world. Many people are confused over what they are allowed to do, even locals. You can't say the same for a highway. Almost all citizens have experienced a high-way, there is not confusion over whether people are allowed to protest on it, let alone block it. The protesters entering the highway would've had no purpose of entering it other than to cause chaos. Most citizens have never been to the Capitol, indeed, even many locals have never been to the Capitol building. Unlike me, I was entering what I thought I had a personal right to, and in order to protest, what many people go to the Capitol to do! 2) On October 1, 2011, thousands of demonstrators marched through Lower Manhattan to show support for the Occupy Wall Street movement. Although no permit for the march had been sought, the New York City Police Department was aware of the planned event in advance.Comparisons: Our group had a permit to march to the Capitol, and if I recall (it's been over a year since I had this particular discovery (DC jail stole it)) to protest on certain areas of the Grounds.3) When the march arrived at the Manhattan entrance to the Bridge, police, including command officials, and other city officials watched as the protesters poured across Centre Street towards the Bridge. A bottleneck soon developed, creating a large crowd at the entrance to the Bridge's pedestrian walkway. While video footage suggests that the crowd waiting to enter the pedestrian walkway blocked traffic on Centre Street, defendants do not contend that they had probable cause to arrest plaintiffs for their obstruction of traffic at that point, as opposed to their later obstruction of traffic on the Bridge roadway (Because no order of dispersal was given). Indeed, plaintiffs alleged in their Complaint that the police themselves stopped vehicular traffic on Centre Street near the entrance to the Bridge before the majority of the marchers arrived at the entrance.Comments: This was an understandable action taken by police because unlike what would happen later, it would appear this bottle neck was not a purposeful action caused to create chaos or interrupt traffic. I also added in the fact of why police did not have probable cause to arrest the protesters over this because no dispersal order was given, which like in DC and the Capitol is required prior to arresting protesters/ groups of people.4) While a steady stream of protesters continued onto the walkway, a group of protesters stopped and stood facing the police on the ramp constituting the vehicular entrance to the Bridge at a distance of approximately twenty feet. By this time, a large

crowd of demonstrators had pooled behind that lead group. Given the size and density of the crowd, it would clearly have been impossible for vehicles to enter the bridge using the ramp at that location. At this point, all the video evidence confirms that the march had divided; one group was proceeding across the Bridge via the pedestrian walkway, while a second group had moved onto the vehicular roadway, where they were blocked by a line of police.An officer on the vehicular ramp stepped forward with a bullhorn and made an announcement. The officer can clearly be heard repeating several times into the bullhorn: "I am asking you to step back on the sidewalk, you are obstructing traffic." Plaintiffs allege that these statement were "generally inaudible," and the video excerpts they have provided are consistent with that allegation. Two minutes later the same officer announced into the bullhorn: "You are obstructing vehicular traffic. If you refuse to move, you are subject to arrest," and "If you refuse to leave, you will be placed under arrest and charged with disorderly conduct." While it is clear that at least some marchers at the front of the crowd heard this announcement, plaintiffs allege that the officers knew that their warnings or orders to disperse would not have been audible to the vast majority of those assembled. There was considerable noise and confusion at the scene.Comparisons: In Garcia, the police first gave a dispersal order and a threat of arrest, something that officers did not do for me. Further, it would appear that the plaintiffs, though not able to hear the police, would've recognized a few things. First, that the main part of the protest/ approved part of the protest was going the opposite way. Second, this was not the protest plan (unlike our plan, to march to the Capitol). Third, that police were instead of guiding them towards their known destination (as they were earlier), were now facing them and probably pointing to go the other direction. Again, a common person would know that they have no 1st amendment right to block traffic to a major bridge in NYC. The same can't be said for being allowed to protest in the Peoples house as a United States citizen.5) A minute and a half after the second announcement, the officers and city officials in the lead group turned around and began walking unhurriedly onto the Bridge roadway with their backs to the protesters. The protesters began cheering and followed the officers onto the roadway in an orderly fashion about twenty feet behind the last officer. The protesters on the roadway then encouraged those on the pedestrian walkway to "come over," and the videos show several protesters jumping down from the pedestrian walkway onto the roadway, though for the most part the marchers on the pedestrian walkway continued their progress on the walkway and did not enter the vehicular lanes. Protesters initially walked up the Bridge via the first (northernmost) entry ramp, but they eventually blocked the second and third ramps as well and occupied all of the Bridge's eastbound traffic lanes, preventing any cars from moving onto the Bridge in that direction.Comparisons: Unlike in my case, the present protesters in Garcia were given a second order to disperse. I was given none, and told the opposite. Again, it is clear, there would be no 1st amendment rights confusion over pedestrians being allowed to block the Brooklyn Bridge.6) Midway across the Bridge, the officers in front of the line of marchers turned and stopped all forward movement of the demonstration. An officer announced through a bullhorn that those on the roadway would be arrested for disorderly conduct. Plaintiffs allege that this announcement was also inaudible. Officers blocked movement in both directions along the Bridge roadway and "prevented dispersal through the use of orange netting and police vehicles." The officers then methodically arrested over seven hundred people who were on the Bridge roadway. Comparisons: Unlike in my case, officers then gave a third warning through a bull horn to protesters on the road blocking traffic. Again, I was given none, and in fact, was told the opposite.7) Nevertheless, plaintiffs do not allege that any officer explicitly stated that the marchers would be permitted to advance along the vehicular lanes of the

Bridge. Nor does any plaintiff allege that he or she observed any officer beckon to the demonstrators or state by word or gesture that they were welcome to proceed. Comparisons: This is also a major difference. Unlike the plaintiffs in Garcia, I have shared that an officer gave me explicit/ express permission to be in the capitol, protesting as I was/ others around me were. I've also shared that he told me how far I could go, when I had to leave, and gave additional rules. I've also, unlike the plaintiffs in Garcia, shared that I observed body language and facial expressions, and even other factors that supported that the police were letting us in. Unlike in the Garcia case, the in-actions I witnessed go to support my other claims, where as Garcia only had inactions to rely on. The inactions alone caused the District court to say they were estopped (see #8), and caused confusion for a while in the 2nd circuit. My case would have not been so confusing, and given its strength in the areas that caused the Garcia case to throw away the entrapment by estoppel defence, the same would not have happened for me. The two cases are very different.8) The district court held that the allegations in the Complaint, if true, established that a reasonable officer would have known that he did not have probable cause to arrest plaintiffs. The district court further held that while plaintiffs had clearly violated the law by entering the Bridge roadway and blocking vehicular traffic, based on the facts alleged, no reasonable police officer could believe that plaintiffs had received fair warning that their behavior was illegal, as required by law. The district court concluded that while New York's disorderly conduct statute would normally have given protesters fair warning not to march on the roadway, it did not do so here, where defendants, who had been directing the march along its entire course, seemed implicitly to sanction the protesters' movement onto the roadway.9) It cannot be said that the officers here disregarded known facts clearly establishing a defense. In the confused and boisterous situation confronting the officers, the police were aware that the demonstrators were blocking the roadway in violation of § 240.20(5). They were also certainly aware that no official had expressly authorized the protesters to cross the Bridge via the roadway. To the contrary, the officers would have known that a police official had attempted to advise the protesters through a bullhorn that they were required to disperse. While reasonable officers might perhaps have recognized that much or most of the crowd would be unable to hear the warning due to the noise created by the chanting protesters, it was also apparent that the front rank of demonstrators who presumably were able to hear exhibited no signs of dispersing.Comparisons: Unlike in Garcia, the Capitol police clearly were allowing such conduct. It had been expressed through various channels and ways. There was no bull horns used to order a dispersal where I was despite that in the 1970s they (Police and DC circuit) knew that even a bullhorn was too weak to reach huge crowds and had a giant sound system to reach large crowds over the roar of the crowd.10) The Complaint and videotapes are devoid of any evidence that any police officer made any gesture or spoke any word that unambiguously authorized the protesters to continue to block traffic, and indeed the Complaint does not allege that any of the plaintiffs observed any such gesture.Comparisons: Just in my direct videos, there is tons of evidence that police officers made gestures and spoke words that authorized or supported the idea of authorization that we were allowed to enter, remain, protest as we were, and even go further into the building. The plaintiffs in Garcia don't even allege such things, let alone have any evidence for such claims.11) Plaintiffs rely on the Supreme Court's decision in Cox v. Louisiana to argue that, in light of their apparent earlier passivity in the face of the march, police officers had to provide the protesters with "fair warning" before changing course and effecting any arrests. See 379 U.S. 559, 574, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965). But the facts of that case differ significantly from those at issue here. In Cox, a large group of demonstrators protesting on the street opposite a courthouse

were arrested and charged with violating a statute that prohibited "picket[ing] or parad[ing] in or near a building housing a court of the State of Louisiana." Cox, the leader of the demonstrators, testified to an explicit conversation with police officials in which he had been given "permission" to conduct the demonstration on the far side of the street, some 101 feet from the courthouse steps. Comparison: The reason the court denied the Garcia plaintiffs to claim similarity with Cox was because Cox was given explicit permission from an officer he had a conversation with to protest where he was, as he was. Unlike the Plaintiffs in Garcia, I too testified to having a conversation with an officer who gave me permission to protest where I was, where I would go, and as I was/ others were. Not to mention all the other factors shared above and below in the other comparisons.12) The circumstances in this case are quite different. Unlike the "unspecific" statutory command in Cox , § 240.20(5)'s prohibition against obstructing traffic is hardly vague, and it would have been clear to any person (and certainly to a reasonable police officer) that the protesters were occupying a location where they were not ordinarily permitted to be. Comparisons: Again, who thinks they are welcome to occupy a highway on foot for a protest? No one. Who thinks they are welcome to protest across the street from a court house? Most people who live near that court house. Who thinks they are welcome to protest inside The Peoples House? Most people in the United States.13) Also unlike Cox , there was no explicit consultation between the leaders of the demonstration and the police about what conduct would be permitted. Comparison: As I've testified to, I had an explicit consultation with an officer about what conduct would be permitted and not permitted.14) Nor was there any express statement from any police official authorizing the protesters to cross the Bridge on the vehicular roadway, opining that doing so would be lawful, or waiving the enforcement of any traffic regulation. Comparison: Clearly, the police were authorizing people who were protesting where I was, as I was, and when I was.15) Most importantly, no plaintiff alleges in the Complaint that he or she heard any statement from any police officer authorizing the protesters to cross the Bridge via the vehicular roadway, or observed any unambiguous indication from any police officer inviting the protesters to cross the Bridge in that manner. Nor is any such statement or gesture recorded in the videotapes submitted by the parties and incorporated into the Complaint by reference. Indeed, most of the plaintiffs allege that they did not see anything the police officers did, and simply "followed the march" as it proceeded across the Bridge.Comparisons: Again, unlike plaintiffs in Garcia, I do allege such things, and have evidence for such things on video. Even supportive gestures are shown in my videos. Unlike plaintiffs in Garcia, I first observed police prior to entering rather than just following the crowd into the building and taking the crowd at their word that the police were letting us in.16) An officer still has probable cause to arrest, and certainly is entitled to qualified immunity, so long as any such defense rests on facts that are so unclear, or a legal theory that is not so clearly established, that it cannot be said that any reasonable officer would understand that an arrest under the circumstances would be unlawful. Reichle v. Howards, —— U.S. ——, 132 S.Ct. 2088 2093, 182 L.Ed.2d 985 (2012) ; see also Messerschmidt v. Millender, —— U.S. ——, 132 S.Ct. 1235 1244, 182 L.Ed.2d 47 (2012).Comments/ Comparison: I share this because I want the court to be reminded what the DC circuit court said in Barham V. Ramsey (and also in Carr V. District of Columbia/ Dellums V. Powell) when the police chief knew that a dispersal order had not been given to the people prior to arrest. The DC circuit said (unlike in Garcia) that the police chief knew there was no dispersal order given, and yet arrested them, which not only caused the criminal charges to be dismissed, but caused him to lose his qualified immunity in that case. My case is similar to the Barham case in that no dispersal order was given to me/ around me. In fact, it's even more extreme because I received express

permission to do what I was doing and had many officers further support that through implied actions and inactions. The Barham recognized that DC (the park in this case) is a confusing place regarding 1st amendment rights, and that no dispersal order was given. Barham officers made more clear failures than Garcia, and the officers in my case made more clear failures than in Barham. My case and the Garcia case are very different.17) As a matter of law, Cox establishes that, under some circumstances, demonstrators or others who have been advised by the police that their behavior is lawful may not be punished for that behavior. The extent of that principle is less than clear, and we need not decide here how far it might extend.Comments: Unlike in Garcia, it is clear the agency was allowing certain conduct, and it is also clear that I was given permission to do what I was doing. Very different cases.

Motion 2 of 7, Part 5 of 518) Plaintiffs also rely on our holding in Papineau v. Parmley, 465 F.3d 46 (2d Cir.2006), which denied qualified immunity to officers who arrested peaceful protesters without first giving them "fair warning" through an order to disperse. Papineau is inapposite, however. In Papineau, plaintiffs were protesting on private property bordering a public highway when a handful of protesters briefly entered the highway to distribute pamphlets. Once all participants were back on the property, police officers entered and began arresting protesters indiscriminately and without advance warning. Because the protest in Papineau occurred on private property and posed no danger of "imminent harm" at the time of the arrests, plaintiffs neither needed permission from the police to engage in that protest nor, absent clear orders to disperse, had any notice that they might be engaging in unlawful conduct.Comparisons: Though the situation involves private property, I want to point out some quick things. The protesters in Papineau were protesting mostly in an area where they had a personal interest and ownership in. The protesters in Garcia cannot claim the same for a highway. However, Capitol Police recognize that many people believe that they too have an interest/ ownership in the Capitol building similar to that of their own personal (but shared) private property, hence the name "The Peoples house", and the chants of "Our house". Additionally, as mentioned, those in Garcia had 3 separate dispersal orders prior to arrest, I and those in Papineau did not. Finally, unlike both cases, I was given express and implied permission to do what I was doing by police.Final Comment: Our (protesters who were protesting as I was) grant of permission could be shown by officers not arresting any of the protesters there around me whether the protesters out numbered them, or vice versa. It is also shown in other areas of the building where police vastly outnumbered the protesters, they did not arrest many of them. Almost all arrests made that day were from violent protesters, or those who broke curfew. The arrests for those who behaved as I did were made between the next day, all the way to the following years after the incident, and by an entire different agency (FBI). In the Garcia case, though vastly outnumbered by a court described hostile crowd, the arrests were made at that point. The agency quickly made it clear that such actions were not being allowed. I did get express permission, and later I got directions to go further into the building. These protesters did not get permission, nor did they get directions to go further down the bridge ramps/ highway... That is why (along with the many other factors expressed in previous numbers) the Court did not allow an entrapment by estoppel defence.Part 5:Entrapment By Estoppel Related Motions:1) For the government to explain why both MPD and capitol police didn't order a dispersal near me/ for me, nor share the laws I was breaking, nor give me time to disperse after hearing that I was breaking those laws. (See Part 4, section 2, #1)1.1) Both MPD and Capitol police know not doing so has caused cases to be dismissed and/ or for the officers to be sued/ lose their qualified immunity (See Baram, Dellums,

Carr, etc.). It's their duty to explain and do such things prior to arresting anyone involved in a demonstration or riot. In cases where they have failed to do this the charges have been thrown out and/ or the convictions have been thrown out. (See Part 4, section 2, #1)2) To have a hearing (adequate notice please, unlike your surprise and unrequested bond hearing 10/12/21 you gave me) to determine if my arrest was proper since MPD and Capitol Police failed to do their duty in giving me a dispersal order, telling me what law I was breaking, or giving me adequate time to respond to such information. (See Part 4, section 2, #1)3)To dismiss my charges since both MPD and Capitol Police failed to do this/ their duty.3.1) The government has the burden to show that this was done for me. Worse for them, they know I have multiple videos to show officers doing the opposite of telling me to leave or that I was breaking the law. (See Part 4, section 2, #1)4) Motion to include the Dellums court Jury instruction on the matter of a dispersal order:Comments: The jury instruction can be shown in Part 4, Section 2, number 16. 5) Colloquy into why the officers who moved the gates/ barriers and let people pass couldn't be identified when there was a maximum of 4,000 officers present yet they were able to identify people in the crowd with masks on from every state out of hundreds of millions of people.6) Motion to admit officers body camera footage purposely being turned off when trying to cover up speech about their misconduct and being set up by their superiors.Comments: This footage helps support the entrapment defence, and is an aid to the potential of entrapment by estoppel defence.7) Implied should be added to jury instructions: see Dellums number 8, dc cir court in Dellums8) Motion to know if any capitol police or MPD officers were also employed or compensated in any way by the FBI8.1) My arresting officer was both a state trooper and FBI agent. I'm wondering if others were also employed by the FBI. If so, I'd also motion for their body camera footage to see if like other undercover agents there that day if they too were inciting people or making them feel welcome in the capitol.9) To admit testimony/ proof of 20 undercover agents being present with proud boys on 1/6/21(increased chances for entrapment/ entrapment by estoppel).10) To present statements of William Popes prosecutor admitting undercover officers were acting as provocateurs (increases the chances that some uniformed officers may have had goal of allowing protesters in.11) To be able to show times givermnet lied so jury can decide if they are trustworthy: 10/12/21, 2/14/22, 4/14/22, 3rd revocation hearimg, 2md revocation hearimg, 1st revocation hearing, Protective order debate hearing in 2021.

Notes I need sent to me or to someome that can gove to me...Questioms for capitol police notes (yet ro be organized/ finished): 1) (open up CL:3, E-B-E-19, #2) I'd like to read you somethig. and ask you questiins as we breifky read alomg, are you ready? (Once I'm ready with that opemed i then state): "okay, these are quotes from a coirt focusing on arrests stemmping from the case of Baram V. Ramsey in which I see great simikarities in police actions and failures, I wamt to see how you and yoir agency to the best of your kniwledge acted differently or simikarly... S: "In the weeks leading up to the pritest, MPD's civil disturnance unit braced for an influx of protesters." Q: Now, do you recall when Trump posted his now famois tweet that essiemtially said 'Be in DC, will be wild'? (About 2 weeks prior to the 6th)... Q: Do you personally remember or are you aware of Capitol police being aware that this protest was going to happen on the 6th? Q: Did you personally prepare or are you aware of your leadership preparing for an influx of protesters? Q: how did you all prepare for this?Q: are you aware if you yourself or if leadershio knew that there was a high potential for violence at this protest? (I've read reports that capitol police and other agenicies were bombared with such news and warnings), Q: What sort of preperatiins are tyoically made in hearing of a large amount of protesters at rhe capitol,

espeshailly if there is intelligence to suggest that thise protesters are going to inclined to violence? (Dom't read rhis, read past parenthesis: Hard gear):.... Q:Do they get issued helmets? Q:Why did so many officers not have helmets (In the famois first line breaching where Ryan samsul amd others cross over I didn't see any of tuose officers with helmets? Q: Do they get gas masks Q: Why did so many offiicers not have gas masks (in that same video I didm't see any gas masks)? Q: Do they have armour/ hard gear on? Q:Coukd you explain what hardgear consists of to myself and the jury? Q: Why did so many not have hard gear on (in that same video I didnt see any hard gear on)? Q: do they have radios with effective comincatioms/ channels in place?Q: why were so many capitol police complaining about not neing abke to get in contact or find anything out? Why did so many nit have radios?Q: Do they have all units called up? Q: Were all officers present/ called up?Q: Do they have bull horns? Q: are bull horns so,etimes used to issue disperal or cease amd desist orders?Q:Why were no bull horns around/ used? Q:Where were they? Q:Where are they nirmally held? Q:Why couodnt anyone find them during this particular protest/ riot? Q: Why werent they prepared to be used? (Statement): Nkw in 1970, over 50 years ago, the Capitol police shared in Dellums V. Powell that they bought a massive and insanley loud sound device to deal with massive pritests called the sound curdler which was comverted from a Brinks wagon, it was made to reach protesters far and wide, even over thousands of peopels screams and roars, specificially to ensure they coukd hear orders to disperse simce they had heard complaimts that often times people coukd not hear dispersal orders from bull horns in loud demomstrations... Q: Now, that was over 50 years ago, and technogy in all areas espeshailly in audio equipment certainly has advanced, does the Capitol police have anything more powerful than a bull horn to aid with orderimg a very large and loud crowd to disperse? (No): Responce: the capitol police of 1970 recognized this was a majir issue, why if we are to learn from history wouod you nit have such rechnklogy?(Yes): Where was it?.... Why wasm't it used/ prepared if Capitol Police kmew well in advance of a latge amoitn of people comimg and that they may be violemt or prone to breaking laws?Q: are there other barriers ypu had aside from small and short bike racks?Q: did ypu habe enoigh pf these to wrap around the buikding? The grounds? (If yes, why wasn't this dome?")Q: what aboit barricades, I now know that some bike racks were used, but they didm't wrap around the capitol, imstead there were only random poimts in which as yoir owm officers have stated were able to be easiky walked around... Was there more that coupd have been done with barriers given all the warnigns and time that capitol police had to orepare for this portest? Q: why wasn't more done on this front?So, to conclude this comparison, in the Baram V. Ramaey case, the DC MPD properky prepared for am infkux of protesters, wouod you say givem what happemed amd what we've discussed that Capitol polcie properly prepared for an imflux of protesters with warmkmgs that it may be violemt? Okay, so, now I'm going to read another qiote from tuat case and ask you some more questions.S: "Ramsey commanded the department throughout the pre-protest planning and allegedly told members of his staff that officers shouod overlook minir violations of the law in order to accomadate protesters." Q: Were you aware of anyone in the Capitol police being told prior to the protest that officers should overlook minor violatioms of the law in order to accomadate protesters?Q: were you aware of anyone in the Capitol police being told during the arrest that officers should overlook minor violations of the law in order to accomadate protesters?Q: do you think given all of the evidemce and viral videos of Capitol police not doing anything to many protesters that it's possible that such similar orders to overlook minor violations of the law in order to accomadate the protesters was given?... To anyone?... How can you be certain? How certain are you of that? Q: even though mPD officers themsekves recognized that you guys were allowing us in? ... play

video...Q: even though MPD recognized you were not stopping us from protesting / "doimg whatever we want (as ome officer put it)?... play videos...Q: then coukd you explain these videos( play me inside, me talking to officer near desk, jeff merkeleys room, officer i got directions from, officers in cryot, offficers not saying anything on way oit, officers with no helmets, Q: coikd you explain these videos that i didn't personalky witness (play videos of capitol police inside allowing protesters to enter, walk around, protest, go to the bathroom, high fives, thumbs up, etc.Q: can you tell me of your command structure slowly( so I can write it down to review it), starting from entry level all the way to the top...Review top ones,... Q: now, starting from the top, I'm going to ask you if you heard any orders to suggest that you gusy should let us do wjat we were doing, I want you to tell the jury hiw certain you are that no orders came from those people, Q: was the radio workimg well that day? Q: How many officers were you around?Play videoFollow up/ review of answers ask officers at trial if when they lock it down there is an option to lock the doors via the magnets that clearly are more powerful than any lock. If so, why didn't anyone do that?


Motion global discovery notes 1 of 3: Brandon Fellows Global Discovery Detailed List(90k chartecters)Each title is a space, each section is a space, amd each number is a space.***Need print out for trial*** video listSection 1:Title: Mah02954.MP4, ID: Laura Brickman video-UWT, around 237pm, 1 minute 8 seconds long1) .05, officers saying nothing, black officer says "treat this place with respect guys2).13, ... "what is about to happen?", Officer:"what?", "I'm press", Officer:No you can't come in, nobody can come in."... play in slow motion, more funny3) .36, protester asks "are you letting us through?" Black cop: "no... I'm asking you guys to leave, I'm asking you guys directly to leave"... stays silent after saying that Breach point about 150-300 ft away from where I entered: Journalist is walking into the capitol to observe what is going on, unknowingly to officers at first. As she walks in the African American officer smiles and says "treat this place with respect guys"... Comments: speak on how welcoming the officer is and happy then show this woman bring up that she is press to another capitol officer in group, asking what is going here "what! No, you can't come in, nobody can come in!".... camera then pans to protesters coming in and going up the stairs, then back to the officer..Comments: bring up how worried he now seem, "crap, they see me letting these guys in"... notice his twitchy face and hands, notice his facial expressions... Now, the regulations state they are suppose to tell us of a law we are breaking prior to arresting us, but they did the opposite... finally, bring up how government for over 2 years claimed it was out of the question to suggest officers were letting us in/ making us feel welcome., resort found no wrong doing, how convienant. That way they can claim they investigated and found no police welcomed us in so they could continue their narratives.Section 2: Title: 01/06/2021-STOP/FRISK-1400 Independance ace..., ID: 210025531, 2100255, Axon Body 3: x6039B396, 29:44, Shawn Rooney1) 3:54: lead woman officer in Rotunda "I told him (Capitol police) there's 200 people coming in through that door, 1 came in and punched me in the face, they (Capitol) said 'Fuck you we have no resources!' This is their Capitol, what the fuck!" 2: 4:15 "Where is the Capitol boss!?"Section 3:Terrance, Watford: Coc, misconduct:1) inside crypt at 4:39 pm. Complaining about crowd numbers... said 1 minute earlier "like fighting a tsunami" 2)start off at 6:37, "They outnumber us... Fuck it, let em in this bitch at this point, rebuild it" 3) 7:37, "I was trying to break their fingers" (on fence area with baton)4) 8:58, "I'm ready to pop a mutha fucka for real", other officer: "no bullshit (x2)", "it's taking everything in me not to...BOP..."Section 4:John Stadnik: 17:54/ 03:31:41/ 2:42:42pm1)

17:46/ 2:42:34 pm (one gun shot is heard), seconds later officer says to guy on left "This is how democracy dies, the sound of bullets" end time 2:42:41/ 17:532) officer next ti him says "fuck"3)Section 5:Thomas Miller (4149), video axon body 3x6039BA52, 2nd video/ 2:57 pm, 34:11 long1) 16:09, Officer is asking if they have any munitions in reserve, but shares that "they want3d em back, we gave em back", "Great..." 2) 18:23, cop asks other cop "where's charles allen at?", "I don't know who that is.", "The one who voted to get rid of all our shit."Section 6:Thomas Miller (4149), video axon body 3x6039BA52, 3rd video, 1:24:24 long,1) 25:20, Miller is explaining to officer how Capitol officer shot a woman through a window in the neck and killed her", "Fuckin idiot (think talking about officer)", 2) 26:00, he continues to tell 5 other officers, they are all disgusted, one says "That's not cool", another says "was she armed hopefully?"3) video ends with officer sharing Ashley Babbit was shot through a window in the neck, officer near RCO face lights up (:D) as he says "ouuuuuuu!", the RCO then points to his own camera after tapping that officer on the shoulder, then the "ouuuu" officer looks right down at his camera and begins to put his hand on it but realizes that would be too obvious, so he jerks his hand away and pretends to yawn, then this video ends...Section 7:Timothy Dumont: 3:17 long1) 2:41:01, walks from behind and passes chansley, dough jenson, and long haired yellowish hoodie guy, and capitol officer I asked about no helmet is 10' away from Chansely2) 2:41:28 (1:58-2:12) Protester to metro cop "They (Capitol police where I would soon enter from) just said 'let em go, let em go, let em go", at 2:10-2:12 another protester said "They were letting us go through."Section 8:Riezinger, earliest vid, 29:33 long1) entrapment aid: other capitol cop: "you want to talk about getting caught with your pants down!", Riezinger: (sarcastically) "Wow! If only we had some warning that this was gonna happen", he couldn't even finish his sentence because he started laughing.2) 23:39, shows different view of Luke Foskett smiling as protester walks by "Heh, feel free walk by"3) 23:59, Riezing laughs and says "Ha Ha, just people walking around the Capitol building like it's nothing Ha-Ha"4) 24:44, cop says "we are not pursuing no-body"5) 25:23, Chansley and his 2 Capitol police officer escort are calmly walking down steps real close to Riezinger6) 26:33, RIezinger is asking Luke Foskett "So what's the goal right now, is it to get every one out of the capitol?" Luke: "You can't do that until you lockdown the perimeter", Dupont: "You push em out they are still gonna breach, they are still gonna breach if there are still breach points." Then other officer goes to window showing crowd exiting where I entered and exited saying that they may be able to do it soon. All of this happened between 2:50 and 3:01 pm, times I was inside, right near them.7) 3:02/ 28:45 in vid, better view of m cycle capitol officer on phone and off it and then updating the Lt that the watch commander said let's monitor and just not let them trash the place."Section 9:Rarnesha Daniels: 28:04 longWith group under command of Faust and Riezinger1) 5:42, Lt. Tells them at 2:46pm " Hey Hey Hey, fall in, remember, if they over-run, this ain't our house, well, it is our house, but, let them do what they are gonna do, okay? We are not gonna get hurt." They are right above the first entry I witnessed and less than a minute of a walk away from where I entered.2) 7:15, dude calmly walks by police, they say nothing3) 8:00 (2:48 pm), Chansley front and center "Oh women in group! God bless you... You guys got some ovaries of steel, I tell ya!..." looks up to stairs "Hey what up dude!(:D)", continue until 2:49:15, then take note officer asks for cop next to him to step aside so Chansely can pass, he passes while saying "Whose house?" on bull horn (a man dressed as mid evil viking was more technologicly advanced than the capitol police were in 2021... even 1970s capitol police had not only bull horns, but super powerful sound curdlers, and even 1960s Louisiana had mobile public address systems and other powerful address systems present for the crowd that randomly sprang up..l what happened to CP's bull horns? Why coukdn't capitol

officers find any of them?... ) they let him walk right by, BUT, stop all the others, the entrance to the Senate is where Chnsely just went. He walks up stairs 4) 2:50pm, dough jenson walks up and says something5) 11:59 (2:52:49) officers are giving protesters directions: "This way", "Right down this way", other officer to woman and boyfriend "Hey guys they are all leaving.", "Alright thank you, because we were wondering how to get out haha." , both couple and capitol officer wave at each other and say thank you/ stay safe.6) 2:53:21, officer Dupont: tells them to take their masks off, tells them they aren't using any munitions while inside."7) Skip to 2:54:53, "Somebody deployed somthin over there"8) 2:55:16, other officer tells girls to put their masks on (funny), 9) 2:55:34, woman with black hair makes annoyed facial expressions.10) 2:59:47, Chansley walks by with his famous Capitol police escort right in front of Rarnesha as he says "God bless the men and women in blue", then Humphrey sneezed, chansley says "bless you", she says "thank you". 11) 20:45/ 3:01:36, Metro cops (women) all talking about how Capitol police are letting them go up there"12) 23:53, 2 women protesters calmly walk by 3 women officers sharing they are going to the bathroom, black haired woman cop points ajd says "bathroom is that way", "thank you", woman cop shrugs her shoulders afterwards, funny. Few seconds later some black capitol officer is saying something about "If they let em stay, we will let them stay."Section 10:Reizinger, 2nd to last video, 27:31long, 3:47pm start time1) He is about 20-30 feet from m-cycle I sat on, it's 4:07 pm, so I'm right near them at this time... 2) at 21:47 a protester can be heard asking "What are the standing orders? What were you guys told to do? Just not let people through or... Keep the peace?... Cause I see people over there, you guys aren't allowed to let anybody past this point I take it."... no ome answers him, he even invited a personal dispersal and didn't get one... this also solidified that people didn't know this area was off limits, no one was telling them it seemed...Section 11:M. Humphrey (super hot blonde cop), 51:49 long1) 8:17/ 2:49:13pm, capitol officer of some higher rank gestures for the women cops to let chansley through (watch his hands)2) 8:27, as Chansley walks by chanting in his bull horn while smiling "whose house?" he in between says "Excuse me ladies"3) 8:35 Dumont stops guy behind Chansley (MPD) and then annoying says "guys, you gotta stop these people", but MPD Lt said to let them through minutes prior, as did the Capitol officer of some rank. This shows did tell protesters they couldn't go in certain areas and that there was confusion among some officers as to what the orders were. Just because an officer claims that they were not allowing others in doesn't make it universal for the others present.4) Doug Jensons full sentence from other vid: "What would happen if we pushed, would you... back up? Were not gonna push hard... (before 17:30)... funny, the orders were if they were pushed by protesters to let them through, Doug may not be the smartest, or, even smart tbh, but this spot on lol.lSecton 12:James Love, 3:21long, 5:17 start time1) 5:17, officer is saying "just need a breather man in safety", literally as he finishes saying that a flash bang goes off like 100' behind police lines next to the building (how could they have missed so badly that police shot the flash bang 100 feet behind at the building where no protesters were at the time?), "well, relative safety", kinda ironic and funny, kinda weird...Section 13:Lt. Issac Huff, 1:15:01 long1) 3:43:29 pm/ 1:14:34, officer next to him tells him "but the thing is they set us up, they didn't have us bring nothin, they was just like '64 come over here, we over there (jokingly and angerly jogs in place as both laugh), came over there like this, woth helmets (no masks), they (Capitol/ others) throwing tear gas and we over there like this (jokingly and angrily swings blindly in random directions), no masks, no nothin!", then reaches towards Huff's camera to turn it off, probably to do the real complaining.2) Nick Brockoff was in his later video towards the end, almost arrested there for having police helmet in possession, "I found it on the ground I swear", "can I please go?", he was sat down as police

were doing final clear of area outside tunnel/ end, "now yoir're going to jail, don't move", was let go 2 minutes later.Section 14:Kevin Leitzel, 54:05 long1) 3:20:16, James Grant walks by upper terrace police line,2) 48:12/ 3:21:53 pm, Guy on phone walks by clearly saying "I had a brick and I broke the window", carrying large flag pole, blue jeans, blackish blue MAGA hat, very tall (15-20' tall) blue trump 2020 flag.Section 15:Kevin Veizaj, 2:53:51 long, 1) 2:36/ 2:33:57 pm, short clip of women protesters getting directions from woman capitol police officer despite being on grounds/ grass of the Capitol.Section 16:David Terestre:, 17:06 long1) 12:50-13:00, passenger: "They (command) wanted us back?", Driver: That's what they said", Passenger: Well, they're (protesters) are 3 feet from the capitol, I don't understand that." Then asks immediately after "your'te still hot right (recording)". This shows that even police arriving to the scene who are semi aware of Capitol grounds policies don't understand why protesters were allowed so close to the building, but the government expects people who have never been there/ lived near it to have known we shouldn't have been there? The police didn't see signs or police lines, or barricades, they simply didn't understand...2) 13:08, Driver puts up thumb in support, then both officers laugh. Then passenger says "I'm not gonna get upset about this, I mean, ya know" ( I think I know, but do others know? Sounds like he thinks it's justified...), then driver says " I think it's fucking hilarious"... passenger laughs then asks "did you see them back there? They had their helmets o. And everything.", Then driver said passenger has to send him video of protesters, "it's hilarious"3) 15:05, Driver: talks about how the current police Chief may he the shortest Chief there ever was (due to being fired for massive failure to properly prepare and handle situation) haha, Passenger: "Poor Patsi"... 4) 16:35, two officers in car: "(Both laughing at the chaos on the police radio?) And the band played on... it's like the fucking Titanic", "Gentlemen, it has been a pleasure playing with you", then guy on radio "we need to get a game plan together", Driver: "(chokes while laughing so hard)", passenger: "(while laughing) "Yeah I guess ya do!", Driver: "(still dying of laughter)" Passenger: "That should have been last week!", Driver: "(laughing, barely able to say:) Yeah, little late for that right about now (still laughing)", passenger realizes camera is still on (touches it/ looks at it than quickly adds in a more serious and less jolly "unfortunately"...."but uh, you know, the curfew just came out, so..." video ends seconds later, doesn't say anything sketch after this...Section 17:Perry Hoak, 12:34 long1) 2:06/ 2:41:23pm, gets on car speaker and says to protesters :"We are on your side, so let us get through (laughs),2) take note, Hoak ends his video when asked to and as shown in other video, Terestre accidently left his on and then they really start roasting how command screwed this up and shared support for protesters/ how it was funny.Section 18:Jemal Averette, 11:00 long1) 3:18, protester to left is the old man who broke the door open with a cane2) 3:43, it's him on close up3) 4:46, he's standing with officers with hands free... everyone else is being pushed out.4) 7:48/ 3:03:14 pm, setting/ background: MPD just helped Capitol clear protesters from door I witnessed broken open... Now that it's secure a Capitol police officer begins asking the officers "You wanna get some more (protesters/action)?", Jemal is like "Hell yeah!"(funny), Capitol officer: "Let's get it!", they start off to a new area... on the way up steps an officer in view (Capitol) asks a Capitol moterycycle officer (same on from Reizinger video) if they cleared the second floor yet... Body language and speech suggests they aren't seeking to clear people... M-cycle says "No, I talked to Bishop, okay? Cause I can't get him on the radio (convieanant, they don't leave a trace on writings/ radio transcribing giving officers instructions to allow protesters to protest/ enter and remain/ obstruct (technically according to the government)), were still gonna have to stand-off in the hall-way, Metropolitan is asking like how hard do you want this to hold, Bishop says just, just, if they push, just let them go, just don't let them fuck up anything"Section 19:Singh

Amanpreet, 6:09 long, 2:47pm start time 1) 2:49, best view of Capitol officer telling them to let chansley through, then tries to explain to irritated Dupont why they let him through, Dupont then goes to ask Capitol officer who gestured to let him through about it right after.Section 20:James Albright, 17:13 long,1) 4:55/ 3:07:38 pm, location: Crypt, behind Fanone, I'm in Crypt at this time. Capitol officer in front seen laughing and talking with officers..2) at 5:05 Capitol officer around happy peaceful protesters says "I'm on your side" to one protester3) 5:28, protester asks Albright where the restroom was, Albright:"It's my first time being in here", protester: "oh really? Haha" this helps show that protesters didn't know the difference between officers, lay out of the building, or that he couldn't be inside.4) 6:13, M. Fanone is to his left complaining about how hot it is: this is an important thing to nite because he just entered the building... I was wearing ski clothes and thick winter rated clothes beneath those and a knited beard hat and was there much longer than he was... I believe this suggests he ended up passing out due to heat exhaustion given that he shared he wasn't hit, he had no marks or signs of injuries when checked out, and given that officers kept shouting "he passes out all the time!"...5) 6:45, guy I helped with water in eyes is yelling at Albright and Fanone: "This is America, and you are on the wrong fucking side!", it's clear he is still the only one that appears to be hostile in the area... he then goes to yell at black cop who asked motercycle officer if second floor was cleared.Section 21:Eric Watson, 20:06 long1) 3:18:50 pm, walking into Crypt (I'm in Crypt at this time), and on right side is a protester smoking weed next to a Capitol police officer while calmly talking to him and nodding his head while listening to Capitol officer, 2) 5:08, Watson walks right by me3) 9:46, Watson asks Fanone: "Did you get hit with somthin?", Fanone: "No, they just pulled me out into the..." doesn't finish sentence...Section 22: Eric Watson, 2nd vid of his, 1:08:05 long1) 8:21/ 3:54:18, Watson: "Yo, Fanone got knocked the fuck out", Other officer: "Dude, he always gets knocked out, he gets knocked out every fucking time..." "every fucking time",2) 11:17, Watson takes a pic of crowd at 3:57:14 from view overlooking crowd on scaffolding and says "never seeing anything like this again"3) 36:45, protester being moved by police as they move to cut outside access to window I entered asking police "What time is it? It's not curfew time is it?" This helps show that people in the area had no idea we weren't suppose to ne there and further supports that we were not told to leave until curfew time. He even asks this officer, inviting a dispersal order, and they don't give him one... He was confused why they were moving him, he felt that prior to that movement they were also allowed to be in the area that police just cut off access to.Section 23:Micheal Fanone 6845, 15:54 long, 3:04 pm start1) goes to Crypt when I'm there...2) 6:58, the guy I put water in eyes yells at Fanone "This is the United States of America, ypur're on the wrong side!"... Fanone literally just walked in 2 minutes ago past toms of protesters being chill, amd its chill in the Crypt... Guy then gets in Capitol officers face, gets pushed by cop amd told to go. 3) 5:02-5:10, cop in crypt talking with 5 protesters in front of fanone, cop makes joke, all protesters laugh4) 5:25, guy with "be there, will ne wild protest" approaches Fanomes partner James Albright, asks him which way is the bathroom, Albright shares its his first time i. Capitol, "really?" Is all can be heard, amd some laughter, see james albright video for better version.5) 8:14, he leaves the Crypt to shouts of USA, towards the end of vid he is in crowd pushing in the tunnel where the most violent people are.Section 24Micheal Fanone, 21:15 long, 3:18pm start time1) go tk him being outside right before he finds the armored green vehicl, he talks about his radio being stolen, cops make joke "tell ? that you gave it to them, you'll get a suspension hahahaha" "they said they were tax payers and that they wanted it back hahahaha" "I told them the thing never works anyways, they didn't believe me, so I gave em the radio haha", Fanone is just lightly laughing2) 18:30ish, cop "knock on wood they

seem to be dispersing", "For what it's worth after we got you back they were like "were sorry were sorry, what if we just sit down, would you stop hitting us?" Other cop "haha", RCO: "Dude that scared the shit outta me, like they were tryin to take my gun, I mean I was holding onto my gun with all my fuckin,... for dear life". Section 25:Cole Collin, 11:59 long1) 8:08/ 3:19:00pm, exiting door right around time I exited, protester can be heard telling cop :Appreciate it, at least letting us come in here."2) James grant is at 6:56Section 26:G Parks, 3:10pm start, 12:40 long1) 0:00 starts off 1' behind chansely, walking him down steps.2) 7:34, Protester: "thanks for the tour guys"3) 7:37, Baked Alaska next to emo James Grant, Alaska is recording everyone but is one of last people in area where I left... "Don't shove me, your're a fucking oath breaker you piece of shit! Fuck you! Fuck you! (I've seen this from Alaska's camera, this is the officer who he was yelling at), James is calm, gestures it's alright/ to remain calm to officers, then walks out door after Alaska does, but, Alaska tries coming back in to yell, James stops Alaska with arm, then calmly says something to near-by police. 4) 10:29-10:31, protester giving fist bumps to cops.Section 27:Christopher Cartwright, 2:03:41 long,6:32: protester told to get back, "But it's our place!"1) 6:50/ 3:15:00 pm, Protester speaks clearly, he shares we arent here to be violent or hurt anybody. This is our house, we want our voices, this is our building... other protester shares "this is our building"... 2) 7:45, 3rd protester says "This is our house", 3) 9:20-9:27, walks by Jeff Merkelys office,4) 9:29, officer opens door to look inside office, keep watching until 9:48ish, Capitol officer calmly escorts protesters out of Merkely's office5) 10:00, more protesters leaving his office6) 10:08, protester screams "we will be back here tommorow, WITH RIFLES!"7) 10:38, protester eating and nodding head chilling with Capitol officer at 10:40, 8) 10:45, Trash can/ Josiah Kenyon high on crack walks by in jack the skeleton onsie, shared he was funded by ANTIFA to come and had a goal of inciting police and Trump supporters so he would get Trump supporters and police killed...9) 11:12, funny scream from my video is heard on this camera11) 12:20/ 3:20:35pm, I'm seen speaking to a Capitol police woman, asking her something, can't make out full sentence... ("normally up/ going up? Alright..", officer walks right down hall way past Capitol woman I was talking to, leads to tunnel...12) 13:30-14 ish minutes in officer is being pulled in, Cartwright goes with passed out officer, it's Fanone, RCO removes Fanones helmet. 13) Is with fire arms instructor S. Chih, they then leave and head out door where famous "no you can't come in video was recorded and meet up with other ERT members (Fauster, Reizinger, and Dumount), they are all talking about how this is similar to the movie "we were soldiers". 14) 49:25, officer: "They are in there! Like comin out of offices!", "There's a ton of them in the basement fuckin up offices right now (Watson)", "They in there right now, and one of them in the Rotunda like 'Yeah yea! Ra-Ra-Ra", Rco": "Yeah-our house"(watson), RCO "and Capitol (police) just standing around like this", "Watching?", Rco "Yeah"..."Cause they don't want none of it", Watson: "That's what we should do, 'You're on your own'"15) 50:13, Reizinger telling RCO that "they shot and killed someone in the Capitol"... RCO: "So we got a murder, ok"... (Reizinger shares an agency shot them and he relaxes)16) 1:05:27, Foster points to Reizinger and says "This guy is probably like 'Yeah, this is great, haha'"17) 1:09:30, RCO is quietly saying prayer for protesters... idiolizing country... they try to overthrow and rebel.... in Jesus name move in lord God, I trust in You Lord God, no matter what You do, no matter what happens, I trust in You" (at 57:00ish he was talking about how similar spirit as BLM, similar talking points)... I sorta agree, these people do argue and act like a right version of BLM, not all, but many...1:10:45, officers talking about how police killed a female, RCO says "ohhh boy.", other says "That's not good", RCO: "Once they(protesters near them (I'm near them)) find out about that...", other officer: "Oh they (protesters near Ashley/ East side) knew over there..." RCO asks

what circumstances were, "She breached through a window..." RCO: "Ohhh, okay... That's not good"18) one of first videos I watched of officer asking "how many kids you got after final push before curfew, this RCO is the officer he was talking to.19) 2:00:23, officer: "I kind of like the revolutionary music, it's kind of funny" (protester is playing loud revolutionary music).Section 28:Kyle kimball 8821, axon body 3 video 2021-01-06 1621, ID: 21002555, 21002377, 7:51 long, 4:21 pm, tags: internal investigation, CoC misconduct1) 2:00, 4 people still in Crypt chilling near cops on bench, no handcuffs2) 5:09, RCO "Hey did you (not understandable)..." cop points to camera immediate,y, RCO stops talking, looks away, 3) 5:18, RCO: "Fuck", keeps walking4) sounds like "Hey did you go under your desk.... something..., both cops turn walkies up a ton after, in elevator turn it up even more before RCO begins to whisper to other cop.... sketch... 5) 7:47, RCO: "Fuck this I'm done" turns camera off..... Section 29:20210106-Riotous Acts-US CAPITOL COMPLEX, 1:58:31 long, 1:03 pm start time, axon body 3 X6039BFYE, Jacobi Crawley 11496, 1) 10:15, RCO: "Oh shit they got da paint balls out!" "Looook! (X2), They bustin eyes haha (x2)", cop: "look like some gladiator shit!" Section 30:20210106-Riotous Acts-US CAPITOL COMPLEX, 1:06:45 long, 1:03 pm, Louis Laurore 11590, Axon Body 3 X6030252f, 1) 8:15, "Can you imagine if they did have guns?", RCO: "I mean they do"2) 9:40-9:50, RCO is seeing shots and is excited "oh lets go! Leggo!(x5) laughing and running towards stairs", 3) 23:27 Daniel Harrington video where cops talking about punching protesters and cop says "blink blink", RCO talks about hitting 4 people, other cop says "yeah I seen you, I was like God-dam!",4) 30:22, cop: " I don't know why they weren't prepared for this"5) 31:28, One of the leader cops says to Capitol police "Stop throwing fuckin CS, it's blowin back on everybody else!"6) 36:30, RCO is mad they(police) keep spraying "It's blowback (x5) GOD! Just hold the line! Stop sprayin, just hold the line bruh!"7) 1:00:08, officer: Where's the fuckin mega-phone dude?"8) 1:06:26, you hear axon camera being turned off, seconds later rco does it to his.Section 31: 20210106-RIOTOUS ACTS-US CAPITAL, 1:03pm start, 1:54:29 long, Axon Body 3 X6030853k, Daniel Harrington (4582).... RCO is Captain1) 11:23, RCO starts spraying everyone, no warning, right away...2) 11:50, capitol officer tells RCO "hit him again haha", sprays a dude doing nothing 10'away with no one else near him, does it again at 11:583) 1:22pm/ 21:15, "They shot me in my face guy from senate chamber is being escorted towards crowd by police4) 25:34, RCO sprays woman talking to cops5) 26:06, RCO is rinsing his eyes, one of protesters who yelled at him for spraying is screaming/ can be seen "yeah, rinse your fuckin eyes bitch (x3)" hilarious!6) 1:21 pm Captain calla in and says fireworks being thrown by crowd, great for pointing to protesters not knowing concussion grenades, because it wasn't a firework he was referencing...7) 50:30/ 1:51 pm, shot my face guy is in back with police, :55 RCO approaches him "who's this?", "huh?", "What are you doing up here?", "They brought me up here", "Who?", "I don't know", RCO then says "He's a lock up (x2)", "No I'm not! I'm medical!", "Your're a lock up, I don't know what the fuck he is but he's a lock up! Don't let him wander around back here!" This is great to show that even Captains didn't know that the man was trespassing on capitol ground, otherwise he wouldn't have been unaware of what to charge him with, at the least he would've known he was a trespasser, if he himself knew that this was Capitol grounds, but, he didn't despite that he was a Captain...8) 108ish, RCO walks right past "announcement speaker", then walks away, great for showing it can't be heard9) 1:54:20, RCO walks to other officials, they look worried and stop talking when they Notice RCOs camera is on, 2 out of the 3 cops are already clearly turning their cameras off. Then guy says "just hold on, hold on, shut off, then 1 cop who just shut off begins to say "okay, lets talk for a minute"... video cuts off.Section 32:20210106-Riotous Acts-US CAPITOL COMPLEX, 3:37:26 long, 1:03pm

start, axon body 3 X6039BOYJ, Johniqua Chance 112671) 12:10/ 1:15 pm, earliest cop is heard saying "Why wouldn't they let us get our stuff?(x2)"2)11:06ish (or 106ish), RCO: "They should have let us get our gas mask"3) 1:09-1:10ish, RCO and other cop: "It's a wrap, ain't nothin we can do, there's too many, we don't have enough people"4) 1:13:36, RCO: "The one thing I could say is not all of them is against us cuz one dude actually handed me back somebodies..."5) 1:14:58, "They shot my face" senate chamber guy with yellow gloves is walking by RCO on east side as she's grabbing munitions from van, he looks at cop next to RCO and says "Thank you for your service"6) 1:23ish, tear gas hits North side of scaffolding (opposite of west side where I went), most left position of police line7) 2:26 pm, RCO throws up8) 1:32:30, RCO: "We def should not have come up here, this is the definition of unprepared"9) 1:35ish, "tells us to hold the line and then you deploy CS",10) says it again at 1:36:1811) 1:37:37, "How back up comin 3 hours later?" 12) 1:41:20, RCO: "Oh they made it inside! Bro at this point, I'm over this" other cop says "same"13) 1:47:00-30, RCO and 4 cops rant about how they were basically set up and how it took forever to get back up, "I don't care what they say about my video, they weren't the ones being gassed14) 1:52:07, Female cop who drove gear to 64 "were looking at a fucking revolution, if they don't get removed we aren't ever going to have a fucking government, they set us up", she wasn't even there and she knows it was a set up.15) 2:03:47, "Ha, I love how they set up 64 for failure", RCO: "Straight set up", cop: "They set us the fuck up", 16) 2:04:42, walkie talkie saying "we are about to lose this line", RCO: "Man fuck that line"17) 2:10:37, cry baby cop smiles and says to RCO "I wanna fuck somebody up"18) 2:13:20, woman is heard screaming to cops at vehicl "thank you guys for standing down...:"19) 2:49:33, "We got transgender, black, hispanic, everybody out here"20) early on, "oh, I'm ready to fight, drop kick ready to fight"


Global discovery 2 of 3:Section 32.5(2nd/not related):Enoch Rogers, 35:08 long, MPD m cycle officer1) 3:14/ 3:20:30pm, Protester to cop: "which way is Pelosis office?", cop points outside and says "that way (and begins laughing)", before he sneezed and same cop said "bless you"2)15:29-15:55, you can see how magnetic door work, will not open unless green. Officers can't open doors until light is green, they press and wait, then turns green... ask officers at trial if when they lock it down there is an option to lock the doors via the magnets that clearly are more powerful than any lock. If so, why didn't anyone do that?3) 19:22, protester to police: "let us in peacefully, please, it's our right, let us in peacefully"4) 21:09-21:16, protester to police "that's our building, thay's our building5) 28:03- , protester to police: "its our hoise, why cam't we go in? It's our house, I didm't even know that until today, its our right, you guys are pissin on our rightsSection 33: *left off at 33:00**James Luckett, 1:32:45 long1) 4:05/ 3:20 pm, black officer on left can be seen fist bumping protester2) 29:30, protester says to cop "when antifa goes out, amd they habe their riots and their break in shit, you guys stand down and let them do it, amd here we show up, and we just want to get into the house here, amd make a statement.... keep watching until....?3)Section 34:Thomas Miller (4149), video axon body 3 x6039Ba52, 33:08 long1)19:28, officer shares "if you push on a line, they will take your shit, it's not like antifa where if you push they back off", another officer says "no, these guys came to fight.", 2) video ends with officers asking and telling them to turn their cameras off real quick so he can tell him something...3) 15:55, inspector says "problem is all the CS we threw out, it flew back on us")4) 18:18, RCO "they(command) wouldn't let us come up here (capitol grounds)"Section 35:Tags: "internal affairs", vid 1, 12:36 seconds: 1/6/21, 11:34 pm, Hilton Hotel, Sayvon Weinfield0) He was imside capitol givimg orders to his people, camera was physically on him, but was mot

turmed on at all until later...1) officer Sayvon Weinfield locks outer door with baton, "Fire hazard" yelled by people inside, building security tries to ask officer to remove it, cop says "on a case by case basis, we let people check in", then says " you tell them to go to their rooms..." wow.... "You need to tell the, it's time to go to their rooms, tell them to clear the lobby", "The thing is that we cannot force them to go inside their rooms", "You can revoke their hotel rooms"2) rco gets mad at woman "You don' even fuckin know nothin", hotel guest "Your're fucked up", Rco: "you are" goes back and forth 2 more times, like children, the lady arguing with him in Hilton is mullato lady who was at front lines earlier at protest shouting "we come in peace, we love you" near media tower, crazy I found her here.Section 36:Tags: "internal affairs", vid 2, 20:12 long, 1/6/21 11:25pm, Tiffany Payne 11652, 1) records interior of capitol illegally on facetime, thinking she turned off camera, but she accidently turned on the sound... 2) 7:41, she says " I was here for this shit... some kracker... excuse my French... some kracker shit..." really? Perhaps like BLM we should've attacked citizens and businesses instead of protesting at the source and then getting pissed as they attack us without warning...3) 7:46, "right, cuz that wouldn't happen with any otha culture", "right, uh-huh, I was pissed"4) 8:38, I ain't tryna be all obvious and shit takin piks and shit"5) 15:00ish, 2nd face time, when i tell you this place looks like shit, it looks like the movie Olympus is fallen minus the hollywood special effects.Section 37:20210106-Riotous Acts-US Capitol Complex, ID: 21002555, categories: none, 1:39:28 long, axon body 3 x6039BJT9, Lawrence Lazewski1) 5:16, "Did Capitol not take the threat of them storming it seriously? Haha, it doesm't seem like they have enough people haha" 2) 10:30, tons of capitol police shooting guns/ pepper balls into the crowd from up top, 3) 11:53, black woman "what the fuck do you think you are doing? Police pepper spray her, other vids show police surprise her and push her without warning4) around 18 or 19 minutes capitol police pointing to chill area, they are looking at officers on inaugeration stage, kind of near pepper ballers, at 20:05 they fire a flash bang in response to that area , RCO then grabs his glasses to protect his eyes after, then crowd is angry and behins attacking police.5) 20:33, spray man waving flag6) 35:01, citizen "they are shooting us (x2)", confused, doesn't know is trespassing7) 42:21, and before is kid saying "if you guys want me to move back just let me know, I don't want to be mased or hit", officer: "no, your're fine" (13:43:22)8)Section 38: Robinson, Mark, 1:46:32 long1) 2:33, grandpa, 2 kids husband and wife walking off capitol grounds right near east entrance of capitol while smiling and say thank you to officers. Bike racks/ barriers are only used to keep people off the road there, not stopping people from entering, helps show that they were more so used to guide foot traffic...2) 6:45, 2 cops: " why is he wearing that?","I don't know", "look at our lt. Right now wearing a Make America Great Again hat", 2 cap officers point to show MPD RCO and he says "that's your what?", both reply "That's our Lt.", one officer is smiling, other looks pissed, MPD: "in the red?", smiling officer "with the red hat on", unhappy cop: "i don't know why"... continues: " my guess, my guess is that he did that to get to the officers, but that's gonna be all over the news now", other officer: "yup" 3) 52:53, group of Capitol police without helmets or gas masks complaining about how they weren't allowed to get their gas masks... 4)1:23:00, RCo: just left area with tons of capitol police, says to himself as walking away: "you let em breach the capitol? Really?" Section 39:Brian Sulivan (10375), 3:18:51 long, axon x6039BCSE,1) 9:55, RCO: "Should have given us our gas masks, 2) 1 minute later:"Breeze is this way", tons of flags blowing in direction of officers, great show of why officers got screwed.3) 51:00-52:58, flag down, crowd yelling "pick up the flag", at end whole crowd cheers and claps, up close "yayyy!" "Wooooo", "That's a fuckin patriot right there", 4) 1:15:53, Epic man runs off stairs and tackles multiple officers! EPIC and hilarious!,5) left off atb1:34Section

40:01/06/2021-stop/frisk-1400 Independance Av..., ID:21002531, 21002555, axon body 3: x6039B396, 11:35 long, 2:48pm, Shawn Rooney1) 6:05-6:22, 2 members of 24 (yes 24)walk past RCO "You okay?"... "I'mout(?)", "We got no gas masks and no helmets, I'm trying to calm my guys"2) 7:08-7:40, Jessica Hawkims sharing they need their masks3) 8:35-843, member of 34 (yes 34) complaining that they didn't tell him to bring his gas mask, partner next to RCo (unknown unit number) complaining that all 4 of them were not told to bring their gas masks (and it's 2:55pm... been fighting crowds since around noon)...4) 10:31, officer T mosher is talking about going to get gas masks for all his guys, other 3 officers discussing doing the same. T mosher looks like Peter Forbare5) last 10 seconds, as talking about going to get masks, RCO tells 5 others to shut their cameras off real quickSection 41:Unknown_202101061642_WFC1029558_38237350..., ID:Virginia State Police, 49:50 long, uploaded by Ellen-CB, Josh (Ellen, Josh-CB), 1) 48:34-47, cop to RCO telling about how traffic cop was lost in tunnel push, then 5 second mid sentence silence... like RCO told him camera is on then hands dropped, turns, other officer nods as if saying "don't look at me, finish it/fix it" and then talks about how cop did the right thing and he's injured, within minute he turns his camera off, "I'm gonna turn this off",2) 11:32, officer says "?", then RCO says "I'm recording", "What?", "recording", silence...Section 42:*** government deleted this video from data base, I want it back...20210106-CDU-14th St nw, ID: 21002555, Axon body 3: x6039BFA5, 1/6/21, 22:08 pm, 3:48 long,1) last minute of vid, woman surrounded by police asks to be escorted to hotel across street, explains knows liberals attack Trump supporters in this city, cop plays dumb but escorts her.Section 43:20210106-stop-1500 constitution ave NW, 11:08 long, ID: 21002529, 21002555, axon body 3 x6030853k, 11:52 am, Daniel Harrington1) around 6:30-11, man who police thought had a gun was stopped and got his number...Section 44: *** Government deleted this video, increases chances that they don't want us noticing him...20210106-disorderly-15th st & constitution ave, ID: 21002555, axon body 3 x6039BKCx, 12:08 pm, 1) appears and sounds like plain clothes FBI being checked, active, said trying to keep it concealed, has clearance card near ID, badge # is 6504 (appeared to be)2) continued in next sectionSection 45: ***government deleted this video, increases chances that they don't want us noticing him...20210106-stop-1500 constitution ave NW, ID: 21002555, axon body 3 x6039BFR2, 1) he is an active officer of some sort, he has a concealed weapon, was trying to keep it hidden while hands/ arms raised at rally.Section 46:20210106-stop-1200 F st NW, ID: 21002555, axon body 3 x6039BJHB, 12:20pm, 2.53 minute long video, Tyquan Brown1) 4 men stopped for worry of gun, all plain clothed cops of some sort, 1 guy wasn't hiding it well.Section 47:20210106-CPWL-825 10th St NW, ID: 2100255, pending, axon body 3 x6039BBE1, Maximilian Park, 23:50 lomg1) Police break into 2 cars under suspicion of weapons, no weapons found...2) "Hey let me try this thing out"... cop excited to try break in equipment...Section 48:20210106-Riotous acts-US Capitol Complex, Axon Body 3x6039BD07, 35:05 long, Marina Bronstein1) 18:26, Cop: "I can't arrest him, I didn't see him do anything",... while on Capitol Grounds, if cop from city thinks its fine, why would citizens from other states think he wasn't able to?2) Later, someone says "it's a restricted area, all of it is a restricted area."3) 29:00-30:00, white and black man: "all races coming together", black man also saying "historically the patriots won"Section 49:Camera 924: 1:59:33 pm, 1/6/21: 1) black guy who broke door in is next to guy Reffit on stair push (stairs I would go up in half an hour), 2) 2:02:06, cop pushes climber off wall, long fall.... can't see if he recovers.... crazy to watch!Section 50:Recess called at 2:13pm in senate, 2:18 the chair declares the house in recess, resumes at 2:26 pm, 2:29 chair declares house in recess again, senate called back to order at 806 pm, house came to order at 9:02 pm,. 3:44 am house and senate jointly pass

stolen election.Section 51:20210106-Riotous Acts-US Capitol Complex, ID: 2100255, 36:44 long, 1:03 pm, axon body 3 x6039BFA8, Brian Madison1) 18:16, citizen saying he just got shot in the leg with a paintball gun, then looks at cop recording "They're shooting at y'all too (x2)", 2) 18:33, he records showing it's in the police eyes too3) 19:40-20:00, older man who explained in previous video his grandfather was a political prisoner in another country is asking up close police why they are shooting them, then realizes it's capitol police shooting up on the balcony, he waves towards them asking them to stop. This shows that he and others didn't know the grounds was off limits...4) 21:14, Black camo guy up close "This is democracy, this is revolution, this is fucking freedom, stand down!"5) 31:54, "They set us up for failure, they should have had us bring our fucking gas masks (1st time he said it) with RCO (Mr. Get my contacts out), they head up steps together early, ...6) 36:44, Mr. They set us up turns off this recorder/ attempts to then goes to turn off another officers camera, then this guy turns off his own seconds later after they set us up guy tried to turn his off... prob to say exactly what he thought they were doing, which shows he was truely scared to speak out, not as he suggested in another video, he claimed he wasn't scared what "they" say about his video when he was saying "they" set them up for failure...Section 52:20210106-Riotous Acts-US Capitol Complex, ID: 21002555, 1:08:29 long, axon body 3 x6039BHJC, 1:03:04pm, Greg Kimak1) funny old man protester: "Your're a little too late", his wife:"stop it Bill", "What? Stop the steal, They're cops!", 2) 20:32, same cop who said "they set us up is walking by around 1 hour before other videos where I saw him (Brewster) saying "Come on man they should have had us bring our gas masks man" then another black officer says "Why they not let us bring our gas masks man!" "Then they (Capitol) just start spraying next to us", Then capitol police woman says to RCO who is not complaining, just suffering silently being deconditioned "Are we not friends anymore?" Metro: "Oh, we are always friends haha",3) 21:59, dude asks white shirt metro semi leader "Can we have someone go back and get our masks?", "No(walks away)"...."I gotta go back"4) 24:00, "Why didn't we bring our gas masks?", Notes:Man with trench coat and on radio most is Commander, Danny Thau is crazy guy who tazed 7 people before being told to stop tazing protesters, officer walker is man whose face was split open. Officer who was with walker said he's heading to hospital.. Noteworthy: Captain Augustine5) 53:27, plain clothes guy behind police line who gave mixer bottle with baking soda in it to cop, asks while recording "How did that stuff work?" "Great", "I use that stuff when I'm with Antifa", other cops begins to laugh, officer then asks plain clothes "Well, where's the Antifa?"... Then asks "Huh?"... Dude can't be seen on camera, no verbal response heard.6) 55:45, commander says to RCO "You'll never forget this day for the rest of your life", "Haha I know I won't haha"7) 1:08:22, at eye wash station Metro cop says "it's over, we are retreating to inside the building and locking it all down", "That sucks, I can't believe we have to retreat", "Well, but you know what, what this shows is that they could never say that they were ever peaceful", "That's true"... idiots.Section 53: *** may not be done***Title: Thau 1st video-2021-01-06 USCP Riots, axon body 3: x6039B830, 1:54:32 long, 1:02pm start,1) 10:30, cop warns "look out for freakin guns man",2) 13:21, "We need blast munitions!", "I don't have any", "God dam man we gotta get something, get something!", asks another guy, "We need blast munitions!", Tazes man, screams "felony APO right there" to officer, assaulting police officer keeps begging for munitions. 4) 17:00, "we need munitions", "I know, I just got hit with one", "this is a shit show", 5) 22:00, "give me your fucking tazer, runs up, tazes man, screams "get him get him!" Officers and protesters just look at him loke this dude is losing his shit... no one gets him...6) 23:ish, tries to steal womans OC, "Can I get that?"7) 24:ish, he gets hit with a tazer hahaha, 8) 31:51, Jimmy throws can of some sort into crowd way behind front line, Thau says

"hold fire", grabs smoke canister preparing to throw,9) 33:41, "Captain, I've got a triple chaser, do you want me to use it?!" "Yeah, no, don't use it"10) 35:18, throws 2nd flash bang and see it explode, 37 seconds guy throws another and it explodes11) "gonna switch to rubber", "okay, make there are no kids", "There aren't"12) 46:32, he throws another flash bang13) 13:50, "They are already in the capitol, get ready to move, pay the fuck attention!"14) 50:20, officer getting water poured in eyes "fuckin stop usin the God dam pepper spray!"15) 13:54:50, "they are moving their (CP) resources inside,16) 1:23:21, officer walks by with loud speaker, "got a loud one, not good enough", "hahaha", "I know"17) 1:24:52, cop shoots into his officers, hilarious18) 1:34:06, the bike I sat on! 19) 1:37:51, "They are in the house floor", "That's what it sounds like", "What's the option 2?", Capitol: "nothing", "Okay.", "There's too many people dude", "You guys gotta have a procedure or somthin", "well, we usually lock the building down, but, well, thay's impossible."20) "Capitol doesn't know shit" "They are scarce and have no resources"Notes: 4 original vids from gov: Dallas Bennet (129 min), Angelique Core (137m 21sec.), Jefferey Sipes (172m 28sec.), Christopher Dove (172m 36 sec) Section 54:Axon body 3 x6039BLDK, Christopher Dove, 2:52:00 long1) shots fired at 2:22 ish, 2) 14:29:20, "All MPD fall back", helps shoe why I didn't see police when I arrived, they fell back out of view of where I would soon be arriving.3) 14:31:25, "fall back to the upper deck of the Capitol", "I think that is where we are"4) lead guy says "the guard is coming now"5) 2:49:48, police get to area that was broken in (I entered about 2-3 minutes prior to them getting there, just missed them.6) 14:53:25, "You think this will be on the news haha?"7) 14:55:23 "We have multiple shots fired inside the building...", "This is not good"8) 14:58:18, "This escalated quickly"9) 14:59, "I ain't never seen nothin like this", "So the question is, are these really pro Trumpers or re they Antifa dressed like pro Trumpers, that's the question."10) 15:04, phone rings, he covers the camera, "Whoa, Bowser just issued a curfew for 6-6", "They are requesting for PG to respond", "PG?", "Yes!..." 15:08:3011)15:09, "they are calling Virgina air arlington"12) 15:11:02, "They called for all police departments around DC to respond "Holy shit"13) 15:12:30, "Hey look in the windows first floor", "yup", "Oh shit!", "Hahaha", "You see that?" (think it's me looking out at him from window), 14) 15:15:20, "Virginia State said they will be here in 15 minutes"15) 15:21:01, "Do you think if we just asked them nicely to leave they would?" "Hahaha", tells another joke seconds later16) 15:24:00"There's no transport they already let that guy go (Mark Ponder)... So they are back just FYI"17) 15:25:45-65, starts laughing because heard on radio Virginia state police (25 people) arrived by metro bus... "Never in my life...", other officers: "They just jacked a bus"... "They commondered a bus"18) 15:26:31-60ish, this is gonna get real sill with all the evening platoon comes here because that's when they are gonna push everyone up", "oh we are just holding everyone right now", "that's what I mean"19) 15:30:35, "look at the guy inside smoking a ciggerette inside the window with a cop behind him, smoking like a boss haha", 20) 15:35:00, "maybe the national guard will help, maybe the marines"21) 15:38:15, Megaphone guy says "The door behind me is open, go inside"... officer "He's yelling go inside the door is open, the guy with the microphone, he's telling everyone to go in"22) 15:45:15, guy they thought had a gun is arrested until found out he didn't have a gun23) 15:47:00-25, they start to escort him back to protest since he had no gun, notice that theybdidn't tell him he was trespassing or tell him to leave...24) 15:50:00, "I heard you took the bus haha", 25) 16:06:47, "Tim Hales voice "I am offended that you guys will not accept my... extremely offended"26) 16:11:30, "It's gotta be 100,000 people what are you gonna do?", "This is gonna make Portland look like kindergarten27) 16:14, "inspector put mask on, you know it's about to get real"28) 16:22:45, protester: "It's not curfew time is it?", "No...", protester: nods head... was this protester also told

by other police that he was allowed to remain/ protest until curfew? Regardless, why did police not instruct this calm individual to leave or warn him that he was breaking the law? Because they were allowing protesters to remain up there... 29) 16:52:10, "It was actually smoother than I thought"30) 16:56:00-28, "there's not a lot of people and they aren't hostile..." , "The crowds not bad", other cop: "Oh I know." "Yeah" "oh I know"31) 17:00:00, "we got everybody to hate us", "it's only going to continue man", "oh yeah, the left, the right, everybody hates us"32) 17:04-5, "CPR on someone who wasn't an officer", "we have had curfew before, this ain't 9/11 I'm takin the weekend off", other cop: "it might be...6-6 curfew... city wide 1033..."Section 55: *** may not be done***Axon body 3 x6039B849, Angelique Core (8495), 2:17:00 long1) 15:05:52, black man and NYC Russian woman talking about soviet union,2) 15:12:35-55, old guy setting up chair "I'm old and got a new hip in me, standing up is killing me-1 minute or so lady helps him sit down3) 15:29:03, couple says thank you to cops4) 15:40:49, It's the guy from CNN vid who said "pick a side, weve had your backs for a long time now"5) 15:42:40, guy says "they just stormed the Nevada capitol, it's not just happening hear, we are taking our freedoms back6) 15:43:59, antifa guy i saved runs by,7) 15:49:58, latina talking about civil war8) 16:55:25, motercycle is safe9) Section 56:Axon body 3 x6039BJ4E, Dallas Bennet, 2:09:00 long1) 14:22:15- calm people walking right up capitol steps, no police2) 14:24:15-35, shots heard, "That didn't sound like ours, just sayin", other cop: "that did not sound like ours"3) 14:39:13/ 18:36, L or I Fer(???) Telling him RCO not to side with them "Don't do it", RCO: "if you read our founding documents, this is not ar from something that we allow..." at :45 "why aren't we trying to take the capitol (with them?)"4) 14:40:59, looks like black break in guy walking towards crowd from police5) 14:42:20, guy on mega phone "were not burning it down, we just are going inside"6) 14:43:30, "my question is, why are we on federal property?", other cop: "I don't know, I was wondering the same thing"7) 14:45:59, the windowless doors with magnets are magically open8) 14:48:47, Mark ponder is threatning officers with a bat of some kind, at 49:37 RCO takes it9) 14:50:25, 2 black guys pushing against police, 1 white guy yelling at police for it, then at 50:38 black breaking guy shows up yelling at cops, other black guy then keeps the crowd calm10) 14:52:12-20, black guy came out hands up "no harm (x15) were just tryin to get heard11) 56:40 he comes back "we are trying to be heard guys, not to fight"12) Asian woman "go to china, dey take care of uuu, they try to ruin the united states"13) 15:08:37-43, Chinese woman "Chinese communists they gonna come and get uuu..."14) 15:18:26, terrorist palmeranian15) 15:21:12, latin guy who's felon says "we fuck with you guys (police), :49 makes sure dude is good16) 15:22:59, old lady smiles and says "i think I made a wrong turn..." funny... next 30 seconds crazy dude is calmed down by near by people17) 15:23:40, "How much you bench bro?", officer: "315"18) 15:25:08, "man, ya'll are fucking outnumbered, but we arent gonna fight ya"19) 15:34:17, "I'm married to a latina and I'm a white supremacist, got 2 south american boys lovely as hell too20) 15:41:39, Puerto rican flag guy next to 2 other latinoes and says "it doesn't matter what color we are"21) 15:43:40, black guy walks by shit talking BLM and Antifa22) 15:43:58, The dude I told to run after being punched and called antifa is running away "they just had me surrounded! They started hitting me for no fucking reason"23) 15:51:36, crazy shirtless man who attacked officers earlier breaks through crowd "this is my house..." officer says "here he comes" showing he remembered the one trouble maker in the area of thousands....24) 1t:54:08, protester: "time to do some patriot ass kickin up in DC, we can't beat up antifa cause our mayor won't let us, we just get on our knees and suck her dick" (mocking cops)25) 2:08:11/16:29:22: RCO telling Gonzalez ""I had to straight shank this guy cause he was pushin in"... other officer points to mouth and his own camera to warn him his camera is going,

then je out of no where claims the pain traveled up, (sounds very scripted and fake), he then turns jis camera off. Before he fell in face straight shanked a protester in face, looked very painful, I saw it...Section 57:*** may not be done***Axon body 3, x6039BK2Z, Jeffrey Sipes (6792), 2:52:00 long1) 15:13:00, "look in window!" (Think it's me), 2) 15:15:18, "never seen this before in my whole career"3) 15:26:00, metro bus4) 15:30:00, girl officer texting5) 15:38:10, "he said go inside the door is open"6) 15:47:23, people cheering we took another state capitol7) 15:48:51, Fernando walks into camera, the guy who may have asked why arnet we joining them8) 15:54:00, cop recording crowd with phone9) 16:09:00, cop texting10) 16:21:35, peaceful move down of cops11) 16:25:10, old lady being escorted by cops to leave12) 16:56:00, officer takes photo of cops folding flag13) 16:58:40, "dude! Are you going to wear the hat(officer kept trump cowboy hat)", calls cap, o brien she14) "this is worse when they ordered us all in for the BLM shit...15) 17:13:0: metro bus16) Section 58: *** re-watch/ write***Stephen Chih, 20210106-Riot-US Capitol Building, ID: 21002555, 11:28 long, axon body 3 x6039B7Q4,1)9:23, lightly pushes/ guides James Grant towarss door.2) 9:26-10:00, Merkelys office, officer asks them to come out (3:17pm) protesters coming out of them calmly, 3) skip to 10:14-10:18 on the dot, caoitol officer is giving pritester directions on where to go, granted it's towarss the exit, it's the hall way I walked down towards Crypt4) skip or watch to 10:33, man who continued directioms to statues is still seen standing there5) 10:43, on right protester is eating and nodding his head while calmly talking to capitol police officer6) 11:04, protester to RCO "thank you guys for being here, we love you" Section 58.5:Stephen Chih, 3:58 long, 3:19pm start time1) 0:47, I'm talking to Capitol police woman2) less than 1.5 minutes later he begins to help compulsive liar Micheal Fanone inside who seemingly was suffering from heat stroke... Section 59: *** finish, left off at 40:00***20210106-First amendment assembly-US capi..., 1:03 pm start, 2:22:22 long, axon body 3 x6039BF80, Kevin Valentine,1) 3:31-3:36, cop: "ya'll remember, gut punches, they (superiors) cam't see gut punches",2) 28:37, guy takes selfie with RCO, RCO thumbs up in photo and fist bumps guy behind fence3) 30:46, flash bang "good god dude, they are getting carried away with that"4) 38:31-40, latino funny guy "that's what is great about this country, we got white, black, Asian, rich, poor, latino WOOO!5) Section 60:Couod not find... now, nit important vid anyways... 20210106-Riot-US Capitol Building, ID: 21002555, 1:13:57 long, axon body 3 x6039BF8E, 1) 14:09/ 1:41:49pm, old man and RCO debating about election being stolen, RCO says "it worked, you voted, trust the system", "I'm from PA! It did not work, 200k votes....", old man continues to state stats, cop stupidly just keeps saying "it worked", old man says "you know I grew up in the 1960s", RCO "your people grew up in the 1960s as my people in the 1960s were dying every day, okay? Thank you"...Section 61:20210106-Riotous Acts-US Capitol Complex, ID: 21002555, 1:03pm start time, 2:18:05, axon body 3 x6039BKVP, Matthew Cek(7357)1) 14:28, black camo guy yelling/ leading screaming at cops "he got a right to be here" to hard helmet guy with pole2) 15:35, black camo guy "I'm going to speak to Kamala" facing crowd, :55 "Let me go in" is what he said to crowd, then gets hugged, then says it again towards police...Section 62:*** early on, asks capt to get masks, "no",... also recheck #1320210106-Riotous acts-US capitol complex, ID: 21002555, 1:03pm start, 1:16:51 long, axon body 3 x6039Bjju, Nathan Tate (11280)1) 2:00, RCO: "do we need our helmet and mask?" "No"2) 14:13, "why wouldn't they let us get our stuff yall, why wpuldn't they let us get our stuff?" He asked on walk if they would need gas masks or helmets, told "no"3) 15:08, Bart threatning with body to push a cop lol, 15:12 he unexpectanly pushes officer LOL4) 15:57, RCO: "why woukdn't they let us get our stuff!" 5) 16:34, 4 cops and RCO swearing and blind :"they gotta let us get our masks6) Rco: "they (capitol) sprayed them with no regard for us bruh"7) other cop

"they shoulda had us bring oir gas masks, RCO: "Thay's what I just said bro! Why they didm't let us get the gas masks man", other cop: "IDK, whoever the fuck it is is gonna get punched", RCO: "dam bruh, then they just start sprayin em straight in the face, i got hit liem 5 times, it burns... "8) 18:53, RCO: "They (capitol) sprayed them (protesters) with no regard for us"9) 26:37, "why would they (capitol) spray us like that though? They was spraying us! They had OC too"10) 38-40:15, RCO says "He got a gun" Finally finds him, guy says "I don't have a weapon, I came here to protest peacefully, I don't need a weapon", cop says "okay your're good"11) 14:25-14:27, guy in crowd "you flash bang a terrorist, you don't flash bang old people!"12) 49:57, guy from senate chamber with hole in the face with tellow glove is let through gates by police and brought to EMT, famous dude13) 116:07/ 2:17:09pm, Rco: on phone looking at first door where famous media woman questions seemingly welcoming capitol police ("No, youncam't come in"), "They upstairs bro", "How are they comin in?", "They breakin through bruh!... and they (capitol) not shooting at... they (capitol) shootin at us!", "They shootin!?"..."not with the ah, they shootin with the oc spray", "oh lord", "what happened on... (time?), they got a video of you", "for real?", "yeah", "what I do?", "you punched a dude", "ohh"...take notice he starts walking backwards now as he says nervously "nah nah, dude grabbed you, and you like pushin him back", rco: "yeah", "huh" (he is whispering to the guy on the phone), rco "nah (whispers in phone more as guy continues story then turns his camera off (cover up)) Section 63: ***find time for 4***Eric Hairston, 1:06 long1) 14:38, RCO: "what are we doing here?", officer "no idea" (grounds of capitol)2) 14:43, RCO asks another officer "whats the fuckin plan?", "i don't know"3)14:52, other officer "they fucked us all up", RCO "whats the fuckin plan?", 2 cops then complain about "the mother fuckers" popped it over it there, cs... kept blowing back all this way, throwing hand thrown shit", "they should have called us up here earlier!"... 4) "why didn't they call us earlier?"Section 64:Daniel Harrington, 8:47 long1) 2:34, secret service on camera right up and close, use to show jury, these barriers were burst through when they began letting some people through, they dkdm't arrest or stop everyone, only those who attacked police or initially caused breach.Section 65:Shawn Rooney, 29:44 long, 3:02pm enters capitol1)3:51, MPD female ranking officer inside capitol rotunda complaining to RCO:"I told them, theres 200 people coming in through that door, one of them came in and punched me in the face, they said fuck you we have no resources,... this is their Capitol what the fuck!?"2)4:10-4:26, command lady to RCO "where is the capitol boss(x5)", "somebody, like the supervisor a manager, anybody!"


discovery Part 3 of 3Section 66:Shawn Rooney, 24:07 long, shawn is a Leitenit, he is passenger in car to inpector of MPD (later vid)1) 14:14, man had a knife is detained, trying to find charge to arrest him on, Capitol building is 20' away.2) 19:10, RCO: just got off the phone, telling Captain next to him, "I just went to run it by the on duty AUSA, it is not illegal to have amy knife,, espeshailly if it is sheathed...", breathes in tear gas, can't finish....man was on the bleachers of the capitol3) 21:29-22:18, able to talk again: "stop and frisk... just tell him.. dom't bring a big ass knife like this out here man, just give him the verbage... AUSA even said that uh it's not illegal to have it in a sheath like that," AUSA asked where he is from "Alabama", "no"... showing that they recognize that people not from around DC wouldn't have known that it may not be a good idea to have on grounds..."cut em loose". Section 67:Shawn Rooney, 32:47 long1)4:20, In car with Commander kf MPD, get on radio, tells units to stand-by for first dispersal warning, immediately after gives a dispersal order, gives law broken, and announces to them that it is their first warning.2) 5:20, he gives the protesters a second "first" warning3) 6:10,

he gets on radio and tells them to bring a cruiser in to announce same on the west side4) skip to 6:35, commander gives his last and final warning to protesters to leave5) 7:10-33, commander gets on radio and says "execute, commence arrest"6) 14:00-14 , rco is giving info of dispersal times given to protesters on paperwork, 7) 14:33, rco: "nkw the thing is, is this gonna be capitol police curfew or city wide curfew?" ( helps support that capitol police shared that there was a curfew/ MPD themselves thought we were allowed to be there until curfew)8) 17:31 (mi ute earlier guy was arrested for gun), you cannsee on camera the handgun in a bag, ome in chamber...Section 68: Peter Sheldon, main lt of MPd in capitol, 24:48 long1) 6:49, RCO screaming angry to capitol officer "WHERE ARE ALL OF THE FEDERAL OFFICERS!?, I'm sorry to yell at you. your're it?" Capitol officer "Sir, I don't know", 2) 14:47, RCO is looking at capitol officer point and wave protester towards another hallway as he is taking a flash photo of the capitol officer, RCO mumbles to him self sounds like: "some fucking tour guide shit?"3) 14:55, after witnessing that RCO approaches 3-4 protesters "hey gentleman, this young man (capitol officer) is gonna tell you guys where to go, ok? Thank you" (Capitol officer giving directions on where to go, have a good night"4) 15:09, protesters asks RCO "arent you supposed to be beating us back right now?", RCO: "i don't beat people sir"5) 15:18- , RCO approaches 2 capitol officers (1 is the man i asked about not having helmets), tells them that their whole capitol is going to be filled with protesters if they dom't get more assets, "tell your inspector..."6) 17:25, chansely is being escorted by capitol police, RCO says to himself "who the hell is this guy?" (Hilarious)7) 19:39, rco is told by capitol officer that his watch commander said to monitor tue protesters and just not let them trash the place8) 21:55, RCO is telling 2 women protesters where to find capitol police officers "that can point you in the right direction", tells same to 2 men behind them seconds later9) 22:44, RCO to capitol officers "do you guys know there are people in there?" (The senate chamber), "oh really?"10) 23:10, RCO to new group of capitol officers "do you guys know there are people in there? Protesters.", Capitol officer "okay, are we removing them or no?", "I don't know, I'm not your official but I would get them hell out of there", Capitol police: "okay"11) 24:13, group of capitol officers are still standing outside chamber, 1 officer tells RCO "we will leave the chamber till later, i gotta see what the chief wants to do with that before i can touch it", RCO:"... altighhht..." hilariousSection 69:Peter Sheldon, 8:07,1) 3:18-4:12. Rco walks by capitol police officer with arrested protester, capitol doesnt know why he was arrested (in rotunda), RCO asks other LT, "do we know why he is under arrest because I want to get rid of him", even MPD and capitol don't think to arrest due to trespassing..Section 70:3 striper A. Alioto, 2:14:39 long1) inaugeration area, 8:26, Thau comes running in and sprays a bunch of peaceful people randomly, sprays tons of officers too2) 8:34, RCO says to Thua "hey dude, watch the wind direction!"3) 1:20:00ish, capitol officer is telling rco right outside of cryot (2:39 pm) that protesters broke in through a window and now are in the building and chamber, MPD woman red head looks to rco and says "what are we gonna do?" RCO: "nothin".4) 1:23:18 (2:42:28pm) protester to rco in crypt asking for bathroom, rco says no bathroom, protester says he just was told bathroom was that way by officer (capitol)5) 1:26:55/ 2:45:59pm , Neely/ birdman talks to RCO outside cryptNote: the door that closes like a garage door that leads downstairs, right next to it, the wide steps that go up and have a gold framed painting, that leads to the house floor.6) 1:28:45/ 2:47:48 pm, RCO to other MPD "how are they (protesters) coming back in?", "They (capitol) are letting them (protesters)7)2:49:20pm/ 1:30:13, you can hear phones going off to warn of 6 om curfew8) Sam Lazar entering door that leads to statury hall with some girl he's leading in front of him, hes wearing a leather jacket and aviator sunglasses9) 1:38:35, RCO is talking about how he sprayed sideways in a certain area outside,

then frank and redhead start sharing that he messed up a bunch of people, red head quickly shares,: "you chased us upstairs", RCO:"into the building?", Tara: "yeah"Section 71:*** make sure doneFrank edwards, 1:44:58 long1) 51:57, outside officer playing dispersal near rear, RCO says "no, the loud one", cop shrugs his shoulders)2) 1:08:55/ 2:41:15pm, in crypt, protester being told by MPD RCO to leave, protester says "they (capitol) let me in over there (where I would soon enter)"3) 2:58pm, capitol police high rankers, and previuois on vid atf stiff arent aware of gunshot situation, they claim no victim, don't know where shot was or who shot it... 15 minutes later...Section 72:*** timeTara Tindall1) 1:02:29, Daniel Thau explaining that every time they hit ome person with anything, 10 people are getting angrier, time was 2:19:08pm when he said that, continues to hit them throughpit next several hours, even in calm areas where I was, 2) 1:22:25, rco lookimg into crypt at 2:39pm "we don't have wnough people"3) 1:27:16/ 1:43:56pm, inside crypt RCO is telling 2 new MPD officers who just arrived to"hey guys, help guide them tomwhere they need to go okay?"4) continue to 1:27:40, continues givimg directions to protesters5) mpd cop is looking at protesters walk around liezurely as capitol police do nothing and he says "what the fuck is happening here?"6)1:39:08, capitol officer is laughing and pointimg out that "it was 2 of us holdimg the door against all them"7) the guy who's responsibke for sending munition reserves away amd keeps turning off officers cameras turns off Taras cam and Frank Edwards in RotundaSection: 73Jamal Green (11196), 36:26 long, 1:03pm start, 1) end of vid, he is the second guy from platoon 64 to have his cam turned off by cop while complaining about contacts.Section: 7420210106-Rioitous Acts-US capitol Complex, ID: 21002555, 54:22 long, 1:03 pm start, axon body 3 x6039BC2x, 1) 11:46, first person pushed is black woman who had no idea police were there, violent push, then she was angry and began screaming "why the fuck..." sprayed mid-sentance, others in crowd get angry and came to her aid, cops pushed her violently while shouting "move back"2) 17:45-18:30, cops and peaceful talking man are both being hit by pepper bals, no warning, he gets mad "I didn't do anything to you...", cop can't breathe because of capitols pepper balls so he leaves3) 22:49, citizen "he shot me in the shoulder (x2)", angry protester not wanting to back up calmly explaining to police, 4) 30:00-31:00, black citizen speaking up and leading others peacefully, police briefly talk to him, another black guy next to him after 31:00, guy who looks like Fe's dad in previous documents is on this vid in gator5) 33:44, black camo guy walks by "America was founded by brave fucking men", Fe's dad in black skull mask,6) 33:45, older man walks up to cop with flask "you guys need a drink? You sure? Then drinks alcohol, raises his flask, smiles, and leaves, tons of drunk guys in crowd...Section: 75Stephen Naticchione (11047), 1:42:00 long, 1:03 pm start, 1) 10:45, cops: "They already taggin people", "they (capitol)taggin them with paintballs", "This is wild",2) 19:24, MCq is hit in the fave with paint/ pepper ball while talking, old man who's father was political prisoner says "why are letting them do that to us?!", Then crowd betins shouting at shooters in unison, 3) 20:07, 1st flash bang, everyone flinches and crowd heard screaming, crowd to the right of rco begins to fight in response, then 20:21 cop sprays people who were chilling there just a second ago/ for a few minutes without incident, then after spraying screams "back up", sprays 7 more times, those people get pissed.4) 32:51, police threw smoke grenade, gets thrown back, black guy says "hahahahaha, shouodn't have thrown that shit out here!"5) 1:12:19, Rco: "shit I take antifa over this any day"6) 1:37:38, "How you gonna say hold the line and then deploy CS!? "That's the dumbest thing I ever heard!", "That was Capitol! capitol threw cs!", "son they won bro, ya eva play command and conquer?"7) 1:40:07, "at what point are they gonna let them have this shit, this is crazy?", RCO, "64 you can go home, good job being decoys, being bait"8) 1:41:45, it's Nathan Tate telling him (RCO) to turn camera off, towards end he

begins to tell his story "They got me on (Julie kelly?)"... turned off to hide misconduct.Section: 76Derron Copeland (10069), 1:24:17 long, 1:03 pm start time1) 19:58-21:00, "God dam command some idiots", continues complaining about no masks until 212) 24:10, RCO: "They knew what we were going into and they didn't tell us to grab our gas masks, that's poor fuckin management"3) 24:33, RCO records officer Nathan Tate admitting he "got someone (gibberish) blink blink", this is before he found out he went viral and was on the news amd then turned his camera off. Rco admitted he punched a guy too4) 26:39, RCO "most ill-prepared ever"5) 36:48, same dude comes over to try to turn off a 3rd camera (rco) until 1st guy whose camera was shut off warns "A-yo, a-yo, we got the chief over here"(looking real worried), cam shut off guy stops turning his camera off and says "oh yeah, he saw me do it", then walks away...6) 38:15, capitol police is complaining about how he does not have a gas mask "give us a gas mask" (talking to Mpd officer randomly about how his bosses didn't give him a gas mask)7) 46:45, RCO, "we doin more harm to ourselves than them!"8) 1:13:45, "They already in there, Capitol(police) ain't doin nothin, they(capitol) ain't doin shit!(think he is looking at my window I'd soon enter)"9) 1:14:23, Rco: "capitol lettin them do what they want", :28 RCO "Hey, capitol ain't doin nothin sir!", 2 cops: "we tookma loss man", "Major L"Section 77Continued from previous video alreadybwritten on: 2:15:03 long, axon body 3 x6039BKLD1) 2:32-2:33pm, officer after retreat to inauguration stage: "we just got our asses kicked bro", "yo we lost bro, I'm outta here" strts walking away2) 2:33:45pm,-30 seconds or so, officer is saying his superiors set them up for failure, "They didn't ask for reinforcements until 2 hours later?!", "They set us up", "They set us the fuck up", "no resources, we ain't got nothing", "lindsey Lindsey, there's too many, we ain't gonna be able to do shit"3) 1:38:00, "they set us up!", "theres too many of them!", "yeah!", "they said theres too many of them, I said nahh, we be aight... theres too many of em...", "we took a major L bro", 5 other officers laughing "haha", "we took the L of the century yo!", "And the pary's just getting started", "hahahaha", "they kicked our ass!" 4) 1:49:22, female cop: "they tell me to go back, you werent on the front lines getting gassed, they didn't tell us to bring our gas masks, they set us up."5) 1:53:38, "They took it! They actually took it!", "They really took it!", "They was actually inside!", "Yeah I know!", othher officer: " "They took it", 3rd officer: "oh no doubt", talking outside capitol grounds as grabbing gas masks from van.6) 2:14:36, white female cop: "they set us up, biggest fuckin set up ever", Mexican cop responds: "I'm still live", Female cop now becomes silent... then he turns his camera off, RCO begins to turn camera off 10 seconds after...Section 7820210106-Riotous Acts-US Capitol Complex, ID: 21002555, axon body 3 x6039BFA8, 36:44 long1) 10:50, pepperballs being shot super far back into crowd2) 20:52/ 1:21pm, Black guy in ar,y coat is up front preparing to push against front line telling them to stand down and "this is revolution, this is fucking freedom"3) 32:04/ 1:33pm, "they set us up for failure, they knew what we were going into, why didn't they have us grab our gas masks?!", 4) 32:55, he says it again and other cop agreesSection:79Guy reffit evidence, "Trump Supporters Storm Capitol Building During January 6 Insurrection-4k Footage: 1) 16:33, black camo guy is in same inside area I was 2 windows to the right, secomds before, in my window, seperate guy is telling camera recorder to come in verbally and waving them in, I'm in a corner helping guy in corner, not a lot of people, no police in site2) same black guy outside: "president Trump aint back down, don't be afraid"3) 19:45, cringey proud boy walks by in front of cops with okay sign "we back the yellow, not blue"4) 23:15, I'm talking to hooded columbian woman near tarpSection:80Axon body 3 x6039B849, 1) 15:02:04-0500, black dude walks by cop camera covering his face, he helped break in2) 15:44:40, antifa member(?): "fuck you proud boys, get out of here"Section:81Axon body 3 x6039BH351) 15:39:03-50: I am talking with Columbian

girl, she is telling me how they use tarps like the one she has (100'long), wrap them like a present and run around them, she is in grey to my right, 2) 15:39:45-47, she then goes to organize the attack, youncan hear her say "we need more people, 3) 15:40:40-58, I'm walking then move away before they attack4) At 15:47:16, She's back on camera pushing against cops 5) 15:49:15, seconds her and her other female friend walk amd stare into camera6) 16:05:15-30, "no body touched bike", then "who got shot?", "some girl"7) 16:09:52, Fist bump if you love black people, and same sign other side says "show ur tits if you love Trump8) 16:15:34, sexy black girl in chetta jacket with sign laughs and talks with whiter blwck person that has sign that says "grab the swamp by the pussy!", everybody loves them,mtons of people taking her photo and taking photos with her9) 16:18:08, another black girl walks by, after she leaves at 16:9:25 I'm right within view10) 16:20:41, black lady is screaming at cops11) 16:20:46-48, I get on bike then man says "thank you for your service12) 16:20:57, I'm getting infamous photo on bike13) 16:22:00-20, I'm waiting for a new m cycle photo, crowd points and records a new fight breaking out "they are hittin them", black lady says "police are beating peaceful protesters with batons but since we are conservative, for trump, that doesn't matter", then first person cops push is black lady14) 16:23:19, gas is thrown15) 16:23:27, tear gas canister hits my head16) 16:24:17, gas is released next to me and I calmly walk away17) 16:50, cops are laughing and joking with eachother18) 16:56:50, "who's this traitor guy?"19) 16:58:07, officers are coughing from other video, officer PK dean is the guy at :09 frommother vid, triple stripes, 20) 17:01:00, "Honestly, this could have gone a lot worse, see now I know my mask is working, first time I used it in a few weeks"21) 17:11:20, "That was actually kind of fun", "That's your first riot?"22) 17:15:45, "I didn't really expect this today hahahaha"Section:82(originally written in previous vid notes as "other vid")17:10:35, "I mean are we surprised? This is worse than when they ordered us all in after the BLM shit", "Pennsylvania was packed from the White house to the Capitol, there were thousands" 17:14:30Section 83:officer: Luke Foskett (7153), axon body 3 x6039bd59, 1) 2:24:23pm/ 6:48: officers watching protesters around capitol from vehicl and listening to radio: "They're going to burn that fucking building down"| "Haha (points out his camera is on)... That's fine, we'll figure it out"| 2) 31:27: Chansley walks by 7 officers with no one telling him to stop as he's yelling "whose house?" In bull horn with one other person behind him, they only stop the other guy, they let Chansley through amd RCO watches him walk up the steps to the senate floor, no ome says anything to him, officers leave him to search up there alone, no ome told him to come down. (This is all happening right above the first breach point I recorded, many of these officers go downstairs where I was and also encounter people who went were I was).3) 34:25: cops laugh at people everywhere "What is this, Olympus Is Fallen?"| "Yeah"| "We need Gerald Butler!"4) 36:40: capitol officer says to Metro officer " they've been pretty cool once we encounter them right?"| "Yeah, that's there MO" Metro officer then points to camera which stops the capitol police officer mid-sentance "But the problem is...." > convo stops abruptly... then he randomly says "need to get to the doors".... metro warned him just like he warned the other officer to be careful with what he was saying...If we have been pretty cool when they speak to us/ not hostile, then why not give us a dispersal order?5) 39:18: lone protester walks by cop, RCO laughs with 6 other cops and quietly tells officers "feel free, walk by"> officers begin laughing about the movie Olympus Is Fallen again6) 40:00: woman officer: "man went down the hall"| officer: "That's fine (x5-10)"> then speaks to woman officer directly "So the goal is...(doesn't finish sentence, just stops and walks away)"... told cops it was fine that protester walked down the hall.7) 41:00: It's the Capitol Police officer I spoke to as I left, Mr. No helmet| "Where are we trying to stop them from going?"| "They are on the Senate floor"| "We've lost the

building"| "at this point we're trying to get the ones who want to get out, out." , during amninsurrection, people don't seek to leave on their owm...8) 41:54: Chansley is escorted by 2 capitol police officers and is saying "God bless the men and women in blue"| Female officer: "Thank you"| Chansley walks by 7 or 8 cops... (2:59:52pm).9) 44:14: Capitol Police officer (Motercycle officer(perhaps the mcycle I sat on?) Speaking to Metro police officer Lt:... "Lt"| Lt: "Sir..."| Cap officer: "I just talked to our watch commander, he said let's monitor and just not let them trash the place" (3:02:27 pm when he shared this with Lt.)(I was in the building at this time (not sure when he spoke to the watch commander)10) 46:47: 2 women protesters walking by police metro police "they (capitol) told us we could use the bathroom"| metro officer: talks to himself and says "I don't know how that's acceptable"11) 15:37:59: MPD officer T.Miller is saying that they should've had guys up at Capitol building amd is pissed that they (Metro) werem't allowed to, he said they weren't allowed to because "we can't send our guys in there, we have other responsibilities, there's guys all over the city with guns!" (On thus current video it's 1:20:00-1:20:2012) Trump Supporting Cop (Riezimger) (said so 10 minutes prior and in his body cam(shown later) said "Once Pence chose the easy way out you knew it was gonna happen, as soon as he did it (certified the election)| 2 seconds prior cops were talking about what caused the breach...| Other cop said "It would have happened either way"| Riezimger: "oh I know". (This shows that the fake news that pence certified the election and was the reason the crowd broke in was somehow also reaching the officers who were outside the building and away from protesters... Who told them Pence certified the election? Regardless, this is great because thus is exactly what I shared, people began breaking in when they were told by people with loudspeakers (probably insiteful feds) that pence certified the election... How was I planning to interrupt a proceeding when I and many others were under the impression that the proceeding was over prior to even entering the building? People knew pence was the tie breaker, only certifying it if it came to a tie/ everyone else had voted already... The "easy way out" was seen by conservatives as passing/ certifying it, "fighting like hell" as Trump said would he to not certify it"...Section 84: Title: 20210106-Riotous Acts-US capitol Complex, ID: 21002555, categories: none, axon body x6039bkvp, Video length: 2:18:05, Matthew Cek (7357)1) 11:50-12:00: fence beyond bike racks is less than waist high and has cut out for others to walk up, only sign on it is small and says "keep off fence", nothing to warn flash-banged, pepper balled, OC sprayed crowd that it was off limits2) 12:42: black camo guy (acts like a fed, and helped cause the actual first break in, yet, just like Epps, hasn't been targeted) is telling protesters to relax, he tells the crowd "the cops arent the enemies" points at capitol "they are, stick to the plan"... black guy is now telling cops to relax, cop tells man next to him with pole to back up, black guy says "he has a right to be here, this is America(right in front of camera), 15:09-15:12: he says "we have to fight, we have to fucking fight or we have to fucking die", for a solid minute he speaks to people in crowd (like a leader) "we need to go in" (just like epps said), people hug him.3) 1:03:23: Police are playing "loud" speaker/ dispersal, one of leader/ high ranking cops screams "LOUDER, SO THAT WAY THEY CAN HEAR!" (It's a quite speaker compared to the crowd)4) 1:07:41 plain clothed guy is in the same spot recording, some sort of government agent who he uses water and baking soda when he's with antifa.5) 1:15:57/ 2:16:59 pm: the flag above scaffolding is waiving, this may have been the flag that grabbed my attention as I approached capitol grounds.6) 1:20:02: crowd is overlooking officers from stairs and overhang is screaming "WE LOVE YOU GUYS!" super aggressively as items are being thrown down by the people next to them... HILARIOUS! | smoke grenades thrown back from crowd around 14:25.7) 1:35:25/ 2:36:27pm: beautiful woman on inauguration stage asks RCO "were you guys told to stand

down?" | officer: "What?! No!?", then looks behind him and sees tons of officers walking inside building away from protesters, seems reasonable to ask... within 1 minute RCO also leaves and walks into the capitol...8) 1:40:25: officer with M16 outside Crypt says to RC "Protect yourself man, do whatever the fuck you gotta do, just protect yourself (he's black), next rco walks in a few couple seconds and looks to right of crypt, sees protesters (under 10) being held back by a few police, pauses, last time he saw protesters was on retreat into tunnel on inauguration stage, crazy...| lady cop points to go or to go guard opposite end of crypt, no officers there yet...9) 1:42:10 goes to separate area from crypt and doors are being held by 20 or so cops, hitting people trying to get in with batons10) 2:45/2:44:50ish: lady cop and others turn corner from RCO trying to catch breathe, walkie says "shots fired" | lady cop: "shots fired" | other cop: "did they just say shots fired?!" | Lady cop: "Yes, shots fired!"11) 1:45:47: pretty sure I saw Fanone entering crypt looking hella scared with RCO12) 2:47pm: tons of people in crypt, officers kindly pointing them to the other end of the crypt.13) 2:50pm, after walking up steps to rotunda RCo sees tons of protesters inside that room and says "fuck"14) 2:51:50: RCO is asking others to walk please away from entrance, is gently guiding them further inside the building, then a protester asks him where a bathroom is, man walks by RCO and says thank you to officers 4 times, he's super happy, officers reply to him "yup", amd "your're welcome" 15) 2:01:11/ 3:02:14pm: cops enter crypt elevator | metro asks capitol officer "This ever happen before?" | Capitol: " Absolutely fuckin not", "Capitol leadership is a complete fucking failure" | other Capitol cop: "Capitol leadership is shit, they are the worst officials ever!" | Metro officer: (2 cops unsure if both metro): "How did this happen (both ask sepertly)" | Capitol: "So all we had was like bike rack fences outside, and there was like 1,000 people outside, and they just start jumping the fences, push past the line, there's no hard gear anywhere, broke the windows and ran in. (A capitol police officer is saying this to 2 metro cops) | capitol: "House was not in session as this happened", of capitol polive who run the buildimg were under the impression that the house was not in session at the time, how woukd most protesters "knowingly" be tryimg to onbstruct the "official proceeding"?... 16) 2:04:57 -2:05:01/ 3:06:03pm : walkie talkie "I have 25 people in Senate chamber, they are going through desks and are on top of the podium">> cop in elevator: "Jesus dude" | Walkie talkie: "Does anyone have a bull horn I can use, I need a bull horn"Section 85:officer: Christopher berridge title: congress CDU deployment, E14 designator, uploaded by: brian reed (1383), tags: arlington county pd, highly sensitive, video length: 2:15:31, time: 00:04:01/ 3:39:13pm,1) officers in vehicl arriving to capitol: "Holy shit that's a lot of people", woman officer/driver: "That's a lot of fuckin...well people are pissed", Guy officer: "yup"Woman officer: "Should... I mean democrats are pissed, that's when you know they are in the wrong"Guy officer: "Yup"Section 86: Officer: Stephen Naticchione (11047), video length: 1:40:45, Title: 20210106-Riotous Acts-US capitol complex, ID: 21002555, axon body 3: x6039bdfc, time: 2:41:46pm, 1) 5 officers sharing "they set us up", "why did they set us up for?", "They set us up bad", continue until officer says "...been gassing us the past hour", "...and they don't send us back up until 3 hours later?!", Background: this unit was gassed out mostly from their own officers spraying OC and tear gas despite that wind was against them and most officers didn't have gas masks/ were told by superiors to not bring gas masks. They had to retreat after Lt. Or Srt. Thau fired a tear gas cannister behind his own line causing the police line to break and protesters to move forward.Section 87: officer: Joseph Young (9648), axon body 3 x6039bkaz, video length: 1:33, time: 2:28 pm, 1) 1:21 into clip officer says to other officer while looking at crowd calmly walking on capitol grounds "We fucked this shit all up", "There should have been a line set up before they even got here bruh..." (Pittman said this), both officers are m-cycle cops, they just

arrived. This shows: even Officers felt there was nothing holding the crowd back, that officers who arrived at 228 (before I arrived) didn't see barricades or police holding people back, just like I didn't see any when I arrived a little bit later... Section 88:Officer: Anthony Campanale, video length: 2:15:48, clip time: 4:14:07pm/ 33:27:1) RCO looks at capitol command/ high rankers who are wearing suits (2 of them) and says "Yo, you guys are in the right stuff, you got the right gear on for this", officers around him laugh, Officer Riezinger says "Those fucking clowns(2 guys wearing suits and no masks right before cs is about to be deployed in crowd)".This shows: ERT members thought that Capitol was poorly prepared and were clowns for not being prepared/ taking it seriously even as it was happening., 2:45pm, red heads name is cara or kara, actually, may ne Tara Tu somethingC morris is kinda with themW. Bogner at 2:02 is with dispersal message outside, look him up

August 18, 2023 (US/Eastern)


First of 7 documents: Part 1 of 1:(Do not semd this to court: please send to public defenders office or myself as legal mail. Spaceing out the video topics would be helpful):Brandon Fellows Global Discovery Topic Index (7k charecters)Each video topic is spaced:***Need print out for Trial***Important times:Recess called at 2:13pm in senate, 2:18 the chair declares the house in recess, resumes at 2:26 pm, 2:29 chair declares house in recess again, senate called back to order at 806 pm, house came to order at 9:02 pm,. 3:44 am house and senate jointly pass stolen election. I entered at 2:47pm, MPD arrived within view of outside window area at 2:49:48 (about 2 minutes later). I left around 3:20-23pm, was on upper west terrace until about 4:24-28. 2:29:20pm was official order to fall back, they had been falling back without orders a few minutes before due to tear gas and no masks. Curfew issued to some around 2:49(section 70(7)), others at 3:04(section 54(10)).Entrapment BY estoppel: Section A: strongest video evidence: section 8(7), section 18(all), section 56(3), section 68(7), section 76(8-9)Section B: Where I was when I was there: section 10(all), section 20(all), section 21(all), section 22(3), section 23(all), section 25(all), section 26(all), section 27(3-5* (caution, read 6)), section 27(7-14, 16,), section 54(13,18,19,21-23, 26,28,30), section 55(2,3,8), section 57(1,5,8,9), section 58(4-6), section 58.5(all), section 76(8-9), section 79(1)(maybe),4), section 81(1-5,11-18)Section C: near where I was when I was there: Section 7( 2), section 8(2-6), section 9(1-5, 10-12), section 11(1-3), section 19(1), section 33(1), section 54(2,3,5), section 68(all), section 70(4,6), section 71(2), section 72(2-5), section 83(1-8($9)),10-12), section 84(8(maybe),12-16), Section D: overall/ supportive evidence: Section 1 (all), section 3(2), section 13(2), section 15(1), Section 16(2, 4), section 17(1), section 27(19), section 28(1), section 32(3, 18, 12,16), section 33(2), section 36(>3), section 37(7), section 38(1,2,4), section 48(1), section 53(19-20), section 54(10), section 56(1,6,7,16,17), section 57(4,11,13), section 59(2), section 62(10,13), section 63(1,2), section 65(2), section 66(all), section 67(1-7), section 69(1), section 70(3), section 75(6,7), section 77(1-4), section 84(1,7), section 85(1), Section E: Other/ funny police/ protester interactions (not already included): section 32.5(1), section 52(1), section 54(17), section 74(6Entrapment:Section A: Willaim pope/ christopher Wray, Capitol Police Chief Sund:, and: sections 44-47, section 62(9)Section B: Supportive evidence: Section 1(all), section 2(all), Section 8(1), Section 13(1), section 16(1, 3), section 18(all), section 29(1), section 30(4-7), section 31(9), section 32(1-3, 6,8-11,13,14,15), section 32.5(2), section 34(4), section 37(1-3), section 38(4), section 40(3), section 51(1-3,5), section 52(2-4), section 53(14, 17), section 55(5), section 56(1,4,5,7), section 57(6), section 59(3), section 62(1-9), section 62(11,13), section

63(3,4), section 65(1,2), section 68(1,9-11), section 72(1,5,6), section 74(1,2,3), section 75(1-3,6,7), section 76(1,2,4,7), section 77(2-4,5(maybe),6), section 78(1,3,4), section 82(all), section 83(11,12), section 84(1,2,4,15,16), section 86(1), section 87(1), section 88(1)Capitol Police/ MPD Didn't prepare/Mishaps: (is also potential aid to Entrapment):Section 2(all), Section 3(1, 2), Section 5(all), section 8(1, 6), section 9(3, 6-9), Section 12(1), section 13(1), Section 16(3, 4), section 19(1), section 30(4-7), section 32(1-3, 6-12,16), section 34(3), section 37(1-3), section 38(1,3), section 39(1-2), section 40(1-4), section 51(1-3,5), section 52(2-4), section 53(2,4,14,17,19,20), section 54(11,16), section 56(6,18), section 62(1-9), section 63(1-3), section 65(1), section 68(1,9-11), section 70(1-3,9(great example)), section 71(3), section 72(1,2,5,6), section 74(1,2), section 75(6), section 76(1,2,4(great quote),6,7), section 77(1-4), section 78(3,4), section 81(22), section 83(3,6,11), section 84(1,3,8(maybe),15), section 86(1), section 87(1), section 88(1)Misconduct/cover ups(increase chance for entrapment):Section 3(3, 4), Section 6(3), section 13(1), section 16(4), section 17(2), section 20(4), section 21(3), section 22(1), section 24(all), section 28(2-5), section 29(1), section 30(2-3(8?)), section 31(1,2,4,5,9), section 32(17, 13), section 34(2), section 35(0-2), section 36(1&3), section 37(4,5,6), section 40(5), section 41(1-2), section 47, section 49(2), section 51(3(maybe1-2,6), section 52(5), section 53(5,8,10-12), section 56(25), section 59(1,3), section 62(11,13(second part), section 72(7), section 73(1), section 74(1,2,3), section 75(1-3,8), section 76(3,5,6(even Capitol didn't get masks)), section 77(6), section 78(1), section 81(13), section 83(1,4Ashley Babbit or Rossane related:Section 6 (all), section 27(15, 17(2nd part)), section 54(7,32), section 56(2), section 81(6), section 84(10,Trespass defence (non entrapment by estoppel related):Section 10(all), Section 16 (1), section 22 (3), section 27(0-2), section 31(3,7), section 32.5(3-5), section 33(2), section 37(6-7), section 38(1), section 48(1), section 54(21-23,28), section 55(2,3), section 56(1,16,23), section 57(8,9), section 58(2), section 59(2), section 61(1,2), section 62(10,11), section 66(all), section 67(1-7), section 69(1), section 70(6), section 71(1,2), section 72(3,4), section 74(1,2,3), section 75(3), section 79(1), section 83(1-8($9)),10-12), section 84(1,3,5(maybe),7,14), section 87(1)Cops agree It was a site to see in person:Section 22(2), section 29(1), section 30(1), section 52(6), section 54(9,17,20), section 57(2,12,14), section 75(1,5), section 77(3,5), section 84(15,16), section 85(1), My belief that we had guns in crowd:Section 30(1), sections 43-47, section 53(1), section 54(22), section 62(10), section 67(8(maybe), section 83(11Mega phone/bull horn related(aid to potential entrapment and trespass):Section 30(7), section 31(8), section 53(16), section 54(15,21,26), section 56(5), section 67(1-7), section 71(1), section 83(2,12)(maybe all of 83 if not already shown), section 84(3,15,16), "Didn't you hear concussion grenades" defence:Section 31(6), section 54(1cop thought were bullets), section 56(2(see <Random positive/funny comments on us from police (not already included)Section 32(4),section 54(6,29-30,), section 57(13), section 81(20,21), section 83(4All races(and a puppy) present (began topic at sec. 32):Section32(19), section 48(3), section 51(4), section 55(1,7,), section 56(8-16,19-21), section 59(4), section 61(1,2), section 74(1,4,5), section 75(4), section 78(2), section 79(2), section 80(1), section 81(1-5,7-10,13), section 84(2I came to fight Antifa/not 1512, ended up saving an antifa member:Section 42(1), section 54(9), section 55(6), section 56(22), section 80(2), section 81(1-5), $$$$$section 83(12), section 84(15Stairs I climbed related:Section 49(1-2), Declaration of independence related/ defence/ state of mind:Section 56(1), section 85(1), Secret service in gear related (Ellipse)Section 64(1), Other videos with me in them/ corrobating evidence(started at section 81):Section 81(1-16), , 2:45pm, red heads name is cara or kara, actually, may ne Tara Tu

somethingC morris is kinda with themW. Bogner at 2:02 is with dispersal message outside, look him up

Read at 12:47 PM

12:48 PM

wfwefwefwe

Read at 6:40 PM

7:34 PM

Ryan: Motion 2 of 7, Part 1 of 5Entrapment by Estoppel Response/ Motions (Notes Written But Stolen For Over A Year, git them back shortly before our discussing the motiin in limine on the matters. Additiomally, mot fully finished as I had to do my best to re scramble/ scramble to prepare for trial after my preperatioms were illegally stolen frommme by tue governmemt 9 times)/ Notice/ Case Law And ArgumentsIndex:Intro:Part 1: NoticesPart 2: Response to Pages 1-5 Of The Government's Motion In Limine To Preclude My Entrapment By Estoppel DefencePart 3: Response to Pages 6-10 Of The Government's Motion In Limine To Preclude My Entrapment By Estoppel DefencePart 4: Case Law and ArgumentsSection 1: Overall/ RandomSection 2: Dellums courtSection 3: Barham V. RamseySection 4: Carr V. District of ColumbiaSection 5: United States V. Eicher, 2023 U.S. Dist. Lexis 90103, DDC opinion by Beryl HowellSection 6: Cox v. Louisiana 379 U.S. 536 85 S.Ct. 453 13 L.Ed.2d 471Section 7: United States V. Gutierrez-Gonzales, 184 F.3d 1160 (10th Cir. 1999)Section 8: Garcia v. Doe, 779 F.3d 84 2nd Cir.Part 5: Entrapment By Estoppel Related Motions:Intro:The government has continually tried to increase the chances of them winning against me by illegally locking me up over lies, refusing to give discovery, giving incomplete discovery, having my preparations taken about 9 times, and now, by trying to stop me from sharing what happened that day to the jury. The main reason I haven't taken their time served plea deals (despite one of them being a misdemeanor and despite being in jail) is because I wanted to promote the truth of why I did what I did that day. I thought I was allowed to enter and protest as I did because of preconceived notions (1st amendment/ "The people's house"), others around me/ 3rd party entrapment( "They are letting us in!", "It's our house, we have a right to be here"), possibly due to government agents / entrapment(prosecutor has admitted they were present in the areas I was when I was there, see William Pope motion), and by police words, actions, and in-actions (entrapment by estoppel).To not allow me to advocate what truely happened that day and to conduct a complete defence would be another way this court denies me of a constitutional right. I desire to show a jury my complete defence, I already won't be able to do so as a result of all the things the government has done to hinder my preparations, it's not proper to let them do this also.I desire not only to show this via a jury instruction, but during my opening and closing statements as well as during my arguments. To only allow the jury instruction and not allow me to present this anywhere else would be to stop me from presenting my full defence. To only give a jury instruction at the end would be to only allow the court to say "Oh, by the way, he claims he's not guilty because police made him feel he was allowed to do this". I imagine a juror may ask "Why didn't he mention this earlier?", and by that time, have already been "sold" on my guilt so as to decrease the chance of

them finding me not guilty due to entrapment by estoppel. Instead, I wish to let the jurors know in my opening that I'm not disputing that my actions MAY be viewed to have been disorderly, and I'm not disputing that I unknowingly trespassed, I'm arguing that I shouldn't be found guilty of these misdemeanors because I truly believed due to police actions, words and inactions (and other factors) that I was allowed inside to protest as others in the same area were. I intend to put on evidence to support this in many various forms. It should be up to the jurors to decide if they think I was fooled into thinking I was allowed inside to protest as I did due to these factors.Before beginning, I wish to remind the court that I had my preparations taken many times, destroyed multiple times, I was moved 10 times in 24 months. A lot of this information was previously stolen from me, some of this was regathered after notes and preparations on such things were destroyed. You are receiving this now because of these situations. Had the court granted my many forms of requested relief, these arguments and motions would have been submitted much earlier. This is one of the many reasons why I shared I'm not ready to go to trial, but you continue to "fall" for the governments lies and then ignorantly assert false statements as fact, really causing confusion for a later appellate court to understand the actual facts of the situation... Very corrupt, but well thought out. Please stop these sort of actions...Part 1: Notices: 1) I intend to advance an entrapment by estoppel defence to my 4 misdemeanor charges.2) I intend to advance an entrapment defence to all of my charges.3) I intend to advance these aids to both my entrapment defence and entrapment by estoppel defences:3.1) 3rd party entrapment: That Trump (and lack of signs, barricades, and police) made me beleive I was welcome on Captiol grounds, as did people walking everywhere on it. That protesters helped bring me to the window to observe if police were allowing us in, and helped me to realize and feel safer that police (who I was watching and trying to listen to) were truely letting us in.Comments: This has been allowed and recognized by the 2nd Circuit in United States V. Morrison (February 26, 2009) as establishing the entrapment by estoppel defence under a conduit theory. In that case, the purported misrepresentations of law by the governor or other public officials could be relayed through Facer. Here is an explanation from the judge: "I declined to grant the governments request to preclude the defence from endeavoring to present evidence in support of the subject defence. Instead, I took the position that it was 'appropriate that the defence have an opportunity to try to develope [the] point' noting that '[they] may or may not be successful.'..."3.2) Evidence for my disorders (Autism spectrum, ODD, and ADHD). Comments: I was hoping to habe a mental evaluatiin to look into such matters, or be free and be able to hunt down which doctors gave me the diagnoses. However, my useless contract breaking lawyers (now stand-by counsels) set me up for a competency hearimg instead wjere they do not look into such matters, only to see if I am compatent to stand trial... This court also is fault here for allowong me to be locked up over lies without actually looking into the evidence. It was working with tje government/ protectimg it by refusing to look into these matters.4) I intend to support the fact that police were allowing people who were protesting to protest as I was by presenting videos of police where I was and where I wasn't.The government has issue with the latter part...Comments: I'll quickly point out that I don't disagree with the government that videos of officers actions, words, or inactions that I didn't see couldn't have possibly had an effect on my state of mind. Rather, I'd correctly point out that it further disproves what the government has continually asserted, that police were not welcoming protesters in or allowing them to protest in the Capitol. Analogy: In a Creationist v. Evolutionist debate (which I've witnessed), imagine how restrictive it would be for the creationist to only give proof of creation with things that he personally has witnessed. Most of the proof for God is relayed through the bible, archeology, history, and science. Nearly the

entire practice of apologetics would be lost by that restriction. Imagine how restrictive it would be for an evolutionist to rely on only giving proof for examples of evolution that he personally has witnessed. Given that evolution is often taught to take periods of time much greater than a lifetime to witness, that also would be restrictive. Nearly the entire subject of biology would be thrown away. In both circumstances, how could a jury listening to the debate know what the truth is without having heard what the whole defence for each theory is? They wouldn't because it would be an incomplete defence! The government wants me to have an incomplete defence, doing so won't allow the jury to hear my actual defence. The government showed their hand, they strongly and continually have asserted no police were welcoming protesters in to protest. Let them stand with that assertion rather than suppressing the truth. Only the weak rely on suppression and censorship, let the truth out. My point in sharing these kinds of videos is to substantiate the other claim of mine that the government has said didn't happen, that I was allowed in by police. If police were allowing others in, then clearly there is greater chance that the same was done for me, which is what I've claimed since the very second I left the building. Remember, entrapment by estoppel defences don't just look at the actions of the defendant, they look into the actions of the officers involved, and can also look into the actions of the agency in dealing with the protesters similarly situated (see case law arguments for proof).This is further argued and proved more in detail later in this motion, so please, don't draw your decision based only on that short argument.Part 2: Response To Pages 1-5 Of The Government's Motion In Limine To Preclude My Entrapment By Estoppel Defence:1) The government first argues to stop me from arguing an entrapment by estoppel defence in regard to alleged statements of law enforcement.Response: That matter should be up to the jury to decide whether they believe me or not (though if the government didn't steal and refuse to give me my phone back, I could provide them with the video evidence). Read Part 5 for further arguments and relevant case law.2: They next argue that I shouldn't be allowed to present the defence at all because "in order to prove an entrapment by estoppel defence, a defendant must show (proffer):2.1) "A government agent actively mislead [me] about the state of the law defining the offence."Response: I've testified that I witnessed police officers actions in the area I would enter to be in line with what other protesters were shouting from both inside and outside ("They are letting us in"). I've testified that I spoke to and recorded an officer inside who gave me the rules to follow and assured me so long as I followed those rules that I would not be arrested. Since testifying to that, I've seen video of that officer and I speaking to each other just as I mentioned. I've testified that I later got directions from another officer on where these statues were (which the previous officer told me I could go to), and that I also recorded this officer. I've testified that officers seemed welcoming (I recorded them too) and even shared such things the very second I left the building to National Fake News Media (CNN) where my first January 6th related video went viral, all before I even knew that I would be charged, that I broke any laws, or before I knew about an entrapment by estoppel defence. I've also testified that no dispersal orders were given to me nor was I told I was breaking any laws or could face arrest, indeed, I was told the opposite by Capitol Police. I've testified I did not see any "no trespassing" signs, nor police barricades, nor had I encountered police lines until I had left the building. Read Part 5 for further arguments and relevant case law.2.2) "The government agent was responsible for interpreting, administering, or enforcing the law defining the offence."Response: The Capitol police have a manual with how to deal with civil disorders, protesters, and 1st amendment issues on Capitol grounds, they can not only allow people to protest at certain times in certain areas, but they can also arrest those for breaking their laws/ rules. As seen in the Dellums decision, which has since been supported in other case law

(Barham V. Ramsey, Carr V. District of Columbia, etc.) the Capitol police have a duty to warn protesters that their conduct is illegal and warn them that if they do not stop that they will be arrested. Not only that, but when protesters have failed to hear these warnings the DC circuit has held that the police were at fault, as they should have individually warned protesters that they were breaking the law, that they needed to disperse, and that they be given sufficient time to comply. When this wasn't met, the DC circuit threw out the convictions and held the Capitol police liable in civil court. It is clearly established that the Capitol Police are responsible for interpreting, administering, and enforcing such laws... Even metropolitan Police departments there that day recognized that they had to follow the Capitol police orders as it was their duty to administer the law, not MPD's duty, which is why they sought guidance on what to do from them throughout the day. Read Part 5 for further arguments and relevant case law.Though I had no idea there were 2 separate police forces (and others) present on capitol grounds, nor would I have guessed only one agency had the ultimate authority there, the government would have a stronger argument if I were alleging an MPD officer made me feel welcome inside the Capitol, but that's not the case. Though MPD made me feel welcome outside the Capitol building.2.3) "That the defendant actually relied on the agents' misleading pronouncement (can also be implied)."Response: I did rely on the agents statements, actions, and in-actions. I did not enter the building when protesters broke the window, indeed, even when offered a hand to climb up and enter (as seen on video), I waited to further examine the officers actions and in-actions, while also trying to watch and listen for additional supportive evidence that we were truely being allowed inside. Had it been shared that I was breaking the law and could face arrest if I did not leave or stop protesting as others around me were, I would've left the area immediately, and warned others that they too should leave. The Capitol police recognize this is typical of people whose conduct is not in line with the law (that they fix it to be in line with the law, see Dellums) in the capitol. Because of this, they required their officers to first warn others that their conduct is improper and give them time to fix it. Multiple warnings are issued prior to an arrest. When this hasn't been done, the arrests were thrown out. Read Part 5 for further case arguments and relevant case law.2.4) "That the defendant's reliance was reasonable in light of the identity of the agent, the point of law misrepresented, and the substance of the misrepresentation."Response: This is mainly to be decided by a jury. Still, I would never have sought to destroy the place (in fact I attempted to stop others from doing so as seen in one video in Merkely's office), nor assumed an officer could give me permission to do so. However, I did seek to enter as others seemingly were being allowed to and to protest as they seemed to be allowed to protest. I took note the major difference in how police treated the super minority of protesters in my area who seemed to be inclined to violence (one protester I met inside who was pepper sprayed) and those simply chanting and smoking weed. I even took note of the officers near a man on a desk not even saying a word to him about him being up there. Given the name of "The people's house", 1st amendment confusion, and how our country was founded, I was under the impression that such actions were allowed. This is supported in case law and the Capitol Police manual for dealing with such protesters. The capitol police have recognized that civilian and protesters confusion over what they are allowed to do and not do in the Capitol building is so widespread and common that they found it to be unfair to simply arrest such people prior to warning them of the law, warning them that if they don't stop they will be arrested, and to give them reasonable time to comply with that information. Clearly, this was reasonable to believe, as even the Capitol police recognize that many people are confused over what they are allowed to do and not do in a place referred to as "The People's House". 3) The government argues I should've known that to

enter was illegal given that I entered through a broken window. However, I was lead to believe by preconceived notions, protesters, and police, that I had a right, just like a partial owner of a house to enter. Hard to understand? I'll provide you three quick true stories to help you understand my thought process.True story 1: In college, one of my roommates was a drunken idiot most nights, it was very annoying. He'd often break things, scream, and start fights. I imagine if I came home towards the side of the house that we rented and saw a broken window, or even that he broke it to get inside, that I may very well go in that window whether I witnessed it or not, especially considering that it's closer than the door. I wouldn't think I was trespassing because it is MY HOUSE, though I'm only a partial owner... I don't imagine I'd ever break the window to get inside, but if it's already broken, I'm a man of efficiency and curiosity, I would enter the quickest way I could. True story 2: In high school, to get home, I attempted to follow the most direct route, I didn't want to walk around the gates, that would add a minute or two to my run, so I'd climb the gate and continue on the most direct path so I could reach my destination as soon as possible. Being a student at the school, I felt since my presence was welcome on the grounds and inside the school that entering the area (even through unorthodox methods) was welcome. Though I wouldn't feel a sense of being welcomed enough to enter through a broken window at school (unless teachers told me I could),I felt it enough to climb over barriers, something I didn't do at the Capitol, a place I felt I had more rights to (like a partial owner) than the school.True story 3: Finally, the same thing happened just hours earlier at the Ellipse. The people broke past security, even knocked a man who was holding the crowd back down. Was the Ellipse now off limits to all just because the line was breached and because some protesters sparred and charged at security and the secret service? No! I waited for them to settle the crowd down until it was clear that I and others were allowed to continue on, which I also did at the Capitol. As a result, thanks to friends in the secret service, I got one of the best seats in the Ellipse, eventually seated in row 5, less than 100 feet away from Trump. Secret service ensured I was the first civilian allowed inside the Ellipse (I have this on video too). Just as I would witness later, I took note how the secret service and security dealt with violent and destructive protesters, they were treated differently than protesters who behaved as I did.Finally, I offer this analogy: Imagine you and others are locked out of your car. Lets say you all pitched in to buy the car or were mutual owners.. One of the people breaks the glass window to enter the car. You may be thinking, "that was stupid/ crazy", and find it annoying that you will probably be paying for a new one (as I would being a tax payer by paying for that broken window I climbed through), but you wouldn't assume that the idiot who broke it is trespassing, you'd assume he is stupid or crazy for breaking it (just as I assumed of those who broke the windows open, or the first door I saw open (I'm on video saying "This is fucking crazy after I witnessed and recorded it)". You'd assume he is too is a partial owner. Now of course, there are laws in place to stop him from destroying your mutually owned property, and you could even press charges on him or bring him to court to deal with that. However, you wouldn't expect to get a charge by entering through what is already broken if you were a partial owner! That is the best way I can convey how I viewed the situation at the Capitol. I figured the people who broke windows or stole things could be held legally responsible, and obviously for attacking the overly friendly police, but not for entering into the capitol, especially after all that I witnessed. Read Part 5 for further arguments and relevant case law.4: The government argues to stop me from offering evidence or argument concerning any claim that, by allegedly failing to act, law enforcement made [my] entry into the United States Capitol building or Grounds, or his conduct therein, lawful.Response: The government seems to be confused over the simple definition of an

entrapment by estoppel defence. Entrapment by estoppel defences don't make illegal conduct lawful due to police actions, words, or inactions. Rather, they negate criminal liability despite the unlawful actions being committed. With that being corrected, police in-action is recognized as a form of implied entrapment by estoppel. The courts have allowed defendants to show police in-action in support of entrapment by estoppel defences. Additionally, considering the confusion regarding lawful conduct at the capitol, the capitol police and the DC Circuit courts found it proper to require Capitol police to order warnings and dispersals to protesters and law breakers prior to arresting them. When such actions have not been followed (making them in-actions), the arrests were thrown out. Clearly, police in-action is recognized as a form of entrapment by estoppel. Please read Part 5 for further arguments and relevant case law (there is a lot on this in Part 5).5) The government asks to stop me from "arguing or presenting evidence of alleged inaction by law enforcement, unless [I] specifically observed or was otherwise personally aware of such conduct." On page 8 they argue that "though conduct of law enforcement may be relevant to the defendant's state of mind,... any action or inaction of which defendant was not aware cannot possibly have had any effect on his state-of-mind and is inadmissible as irrelevant under Rule of Evidence 401." Response: I don't disagree with the government that any action or inaction that I didn't see cannot possibly have had any effect on my state of mind. However, that argument is a bit too "zoomed in" to one subject. "Zoom out" of just focusing on the state of the defendants mind and you'll find the reasons I and the DC circuit courts believe this evidence is admissible in my case. First, the nature of this defence can often be aided by proof of a collective action, inaction, orders to allow certain conduct, or the failure to give orders to stop certain conduct. Even accusations of police inaction have caused courts in this very Circuit to look at the collective inactions of officers and the agency they represent as a whole. (See Part 5 (Barham, Dellums, and Carr)).Second, entrapment by estoppel and related defences (a police officers failure to do their duty), isn't only predicated on the state of the defendants mind, it's based off of an agents' actions, words, in-actions, and even their thoughts if they can be found out. In fact, sometimes (including in the DC circuit courts) the agents/ police officers actions, words, inactions, and even past words/ thought processes have been used against them to figure out if they truely did fail to do their duty or make others believe they were allowed to do what they were doing REGARDLESS of whether the protesters/ rioters witnessed them, or had no way of witnessing them.For example, take a look into the DC Circuit case of Barham V. Ramsey, or specifically look to part 5, section 3, # 2. Do you know how the court found out that the MPD commander told members of his staff weeks prior to the protest that officers should overlook minor violations of the law in order to accomodate protesters? They looked into the police officers actions, words, and orders to not act on minor violations of the law (in-actions). Do you think any protester was present in the MPD offices weeks prior to hear this? Clearly not! So why did the court not only look into this, and admit the evidence, but use it against the government/ commander?The reason the court looked into this is in my view best shown by a similar case. Take a look into the DC Circuit case of Dellums V. Powell, or Part 5, Section 2, #1, "the burden of proof was on defendant police chief (of the Capitol Police)." "The court held that an order to quit and an opportunity to disperse had to precede arrests." In other words, upon an allegation of the police failing to warn protesters that they can't do something and must stop, the court looked into the officers words, actions, orders of in-actions, and actual inactions even though protesters/ rioters clearly couldn't have seen or heard some of those.Another example to prove this is in Part 5, section 2, #12. How did the court find out what Chief Powell said to Chief Wilson? I'll tell you how they didn't get it, they didn't get it by requiring all of the plaintiffs to have personally heard

what he said to Wilson in this self described loud enviroment. So, what am I saying? I'm saying a lot of things... One, that just because I didn't witness an officers words, actions, in-actions, or orders to take no actions, doesn't mean that such evidence shouldn't be admitted. Have the court look back to our 10/12/21 hearing, take notice, the prosecutor acted as if it was crazy to suggest that officers were welcoming us in any way whatsoever. They even got a statement from an officer (who I don't know/ remember, and who doesn't know me/ remember me) since then to assert that no one was allowing us or telling us that we were allowed inside. How damaging it would be to show that many police officers were welcoming us in, that many were giving directions, that many were not doing their duty, and that many were telling other officers not to do anything to us (or even the more recent videos that they also use to deny, that undercover officers were actually influencing the crowd to break the law and go into the building). Oh how damaging that would be to their previous and even current assertions! And I've viewed them... See, the government knows this, which is why they are desperate to hide this evidence from you, and from the jury... They can't rely on the truth to win, so they seek suppression (or destroying and taking my preparations/ partaking in discovery violations, depending on the month). What I'm saying is, the entrapment by estoppel defence looks into and welcomes evidence to suggest that officers were welcoming or doing things that could've made others feel as if they were welcomed. It can and often does look into the collective action or preparations of an entire agency, the commanders, or Chiefs, even if such things weren't witnessed by a defendant. As we have seen, the government has tried to suggest that was not the case at all for anyone. Sure, my videos are helpful to making my defence, but you know what is more helpful? Showing that police everywhere were doing the same, or exactly what I said they were since the second I left the building. You must see through them judge, they use to claim there no was such possibility, now, they claim there isn't, but that I must be stopped from presenting such evidence. They are singing a different tune!Another reason this should be allowed is because these officers were all over and moved all over the building. They encountered one another, they encountered the protesters that I was near, or me personally at a later or earlier time than was recorded. They were right above where I was, or to the side, or entered an area before or after I did. Some, walked right past me, but that 2 seconds of me waving to some of them, or smiling at them only shows so much. What really solidifies beyond a reasonable doubt (yes, that high) that the Capitol police as a whole/ agency were allowing protesters like myself in and to protest as I was, at the time that I was inside, is a look into the collective.This court should apply the standard that the Dellums and Barham courts used, to welcome any evidence of police actions, words, in-actions, or orders of in-action. Except, not only should it be used to point out that they failed to order a warning of arrest, law breaking, or to order a dispersal, it should be used to establish and support that overall, police were welcoming/ not stopping us, and in effect allowing me in to protest as I was.The government counters my argument before I even made it by claiming that to include this defence (which is the truth/ what truely happened with me on that day) would be prejudicial to them and confuse the jury.I don't disagree, the truth is prejudicial to their claims against me. It very well may confuse a jury who has been told by the media that many there that day went to the capitol because Trump told us to and that we were were intending to overthrow the government. Here is what I suggest, to eliminate potential confusion. First, I show my videos and evidence that I personally witnessed that made me feel as if police were welcoming me in, that I was allowed to protest as I did, and where I did. Then, after my direct evidence and videos showing officers who I encountered has been shown, I then present further evidence to show the jury that Capitol Police were welcoming us to protest inside through their actions, words, and in-

actions. This of course isn't relevant to my state of mind, but it is relevant to establish a strong and true foundation that Capitol Police as a collective were allowing conduct like mine to happen when I was in the building/ grounds.A simple jury instruction that the jury only use videos that I took, or videos that I'm in/ next to as evidence to my state of mind would negate any supposed prejudice to an impartial ruling.Now I know I already in a way argued this, but I want to address this aspect of their argument still just in case. The government argued such evidence would not be admissible under rule of evidence 401, however that, was to my state of mind. The court now knows why such evidence should be admitted. Further, I love what the Rhine Court said on this:United States V. Rhine (D.D.C. 2023):"Relevance under Rule 401 is a low bar, merely requiring that evidence have "any tendency" to make a fact of consequence more or less probable... Surely, if the jury found that defendant brought knives and pepper spray with him, into the capitol, it would tend to show he intended to engage in disorderly or disruptive conduct while he was there. The officer's testimony on this subject is therefore relevant and significantly probative as to Defendant's mental state."Comments: (See similarities of Rhine case law and this paragraph I wrote): Yes, a low bar, and the evidence that I wish to present has a strong tenancy to make the fact of entrapment by estoppel more probable. Surely, if the jury found out that Capitol police were welcoming others in through their words, actions, or in-actions, it would tend to show that they were fooling people like myself into thinking we were allowed in while I was there. The officers conduct and videos relevant to this subject is therefore relevant and significantly probative as to the likelihood of there being entrapment by estoppel to defendants like me who have claimed it (especially if like me, they have claimed it since the very second they left the building to National Fake News Media).

Read at 9:33 PM

9:33 PM

fewfwefwef

Read at 9:38 AM

August 19, 2023 (US/Eastern)

9:42 AM

Ryan: Motion 2 of 7, Part 2 of 5In conclusion to this long and multi pronged argument, if the court wants to fully assess the situation and the jurors are to be made fully aware of whether police were allowing protesters like myself to protest as we were, they must also be able to view videos relevant to that subject (whether police were allowing protesters like myself to protest as I did). Such evidence would certainly be relevant to that subject, as we can clearly see from the Dellums and Barham DC Circuit courts. That is the full "zoomed out" picture.6) The government again "conveniently" cites another irrelevant decision as to why this court should grant their motion in my case when they cite the decision reached in United States v. Chwiesiuk (D. D.C. 2023). Response: They "conveniently" failed to share that the defendants in that case didn't intend on pushing such defences, the defence didn't object! Of course it was granted!Further, other issues with this case include the false assumption that all protesters "faced temporary and

permanent barricades and Capitol Police positioned to prevent unauthorized entry to the Capitol" and that "police "engaged in combat with the rioters to prevent them from... breaking police lines". These assumptions clearly also had an effect on the conclusion reached in this motion. As mentioned and testified to, I saw no such things where I would enter. This court also relied on chief judge Howell's previous position on such matters in Chrestman. Since then, her position has clearly evolved to welcome an entrapment defence from such defendants so long as a proffer of evidence is shown. 7) The government cites chief Judge Howell's previous view of entrapment by estoppel in Chrestman. Response: They "conveniently" failed to bring up how her view of entrapment by estoppel in January 6 cases has evolved. She no longer suggests that the Capitol Police don't have authority. She no longer asserts that no January 6th defendant could claim such a defence given police barricades, police lines, and police orders restricting entry at the Capitol. In fact, reading her writings in Eicher (2023), it's clear she is open to defendants offering evidence for such claims (entrapment by estoppel), so long as it's not based on President Trump, that she has remained solid on. She even helps prove that the DC courts recognize and are willing to look at and consider implied entrapment by estoppel (including in-actions.) See Part 5 section 5 for all the proof and other relevant arguments and case law. Part 3: Response To Pages 6-10 Of The Government's Motion In Limine To Preclude My Entrapment By Estoppel Defence:1) The government "submits that [I] will be unable to put forth any evidence that law enforcement officers gave [me] express permission to enter the Capitol Grounds, much less the Capitol building...given that there were "obvious police barricades, police lines, and police orders restricting entry at the Capitol."Response: First, the government fails to recognize what even DC district court judges have shared, that the grant of permission need not be explicit... Still, I'll argue their flawed position for fun. I don't dispute that they gave didn't me express permission to be on the grounds, until I spoke to the officer inside (who gave me all the rules to follow, and permission). However, prior to speaking to that officer there were no "obvious police barricades" that I noticed, the government knows these were removed, or moved long before I arrived. The government knows I didn't see any police until a crazy old man broke into the Capitol with his cane and entered into an area (not where I entered) that police made clear they didn't want people in. I told national fake news about this, and even pointed to him on live television "this guy broke in over there". Finally, the government knows that I was given no police orders restricting my entry, in fact, quite the opposite occured, which they know also, hence them trying to stop me from introducing evidence on such things. Prior to entering I heard others sharing that police were allowing us in. I then observed police and listened to and watched what the protesters around them were saying and doing while also watching and listening to those officers responses. Everything lead me to believe that I was allowed to enter the Capitol. Though the government has taken and refused to give my video evidence which shows the officer I spoke to giving me express permission and rules, I still have additional evidence. First, testimony is evidence, and I have provided such evidence already, though here they pretend I didn't share such evidence. Second, I have a non-audio version of the officer and I speaking over CCTV footage. This is important because the government knows I did not view this evidence prior to April 2022. Given that I testified on 10/12/21 to speaking to this officer, sharing he went where he actually went after our talk, and given that the talk happened in the area I said it did, all before I had seen this video, further supports that I was telling the truth, that I got permission and rules from that officer. Third, my other videos further support that I was given permission to enter. Fourth, videos from the body cameras of officers further support that they were allowing people who were protesting as I was to enter and protest.2) That my actions

of entering through a broken window belie the argument of entrapment by estoppelResponse: I already addressed this (see Part 2, #3). 3) Citing ChrestmanResponse: Dealt with a few times earlier, but, see her updated view of thinking in Eicher (Part 5, Section 5).4) Again on page 8 the government relies on an outdated view from Chief Judge Howell on Chrestman to claim that officer inaction or failure to notify a person that their actions are unlawful cannot shield an individual from liability for an illegal act.Response: Tell that to the Dellums, Carr, or Barham courts, all DC Circuit cases in which for many protesters, police failed to warn those present that they were breaking the law and had to leave/ stop what they were doing. The court took note of police failures and inactions to properly warn protesters and ensured the defendants charges were dropped as a result of these factors. Remember, the Commander of the MPD in Barham told his agency to ignore minor violations of the law to accomodate protesters (do not act to arrest them or warn them their activity is illegal). The Barham court saw this as a reason to throw out the convictions. That conversation was clearly not in the presence of the protesters, the DC circuit recognized that when looking into officer inactions, or orders of inaction to an agency, a look into the collective is admissible. 5) They cite Cox V. Louisiana to help support this assertion.Response: Though the government tried to cite this against me, there is actually so much that proves it supports an entrapment by estoppel defence in my case that I made an entire breakdown/ section of comparisons and arguments relating to this case. Please see Part 5, Section 6.6) They cite United States V. Gutierrez-Gonzales, 184 F.3d 1160 (10th Cir. 1999)Response: Though the government tried to cite this against me, there is actually so much that proves it supports an entrapment by estoppel defence in my case that I made an entire breakdown/ section of comparisons and arguments relating to this case. Please see Part 5, Section 7.7) They cite Garcia v. Does, 779 F.3d 84, 95 (2nd Cir 2015)Response: Though the government tried to cite this against me, there is actually so much that proves it supports an entrapment by estoppel defence in my case that I made an entire breakdown/ section of comparisons and arguments relating to this case. Please see Part 5, Section 8.8) They argue that "it is illogical to conclude that officers overwhelmed by a hostile, forceful mob were permitting or authorizing rioters to enter and explore the building simply because those officers did not physically oppose that which they could not stop.Response: (See Part 5 section 8 for full comparisons/ arguments) In Garcia V. Does, the crowd was as officers described "hostile", the police shared they too were overwhelmed by the number of protesters. However, once they got enough police to take care of the protesters, they arrested them. Not only that, they gave them three dispersal orders and time to comply(they didn't do that for me).On January 6th, what happened with the protesters once the police had enough people to arrest them? They didn't arrest them so long as they obeyed curfew and didn't break the rules that were set out. Video after video after video, it is shown that whether protesters outnumbered police, or vice versa, arrests were not conducted during the time I was inside, and even for large parts of time before and after, so long as they behaved as officers shared we had to behave.Such accommodating actions for protesters on the part of police agencies aren't unusual, see Meyers V. City of New York (2nd cir.) or Barham V. Ramsey (DC Cir.). Even so, as shown in Carr V. District of Columbia (DC Cir.), "a crowd substantially filled with violence does not negate the requirement of police to give a dispersal order that protesters can hear". Furthermore, as shown in a NAACP Supreme Court case against a hardware company, you aren't suppose to punish individuals based off of the actions of others in a protest, I was not hostile, most around me were not hostile... Their argument is beyond flawed.9) They argue that the court should preclude evidence of officer inaction not perceived by me. Response: This has already been argued: See Part 2 number 5.10) They cite Williams case law.Response:

Given that the arguments and citations taken from Williams are already addressed in Eicher, Cox, and Chrestman references that I argued, it also has been, or will be address in those sections of Case law arguments.Part 4Case Law Arguments:Section 1: General/ Overall:1: As the 2nd circuit shares: "An entrapment by estoppel defence doesn't depend solely on absence of criminal intent (since the government tries to falsely assert that I must have had criminal intent because I entered through a broken window in a place called "The People's House"). Nor is it limited to the circumstances of actual authorization (as they assert that I didn't receive 'actual' authorization to enter, and falsely assert that I didn't receive 'actual' authorization to remain and go/ protest as others around me were). Rather, it focuses on the conduct of the government leading the defendant to believe reasonably that he was authorized to do the act forbidden by the law (something that the government tries to ignore when it is the central focus of this defence). The doctrine depends on the unfairness of prosecuting one who has been led by the conduct of government agents to believe his acts were authorized. This focus on unfairness arises from circumstances that gave birth to entrapment by estoppel."2: "The question of entrapment is generally one for the jury, rather than for the court." -Matthews V. United States, 485 U.S. 58, 63, 108 S. Ct. 883, 99 L.Ed. 2d 54 (1988)Comments: That means I should be allowed to present it in opening and closing statements as well as during arguments.3: The main focus is on the government not me: "...after public officials acted as they did, to sustain appellate later conviction for demonstrating where they told him he could 'would be to sanction an indefensible sort of entrapment by the state-concicting a citizen for exercising a privilege which the state had clearly told him was available to him'" -Cox, 379 U.S. at 571 (quoting Raley V. Ohio, 360 U.S. 423, 426, 79 S. Ct. 1257, 3 L. Ed. 2d 1344 (1959)."4: I acted just as others around me were: The 6th Circuit in Levin, 973 F.2d at 468 also had an entrapment defence. The court shared that the defendants conduct was identical to that which HCFA had approved. His conduct was not vastly different from what they authorized... Comments: I personally witnessed everything I did, I mirrored people's actions so long as I knew officers were allowing such actions due to their personal actions, words, or inactions. I witnessed the man on a desk waving a flag next to the officer I got rules from, I witnessed others smoking, I witnessed the officer who gave rules to me walk right by Jeff Merkelys' room. Have the court take notice of the photo that the government provided in their motion in limine, notice how many people are in that photo prior to me entering. They are further than the eye can see and that the camera can capture, yet I wasn't that far away from the door/ window, that's because I waited to observe the actions of police and what they were and were not allowing prior to entering. I didn't jump on top of the desk until I took notice that the man already on the desk was ignored by the officer I got the rules of the day for, and I didn't move down towards the Crypt or Jeff Merkely's office until many others had done so, and when I was temporarily sketched out again I inquired to ensure that I still was allowed to go down to the statues (Crypt) and I was given evidence to suggest that I was by a separate Capitol police officer. 5: United States V. Wilson, 721 F.2d 967, 975 (4th Cir. 1983) (violation of statute must be initiated by government agent): Comments: Though it was through their actions, there still is a major difference in this case compared to mine. The difference in my case is that Capitol police and MPD have long established methods and requirements for arresting a group of protesters or those in a riot. They are required to warn the protesters that they are breaking the law, to stop, and to be given adequate time to leave/ stop. Still, even if this wasn't the case, for me, the Capitol police did initiate this violation through their words, actions, and inactions. I did not blindly rush in, I waited and observed (with my eyes and ears) the police, what protesters around them were saying, and what was seemingly (and clearly) allowed and not

allowed. 6: United States V. Nakouzi, November 30, 2005, 2nd Cir.: "To prevail on a defence of entrapment by estoppel, the defendants conduct must also remain within the general scope of the assurance of authorization; this defence will not support a claim of an open-ended licence to commit crimes in the expectation of receiving subsequent authorization." Comments: Again, everything I did was not done prior to me taking notice that police were allowing others to do it. Everything I did was already done within the view and scope of the present officers, and to ensure I was allowed to do what others were allowed to do, I personally sought and received express permission to do them, most of which had already been conveyed as being welcomed through implied actions and inactions.7: United States V. Hurtado, 47 F.3d 577, 584 (2d Cir. 1995) ("A defence theory must be charged as long as it has some foundation in the proof, no matter how tenuous that defence may appear to the trial court.") "Accordingly, the government's motion to preclude these defences and related evidence is denied."Comments: Clearly, Judge Howell now recognizes this, compare her previous position in Chrestman with that of Eicher.8: When my "meter" of trusting that I was allowed enter, remain, or to protest as others were was wavering, I inquired to see if I truely was allowed to do so three separate times. Thankfully, all three times are on video. This shows I was sincerely desirous of obeying the law. This is important because as the law-books share: "To invoke the entrapment by estoppel defence the defendant must show that he relied on the officials statement and that his reliance was reasonable, in that a person sincerely desirous of obeying the law would've accepted the information as true and would not have been put on notice to make further inquires." Comments: When in doubt I made the inquires, all three resulted in a "yes", that I was allowed to do as others were before me in the areas I was in.9: As the law-books share: "this defence is really a narrow exception to the general rule that ignorance of the law is no excuse."10: In Cox V. Louisiana, a state statute made it a criminal offence to demonstrate "near" a courthouse. Defendant, the leader of a planned demonstration was advised by police officials that a certain location across the street from the courthouse was permissible. When the demonstration began, defendant was arrested for being too close to the courthouse. The court again reversed, stating that this was "an indefensible sort of entrapment" because defendant was wrongly advised by the police officials who were "charged with responsibility for administering and enforcing the statute. Comparisons: In my case, I was advised by police officials (both through words, actions, and inactions) that certain forms of protesting were permissible in certain locations. After the demonstration, I was arrested for following the advise. This is an indefensible sort of entrapment because I was wrongly advised by the police officials who were charged with responsibility for administering and enforcing the statute. However, an even more extreme issue is presently working against the government in my case and that is that the Capitol police are required to order dispersals and warnings prior to making arrests. The police in Cox were not required to do this. The Capitol police did not do this, further strengthening the point that this is/ was an indefensible sort of entrapment.11: It's easy for people to have thought we were allowed to protest as we(the peaceful ones) were: The statute 40 U.S.C §5104 (f) (I'm facing two 40 U.S.C §5104 charges), the statute restricting expressive activity on the grounds of the capitol, became the subject of a constitutional challenge in Jeannette Rankin Brigade V. Chief of Capitol Police, 342 F. Supp. 575 (D.D.C. 1972). There, a three-judge court declared the statute unconstitutional under the 1st and 5th amendments, enjoining the Capitol Police from enforcing it. The court ruled the government's interest in maintaining decorum failed to justify a ban on political demonstrations outside the building housing the nations elected representatives. The Supreme Court affirmed in 1972.12: Meyers V. City of New York (2nd Cir. 2020): The mayor of New

York City temporarily forwent enforcing trespass laws against protesters occupying Zuccotti Park in Manhattan telling the police to focus on more serious crimes in the area (This is similar to what Capitol police clearly did, they temporarily forwent enforcing trespass, disorderly conduct, and parading and picketing laws, when someone began to assault officers they would then take action, when some protesters hopped up on statues, they spoke loudly and forced the protester off of the statue.). After the NYC police department evicted the protesters and charged them criminally, the protesters insisted that they, like the Cox protesters, had relied on the Mayor's statement that 'we'll allow [the protesters] to express themselves" "as long as [they] obey the laws." (2019 U.S. Dist. Lexis 53150 [WL] at *1 (cleaned up)). That statement however did not advise the protesters that the behavior for which they were prosecuted was lawful(avoiding a dispersal order being the main thing the court focused on).Comment: Here, the police clearly were witnessing the protesters before me conduct the very action that I soon would get permission to do myself/ mirror. Unlike in Meyers, I didn't enter and then act beyond that which the officers had previously authorized. Everything I did was authorized by Capitol Police through both words, actions, and inactions. As the court shared, unlike me, the police had probable cause to arrest the protesters for disorderly conduct and trespassing after the protesters ignored a dispersal order.13: Chrestman: "Central to Raley, Cox, and PICCO is the fact that the government actors in question provided relatively narrow misstatements of the law that bore directly on a defendants specific conduct. Moreover, in all 3 cases, the government actors statements were made in the specific exercise of the powers lawfully entrusted to them, of examining witnesses at commission hearings, monitoring the location of demonstrations, and issuing technical regulations under a particular statute, respectively." Comments: I was given relatively narrow misstatements of the law that bore directly on my specific conduct. Moreover, the government actors statements were made in the specific exercise of the powers lawfully entrusted to them, Capitol police issue technical regulations for the capitol building and grounds, monitor and allow demonstrations, and warn of arrest/ arrest people for breaking rules on Capitol grounds or the building.14: Blood, 435 F.3d at 626: District court's instruction incorporated both elements of entrapment and entrapment by estoppel.Comments: Both were present at the Capitol that day, the prosecutor from William Popes case admitted that. I seek to have both elements presented and argued.Section 2: Case Law And Arguments From Dellums V. Powell, August 4, 1977, DC Cir.:1) Plaintiffs were arrested by U.S. Capitol Police without an order to quit as they protested the Vietnam war on the steps of the U. S. Capitol. The court held that since class members were arrested without a warrant, unlawful imprisonment was presumed as a matter of law, and the burden of proof was on defendant police chief. The court held that an order to quit and an opportunity to disperse had to precede arrests.Comments: Not only did police not order me to leave, they did the opposite. Further, the government should bear the burden of proving that I was ordered to disperse and given adequate time to comply just as the Dellums court required.2) In any situation in which an order to disperse can constitutionally be given, there will be substantial noise or disorder. For this reason police will either have to warn each demonstrator individually or work through the leaders of a demonstration to the extent they have access to powerful public address systems.Comments: On 1/6/21, Capitol police did not warn me or order me to disperse, even when I was speaking to them directly or walking by them where there was not a ton of noise, whether inside the capitol or outside the Capitol. Since then, I've come to realize (mainly because I'm looking for such evidence) that even in areas where police vastly outnumber protesters, peaceful ones at that, they often don't order a dispersal order.3) At the capitol the leaders were stopped by a capitol police officer, but were allowed to enter the grounds

when congressman Dellums appeared and explained the arrangement for meeting on the Capitol steps. Comments: This goes against the governments false claim that Capitol police don't have the authority to authorize protesters to enter and protest at the Capitol. Additionally, just as in my case, the protesters were at first stopped from being allowed on the grounds/ inside the building, but later were. It could be surmised that they had a similar situation happen in that they were informed that Trump had told us we were going to protest at the Capitol just as Congressman Dellums told police this and later got permission to do as they normally would not be able to do, protest on capitol grounds. It also could be surmised just like in Dellums, just because protesters were at first stopped by capitol police from protesting at the capitol, the police had the authority and power to change their minds and allow protesters to gather at the capitol and protest.4) While Congressman Abzug was addressing the crowd, the police cordoned off the bottom of the steps, preventing anyone from leaving, and began arresting members of the assemblage. Comments: Just as in my case, police welcomed my presence and activity, and then later, despite that permission, I was arrested.5) "... the record shows that chief Powell unquestionably took some steps to order the crowd to disperse on May 5 and, moreover, he testified that standard practice at the Capitol would be for such orders to be given because it was the experience of the Capitol Police that many people were not aware of the statutes governing conduct at the Capitol and would, upon being notified of a potential violation bring their conduct into line with the law. (Tr. 2096, 2099-2100, JA 1286, 1289-1290). Comments: In my case, all of the Capitol police and Metropolitan police I personally was around and interacted with did not take any steps to order me to disperse or to stop protesting as I was, indeed, they did the opposite and welcomed it. Additionally, take note, the Capitol police chief shared that many people are not aware of the statutes governing conduct at the Capitol, and upon being notified of a potential violation, they typically bring their conduct into line with the law. Even on the limited law library, there are so many examples of people incorrectly thinking they are allowed to be present and protest because the building is called "The People's House. So, why were the orders to stop and to disperse not given if that is their experience, especially with a present crowd that was overwhelmingly filled with protesters shouting and sharing their support and affinity for police ("back of the blue"). Would these people not want to please the police more so than those who may detest them, whom these officers also encountered in the past and gave dispersal orders to? Why was the standard procedure ignored, and even more extreme, why was the opposite conveyed to me/ others around me?6) In addition, regulations issued by Chief Powell required that persons be given individual warnings to leave before they were placed under arrest for participating in a mass demonstration. According to Chief Powell's testimony, however, such individualized orders to leave were not given on May 5. Notwithstanding this administrative interpretation, Chief Powell urges that orders to disperse are not required by section 124 and, further, that a violation of his own regulations in this regard has no bearing on the falsity of an arrest under that section. For the reasons set forth below, we find that orders to disperse were required, and we therefore reject Chief Powell's contention.7) There is a past history of being allowed to protest in the Capitol, even if police tell you to leave due to the 1st amendment. This history definitely could have solidified a thought process for many of being allowed to protest on Capitol grounds. This was shown in United States V. Nicholson, 97 Daily Wash. L. Rptr. 1213, No5, 20210-69A et. al. (D.C. Ct. Of Gen. Sess. June 19, 1969), aff'd, 263 A.2d 56 (D.C. App. 1970), appendix at [1]-[2]. In this case (which was cited by the Dellums court) 13 quakers were arrested while standing on the steps of the Capitol reading names of Vietnam War dead from the Congressional record. They were charged... in that they failed to leave the Capitol when requested by a Capitol

policeman to do so. The Quakers moved to dismiss that their activities were protected by the first amendment. Judge Greene agreed, holding that the Capitol was a public forum.8) "the protesters were unquestionably granted an unwritten "permit (implied permission)", as described in Nicholson, to assemble on the Capitol Grounds and steps. Because police officials in effect (implied entrapment by estoppel) told the demonstrators that they could meet where they did, to sustain [plaintiffs] later conviction where they told [them they] could 'would be to sanction an indefensible sort of entrapment by the state-convicting a citizen for exercising a privilege which the state had clearly told him was available to him.' (Cox V. Louisiana)... In these circumstances, no constitutionally valid arrest could have been made until an order to disperse had been given which was itself based on permissible considerations (Dellums again citing Cox V. Louisiana)." Comments: And the government tries to fool this court by saying that the Capitol police can't tell people that they can protest at the Capitol? That they can't give permission to people? That implied entrapment by estoppel isn't recognized? That the DC courts haven't weighed in on entrapment by estoppel defences? Well, now you know! 9) "The evidence is similarly in conflict on the question whether Chief Powell made a bona-fide effort to make sure the crowd heard his dispersal order. Although there was certainly evidence that the jury could credit to the effect that Powell made attempts to inform the crowd and was each time hooted down and drowned out, there was also evidence that Chief Powell realized that the crowd had not heard his warnings and yet took no steps to correct the situation. For example, a reporter present at the scene testified that he had overheard Chief Powell say to Chief Wilson "that he [Powell] wasn't sure whether they [the demonstrators] heard him or not, or [that] he didn't think a lot of them heard him. Regardless of this, no further warnings were made, although such warnings were required by Chief Powell's regulations. Comments: Can the government even claim that police did at least as much as the Chief in Dellums?9.1) Nor was use made of a powerful police sound truck that was at the scene, nor was any attempt to use the public address system of the demonstrations leaders; indeed, an offer from Congressman Dellums to make announcements over that system was specifically refused by Chief Powell. Chief Powell urges us in a brief that the fact that no one heard his warnings was due to the loudness of the crowd and, therefore, was not his fault. We are not impressed with this argument. In any situation in which an order to disperse can constitutionally be given there will be substantial noise or disorder, see Washington Mobilization Committee V. Cullianan, Supra note 31, 566 F.2d at 120. For this reason police will either have to warn each demonstrator individually or warn through the leaders of a demonstration to the extent they have access to powerful public address systems. Alternatively, it appears that a device called a "sound curdler" is available which can make the police heard over most tumult: Q. What is the curdler that you referred to? A. That is an audio curdler that we had installed on top of the barricade car, which is a converted Brinks wagon kept in the yard up at the Tactical unit. This particular curdler was bought in 1970 from applied electronics over in Alexandria because of the fact that we had given a lot of instructions on bull horns, which is the small audio handler that people claimed they could not hear distinguished over the roar of the crowd. Parenthetically, it should be noted that Zanders testimony in Cullinane would tend to indicate that Chief Powell should have been aware that the hand-held bull horn he testified he used to give his orders was not powerful enough to reach the crowd." Comments: How is it that in the early 1970s the Capitol police seemed to have on hand powerful public address systems to disperse of large crowds, but on January 6th 2021, the Capitol police couldn't even find their weak bull horns anywhere? Take one look into my crappy legal law library and you'll find that Capitol police still in the 2000s and even 2010s were using their bull horns and other PA systems

to disperse crowds... Why did they disappear on the 6th? Why did Capitol police give me directions and rules, or stand and smile instead of giving me individual dispersal orders? They had innumerable chances to do so!

Read at 11:45 AM

11:45 AM

wqvwvcqeecwec

Read at 11:46 AM

12:28 PM

Ryan: Motion 2 of 7, Part 3 of 510) "...Thus, although the line of Marchers was initially stopped at the boarder of the Capitol Grounds by Inspector Xander of the Capitol Police, he stepped aside upon being told by Representatives Dellums, Abzug, and Mitchell that they had invited the Marchers to meet with them. Comments: Perhaps the capitol police heard that Trump had invited us to meet us there. Perhaps friendly Congress members or senate members would be present and shared that they planned to meet or speak with us just as others had done outside of the White house. Perhaps there was an auditorium like setting inside the building where a select number of protesters could sit/ stand to listen to speakers (after all, only a select few made it into seated positions in VIP and directly outside it, all others had to stand or bring their own chairs). These are all thoughts that briefly crossed my mind either in trying to guess what was going on at the capitol before I got there or while encountering police inside... I was open to tons of possibilities and trying to assess what the actual situation was, including even (the prosecutor will love using this) that some protesters were starting a revolution when they initially broke in after hearing that Mike Pence certified the election (perhaps they recognized the tyranny and that the election was stolen (after all, we (the American people) have a right and a duty to overthrow a tyrannical government)). Regardless, I personally had no intension of breaking any laws, I'm not selfless enough to do that, I loved where my career and life were going and was not looking to screw it up, hence why I was only interested in coming into the capitol when people started sharing "they are letting us in!" and even then, I only entered after observing police truely were letting us in. The same situation happened at the Ellipse hours earlier, excited and violent protesters broke through security lines and jumped over bike racks (but this time I clearly saw bike racks, though they were mainly used to help guide lines). A security officer was even knocked to the ground via a punch from a supporter. The secret service agent, the women (campaign staffers) and I were almost knocked down at the violent pushing of the crowd... Still, security allowed many of those people who broke through the security line to continue on. Very similar to what happened hours later at the capitol.11) "In addition, no efforts (inaction) were made to keep the protesters from assembling on the steps." Comments: This is exactly what many people (including myself) experienced when we arrived to the steps, right outside the building, and shortly after, inside the Capitol building. Later, many protesters including myself didn't see any efforts to keep protesters from assembling in certain areas in the capitol.11.5(11 continued)): "There can be no doubt that these actions (or as they put it, inactions) constituted police permission to assemble on the steps." Comments: This shows the DC Circuit recognizes that police in-action ("no efforts (in-action)

were made to keep the protesters from assembling on the steps") can constitute implied permission/ entrapment by estoppel ("There can be no doubt that these actions (in-actions) constituted police permission to assemble on the steps") (Further, the court also shows that actions/ implied entrapment is recognized in the same section because in-action is the action of doing nothing, so the court is saying actions can also be implied entrapment by estoppel.).12) "Chief Powell was not acting in good faith. Chief Powell's INACTION after his remark to chief Wilson indicates that Powell was aware that notice to the crowd had been inadequate. Buttressing the interference of bad faith is the further fact that chief Powell, by relying exclusively on dispersal orders shouted over a hand-held bull horn in attempting to give notice, violated his own "procedure for handling protest groups."Comments: Again, the DC circuit does consider police inaction in entrapment by estoppel cases.12.5(12 continued)): Federal exhibit 11: This regulation states that preliminary to arrests the ranking official in charge at the scene shall approach the demonstration leadership and explain the law violations which are being committed. He shall request that any and all violations be corrected immediately. If such a request is complied with, no further police action shall be taken. If the leaders do not comply with the request, the official shall publicly announce to the crowd through a voice amplification the following "I am [insert name and title]. I hereby inform all persons assembled that you are in violation of [state the regulation in general terms and give statute number in code if known]. In the name of the United States Capitol Police Board, I command all of you here assembled to disperse." The official in charge shall wait a reasonable length of time for compliance. If after this first announcement nothing develops, the official shall repeat the aforesaid order. Arresting officers shall accompany the transporting officers to the proximity of the individuals about to be arrested. The arresting officer shall state to the violator that you are in violation of (give law violated). When applicable state "You are requested to please depart this area immediately and peaceably or you shall subject yourself to immediate arrest." 13) At trial, Chief Powell maintained that he could not ascertain who the leaders of the demonstration were, although he further admitted that he made no attempt to locate any of the Congressman who had invited the group onto the steps. Nor apparently was any attempt made to use the sound amplification equipment of the demonstrators to give dispersal orders. Chief Powell admitted that he never identified the statute alleged to have been violated. Chief Powell admitted that he knew for a fact that "none of the arresting officers made the statement [to leave or to be arrested] and gave that last opportunity to leave to the people who were being arrested."14) "The application of trespass statutes to government land presents greater complexities (to an already complex charge that typically requires a "knowingly" factor, making government land "DOUBLE COMPLEX" in regards to trespass statutes)... But there are other types of government land-public parks, streets, sidewalks, and historic lamdmarks-which may not ordinarily be closed to the public for reasonable use ("TRIPLE COMPLEX"). See Hague V. C.I.O., 307 U.S. 496, 515-16, 59 S. Ct. 954, 83 L. Ed. 1423 (1939); Marsh V. Alabama, 326 U.S. 501, 90 L. Ed. 265, 66 S. Ct. 276 (1946): Cox V. Louisiana, 379 U.S. 536, 13 L. Ed. 2d 471, 85 S. Ct. 453 (1965); Shuttlesworth V. Birmingham, 394 U.S. 147, 22 L. Ed 2d 162, 89 S. Ct. 935 (1969) Gregory V. Chicago, 394 U.S. 111, 22 L. Ed. 2d 134, 89 S. Ct. 946 (1989). The Capitol of the United States, a national historical shrine and the political centerpiece of the Republic, is in the latter category. It may not be declared off limits to the people. Indeed, the Congress invites and welcomes the public. In view of the broad and general invitation extended to the citizenry to this preeminently public building and the surrounding grounds , individual citizens could not be held to be "without lawful authority to remain... thereon", within the meaning of the unlawful entry statute, in the

absence of some other, specific bar to their presence("QUADTRUPLE COMPLEX")."Comments: Out of all the buildings in the country, and arguably, the world, the Capitol building seems to be the most complex regarding trespassing laws. Clearly, the Capitol police and the DC circuit recognize this which is why they approved of Federal exhibit 11 (see 12.5 above) to be implemented as as a required regulation for the Capitol police to follow prior to arresting people on Capitol Grounds/ the building.15) the court emphasized that the fair notice required by the Culliname court is notice reasonably likely to have reached all of the crowd despite any noise the demonstrators may have been making." id. at 181-82 n.3116) The Dellums jury instructions: "...the defendants (Powell, police, and Government) were also required to prove that demonstrators "were in fact ordered off" the property, and that they were given a "chance of getting off or staying on and being arrested" and that they "ignored the order knowingly". Guided by these and other instructions, the jury deliberated for more than a day. The substantial verdict they returned in favor of the plaintiffs clearly shows that the jury credited the plaintiffs" characterization of the events in question... Plaintiffs were able to introduce voluminous evidence in support of their points that... the warnings were not heard." Comments: Clearly, the DC circuit courts recognize police inaction from the Capitol police, they recognize it so much they gave this jury instruction, with the burden on the government! I'm seeking the same thing. Further, just as the DC circuit court allowed those charged to present voluminous evidence to make their points that the police failed to do their duty, I should be allowed to as well.17) ...a vague statute puts too much discretion in the hands of officials with the result that the statute may be enforced selectively against those who hold unpopular points of view. Comments: Take notice of my 1512 charge, obstructing an official proceeding. Take notice of Tigthe Barry, a man my magistrate judge let go for violently obstructing and single handily interrupting his 7th official proceeding. She only made him pay a 10 dollar fine and serve 12 hours in jail for his 7th time interrupting an official proceeding, and even grouped in his 2 contempt of court actions while on pre-trial release, one of which was for assaulting a secret service sargent with a tent pole during a political demonstration... The 2 more recent times he personally interrupted official proceedings were for Brett Kavanaugh and Jeff Sessions, republicans... But I'm charged with the 1512? That same Magistrate that Tigthe had gave me 30 something conditions of release as she only gave him 2 or 3? This is exactly what the Dellums court warned about!Section 3: Case Law And Arguments On Barham V. Ramsey January 13, 2006 DC Cir (This Court Relied On Dellums V. Powell In Coming To Its Decision).:1) Even the Metropolitan Police Department has a similar rule regarding warning protesters (even a protest filled with substantial amounts of obstruction or violence) prior to arrest: "Newsham and Ramsey concede that the mass arrest was executed with no prior warning to the occupants of the park to disperse and no warning to them that arrest was imminent. In the end, 386 people were arrested. The District court denied the governments motion, holding that MPD's arrest of hundreds of individuals assembled in the exercise of 1st amendment rights, without first issuing an order to disperse followed by a reasonable opportunity to comply, violated plaintiffs clearly established constitutional rights." 1.5 (1 continued)): "Murphy explained that if he issued an order to arrest without first issuing three successive warnings, he would violate his agency's mass arrest policy."... The government sought an appeal of that decision and lost again.2) "In the weeks leading up to the protests, MPD's civil disturbance unit braced for an influx of protesters. Ramsey commanded the department throughout the pre-protest planning and allegedly told members of his staff that officers should overlook minor violations of the law in order to accomodate protesters." Comments: Clearly, the Capitol police were doing the same. They knew

weeks ahead that a protest was coming, they had been warned through intelligence reports of the threat of violence and law breaking. Yet for whatever reason, they clearly, even according to their own and MPD officers, didn't prepare for it... Still, they clearly told members that they should overlook minor violations of the law in order to accomodate protesters. I witnessed it myself, the world witnessed it.3) Again, the Barham court found that even MPD was required to issues a dispersal order to protesters in order for the arrests to stand: "When compelling circumstances are present, the police may be justified in detaining an undifferentiated crowd of protesters, but only after providing a lawful order to disperse followed by a reasonable opportunity to comply with that order. Two cases spell this out: First in Washington Mobilization Committee V. Cullinane, 184 U.S. App. D.C. 215, 566 F.2d 107 (D.C. Cir. 1977) ("It is the tenor of the demonstration as a whole that determines whether the police may intervene; and if it is substantially infected with violence or obstruction the police may act to control it as a unit."..."the police may validly order violent or obstructive demonstrators to disperse or clear the streets. If any demonstrator or bystander refuses to obey such an order after fair notice and opportunity to comply, his arrest does not violate the constitution even though he has not previously been violent or obstructive.") (Second case cited was Dellums)."Comments: This tosses out the governments excuse of "It was a hostile crowd", which I witnessed many areas where it was not only nit violent, but people wearing Blue lives matter clothing and waving similar flags... They have encountered worse, like less than a year earlier at the White house where more officers were injured under the group that screams "kill all cops", ANTIFA...4) The court held that "a reasonable police chief" encountering the events unfolding in Pershing Park "would recognize the need--and indeed the duty--to ask a subordinate officer whether a dispersal order had been given prior to ratifying a mass arrest."-388 F. Supp. 2d at 61.Comments: Did the FBI do this prior to coming to arrest me? Just wondering.5) "Institutionally, moreover, MPD clearly grasped the constitutional rights elaborated in the applicable case law. MPD's Manual for Mass Demonstrations and Responding to Civil Disturbances instructs officers on the protocol for dealing with situations like the one Newsham faced. Under the guidelines established by the department (which are only partially reproduced on the record), officers seeking to disperse a crowd must "attempt to verbally persuade the crowd to disperse of its own accord "by issuing an initial warning" followed by a "final warning." Then, "if, after a reasonable amount of time following the final warning, the crowd continues in its refusal to disperse, the unit commander shall direct that the violators be arrested." -MPD Manual fo Mass Demonstrators and Responding to Civil Disturbances at 21, J.A. 564.Comments: Did the MPD do this for me on 1/6/21? No. Why didn't they? Did Capitol Police command also instruct their officers that they were nit going to be arresting us/ that certain conduct was allowed in order to accomodate us?6) Significantly, the MPD Manual acknowledges that its procedures embody judicially enunciated constitutional principles. It prefaces the discussion of mass arrest procedures by noting: "Following the civil disturbances of April 1968, procedures were developed by the Metropolitan Police Department, in cooperation with the courts, to provide for the speedy, but fair administration of Justice during mass arrest situations." -id at 22, J.A. 565. The procedures now in place apparently resulted from "court ordered prescriptions against certain mass arrest techniques followed during the April 1971 disorders.Comments: Go and read up on the attached newspaper titles from that era that the court provided in their notes, they make the fed set up January 6th riot look like kindergarten in comparison. Yet the police and courts didn't allow the excuse of "but the crowd was hostile (which they clearly were)" to stop them from requiring such procedures on warning protesters (even substantially sized, lr substantially violent ones) to

disperse or face arrest. Though the government tries the same argument they tried numerous times years ago, it should fail for the same reasons. The national guard was called and still couldn't stop those disturbances and riots for weeks, even months. Our set up by the feds riot was only 4 hours, and I think I'm the only one that came back the next day, and all I did was buy an airforce one backpack from across the street of the Capitol, clearly, this isn't a new situation that the courts have been introduced with.7) The Circuit court affirmed arrests were improper due to no warnings of breaking the law or orders to disperse/ reasonable amount of time to respond. "In a government of laws, the regulation of conduct- particularly conduct in the sensitive area covered by the First Amendment- must be predicated on a set of definite rules, not on the opinions of police officers." - The Barham court citing the Dellums Court who was citing Cox V. Louisiana, supra, 379 U.S. at 552.Comments: Again, the DC courts clearly have tossed their hat into the ring and made their positions clear regarding entrapment by estoppel defences.Section 4: Carr V. District of Columbia (June 17, 2008):Protesters against president Bush organized a concert in DC on 1/20/2005. Fliers handed out said "after the last song we invite you to join in a festive March from this show through the streets of DC to the doorstep of those in power. They also shared they wanted "to create an explosive protest against the war in Iraq and the war here at home as well as against all that represents.Comments: Sound similar to the events of 1/6/21 (Trump: "After I'm done speaking....We are going to peacefully and patriotically March down to the Capitol... to give them (the people in power) the boldness they need... to fight for America...")(Rudy: "Let's have trial by combat!")Along the way, property damage (including windows being broken) commenced from the crowd. Rocks and bottles were thrown at police vehicles, a rock broke the windshield of a police cruiser and fireworks were being used by the crowd. Comments: I do recall windows bring broken at the Capitol, and shortly after leaving the building, some people stupidly charging at a police line outside. I read on the news a man got 5 years for throwing a firecracker at police.The commander of the MPD then sent Civil Disturbance Units to arrest protesters for rioting. The CDU officers arrested them without ordering the protesters to stop or disperse.Comments: CDU units were present, but they didn't arrest me, I was arrested by the FBI 10 days later.Here is what we can learn:1) "Contrary to the District's representation, Cullinane specifically prohibits Mass arrests without notice or opportunity to comply where a crowd has become violent or obstructive." Comments: I was next to MPD for a long time, even taking sexy photos with them, why did they not order a dispersal, or threaten me with arrest, or tell me I was breaking any laws and would be arrested if I didn't leave?2) The government argued that the protesters charged were celebrating the acts of vandalism by cheering and throwing up their hands which encouraged more such acts. The court didn't find merit in that argument.Comments: I've seen the government argue such points in other January 6th cases...3) The district then argued that defendants were guilty of rioting because they continued to move with the "mob" despite the vandalism that was occuring. By continuing to march, the District claims, plaintiffs "tended to enlarge and perpetuate the atmosphere of violence and tumult..." and therefore may be charged with rioting. To this, the court said: "This argument lacks merit. The law is clear that "the right to associate does not lose all constitutional protection merely because some members of the group may have participated in conduct or advocated doctrine that itself is not protected." -N.A.A.C.P. V. Clarborn Hardware Co., 458 U.S. 886, 908, 102 S. Ct. 3409, 73 L. Ed. 2d 1215 (1992).Comments: Similarly, the government argues this generally and in regards to those with the 1512 charge in that I/ we are guilty of obstructing because we/ I "was raindrop in the field causing a flood". Since I was present as others were obstructing, I too am guilty of obstructing and it shows my intension of obstructing,

that is wjat they have argued.4) They then continue: "Rather, when violence "occurs in the context of constitutionally protected activity, precision of regulation is demanded. Specifically the presence of activity protected by the first amendment imposes restraints... on the persons who may be held accountable. If a person is to be punished for his association with those who engaged in vandalism, there must be "clear proof that...he specifically intended to accomplish the aims of the protest by resort to violence." -quoting the Supreme Court case of scales V. United States, 367 U.S. 203, 229, 81 S. Ct. 1469, 6 L. Ed. 2d 782 (1961). 5) The court elaborated further when they said: "Under Supreme Court precedent, a peaceful political protester may not be punished for failing to cease his protected activity simply because others associated with the assembly may have committed illegal acts. Therefore, since the District has not provided any particularized showing that any individual plaintiff intended to engage in or further riotous behavior, it cannot sustain its arrest on this ground." The District then argued that plaintiff left the bar to join the march at a time when acts of vandalism were being committed, thereby demonstrating by his actions "his active support and participation in the mob's conduct sufficient to evince his willful engagement in a riot." The court responded "Even assuming that the District was correct that Singer intended to join the demonstration, absent evidence that Singer intended to engage in and further the vandalism, he cannot be punished for the peaceful exercise of his first amendment rights."Section 5: United States V. Eicher, 2023 U.S. Dist. Lexis 90103, DDC opinion by Beryl Howell (on entrapment by estoppel): (Compare with her previous view on E-B-E in Chrestman 2021)1) "First, defendant must show "that a government official affirmatively communicated to the defendant the officials approval of the conduct at issue," Alvarado, 808 F.3d at 485; see also Sheppard, 2022 U.S. Dist. Lexis 232610, 2022 WL 17978837 at *9... This official statement of law NEED NOT BE EXPLICIT. As Sheppard explains, "the public authority and entrapment by estoppel defences are available only when the officials's statements OR CONDUCT state OR CLEARLY IMPLY that the defendant's actions are lawful." 2022 U? Dist. Lexis 232610, 2022 WL 17978837 at *9."Comments: Clearly, the previous biggest opponent of the entrapment by estoppel defence in 1/6 cases not only is welcoming it, but even pointing out that implied entrapment by estoppel is recognized.2) "In Cox for example, the Supreme Court reversed the conviction of the leader of a civil rights protest under a Louisiana anti-picketing statute, which prohibited demonstrations "near" a courthouse without defining "near", holding that the conviction violated the Due process clause because the towns police chief "IN EFFECT told demonstrators that they could meet where they did, 101 feet from the courthouse steps." 379 U.S. at 571.Comments: Again, she points out implied entrapment by estoppel is recognized.3) I should not be stopped from mentioning how law enforcement made me feel that I was welcome to enter, remain and protest as I did, it eliminates the truth and my entire defence: "the parties agree that the government will have to prove at trial that defendant "entered or remained in a restricted building or grounds without lawful authority to do so," and that he did so "knowingly".Comments: If the government is to argue at trial to the jury that a defendant didn't have lawful authority to enter or protest, it would only be fair for the defence to argue that they did have lawful authority... It would not be fair to only suggest it as a defence during jury instructions as the government would be arguing the opposite during trial, I should not be stopped from doing the opposite.3.5(3 continued)) "Evidence related to the former presidents'statements urging supporters to, for example, "go to the Capitol",... may be probative as to defendant's required intent for this charge. In fact, other judges in this district have explicitly instructed juries that, as to this count, "a person who enters or remains in a restricted area with a good faith belief that she is entering or remaining with LAWFUL AUTHORITY is

not guilty of "violating 18 U.S.C. § 1752 (a)(1). As a result, evidence showing defendant believed her actions were authorized "also could constitute a failure of proof defence" as to count one. Jumah, 493 F.3d at 874 n.4." Comments: Though it was not the main reason for why I entered into the Capitol, nor even the second reason, it still lead me to the grounds which lead me to the window that I would eventually enter into. Trump sharing we were going to the Capitol had an influence on me, but definitely wasn't the strongest influence... I especially knew he would not approve of how some protesters entered into the Capitol (violently and destructively).4) She was permitted to present evidence that she was allowed to enter and remain: "...and the jury will be able to assess the credibility and believability of that testimony in the fuller evidentiary context of what was occuring when defendant allegedly engaged in the charged offence conduct."Comments: If Howell is welcoming defendant's to offer evidence and testimony that they were allowed to enter and remain, then this court should allow it as well. 5) "...similarly, defendants who seek to present evidence of law enforcement INACTION during the January 6th riot have been permitted to do so, provided they actually perceived such inaction, because this evidence may be probative of their state of mind. See, e,g, Mem. & order, U.S. V. Bender, case No. 21-cr-508 (BAH), ECF No. 76; U.S. V. Oliveras, case No. 21-cr-738 (BAH), 2023 U.S. Dist. Lexis 7805, 2023 WL 196525, at *2 (D.D.C. Jan. 17, 2023)."Comments: Again, if Howell is recognizing and allowing arguments of implied entrapment through law enforcement in-action, this court should allow it as well. I'll also note I addressed the issue with this "Zoomed in" argument in Part 2, #5.6) "Fortunately, he can do so any number of ways (establish his awareness of alleged permissiveness), such as a good faith proffer outside the presence of the jury, or using other evidence to show that defendant was adequately nearby the alleged INACTION at the correct time to have perceived and understood such permissiveness as giving him permission to enter the Capitol."Comments: Again, even Howell now recognizes implied entrapment by estoppel can be shown through law enforcement in-action.Section 6: Cox v. Louisiana 379 U.S. 536 85 S.Ct. 453 13 L.Ed.2d 4711) When Cox arrived, 1,500 of the 2,000 students were assembling at the site of the old State Capitol building, two and one-half blocks from the courthouse. Captain Font of the City Police Department and Chief Kling of the Sheriff's office, two high-ranking subordinate officials, approached the group and spoke to Cox at the northeast corner of the capitol grounds. Kling asked Cox to disband the group and "take them back from whence they came." Cox did not acquiesce in this request but told the officers that they would march by the courthouse... The officer repeated his request to disband, and Cox again refused. Kling and Font then returned to their car in order to report by radio to the Sheriff and Chief of Police who were in the immediate vicinity; while this was going on, the students, led by Cox, began their walk toward the courthouse. Comments: I too was protesting at a Capitol building less than a block away from this court house. Unlike me, Cox was at first told by police, twice, to turn around and leave, he refused. I never was told to leave, I was shown and told the opposite multiple times. Yet this mans charges were thrown out due to entrapment by estoppel.2) As Cox, still at the head of the group, approached the vicinity of the courthouse, he was stopped by Captain Font and Inspector Trigg and brought to Police Chief Wingate White, who was standing in the middle of St. Louis Street. White testified that he told Cox that "he must confine" the demonstration "to the west side of the street." White added, "This, of course, was not—I didn't mean it in the import that I was giving him any permission to do it, but I was presented with a situation that was accomplished, and I had to make a decision." Comments: Cox was told where his protesting was allowed to and where it wasn't allowed to be. I too was told the same. The police Chief in Cox suggests he allowed what is typically not allowed because "he was

presented with a situation that was accomplished"... I assume now knowing all the facts (that I didn't know when entering the Capitol) that it could be a strong possibility that Capitol Police officers felt similarly to Cox's officers, that they (70 officers) were presented with a situation (2,000 protesters) and so allowed what is normally not allowed. Like in Cox, famous police officers who were doing similar to the Cox officers (allowing protesters in and giving them directions/ rules) also claim "I/ we was/were not giving [anyone] permission to do it". The government in my case makes a similar argument in there motion in limine, they suggest the police were presented with a situation that they could not control ("a situation that was accomplished"), and just like the government in Cox did, asserts that they still have a right to convict me, a person they gave permission to protest as I was and where I was/ would go... Those who don't learn from history are doomed to repeat it (Supreme Court here I come?).3) Cox testified that the officials agreed to permit the meeting. James Erwin testified that "My understanding was that they would be allowed to demonstrate if they stayed on the west side of the street and stayed within the recognized time," Comments: I testified that the officers agreed to permit my protesting and presence. I testified that they laid out where I could and could not go, and set time restraints (curfew).4) The Sheriff, then took a power microphone and said, "Now, you have been allowed to demonstrate. Up until now your demonstration has been more or less peaceful, but what you are doing now is a direct violation of the law, a disturbance of the peace, and it has got to be broken up immediately." Comments: Cox received a warning and despite it being the 1960s, an officer hopped onto a "power microphone" that was able to reach the protesters... Cox and his protesters received a dispersal order. I did not. Where was this sort of "advanced technology" in my case in 2021, especially considering what the Dellums and Barham Court shared in the DC circuit about Bull horns in the 1970s and in 2008? What happened to the Capitol police officers Bull horns they always use, or their powerful PA system they have? It was set up by the feds...5) The testimony as to what then happened is disputed. Some of the State's witnesses testified that Cox said, "don't move"; others stated that he made a "gesture of defiance." It is clear from the record, however, that Cox and the demonstrators did not then and there break up the demonstration.

Read at 12:28 PM

12:38 PM

jlhgdljyg/kfklhgxluydf

Read at 2:13 PM

2:53 PM

Ryan: Motion 2 of 7, Part 4 of 5---6) Two of the Sheriff's deputies immediately started across the street and told the group, "You have heard what the Sheriff said, now, do what he said." A state witness testified that they put their hands on the shoulders of some of the students "as though to shove them away." Comments: Cox received a second dispersal order, he still did not listen given the time frame between this order and tear gas being sent out (see next).7) Almost immediately thereafter—within a time estimated variously at two to five minutes—one of the policemen exploded a tear gas shell at the crowd. This was followed by several other shells. The

demonstrators quickly dispersed, running back towards the State Capitol and the downtown area; Cox tried to calm them as they ran and was himself one of the last to leave.Comments: Cox tried to calm/ keep protesters present despite the tear gas and dispersal orders. I didn't, someone shoots tear gas at me I'm leaving. If a police officer tells me to leave, I'm leaving.8) No [civilians] participating in the demonstration were arrested on that day. The next day appellant was arrested and charged with the four offenses above described.Comments: Like me, Cox went home and was later arrested and charged for his actions at the protest. Unlike me, he was charged by the same agency he disobeyed dispersal orders from. 9) Appellant was convicted of violating a Louisiana "disturbing the peace" statute.. "And who fails or refuses to disperse and move on * * * when ordered so to do by any law enforcement officer of any municipality, or parish...shall be guilty of disturbing the peace." LSA-Rev.Stat. § 14:103.1 (Cum.Supp.1962). Comments: This is similar to my disorderly conduct charge. Like MPD and Capitol police Manuals/ court decisions require them to issue a dispersal order in order to be found guilty/ be arrested, so too does Cox's charge here.10) Cox was charged with an obstruction charge: OBSTRUCTING PUBLIC PASSAGE Louisiana statute, LSA-Rev.Stat. § 14:100.1 (Cum.Supp.1962), which provides:"No person shall wilfully obstruct the free, convenient and normal use of any public sidewalk, street, highway, bridge, alley, road, or other passageway, or the entrance, corridor or passage of any public building, structure, watercraft or ferry, by impeding, hindering, stifling, retarding or restraining traffic or passage thereon or therein.Comments: I too was charged with an obstruction charge. My only felony, 18 U.S.C. §1512(C)(2).11) In upholding appellant's conviction under this statute...There is no doubt from the record in this case that this far sidewalk was obstructed, and thus...appellant violated the statute.Comments: Though I disagree for various reasons, the government argues my mere presence in the Capitol obstructed an official proceeding.12) The control of travel on the streets is a clear example of governmental responsibility to insure this necessary order. A restriction in that relation, designed to promote the public convenience in the interest of all, and not susceptible to abuses of discriminatory application, cannot be disregarded by the attempted exercise of some civil right...Comments: Similarly, the government recognizes the importance of ensuring that Congress can due its duty (in this case to certify a stolen election) and is able to do so with the necessary order. Please, for the purposes of the next number, take notice of "and not susceptible to abuses of discriminatory application".13) But here it is clear that the practice in Baton Rouge allowing unfettered discretion in local officials in the regulation of the use of the streets for peaceful parades and meetings is an unwarranted abridgment of appellant's freedom of speech and assembly secured to him by the First Amendment, as applied to the States by the Fourteenth Amendment. It follows, therefore, that appellant's conviction for violating the statute as so applied and enforced must be reversed.Comments: Here too the federal government has shown it is selective in who it charges/ doesn't charge with a 1512. Take a look at Tigthe Barry who has done so 7 times and has never been charged with a 1512 because he is a democrat. My favorite comparisons are on his personal obstructing Brett Kavanuagh's proceeding, and his 2 violent contempt of courts while on pre-trial release, all of which he served 12 hours in jail for and paid a 10 dollar fine, which the government even moved to drop that. Less than 1.25 years later, and my selective magistrate judge went crazy on the restrictions for me despite having no criminal history, and being more accomplished than Barry... Those who don't learn from history are doomed to repeat it!14) For the reasons discussed above the judgment of the Supreme Court of Louisiana is reversed.Comments: For that reason (selective prosecution) I should not be charged with the 1512...15) Not argument, just love this point from Cox: Speech is often provocative and

challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech * * * is * * * protected against censorship or punishment * *. There is no room under our Constitution for a more restrictive view. For the alternative would lead to standardization of ideas either by legislatures, courts, or dominant political or community groups." Terminiello v. City of Chicago, 337 U.S. 1, 4-5, 69 S.Ct. 894, 93 L.Ed. 1131. In Terminiello convictions were not allowed to stand because the trial judge charged that speech of the defendants could be punished as a breach of the peace " 'if it stirs the public to anger, invites dispute, brings about a condition of unrest, or creates a disturbance, or if it molests the inhabitants in the enjoyment of peace and quiet by arousing alarm.' " Id., 337 U.S., at 3, 69 S.Ct., at 895. Maintenance of the opportunity for free political discussion is a basic tenet of our constitutional democracy.Comments: I share this because the government said it was not my actions on 1/6/21 that were the most concerning, it was my speech after 1/6/21... They've targeted me mainly because of my speech... They threw me in jail because of lies(they broke the BRA), and to punish me for my speech...Section 7: United States V. Gutierrez-Gonzales, 184 F.3d 1160 (10th Cir. 1999) Background: The Defendant, Mr. Gutierrez-Gonzalez, was convicted of reentry subsequent to deportation following an aggravated felony (second degree murder), in violation of 8 U.S.C. 1326(a)(1)&(2) and 8 U.S.C. 1326(b)(2). On appeal, Mr. Gutierrez-Gonzalez alleged that the district court erred in not considering his defense of entrapment by estoppel....Why the court denied his entrapment by estoppel defence: 1) Mr. Gutierrez-Gonzalez received and signed an Advisal of Penalty for Reentry Form informing him in his native tongue of the penalties which can be imposed should he return to this country after deportation without obtaining permission from the Attorney General. 2) Gonzalez then for a third time illegally entered the country, without obtaining permission from the Attorney General. Upon applying for a work permit, he was told that they could not give him a green card. He then shared that he knew he was in the country illegally.3) Mr. Gutierrez-Gonzalez then applied for a change of status (not with the Attorney General) and lied by saying that he never was deported. He then signed the form, certifying "under penalty of perjury . . . that this application, and the evidence submitted with it, is all true and correct."4) Mr. Gutierrez-Gonzalez (still in the United States illegally) then took his application for adjustment of status to an INS office in Texas, for processing. When submitting the application, he told the INS clerk that he was in the United States illegally. Regardless, the INS clerk issued him a work authorization permit (Form I-688B). However, the clerk specifically informed Mr. Gonzalez that the work permit was not an entry document.5) Gonzalez was found by agents after being placed in jail for committing more crimes. He was then charged by boarder patrol agents. The statute under which Mr. Gutierrez-Gonzalez was convicted states in relevant part: ...The statute expressly excludes any specific intent regarding entry into the United States and makes it a crime for a deported alien to be found "at any time" in this country "unless" he has the "express" consent of the Attorney General. "nothing more than a showing of general intent is required" and "the government need not show that defendant willfully and knowingly engaged in criminal behavior, but only that the defendant's acts were willful and knowing that the defendant willfully and knowingly reentered the United States and that he did so without the Attorney General's permission."...by excluding a specific intent requirement, Congress placed the burden of correctly obtaining permission from the Attorney General and reentering the United States legally on the alien.6) Gonzalez does not challenge the fact that the government proved every element of the crime required by the statute: that Mr. Gutierrez-Gonzalez was (1) knowingly in the United States, (2) without the permission of the Attorney General, (3) after prior deportation

for an aggravated felony. Rather, Mr. Gutierrez-Gonzalez argues that the government should be estopped from prosecuting him because an "agent of the government" led Mr. Gutierrez-Gonzalez to believe that he was in the country legally. Mr. Gutierrez-Gonzalez contends that he reasonably believed he was in the United States legally as a result of his interaction with Diocesan Services and the issuing of a work permit by the INS. 7) Diocesan Services is not licensed by the government. It is not a government agency.8) Finally, Gonzalez argues that the INS "affirmatively misled him as to the state of the law" and that he "relied on that misrepresentation," when the INS clerk issued him a temporary work permit.... Gonzalez did not inform the INS clerk that he had previously been deported from the United States. Rather, Gonzalez submitted a fraudulent application that affirmatively stated that he had never been deported. The INS clerk specifically informed Mr. Gutierrez-Gonzalez that the work permit "was not an entry document." Under these facts, even if an INS clerk could be considered an "agent of the government" charged with interpreting, administering or enforcing immigration law and the actions in this case considered "active misleading" as to the state of the law, Mr. Gonzalez's alleged "belief" that he was in the United States legally was not reasonable.Overall Comparisons: For me to be in a semi-similar situation as Gonzelez I would've had to: have been convicted of trespassing into the Capitol twice, have been also convicted of murder while inside the Capitol, and I then would've had to sign a document stating "I agree and understand that I'm never to enter the Capitol again unless I get written permission from the Attorney General himself, and that no one else may give me that permission, no matter their actual or apparent authority". I'd have to then go into the Capitol a third time, clearly knowing I'm not allowed to legally be there. I'd have to have even stated this to others while inside. Then I'd have to commit perjury when asked if I've ever been arrested in the Capitol before. I'd then have to be arrested for committing a separate crime in the Capitol. Then I'd have to claim that some lady who doesn't work for the government told me I could be in the Capitol, even though there was clear evidence that she didn't say such things, and that I even shared that I knew I was breaking the law... Finally, like Gonzalez, I'd have to be charged with a statute that doesn't require any intention of wrong doing to be convicted... Clearly, my case is nothing like this and no judge, even on heavy drugs, would ever come close to thinking that man deserved an entrapment by estoppel defence. It is sad the government chooses cases like this to suggest that you too should deny my entrapment by estoppel defence. Clearly, they have no valid arguments! Pathetic!Section 8: Garcia v. Doe, 779 F.3d 84 2nd Cir.The government cites this case as to why I should be stopped from arguing that law enforcement inaction made my conduct on January 6th lawful.I'm not suggesting that police inaction made my conduct lawful. Entrapment by estoppel doesn't make illegal actions lawful, it eliminates criminal liability even if all the elements of the charges are met.With that out of the way, the government points out that in Garcia, the entrapment by estoppel defence was not allowed despite that those charged argued their conduct had been implicity approved by police, but could not show it was affirmatively approved by police.Before I point out the differences and problems with this case comparison, please take note, the 2nd circuit appellate court multiple times were leaning towards allowing such a defence despite these circumstances (see there 2014 ruling on this case), so this wasn't so simple for the 2nd circuit, and the District court thought the inactions were enough to warrant this defence (even though it had less compelling circumstances than my case). But, as my comparisons will show, my case is much stronger and very different from the Garcia case. 1) The 2014 court affirmed the judgment of the District court because the court could not resolve at this early stage the ultimately factual issue of whether certain defendants implicitly invited the demonstrators to walk onto the roadway of the Brooklyn

Bridge, which would otherwise have been prohibited by New York law.Note: The court was willing to accept the potential that police had given the implied permission to protest on a highway/bridge, despite that normally, they clearly wouldn't be allowed to.Comparison: A highway is rarely thought of as a place we have a right to protest on foot. Compare that to the Capitol building, a place so confusing the Capitol Police and Circuit courts made it a point to not arrest people prior to warning them of arrest, and a dispersal order. It arguably is the most confusing area in the world. Many people are confused over what they are allowed to do, even locals. You can't say the same for a highway. Almost all citizens have experienced a high-way, there is not confusion over whether people are allowed to protest on it, let alone block it. The protesters entering the highway would've had no purpose other than it other than to cause chaos. Most citizens have never been to the Capitol, indeed, even many locals have never been to the Capitol building. Unlike me, I was entering what I thought I had a personal right to, and in order to protest, what many people go to the Capitol to do! 2) On October 1, 2011, thousands of demonstrators marched through Lower Manhattan to show support for the Occupy Wall Street movement. Although no permit for the march had been sought, the New York City Police Department was aware of the planned event in advance.Comparisons: Our group had a permit to march to the Capitol, and if I recall (it's been over a year since I had this particular discovery (DC jail stole it)) to protest on certain areas of the Grounds.3) When the march arrived at the Manhattan entrance to the Bridge, police, including command officials, and other city officials watched as the protesters poured across Centre Street towards the Bridge. A bottleneck soon developed, creating a large crowd at the entrance to the Bridge's pedestrian walkway. While video footage suggests that the crowd waiting to enter the pedestrian walkway blocked traffic on Centre Street, defendants do not contend that they had probable cause to arrest plaintiffs for their obstruction of traffic at that point, as opposed to their later obstruction of traffic on the Bridge roadway (Because no order of dispersal was given). Indeed, plaintiffs alleged in their Complaint that the police themselves stopped vehicular traffic on Centre Street near the entrance to the Bridge before the majority of the marchers arrived at the entrance.Comments: This was an understandable action taken by police because unlike what would happen later, it would appear this bottle neck was not a purposeful action caused to create chaos or interrupt traffic. I also added in the fact of why police did not have probable cause to arrest the protesters over this because no dispersal order was given, which like in DC and the Capitol is required prior to arresting protesters/ groups of people.4) While a steady stream of protesters continued onto the walkway, a group of protesters stopped and stood facing the police on the ramp constituting the vehicular entrance to the Bridge at a distance of approximately twenty feet. By this time, a large crowd of demonstrators had pooled behind that lead group. Given the size and density of the crowd, it would clearly have been impossible for vehicles to enter the bridge using the ramp at that location. At this point, all the video evidence confirms that the march had divided; one group was proceeding across the Bridge via the pedestrian walkway, while a second group had moved onto the vehicular roadway, where they were blocked by a line of police.An officer on the vehicular ramp stepped forward with a bullhorn and made an announcement. The officer can clearly be heard repeating several times into the bullhorn: "I am asking you to step back on the sidewalk, you are obstructing traffic." Plaintiffs allege that these statement were "generally inaudible," and the video excerpts they have provided are consistent with that allegation. Two minutes later the same officer announced into the bullhorn: "You are obstructing vehicular traffic. If you refuse to move, you are subject to arrest," and "If you refuse to leave, you will be placed under arrest and charged with disorderly conduct." While it is clear that at least some

marchers at the front of the crowd heard this announcement, plaintiffs allege that the officers knew that their warnings or orders to disperse would not have been audible to the vast majority of those assembled. There was considerable noise and confusion at the scene.Comparisons: In Garcia, the police first gave a dispersal order and a threat of arrest, something that officers did not do for me. Further, it would appear that the plaintiffs, though not able to hear the police, would've recognized a few things. First, that the main part of the protest/ approved part of the protest was going the opposite way. Second, this was not the protest plan (unlike our plan, to march to the Capitol). Third, that police were instead of guiding them towards their known destination (as they were earlier), were now facing them and probably pointing to go the other direction. Again, a common person would know that they have no 1st amendment right to block traffic to a major bridge in NYC. The same can't be said for being allowed to protest in the Peoples house as a United States citizen.5) A minute and a half after the second announcement, the officers and city officials in the lead group turned around and began walking unhurriedly onto the Bridge roadway with their backs to the protesters. The protesters began cheering and followed the officers onto the roadway in an orderly fashion about twenty feet behind the last officer. The protesters on the roadway then encouraged those on the pedestrian walkway to "come over," and the videos show several protesters jumping down from the pedestrian walkway onto the roadway, though for the most part the marchers on the pedestrian walkway continued their progress on the walkway and did not enter the vehicular lanes. Protesters initially walked up the Bridge via the first (northernmost) entry ramp, but they eventually blocked the second and third ramps as well and occupied all of the Bridge's eastbound traffic lanes, preventing any cars from moving onto the Bridge in that direction.Comparisons: Unlike in my case, the present protesters in Garcia were given a second order to disperse. I was given none, and told the opposite. Again, it is clear, there would be no 1st amendment rights confusion over pedestrians being allowed to block the Brooklyn Bridge.6) Midway across the Bridge, the officers in front of the line of marchers turned and stopped all forward movement of the demonstration. An officer announced through a bullhorn that those on the roadway would be arrested for disorderly conduct. Plaintiffs allege that this announcement was also inaudible. Officers blocked movement in both directions along the Bridge roadway and "prevented dispersal through the use of orange netting and police vehicles." The officers then methodically arrested over seven hundred people who were on the Bridge roadway. Comparisons: Unlike in my case, officers then gave a third warning through a bull horn to protesters on the road blocking traffic. Again, I was given none, and in fact, was told the opposite.7) Nevertheless, plaintiffs do not allege that any officer explicitly stated that the marchers would be permitted to advance along the vehicular lanes of the Bridge. Nor does any plaintiff allege that he or she observed any officer beckon to the demonstrators or state by word or gesture that they were welcome to proceed. Comparisons: This is also a major difference. Unlike the plaintiffs in Garcia, I have shared that an officer gave me explicit/ express permission to be in the capitol, protesting as I was/ others around me were. I've also shared that he told me how far I could go, when I had to leave, and gave additional rules. I've also, unlike the plaintiffs in Garcia, shared that I observed body language and facial expressions, and even other factors that supported that the police were letting us in. Unlike in the Garcia case, the in-actions I witnessed go to support my other claims, where as Garcia only had inactions to rely on. The inactions alone caused the District court to say they were estopped (see #8), and caused confusion for a while in the 2nd circuit. My case would have not been so confusing, and given its strength in the areas that caused the Garcia case to throw away the entrapment by estoppel defence, the same would not have happened for me. The two cases are

very different.8) The district court held that the allegations in the Complaint, if true, established that a reasonable officer would have known that he did not have probable cause to arrest plaintiffs. The district court further held that while plaintiffs had clearly violated the law by entering the Bridge roadway and blocking vehicular traffic, based on the facts alleged, no reasonable police officer could believe that plaintiffs had received fair warning that their behavior was illegal, as required by law. The district court concluded that while New York's disorderly conduct statute would normally have given protesters fair warning not to march on the roadway, it did not do so here, where defendants, who had been directing the march along its entire course, seemed implicitly to sanction the protesters' movement onto the roadway.9) It cannot be said that the officers here disregarded known facts clearly establishing a defense. In the confused and boisterous situation confronting the officers, the police were aware that the demonstrators were blocking the roadway in violation of § 240.20(5). They were also certainly aware that no official had expressly authorized the protesters to cross the Bridge via the roadway. To the contrary, the officers would have known that a police official had attempted to advise the protesters through a bullhorn that they were required to disperse. While reasonable officers might perhaps have recognized that much or most of the crowd would be unable to hear the warning due to the noise created by the chanting protesters, it was also apparent that the front rank of demonstrators who presumably were able to hear exhibited no signs of dispersing.Comparisons: Unlike in Garcia, the Capitol police clearly were allowing such conduct. It had been expressed through various channels and ways. There was no bull horns used to order a dispersal where I was despite that in the 1970s they (Police and DC circuit) knew that even a bullhorn was too weak to reach huge crowds and had a giant sound system to reach large crowds over the roar of the crowd.10) The Complaint and videotapes are devoid of any evidence that any police officer made any gesture or spoke any word that unambiguously authorized the protesters to continue to block traffic, and indeed the Complaint does not allege that any of the plaintiffs observed any such gesture.Comparisons: Just in my direct videos, there is tons of evidence that police officers made gestures and spoke words that authorized or supported the idea of authorization that we were allowed to enter, remain, protest as we were, and even go further into the building. The plaintiffs in Garcia don't even allege such things, let alone have any evidence for such claims.11) Plaintiffs rely on the Supreme Court's decision in Cox v. Louisiana to argue that, in light of their apparent earlier passivity in the face of the march, police officers had to provide the protesters with "fair warning" before changing course and effecting any arrests. See 379 U.S. 559, 574, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965). But the facts of that case differ significantly from those at issue here. In Cox, a large group of demonstrators protesting on the street opposite a courthouse were arrested and charged with violating a statute that prohibited "picket[ing] or parad[ing] in or near a building housing a court of the State of Louisiana." Cox, the leader of the demonstrators, testified to an explicit conversation with police officials in which he had been given "permission" to conduct the demonstration on the far side of the street, some 101 feet from the courthouse steps. Comparison: The reason the court denied the Garcia plaintiffs to claim similarity with Cox was because Cox was given explicit permission from an officer he had a conversation with to protest where he was, as he was. Unlike the Plaintiffs in Garcia, I too testified to having a conversation with an officer who gave me permission to protest where I was, where I would go, and as I was/ others were. Not to mention all the other factors shared above and below in the other comparisons.12) The circumstances in this case are quite different. Unlike the "unspecific" statutory command in Cox , § 240.20(5)'s prohibition against obstructing traffic is hardly vague, and it would have been clear to any person (and certainly to a reasonable police

officer) that the protesters were occupying a location where they were not ordinarily permitted to be. Comparisons: Again, who thinks they are welcome to occupy a highway on foot for a protest? No one. Who thinks they are welcome to protest across the street from a court house? Most people who live near that court house. Who thinks they are welcome to protest inside The Peoples House? Most people in the United States.13) Also unlike Cox , there was no explicit consultation between the leaders of the demonstration and the police about what conduct would be permitted. Comparison: As I've testified to, I had an explicit consultation with an officer about what conduct would be permitted and not permitted.14) Nor was there any express statement from any police official authorizing the protesters to cross the Bridge on the vehicular roadway, opining that doing so would be lawful, or waiving the enforcement of any traffic regulation. Comparison: Clearly, the police were authorizing people who were protesting where I was, as I was, and when I was.15) Most importantly, no plaintiff alleges in the Complaint that he or she heard any statement from any police officer authorizing the protesters to cross the Bridge via the vehicular roadway, or observed any unambiguous indication from any police officer inviting the protesters to cross the Bridge in that manner. Nor is any such statement or gesture recorded in the videotapes submitted by the parties and incorporated into the Complaint by reference. Indeed, most of the plaintiffs allege that they did not see anything the police officers did, and simply "followed the march" as it proceeded across the Bridge.Comparisons: Again, unlike plaintiffs in Garcia, I do allege such things, and have evidence for such things on video. Even supportive gestures are shown in my videos. Unlike plaintiffs in Garcia, I first observed police prior to entering rather than just following the crowd into the building and taking the crowd at their word that the police were letting us in.16) An officer still has probable cause to arrest, and certainly is entitled to qualified immunity, so long as any such defense rests on facts that are so unclear, or a legal theory that is not so clearly established, that it cannot be said that any reasonable officer would understand that an arrest under the circumstances would be unlawful. Reichle v. Howards, ⸺ U.S. ⸺, 132 S.Ct. 2088 2093, 182 L.Ed.2d 985 (2012) ; see also Messerschmidt v. Millender, ⸺ U.S. ⸺, 132 S.Ct. 1235 1244, 182 L.Ed.2d 47 (2012).Comments/ Comparison: I share this because I want the court to be reminded what the DC circuit court said in Barham V. Ramsey (and also in Carr V. District of Columbia/ Dellums V. Powell) when the police chief knew that a dispersal order had not been given to the people prior to arrest. The DC circuit said (unlike in Garcia) that the police chief knew there was no dispersal order given, and yet arrested them, which not only caused the criminal charges to be dismissed, but caused him to lose his qualified immunity in that case. My case is similar to the Barham case in that no dispersal order was given to me/ around me. In fact, it's even more extreme because I received express permission to do what I was doing and had many officers further support that through implied actions and inactions. The Barham recognized that DC (the park in this case) is a confusing place regarding 1st amendment rights, and that no dispersal order was given. Barham officers made more clear failures than Garcia, and the officers in my case made more clear failures than in Barham. My case and the Garcia case are very different.17) As a matter of law, Cox establishes that, under some circumstances, demonstrators or others who have been advised by the police that their behavior is lawful may not be punished for that behavior. The extent of that principle is less than clear, and we need not decide here how far it might extend.Comments: Unlike in Garcia, it is clear the agency was allowing certain conduct, and it is also clear that I was given permission to do what I was doing. Very different cases.18) Plaintiffs also rely on our holding in Papineau v. Parmley, 465 F.3d 46 (2d Cir.2006), which denied qualified immunity to officers who arrested peaceful protesters without first giving them "fair warning" through an order to

disperse. Papineau is inapposite, however. In Papineau, plaintiffs were protesting on private property bordering a public highway when a handful of protesters briefly entered the highway to distribute pamphlets. Once all participants were back on the property, police officers entered and began arresting protesters indiscriminately and without advance warning. Because the protest in Papineau occurred on private property and posed no danger of "imminent harm" at the time of the arrests, plaintiffs neither needed permission from the police to engage in that protest nor, absent clear orders to disperse, had any notice that they might be engaging in unlawful conduct.

Read at 3:24 PM

3:24 PM

;kjg;jhv

Read at 4:42 PM

4:45 PM

Ryan please add this 1 paragrapgh to the end of motion 2, part 3 of 5, it got cut off. :----Comments: Cox and others were told to leave by police when police felt they were breaking the law, Cox and the protesters ignored them and did not leave. I left on my own, thanking officers and wishing them a good day as I walked away peacefully. Yet Cox still had his charges thrown away due to entrapment by estoppel.----------------------------------------------Ryan: Motion 2 of 7, Part 4 of 5---6) Two of the Sheriff's deputies immediately started across the street and told the group, "You have heard what the Sheriff said, now, do what he said." A state witness testified that they put their hands on the shoulders of some of the students "as though to shove them away." Comments: Cox received a second dispersal order, he still did not listen given the time frame between this order and tear gas being sent out (see next).7) Almost immediately thereafter—within a time estimated variously at two to five minutes—one of the policemen exploded a tear gas shell at the crowd. This was followed by several other shells. The demonstrators quickly dispersed, running back towards the State Capitol and the downtown area; Cox tried to calm them as they ran and was himself one of the last to leave.Comments: Cox tried to calm/ keep protesters present despite the tear gas and dispersal orders. I didn't, someone shoots tear gas at me I'm leaving. If a police officer tells me to leave, I'm leaving.8) No [civilians] participating in the demonstration were arrested on that day. The next day appellant was arrested and charged with the four offenses above described.Comments: Like me, Cox went home and was later arrested and charged for his actions at the protest. Unlike me, he was charged by the same agency he disobeyed dispersal orders from. 9) Appellant was convicted of violating a Louisiana "disturbing the peace" statute.. "And who fails or refuses to disperse and move on * * * when ordered so to do by any law enforcement officer of any municipality, or parish...shall be guilty of disturbing the peace." LSA-Rev.Stat. § 14:103.1 (Cum.Supp.1962). Comments: This is similar to my disorderly conduct charge. Like MPD and Capitol police Manuals/ court decisions require them to issue a dispersal order in order to be found guilty/ be arrested, so too does Cox's charge here.10) Cox was charged with an obstruction charge: OBSTRUCTING PUBLIC PASSAGE Louisiana statute, LSA-Rev.Stat. § 14:100.1 (Cum.Supp.1962), which provides:"No person shall wilfully obstruct the free, convenient and normal use of any public sidewalk, street,

highway, bridge, alley, road, or other passageway, or the entrance, corridor or passage of any public building, structure, watercraft or ferry, by impeding, hindering, stifling, retarding or restraining traffic or passage thereon or therein.Comments: I too was charged with an obstruction charge. My only felony, 18 U.S.C. §1512(C)(2).11) In upholding appellant's conviction under this statute...There is no doubt from the record in this case that this far sidewalk was obstructed, and thus...appellant violated the statute.Comments: Though I disagree for various reasons, the government argues my mere presence in the Capitol obstructed an official proceeding.12) The control of travel on the streets is a clear example of governmental responsibility to insure this necessary order. A restriction in that relation, designed to promote the public convenience in the interest of all, and not susceptible to abuses of discriminatory application, cannot be disregarded by the attempted exercise of some civil right...Comments: Similarly, the government recognizes the importance of ensuring that Congress can due its duty (in this case to certify a stolen election) and is able to do so with the necessary order. Please, for the purposes of the next number, take notice of "and not susceptible to abuses of discriminatory application".13) But here it is clear that the practice in Baton Rouge allowing unfettered discretion in local officials in the regulation of the use of the streets for peaceful parades and meetings is an unwarranted abridgment of appellant's freedom of speech and assembly secured to him by the First Amendment, as applied to the States by the Fourteenth Amendment. It follows, therefore, that appellant's conviction for violating the statute as so applied and enforced must be reversed.Comments: Here too the federal government has shown it is selective in who it charges/ doesn't charge with a 1512. Take a look at Tigthe Barry who has done so 7 times and has never been charged with a 1512 because he is a democrat. My favorite comparisons are on his personal obstructing Brett Kavanuagh's proceeding, and his 2 violent contempt of courts while on pre-trial release, all of which he served 12 hours in jail for and paid a 10 dollar fine, which the government even moved to drop that. Less than 1.25 years later, and my selective magistrate judge went crazy on the restrictions for me despite having no criminal history, and being more accomplished than Barry... Those who don't learn from history are doomed to repeat it!14) For the reasons discussed above the judgment of the Supreme Court of Louisiana is reversed.Comments: For that reason (selective prosecution) I should not be charged with the 1512...15) Not argument, just love this point from Cox: Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech * * * is * * * protected against censorship or punishment * *. There is no room under our Constitution for a more restrictive view. For the alternative would lead to standardization of ideas either by legislatures, courts, or dominant political or community groups." Terminiello v. City of Chicago, 337 U.S. 1, 4-5, 69 S.Ct. 894, 93 L.Ed. 1131. In Terminiello convictions were not allowed to stand because the trial judge charged that speech of the defendants could be punished as a breach of the peace " 'if it stirs the public to anger, invites dispute, brings about a condition of unrest, or creates a disturbance, or if it molests the inhabitants in the enjoyment of peace and quiet by arousing alarm.' " Id., 337 U.S., at 3, 69 S.Ct., at 895. Maintenance of the opportunity for free political discussion is a basic tenet of our constitutional democracy.Comments: I share this because the government said it was not my actions on 1/6/21 that were the most concerning, it was my speech after 1/6/21... They've targeted me mainly because of my speech... They threw me in jail because of lies(they broke the BRA), and to punish me for my speech...Section 7: United States V. Gutierrez-Gonzales, 184 F.3d 1160 (10th Cir. 1999) Background: The Defendant, Mr. Gutierrez-Gonzalez, was convicted of reentry subsequent to deportation following an aggravated

felony (second degree murder), in violation of 8 U.S.C. 1326(a)(1)&(2) and 8 U.S.C. 1326(b)(2). On appeal, Mr. Gutierrez-Gonzalez alleged that the district court erred in not considering his defense of entrapment by estoppel....Why the court denied his entrapment by estoppel defence: 1) Mr. Gutierrez-Gonzalez received and signed an Advisal of Penalty for Reentry Form informing him in his native tongue of the penalties which can be imposed should he return to this country after deportation without obtaining permission from the Attorney General. 2) Gonzalez then for a third time illegally entered the country, without obtaining permission from the Attorney General. Upon applying for a work permit, he was told that they could not give him a green card. He then shared that he knew he was in the country illegally.3) Mr. Gutierrez-Gonzalez then applied for a change of status (not with the Attorney General) and lied by saying that he never was deported. He then signed the form, certifying "under penalty of perjury . . . that this application, and the evidence submitted with it, is all true and correct."4) Mr. Gutierrez-Gonzalez (still in the United States illegally) then took his application for adjustment of status to an INS office in Texas, for processing. When submitting the application, he told the INS clerk that he was in the United States illegally. Regardless, the INS clerk issued him a work authorization permit (Form I-688B). However, the clerk specifically informed Mr. Gonzalez that the work permit was not an entry document.5) Gonzalez was found by agents after being placed in jail for committing more crimes. He was then charged by boarder patrol agents. The statute under which Mr. Gutierrez-Gonzalez was convicted states in relevant part: ...The statute expressly excludes any specific intent regarding entry into the United States and makes it a crime for a deported alien to be found "at any time" in this country "unless" he has the "express" consent of the Attorney General. "nothing more than a showing of general intent is required" and "the government need not show that defendant willfully and knowingly engaged in criminal behavior, but only that the defendant's acts were willful and knowing that the defendant willfully and knowingly reentered the United States and that he did so without the Attorney General's permission."...by excluding a specific intent requirement, Congress placed the burden of correctly obtaining permission from the Attorney General and reentering the United States legally on the alien.6) Gonzalez does not challenge the fact that the government proved every element of the crime required by the statute: that Mr. Gutierrez-Gonzalez was (1) knowingly in the United States, (2) without the permission of the Attorney General, (3) after prior deportation for an aggravated felony. Rather, Mr. Gutierrez-Gonzalez argues that the government should be estopped from prosecuting him because an "agent of the government" led Mr. Gutierrez-Gonzalez to believe that he was in the country legally. Mr. Gutierrez-Gonzalez contends that he reasonably believed he was in the United States legally as a result of his interaction with Diocesan Services and the issuing of a work permit by the INS. 7) Diocesan Services is not licensed by the government. It is not a government agency.8) Finally, Gonzalez argues that the INS "affirmatively misled him as to the state of the law" and that he "relied on that misrepresentation," when the INS clerk issued him a temporary work permit.... Gonzalez did not inform the INS clerk that he had previously been deported from the United States. Rather, Gonzalez submitted a fraudulent application that affirmatively stated that he had never been deported. The INS clerk specifically informed Mr. Gutierrez-Gonzalez that the work permit "was not an entry document." Under these facts, even if an INS clerk could be considered an "agent of the government" charged with interpreting, administering or enforcing immigration law and the actions in this case considered "active misleading" as to the state of the law, Mr. Gonzalez's alleged "belief" that he was in the United States legally was not reasonable.Overall Comparisons: For me to be in a semi-similar situation as Gonzelez I would've had to: have been convicted of

trespassing into the Capitol twice, have been also convicted of murder while inside the Capitol, and I then would've had to sign a document stating "I agree and understand that I'm never to enter the Capitol again unless I get written permission from the Attorney General himself, and that no one else may give me that permission, no matter their actual or apparent authority". I'd have to then go into the Capitol a third time, clearly knowing I'm not allowed to legally be there. I'd have to have even stated this to others while inside. Then I'd have to commit perjury when asked if I've ever been arrested in the Capitol before. I'd then have to be arrested for committing a separate crime in the Capitol. Then I'd have to claim that some lady who doesn't work for the government told me I could be in the Capitol, even though there was clear evidence that she didn't say such things, and that I even shared that I knew I was breaking the law... Finally, like Gonzalez, I'd have to be charged with a statute that doesn't require any intention of wrong doing to be convicted... Clearly, my case is nothing like this and no judge, even on heavy drugs, would ever come close to thinking that man deserved an entrapment by estoppel defence. It is sad the government chooses cases like this to suggest that you too should deny my entrapment by estoppel defence. Clearly, they have no valid arguments! Pathetic!Section 8: Garcia v. Doe, 779 F.3d 84 2nd Cir.The government cites this case as to why I should be stopped from arguing that law enforcement inaction made my conduct on January 6th lawful.I'm not suggesting that police inaction made my conduct lawful. Entrapment by estoppel doesn't make illegal actions lawful, it eliminates criminal liability even if all the elements of the charges are met.With that out of the way, the government points out that in Garcia, the entrapment by estoppel defence was not allowed despite that those charged argued their conduct had been implicity approved by police, but could not show it was affirmatively approved by police.Before I point out the differences and problems with this case comparison, please take note, the 2nd circuit appellate court multiple times were leaning towards allowing such a defence despite these circumstances (see there 2014 ruling on this case), so this wasn't so simple for the 2nd circuit, and the District court thought the inactions were enough to warrant this defence (even though it had less compelling circumstances than my case). But, as my comparisons will show, my case is much stronger and very different from the Garcia case. 1) The 2014 court affirmed the judgment of the District court because the court could not resolve at this early stage the ultimately factual issue of whether certain defendants implicitly invited the demonstrators to walk onto the roadway of the Brooklyn Bridge, which would otherwise have been prohibited by New York law.Note: The court was willing to accept the potential that police had given the implied permission to protest on a highway/bridge, despite that normally, they clearly wouldn't be allowed to.Comparison: A highway is rarely thought of as a place we have a right to protest on foot. Compare that to the Capitol building, a place so confusing the Capitol Police and Circuit courts made it a point to not arrest people prior to warning them of arrest, and a dispersal order. It arguably is the most confusing area in the world. Many people are confused over what they are allowed to do, even locals. You can't say the same for a highway. Almost all citizens have experienced a high-way, there is not confusion over whether people are allowed to protest on it, let alone block it. The protesters entering the highway would've had no purpose of entering it other than to cause chaos. Most citizens have never been to the Capitol, indeed, even many locals have never been to the Capitol building. Unlike me, I was entering what I thought I had a personal right to, and in order to protest, what many people go to the Capitol to do! 2) On October 1, 2011, thousands of demonstrators marched through Lower Manhattan to show support for the Occupy Wall Street movement. Although no permit for the march had been sought, the New York City Police Department was aware of the planned event in advance.Comparisons: Our group had a permit to

march to the Capitol, and if I recall (it's been over a year since I had this particular discovery (DC jail stole it)) to protest on certain areas of the Grounds.3) When the march arrived at the Manhattan entrance to the Bridge, police, including command officials, and other city officials watched as the protesters poured across Centre Street towards the Bridge. A bottleneck soon developed, creating a large crowd at the entrance to the Bridge's pedestrian walkway. While video footage suggests that the crowd waiting to enter the pedestrian walkway blocked traffic on Centre Street, defendants do not contend that they had probable cause to arrest plaintiffs for their obstruction of traffic at that point, as opposed to their later obstruction of traffic on the Bridge roadway (Because no order of dispersal was given). Indeed, plaintiffs alleged in their Complaint that the police themselves stopped vehicular traffic on Centre Street near the entrance to the Bridge before the majority of the marchers arrived at the entrance.Comments: This was an understandable action taken by police because unlike what would happen later, it would appear this bottle neck was not a purposeful action caused to create chaos or interrupt traffic. I also added in the fact of why police did not have probable cause to arrest the protesters over this because no dispersal order was given, which like in DC and the Capitol is required prior to arresting protesters/ groups of people.4) While a steady stream of protesters continued onto the walkway, a group of protesters stopped and stood facing the police on the ramp constituting the vehicular entrance to the Bridge at a distance of approximately twenty feet. By this time, a large crowd of demonstrators had pooled behind that lead group. Given the size and density of the crowd, it would clearly have been impossible for vehicles to enter the bridge using the ramp at that location. At this point, all the video evidence confirms that the march had divided; one group was proceeding across the Bridge via the pedestrian walkway, while a second group had moved onto the vehicular roadway, where they were blocked by a line of police.An officer on the vehicular ramp stepped forward with a bullhorn and made an announcement. The officer can clearly be heard repeating several times into the bullhorn: "I am asking you to step back on the sidewalk, you are obstructing traffic." Plaintiffs allege that these statement were "generally inaudible," and the video excerpts they have provided are consistent with that allegation. Two minutes later the same officer announced into the bullhorn: "You are obstructing vehicular traffic. If you refuse to move, you are subject to arrest," and "If you refuse to leave, you will be placed under arrest and charged with disorderly conduct." While it is clear that at least some marchers at the front of the crowd heard this announcement, plaintiffs allege that the officers knew that their warnings or orders to disperse would not have been audible to the vast majority of those assembled. There was considerable noise and confusion at the scene.Comparisons: In Garcia, the police first gave a dispersal order and a threat of arrest, something that officers did not do for me. Further, it would appear that the plaintiffs, though not able to hear the police, would've recognized a few things. First, that the main part of the protest/ approved part of the protest was going the opposite way. Second, this was not the protest plan (unlike our plan, to march to the Capitol). Third, that police were instead of guiding them towards their known destination (as they were earlier), were now facing them and probably pointing to go the other direction. Again, a common person would know that they have no 1st amendment right to block traffic to a major bridge in NYC. The same can't be said for being allowed to protest in the Peoples house as a United States citizen.5) A minute and a half after the second announcement, the officers and city officials in the lead group turned around and began walking unhurriedly onto the Bridge roadway with their backs to the protesters. The protesters began cheering and followed the officers onto the roadway in an orderly fashion about twenty feet behind the last officer. The protesters on the roadway then encouraged those on the pedestrian walkway to

"come over," and the videos show several protesters jumping down from the pedestrian walkway onto the roadway, though for the most part the marchers on the pedestrian walkway continued their progress on the walkway and did not enter the vehicular lanes. Protesters initially walked up the Bridge via the first (northernmost) entry ramp, but they eventually blocked the second and third ramps as well and occupied all of the Bridge's eastbound traffic lanes, preventing any cars from moving onto the Bridge in that direction.Comparisons: Unlike in my case, the present protesters in Garcia were given a second order to disperse. I was given none, and told the opposite. Again, it is clear, there would be no 1st amendment rights confusion over pedestrians being allowed to block the Brooklyn Bridge.6) Midway across the Bridge, the officers in front of the line of marchers turned and stopped all forward movement of the demonstration. An officer announced through a bullhorn that those on the roadway would be arrested for disorderly conduct. Plaintiffs allege that this announcement was also inaudible. Officers blocked movement in both directions along the Bridge roadway and "prevented dispersal through the use of orange netting and police vehicles." The officers then methodically arrested over seven hundred people who were on the Bridge roadway. Comparisons: Unlike in my case, officers then gave a third warning through a bull horn to protesters on the road blocking traffic. Again, I was given none, and in fact, was told the opposite.7) Nevertheless, plaintiffs do not allege that any officer explicitly stated that the marchers would be permitted to advance along the vehicular lanes of the Bridge. Nor does any plaintiff allege that he or she observed any officer beckon to the demonstrators or state by word or gesture that they were welcome to proceed. Comparisons: This is also a major difference. Unlike the plaintiffs in Garcia, I have shared that an officer gave me explicit/ express permission to be in the capitol, protesting as I was/ others around me were. I've also shared that he told me how far I could go, when I had to leave, and gave additional rules. I've also, unlike the plaintiffs in Garcia, shared that I observed body language and facial expressions, and even other factors that supported that the police were letting us in. Unlike in the Garcia case, the in-actions I witnessed go to support my other claims, where as Garcia only had inactions to rely on. The inactions alone caused the District court to say they were estopped (see #8), and caused confusion for a while in the 2nd circuit. My case would have not been so confusing, and given its strength in the areas that caused the Garcia case to throw away the entrapment by estoppel defence, the same would not have happened for me. The two cases are very different.8) The district court held that the allegations in the Complaint, if true, established that a reasonable officer would have known that he did not have probable cause to arrest plaintiffs. The district court further held that while plaintiffs had clearly violated the law by entering the Bridge roadway and blocking vehicular traffic, based on the facts alleged, no reasonable police officer could believe that plaintiffs had received fair warning that their behavior was illegal, as required by law. The district court concluded that while New York's disorderly conduct statute would normally have given protesters fair warning not to march on the roadway, it did not do so here, where defendants, who had been directing the march along its entire course, seemed implicitly to sanction the protesters' movement onto the roadway.9) It cannot be said that the officers here disregarded known facts clearly establishing a defense. In the confused and boisterous situation confronting the officers, the police were aware that the demonstrators were blocking the roadway in violation of § 240.20(5). They were also certainly aware that no official had expressly authorized the protesters to cross the Bridge via the roadway. To the contrary, the officers would have known that a police official had attempted to advise the protesters through a bullhorn that they were required to disperse. While reasonable officers might perhaps have recognized that much or most of the crowd would be unable to hear the warning

due to the noise created by the chanting protesters, it was also apparent that the front rank of demonstrators who presumably were able to hear exhibited no signs of dispersing.Comparisons: Unlike in Garcia, the Capitol police clearly were allowing such conduct. It had been expressed through various channels and ways. There was no bull horns used to order a dispersal where I was despite that in the 1970s they (Police and DC circuit) knew that even a bullhorn was too weak to reach huge crowds and had a giant sound system to reach large crowds over the roar of the crowd.10) The Complaint and videotapes are devoid of any evidence that any police officer made any gesture or spoke any word that unambiguously authorized the protesters to continue to block traffic, and indeed the Complaint does not allege that any of the plaintiffs observed any such gesture.Comparisons: Just in my direct videos, there is tons of evidence that police officers made gestures and spoke words that authorized or supported the idea of authorization that we were allowed to enter, remain, protest as we were, and even go further into the building. The plaintiffs in Garcia don't even allege such things, let alone have any evidence for such claims.11) Plaintiffs rely on the Supreme Court's decision in Cox v. Louisiana to argue that, in light of their apparent earlier passivity in the face of the march, police officers had to provide the protesters with "fair warning" before changing course and effecting any arrests. See 379 U.S. 559, 574, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965). But the facts of that case differ significantly from those at issue here. In Cox, a large group of demonstrators protesting on the street opposite a courthouse were arrested and charged with violating a statute that prohibited "picket[ing] or parad[ing] in or near a building housing a court of the State of Louisiana." Cox, the leader of the demonstrators, testified to an explicit conversation with police officials in which he had been given "permission" to conduct the demonstration on the far side of the street, some 101 feet from the courthouse steps. Comparison: The reason the court denied the Garcia plaintiffs to claim similarity with Cox was because Cox was given explicit permission from an officer he had a conversation with to protest where he was, as he was. Unlike the Plaintiffs in Garcia, I too testified to having a conversation with an officer who gave me permission to protest where I was, where I would go, and as I was/ others were. Not to mention all the other factors shared above and below in the other comparisons.12) The circumstances in this case are quite different. Unlike the "unspecific" statutory command in Cox , § 240.20(5)'s prohibition against obstructing traffic is hardly vague, and it would have been clear to any person (and certainly to a reasonable police officer) that the protesters were occupying a location where they were not ordinarily permitted to be. Comparisons: Again, who thinks they are welcome to occupy a highway on foot for a protest? No one. Who thinks they are welcome to protest across the street from a court house? Most people who live near that court house. Who thinks they are welcome to protest inside The Peoples House? Most people in the United States.13) Also unlike Cox , there was no explicit consultation between the leaders of the demonstration and the police about what conduct would be permitted. Comparison: As I've testified to, I had an explicit consultation with an officer about what conduct would be permitted and not permitted.14) Nor was there any express statement from any police official authorizing the protesters to cross the Bridge on the vehicular roadway, opining that doing so would be lawful, or waiving the enforcement of any traffic regulation. Comparison: Clearly, the police were authorizing people who were protesting where I was, as I was, and when I was.15) Most importantly, no plaintiff alleges in the Complaint that he or she heard any statement from any police officer authorizing the protesters to cross the Bridge via the vehicular roadway, or observed any unambiguous indication from any police officer inviting the protesters to cross the Bridge in that manner. Nor is any such statement or gesture recorded in the videotapes submitted by the parties and incorporated into the Complaint by reference. Indeed,

most of the plaintiffs allege that they did not see anything the police officers did, and simply "followed the march" as it proceeded across the Bridge.Comparisons: Again, unlike plaintiffs in Garcia, I do allege such things, and have evidence for such things on video. Even supportive gestures are shown in my videos. Unlike plaintiffs in Garcia, I first observed police prior to entering rather than just following the crowd into the building and taking the crowd at their word that the police were letting us in.16) An officer still has probable cause to arrest, and certainly is entitled to qualified immunity, so long as any such defense rests on facts that are so unclear, or a legal theory that is not so clearly established, that it cannot be said that any reasonable officer would understand that an arrest under the circumstances would be unlawful. Reichle v. Howards, —— U.S. ——, 132 S.Ct. 2088 2093, 182 L.Ed.2d 985 (2012) ; see also Messerschmidt v. Millender, —— U.S. ——, 132 S.Ct. 1235 1244, 182 L.Ed.2d 47 (2012).Comments/ Comparison: I share this because I want the court to be reminded what the DC circuit court said in Barham V. Ramsey (and also in Carr V. District of Columbia/ Dellums V. Powell) when the police chief knew that a dispersal order had not been given to the people prior to arrest. The DC circuit said (unlike in Garcia) that the police chief knew there was no dispersal order given, and yet arrested them, which not only caused the criminal charges to be dismissed, but caused him to lose his qualified immunity in that case. My case is similar to the Barham case in that no dispersal order was given to me/ around me. In fact, it's even more extreme because I received express permission to do what I was doing and had many officers further support that through implied actions and inactions. The Barham recognized that DC (the park in this case) is a confusing place regarding 1st amendment rights, and that no dispersal order was given. Barham officers made more clear failures than Garcia, and the officers in my case made more clear failures than in Barham. My case and the Garcia case are very different.17) As a matter of law, Cox establishes that, under some circumstances, demonstrators or others who have been advised by the police that their behavior is lawful may not be punished for that behavior. The extent of that principle is less than clear, and we need not decide here how far it might extend.Comments: Unlike in Garcia, it is clear the agency was allowing certain conduct, and it is also clear that I was given permission to do what I was doing. Very different cases.

Read at 10:09 PM

10:09 PM

wfwfefewfwef

Read at 11:22 AM

Yesterday (US/Eastern)

11:24 AM

Ryan: Motion 2 of 7, Part 5 of 518) Plaintiffs also rely on our holding in Papineau v. Parmley, 465 F.3d 46 (2d Cir.2006), which denied qualified immunity to officers who arrested peaceful protesters without first giving them "fair warning" through an order to disperse. Papineau is inapposite, however. In Papineau, plaintiffs were protesting on private property bordering a public highway when a handful of protesters briefly entered the highway to distribute pamphlets.

Once all participants were back on the property, police officers entered and began arresting protesters indiscriminately and without advance warning. Because the protest in Papineau occurred on private property and posed no danger of "imminent harm" at the time of the arrests, plaintiffs neither needed permission from the police to engage in that protest nor, absent clear orders to disperse, had any notice that they might be engaging in unlawful conduct.Comparisons: Though the situation involves private property, I want to point out some quick things. The protesters in Papineau were protesting mostly in an area where they had a personal interest and ownership in. The protesters in Garcia cannot claim the same for a highway. However, Capitol Police recognize that many people believe that they too have an interest/ ownership in the Capitol building similar to that of their own personal (but shared) private property, hence the name "The Peoples house", and the chants of "Our house". Additionally, as mentioned, those in Garcia had 3 separate dispersal orders prior to arrest, I and those in Papineau did not. Finally, unlike both cases, I was given express and implied permission to do what I was doing by police.Final Comment: Our (protesters who were protesting as I was) grant of permission could be shown by officers not arresting any of the protesters there around me whether the protesters out numbered them, or vice versa. It is also shown in other areas of the building where police vastly outnumbered the protesters, they did not arrest many of them. Almost all arrests made that day were from violent protesters, or those who broke curfew. The arrests for those who behaved as I did were made between the next day, all the way to the following years after the incident, and by an entire different agency (FBI). In the Garcia case, though vastly outnumbered by a court described hostile crowd, the arrests were made at that point. The agency quickly made it clear that such actions were not being allowed. I did get express permission, and later I got directions to go further into the building. These protesters did not get permission, nor did they get directions to go further down the bridge ramps/ highway... That is why (along with the many other factors expressed in previous numbers) the Court did not allow an entrapment by estoppel defence.Part 5:Entrapment By Estoppel Related Motions:1) For the government to explain why both MPD and capitol police didn't order a dispersal near me/ for me, nor share the laws I was breaking, nor give me time to disperse after hearing that I was breaking those laws. (See Part 4, section 2, #1)1.1) Both MPD and Capitol police know not doing so has caused cases to be dismissed and/ or for the officers to be sued/ lose their qualified immunity (See Baram, Dellums, Carr, etc.). It's their duty to explain and do such things prior to arresting anyone involved in a demonstration or riot. In cases where they have failed to do this the charges have been thrown out and/ or the convictions have been thrown out. (See Part 4, section 2, #1)2) To have a hearing (adequate notice please, unlike your surprise and unrequested bond hearing 10/12/21 you gave me) to determine if my arrest was proper since MPD and Capitol Police failed to do their duty in giving me a dispersal order, telling me what law I was breaking, or giving me adequate time to respond to such information. (See Part 4, section 2, #1)3)To dismiss my charges since both MPD and Capitol Police failed to do this/ their duty.3.1) The government has the burden to show that this was done for me. Worse for them, they know I have multiple videos to show officers doing the opposite of telling me to leave or that I was breaking the law. (See Part 4, section 2, #1)4) Motion to include the Dellums court Jury instruction on the matter of a dispersal order:Comments: The jury instruction can be shown in Part 4, Section 2, number 16. 5) Colloquy into why the officers who moved the gates/ barriers and let people pass couldn't be identified when there was a maximum of 4,000 officers present yet they were able to identify people in the crowd with masks on from every state out of hundreds of millions of people.6) Motion to admit officers body camera footage purposely being turned off when trying to cover up speech about

their misconduct and being set up by their superiors.Comments: This footage helps support the entrapment defence, and is an aid to the potential of entrapment by estoppel defence.7) Implied should be added to jury instructions: see Dellums number 8, dc cir court in Dellums8) Motion to know if any capitol police or MPD officers were also employed or compensated in any way by the FBI8.1) My arresting officer was both a state trooper and FBI agent. I'm wondering if others were also employed by the FBI. If so, I'd also motion for their body camera footage to see if like other undercover agents there that day if they too were inciting people or making them feel welcome in the capitol.9) To admit testimony/ proof of 20 undercover agents being present with proud boys on 1/6/21(increased chances for entrapment/ entrapment by estoppel).10) To present statements of William Popes prosecutor admitting undercover officers were acting as provocateurs (increases the chances that some uniformed officers may have had goal of allowing protesters in.11) To be able to show times givermnet lied so jury can decide if they are trustworthy: 10/12/21, 2/14/22, 4/14/22, 3rd revocation hearimg, 2md revocation hearimg, 1st revocation hearing, Protective order debate hearing in 2021.


Notes I need sent to me or to someome that can gove to me...Questioms for capitol police notes (yet ro be organized/ finished): 1) (open up CL:3, E-B-E-19, #2) I'd like to read you somethig. and ask you questiins as we breifky read alomg, are you ready? (Once I'm ready with that opemed i then state): "okay, these are quotes from a coirt focusing on arrests stemmping from the case of Baram V. Ramsey in which I see great simikarities in police actions and failures, I wamt to see how you and yoir agency to the best of your kniwledge acted differently or simikarly... S: "In the weeks leading up to the pritest, MPD's civil disturnance unit braced for an influx of protesters." Q: Now, do you recall when Trump posted his now famois tweet that essiemtially said 'Be in DC, will be wild'? (About 2 weeks prior to the 6th)... Q: Do you personally remember or are you aware of Capitol police being aware that this protest was going to happen on the 6th? Q: Did you personally prepare or are you aware of your leadership preparing for an influx of protesters? Q: how did you all prepare for this?Q: are you aware if you yourself or if leadershio knew that there was a high potential for violence at this protest? (I've read reports that capitol police and other agenicies were bombared with such news and warnings), Q: What sort of preperatiins are tyoically made in hearing of a large amount of protesters at rhe capitol, espeshailly if there is intelligance to suggest that these protesters are going to inclined to violence? (Dom't read rhis, read past parenthesis: Hard gear):.... Q:Do they get issued helmets? Q:Why did so many officers not have helmets (In the famois first line breaching where Ryan samsul amd others cross over I didn't see any of tuose officers with helmets? Q: Do they get gas masks Q: Why did so many offiicers not have gas masks (in that same video I didn't see any gas masks)? Q: Do they have armour/ hard gear on? Q:Coukd you explain what hardgear consists of to myself and the jury? Q: Why did so many not have hard gear on (in that same video I didnt see any hard gear on)? Q: do they have radios with effective comincatioms/ channels in place?Q: why were so many capitol police complaining about not neing abke to get in contact or find anything out? Why did so many nit have radios?Q: Do they have all units called up? Q: Were all officers present/ called up?Q: Do they have bull horns? Q: are bull horns so,etimes used to issue disperal or cease amd desist orders?Q:Why were no bull horns around/ used? Q:Where were they? Q:Where are they nirmally held? Q:Why couodnt anyome find them during this particular protest/ riot? Q: Why werent they prepared to be used? (Statement): Nkw in 1970, over 50 years ago, the Capitol police shared in Dellums V. Powell that they bought a massive and insanley

loud sound device to deal with massive pritests called the sound curdler which was comverted from a Brinks wagon, it was made to reach protesters far and wide, even over thousands of peopels screams and roars, specificially to ensure they coukd hear orders to disperse simce they had heard complaimts that often times people coukd not hear dispersal orders from bull horns in loud demomstrations... Q: Now, that was over 50 years ago, and technogy in all areas espeshailly in audio equipment certainly has advanced, does the Capitol police have anything more powerful than a bull horn to aid with orderimg a very large and loud crowd to disperse? (No): Responce: the capitol police of 1970 recognized this was a majir issue, why if we are to learn from history wouod you nit have such rechnklogy?(Yes): Where was it?.... Why wasm't it used/ prepared if Capitol Police kmew well in advance of a latge amoitn of people comimg and that they may be violemt or prone to breaking laws?Q: are there other barriers ypu had aside from small and short bike racks?Q: did ypu habe enoigh pf these to wrap around the buikding? The grounds? (If yes, why wasn't this dome?")Q: what aboit barricades, I now know that some bike racks were used, but they didm't wrap around the capitol, imstead there were only random poimts in which as yoir owm officers have stated were able to be easiky walked around... Was there more that coupd have been done with barriers given all the warnigns and time that capitol police had to orepare for this portest? Q: why wasn't more done on this front?So, to conclude this comparison, in the Baram V. Ramaey case, the DC MPD properky prepared for am infkux of protesters, wouod you say givem what happemed amd what we've discussed that Capitol polcie properly prepared for an imflux of protesters with warmkmgs that it may be violemt? Okay, so, now I'm going to read another qiote from tuat case and ask you some more questions.S: "Ramsey commanded the department throughout the pre-protest planning and allegedly told members of his staff that officers shouod overlook minir violations of the law in order to accomadate protesters." Q: Were you aware of anyone in the Capitol police being told prior to the protest that officers should overlook minor violatioms of the law in order to accomadate protesters?Q: were you aware of anyone in the Capitol police being told during the arrest that officers should overlook minor violations of the law in order to accomadate protesters?Q: do you think given all of the evidemce and viral videos of Capitol police not doing anything to many protesters that it's possible that such similar orders to overlook minor violations of the law in order to accomadate the protesters was given?... To anyone?... How can you be certain? How certain are you of that? Q: even though mPD officers themsekves recognized that you guys were allowing us in? ... play video...Q: even though MPD recognized you were not stopping us from protesting / "doimg whatever we want (as ome officer put it)?... play videos...Q: then coukd you explain these videos( play me inside, me talking to officer near desk, jeff merkeleys room, officer i got directions from, officers in cryot, offficers not saying anything on way oit, officers with no helmets, Q: coikd you explain these videos that i didn't personalky witness (play videos of capitol police inside allowing protesters to enter, walk around, protest, go to the bathroom, high fives, thumbs up, etc.Q: can you tell me of your command structure slowly( so I can write it down to review it), starting from entry level all the way to the top...Review top ones,... Q: now, starting from the top, I'm going to ask you if you heard any orders to suggest that you gusy should let us do wjat we were doing, I want you to tell the jury hiw certain you are that no orders came from those people, Q: was the radio workimg well that day? Q: How many officers were you around?Play videoFollow up/ review of answers ask officers at trial if when they lock it down there is an option to lock the doors via the magnets that clearly are more powerful than any lock. If so, why didn't anyone do that?

Global discovery 2 of 3:Section 32.5(2nd/not related):Enoch Rogers, 35:08 long, MPD m cycle officer1) 3:14/ 3:20:30pm, Protester to cop: "which way is Pelosis office?", cop points outside and says "that way (and begins laughing)", before he sneezed and same cop said "bless you"2)15:29-15:55, you can see how magnetic door work, will not open unless green. Officers can't open doors until light is green, they press and wait, then turns green... ask officers at trial if when they lock it down there is an option to lock the doors via the magnets that clearly are more powerful than any lock. If so, why didn't anyone do that?3) 19:22, protester to police: "let us in peacefully, please, it's our right, let us in peacefully"4) 21:09-21:16, protester to police "that's our building, thay's our building5) 28:03- , protester to police: "its our hoise, why cam't we go in? It's our house, I didm't even know that until today, its our right, you guys are pissin on our rightsSection 33: *left off at 33:00**James Luckett, 1:32:45 long1) 4:05/ 3:20 pm, black officer on left can be seen fist bumping protester2) 29:30, protester says to cop "when antifa goes out, amd they habe their riots and their break in shit, you guys stand down and let them do it, amd here we show up, and we just want to get into the house here, amd make a statement.... keep watching until....?3)Section 34:Thomas Miller (4149), video axon body 3 x6039Ba52, 33:08 long1)19:28, officer shares "if you push on a line, they will take your shit, it's not like antifa where if you push they back off", another officer says "no, these guys came to fight.", 2) video ends with officers asking and telling them to turn their cameras off real quick so he can tell him something...3) 15:55, inspector says "problem is all the CS we threw out, it flew back on us"4) 18:18, RCO "they(command) wouldn't let us come up here (capitol grounds)"Section 35:Tags: "internal affairs", vid 1, 12:36 seconds: 1/6/21, 11:34 pm, Hilton Hotel, Sayvon Weinfield0) He was imside capitol joining orders to his people, camera was physically on him, but was mot turmed on at all until later...1) officer Sayvon Weinfield locks outer door with baton, "Fire hazard" yelled by people inside, building security tries to ask officer to remove it, cop says "on a case by case basis, we let people check in", then says " you tell them to go to their rooms..." wow.... "You need to tell the, it's time to go to their rooms, tell them to clear the lobby", "The thing is that we cannot force them to go inside their rooms", "You can revoke their hotel rooms"2) rco gets mad at woman "You don' even fuckin know nothin", hotel guest "Your're fucked up", Rco: "you are" goes back and forth 2 more times, like children, the lady arguing with him in Hilton is mullato lady who was at front lines earlier at protest shouting "we come in peace, we love you" near media tower, crazy I found her here.Section 36:Tags: "internal affairs", vid 2, 20:12 long, 1/6/21 11:25pm, Tiffany Payne 11652, 1) records interior of capitol illegally on facetime, thinking she turned off camera, but she accidently turned on the sound... 2) 7:41, she says " I was here for this shit... some kracker... excuse my French... some kracker shit..." really? Perhaps like BLM we should've attacked citizens and businesses instead of protesting at the source and then getting pissed as they attack us without warning...3) 7:46, "right, cuz that wouldn't happen with any otha culture", "right, uh-huh, I was pissed"4) 8:38, I ain't tryna be all obvious and shit takin piks and shit"5) 15:00ish, 2nd face time, when i tell you this place looks like shit, it looks like the movie Olympus is fallen minus the hollywood special effects.Section 37:20210106-Riotous Acts-US Capitol Complex, ID: 21002555, categories: none, 1:39:28 long, axon body 3 x6039BJT9, Lawrence Lazewski1) 5:16, "Did Capitol not take the threat of them storming it seriously? Haha, it doesm't seem like they have enough people haha" 2) 10:30, tons of capitol police shooting guns/ pepper balls into the crowd from up top, 3) 11:53, black woman "what the fuck do you think you are doing? Police pepper spray her, other vids show police surprise her and push her without warning4) around 18 or 19 minutes capitol police pointing to

chill area, they are looking at officers on inauguration stage, kind of near pepper ballers, at 20:05 they fire a flash bang in response to that area , RCO then grabs his glasses to protect his eyes after, then crowd is angry and behins attacking police.5) 20:33, spray man waving flag6) 35:01, citizen "they are shooting us (x2)", confused, doesn't know is trespassing7) 42:21, and before is kid saying "if you guys want me to move back just let me know, I don't want to be mased or hit", officer: "no, your're fine" (13:43:22)8)Section 38: Robinson, Mark, 1:46:32 long1) 2:33, grandpa, 2 kids husband and wife walking off capitol grounds right near east entrance of capitol while smiling and say thank you to officers. Bike racks/ barriers are only used to keep people off the road there, not stopping people from entering, helps show that they were more so used to guide foot traffic...2) 6:45, 2 cops: " why is he wearing that?","I don't know", "look at our lt. Right now wearing a Make America Great Again hat", 2 cap officers point to show MPD RCO and he says "that's your what?", both reply "That's our Lt.", one officer is smiling, other looks pissed, MPD: "in the red?", smiling officer "with the red hat on", unhappy cop: "i don't know why"... continues: " my guess, my guess is that he did that to get to the officers, but that's gonna be all over the news now", other officer: "yup" 3) 52:53, group of Capitol police without helmets or gas masks complaining about how they weren't allowed to get their gas masks... 4)1:23:00, RCo: just left area with tons of capitol police, says to himself as walking away: "you let em breach the capitol? Really?" Section 39:Brian Sulivan (10375), 3:18:51 long, axon x6039BCSE,1) 9:55, RCO: "Should have given us our gas masks, 2) 1 minute later:"Breeze is this way", tons of flags blowing in direction of officers, great show of why officers got screwed.3) 51:00-52:58, flag down, crowd yelling "pick up the flag", at end whole crowd cheers and claps, up close "yayyy!" "Wooooo", "That's a fuckin patriot right there", 4) 1:15:53, Epic man runs off stairs and tackles multiple officers! EPIC and hilarious!,5) left off atb1:34Section 40:01/06/2021-stop/frisk-1400 Independance Av..., ID:21002531, 21002555, axon body 3: x6039B396, 11:35 long, 2:48pm, Shawn Rooney1) 6:05-6:22, 2 members of 24 (yes 24)walk past RCO "You okay?"... "I'mout(?)", "We got no gas masks and no helmets, I'm trying to calm my guys"2) 7:08-7:40, Jessica Hawkims sharing they need their masks)3) 8:35-843, member of 34 (yes 34) complaining that they didn't tell him to bring his gas mask, partner next to RCo (unknown unit number) complaining that all 4 of them were not told to bring their gas masks (and it's 2:55pm... been fighting crowds since around noon)...4) 10:31, officer T mosher is talking about going to get gas masks for all his guys, other 3 officers discussing doing the same. T mosher looks like Peter Forbare5) last 10 seconds, as talking about going to get masks, RCO tells 5 others to shut their cameras off real quickSection 41:Unknown_202101061642_WFC1029558_38237350..., ID:Virginia State Police, 49:50 long, uploaded by Ellen-CB, Josh (Ellen, Josh-CB), 1) 48:34-47, cop to RCO telling about how traffic cop was lost in tunnel push, then 5 second mid sentence silence... like RCO told him camera is on then hands dropped, turns, other officer nods as if saying "don't look at me, finish it/fix it" and then talks about how cop did the right thing and he's injured, within minute he turns his camera off, "I'm gonna turn this off",2) 11:32, officer says "?", then RCO says "I'm recording", "What?", "recording", silence...Section 42:*** government deleted this video from data base, I want it back...20210106-CDU-14th St nw, ID: 21002555, Axon body 3: x6039BFA5, 1/6/21, 22:08 pm, 3:48 long,1) last minute of vid, woman surrounded by police asks to be escorted to hotel across street, explains knows liberals attack Trump supporters in this city, cop plays dumb but escorts her.Section 43:20210106-stop-1500 constitution ave NW, 11:08 long, ID: 21002529, 21002555, axon body 3 x6030853k, 11:52 am, Daniel Harrington1) around 6:30-11, man who police thought had a gun was stopped and got his number...Section 44: *** Government deleted this

video, increases chances that they don't want us noticing him...20210106-disorderly-15th st & constitution ave, ID: 21002555, axon body 3 x6039BKCx, 12:08 pm, 1) appears and sounds like plain clothes FBI being checked, active, said trying to keep it concealed, has clearance card near ID, badge # is 6504 (appeared to be)2) continued in next sectionSection 45: ***government deleted this video, increases chances that they don't want us noticing him...20210106-stop-1500 constitution ave NW, ID: 21002555, axon body 3 x6039BFR2, 1) he is an active officer of some sort, he has a concealed weapon, was trying to keep it hidden while hands/ arms raised at rally.Section 46:20210106-stop-1200 F st NW, ID: 21002555, axon body 3 x6039BJHB, 12:20pm, 2.53 minute long video, Tyquan Brown1) 4 men stopped for worry of gun, all plain clothed cops of some sort, 1 guy wasn't hiding it well.Section 47:20210106-CPWL-825 10th St NW, ID: 2100255, pending, axon body 3 x6039BBE1, Maximilian Park, 23:50 lomg1) Police break into 2 cars under suspicion of weapons, no weapons found...2) "Hey let me try this thing out"... cop excited to try break in equipment...Section 48:20210106-Riotous acts-US Capitol Complex, Axon Body 3x6039BD07, 35:05 long, Marina Bronstein1) 18:26, Cop: "I can't arrest him, I didn't see him do anything",... while on Capitol Grounds, if cop from city thinks its fine, why would citizens from other states think he wasn't able to?2) Later, someone says "it's a restricted area, all of it is a restricted area."3) 29:00-30:00, white and black man: "all races coming together", black man also saying "historically the patriots won"Section 49:Camera 924: 1:59:33 pm, 1/6/21: 1) black guy who broke door in is next to guy Reffit on stair push (stairs I would go up in half an hour), 2) 2:02:06, cop pushes climber off wall, long fall.... can't see if he recovers.... crazy to watch!Section 50:Recess called at 2:13pm in senate, 2:18 the chair declares the house in recess, resumes at 2:26 pm, 2:29 chair declares house in recess again, senate called back to order at 806 pm, house came to order at 9:02 pm,. 3:44 am house and senate jointly pass stolen election.Section 51:20210106-Riotous Acts-US Capitol Complex, ID: 2100255, 36:44 long, 1:03 pm, axon body 3 x6039BFA8, Brian Madison1) 18:16, citizen saying he just got shot in the leg with a paintball gun, then looks at cop recording "They're shooting at y'all too (x2)", 2) 18:33, he records showing it's in the police eyes too3) 19:40-20:00, older man who explained in previous video his grandfather was a political prisoner in another country is asking up close police why they are shooting them, then realizes it's capitol police shooting up on the balcony, he waves towards them asking them to stop. This shows that he and others didn't know the grounds was off limits...4) 21:14, Black camo guy up close "This is democracy, this is revolution, this is fucking freedom, stand down!"5) 31:54, "They set us up for failure, they should have had us bring our fucking gas masks (1st time he said it) with RCO (Mr. Get my contacts out), they head up steps together early, ...6) 36:44, Mr. They set us up turns off this recorder/ attempts to then goes to turn off another officers camera, then this guy turns off his own seconds later after they set us up guy tried to turn his off... prob to say exactly what he thought they were doing, which shows he was truely scared to speak out, not as he suggested in another video, he claimed he wasn't scared what "they" say about his video when he was saying "they" set them up for failure...Section 52:20210106-Riotous Acts-US Capitol Complex, ID: 21002555, 1:08:29 long, axon body 3 x6039BHJC, 1:03:04pm, Greg Kimak1) funny old man protester: "Your're a little too late", his wife:"stop it Bill", "What? Stop the steal, They're cops!", 2) 20:32, same cop who said "they set us up is walking by around 1 hour before other videos where I saw him (Brewster) saying "Come on man they should have had us bring our gas masks man" then another black officer says "Why they not let us bring our gas masks man!' "Then they (Capitol) just start spraying next to us", Then capitol police woman says to RCO who is not complaining, just suffering silently being deconditioned "Are we not friends anymore?" Metro: "Oh, we are always

friends haha",3) 21:59, dude asks white shirt metro semi leader "Can we have someone go back and get our masks?", "No(walks away)"...."I gotta go back"4) 24:00, "Why didn't we bring our gas masks?", Notes:Man with trench coat and on radio most is Commander, Danny Thau is crazy guy who tazed 7 people before being told to stop tazing protesters, officer walker is man whose face was split open. Officer who was with walker said he's heading to hospital.. Noteworthy: Captain Augustine5) 53:27, plain clothes guy behind police line who gave mixer bottle with baking soda in it to cop, asks while recording "How did that stuff work?" "Great", "I use that stuff when I'm with Antifa", other cops begins to laugh, officer then asks plain clothes "Well, where's the Antifa?"... Then asks "Huh?"... Dude can't be seen on camera, no verbal response heard.6) 55:45, commander says to RCO "You'll never forget this day for the rest of your life", "Haha I know I won't haha"7) 1:08:22, at eye wash station Metro cop says "it's over, we are retreating to inside the building and locking it all down", "That sucks, I can't believe we have to retreat", "Well, but you know what, what this shows is that they could never say that they were ever peaceful", "That's true"... idiots.Section 53: *** may not be done***Title: Thau 1st video-2021-01-06 USCP Riots, axon body 3: x6039B830, 1:54:32 long, 1:02pm start,1) 10:30, cop warns "look out for freakin guns man",2) 13:21, "We need blast munitions!", "I don't have any", "God dam man we gotta get something, get something!", asks another guy, "We need blast munitions!", Tazes man, screams "felony APO right there" to officer, assaulting police officer keeps begging for munitions. 4) 17:00, "we need munitions", "I know, I just got hit with one", "this is a shit show", 5) 22:00, "give me your fucking tazer, runs up, tazes man, screams "get him get him!" Officers and protesters just look at him loke this dude is losing his shit... no one gets him...6) 23:ish, tries to steal womans OC, "Can I get that?"7) 24:ish, he gets hit with a tazer hahaha, 8) 31:51, Jimmy throws can of some sort into crowd way behind front line, Thau says "hold fire", grabs smoke canister preparing to throw,9) 33:41, "Captain, I've got a triple chaser, do you want me to use it?!" "Yeah, no, don't use it"10) 35:18, throws 2nd flash bang and see it explode, 37 seconds guy throws another and it explodes11) "gonna switch to rubber", "okay, make there are no kids", "There aren't"12) 46:32, he throws another flash bang13) 13:50, "They are already in the capitol, get ready to move, pay the fuck attention!"14) 50:20, officer getting water poured in eyes "fuckin stop usin the God dam pepper spray!"15) 13:54:50, "they are moving their (CP) resources inside,16) 1:23:21, officer walks by with loud speaker, "got a loud one, not good enough", "hahaha", "I know"17) 1:24:52, cop shoots into his officers, hilarious18) 1:34:06, the bike I sat on! 19) 1:37:51, "They are in the house floor", "That's what it sounds like", "What's the option 2?", Capitol: "nothing", "Okay.", "There's too many people dude", "You guys gotta have a procedure or somthin", "well, we usually lock the building down, but, well, thay's impossible."20) "Capitol doesn't know shit" "They are scarce and have no resources"Notes: 4 original vids from gov: Dallas Bennet (129 min), Angelique Core (137m 21sec.), Jefferey Sipes (172m 28sec.), Christopher Dove (172m 36 sec) Section 54:Axon body 3 x6039BLDK, Christopher Dove, 2:52:00 long1) shots fired at 2:22 ish, 2) 14:29:20, "All MPD fall back", helps shoe why I didn't see police when I arrived, they fell back out of view of where I would soon be arriving.3) 14:31:25, "fall back to the upper deck of the Capitol", "I think that is where we are"4) lead guy says "the guard is coming now"5) 2:49:48, police get to area that was broken in (I entered about 2-3 minutes prior to them getting there, just missed them.6) 14:53:25, "You think this will be on the news haha?"7) 14:55:23 "We have multiple shots fired inside the building...", "This is not good"8) 14:58:18, "This escalated quickly"9) 14:59, "I ain't never seen nothin like this", "So the question is, are these really pro Trumpers or re they Antifa dressed like pro Trumpers, that's the question."10) 15:04, phone rings, he covers the camera, "Whoa, Bowser

just issued a curfew for 6-6", "They are requesting for PG to respond", "PG?", "Yes!..." 15:08:3011)15:09, "they are calling Virgina air arlington"12) 15:11:02, "They called for all police departments around DC to respond "Holy shit"13) 15:12:30, "Hey look in the windows first floor", "yup", "Oh shit!", "Hahaha", "You see that?" (think it's me looking out at him from window), 14) 15:15:20, "Virginia State said they will be here in 15 minutes"15) 15:21:01, "Do you think if we just asked them nicely to leave they would?" "Hahaha", tells another joke seconds later16) 15:24:00"There's no transport they already let that guy go (Mark Ponder)... So they are back just FYI"17) 15:25:45-65, starts laughing because heard on radio Virginia state police (25 people) arrived by metro bus... "Never in my life...", other officers: "They just jacked a bus"... "They commondered a bus"18) 15:26:31-60ish, this is gonna get real ish with all the evening platoon comes here because that's when they are gonna push everyone up", "oh we are just holding everyone right now", "that's what I mean"19) 15:30:35, "look at the guy inside smoking a ciggerette inside the window with a cop behind him, smoking like a boss haha", 20) 15:35:00, "maybe the national guard will help, maybe the marines"21) 15:38:15, Megaphone guy says "The door behind me is open, go inside"... officer "He's yelling go inside the door is open, the guy with the microphone, he's telling everyone to go in"22) 15:45:15, guy they thought had a gun is arrested until found out he didn't have a gun23) 15:47:00-25, they start to escort him back to protest since he had no gun, notice that theybdidn't tell him he was trespassing or tell him to leave...24) 15:50:00, "I heard you took the bus haha", 25) 16:06:47, "Tim Hales voice "I am offended that you guys will not accept my... extremely offended"26) 16:11:30, "It's gotta be 100,000 people what are you gonna do?", "This is gonna make Portland look like kindergarten27) 16:14, "inspector put mask on, you know it's about to get real"28) 16:22:45, protester: "It's not curfew time is it?", "No...", protester: nods head... was this protester also told by other police that he was allowed to remain/ protest until curfew? Regardless, why did police not instruct this calm individual to leave or warn him that he was breaking the law? Because they were allowing protesters to remain up there... 29) 16:52:10, "It was actually smoother than I thought"30) 16:56:00-28, "there's not a lot of people and they aren't hostile..." , "The crowds not bad", other cop: "Oh I know." "Yeah" "oh I know"31) 17:00:00, "we got everybody to hate us", "it's only going to continue man", "oh yeah, the left, the right, everybody hates us"32) 17:04-5, "CPR on someone who wasn't an officer", "we have had curfew before, this ain't 9/11 I'm takin the weekend off", other cop: "it might be...6-6 curfew... city wide 1033..."Section 55: *** may not be done***Axon body 3 x6039B849, Angelique Core (8495), 2:17:00 long1) 15:05:52, black man and NYC Russian woman talking about soviet union,2) 15:12:35-55, old guy setting up chair "I'm old and got a new hip in me, standing up is killing me-1 minute or so lady helps him sit down3) 15:29:03, couple says thank you to cops4) 15:40:49, It's the guy from CNN vid who said "pick a side, weve had your backs for a long time now"5) 15:42:40, guy says "they just stormed the Nevada capitol, it's not just happening hear, we are taking our freedoms back6) 15:43:59, antifa guy i saved runs by,7) 15:49:58, latina talking about civil war8) 16:55:25, motercycle is safe9) Section 56:Axon body 3 x6039BJ4E, Dallas Bennet, 2:09:00 long1) 14:22:15- calm people walking right up capitol steps, no police2) 14:24:15-35, shots heard, "That didn't sound like ours, just sayin", other cop: "that did not sound like ours"3) 14:39:13/ 18:36, L or I Fer(???) Telling him RCO not to side with them "Don't do it", RCO: "if you read our founding documents, this is not ar from something that we allow..." at :45 "why aren't we trying to take the capitol (with them?)"4) 14:40:59, looks like black break in guy walking towards crowd from police5) 14:42:20, guy on mega phone "were not burning it down, we just are going inside"6) 14:43:30, "my question is, why are we on federal property?", other cop: "I

don't know, I was wondering the same thing"7) 14:45:59, the windowless doors with magnets are magically open8) 14:48:47, Mark ponder is threatning officers with a bat of some kind, at 49:37 RCO takes it9) 14:50:25, 2 black guys pushing against police, 1 white guy yelling at police for it, then at 50:38 black breaking guy shows up yelling at cops, other black guy then keeps the crowd calm10) 14:52:12-20, black guy came out hands up "no harm (x15) were just tryin to get heard11) 56:40 he comes back "we are trying to be heard guys, not to fight"12) Asian woman "go to china, dey take care of uuu, they try to ruin the united states"13) 15:08:37-43, Chinese woman "Chinese communists they gonna come and get uuu..."14) 15:18:26, terrorist palmeranian15) 15:21:12, latin guy who's felon says "we fuck with you guys (police), :49 makes sure dude is good16) 15:22:59, old lady smiles and says "i think I made a wrong turn..." funny... next 30 seconds crazy dude is calmed down by near by people17) 15:23:40, "How much you bench bro?", officer: "315"18) 15:25:08, "man, ya'll are fucking outnumbered, but we arent gonna fight ya"19) 15:34:17, "I'm married to a latina and I'm a white supremacist, got 2 south american boys lovely as hell too20) 15:41:39, Puerto rican flag guy next to 2 other latinoes and says "it doesn't matter what color we are"21) 15:43:40, black guy walks by shit talking BLM and Antifa22) 15:43:58, The dude I told to run after being punched and called antifa is running away "they just had me surrounded! They started hitting me for no fucking reason"23) 15:51:36, crazy shirtless man who attacked officers earlier breaks through crowd "this is my house..." officer says "here he comes" showing he remembered the one trouble maker in the area of thousands....24) 1t:54:08, protester: "time to do some patriot ass kickin up in DC, we can't beat up antifa cause our mayor won't let us, we just get on our knees and suck her dick" (mocking cops)25) 2:08:11/16:29:22: RCO telling Gonzalez ""I had to straight shank this guy cause he was pushin in"... other officer points to mouth and his own camera to warn him his camera is going, then je out of no where claims the pain traveled up, (sounds very scripted and fake), he then turns jis camera off. Before he fell he straight shanked a protester in face, looked very painful, I saw it...Section 57:*** may not be done***Axon body 3, x6039BK2Z, Jeffrey Sipes (6792), 2:52:00 long1) 15:13:00, "look in window!" (Think it's me), 2) 15:15:18, "never seen this before in my whole career"3) 15:26:00, metro bus4) 15:30:00, girl officer texting5) 15:38:10, "he said go inside the door is open"6) 15:47:23, people cheering we took another state capitol7) 15:48:51, Fernando walks into camera, the guy who may have asked why arnet we joining them8) 15:54:00, cop recording crowd with phone9) 16:09:00, cop texting10) 16:21:35, peaceful move down of cops11) 16:25:10, old lady being escorted by cops to leave12) 16:56:00, officer takes photo of cops folding flag13) 16:58:40, "dude! Are you going to wear the hat(officer kept trump cowboy hat)", calls cap, o brien she14) "this is worse when they ordered us all in for the BLM shit...15) 17:13:0: metro bus16) Section 58: *** re-watch/ write***Stephen Chih, 20210106-Riot-US Capitol Building, ID: 21002555, 11:28 long, axon body 3 x6039B7Q4,1)9:23, lightly pushes/ guides James Grant towarss door.2) 9:26-10:00, Merkelys office, officer asks them to come out (3:17pm) protesters coming out of them calmly, 3) skip to 10:14-10:18 on the dot, caoitol officer is giving pritester directions on where to go, granted it's towarss the exit, it's the hall way I walked down towards Crypt4) skip or watch to 10:33, man who continued directioms to statues is still seen standing there5) 10:43, on right protester is eating and nodding his head while calmly talking to capitol police officer6) 11:04, protester to RCO "thank you guys for being here, we love you" Section 58.5:Stephen Chih, 3:58 long, 3:19pm start time1) 0:47, I'm talking to Capitol police woman2) less than 1.5 minutes later he begins to help compulsive liar Micheal Fanone inside who seemingly was suffering from heat stroke... Section 59: *** finish, left off at 40:00***20210106-First amendment assembly-US capi..., 1:03 pm start, 2:22:22 long,

axon body 3 x6039BF80, Kevin Valentine,1) 3:31-3:36, cop: "ya'll remember, gut punches, they (superiors) cam't see gut punches",2) 28:37, guy takes selfie with RCO, RCO thumbs up in photo and fist bumps guy behind fence3) 30:46, flash bang "good god dude, they are getting carried away with that4) 38:31-40, latino funny guy "that's what is great about this country, we got white, black, Asian, rich, poor, latino WOOO!5) Section 60:Couod not find... now, nit important vid anyways... 20210106-Riot-US Capitol Building, ID: 21002555, 1:13:57 long, axon body 3 x6039BF8E, 1) 14:09/ 1:41:49pm, old man and RCO debating about election being stolen, RCO says "it worked, you voted, trust the system", "I'm from PA! It did not work, 200k votes....", old man continues to state stats, cop stupidly just keeps saying "it worked", old man says "you know I grew up in the 1960s", RCO "your people grew up in the 1960s as my people in the 1960s were dying every day, okay? Thank you"...Section 61:20210106-Riotous Acts-US Capitol Complex, ID: 21002555, 1:03pm start time, 2:18:05, axon body 3 x6039BKVP, Matthew Cek(7357)1) 14:28, black camo guy yelling/ leading screaming at cops "he got a right to be here" to hard helmet guy with pole2) 15:35, black camo guy "I'm going to speak to Kamala" facing crowd, :55 "Let me go in" is what he said to crowd, then gets hugged, then says it again towards police...Section 62:*** early on, asks capt to get masks, "no",... also recheck #1320210106-Riotous acts-US capitol complex, ID: 21002555, 1:03pm start, 1:16:51 long, axon body 3 x6039Bjju, Nathan Tate (11280)1) 2:00, RCO: "do we need our helmet and mask?" "No"2) 14:13, "why wouldn't they let us get our stuff yall, why wpuldn't they let us get our stuff?" He asked on walk if they would need gas masks or helmets, told "no"3) 15:08, Bart threatning with body to push a cop lol, 15:12 he unexpectanly pushes officer LOL4) 15:57, RCO: "why woukdn't they let us get our stuff!" 5) 16:34, 4 cops and RCO swearing and blind :"they gotta let us get our masks6) Rco: "they (capitol) sprayed them with no regard for us bruh"7) other cop "they shoulda had us bring oir gas masks, RCO: "Thay's what I just said bro! Why thay didn't let us get the gas masks man", other cop: "IDK, whoever the fuck it is is gonna get punched", RCO: "dam bruh, then they just start sprayin em straight in the face, i got hit liem 5 times, it burns... "8) 18:53, RCO: "They (capitol) sprayed them (protesters) with no regard for us"9) 26:37, "why would they (capitol) spray us like that though? They was spraying us! They had OC too"10) 38-40:15, RCO says "He got a gun" Finally finds him, guy says "I don't have a weapon, I came here to protest peacefully, I don't need a weapon", cop says "okay your're good"11) 14:25-14:27, guy in crowd "you flash bang a terrorist, you don't flash bang old people!"12) 49:57, guy from senate chamber with hole in the face with tellow glove is let through gates by police and brought to EMT, famous dude13) 116:07/ 2:17:09pm, Rco: on phone looking at first door where famous media woman questions seemingly welcoming capitol police ("No, youncam't come in"), "They upstairs bro", "How are they comin in?", "They breakin through bruh!... and they (capitol) not shooting at... they (capitol) shootin at us!", "They shootin!?"..."not with the ah, they shootin with the oc spray", "oh lord", "what happened on... (time?), they got a video of you", "for real?", "yeah", "what I do?", "you punched a dude", "ohh"...take notice he starts walking backwards now as he says nervously "nah nah, dude grabbed you, and you like pushin him back", rco: "yeah", "huh" (he is whispering to the guy on the phone), rco "nah (whispers in phone more as guy continues story then turns his camera off (cover up)) Section 63: ***find time for 4***Eric Hairston, 1:06 long1) 14:38, RCO: "what are we doing here?", officer "no idea" (grounds of capitol)2) 14:43, RCO asks another officer "whats the fuckin plan?", "i don't know"3)14:52, other officer "they fucked us all up", RCO "whats the fuckin plan?", 2 cops then complain about "the mother fuckers" popped it over it there, cs... kept blowing back all this way, throwing hand thrown shit", "they should have called us up here earlier!"... 4) "why didn't they call us

earlier?"Section 64:Daniel Harrington, 8:47 long1) 2:34, secret service on camera right up and close, use to show jury, these barriers were burst through when they began letting some people through, they dkdm't arrest or stop everyone, only those who attacked police or initially caused breach.Section 65:Shawn Rooney, 29:44 long, 3:02pm enters capitol1)3:51, MPD female ranking officer inside capitol rotunda complaining to RCO:"I told them, theres 200 people coming in through that door, one of them came in and punched me in the face, they said fuck you we have no resources,... this is their Capitol what the fuck!?"2)4:10-4:26, command lady to RCO "where is the capitol boss(x5)", "somebody, like the supervisor a manager, anybody!" discovery Part 3 of 3Section 66:Shawn Rooney, 24:07 long, shawn is a Leitenit, he is passenger in car to inpector of MPD (later vid)1) 14:14, man had a knife is detained, trying to find charge to arrest him on, Capitol building is 20' away.2) 19:10, RCO: just got off the phone, telling Captain next to him, "I just went to run it by the on duty AUSA, it is not illegal to have amy knife,, espeshailly if it is sheathed...", breathes in tear gas, can't finish....man was on the bleachers of the capitol3) 21:29-22:18, able to talk again: "stop and frisk... just tell him.. dom't bring a big ass knife like this out here man, just give him the verbage... AUSA even said that uh it's not illegal to have it in a sheath like that," AUSA asked where he is from "Alabama", "no"... showing that they recognize that people not from around DC wouldn't have known that it may not be a good idea to have on grounds..."cut em loose". Section 67:Shawn Rooney, 32:47 long1)4:20, In car with Commander kf MPD, get on radio, tells units to stand-by for first dispersal warning, immediately after gives a dispersal order, gives law broken, and announces to them that it is their first warning.2) 5:20, he gives the protesters a second "first" warning"3) 6:10, he gets on radio and tells them to bring a cruiser in to announce same on the west side4) skip to 6:35, commander gives his last and final warning to protesters to leave5) 7:10-33, commander gets on radio and says "execute, commence arrest"6) 14:00-14 , rco is giving info of dispersal times given to protesters on paperwork, 7) 14:33, rco: "nkw the thing is, is this gonna be capitol police curfew or city wide curfew?" ( helps support that capitol police shared that there was a curfew/ MPD themselves thought we were allowed to be there until curfew)8) 17:31 (mi ute earlier guy was arrested for gun), you cannsee on camera the handgun in a bag, ome in chamber...Section 68: Peter Sheldon, main lt of MPd in capitol, 24:48 long1) 6:49, RCO screaming angry to capitol officer "WHERE ARE ALL OF THE FEDERAL OFFICERS!?, I'm sorry to yell at you. your're it?" Capitol officer "Sir, I don't know", 2) 14:47, RCO is looking at capitol officer point and wave protester towards another hallway as he is taking a flash photo of the capitol officer, RCO mumbles to him self sounds like: "some fucking tour guide shit?"3) 14:55, after witnessing that RCO approaches 3-4 protesters "hey gentleman, this young man (capitol officer) is gonna tell you guys where to go, ok? Thank you" (Capitol officer giving directions on where to go, have a good night"4) 15:09, protesters asks RCO "arent you supposed to be beating us back right now?", RCO: "i don't beat people sir"5) 15:18- , RCO approaches 2 capitol officers (1 is the man i asked about not having helmets), tells them that their whole capitol is going to be filled with protesters if they dom't get more assets, "tell your inspector..."6) 17:25, chansely is being escorted by capitol police, RCO says to himself "who the hell is this guy?" (Hilarious)7) 19:39, rco is told by capitol officer that his watch commander said to monitor tue protesters and just not let them trash the place8) 21:55, RCO is telling 2 women protesters where to find capitol police officers "that can point you in the right direction", tells same to 2 men behind them seconds later9) 22:44, RCO to capitol officers "do you guys know there are people in there?" (The senate chamber), "oh really?"10) 23:10, RCO to new group of capitol officers "do you guys know there are people in there? Protesters.", Capitol officer "okay,

are we removing them or no?", "I don't know, I'm not your official but I would get them hell out of there", Capitol police: "okay"11) 24:13, group of capitol officers are still standing outside chamber, 1 officer tells RCO "we will leave the chamber till later, i gotta see what the chief wants to do with that before i can touch it", RCO:"... altighhht..." hilariousSection 69:Peter Sheldon, 8:07,1) 3:18-4:12. Rco walks by capitol police officer with arrested protester, capitol doesnt know why he was arrested (in rotunda), RCO asks other LT, "do we know why he is under arrest because I want to get rid of him", even MPD and capitol don't think to arrest due to trespassing..Section 70:3 striper A. Alioto, 2:14:39 long1) inaugeration area, 8:26, Thau comes running in and sprays a bunch of peaceful people randomly, sprays tons of officers too2) 8:34, RCO says to Thua "hey dude, watch the wind direction!"3) 1:20:00ish, capitol officer is telling rco right outside of cryot (2:39 pm) that protesters broke in through a window and now are in the building and chamber, MPD woman red head looks to rco and says "what are we gonna do?" RCO: "nothin".4) 1:23:18 (2:42:28pm) protester to rco in crypt asking for bathroom, rco says no bathroom, protester says he just was told bathroom was that way by officer (capitol)5) 1:26:55/ 2:45:59pm , Neely/ birdman talks to RCO outside cryptNote: the door that closes like a garage door that leads downstairs, right next to it, the wide steps that go up and have a gold framed painting, that leads to the house floor.6) 1:28:45/ 2:47:48 pm, RCO to other MPD "how are they (protesters) coming back in?", "They (capitol) are letting them (protesters)7)2:49:20pm/ 1:30:13, you can hear phones going off to warn of 6 om curfew8) Sam Lazar entering door that leads to statury hall with some girl he's leading in front of him, hes wearing a leather jacket and aviator sunglasses9) 1:38:35, RCO is talking about how he sprayed sideways in a certain area outside, then frank and redhead start sharing that he messed up a bunch of people, red head quickly shares,: "you chased us upstairs", RCO:"into the building?", Tara: "yeah"Section 71:*** make sure doneFrank edwards, 1:44:58 long1) 51:57, outside officer playing dispersal near rear, RCO says "no, the loud one", cop shrugs his shoulders2) 1:08:55/ 2:41:15pm, in crypt, protester being told by MPD RCO to leave, protester says "they (capitol) let me in over there (where I would soon enter)"3) 2:58pm, capitol police high rankers, and previuois on vid atf stiff arent aware of gunshot situation, they claim no victim, don't know where shot was or who shot it... 15 minutes later...Section 72:*** timeTara Tindall1) 1:02:29, Daniel Thau explaiming that every time they hit ome person with anything, 10 people are getting angrier, time was 2:19:08pm when he said that, continues to hit them throughpit next several hours, even in calm areas where I was, 2) 1:22:25, rco lookimg into crypt at 2:39pm "we don't have wnough people"3) 1:27:16/ 1:43:56pm, inside crypt RCO is telling 2 new MPD officers who just arrived to"hey guys, help guide them tomwhere they need to go okay?"4) continue to 1:27:40, continues givimg directions to protesters5) mpd cop is looking at protesters walk around liezurely as capitol police do nothing and he says "what the fuck is happening here?"6)1:39:08, capitol officer is laughing and pointimg out that "it was 2 of us holdimg the door against all them"7) the guy who's responsibke for sending munition reserves away amd keeps turning off officers cameras turns off Taras cam and Frank Edwards in RotundaSection: 73Jamal Green (11196), 36:26 long, 1:03pm start, 1) end of vid, he is the second guy from platoon 64 to have his cam turned off by cop while complaining about contacts.Section: 7420210106-Rioitous Acts-US capitol Complex, ID: 21002555, 54:22 long, 1:03 pm start, axon body 3 x6039BC2x, 1) 11:46, first person pushed is black woman who had no idea police were there, violent push, then she was angry and began screaming "why the fuck..." sprayed mid-sentance, others in crowd get angry and came to her aid, cops pushed her violently while shouting "move back"2) 17:45-18:30, cops and peaceful talking man are both being hit by pepper bals, no warning, he gets mad "I didn't do anything to

you...", cop can't breathe because of capitols pepper balls so he leaves3) 22:49, citizen "he shot me in the shoulder (x2)", angry protester not wanting to back up calmly explaining to police, 4) 30:00-31:00, black citizen speaking up and leading others peacefully, police briefly talk to him, another black guy next to him after 31:00, guy who looks like Fe's dad in previous documents is on this vid in gator5) 33:44, black camo guy walks by "America was founded by brave fucking men", Fe's dad in black skull mask,6) 33:45, older man walks up to cop with flask "you guys need a drink? You sure? Then drinks alcohol, raises his flask, smiles, and leaves, tons of drunk guys in crowd...Section: 75Stephen Naticchione (11047), 1:42:00 long, 1:03 pm start, 1) 10:45, cops: "They already taggin people", "they (capitol)taggin them with paintballs", "This is wild",2) 19:24, MCq is hit in the fave with paint/ pepper ball while talking, old man who's father was political prisoner says "why are letting them do that to us?!", Then crowd betins shouting at shooters in unison, 3) 20:07, 1st flash bang, everyone flinches and crowd heard screaming, crowd to the right of rco begins to fight in response, then 20:21 cop sprays people who were chilling there just a second ago/ for a few minutes without incident, then after spraying screams "back up", sprays 7 more times, those people get pissed.4) 32:51, police threw smoke grenade, gets thrown back, black guy says "hahahahaha, shouodn't have thrown that shit out here!"5) 1:12:19, Rco: "shit I take antifa over this any day"6) 1:37:38, "How you gonna say hold the line and then deploy CS!? "That's the dumbest thing I ever heard!", "That was Capitol! capitol threw cs!", "son they won bro, ya eva play command and conquer?"7) 1:40:07, "at what point are they gonna let them have this shit, this is crazy?", RCO, "64 you can go home, good job being decoys, being bait"8) 1:41:45, it's Nathan Tate telling him (RCO) to turn camera off, towards end he begins to tell his story "They got me on (Julie kelly?)"... turned off to hide misconduct.Section: 76Derron Copeland (10069), 1:24:17 long, 1:03 pm start time1) 19:58-21:00, "God dam command some idiots", continues complaining about no masks until 212) 24:10, RCO: "They knew what we were going into and they didn't tell us to grab our gas masks, that's poor fuckin management"3) 24:33, RCO records officer Nathan Tate admitting he "got someone (gibberish) blink blink", this is before he found out he went viral and was on the news amd then turned his camera off. Rco admitted he punched a guy too4) 26:39, RCO "most ill-prepared ever"5) 36:48, same dude comes over to try to turn off a 3rd camera (rco) until 1st guy whose camera was shut off warns "A-yo, a-yo, we got the chief over here"(looking real worried), cam shut off guy stops turning his camera off and says "oh yeah, he saw me do it", then walks away...6) 38:15, capitol police is complaining about how he does not have a gas mask "give us a gas mask" (talking to Mpd officer randomly about how his bosses didn't give him a gas mask)7) 46:45, RCO, "we doin more harm to ourselves than them!"8) 1:13:45, "They already in there, Capitol(police) ain't doin nothin, they(capitol) ain't doin shit!(think he is looking at my window I'd soon enter)9) 1:14:23, Rco: "capitol lettin them do what they want", :28 RCO "Hey, capitol ain't doin nothin sir!", 2 cops: "we tookma loss man", "Major L"Section 77Continued from previous video alreadybwritten on: 2:15:03 long, axon body 3 x6039BKLD1) 2:32-2:33pm, officer after retreat to inaugeration stage: "we just got our asses kicked bro", "yo we lost bro, I'm outta here" strts walking away2) 2:33:45pm,-30 seconds or so, officer is saying his superiors set them up for failure, "They didn't ask for reinforcements until 2 hours later?!", "They set us up", "They set us the fuck up", "no resources, we ain't got nothing", "lindsey Lindsey, there's too many, we ain't gonna be able to do shit3) 1:38:00, "they set us up!", "theres too many of them!", "yeah!", "they said theres too many of them, I said nahh, we be aight... theres too many of em...", "we took a major L bro", 5 other officers laughing "haha", "we took the L of the century yo!", "And the pary's just getting started", "hahahaha", "they kicked our ass!" 4) 1:49:22, female cop: "they tell

me to go back, you werent on the front lines getting gassed, they didn't tell us to bring our gas masks, they set us up.")5) 1:53:38, "They took it! They actually took it!", "They really took it!", "They was actually inside!", "Yeah I know!", othher officer: " "They took it", 3rd officer: "oh no doubt", talking outside capitol grounds as grabbing gas masks from van.6) 2:14:36, white female cop: "they set us up, biggest fuckin set up ever", Mexican cop responds: "I'm still live", Female cop now becomes silent... then he turns his camera off, RCO begins to turn camera off 10 seconds after...Section 7820210106-Riotous Acts-US Capitol Complex, ID: 21002555, axon body 3 x6039BFA8, 36:44 long1) 10:50, pepperballs being shot super far back into crowd2) 20:52/ 1:21pm, Black guy in ar,y coat is up front preparing to push against front line telling them to stand down and "this is revolution, this is fucking freedom"3) 32:04/ 1:33pm, "they set us up for failure, they knew what we were going into, why didn't they have us grab our gas masks?!", 4) 32:55, he says it again and other cop agreesSection:79Guy reffit evidence, "Trump Supporters Storm Capitol Building During January 6 Insurrection-4k Footage: 1) 16:33, black camo guy is in same inside area I was 2 windows to the right, secomds before, in my window, seperate guy is telling camera recorder to come in verbally and waving them in, I'm in a corner helping guy in corner, not a lot of people, no police in site2) same black guy outside: "president Trump aint back down, don't be afraid"3) 19:45, cringey proud boy walks by in front of cops with okay sign "we back the yellow, not blue"4) 23:15, I'm talking to hooded columbian woman near tarpSection:80Axon body 3 x6039B849, 1) 15:02:04-0500, black dude walks by cop camera covering his face, he helped break in2) 15:44:40, antifa member(?): "fuck you proud boys, get out of here"Section:81Axon body 3 x6039BH351) 15:39:03-50: I am talking with Columbian girl, she is telling me how they use tarps like the one she has (100'long), wrap them like a present and run around them, she is in grey to my right, 2) 15:39:45-47, she then goes to organize the attack, youncan hear her say "we need more people, 3) 15:40:40-58, I'm walking then move away before they attack4) At 15:47:16, She's back on camera pushing against cops 5) 15:49:15, seconds her and her other female friend walk amd stare into camera6) 16:05:15-30, "no body touched bike", then "who got shot?", "some girl"7) 16:09:52, Fist bump if you love black people, and same sign other side says "show ur tits if you love Trump8) 16:15:34, sexy black girl in chetta jacket with sign laughs and talks with whiter blwck person that has sign that says "grab the swamp by the pussy!", everybody loves them,mtons of people taking her photo and taking photos with her9) 16:18:08, another black girl walks by, after she leaves at 16:9:25 I'm right within view10) 16:20:41, black lady is screaming at cops11) 16:20:46-48, I get on bike then man says "thank you for your service12) 16:20:57, I'm getting infamous photo on bike13) 16:22:00-20, I'm waiting for a new m cycle photo, crowd points and records a new fight breaking out "they are hittin them", black lady says "police are beating peaceful protesters with batons but since we are conservative, for trump, that doesn't matter", then first person cops push is black lady14) 16:23:19, gas is thrown15) 16:23:27, tear gas canister hits my head16) 16:24:17, gas is released next to me and I calmly walk away17) 16:50, cops are laughing and joking with eachother18) 16:56:50, "who's this traitor guy?"19) 16:58:07, officers are coughing from other video, officer PK dean is the guy at :09 frommother vid, triple stripes, 20) 17:01:00, "Honestly, this could have gone a lot worse, see now I know my mask is working, first time I used it in a few weeks"21) 17:11:20, "That was actually kind of fun", "That's your first riot?"22) 17:15:45, "I didn't really expect this today hahahaha"Section:82(originally written in previous vid notes as "other vid")17:10:35, "I mean are we suprised? This is worse than when they ordered us all in after the BLM shit", "Pennsylvania was packed from the White house to the Capitol, there were thousands" 17:14:30Section 83:officer: Luke Foskett (7153), axon body 3 x6039bd59, 1)

2:24:23pm/ 6:48: officers watching protesters around capitol from vehicl and listening to radio: "They're going to burn that fucking building down"| "Haha (points out his camera is on)... That's fine, we'll figure it out"| 2) 31:27: Chansley walks by 7 officers with no one telling him to stop as he's yelling "whose house?" In bull horn with one other person behind him, they only stop the other guy, they let Chansley through amd RCO watches him walk up the steps to the senate floor, no ome says anything to him, officers leave him to search up there alone, no ome told him to come down. (This is all happening right above the first breach point I recorded, many of these officers go downstairs where I was and also encounter people who went were I was).3) 34:25: cops laugh at people everywhere "What is this, Olympus Is Fallen?"| "Yeah"| "We need Gerald Butler!"4) 36:40: capitol officer says to Metro officer " they've been pretty cool once we encounter them right?"| "Yeah, that's there MO" Metro officer then points to camera which stops the capitol police officer mid-sentence "But the problem is...." > convo stops abruptly... then he randomly says "need to get to the doors".... metro warned him just like he warned the other officer to be careful with what he was saying...If we have been pretty cool when they speak to us/ not hostile, then why not give us a dispersal order?5) 39:18: lone protester walks by cop, RCO laughs with 6 other cops and quietly tells officers "feel free, walk by"> officers begin laughing about the movie Olympus Is Fallen again6) 40:00: woman officer: "man went down the hall"| officer: "That's fine (x5-10)"> then speaks to woman officer directly "So the goal is...(doesn't finish sentence, just stops and walks away)"... told cops it was fine that protester walked down the hall.7) 41:00: It's the Capitol Police officer I spoke to as I left, Mr. No helmet| "Where are we trying to stop them from going?"| "They are on the Senate floor"| "We've lost the building"| "at this point we're trying to get the ones who want to get out, out." , during amninsurrection, people don't seek to leave on their owm...8) 41:54: Chansley is escorted by 2 capitol police officers and is saying "God bless the men and women in blue"| Female officer: "Thank you"| Chansley walks by 7 or 8 cops... (2:59:52pm).9) 44:14: Capitol Police officer (Motercycle officer(perhaps the mcycle I sat on?) Speaking to Metro police officer Lt:... "Lt"| Lt: "Sir..."| Cap officer: "I just talked to our watch commander, he said let's monitor and just not let them trash the place" (3:02:27 pm when he shared this with Lt.)(I was in the building at this time (not sure when he spoke to the watch commander)10) 46:47: 2 women protesters walking by police metro police "they (capitol) told us we could use the bathroom"| metro officer: talks to himself and says "I don't know how that's acceptable"11) 15:37:59: MPD officer T.Miller is saying that they should've had guys up at Capitol building amd is pissed that they (Metro) werem't allowed to, he said they weren't allowed to because "we can't send our guys in there, we have other responsibilities, there's guys all over the city with guns!" (On thus current video it's 1:20:00-1:20:2012) Trump Supporting Cop (Riezimger) (said so 10 minutes prior and in his body cam(shown later) said "Once Pence chose the easy way out you knew it was gonna happen, as soon as he did it (certified the election)| 2 seconds prior cops were talking about what caused the breach...| Other cop said "It would have happened either way"| Riezimger: "oh I know". (This shows that the fake news that pence certified the election and was the reason the crowd broke in was somehow also reaching the officers who were outside the building and away from protesters... Who told them Pence certified the election? Regardless, this is great because thus is exactly what I shared, people began breaking in when they were told by people with loudspeakers (probably insiteful feds) that pence certified the election... How was I planning to interrupt a proceeding when I and many others were under the impression that the proceeding was over prior to even entering the building? People knew pence was the tie breaker, only certifying it if it came to a tie/ everyone else had voted already... The "easy way out" was seen by

conservatives as passing/ certifying it, "fighting like hell" as Trump said would he to not certify it"...Section 84: Title: 20210106-Riotous Acts-US capitol Complex, ID: 21002555, categories: none, axon body x6039bkvp, Video length: 2:18:05, Matthew Cek (7357)1) 11:50-12:00: fence beyond bike racks is less than waist high and has cut out for others to walk up, only sign on it is small and says "keep off fence", nothing to warn flash-banged, pepper balled, OC sprayed crowd that it was off limits2) 12:42: black camo guy (acts like a fed, and helped cause the actual first break in, yet, just like Epps, hasn't been targeted) is telling protesters to relax, he tells the crowd "the cops arent the enemies" points at capitol "they are, stick to the plan"... black guy is now telling cops to relax, cop tells man next to him with pole to back up, black guy says "he has a right to be here, this is America(right in front of camera), 15:09-15:12: he says "we have to fight, we have to fucking fight or we have to fucking die", for a solid minute he speaks to people in crowd (like a leader) "we need to go in" (just like epps said), people hug him.3) 1:03:23: Police are playing "loud" speaker/ dispersal, one of leader/ high ranking cops screams "LOUDER, SO THAT WAY THEY CAN HEAR!" (It's a quite speaker compared to the crowd)4) 1:07:41 plain clothed guy is in the same spot recording, some sort of government agent who said he uses water and baking soda when he's with antifa.5) 1:15:57/ 2:16:59 pm: the flag above scaffolding is waiving, this may have been the flag that grabbed my attention as I approached capitol grounds.6) 1:20:02: crowd is overlooking officers from stairs and overhang is screaming "WE LOVE YOU GUYS!" super aggressively as items are being thrown down by the people next to them... HILARIOUS! | smoke grenades thrown back from crowd around 14:25.7) 1:35:25/ 2:36:27pm: beautiful woman on inauguration stage asks RCO "were you guys told to stand down?" | officer: "What?! No!?", then looks behind him and sees tons of officers walking inside building away from protesters, seems reasonable to ask... within 1 minute RCO also leaves and walks into the capitol...8) 1:40:25: officer with M16 outside Crypt says to RC "Protect yourself man, do whatever the fuck you gotta do, just protect yourself (he's black), next rco walks in a few couple seconds and looks to right of crypt, sees protesters (under 10) being held back by a few police, pauses, last time he saw protesters was on retreat into tunnel on inauguration stage, crazy...| lady cop points to go or to go guard opposite end of crypt, no officers there yet...9) 1:42:10 goes to separate area from crypt and doors are being held by 20 or so cops, hitting people trying to get in with batons10) 2:45/2:44:50ish: lady cop and others turn corner from RCO trying to catch breathe, walkie says "shots fired" | lady cop: "shots fired" | other cop: "did they just say shots fired?!" | Lady cop: "Yes, shots fired!"11) 1:45:47: pretty sure I saw Fanone entering crypt looking hella scared with RCO12) 2:47pm: tons of people in crypt, officers kindly pointing them to the other end of the crypt.13) 2:50pm, after walking up steps to rotunda RCo sees tons of protesters inside that room and says "fuck"14) 2:51:50: RCO is asking others to walk please away from entrance, is gently guiding them further inside the building, then a protester asks him where a bathroom is, man walks by RCO and says thank you to officers 4 times, he's super happy, officers reply to him "yup", amd "your're welcome" 15) 2:01:11/ 3:02:14pm: cops enter crypt elevator | metro asks capitol officer "This ever happen before?" | Capitol: " Absolutely fuckin not", "Capitol leadership is a complete fucking failure" | other Capitol cop: "Capitol leadership is shit, they are the worst officials ever!" | Metro officer: (2 cops unsure if both metro): "How did this happen (both ask sepertly)" | Capitol: "So all we had was like bike rack fences outside, and there was like 1,000 people outside, and they just start jumping the fences, push past the line, there's no hard gear anywhere, broke the windows and ran in. (A capitol police officer is saying this to 2 metro cops) | capitol: "House was not in session as this happened", of capitol polive who run the buildimg were under the impression that the house was

not in session at the time, how woukd most protesters "knowingly" be tryimg to onbstruct the "official proceeding"?... 16) 2:04:57 -2:05:01/ 3:06:03pm : walkie talkie "I have 25 people in Senate chamber, they are going through desks and are on top of the podium">> cop in elevator: "Jesus dude" | Walkie talkie: "Does anyone have a bull horn I can use, I need a bull horn"Section 85:officer: Christopher berridge title: congress CDU deployment, E14 designator, uploaded by: brian reed (1383), tags: arlington county pd, highly sensitive, video length: 2:15:31, time: 00:04:01/ 3:39:13pm,1) officers in vehicl arriving to capitol: "Holy shit that's a lot of people", woman officer/driver: "That's a lot of fuckin...well people are pissed", Guy officer: "yup"Woman officer: "Should... I mean democrats are pissed, that's when you know they are in the wrong"Guy officer: "Yup"Section 86: Officer: Stephen Naticchione (11047), video length: 1:40:45, Title: 20210106-Riotous Acts-US capitol complex, ID: 21002555, axon body 3: x6039bdfc, time: 2:41:46pm, 1) 5 officers sharing "they set us up", "why did they set us up for?", "They set us up bad", continue until officer says "...been gassing us the past hour", "...and they don't send us back up until 3 hours later?!", Background: this unit was gassed out mostly from their own officers spraying OC and tear gas despite that wind was against them and most officers didn't have gas masks/ were told by superiors to not bring gas masks. They had to retreat after Lt. Or Srt. Thau fired a tear gas cannister behind his own line causing the police line to break and protesters to move forward.Section 87: officer: Joseph Young (9648), axon body 3 x6039bkaz, video length: 1:33, time: 2:28 pm, 1) 1:21 into clip officer says to other officer while looking at crowd calmly walking on capitol grounds "We fucked this shit all up", "There should have been a line set up before they even got here bruh..." (Pittman said this), both officers are m-cycle cops, they just arrived. This shows: even Officers felt there was nothing holding the crowd back, that officers who arrived at 228 (before I arrived) didn't see barricades or police holding people back, just like I didn't see any when I arrived a little bit later... Section 88:Officer: Anthony Campanale, video length: 2:15:48, clip time: 4:14:07pm/ 33:27:1) RCO looks at capitol command/ high rankers who are wearing suits (2 of them) and says "Yo, you guys are in the right stuff, you got the right gear on for this", officers around him laugh, Officer Riezinger says "Those fucking clowns(2 guys wearing suits and no masks right before cs is about to be deployed in crowd)".This shows: ERT members thought that Capitol was poorly prepared and were clowns for not being prepared/ taking it seriously even as it was happening., 2:45pm, red heads name is cara or kara, actually, may ne Tara Tu somethingC morris is kinda with themW. Bogner at 2:02 is with dispersal message outside, look him up

General omnibus part 1 of 2Note: I was going to organize this and finish this, but honestly, your rushing/ railroadimg me towards trial despite all the 6th amendment and discovery violations that have occured, stopped me from being able to finish this...Im including all notes I currently have and I'm just going to throw whatever I want in here. General Omnibus Motion:Index: (note, this was in progress, index is not updated or fully accurate)***Part A: Intro:***Section 1: What I'm Sending And Why I'm Sending It This Way:Section 2: Requests On How To Proceed:***Part B: General Pretrial Motions:***Part C: Trial Presntation Related Motions:***Part D: Personal/ Global Discovery Related Motions:******Part E: Suppression/ Limine Related Motions:******Part F: Notices To Court:******Part G: State Of Mind Related Motions/ Influences:***Section 1: Autism/ Mental DisordersSection 3: DC/ The Capitol Allowed People To Protest As I Was.Section 4: If police allowed it/ stepped aside, it meant we were in the right/

not breaking the law.Section 5: Declaration of independance/ and wjat people had a right to do to a tyranical government***Part H: Entrapment Related Motions:***Section 1: Primary/ Direct Evidence:Section 2: Secondary/ Supportive Evidence:***Part I: Jury Voir Dire Related Motions::******Part J: Jury Instructions Related Motions:******Part M: Trustworthiness Of The Governments' Assertions Related Motions:***Section1: The Government Has Lied About Me Evidence:Section 2: The Government Has Lied About 1/6 Evidence: ***Part N: Motions Relating To/ Proffering To My Trustworthiness/ Innocence:*****Part A: Intro***Section 1: What I'm Sending And Why I'm Sending It This Way:So i spend my time more efficiently and preserve things for a potential appeal i'm going to just send this court:1) What ive already filed (but hasnt/ didnt reach the court due to the jails' refusals to send them (law says my motions are to be counted as filed the day i hand them to the jail to submit to the court, not my fault the jails refused to send them),2) What i had mostly prepared (but was stolen from me/ not allowed to be taken with me when i've been moved to other jails),3) What i had somewhat prepared (see #2),4) What i had taken notes on in preperation to begin a motion/ motions (see #2 and 3),5) What i had gthered case law on in preperation to begin taking notes for a motion/ motions (see # 2, 3, and 4),6) What I haven't even begun to prepare for but would like to (but haven't been able to due to constantly needing to start over, not having papers, pens, envelopes, stamps, having jails refuse to send other motions, not having a law library, having my notes taken away, no discovery/ discovery issues, or due to other time or situational restraints/ hardships the past 25 months).***Section 2: Requests On How To Proceed:***I request that for efficency (not just for me but for all parties) the court: First: Order the government to submit a list of the numbers they don't object to, then have the court quickly rule on those numbers.Second: Order the government and i to meet to discuss the other disputed motions and attemot to come to further resolutions outside of court/ without the courts assistance.Third: Upon an updated list of the governments remaining obnections, for the court to pass any numbers/ motions it doesn't have an issue passing. Then for me to be updated on the remaining motions that havnt been passed yet. It would also be helpful to know how inclined (or how disinclined) the court is opposing each number/ motion so i know how much attention should be given in preparation for arguing for the passage of that motion.Final: To have a court hearing to debate/ argue the remaing/ disputed motions (After ive been made aware of and had time to prepare verbal arguments for the remaining disputed motions).Note: Should the court ahead of time like additional reasons or information on any number/ motion please ask me to supply such information. (Some id be seeking to supply ex parte).Second Note: When i was moved for the 10th time in 24 months i was given less than 2 hours notice (others received 3 days notice) to pack all my things, have all mail prepared, to be showered, have eaton, prepared for a 24 hour handcuffed (no bathroom trip), shower, and to print out all 6 months of typed motions/ in progress motions, and notes for motions. I was not able to retreive everything in this time due to the little nktice and due to this courts failure to grant releif on past requests (i was fearful such things could happen)... This geberal omnibus motion was delayed even more by these issues/ due to this move....Final Note: Please look back to previous motions/ requests for relief/ complaints on stolen preperations/ discovery violations/ requests for continuances. Then please listen and act for once, i need my preperations, notes, discovery(working/ complete), and a way to prepare slides and videos for trial (i dont have a way to show any of my evidence, and theres a lot...). You barely grant continaunces, but aside from that youve refused to offer any needed and requested releif. Please keep in mind ive had mny requests for motions, discovery, transcripts, and my rewuests for my stolen prperations to be given back ignored by both stand- by counsels, the government, ans this

court. Please keep all this in mind when reviewing my motions. ***Part B: General Pre-Trial Motions:***1) Dismiss due to on selective prosecution1.1) Mostly prpeared in DC jail notes that the jail stole/ refused to let me bring with me over 25 months ago. Standby counsels have failed 8 times to send them to me (according to lewisberg prison, they keep filing the papers incorrectly)...1.2) See United States V. Bryant, 5 F.3d 474, 476 (10th cir. 1993) 2) To have the selective prosecution defence decided by a jury.2.1) You are too corrupt and too biased to objectively rule on this, Id ask that you leave it up to the jurors to be presented with the evidence for this and to decide it, if you arent fearful of them deciding the issue for themselves... They should deceuce this, ive asked for a jury because youve proven to be biased against january sixth defendants and myself (see your difference in ruling/ statements in Capitol hill baptist church v. Bowser and your statements on the same/ a worse situation occuring on 4/14/22). Though a DC jury isnt much better than you, i still trust them more than you. 3) In addition to or if #2 is denied id like to offer the jury a jury nullification option at the end of ttial/ a jury nullification jury instruction. 3.1) The felony espeshailly should have this offered as no one not brain washed by hypocritical hysteria/ hate would think such a charge shouod be able to be applied to me based off of my actions, a 20 year maximum sentance is somthingthe jury should be able to toss out in the interests of justice.4) change of venue: 4.1) I have a full motion for this, ive just been waiting for my dc notes that were stolen from me over 1 year ago to be given back to me. The motion was nearly completed, and i also have newer things to add to it.5) Bill of particulars:A) How did i knowingly tresspass the capitol?B) How did i knowingly tresspass Jeff Merkelys room? C) Specifically, how was i disorderly on capitol grounds?D) Specifically, how was indisorderly in Jeff Merkley's room?E) Specifically, how did i obstruct an offical proceeding?F) Specifically, how did I plan to obstruct an official proceeding? 5.1) I need to know all of the answers to these in order to formulate my defence. My defence is relying on the truth, but i want to be sure im not defending somthing the government doesnt dispute and that i fully understand what it is the government is saying i did and how i did so for each of these charges. Answering these will help me, which in turn will help time to not be wasted in court during trial.6) To dismiss the 1512 charge 6.1) The government has no actual evidence to prove that i planned to obstruct the certification, and the certification had nothing to do with the administration of justice, it was procedural. I did not know that congres still had to vote on the proceeding.7) To dismiss due to prosecurtorial misconduct7.1) See Parts A-F and attcahed documents for appeallte court reply for some examples8) To have jury instruction/ jury decide to dismiss due to prosecutorial misconduct.8.1) See 2.1, same quick arguements9) To dismiss in the interests of justice9.1) To have hearing on the matter and let the jury decice whether to do this (see 2.1, same quick arfuements). Im essentially asking for the jury to be instructed and given the option for a jury nullifcation option and to present an arguement for why they should do so. 10) To be show the governments lies and illegal actions used against me pre-trial10.1) If I lied in court pretrial, the lawbooks are clear, the government could would be able to show prior inconsistant statements and or lies to attack my credibility. I think its only fair that i be allpwed to do the same with the government... The jury is going to have to decide who they feel is more credible and who has more convincing evidence. The jury shpuld be allowed to see the lies to jidge whether the government should be trusted on other claims they will be asserting. The jury should be allowed to see just how mendaciois and filled/ motivated by hate the government has been in thos case. They shouldumb be allowed to see just how severe the lies were and what laws they were willing to break in order to hold me/ place me in jail and to stop me from practicing my 6th amendment right to represent myself.11) To kniw what "past criminal/ bad acts" the government intends to

bring up at trial.12) For all transcripts from 1/16/21 until present to be sent to me:12.1) I've asked for this from current and past stand-by counsels and over 1 year later they still have failed to do this.13) Motion for an actual mental health evaluation13.1) I voluntarily signed up for this while on house arrest despite that this court had no legal right to have me on house arrest since it didnt abide by the BRA. Yet this court tried to act like me rescheduling what i voluntarily signed up for due to being too tired to safely drive an 8,000 pound vehival in the Capitol of New York's busiest highway during rush hour made me a danger to the community and revoked me...13.2) I then tried to get one in jail. I was told by my compulsive kying lawyers that I was being sent to one that would focus on whether I had autism, ADHD, and Oppisitional defiance disorder. I was lied to... It was a simple compatency for trial evaluation and my overall prognosis was very positive (which is why it's weird that my piece of crap lawyers tried to assert that i can't control myself and that this court was convinced at that despite that the evaluation suggested the opposite). The evaluater even told me he wasn't looking for what i thought i came there for, he simply was just seeing if i was compatent to stand trial. We only spoke for aboutn2 hours in total the entire 37 days i was there. 13.3) A HUGE aspect of my defence is my state of mind (entrapment by estoppel, 3rd larty entrapment, not knowing I was tresspassing, not knowing what i was doing was illegal, and not knowing the proccedding wasn't finished...) The courts are clear that mental disorders can have a bearing on these issues, and they most definetly did for me, I've been sharing this before i even read or knew the law... I NEED an real evaluation, but this court and my lawyers have deprived me of being able to do that. 14) To allow me to gain access to video splicing equipment, or an app, or a laptop with basic video editing software with requested videos on file14.1) Would be used to organize videos and for presentation purposes. This would help me present more efficientyl and effectively. It would also save the court time as i wouldnt have to go hunting for specific spots on videos, or where each video was. 15) Motion for a laptop with microsoft powerpoint/ Word15.1) This partenered with basic video editing software would in my mind be the greatest aid to persuading the jury on the evidence and points... I want things to flow smoothly, but for over 2 years, this court hasn't let that happen. 16) Motion to receive paper copy of my criminal record.17) Motion to admit Hong Quan as an additional investigator/ assistant on my case/ get him to sign a protective krder and alllwed to make legal/ unrecorded calls with.18) Motion to know what evidence or words Tom Gillace shared with this court about me.18.1) Even my families ancestors thousands of years ago knew it would only be proper to hear what a persons' accuser had to say about them, they had a right to confront such things and hear what was said and to defend against it. It seems in your courtroom that such basic princibles have been thrown out. Id be interested to know what what was said or presented, and i think the record should include that so i and other courts could know whether those things could have influenced or has influenced you in how youve cinducted yourself in this case and how youve ruled in this case... Esleshsilly since this court has allowed the government to continue to hold me deslite being lresented evidence from the government themselves that they broke the BRA in ordee to give me the condtions of release they gave me and to later lie and revocpke me and place me in jail. Or to call a aotness to the stand, to lrove ineffective assistance of counsel, to not have my prelerations taken. 19) Motion fkr a continuance until all discovery and stolen preperations have been given back to me, along with time to prepare after this has been done.20) Motion to have jurors walk to "crime scene" in and outside of the Capitol, comments. I'd like to speak to jurors and the court in slecific areas so i can better convey what was going on with the crowd, the police, in my mind, and what i was doing so they can better understand. It's right across the street and unlike the issues many courts have with this request,

this court isn't facing those issues since the "crime scene" is right across the street.21) Motion for medical records cara Halverson received/ subpoenaed. I dont have them in my possession nor have I been made aware that the court has them. All i was told was that she had obtained them and that they showed some of my conditions (ADHD, ODD, ect.). I need these for helping the jury to understand my state of mind.21.2) My stand-by counsels were never able to get them from her/ didn't get a respomce from her on this and other evidemce we sought from her.22) To receive transcripts of january 6th defendants who werr found not guilty on all counts, and seperarely of thkse who werr not found guilty of the1512 by judge mcfadden.22.1) I've asked standby cohnsels for this, nothing has ever been given to me. 23) To receive the video evidemce of the "constitutional lawyer" i spoke to who told me i was in danger and not to turn ,yself in because the man seeking me was not a cop as he claimed.23.1) This helps prove my trusting nature of others and that im suscepitible of being fooled by others alomg with being unaware of quickly understanding certain types of new social situations. 23.2) Cara Halverson obtaimed this video but like with my other stuff, she has not givem it to my current stand-by counsels.***Part C: Trial Presntation Related Motions:***1) To be allowed to have a laptop during trial to take notes effiecently2) To be allowed to have tablet to take mobile notes or help remember talking points/ evidence presentation prompts during trial3) To be held in solitary so i can alleviate the courts "worry" of me having a laptop. 3.1) This would be very helpful in preparing me for trial. 4) To have access to or to be alllwed to bring in 5 giant white boards with black and red markers to help aid in arguements for jury. 5) Motion for a laser pointer6) To use/ have a big "debate pyramid" image on/ over my white board7) To admit into evidence the hat and jacket i wore at the capitol for purposes of jury examination/ to have them sent in (and not go missing like much of my property has both in jail (preperations, motions, discovery, notices, correspondance, etc.) And outside it (marshalls/ probation office "losing" my other phone...)***Part D: Entrapment By Estoppel Related:***Section 1: Primary/ Direct Evidence: 1) For the government to explain why both MPD and capitol police didnt order a dispersal near me/ for me, nor share the laws i was breaking, nor give me time to disperse after hearimg that i was breaking those laws.1.1) Both MPD and Capitol police kniw not doing so has caused cases to be dismissed and for the officers to be sued/ lose their qualified immunity (See Baram, Dellums, Carr, etc.). Its their duty to explain and do such things prior to arresting anyone involved in a demonstration or riot. In cases where they have failed to do this the charges have been thrown oit and/ or the convictiins have been thrown out.2) To have a hearing (adequate notice please, unlike yoir suprise and unrequested bond hearing 10/12/21 you gave me...) to determine if my arrest was proper since MPD and Capitol Police failed to do their duty in giving me a dispersal order, telling me what law i was breaking, or giving me adequate time to respond to such information.3)To dismiss my charges since both MPD and Capitol Police failed to do this/ their duty3.1) The government has the burden to show that this was done for me. Worse fkr them, they knkw i have multiple videos to show officers doing the oppisite of telling me to leave or that i was breaking the law.4) Colloquy into why the officers who moved the gates/ barriers and let people pass couldnt be identified when there was a maximum of 4,000 officers present yet they were able to identify people in the crowd with masks on from every state out of hundreds of millions of people.5) Motion to admit offiders body camera footage purposely being turned off when trying to cover up speech about their misconduct and being set up by their superiors.Section 2: Secondary/ Supportive Evidence:1) Motion to know if any capitol police or MPD officers were also employed or compemsated in any way by the FBI1.1) My arresting officer was both a state trooper and FBI agent. Im wondering if others were also employed by the fbi. If so, id also

motion for their body camera footage to see if like other undercover agents there that day if they too were inciting people or making them feel welcome in the capitol.2) To admit testimony/ proof of 20 undercover agents being present with proud boys on 1/6/21(increased chances for entrapment/ entrapment by estoppel).3) To present statements of william popes prosecutor admitting underderciver officers were acting as provocators (inreases the chances that some uniformed officers may have had goal of allowing protesters in.***Part F: Global/ Personal Discovery Related Motions:***1) For all dkscovery from Jeff merkleys room (espeshailly the video that Cara Halverson said she viewed in another clients discovery which shiws me telling an individual not to take a painting (Either ms. Furst never provided it to Ms. Hlaverson or Ms. Halverson never shared it with me despite my requests).2) For all dkscovery videos from the Crypt between the hiors of 2pm and 4 pm on 1/6/21 (both governments videos and videos obtained by or posted by defendants). This includes any officers with body cameras who emtered in the area. There is no searching for the body camera locations in this area...3) For all dkscovery videos from where i entered between the times of 2:15 pm until 6pm on 1/6/21 (both government videos and videos from or poated by defenendants).4) For all discovery videos from where i was before i entered the capitol and after i entered the capitol (near MPD, me arriving at steps, near inaugeration stage, etc.5) Motion for all "sweeping" MPD officers who swept the upper west terrace when i was inside the capitol/ was there when i left the capitol. AND Any videos of MPD officers who wemt inside the capitol for any amount of time.6) To be supplied with the times that congress was evacuated, senate was evacuated, and when i entered the captiol. Additiona,ly to know when the senate was in recess and whrn the hoise was in recess.7) For all social media, videos, photos, etc. received on me to be given to me, i still have a lot missing that i was hoping tk have, the government clearly only sent me some of what they received...8) Motion to be given back and admit at trial the global discovery videos i came across.8.1) These aid in my personel defences, and my entrapment/ entrapment by estoppel defences. The lists of videos are in a folder with my attorney... I still havent been given these back over 1 year after they were illegally stolen by the jail.9) Motion for a disclosure of the governments witness list10) Motion to compel discovery of prosecutors witnesses: Videos from 1/6/21, locations they were in/ near during 1/6/21 and the times they were there, past complaints, misconduct, past arrests, general backround, places/ positions they were removed from/ fired and why.11) Motion to compel the government to account for the phone that my lrobation officer never gave back to me/ put into my lrolerty from my revocation hearing.12) Motion for 1st phone back12.1) It has the video of the officer giving rules for the day/ telling me I would not be arrested if i followed those rules. ***Part G: Suppression/ Limine Related Motions:***1) Pending motion to suppress (depemdimg on if i havent seen discovery the government intends to show/ use at trial, espeshailly since a decent amount of discovery doesnt open). 2) To suppress my 10/12/21 statements2.1) This too was nearly done at the dc jail prior to the jail refusing to let me bring it with me... Until then, my main arguement is that these statements should be suppressed as they were fruits of the poisonous tree (See appeallate court reply Parts A-D (will also be/ did instruct standby counsel to supply this proof of fruits of the posonous tree/ that reply and attachments to this court) 3) Suppress any and all conversations from jail phones, mail, and or other means of communications improperly gathered due to my wrongful incarceration caused by the lies of the government at my detention hearing and revocation hearings 3.1) (Fruit of the poisonous tree) (see 2.1).4) Motion objecting to the deadline of limine/ suppression motions: no discovery ((((, discovery nltes, subplena templates, i asked flr ever since Nlvember 2022 were never delivered, old mltions taken and court hasn't allowed me to get these back which also caused me to nlt be

able to knkw hat i wanted submitted, having no transcripts i requested, having the transcripts i had taken away from me and not given back by this court...4.1) No discovery for over 2 years, then i get discovery that in many cases doesn't work, have my discovery notes (dc jail) taken away by guards (USB) and papers, old motions/ notes of motions taken and not given back, not having the transcrips i requested, having transcripts i use to have taken from me, etc. For these amd other reasons, id object to a deadlinefor linine/ suppression motions being set. Additionally id object to even going to trial until these issues have been resolved, so thing youve failed to offer relief on via either court order or release.... its been about 2 years of me asking for relief...5) Motion to suppress global/ personal discovery I havnt been able to view and or edit and present for trial. 5.1) The goveenment is able to view, edit and present discovery in an organized fashion come trial, I should be able to as well.6) To prohibit out of court statments by prosecutors, court personel, and witnesses.7) Motion in limine: Any stateme ts or remarks that will further inflame the passions and prejudices of an already prejudicial jury pool regarding 1/6/21.7.1) This includes but is not limited to: Continuing the lie that any officers died as a result of 1/6/21 (4 suicides in a year after the event are not deaths related to 1/6/21, if that were the case, the number of protesters killed that day would have risen beyond 4 people. The lrotesters of that day actually had their lives ruined in some capacity, it can't be one sided). Officer Sicknick was not killed by a fire extinguishee as the media falsely reported and was in the Crypt where i was at the time i was giving peolpe directions and was calm (all after his supposed murder via a fire extinguisher). His own mother for months shared that he did not die as a result of janaury 6th.7.2) Continuing the lie that this was an armed insurrection (if 1 person out of 10,000 people shows up to a party to fight, it doesnt make the party an MMA gym, it makes it a party with 1 violent person. The super majority of us didnt show up for an "insurrection"). Many of tbese protesters owned guns. If they were planning to overthrow the government, why would they not brimg their guns?7.3) By mentioning any sort of generalizing terms for the crowd (racists, sexists, radicals, insurrectionists, confederates, murderers, cop killers, bigots, ect.).7.4) To not assert that we or I was doing the bidding of Donald Trump. (He didmt tell us to break in, he simply said he would meet us/ be with us at the Capitol. We were to simply go to the Capitol to see him next.) He did not specify whether he'd be in or outside of the Capitol.7.5) To not assert the incorrect notion that the election was not stolen7.6) See Settles V. United States, 615 A.2d 1105, 1113 (D.C. 1992), Washington V. United States, 760 A.2d 187 (D.C. 2000), United States V. Somers, 496 F.2d 723, 737-39 (3d Cir. 1974). 8) Motion in Limine: Evidence of other crimes:8.1) See Day v. United States, 360 A.2d 483, 485 n.s (D.C. 1976), United States V. Bailey, 505 F.2d 417 (D.C. Cir. 1974); Leonard V. United States, 277 F.2d 834 (9th Cir. 1960). 8) Motion limiting cross examination of witnesses and defendant to relevant issues (unlike how they sometimes tried to bring up irrelevant accusations oor arrests that had nothing to do with January 6th). 9) Motion in limine to stop coirt from saying any negative, ignorant, or false statements about me, my case, or January 6th.9.1) A vreat example of this is when it suggested in June 2023 that I have lied about situation in coirt... I've been the party to prove the other party to lie continoisly whether through investigations, exhbits, videos released to the media, motions, transcripts, or in person. You judge have refused to do anything aboit their lies which is already terrible enough. However, like a true kangeroo court judge you try to portray the oppisite of reality and suggest I have lied... point it out! And unlike how you did at that June 2023 hearing, allow a rebuttal to show you arent the weak, corrupt, and ignirant man that i know you to truely be. You relied on censorship at thst hearing because you have no ability to debate me on the truth. I'd orefer you keep your mouth closed rather than lie or assert somthing eith confidence

that is incorrect, however, i know you at this point, and I understand that is hard for you to do. So i simp.y leave a record that I've asked you to not do it and if you do choose to do it to allow me to prove you wrong instead of simply stating a false point and then stopping me from correcting you or others.***Part H: Notices To The Court:***1) Notice that persoanl discovery issues i kept brining up to court were never resolved at lewisburgh prison, that i still didnt receive the old preperations that the dc and northern neck jail stole, and that now that im back in Dc, i have no way to even view the discovery that did work/ opened.2) Notice of preserving all previously prepared/ stolen/ submitted motions that this court did not receive due to jails, the government, and this court refusing to grant relief prior to, during, and even after these access-to- court violations/ 6th amendment violations occured.6) of at least 15 access to court violations that were stolen/ typed up the the USB device that the DC jail took and then destroyed. These woukdve been filed if the dc jail followed the law and submitted my motions or if thie court granted releif/ wasn't biased in how it applies the law.Entrapment defenceEntrapment by estoppel defenceMental disorder defence (specifically, ODD, ADD, amd Autsim spectrum disorder)***Part I: State Of Mind Related Motions/ Influences:***I am trusting of others: Presenting/ arguing the major contributing factors to my mindset on 1/6/21Presenting/ arguing the less prominant/ minor contributing factors to my mindset on 1/6/211.1) To admit into evidence the supporting evidence for this FACT including but not limited to:2) The government was tyranical (with their covid lockdowns and reactions (Killing 50,000 in nursing homes in NY alome) and attacking the rights of the people, the people had a right to overthrow the governmentPrsenting/ arguing the major conttibuting factors to my minset between late 1/6/21 until 1/16/21. Presenting/ arguing the major contribing factors to my mindset since 1/19/21.My current true mindset on 1/6/21 for me and for others.Section 1: Autism/ mental disorders Section 3: DC/ the Capitol allowed people to protest as I was.Section 4: If police allowed it/ stepped aside, it meant we were in the right/ not breaking the law.Section 5: Declaration of independance/ and wjat people had a right to do to a tyranical government1) Motion to share part of document that shares we have a right and duty to overthrow a tyranical government.2) To obtain or be allowed to obtain and introduce evidence of :2.1) the nursing home murders commited by the governments in NY and across the nation.2.2) the forced shutting down of businesses2.3) the chasing people down on the streets and on the beaches2.4) the arrests of those not willing to put on a face mask/ hurt their health2.5) The forced shutting down of churches/ destroying of the 1st amendment2.6) Not being allowed to visit family, or for senior citizens to leave their rooms/ buildings.Additiojally, this founding document definetly helped influence other peoples thiughts that day and could've aided in the crowds susceptability to beliving that they were allowed inside to over throw the tyranical government, that police were on their side (entrapment by estoppel), more easily inflienced by undercover agents (entrapment), ect. I'll note i wasnt there to over throw the government, clearlt, however, i saw it as a potential reason why people went inside and felt like they were legally justified/ it may have been why police were seemingly allowing us inside to protest. Motion to share videos i posted and search history a few days prior to 1/6/21 as proffer for my thought process prior to 1/6/21Motion to admit my "saxaphone battle" video as a proffer that i get overly excited about most things compared to others (including the events on 1/6/21) as lawbooks share "videos are generally admissible if they are relevant to describe a person", this helps describe my excitement for the unexpected or in new situations (CL:3, B-5, #2)

General omnibus part 1 of 2Note: I was going to organize this and finish this, but honestly, your rushing/ railroadimg me towards trial despite all the 6th amendment and discovery violations that have occured, stopped me from being able to finish this...Im including all notes I currently have and I'm just going to throw whatever I want in here. General Omnibus Motion:Index: (note, this was in progress, index is not updated or fully accurate)***Part A: Intro:***Section 1: What I'm Sending And Why I'm Sending It This Way:Section 2: Requests On How To Proceed:***Part B: General Pretrial Motions:***Part C: Trial Presntation Related Motions:***Part D: Personal/ Global Discovery Related Motions:******Part E: Suppression/ Limine Related Motions:******Part F: Notices To Court:******Part G: State Of Mind Related Motions/ Influences:***Section 1: Autism/ Mental DisordersSection 3: DC/ The Capitol Allowed People To Protest As I Was.Section 4: If police allowed it/ stepped aside, it meant we were in the right/ not breaking the law.Section 5: Declaration of independance/ and wjat people had a right to do to a tyranical government***Part H: Entrapment Related Motions:***Section 1: Primary/ Direct Evidence:Section 2: Secondary/ Supportive Evidence:***Part I: Jury Voir Dire Related Motions::******Part J: Jury Instructions Related Motions:******Part M: Trustworthiness Of The Governments' Assertions Related Motions:***Section1: The Government Has Lied About Me Evidence:Section 2: The Government Has Lied About 1/6 Evidence: ***Part N: Motions Relating To/ Proffering To My Trustworthiness/ Innocence:*****Part A: Intro***Section 1: What I'm Sending And Why I'm Sending It This Way:So i spend my time more efficiently and preserve things for a potential appeal i'm going to just send this court:1) What ive already filed (but hasnt/ didnt reach the court due to the jails' refusals to send them (law says my motions are to be counted as filed the day i hand them to the jail to submit to the court, not my fault the jails refused to send them),2) What i had mostly prepared (but was stolen from me/ not allowed to be taken with me when i've been moved to other jails),3) What i had somewhat prepared (see #2),4) What i had taken notes on in preperation to begin a motion/ motions (see #2 and 3),5) What i had gthered case law on in preperation to begin taking notes for a motion/ motions (see # 2, 3, and 4),6) What I haven't even begun to prepare for but would like to (but haven't been able to due to constantly needing to start over, not having papers, pens, envelopes, stamps, having jails refuse to send other motions, not having a law library, having my notes taken away, no discovery/ discovery issues, or due to other time or situational restraints/ hardships the past 25 months).***Section 2: Requests On How To Proceed:***I request that for effcency (not just for me but for all parties) the court: First: Order the government to submit a list of the numbers they don't object to, then have the court quickly rule on those numbers.Second: Order the government and i to meet to discuss the other disputed motions and attemot to come to further resolutions outside of court/ without the courts assistance.Third: Upon an updated list of the governments remaining obnections, for the court to pass any numbers/ motions it doesn't have an issue passing. Then for me to be updated on the remaining motions that havnt been passed yet. It would also be helpful to know how inclined (or how disinclined) the court is opposing each number/ motion so i know how much attention should be given in preparation for arguing for the passage of that motion.Final: To have a court hearing to debate/ argue the remaing/ disputed motions (After ive been made aware of and had time to prepare verbal arguments for the remaining disputed motions).Note: Should the court ahead of time like additional reasons or information on any number/ motion please ask me to supply such information. (Some id be seeking to supply ex parte).Second Note: When i was moved for the 10th time in 24 months i was given less than 2 hours notice (others received 3 days notice) to pack all my things, have all

mail prepared, to be showered, have eaton, prepared for a 24 hour handcuffed (no bathroom trip), shower, and to print out all 6 months of typed motions/ in progress motions, and notes for motions. I was not able to retreive everything in this time due to the little nktice and due to this courts failufe to grant releif on past requests (i was fearful such things could happen)... This geberal omnibus motion was delayed even more by these issues/ due to this move....Final Note: Please look back to previous motions/ requests for relief/ complaints on stolen preperations/ discovery violations/ requests for continuances. Then please listen and act for once, i need my preperations, notes, discovery(working/ complete), and a way to prepare slides and videos for trial (i dont have a way to show any of my evidence, and theres a lot...). You barely grant continaunces, but aside from that youve refused to offer any needed and requested releif. Please keep in mind ive had mny requests for motions, discovery, transcripts, and my rewuests for my stolen prperations to be given back ignored by both stand- by counsels, the government, ans this court. Please keep all this in mind when reviewing my motions. ***Part B: General Pre-Trial Motions:***1) Dismiss due to on selective prosecution1.1) Mostly prpeared in DC jail notes that the jail stole/ refused to let me bring with me over 25 months ago. Standby counsels have failed 8 times to send them to me (according to lewisberg prison, they keep filing the papers incorrectly)...1.2) See United States V. Bryant, 5 F.3d 474, 476 (10th cir. 1993) 2) To have the selective prosecution defence decided by a jury.2.1) You are too corrupt and too biased to objectively rule on this, Id ask that you leave it up to the jurors to be presented with the evidence for this and to decide it, if you arent fearful of them deciding the issue for themselves... They should decuce this, ive asked for a jury because youve proven to be biased against january sixth defendants and myself (see your difference in ruling/ statements in Capitol hill baptist church v. Bowser and your statements on the same/ a worse situation occuring on 4/14/22). Though a DC jury isnt much better than you, i still trust them more than you. 3) In addition to or if #2 is denied id like to offer the jury a jury nullification option at the end of ttial/ a jury nullification jury instruction. 3.1) The felony espeshailly should have this offered as no one not brain washed by hypocritical hysteria/ hate would think such a charge shouod be able to be applied to me based off of my actions, a 20 year maximum sentance is somthingthe jury should be able to toss out in the interests of justice.4) change of venue: 4.1) I have a full motion for this, ive just been waiting for my dc notes that were stolen from me over 1 year ago to be given back to me. The motion was nearly completed, and i also have newer things to add to it.5) Bill of particulars:A) How did i knowingly tresspass the capitol?B) How did i knowingly tresspass Jeff Merkelys room? C) Specifically, how was i disorderly on capitol grounds?D) Specifically, how was indisorderly in Jeff Merkley's room?E) Specifically, how did i obstruct an offical proceeding?F) Specifically, how did I plan to obstruct an official proceeding? 5.1) I need to know all of the answers to these in order to formulate my defence. My defence is relying on the truth, but i want to be sure im not defending somthing the government doesnt dispute and that i fully understand what it is the government is saying i did and how i did so for each of these charges. Answering these will help me, which in turn will help time to not be wasted in court during trial.6) To dismiss the 1512 charge 6.1) The government has no actual evidence to prove that i planned to obstruct the certification, and the certification had nothing to do with the administration of justice, it was procedural. I did not know that congres still had to vote on the proceeding.7) To dismiss due to prosecurtorial misconduct7.1) See Parts A-F and attcahed documents for appeallte court reply for some examples8) To have jury instruction/ jury decide to dismiss due to prosecutorial misconduct.8.1) See 2.1, same quick arguements9) To dismiss in the interests of justice9.1) To have hearing on the matter and let the jury decice whether to do this (see 2.1, same quick

arfuements). Im essentially asking for the jury to be instructed and given the option for a jury nullifcation option and to present an arguement for why they should do so. 10) To be show the governments lies and illegal actions used against me pre-trial10.1) If I lied in court pretrial, the lawbooks are clear, the government could would be able to show prior inconsistant statements and or lies to attack my credibility. I think its only fair that i be allpwed to do the same with the government... The jury is going to have to decide who they feel is more credible and who has more convincing evidence. The jury shpuld be allowed to see the lies to jidge whether the government should be trusted on other claims they will be asserting. The jury should be allowed to see just how mendaciois and filled/ motivated by hate the government has been in thos case. They shouldumb be allowed to see just how severe the lies were and what laws they were willing to break in order to hold me/ place me in jail and to stop me from practicing my 6th amendment right to represent myself.11) To kniw what "past criminal/ bad acts" the government intends to bring up at trial.12) For all transcripts from 1/16/21 until present to be sent to me:12.1) I've asked for this from current and past stand-by counsels and over 1 year later they still have failed to do this.13) Motion for an actual mental health evaluation13.1) I voluntarily signed up for this while on house arrest despite that this court had no legal right to have me on house arrest since it didnt abide by the BRA. Yet this court tried to act like me rescheduling what i voluntarily signed up for due to being too tired to safely drive an 8,000 pound vehival in the Capitol of New York's busiest highway during rush hour made me a danger to the community and revoked me...13.2) I then tried to get one in jail. I was told by my compulsive kying lawyers that I was being sent to one that would focus on whether I had autism, ADHD, and Oppisitional defiance disorder. I was lied to... It was a simple compatency for trial evaluation and my overall prognosis was very positive (which is why it's weird that my piece of crap lawyers tried to assert that i can't control myself and that this court was convinced at that despite that the evaluation suggested the opposite). The evaluater even told me he wasn't looking for what i thought i came there for, he simply was just seeing if i was compatent to stand trial. We only spoke for aboutn2 hours in total the entire 37 days i was there. 13.3) A HUGE aspect of my defence is my state of mind (entrapment by estoppel, 3rd larty entrapment, not knowing I was tresspassing, not knowing what i was doing was illegal, and not knowing the proccedding wasn't finished...) The courts are clear that mental disorders can have a bearing on these issues, and they most definetly did for me, I've been sharing this before i even read or knew the law... I NEED an real evaluation, but this court and my lawyers have deprived me of being able to do that. 14) To allow me to gain access to video splicing equipment, or an app, or a laptop with basic video editing software with requested videos on file14.1) Would be used to organize videos and for presentation purposes. This would help me present more efficientyl and effectively. It would also save the court time as i wouldnt have to go hunting for specific spots on videos, or where each video was. 15) Motion for a laptop with microsoft powerpoint/ Word15.1) This partenered with basic video editing software would in my mind be the greatest aid to persuading the jury on the evidence and points... I want things to flow smoothly, but for over 2 years, this court hasn't let that happen. 16) Motion to receive paper copy of my criminal record.17) Motion to admit Hong Quan as an additional investigator/ assistant on my case/ get him to sign a protective krder and alllwed to make legal/ unrecorded calls with.18) Motion to know what evidence or words Tom Gillace shared with this court about me.18.1) Even my families ancestors thousands of years ago knew it would only be proper to hear what a persons' accuser had to say about them, they had a right to confront such things and hear what was said and to defend against it. It seems in your courtroom that such basic princibles have been thrown out. Id be interested to know what what was said or

presented, and i think the record should include that so i and other courts could know whether those things could have influenced or has influenced you in how youve cinducted yourself in this case and how youve ruled in this case... Esleshsilly since this court has allowed the government to continue to hold me deslite being lresented evidence from the government themselves that they broke the BRA in ordee to give me the condtions of release they gave me and to later lie and revocpke me and place me in jail. Or to call a aotness to the stand, to lrove ineffective assistance of counsel, to not have my prelerations taken. 19) Motion fkr a continuance until all discovery and stolen preperations have been given back to me, along with time to prepare after this has been done.20) Motion to have jurors walk to "crime scene" in and outside of the Capitol, comments. I'd like to speak to jurors and the court in slecific areas so i can better convey what was going on with the crowd, the police, in my mind, and what i was doing so they can better understand. It's right across the street and unlike the issues many courts have with this request, this court isn't facing those issues since the "crime scene" is right across the street.21) Motion for medical records cara Halverson received/ subpoenaed. I dont have them in my possession nor have I been made aware that the court has them. All i was told was that she had obtained them and that they showed some of my conditions (ADHD, ODD, ect.). I need these for helping the jury to understand my state of mind.21.2) My stand-by counsels were never able to get them from her/ didn't get a respomce from her on this and other evidemce we sought from her.22) To receive transcripts of january 6th defendants who werr found not guilty on all counts, and seperarely of thkse who werr not found guilty of the1512 by judge mcfadden.22.1) I've asked standby cohnsels for this, nothing has ever been given to me. 23) To receive the video evidemce of the "constitutional lawyer" i spoke to who told me i was in danger and not to turn ,yself in because the man seeking me was he was not a cop as he claimed.23.1) This helps prove my trusting nature of others and that im suscepitible of being fooled by others alomg with being unaware of quickly understanding certain types of new social situations. 23.2) Cara Halverson obtaimed this video but like with my other stuff, she has not givem it to my current stand-by counsels.***Part C: Trial Presntation Related Motions:***1) To be allowed to have a laptop during trial to take notes effiecently2) To be allowed to have tablet to take mobile notes or help remember talking points/ evidence presentation prompts during trial3) To be held in solitary so i can alleviate the courts "worry" of me having a laptop. 3.1) This would be very helpful in preparing me for trial. 4) To have access to or to be alllwed to bring in 5 giant white boards with black and red markers to help aid in arguements for jury. 5) Motion for a laser pointer6) To use/ have a big "debate pyramid" image on/ over my white board7) To admit into evidence the hat and jacket i wore at the capitol for purposes of jury examination/ to have them sent in (and not go missing like much of my property has both in jail (preperations, motions, discovery, notices, correspondance, etc.) And outside it (marshalls/ probation office "losing" my other phone...)***Part D: Entrapment By Estoppel Related:***Section 1: Primary/ Direct Evidence: 1) For the government to explain why both MPD and capitol police didnt order a dispersal near me/ for me, nor share the laws i was breaking, nor give me time to disperse after hearimg that i was breaking those laws.1.1) Both MPD and Capitol police kniw not doing so has caused cases to be dismissed and for the officers to be sued/ lose their qualified immunity (See Baram, Dellums, Carr, etc.). Its their duty to explain and do such things prior to arresting anyone involved in a demonstration or riot. In cases where they have failed to do this the charges have been thrown oit and/ or the convictiins have been thrown out.2) To have a hearing (adequate notice please, unlike yoir suprise and unrequested bond hearing 10/12/21 you gave me...) to determine if my arrest was proper since MPD and Capitol Police failed to do their duty in giving me a dispersal order, telling me what

law i was breaking, or giving me adequate time to respond to such information.3)To dismiss my charges since both MPD and Capitol Police failed to do this/ their duty3.1) The government has the burden to show that this was done for me. Worse fkr them, they knkw i have multiple videos to show officers doing the oppisite of telling me to leave or that i was breaking the law.4) Colloquy into why the officers who moved the gates/ barriers and let people pass couldnt be identified when there was a maximum of 4,000 officers present yet they were able to identify people in the crowd with masks on from every state out of hundreds of millions of people.5) Motion to admit offiders body camera footage purposely being turned off when trying to cover up speech about their misconduct and being set up by their superiors.Section 2: Secondary/ Supportive Evidence:1) Motion to know if any capitol police or MPD officers were also employed or compemsated in any way by the FBI1.1) My arresting officer was both a state trooper and FBI agent. Im wondering if others were also employed by the fbi. If so, id also motion for their body camera footage to see if like other undercover agents there that day if they too were inciting people or making them feel welcome in the capitol.2) To admit testimony/ proof of 20 undercover agents being present with proud boys on 1/6/21(increased chances for entrapment/ entrapment by estoppel).3) To present statements of william popes prosecutor admitting underderciver officers were acting as provocators (inreases the chances that some uniformed officers may have had goal of allowing protesters in.***Part F: Global/ Personal Discovery Related Motions:***1) For all dkscovery from Jeff merkleys room (espeshailly the video that Cara Halverson said she viewed in another clients discovery which shiws me telling an individual not to take a painting (Either ms. Furst never provided it to Ms. Hlaverson or Ms. Halverson never shared it with me despite my requests).2) For all dkscovery videos from the Crypt between the hoirs of 2pm and 4 pm on 1/6/21 (both governments videos and videos obtained by or posted by defendants). This includes any officers with body cameras who emtered in the area. There is no searching for the body camera locations in this area...3) For all dkscovery videos from where i entered between the times of 2:15 pm until 6pm on 1/6/21 (both government videos and videos from or poated by defenendants).4) For all discovery videos from where i was before i entered the capitol and after i entered the capitol (near MPD, me arriving at steps, near inaugeration stage, etc.5) Motion for all "sweeping" MPD officers who swept the upper west terrace when i was inside the capitol/ was there when i left the capitol. AND Any videos of MPD officers who wemt inside the capitol for any amount of time.6) To be supplied with the times that congress was evacuated, senate was evacuated, and when i entered the captiol. Additiona,ly to know when the senate was in recess and whrn the hoise was in recess.7) For all social media, videos, photos, etc. received on me to be given to me, i still have a lot missing that i was hoping tk have, the government clearly only sent me some of what they received...8) Motion to be given back and admit at trial the global discovery videos i came across.8.1) These aid in my personel defences, and my entrapment/ entrapment by estoppel defences. The lists of videos are in a folder with my attorney... I still havent been given these back over 1 year after they were illegally stolen by the jail.9) Motion for a disclosure of the governments witness list10) Motion to compel discovery of prosecutors witnesses: Videos from 1/6/21, locations they were in/ near during 1/6/21 and the times they were there, past complaints, misconduct, past arrests, general backround, places/ positions they were removed from/ fired and why.11) Motion to compel the government to account for the phone that my lrobation officer never gave back to me/ put into my lrolerty from my revocation hearing.12) Motion for 1st phone back12.1) It has the video of the officer giving rules for the day/ telling me I would not be arrested if i followed those rules. ***Part G: Suppression/ Limine Related Motions:***1) Pending motion to suppress

(depemdimg on if i havent seen discovery the government intends to show/ use at trial, espeshailly since a decent amount of discovery doesnt open). 2) To suppress my 10/12/21 statements2.1) This too was nearly done at the dc jail prior to the jail refusing to let me bring it with me... Until then, my main arguement is that these statements should be suppressed as they were fruits of the poisonous tree (See appeallate court reply Parts A-D (will also be/ did instruct standby counsel to supply this proof of fruits of the posonous tree/ that reply and attachments to this court) 3) Suppress any and all conversations from jail phones, mail, and or other means of communications improperly gathered due to my wrongful incarceration caused by the lies of the government at my detention hearing and revocation hearings 3.1) (Fruit of the poisonous tree) (see 2.1).4) Motion objecting to the deadline of limine/ suppression motions: no discovery ((((, discovery nltes, subplena templates, i asked flr ever since Nlvember 2022 were never delivered, old mltions taken and court hasn't allowed me to get these back which also caused me to nlt be able to knkw hat i wanted submitted, having no transcripts i requested, having the transcripts i had taken away from me and not given back by this court...4.1) No discovery for over 2 years, then i get discovery that in many cases doesn't work, have my discovery notes (dc jail) taken away by guards (USB) and papers, old motions/ notes of motions taken and not given back, not having the transcrips i requested, having transcripts i use to have taken from me, etc. For these amd other reasons, id object to a deadlinefor linine/ suppression motions being set. Additionally id object to even going to trial until these issues have been resolved, so thing youve failed to offer relief on via either court order or release.... its been about 2 years of me asking for relief...5) Motion to suppress global/ personal discovery I havnt been able to view and or edit and present for trial. 5.1) The goveenment is able to view, edit and present discovery in an organized fashion come trial, I should be able to as well.6) To prohibit out of court statments by prosecutors, court personel, and witnesses.7) Motion in limine: Any stateme ts or remarks that will further inflame the passions and prejudices of an already prejudicial jury pool regarding 1/6/21.7.1) This includes but is not limited to: Continuing the lie that any officers died as a result of 1/6/21 (4 suicides in a year after the event are not deaths related to 1/6/21, if that were the case, the number of protesters killed that day would have risen beyond 4 people. The lrotesters of that day actually had their lives ruined in some capacity, it can't be one sided). Officer Sicknick was not killed by a fire extinguishee as the media falsely reported and was in the Crypt where i was at the time i was giving peolpe directions and was calm (all after his supposed murder via a fire extinguisher). His own mother for months shared that he did not die as a result of janaury 6th.7.2) Continuing the lie that this was an armed insurrection (if 1 person out of 10,000 people shows up to a party to fight, it doesnt make the party an MMA gym, it makes it a party with 1 violent person. The super majority of us didnt show up for an "insurrection"). Many of tbese protesters owned guns. If they were planning to overthrow the government, why would they not brimg their guns?7.3) By mentioning any sort of generalizing terms for the crowd (racists, sexists, radicals, insurrectionists, confederates, murderers, cop killers, bigots, ect.).7.4) To not assert that we or I was doing the bidding of Donald Trump. (He didmt tell us to break in, he simply said he would meet us/ be with us at the Capitol. We were to simply go to the Capitol to see him next.) He did not specify whether he'd be in or outside of the Capitol.7.5) To not assert the incorrect notion that the election was not stolen7.6) See Settles V. United States, 615 A.2d 1105, 1113 (D.C. 1992), Washington V. United States, 760 A.2d 187 (D.C. 2000), United States V. Somers, 496 F.2d 723, 737-39 (3d Cir. 1974). 8) Motion in Limine: Evidence of other crimes:8.1) See Day v. United States, 360 A.2d 483, 485 n.s (D.C. 1976), United States V. Bailey, 505 F.2d 417 (D.C. Cir. 1974); Leonard V. United States, 277 F.2d 834 (9th Cir. 1960).

8) Motion limiting cross examination of witnesses and defendant to relevant issues (unlike how they sometimes tried to bring up irrelevant accusations oor arrests that had nothing to do with January 6th). 9) Motion in limine to stop coirt from saying any negative, ignorant, or false statements about me, my case, or January 6th.9.1) A vreat example of this is when it suggested in June 2023 that I have lied about situation in coirt... I've been the party to prove the other party to lie continoisly whether through investigations, exhbits, videos released to the media, motions, transcripts, or in person. You judge have refused to do anything aboit their lies which is already terrible enough. However, like a true kangeroo court judge you try to portray the oppisite of reality and suggest I have lied... point it out! And unlike how you did at that June 2023 hearing, allow a rebuttal to show you arent the weak, corrupt, and ignirant man that i know you to truely be. You relied on censorship at thst hearing because you have no ability to debate me on the truth. I'd orefer you keep your mouth closed rather than lie or assert somthing eith confidence that is incorrect, however, i know you at this point, and I understand that is hard for you to do. So i simp.y leave a record that I've asked you to not do it and if you do choose to do it to allow me to prove you wrong instead of simply stating a false point and then stopping me from correcting you or others.***Part H: Notices To The Court:***1) Notice that persoanl discovery issues i kept brining up to court were never resolved at lewisburgh prison, that i still didnt receive the old preperations that the dc and northern neck jail stole, and that now that im back in Dc, i have no way to even view the discovery that did work/ opened.2) Notice of preserving all previously prepared/ stolen/ submitted motions that this court did not receive due to jails, the government, and this court refusing to grant relief prior to, during, and even after these access-to- court violations/ 6th amendment violations occured.6) of at least 15 access to court violations that were stolen/ typed up the the USB device that the DC jail took and then destroyed. These woukdve been filed if the dc jail followed the law and submitted my motions or if this court granted releif/ wasn't biased in how it applies the law.Entrapment defenceEntrapment by estoppel defenceMental disorder defence (specifically, ODD, ADD, amd Autsim spectrum disorder)***Part I: State Of Mind Related Motions/ Influences:***I am trusting of others: Presenting/ arguing the major contributing factors to my mindset on 1/6/21Presenting/ arguing the less prominant/ minor contributing factors to my mindset on 1/6/211.1) To admit into evidence the supporting evidence for this FACT including but not limited to:2) The government was tyranical (with their covid lockdowns and reactions (Killing 50,000 in nursing homes in NY alome) and attacking the rights of the people, the people had a right to overthrow the governmentPrsenting/ arguing the major conttibuting factors to my minset between late 1/6/21 until 1/16/21. Presenting/ arguing the major contribing factors to my mindset since 1/19/21.My current true mindset on 1/6/21 for me and for others.Section 1: Autism/ mental disorders Section 3: DC/ the Capitol allowed people to protest as I was.Section 4: If police allowed it/ stepped aside, it meant we were in the right/ not breaking the law.Section 5: Declaration of independance/ and wjat people had a right to do to a tyranical government1) Motion to share part of document that shares we have a right and duty to overthrow a tyranical government.2) To obtain or be allowed to obtain and introduce evidence of :2.1) the nursing home murders commited by the governments in NY and across the nation.2.2) the forced shutting down of businesses2.3) the chasing people down on the streets and on the beaches2.4) the arrests of those not willing to put on a face mask/ hurt their health2.5) The forced shutting down of churches/ destroying of the 1st amendment2.6) Not being allowed to visit family, or for senior citizens to leave their rooms/ buildings.Additiojally, this founding document definetly helped influence other peoples thiughts that day and could've aided in the crowds susceptability to beliving that

they were allowed inside to over throw the tyranical government, that police were on their side (entrapment by estoppel), more easily inflienced by undercover agents (entrapment), ect. I'll note i wasnt there to over throw the government, clearlt, however, i saw it as a potential reason why people went inside and felt like they were legally justified/ it may have been why police were seemingly allowing us inside to protest. Motion to share videos i posted and search history a few days prior to 1/6/21 as proffer for my thought process prior to 1/6/21Motion to admit my "saxaphone battle" video as a proffer that i get overly excited about most things compared to others (including the events on 1/6/21) as lawbooks share "videos are generally admissible if they are relevant to describe a person", this helps describe my excitement for the unexpected or in new situations (CL:3, B-5, #2)


General omnibus part 2 of 2***Part J: Entrapment Related Motions:***Section 1: Entrapment Evidence: Primary/ Direct2) To admit videos that support or show evidence of government agents acting as provockators in the crowd that day.Section 2: Entrapment evidence: Secondary/ supportive:1) Motion to receive or to be allowed to obtain and introduce as supportive evidence Ted Cruz's examination of some high ranking FBI official (don't have stolen notes from DC jail with me, though they can be given to me if stand-by counsels get them to me...) in the senate on whether their were FBI agents working undercover in the crowd on 1/6/21. 1.1) She contantly avoids the question, tries to cover up the truth, and helps the viewer understand that there were undercover agents there that day that the FBI didn't want to let us know about.2) Motion to admit officers body camera footage purposely being turned off when trying to cover up speech about their misconduct and when speaking about being set up by their superiors.3) 1) Motion to know if any Capitol Police or MPD officers were also employed or compemsated in any way by the FBI3.1) My arresting officer was both a state trooper and FBI agent. Im wondering if others were also employed by the fbi. If so, id also motion for their body camera footage to see if like other undercover agents there that day if they too were inciting people or making them feel welcome in the capitol.4) Colloquy into how the "bomber" avoided cameras and protective sweeps from the secret service in an extremely sequre and monitored area.5) Motion to quickly point out how in watergate, the super majlrity of the people initially charged in the break in were glvernment agents, this is to help show that this isn't some crazy conspiracy theory. The FBI in DC has done similar thing like this before to help get a president they didnt like out of office, it's entirely possible that they did this to hurt Trump from getting back in/ to impeach him.6) to show/ introduce quick evidence on government officials knowingly lying on Sadam Hussien having weapons of mass destruction in order to get the public support to invade( "we know they have it" later publicqlly stated they knew they were lying to the American public). This would be relevant to the govrrnment knowingly lying when they claimed to the public "the election wasn't stolen", which just like in in the weapons of mass destruction case we now know to be a lie (FBI's hunter Biden laptop suppression effect on voters/ election interference). 6.1) Would be opening to compare it to the FBI/ government using 1/6/21 narrative and helping to plan it/ make it happen (entraoment) to increase power and funding for domestic terrorism/ increase public sentiment in going after us/ funding it just as they did with their knowningly false statements of sadam having weapons of mass destruction. I also have public statements under oath while speaking to Congress about how a few FBI agents shared that this was what their agency was doing. 7) To admit testimony/ proof of 20 undercover agents being present with proud boys on 1/6/21(increased chances for entrapment) 8) to admit the amlunt of government agents involved/

arrested in Governor Whitmlre kidnapping/ entrapment. 9) to bring up the Tonkin Gulf Resolution breifly as a prlffer that the givernment lied about a manlr event in the past to its citizens in orddr to get what it wanted. 10) Mltion to point out that Martin Luther King was also labeled by the FBI and J. Edgar Hoover to be "The greatest threat to American Democracy", he was speaking out against what was truely wrong in America just as I was after 1/6/21. ***Part L: Jury Instructions Related Motions:******Part M: Trustworthiness Of The Governments Assertions Related Motions:***As the lawbooks share: "Any attempt to mislead the court would certianly be grounds, in and of itself... [to establish] the accused as a dishonest person before the court and the prosecutor, which can only come back to haughnt the defendant at the time of trial." I ask, if this can happen to defendants fearful of losing their own liberty, why should't the same apply to those who lie in order to take away another persons' liberty? The governments' lies about January 6th and about me most definetly should be able to come back to haugnt them at the time kf trial, it's only fair. To deny such a thing wouldn't just be a clear showing of bias, it would serve to be a welcoming mat to future government misconduct and lies.Model Penal Code 242.3 defines hindering a prosecution as occuring when a person: Intends to hinder the apprehension, prosecution, conviction, or punishment of another person for a crime, AND by concealing or destroying evidence of a crime that might aid in the discovery or apprention of such person, by volunteering false information to law enforcement, by preventing or obstructing by means of force, intimitadtion, or deception, anyome from performing an act that might aid in the discovery or apprehension of such persons. In some juristictions, this conduct is reffered to as tampering with physical evidence.Section 1: The Government Has Lied About Me/ my circumstances Evidence:Section 2: The Government Has Lied About 1/6 Evidence:Section 3: Other forms of misconduct/ hindering my defence by the government: 1) Allowing my preperatioms to be taken 7 times2) Global discovery data dump3) Personal discovery issues4) appeals5) USB destruction***Part N: Motions Relating To/ Proffering To My Trustworthiness/Innocence:***1) To bring up my first ever time I was accused of commiting a crime.1.1) As the lawbooks I've read share: "As the court of appeals for tne State of New York noted: 'Proof of prior convictions of perjury or other crimes of individual dishonesty should usually be admitted on trial of another similar charge, notwithstanding thr risk of possible prejudice...' People V. Sandoval, 34, N.Y. 2d 371, 314 N.E. 2d 413 (1974).1.2) If using comvictions can be used against a person to go show them as dishonest, than I think it would only be fair to alsp be able to use times when i was accused of somthing and it turned out to be false to show me as honest.1.3) The best case and the most relevant this 1/6 case is my arrest in college. I was accused of somthing that I didnt do. I was lied about and the charges alone resulted in me losing friends, my coaching position, I was told I was at risk of being kicked out of my college, my college suite, and I lost many mutual friends that i had with this accuser. Fkr months i had this hanging over my head, but i continued asserting the truth. Finally, months later, an investigator found video evidence that I was the party telling the truth. This not only caused my charges to be dropped but for the other party to be charged. In the 1/6 case, since I've left the building I shared that cops seemed to be on our side, i felt welcomed... This case ruined me in many similar (but more extreme) ways. 1.4) As evidence for my truthfulness, I'd like to admit evidence of the phone call from dectjve Barmes. This phone call was made when he obtained the video and was sharing with me the good news that what i had shared months ago was proven to be true, that my charges were dropped, and that he'd like to speak to me aboit pressing charges on the other party for lyin, attacking me, and breaking into my college suite.2) To submit my second arrest/ contempt of court charge as evidence for how i respond to lies and abuse.2.1) This

would offer supportive evidence that Im not guilty of the 1512 charge. It helps show i was only angry at the lies neing shared and respomded how i respomded because of what those lies were doing to me.2.2) The secomd time I was arrested was due to me respomding to an accuser(the same ome who i got a protectice order against following my first arrest/dropped charges (see #1-1.4)) lies about me... I made a social media post that upset the government, just as I did following 1/6/21. It's also extremely similar and relevant because in this case amd the 1/6 case I was responding out of anger to losses I was suffreeering from caused by the lies. In noth cases i had taken to social media and wrote a nunch of inflamatory things anout my abuser/ accusser. The court told me to not post anything more about her, and so I did. Except when she posted a partial picture of the protective order and lied to our friends that she had one agaimst me, it only showed our names, not the bottom of the document that explains the protective order was against her... Just like in this 1/6 case, mutual friends beleived the lies of my accuser and were attacking me. So i posted the full protective order showing it was against her, proving her wrong... For this I was charged with contempt of court. I suffered greater punishment than she did for correcting a lie than she did for breaking in, attacking me, destroying my property, amd then trying to lie about the situation in order to put me in jail (a prime example of female priviledge). Just as in this case as the government shared, it wasnt so much my actions on 1/6/21 that concerned them, it was my social media posts followimg 1/6/21. This shows how I have responded for years to lies, abuse, and my life being destroyed... I talk a lot of crap and make social media posts. The jury should be allowed to see this as it will help them understamd why I posted what I did. The Government intends to show my social media posts, I should be allowed to help explain why I posted such things.3) To admit the plea dealsofered/ plea deal discussions as an additional proffer of my innocence (including the misdemeanor time served plea deal offered around March of 2022) and desire for truthful outcome. 3.1) The lawbooks share that even innocent people are inclined to sign a time served plea deal if they are held in jail/ guilty plea if held in jail. Miceleniois Motions: Selective orosecution related: to admit videos of white house being attacked, to show Luke Graves dropped almost all of their charges (and did the opposite with us), to show more police were injured here than on 1/6/21, to show the crowd was not even a fraction of the size of ours (and yet was more violent/ harder to control), to show media and politicians making fun of trump for being moved down to bunker (("bunker boy") and then comlare to them freak out about Mike Pence having to be moved down into his bunker).Motion to admit the evidence that my vote wasn't counted in 2020 even though i voted in person, a complaint many people had.Motion to point out how the election of Kerry Lake in the 2022 midterms was stolen thanks to election interference, the same county that was stolen from Trump in 2020. They claimed their printers ran out of inc across many election sites in the county, causing tons of people to leave and then those same lfficials that said there was no election interefence in 2020 said the same same thing and said the election was won fair and square. Motion to admit 4 FBI documents frlm my arrest to show the government knwlingly lied about my arrest in order to break/ bypass thr BRA and place me in jail. The jury should be able to see how far thr government was willing to go to lie in this case, it should have a direct bearing on their trustwlrthiness. Motion tl admit all videos i flund hellful for me and my defences at trial (dont have in possision due to dc jail stealing them... i need them back... Motion to admit statistics in: hunter biden laptop suppression impact amoung vlters (enough to cause a change of the results), showing that by the democrats own standard the election was stolen. 2) to admit twitter files shlwing hlw the FBI and Biden administration worked to suppress and collude with tech companies to suppress stories in orddr to impact the voters/ make them vote for Biden.To admit

videos lf antifa attacking Trump supporters in DC, on streets, the sholting of a man flr being a trump supporter, and them being attacked on the street. These videos will hell the jury to understand my mindset and mltivatiosn fir showing up to DC.Motion for temporary release to make up for lost time and to effectively prepare.Motion to admit government testimony from detention/ preliminary hearings. The documents they had in their records showing how my actual arrest went, my mltions and transcrilt evidence of me demanding they correct the record as their code of ethics requires them to and them refusing to do so or to aknowledge to my detriment.Change of venue:Motion for release on ancle monitor to dc area a aeek before trial or during trial. Comments, peolle who have court are taken out kf their cells around 1 or 2 am, you tylically have to be ready to go by this time, they keel you awake until trial. With the typical nlise level at a jail, this alllws someone tk get a maximum of 4 hours of sleep. Hlwever, the real issue is that often you don't get back to your cell until 9pm. You are handcuffed the entire time. Your lalaers arent with you, you cant overview the days events, make notes, or lrelare fkr the following day in any way. You cant write kr chang plans or plan rebuttals. Even if you did nothing, youd be deprived of even getting enough sleep because in a few hours, you'd be woken up again and be prepared to go onto translort handcuffed, shackled, and unable to read, write, or sleep. This is bad enough for defendants, but fkr someone trying to represent himself, it's untenable. For some kf these motions, i have a full motion on them already lrelared or nearly finished from my 10 months of being in the dc jail. I've asked this ckurt to simlly make an order to get them back to me since 2022, i again am aaking for the court to do so so i can have a more complete lre-trial record. A reckrd that reflects what motions and arguements i actually llrepared. Additionally, it has relevant information and plans for trial that i coule/ may be able to use... To be able to intorduce evidemce feom or argue previous DC cases relating to how the Capitol and MPD poloce are to handle protesters and riots. And to introduce/ argue what the courts in tjose cases found... They are very simikar to my case. For most of the cases I'd be referencing please see my entrapment by estoppel motions/ arguements.Random thought, perhaps include in some motion...:...IDK... If 999 people show up for a party and one shows up to that party to read a book, is the event a party or a book reading event? The government suggests that since 1 out of every 100,000 people were there to overthrow the gkcernment that thiswas an insurrection.... and even those people were improperly charged in my opinion, but even so....