**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-83 (TNM)** |
| **BRANDON FELLOWS,** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Brandon Fellows to 37 months of incarceration, a term of supervised release of three years, $2,000 in restitution, a fine of $2,965, and a mandatory special assessment of $190. The government's request of 37 months of imprisonment reflects a sentence at the high end of the Guideline range calculated by the government.

## I.   INTRODUCTION

The defendant, Brandon Fellows, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States

Fellows, a tree cutter and chimney repairman from upstate New York, cheered on the violent mob on the Upper West Terrace before entering the building through a broken window next to the Senate Wing Door. He entered Senator Jeff Merkley's office, sitting at the Senator's conference table and smoking marijuana. He then paraded through the Crypt. On his way out of the building, Fellows heckled police officers who did not have helmets. After he exited, he posed atop of a police motorcycle. The next day, he posted extensively on social media, glorifying the violence of his fellow rioters.

The government recommends that the Court sentence Fellows to 37 months of incarceration, which reflects the gravity of Fellows' conduct, his persistent lack of remorse, and the utter lack of respect he has demonstrated towards this Court and the rule of law.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021, Attack on the Capitol

The government refers the Court to the Affidavit in Support of Criminal Complaint and Arrest Warrant filed in this case, ECF 1-1 ¶ 5-11, for a short summary of the January 6, 2021, attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020, presidential election.

---

Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

**B.**      **Fellows' Role in the January 6, 2021, Attack on the Capitol**

*Approach to the Capitol*

In the early morning hours of January 6, Fellows arrived at the Ellipse to join the queue for the "Stop the Steal" rally that day. He arrived early enough that he was close to the stage during former President Trump's address around noon. Following President Trump's speech, Fellows marched with the crowd to the Capitol building.

*Arrival on Capitol Grounds*

Fellows approached the Capitol from the west side. Once on Capitol grounds, he climbed on the balustrade of the Northwest Stairs at 2:26 p.m. to reach the Upper West Terrace. Fellows was aware of the violent methods that rioters were employing to gain access to the Capitol, and that the police were using chemical spray to prevent the rioters from entering. As he surveyed the thousands of rioters on the West Plaza and the West Lawn, he said, "Oh bro, we're gonna get gassed soon. I heard windows just break." Trial Exhibit 522.

Fellows moved toward Northwest Courtyard, near the Parliamentarian Door and Senate Wing Door, arriving at a time when police had temporarily secured the Senate Wing Door. Rioters were exiting through a broken window adjacent to the Senate Wing Door, but were not entering the building. The mob of rioters continued to gather outside of both the Senate Wing Door and the Parliamentarian Door. Fellows remained with the mob for several minutes, recording from outside the Parliamentarian Door, narrating the chaos for his audience: "We're at the main fucking gates. They're banging it like a fucking battering ram. It's fucking crazy." Trial Exhibit 501. Fellows recorded another rioter ramming the Parliamentarian Door with a cane, trying to force it open.

3

Trial Exhibit 602. Fellows overlaid the video with the message, "We are coming for you traitors." *Id.* When the rioters broke the door open, Fellows celebrated, yelling, "Oh shit! Oh shit! Holy shit, bro!" *Id.*

As Fellows admitted at trial, as he watched the rioter trying to break into the Capitol with a cane, Trial Tr. 8/28/23 at 149, he expected the police to use chemical spray on the rioters:

> Q. You made a passing reference to teargas, "Surprised the gas hasn't come out yet." What were you talking about?
> A. Well, I was surprised, you know. There were people banging on the United States Capitol. I figured they would have responded with teargas in response to that.

Trial Tr. 8/29/23 at 78.

Fellows also admitted that during this time, he was aware police were not allowing rioters into the Capitol: "So you see a police officer in that video come out, and he starts swinging at that guy. Me, I like my face. I don't want to get hit in the face with a baton or pepper-sprayed. So I was making a mental note: They don't want us in there. I'm not going there regardless of whether I believe it." Trial Tr. 8/28/23 at 152.

From the Parliamentarian Door, Fellows became aware that rioters had once again breached the Senate Wing Door and were moving into the Capitol: "This is exciting. We've breached another area." Trial Exhibit 527. Fellows then moved towards one of the broken windows next to the Senate Wing Door.

### *Inside the Capitol Building*

Fellows entered the Capitol through the broken window at 2:52 p.m., as seen in Image 1.



*Image 1 (Screenshot from Trial Exhibit 402.1 at 00:08): Fellows entering the Capitol building at 2:52 p.m.*

After he entered, he paraded through the Senate Wing Door entryway holding a "Trump 2020" flag. He stood on top of broken furniture and waved the flag, as captured in Image 2.



*Image 2 (Screenshot from Trial Exhibit 1101.1 at 00:49): Fellows waving a flag while standing on top of broken furniture in the Senate Wing Door entryway.*

5

From the entryway, Fellows briefly entered a congressional conference room, and then walked across the hall to the private office of Senator Jeff Merkley of Oregon. While inside, Fellows sat in a chair, put his feet up on a conference table, and smoked marijuana, as shown in Image 3. While inside the office, another rioter who was live streaming asked Fellows, "What is your message?" Fellows' response demonstrated both his awareness that the rioters were not allowed into the Capitol, and his general contempt for the rule of law: "Man oh man, we got pissed. We ripped it out of the hands of these police officers," followed by an eruption of laughter. Trial Exhibit 1101.2 at 00:35 to 01:02. Fellows stayed inside Senator Merkley's office for approximately fifteen minutes.



*Image 3 (Screenshot from Trial Exhibit 1102 at 00:11): Fellows smoking marijuana in Senator Merkley's office.*

After leaving Senator Merkley's office, Fellows joined the rioters in the Crypt, where he took a turn around the room, and then exited the same way he came. On his way out of the Senate

Wing Door, he heckled two U.S. Capitol Police Officers, making fun of them for not having helmets. He asked, "Where's your helmet, bro?" and when one of the officers responded that he had not been issued one, Fellows retorted, "Why not? They don't care about you? Are you guys rookies? Is that why?" As the officers testified, they understood Fellows was taunting them, not being friendly or engaging in banter, and they remained conversational with him solely as a de-escalation technique. *See* Trial Tr. 8/24/23 at 81-82 and Trial Tr. 8/28/23 at 17-19.

In total, Fellows was inside the building for approximately 36 minutes.

### *Outside the Capitol Building*

After exiting the building, Fellows almost immediately gave an interview to CNN, which was reporting from the Upper West Terrace. He was excited and animated during the interview, describing the actions of other rioters as "breaking in." Sentencing Exhibit 1, at 01:42. Referring to his own marijuana use in Senator Merkely's officer, he said, "There's just a whole bunch of people lighting up in some Oregon room." *Id*. at 02:27. He then climbed atop of a U.S. Capitol Police motorcycle that was parked on the Upper West Terrace, as seen in Image 4.



*Image 4 (Trial Exhibit 505): Fellows on a U.S. Capitol Police motorcycle on the Upper West Terrace.*

### *Post-January 6 Social Media*

Beginning in the early morning hours of January 7, Fellows social media posts made clear that he had no remorse for his or other's actions at the Capitol. To the contrary, he considered himself in league with all of the other rioters, and embraced their conduct. He relished the fear that the riot had caused, and labeled those who did not support his cause as traitors. He glorified the violence, that had already occurred and happily anticipated future violence.

January 7 at 5:31 a.m.: "Brought my heart joy to see these members terrified for their lives. For what they have done and are doing to this country I hope they live in constant fear." Trial Exhibit 803.

January 7 at 6:46 a.m.: "When the constitution and our election process is thrown out the window is say violence is an option for most. From a Christian perspective maybe not, but the American way is to bring the violence." Trial Exhibit 805.

January 7 at 10:11 a.m.: "Not at all, just a patriot who scared the hell out of the politicians for their treasonous efforts. Hopefully more to come. If you call that an asshole that's fine by me." Trial Exhibit 806.

January 7 at 10:44 a.m.: "We did what Americans have always done. We resisted tyranny and made the government scared of us, the way it should be." Trial Exhibit 809.

January 7 at 9:13 p.m.: "Our attacks were targeted not against the community and businesses like BLM but against the traitors to this nation. What we did here was history, it was American, patriotic, and far from terroism (sic). If it was any form of terroism (sic) it was terrorism committed against the terroists (sic) to our election process and our constitution." Trial Exhibit 702.[2]

January 8 at 1:20 a.m.: "This was our modern day Boston tea party so long as the fight continues. This isn't the end. Many people I met here said civil war is coming." Trial Exhibit 703.

### *Pre-Arrest Obstructive Conduct*

On January 16, 2021, the FBI obtained an arrest warrant for Fellows. The same day, Agent Jason Manchuck from the FBI called Fellows and asked him to turn himself in at the FBI office in Albany. Fellows agreed to turn himself in later that day. When hours passed and Fellows had still not done so, the FBI obtained a pen register/trap and trace warrant to track Fellows' cellphone signal location. The data showed that the cellphone transmitted its normal location information for few hours after Fellows' conversation with Agent Manchuck, but then stopped transmitting a signal. Agent Manchuck went to the location of the last signal, which was a hotel, where he found Fellows and Fellows' cellphone, which he had wrapped in tinfoil to prevent the phone from transmitting its location. Trial Tr. 8/23/23 at 226. At trial, Fellows claimed that he was at the hotel

---

[2] Trial Exhibit 702 contains an error in the conversion from UTC to EST. The correct conversion is 9:13 p.m., not 11:13 p.m.

for the purpose of giving an interview to the media. Trial Tr. 8/28/23 at 225.

### Post-Arrest Interview

Following his arrest on January 16, 2021, Fellows agreed to be interviewed by the FBI. Immediately preceding the interview, during his arrest processing, Fellows, while chuckling, asked the FBI agent for a Sharpie, so that he could write "liberty" on his forehead for his mugshot. Sentencing Exhibit 2 at 15:35-15:50. During the interview, he falsely claimed, as he did at trial, that a police officer inside the Capitol gave him directions and told him he would not be arrested as long as he followed "the rules" and did not hurt any officers. *Id*. at 54:38 to 55:47.

### Post-Arrest Obstructive Conduct

Following his initial appearance on this matter, Fellows was released pending trial. When the FBI attempted to access Fellows' cellphone pursuant to a search warrant, they learned that Fellows had locked his phone, rendering the only data available to the FBI a message stating, in substance, "Our Founding Fathers would be disappointed in you." Trial Tr. 8/24/23 at 11. Fellows later claimed that he had given his iCloud information to a friend and instructed his friend to erase the data on his phone. Trial Tr. 8/23/23 at 235. The FBI found no evidence of Fellows' communication with the friend he referenced, but whether directly or indirectly, it is clear that Fellows caused the deletion of material evidence from his phone.

### Fellows' Trial Perjury

Fellows' trial testimony was filled with knowingly false statements, designed to disseminate misinformation about the Capitol attack.

Regarding the riot itself, Fellows made the absurd claim that he "felt that this was a friendly

experience." Trial Tr. 8/28/23 at 194. Despite the violence he had seen the rioters use against the police, Fellows claimed that "[i]t seemed more to be like an exciting museum tour with our supportive friends, the police." *Id*. at 185.

Fellows claimed that after he entered the building with the mob and stood on broken furniture to wave his flag, a police officer told him that he would not "get in trouble" for going further into the building, as long as he did not break or steal anything, or go into areas guarded by the police. *Id*. at 163-164. Video footage captured Fellows' entry into the building, as well as his standing on top of the furniture, and the footage shows that no officer approached him or talked to him at this time.

 Fellows repeatedly made the false claim that the police gave him and the other rioters permission to enter the building. For example, he testified, "And so, in my head, I'm thinking to myself: Okay. Police officers side with Trump. They probably do side with us. And I'm also, you know, keeping in mind: Okay. The people's house. We have a right to overthrow the government. That's the way America was founded. Maybe they're joining with us." *Id*. at 155. Fellows' assertions as to why he believed he had permission to be on Capitol grounds and inside the building were also absurd. He claimed the reason he thought he was allowed on U.S. Capitol grounds and inside the building was due to his familiarity with the New York State Capitol, where "not only can you go up and touch it, but two weeks -- two or three weeks prior to January 6th, I had sex in a vehicle about 20 feet away from it . . ." *Id*. at 134.

This testimony cannot be reconciled with the evidence, described in detail above, of what Fallows saw and did on January 6, including his contemporaneous statements in which he

acknowledged that he and the other rioters were "breaking in" and that the police were not allowing rioters into the building.

### *Fellows' Trial Conduct*

As this Court is aware, Fellows has repeatedly derided and defied the Court. During a virtual pre-trial proceeding, Fellows wrote "kangaroo court" on a piece of paper and held it up to the screen. At trial, Fellows' behavior escalated. For example, he refused to follow the Court's directions in the presence of the jury. He called the Court a "kangaroo court" again, as well as a "modern-day Nazi court," Trial Tr. 8/29/23 at 102-03, conduct for which the Court held Fellows in contempt. Even after being held in contempt, Fellows continued to make his disdain for the criminal justice system abundantly clear. While the jury rendered its verdict, he interrupted the foreperson and yelled over her, "This is how you radicalize people!" Trial Tr. 8/31/23 at 4. When the Court thanked the jurors for their service, Fellows laughed, "Ha!" *Id.* at 6.

### III.     THE CHARGES AND THE VERDICT

On March 9, 2022, a federal grand jury returned a superseding indictment charging Fellows with five counts: Count One: Obstruction of an Official Proceeding and Aiding and Abetting, 18 U.S.C. §§ 1512(c)(2) and 2; Count Two: Entering and Remaining in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(1); Count Three: Disorderly and Disruptive Conduct in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(2); Count Four: Entering and Remaining in Certain Rooms in the Capitol Building, 40 U.S.C. § 5104(e)(2)(C); and Count Five: Disorderly Conduct in a Capitol Building, 40 U.S.C. § 5104(e)(2)(D).

On August 31, 2023, Fellows was convicted of all counts following a jury trial.

## IV.    STATUTORY PENALTIES

Fellows now faces sentencing on all five counts. As noted by the Draft Presentence Report issued by the U.S. Probation Office, Fellows faces up to 20 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100 on Count One; one year of imprisonment, a term of supervised release of not more than one year, a fine up to $100,000, and a mandatory special assessment of $25 on Counts Two and Three; and six months of imprisonment, a fine up to $5,000, and a mandatory special assessment of $20 on Counts Four and Five.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

### A.  Combined Offense Level

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The offense level calculation here is driven by Count One, obstruction of an official proceeding.

The government acknowledges that this Court has concluded in other January 6 cases that the three-level enhancement under § 2J1.2(b)(2) does not apply to the 18 U.S.C. § 1512(c)(2) convictions in those cases. *See United States v. Seefried*, 639 F. Supp. 3d 8, 20 (D.D.C. 2022). But this Court also noted that it "may still consider the concerns underlying the Government's requests for these enhancements under the § 3553(a) factors at sentencing." *Id*. The government sought this enhancement in its communications with Probation and preserves its objections regarding its applicability.

13

If the Court declines to impose the enhancement under § 2J1.2(b)(2) for Count One, the government requests that this Court vary upward to the range that would have applied had this Court applied the enhancement in order to give effect to "the concerns underlying the Government's requests for these enhancements under the § 3553(a) factors at sentencing." *Seefried*, 639 F. Supp. at 20. Such a variance would be warranted under 18 U.S.C. § 3553(a)(1) regarding the "nature and circumstances of the offense," and more specifically, § 3553(a)(2)((A), "the need for the sentence imposed to reflect "the serious of the offense, to promote respect for the law, and to provide just punishment for the offense." As this Court has found, rioters like Fellows "were responsible for substantially interfering with the certification, causing a multiple-hour delay, numerous law enforcement injuries and the expenditure of extensive resources." *United States v. Hunter Seefried*, 21-cr-287 (TNM), 10/24/22 Sentencing Hearing Tr. at 54.

14

The government's Guidelines analysis is as follows:

**Count One: Obstruction of an Official Proceeding and Aiding and Abetting, 18 U.S.C. §§ 1512(c)(2) and 2**

| Base offense level: | 14 | U.S.S.G. §2J1.2(a) |
|---|---|---|
| Specific Offense Characteristic | +3 | U.S.S.G. §2J1.2(b)<br><br>The official proceeding of Congress's Joint Session, which was required by the Constitution and federal statute, had to be halted while legislators were physically evacuated for their own safety. |
| Adjustment | +2 | U.S.S.G. §3C1.1: "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense."<br><br>The evidence at trial established that Fellows, after receiving a telephone call from the FBI informing him that there was a warrant for his arrest and requesting that he turn himself in, Fellows wrapped his phone in foil. As a result, his phone did not transmit signals to cell sites, which temporarily thwarted the FBI's attempt to arrest him.<br><br>Once Fellows was arrested, the FBI seized Fellows' phone pursuant to a search warrant. Fellows was released following his initial appearance. When the FBI attempted to access the phone, they were unable to, because the phone was locked. The only thing they were able to access was a message that said, in substance, "Our Founding Fathers would be disappointed in you." A few weeks later, Fellows called an FBI agent assigned to the case and stated, in substance, that he had given his iCloud information to a friend to wipe his phone. |
| Total | 19 | |

**Count Two: Entering and Remaining in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(1)**

| Base Offense Level: | 4 | U.S.S.G. §2B2.3(a) |
|---|---|---|
| Special offense characteristic | +2 | U.S.S.G. §2B2.3(b)(1)(A)(vii): the trespass occurred "at any restricted building or grounds."<br><br>On January 6, 2021, the U.S. Capitol was restricted because protectees of the United States Secret Service were visiting. *See* 18 U.S.C. § 1752(c)(1)(B). |
| Cross Reference | | U.S.S.G. §2B2.3(c)(1): "If the offense was committed with the intent to commit a felony offense, apply §2X1.1 in respect to that felony offense, if the resulting offense level is greater than that determined above." |
| Base Offense Level (adjusted) | 19 (from Count One) | U.S.S.G.  §2X1.1(a): "The base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty."<br><br>Fellows entered the restricted area of the Capitol complex for the purpose of obstructing the official proceeding—that is, stopping Congress from doing its work. The substantive offense is thus Count One, and the base offense level for that offense should be applied. |
| Total | 19 | |

**Count Three: Disorderly and Disruptive Conduct in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(2)**

| Base Offense Level: | 10 | U.S.S.G. §2A2.4(a) |
|---|---|---|
| Adjustment | +2 | U.S.S.G. §3C1.1: "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense."<br><br>See discussion above. |
| Total | 12 | |

16

Under U.S.S.G. §3D1.2(a) and (c), "closely related counts" group. Counts One, Two, and Three comprise a single group under U.S.S.G. §3D1.2(a) and (b) because the victim of each count is Congress.[3] Under U.S.S.G. §3D1.3(a), the offense level for a group of closely related counts is determined by using the highest offense level of the counts in each group. The highest offense level is 19 (for Count One); therefore, the combined offense level for the group is 19.

### B. Criminal History

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed.[4] ECF 150, Draft ECF 150, Draft PSR ¶ 59. Accordingly, Fellows' Guidelines imprisonment range is 30 to 37 months' imprisonment.

### VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.  Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Fellows' felonious conduct on January 6, 2021, was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Fellows celebrated the violent actions of other rioters as they broke into the Capitol, and then entered through a broken window and smoked marijuana in a Senator's office. After January 6, he failed to report to the FBI as he had promised, masked his

---

[3] The Guidelines do not apply to Counts Four and Five.

[4] Because Fellows has one criminal history point, *see* ECF 150, Draft PSR ¶ 58, the new § 4C1.1 does not apply to him, as it is an adjustment for zero-point offenders.

phone to evade capture, lauded the violence on social media, and obstructed the investigation into his conduct by wiping the content on his cellphone. The nature and circumstances of Fellows' offenses were of the utmost seriousness, and fully support the government's recommended sentence of 27 months of incarceration.

### B.  The History and Characteristics of the Defendant

Fellows' participation in the riot was not an aberration, but consistent with his history of contempt for the law. Although Fellows has no criminal convictions, he has had multiple prior contacts with the New York State criminal justice system, one of which has resulted in a violation. His conduct has ranged from rude and inappropriate comments to harassment and intimidation. He has targeted both people with whom he has personal relationships and court actors with the goal of manipulating people who he claims treated him unfairly. He has violated court orders and attempted to manipulate the criminal justice system through fraud.

On July 14, 2019, Fellows was arrested in Glenville, NY, following an incident involving his girlfriend at the time (the complainant). ECF 150, Draft PSR ¶ 58. Following a verbal dispute in a Walmart parking lot, Fellows and the complainant got into her car. *Id*. Fellows was in the passenger seat. *Id*. While inside the car, Fellows began striking the dashboard, and the complainant recorded his conduct on her phone. *Id*. Fellows grabbed her phone, striking it against the dashboard until it broke. *Id*. When the complainant demanded the phone back so she could call the police, Fellows stated that the police would not help her. *Id*. The complainant then told him that she was driving to the police department, at which point Fellows jumped out of the car and ran away. *Id*. The complainant used the phone of a passerby to call the police. *Id*. Fellows was charged with two

counts of criminal mischief (one for damaging the phone and one for disabling equipment to prevent a request for emergency assistance), and harassment. The judge issued an order of protection was issued for the complainant. On July 30, 2019, Fellows pled guilty to harassment, which is a violation, not a crime. He was sentenced to a conditional discharge and a fine, and the order of protection remained in place. *Id*.

On August 4, 2019, Fellows was arrested for violating the above-described order of protection. The complainant called the police after Fellows followed her around in a parking lot. ECF 150, Draft PSR ¶ 66. Following this arrest, Fellows provided the New York judge's wife's phone number as his own contact information to the clerk of the court. ECF 29 at 3. Fellows testified at a bond hearing in this matter on October 12, 2021, that he was "intimidated" by the judge in New York had provided the judge's wife's number as his own contact information to take advantage of what he referred to as a "loophole" that would allow him to have a different judge assigned to his case. Bond Hearing Tr. 10/12/21 at 49-50.

While on pre-trial release in this matter, Fellows was arrested in New York for petit larceny on April 29, 2021, from an incident that spanned from December 28, 2020, through March 4, 2021. The complainant hired Fellows to complete a chimney repair, after they agreed to a price and timeframe. ECF 150, Draft PSR ¶ 62. On December 28, 2020, Fellows performed an inspection and outlined the necessary work to be performed, and the complainant paid him a $700 deposit. *Id*. However, in the following weeks, Fellows did not arrive to perform the repair as scheduled, ignored the complainant's phone calls regarding the job, and blocked her number. *Id*. On January 31, 2021, the complainant filed a police report. *Id*. Fellows told the police that he had ordered the

materials for the job and therefore did not intend to repay the complainant. ECF 150, Draft PSR ¶ 63. The case remains pending.

In the instant case, Fellows attempted to intimidate the officer assigned to supervise him while on pre-trial release. On June 14, 2021, Fellows was scheduled for a court-mandated mental health evaluation, but he canceled the same day, stating he was not feeling well. ECF 29 at 3. Fellows then requested permission to go to work, which the officer denied, since Fellows had just stated he was ill. *Id*. Fellows, displeased by that response, inappropriately asked the officer, "Have you checked your hormones?" *Id*. Shortly after the call with Fellows, a man called the officer's mother, asking for the officer. *Id*. The mother offered to pass a message to the officer, and the caller said he would just contact the USPO on her "other numbers." *Id*. Caller ID identified the caller's number as the number used by Fellows to contact the Pretrial Services Agency for official business. *Id*.

Fellows has demonstrated repeated contempt for this Court specifically. Fellows admitted at his bond hearing that he contemplated directly contacting this Court's family members in order to get a different judge assigned to this case. Bond Hearing Tr. 10/12/21 at 49. At trial, he was blatantly disrespectful to this Court and the jury, as detailed in the section entitled "Fellows' Trial Conduct" above.

Lastly, Fellows, despite having worked regularly and earned income, has not filed an income tax return since 2017, ECF 150, Draft PSR ¶ 111, further demonstrating his contempt for and defiance of the law.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Fellows' criminal conduct on January 6 was the epitome of disrespect for the law. This was not, as Fellows insisted during trial, simply a protest. Judge Berman-Jackson stated, "We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power." *United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20.

### D.  The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[5] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to Fellows also weighs heavily in favor of a lengthy term of incarceration. Given Fellows' history of contempt for the law and the judicial system, and his utter lack of remorse, which has been on full display from his participation

---

[5]  *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

in the riot, his social media posts in the days that followed, his efforts to evade arrest and destroy evidence, and his outrageous behavior at trial. He has used every chance he has gotten – in media interviews, his social media, and through his trial testimony – to insist that his actions were perfectly lawful and justified, despite knowing it was not. These statements demonstrate Fellows' lack of remorse and the significant risk that he would engage in similar conduct in the future.

For example, as described above in Section II(B), on January 7, 2021, Fellows took to Facebook to defend and glorify the violence perpetuated by the rioters.

On January 12, 2021, Fellows was quoted by *Bloomberg News* saying that he did not believe he would "get in trouble" for going inside the Capitol. Sentencing Exhibit 3 at 4. He romanticized the riot in the Capitol when he said "it felt like family" with the other rioters and again defended his conduct, saying, "We were there for one common cause, which is making a statement that the government is crushing down on us." *Id*. at 2.

On January 19, 2021, Fellows gave an interview to WNYT, a local television station, wearing the same yarn beard and helmet that he wore on January 6 at the Capitol, making light of the seriousness of the situation. He said, "I don't regret most of, pretty much most of what I did in there." Sentencing Exhibit 4 at 00:42-00:44. He again repeated the lie that the police allowed him inside the building, saying, "A lot of us did have – waited till we had permission from the police to go in." *Id.* at 00:57-1:00.

Lastly, Fellows' lack of remorse has also manifested itself by his contempt for our justice system. Fellows' sworn testimony at trial, as described above in Section II(B), demonstrates that has no regrets for his conduct and feels no remorse. Moreover, as described in Section VI(B)

above, Fellows has no respect for this Court's authority or the U.S. Probation Office. Although Fellows has already received punishment for his conduct at trial, his complete lack of respect for the criminal justice system remains relevant to his sentence, because it not only demonstrates his lack of remorse, but also speaks to who he is as a person, and the need for the sentence in this case to promote respect for the law.

Fellows has repeatedly made it clear that he believes that his actions were justified and has gone to great lengths to spread that message for more than two and half years, through the media, social media, and his testimony at trial. Accordingly, a significant period of incarceration is necessary to deter him from similar action in the future.

### E.   The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

23

### F. Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing

philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[6]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[7]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating

---

[6] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[7] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

The government focuses on two cases where this Court has sentenced defendants post-trial to 18 U.S.C. § 1512(c)(2) and four misdemeanor offenses: *United States v. Hale-Cusanelli*, 21-cr-37 (TNM) and *United States v. Hatchet Speed*, 22-cr-244 (TNM). This Court sentenced both Hale-Cusanelli and Speed to 48 months of incarceration, departing upwards from its Guidelines calculation.

Hale-Cusanelli's and Speed's cases involve aggravating factors not present with Fellows: both were motivated by antisemitic ideologies, Speed had a criminal history category of II, and Hale-Cusanelli was captured on camera yelling at the Capitol Police and pulling a rioter away from an officer attempting an arrest. They both also espoused significantly more violent rhetoric than Fellows did in his social media posts, and Speed stockpiled firearms after January 6.

At the same time, there are aggravating factors in this case which did not exist in *Hale-Cusanelli*. Like Hale-Cusanelli, Fellows testified falsely at trial, but Fellows went beyond this, exhibiting his complete disrespect for the criminal justice system when he engaged in contemptuous conduct during trial and later mocked the jury's verdict. And although Fellows has a criminal history category of I, he has nevertheless had multiple contacts with the New York State criminal justice system that demonstrate his willingness to put his interests above those of others and defy the orders of the court. Fellows relentlessly sought out media attention to justify his conduct at the Capitol, and unlike Hale-Cusanelli, who expressed remorse at his sentencing hearing, Fellows remains insistent that he did nothing wrong.

As a result, the government's recommendation of a sentence lower than the 48 months to which the Court sentenced Hale-Cusanelli and Speed, would not create any sentencing disparity.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C.  § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because Fellows was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall"

impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[8]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and [his or her] criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in

---

[8] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

More specifically, the Court should require Fellows to pay $2,000 in restitution for his convictions on Counts One, Two, and Three. This amount fairly reflects Fellows' role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   FINE

Fellows' conviction under Section 1512 subjects him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b)(3). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). In assessing a defendant's income and earning

capacity, a sentencing court properly considers whether a defendant can or has sought to "capitalize" on a crime that "intrigue[s]" the "American public." *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994).

      A fine is appropriate in this case. As the Draft PSR notes, as of October 25, 2023, Fellows had $2,965 in a GiveSendGo account.[9] ECF 150, Draft PSR ¶ 112. Although the website does not explicitly specify the use for the funds, it details Fellows' arrest and the fact that he is incarcerated. *See* https://www.givesendgo.com/GAJXA. The implication of the website is that the funds will be used for Fellows' legal representation. Given that Fellows proceeded *pro se*, he does not have legal fees, and should not be able to capitalize on his participation in the Capitol breach in this way. He should be fined in the amount of $2,965.

---

[9] According to the account website, as of November 21, 2023, the account contains $2,895. https://www.givesendgo.com/GAJXA.

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 37 months of incarceration, a term of supervised release of three years, $2,000 in restitution, a fine of $2,965, and a mandatory special assessment of $100 on Count One; one year of imprisonment (concurrently with Count One), a term of supervised release of one year (concurrently with Count One), and a mandatory special assessment of $25 on Counts Two and Three; and six months of imprisonment (concurrently with Count One) and a mandatory special assessment of $20 on Counts Four and Five.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:      */s/ Carolina Nevin*
CAROLINA NEVIN
Assistant United States Attorney
New York Bar No. 5226121
601 D Street, NW
Washington, DC 20530
carolina.nevin@usdoj.gov
(202) 803-1612

*/s/ David J. Perri*
DAVID J. PERRI
WV Bar Number: 9219
Assistant United States Attorney Detailee
United States Attorney's Office
Northern District of West Virginia
1125 Chapline St., Suite 3000
Wheeling, WV 26003
David.Perri@usdoj.gov
(304) 234-0100

31